UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

MICHAEL B. KINGSLEY,

        Plaintiff,

vs.

LISA JOSVAI, PATRICIA FISH, ROBERT CONROY, STAN HENDRICKSON, FRITZ DEGNER AND KARL BLANTON,

        Defendants.

Civil Action No. 10-CV-832

**PROPOSED FINDINGS OF FACT IN RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

    Defendants Lisa Josvai, Patricia Fish, Robert Conroy, Stan Hendrickson, Fritz Degner, and Karl Blanton (the "Defendants"), by their attorneys, Whyte Hirschboeck Dudek S.C., hereby submit their Proposed Findings of Fact in Response to Plaintiff's Motion for Partial Summary Judgment and in Support of their Cross-Motion for Partial Summary Judgment:

### PARTIES

    1.    Plaintiff, Michael B. Kingsley ("Kingsley"), was, at all times material to this action, a pre-trial detainee at the Monroe County Jail. (Kingsley Decl. ¶ 2; Josvai Decl. ¶ 3).

    2.    Lisa Josvai, a certified corrections officer in the State of Wisconsin, is the Chief Deputy of the Monroe County Sheriff's Department assigned to the Monroe County Jail, and has worked in the corrections field in the State of Wisconsin since February 1996. (Josvai Decl. ¶ 2).

    3.    Patricia Fish, a certified corrections officer in the State of Wisconsin, is a Sergeant of the Monroe County Sheriff's Department assigned to the Monroe County Jail, and

has worked in the corrections field in the State of Wisconsin since February 1997. (Fish Decl. ¶ 2).

4. Robert Conroy, a certified corrections officer in the State of Wisconsin, is the Jail Administrator of the Monroe County Sheriff's Department and has held this position since March 2005. Lt. Conroy has worked in the corrections field in the State of Wisconsin since November 1998. (Conroy Decl. ¶ 2).

5. Stan Hendrickson, a certified corrections officer in the State of Wisconsin, is a Sergeant of the Monroe County Sheriff's Department assigned to the Monroe County Jail, and has worked in the corrections field in the State of Wisconsin since October 2001. (Hendrickson Decl. ¶ 2).

6. Karl Blanton, a certified corrections officer in the State of Wisconsin, is a Deputy of the Monroe County Sheriff's Department assigned to the Monroe County Jail, and has worked for the Monroe County Sheriff's Department since February 2009. (Blanton Decl. ¶ 2).

7. Nicholas Manka, a certified corrections officer in the State of Wisconsin, is a Deputy of the Monroe County Sheriff's Department assigned to the Monroe County Jail, and has worked in the corrections field in the State of Wisconsin since August 2009. (Manka Decl. ¶ 2).

8. Fritz Degner, a certified law enforcement officer in the State of Wisconsin, is a Deputy of the Monroe County Sheriff's Department, and has worked for the Monroe County Sheriff's Department since 1992. (Degner Decl. ¶ 2).

## BACKGROUND

9. Kingsley was booked into the Monroe County Jail on April 21, 2010 after he was arrested under charges that he was in possession of cocaine with the intent to manufacture, distribute or deliver and had violated the terms of his probation. (Josvai Decl. ¶ 4, Ex. A).

10. After booking, Kingsley was initially placed into Receiving at the Monroe County Jail. On May 1, 2010, Kingsley was transferred to the South Block of the Monroe County Jail. (Josvai Decl. ¶ 5).

## KINGSLEY'S MISCONDUCT ON MAY 21, 2010

11. On May 20, 2010, Deputy Manka was working at the Monroe County Jail performing mandatory cell check. During his cell check, Manka discovered that the light fixture above Kingsley's bunk had been covered with a sheet of yellow legal paper. Manka told Kingsley that he needed to remove the paper covering the light. (Manka Decl. ¶ 3, Ex. A; Posnanski Decl. ¶ 2, Ex. A: Kingsley Depo. at 12:10-22).

12. Kingsley refused to remove the paper covering the light, and admits he refused to remove the paper because he "didn't put it there." Kingsley replied to Manka, telling him that he would need to "call in the CERT (Correctional Emergency Response Team) team." Manka continued with his cell check believing that Kingsley would simply remove the paper covering the light. (Manka Decl. ¶ 4; Posnanski Decl. ¶ 2, Ex. A: Kingsley Depo. at 12:23 – 13:2).

13. After the Monroe County Jail was locked down for the evening, Manka did another cell check at approximately 10:45 p.m. During this cell check, Manka observed that the paper had not been removed from the light fixture above Kingsley's bunk. Manka again asked Kingsley to remove the paper covering the light, to which Kingsley again replied "better call in the CERT team." (Manka Decl. ¶ 5; Posnanski Decl. ¶ 2, Ex. A: Kingsley Depo. at 13:4-22)

14. Manka warned Kingsley that failure to comply with jail rules would result in disciplinary action. On May 20, 2010, Deputy Manka issued Kingsley an Inmate Minor Violation Report and suggested a 23 hour lock-in of Kingsley's cell commencing at the time of the incident on May 20, 2010 and expiring on May 21, 2010 at 11:00 p.m. (Manka Decl. ¶ 6)

15. At approximately 11:00 p.m. on May 20, 2010, Deputy Manka informed Sgt. Hendrickson that he had issued Kingsley an Inmate Minor Violation Report for his refusal to follow orders, and explained what had happened. (Manka Decl. ¶ 7; Hendrickson Decl. ¶ 3, Ex. A)

16. Sgt. Hendrickson signed the Inmate Minor Violation Report and informed Deputy Blanton that Kingsley still needed to remove the paper from the light. Sgt. Hendrickson explained that Kingsley would be required to remove the paper at cell open the next morning. (Hendrickson Decl. ¶ 4).

17. The next morning, May 21, 2010, Deputy Blanton went to Kingsley's cell at approximately 5:25 a.m. Deputy Blanton directed Kingsley to remove the paper covering the light. Kingsley refused to comply with Deputy Blanton's order and did not respond to Deputy Blanton. (Blanton Decl. ¶ 3, Ex. A).

18. At approximately 5:48 a.m., Sgt. Hendrickson performed medication pass at the Monroe County Jail. During medication pass, Sgt. Hendrickson took Kingsley his medication. After offering Kingsley his medication, Sgt. Hendrickson asked Kingsley to remove the paper that was affixed to the light. (Hendrickson Decl. ¶ 5; Posnanski Decl. ¶ 2, Ex. A: Kingsley Depo. at 14:1 – 15:7).

19. At first, Kingsley refused to answer. After a few requests, Kingsley told Sgt. Hendrickson that he would not remove the paper because he did not put it there. (Hendrickson Decl. ¶ 6; Posnanski Decl. ¶ 2, Ex. A: Kingsley Depo. at 14:1 – 15:7).

20. Sgt. Hendrickson explained that while Kingsley may not have put the paper over the light, he still needed to take it down. Sgt. Hendrickson explained this to Kingsley several times, but Kingsley would not answer. (Hendrickson Decl. ¶ 7)

21. At approximately 6:13 a.m., Sgt. Hendrickson called Jail Administrator Lt. Conroy to inform him of the situation with Kingsley. (Hendrickson Decl. ¶ 8; Conroy Decl. ¶ 3, Ex. A).

22. Lt. Conroy arrived at the Monroe County Jail at approximately 6:30 a.m. (Conroy Decl. ¶ 4)

23. After arriving, Sgt. Hendrickson informed Lt. Conroy that there had been no change in Kingsley's behavior. Lt. Conroy explained that he would talk to Kingsley and ask him to comply. (Conroy Decl. ¶ 5; Hendrickson Decl. ¶ 9).

24. At approximately 6:33 a.m., Lt. Conroy walked to Kingsley's cell. Lt. Conroy asked Kingsley to remove the paper from the light fixture. Lt. Conroy explained that it was a fire hazard and needed to come down. Kingsley refused to take the paper down. (Conroy Decl. ¶ 6; Posnanski Decl. ¶ 2, Ex. A: Kingsley Depo. at 15:11-18; 16:21 17:6)

25. Lt. Conroy attempted to gain Kingsley's compliance through several requests. Kingsley continued in his steadfast refusal to remove the paper from the light fixture. (Conroy Decl. ¶ 7).

26. Lt. Conroy then explained that he would remove the paper from the light fixture, but Kingsley would have to cooperate. In order to remove the paper from the light fixture, Kingsley would have to be moved to receiving. (Conroy Decl. ¶ 8).

27. Lt. Conroy further explained that Kingsley would face disciplinary action due to his repeated failure to follow jail staff instructions. Kingsley claimed that he would not move as he maintained he had done nothing wrong. (Conroy Decl. ¶ 9).

28. Kingsley was removed from his cell so that the jail staff could remove the paper from the light fixture. Kingsley was kept in a receiving cell to return order to the jail and to discipline Kingsley for his refusal to comply with jail staff orders. (Conroy Decl. ¶ 10).

29. At 6:37 a.m., Lt. Conroy exited the cell block because Kingsley had made it clear he would not cooperate or obey jail staff instructions. (Conroy Decl. ¶ 11).

30. At approximately 6:38 a.m., Sgt. Hendrickson, Deputy Blanton, Deputy Fritz Degner, Lt. Conroy, and Sgt. Shisler approached Kingsley's cell to escort him to receiving so that the paper could be removed from the light fixture. (Conroy Decl. ¶ 12; Hendrickson Decl. ¶ 10; Blanton Decl. ¶ 4).

31. Sgt. Hendrickson ordered Kingsley to stand up and put his back to the cell door. Kingsley refused, asked why he was being removed from the cell, and stated that he had not done anything wrong. (Hendrickson Decl. ¶ 11; Blanton Decl. ¶ 5; Degner Decl. ¶ 3, Ex. A; Posnanski Decl. ¶ 2, Ex. A: Kingsley Depo. at 17:22-19:23).

32. Kingsley did not stand up as ordered. Instead, Kingsley continued to lay face down on his bunk and refused to follow jail staff direction and orders. (Hendrickson Dec. ¶ 12; Blanton Decl. ¶ 6; Degner Decl. ¶ 4).

33. Lt. Conroy then ordered Kingsley to place his arms behind his back. Kingsley complied while laying facedown on his bunk. (Conroy Decl. ¶ 13; Hendrickson Decl. ¶ 13; Blanton Decl. ¶ 6; Posnanski Decl. ¶ 2, Ex. A: Kingsley Depo. at 17:23 – 18:14).

34. Kingsley understood that he was being taken to receiving because he had refused to remove the paper from the light fixture. (Posnanski Decl. ¶ 2, Ex. A: Kingsley Depo. at 20:1-9).

35. Sgt. Hendrickson and Deputy Blanton then attempted to handcuff Kingsley. While attempting to handcuff Kingsley as he lay on his bunk, Kingsley began tensing and tightening his arms and holding them apart, making it difficult to handcuff him. (Hendrickson Decl. ¶ 14; Blanton Decl. ¶ 7; Conroy Decl. ¶ 14; Degner Decl. ¶ 5).

36. Kingsley admits that he tensed up and the officers had difficulty handcuffing him. (Posnanski Decl. ¶ 2, Ex. A: Kingsley Depo. at 22:6 – 5).

37. The officers eventually handcuffed Kingsley. Deputy Blanton and Sgt. Hendrickson then asked Kingsley to help them get him to his feet. Kingsley refused and continued to resist the officers' instructions by refusing to walk. Kingsley told the officers that they would have to carry him. (Degner Decl. ¶ 6; Hendrickson Decl. ¶ 15; Blanton Decl. ¶ 8; Conroy Decl. 15).

38. When Kingsley was helped to his feet, he fell to his knees claiming his foot hurt and that he could not walk. (Degner Decl. ¶ 7; Hendrickson Decl. ¶ 16; Blanton Decl. ¶ 9; Conroy Decl. ¶ 16; Posnanski Decl. ¶ 2, Ex. A: Kingsley Depo. at 26:7-14).

39. The officers asked what was wrong with Kingsley's foot, but he would not explain. Kingsley refused to put his feet under him to stand up, and curled his legs up. (Degner Decl. ¶ 8; Hendrickson Decl. ¶ 17; Blanton Decl. ¶ 10; Conroy Decl. ¶ 17).

40. Because he refused to walk and would not explain what was wrong with his foot, Deputy Blanton and Sgt. Hendrickson carried Kingsley out of his cell and out of the South Cell Block. (Hendrickson Decl. ¶ 18; Blanton Decl. ¶ 10; Conroy Decl. ¶ 18; Degner Decl. ¶ 9).

41. Once Kingsley was carried out of the South Cell Block, he was placed face down on the floor in the hallway. The officers again asked Kingsley what was wrong with his foot,

and again, Kingsley refused to answer. (Hendrickson Decl. ¶ 19; Blanton Decl. ¶ 11; Conroy Decl. ¶ 19; Degner Decl. ¶ 10).

42. Because there was more space in the hallway, more officers were able to help transport Kingsley. At approximately 6:44 a.m., Lt. Conroy, Deputy Blanton, Sgt. Hendrickson, and Sgt. Shisler carried Kingsley from the hallway into a Receiving Cell. Kingsley was placed face down on the Receiving cell bunk. (Hendrickson Decl. ¶ 20; Blanton Decl. ¶ 12; Conroy Decl. ¶ 20; Degner Decl. ¶ 11).

43. Sgt. Hendrickson and Deputy Blanton then attempted to remove the handcuffs. Kingsley became physically resistive, pulling the handcuffs apart making it difficult to remove them, struggling and trying to get up. Kingsley was repeatedly told to calm down and stop resisting. Kingsley was repeatedly told to relax, to calm down and stop resisting so that the handcuffs could be removed. Kingsley remained resistive, pulling against the handcuffs like he was trying to pull them apart. (Hendrickson Decl. ¶ 21; Blanton Decl. ¶ 13; Conroy Decl. ¶ 21; Degner Decl. ¶ 12).

44. Kingsley admits the officers had difficulty removing the handcuffs and further admits that he tensed up, lifted his head, and said "get the fuck off me." (Posnanski Decl. ¶ 2, Ex. A: Kingsley Depo. at 28:17 – 29:23).

45. Due to Kingsley's resistance, Sgt. Hendrickson instructed Deputy Degner to apply a contact stun with his Taser. Deputy Degner applied a contact stun for five seconds, which is a pain compliance technique. Deputy Degner applied the contact stun in a good faith attempt to gain Kingsley's compliance so that his handcuffs could be removed. This was the lowest level of force available to Deputy Degner using the Taser. After the Taser was applied, Kingsley continued to resist. This was the only force applied to Kingsley. At 6:46 a.m., Lt. Conroy

ordered everyone to clear the cell. (Hendrickson Decl. ¶ 22; Blanton Decl. ¶ 14; Conroy Decl. ¶ 22; Degner Decl. ¶ 13; Leis Decl. ¶ 4).

46. After observing Kingsley's behavior on camera, Lt. Conroy decided to resume efforts to remove Kingsley's handcuffs. At 6:59 a.m., Deputy Blanton, Deputy Tom Wildes, Deputy Bedenbaugh, and Lt. Conroy entered the Receiving Cell. Kingsley remained in the same position as when the officers had left. Lt. Conroy removed the handcuffs as the other jail officers assisted with stabilizing Kingsley. Kingsley again showed resistive tension when Lt. Conroy was removing the handcuffs. (Hendrickson Decl. ¶ 23; Blanton Decl. ¶ 15; Conroy Decl. ¶ 23).

47. Kingsley was placed on medical watch. At 7:05 a.m., Deputy Blanton called Jail Nurse Bethke to explain the situation and ask that she assess Kingsley. (Blanton Decl. ¶ 16; Conroy Decl. ¶ 24).

48. Nurse Bethke came to Kingsley's Receiving cell to assess his injuries, if any. Kingsley refused to see her and did not seek any medical attention for any injuries allegedly sustained during the removal of Kingsley from his cell. (Posnanski Decl. ¶ 2, Ex. A: Kingsley Depo. at 31:25 – 33:30).

## DUE PROCESS AFFORDED KINGSLEY

49. After the incidents on May 21, 2010, Sgt. Fish reviewed the incident reports prepared by Lt. Conroy, Sgt. Hendrickson, Deputy Manka, Deputy Degner, and Deputy Blanton. (Fish Decl. ¶ 3).

50. Sgt. Fish was responsible for reviewing the incident reports and imposing discipline, if appropriate, on Kingsley for the violations of Jail Rules because she was not involved in the underlying incidents. (Fish Decl. ¶ 4)

51. After reviewing the incident reports, Sgt. Fish determined that Kingsley had violated four separate Monroe County Jail Rules: (1) Failing to follow lawful orders; (2) Resisting jail officers; (3) disorderly conduct; and (4) causing jail disruption. (Fish Decl. ¶ 5, Ex. A; Posnanski Decl. ¶ 2, Ex. A: Kingsley Depo. at 38:1-24).

52. Sgt. Fish prepared an Inmate Major Violation Report and determined that Kingsley should receive 10 days in a receiving cell due to his violations of Monroe County Jail Rules. (Fish Decl. ¶ 5, Ex. A).

53. On May 22, 2010, Sgt. Fish went to Kingsley's cell in receiving, gave him the Inmate Major Violation Report, and informed him that she had imposed 10 days in receiving as sanctions for his violations of Monroe County Jail Rules. (Fish Decl. ¶ 6; Posnanski Decl. ¶ 2, Ex. A: Kingsley Depo. at 38:25 – 39:3).

54. Sgt. Fish also informed Kingsley that he had a right to a hearing regarding his violations of jail rules, and that she would be conducting a hearing on the disciplinary sanctions she had decided to impose on Kingsley. Sgt. Fish further explained that Kingsley could either participate in a disciplinary hearing or waive his right to a hearing. (Fish Decl. ¶ 7; Posnanski Decl. ¶ 2, Ex. A: Kingsley Depo. at 39:5-19; 43:3-18).

55. Kingsley replied, "What's the point of having a hearing when it seems to me, though, you have your mind made up without the hearing?" (Posnanski Decl. ¶ 2, Ex. A: Kingsley Depo. at 39:19-22).

56. Kingsley then claimed that he did not understand his hearing rights. (Fish Decl. ¶ 8; Posnanski Decl. ¶ 2, Ex. A: Kingsley Depo. at 40:10-23).

57. Kingsley handed the Inmate Major Violation Report back to Sgt. Fish and stated, "I didn't understand my hearing rights, as though it seems you had your mind made up, if I had a

hearing or if I didn't have a hearing, I would get the 10 days regardless." (Fish Decl. ¶ 9; Posnanski Decl. ¶ 2, Ex. A: Kingsley Depo. at 40:18-23).

58.     The Inmate Major Violation Report affords the Monroe County Jail detainee the opportunity to either request a hearing regarding the alleged jail rule violations or waive the right to a hearing. Kingsley did not sign the Inmate Major Violation Report and refused to indicate his choice as to whether or not to have a hearing. (Fish Decl. ¶ 10, Ex. A; Posnanski Decl. ¶ 2, Ex. A: Kingsley Depo. at 40:24-25).

59.     After Kingsley refused to sign the Inmate Major Violation Report, Sgt. Fish left his receiving cell. During this initial encounter, Kingsley did not state that he wanted a hearing. (Fish Decl. ¶ 11; Posnanski Decl. ¶ 2, Ex. A: Kingsley Depo. at 42:8-13).

60.     Later that morning, Kingsley saw Sgt. Fish walking in the hallway and asked if he could speak to her. At this time, and for the first time, Kingsley requested a disciplinary hearing. (Fish Decl. ¶ 12; Posnanski Decl. ¶ 2, Ex. A: Kingsley Depo. at 45:20 – 46:7).

61.     Sgt. Fish explained to Kingsley that he had waived his right to a disciplinary hearing when he had refused to cooperate when Sgt. Fish presented the Inmate Major Violation Report and explained that Kingsley could either choose to have a disciplinary hearing or waive his right to do so. (Fish Decl. ¶ 13; Posnanski Decl. ¶ 2, Ex. A: Kingsley Depo. at 45:20 – 46:7).

62.     Kingsley then indicated that he wished to appeal Sgt. Fish's decision. Sgt. Fish accepted Kingsley's request, and explained that Chief Deputy Josvai would handle the appeal. (Fish Decl. ¶ 14; Posnanski Decl. ¶ 2, Ex. A: Kingsley Depo. at 46:3-7).

63.     Chief Deputy Josvai handled the appeal at approximately 7:40 a.m. on May 23, 2010. (Josvai Decl. ¶ 6, Ex. B; Posnanski Decl. ¶ 2, Ex. A: Kingsley Depo. at 47:5-15).

64. The purpose of the Major Discipline Appeal was to determine if the sanctions imposed by Sgt. Fish were, or were not, appropriate. (Josvai Decl. ¶ 7; Posnanski Decl. ¶ 2, Ex. A: Kingsley Depo. at 47:16-18; 48:5-8).

65. Chief Deputy Josvai reviewed the incident reports, questioned Kingsley, and listened to his responses. Chief Deputy Josvai explained that she could increase the sanctions imposed on him if appropriate, but ultimately determined that the sanctions imposed were appropriate. (Josvai Decl. ¶ 8; Posnanski Decl. ¶ 2, Ex. A: Kingsley Depo. at 48:9-12).

66. Chief Deputy Josvai then exited the receiving area. (Josvai Decl. ¶ 9).

67. Despite Sgt. Fish and Chief Deputy Josvai's findings, Kingsley did not serve 10 days in receiving. In fact, Kingsley was returned to a regular cell the very next day, on May 24, 2010. (Conroy Decl. ¶ 25; Posnanski Decl. ¶ 2, Ex. A: Kingsley Depo. at 48:24 – 49:21).

68. On May 24, 2010, Lt. Conroy overturned the 10 day sanctions imposed by Sgt. Fish because it was unclear, upon further review, whether Kingsley had actually waived his right to a disciplinary hearing. Lt. Conroy gave Kingsley the benefit of the doubt and determined that Kingsley's refusal to sign the Inmate Major Violation Report indicating whether or not he wanted a hearing was insufficient to waive Kingsley's right to a disciplinary hearing. If an inmate refuses to sign the waiver of the disciplinary hearing, the hearing should be conducted. (Conroy Decl. ¶ 26).

69. Once Kingsley was returned to a regular cell on May 24, 2010 and the sanctions were overturned, he did not face or suffer any further penalties, sanctions or discipline related to his four major jail rule violations on May 21, 2010. (Conroy Decl. ¶ 27).

70. It is undisputed that Kingsley refused to remove the paper from the light fixture in his cell. Kingsley believes that he has no obligations to follow jail staff orders or instructions. In

fact, Kingsley believes his only obligation as a pre-trial detainee is to keep his cell clean. (Posnanski Decl. ¶ 2, Ex. A: Kingsley Depo. at 52:11 – 18).

DATED: August 15, 2011.

/s Timothy H. Posnanski
Andrew A. Jones
Timothy H. Posnanski
Attorneys for Defendants Lisa Josvai, Patricia Fish, Robert Conroy, Stan Hendrickson, Fritz Degner, and Karl Blanton
Whyte Hirschboeck Dudek S.C.
555 East Wells Street
Suite 1900
Milwaukee, WI 53202
Telephone:  414-273-2100
Fax:  414-223-5000
Email:  ajones@whdlaw.com
Email: tposnanski@whdlaw.com