Case: 3:10-cv-00832-jdp   Document #: 71   Filed: 02/09/12   Page 1 of 14

```
 1      IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF WISCONSIN
 2   = = = = = = = = = = = = = = = = = = = = = =
 3   MICHAEL B. KINGSLEY,
 4            Plaintiff,
 5       - vs -                Case No. 10 CV 115
 6   LISA JOSVAI, PATRICIA FISH,
 7   ROBERT CONROY, STAN HENDRICKSON,
     FRITZ DEGNER and KARL BLANTON,
 8
              Defendants.
 9   = = = = = = = = = = = = = = = = = = = = = =
10
11                          COPY
12
13
14              Deposition of:
15
16          MICHAEL B. KINGSLEY
17
               Sparta, Wisconsin
18              July 14, 2011
19
20
21
22
23
24
25   Reporter:  Christal A. Hansen, CSR-IA/IL, RPR
```

```
 1                    I N D E X
 2   WITNESS:                                 Page(s)
 3   MICHAEL B. KINGSLEY
 4       Examination by Mr. Posnanski            4
 5
 6
 7                  E X H I B I T S
 8   Exhibits                              Identified
 9   1 - Monroe County Jail Inmate Major
         Violation Report                        38
10
     2 - Monroe County Jail Inmate Major
11       Violation Report                        49
12   3 - Major Discipline Appeal                 47
13
14
15
16       (Attached to original transcript; copies
17              provided to counsel)
```

                                                                    3

```
 1        DEPOSITION OF MICHAEL B. KINGSLEY,
 2   called as a witness, taken at the instance of
 3   the Defendants, before Christal A. Hansen, a
 4   Registered Professional Reporter and Notary
 5   Public in and for the State of Wisconsin, at the
 6   Monroe County Jail, 210 West Oak Street, City of
 7   Sparta, County of Monroe, and State of
 8   Wisconsin, on the 14th day of July 2011,
 9   commencing at 9:35 a.m.
10
11            A P P E A R A N C E S
12
13   TIMOTHY H. POSNANSKI, ESQ.,
          Whyte, Hirschboeck, Dudek, S.C.,
14        Suite 1900, 555 East Wells Street,
          Milwaukee, Wisconsin 53202-3819,
15        (414) 273-2100, appeared on behalf of the
          Defendants.
```

Page 4

1    MICHAEL B. KINGSLEY
2  called as a witness, after having been first
3  duly sworn, was examined and testified as
4  follows:
5       (Exhibit Numbers 1 - 2 marked for
6       identification by the reporter)
7            EXAMINATION
8  BY MR. POSNANSKI:
9    Q.  Mr. Kingsley, my name is Tom Posnanski.
10 I represent the defendants in this matter.
11 Could you please state and spell your name for
12 the record.
13   A.  Michael Brandon Kingsley,
14 K-I-N-G-S-L-E-Y.
15   Q.  I'm going to go over just a few ground
16 rules for the deposition this morning. One is,
17 are you on any medication or anything else that
18 would affect your ability to recall things from
19 memory or testify truthfully here today?
20   A.  I am taking medication. I don't
21 believe it has any effect on that.
22   Q.  On your memory or ability to recall
23 events from your memory?
24   A.  Right.
25   Q.  I'm going to ask you a series of

Page 5

1  questions. If for any reason you don't
2  understand one of my questions, let me know.
3  I'll do my best to rephrase it. If you answer
4  my question, I'm going to assume you understood
5  it and answered accordingly; is that fair?
6    A.  Fair.
7    Q.  And then, lastly, try not to talk over
8  me. I'll try and wait until you complete your
9  answer before I start a new question, and then
10 if you could, give verbal responses to all of my
11 questions just because the record won't reflect
12 uh-huh, uh-uh or nods of the head. Is that
13 okay?
14   A.  Yes.
15   Q.  I want to talk a little bit about your
16 background and specifically your incarceration
17 history. How many times have you been in jail,
18 how many separate times have you been in jail?
19   A.  Objection. It doesn't have anything to
20 do with the civil matter or the truthfulness of
21 the matter, but numerous times I've been
22 incarcerated.
23   Q.  Where?
24   A.  Monroe County Jail.
25   Q.  Anywhere else?

Page 6

1    A.  Dane County Jail.
2    Q.  Anywhere else?
3    A.  Wisconsin State Prison System.
4    Q.  Anywhere else besides that? Is that
5  no?
6    A.  That's no. Sorry.
7    Q.  When were you in the Dane County Jail?
8    A.  The last time I was in the Dane County
9  Jail was approximately maybe 10 years ago.
10   Q.  And what about in the Wisconsin State
11 Prison System?
12   A.  Approximately -- I was released
13 January 25th of 2011.
14   Q.  When did you go in?
15   A.  August of 2010.
16   Q.  During your various stints in jail have
17 you been disciplined while in jail?
18   A.  As to?
19   Q.  As to rules infractions or what they
20 allege was your disobedience.
21   A.  Yes.
22   Q.  Do you know how many times
23 approximately?
24   A.  Objection motion due to it doesn't have
25 anything to pertain to this matter at hand. So,

Page 7

1  if you're just going to keep on asking me
2  questions about my background, I'm just going to
3  keep on objecting and saying motion because it's
4  going to be a motion I'm going to file with the
5  Federal District Court down in Madison to
6  exclude my past disciplinary hearings.
7    Q.  I understand that. With that objection
8  interposed, can you approximate how many times
9  you've been disciplined, how many times while
10 you were in jail?
11   A.  I can't give you a number. Maybe five
12 times.
13   Q.  Did the various facilities where you
14 were incarcerated have processes for how they
15 disciplined you?
16   A.  The only time I've been disciplined was
17 here at the Monroe County Jail, and it seems to
18 me that their disciplinary procedures are a
19 frame-up and that they -- it's new to them and
20 they don't know how to go about doing it. So,
21 it's pretty much they constantly are in
22 violation of peoples' constitutional rights when
23 it comes to due process.
24   Q.  Is it your testimony that you've only
25 been disciplined at the Monroe County Jail?

8

1  A. That's correct.
2  Q. So, you were never written up or given
3  a rules violation at the Dane County Jail or at
4  the Wisconsin Prison System?
5  A. Minor infractions. The deal in prison,
6  minor conduct report, like, for instance, too
7  much property or something, too many bars of
8  soap. So, they either destroy one or whatever
9  or write you a thing and where you might have to
10 go do some extra duty.
11 Q. So, nothing major?
12 A. Right. That's correct.
13 Q. When you were given minor rules
14 infractions, were you given an opportunity for a
15 hearing for minor infractions?
16 A. In the Wisconsin State Prison System,
17 yes.
18 Q. And do they give you a form or a
19 document when they give you a minor rules
20 infraction?
21 A. Yes. They gave me a form stating what
22 they -- what you're allowed to do, what you --
23 what the process is for due process, your
24 rights, your -- for calling witnesses or having
25 access to Incident Reports, that nature.

9

1  Q. And would that, even for a minor rules
2  violation, would that include a right to a
3  hearing?
4  A. Yes, it would.
5  Q. And how would you elect to exercise
6  your right to a hearing?
7  A. Well, it depends on the situation.
8  Like, the bars, extra hygiene items or something
9  like that, I knew I had extra bars of soap, so
10 they wrote me up for it and I went there and
11 said I had extra bars of soap, yes.
12 Q. So, in that instance is it fair to say
13 you wouldn't exercise your right for a hearing?
14 A. I would exercise a right for the
15 hearing, but I would go in there and admit that
16 I was wrong by having an extra bar of soap.
17 Q. How would you exercise that right?
18 A. I would exercise it by participating in
19 the hearing when they call me down and I would
20 participate in the hearing.
21 Q. I guess before participating in the
22 hearing how did you let them know that you
23 wanted a hearing?
24 A. Because they, the officer calls you up
25 to the station and they say that you can either

10

1  waive your hearing or have a hearing. "Would
2  you like to have a hearing?" "Yes, I would like
3  to have a hearing." And they check mark it and
4  then it goes to the other proceedings.
5  Q. And they check a form to do that?
6  A. Yes.
7  Q. Is that the same form that includes a
8  report of the minor rules infraction?
9  A. I believe so. I believe the, the, the
10 Incident Report is written within it, like the
11 officer's statement, and then at the bottom it
12 says, "Would you like to have a hearing or not?"
13 Q. We're here to discuss incidents that
14 are alleged in your complaint that took place in
15 late May of 2010; is that right?
16 A. That's correct.
17 Q. And there are two separate claims that
18 you advance in your complaint. One is due to
19 use of excessive force and one is for violation
20 of your due process rights; is that right?
21 A. That's correct.
22 Q. I want to talk about each of those
23 separately. Is that all right?
24 A. Yes.
25 Q. The excessive force occurred on

11

1  May 21st, 2010; is that right?
2  A. That's correct.
3  Q. And it all seems to arise from a paper
4  that was covering a light in your cell; is that
5  right?
6  A. That's correct.
7  Q. How did the paper get there?
8  A. I don't know. It was -- I was
9  approximately in that cell for a month and the
10 paper had been on that light the whole entire
11 time.
12 Q. So, you were placed in that cell at
13 some time in April 2010?
14 A. Yes.
15 Q. And when you were placed in that cell,
16 the paper was there the first day, the first
17 minute you arrived?
18 A. That's correct.
19 Q. What kind of paper was it?
20 A. Just regular writing paper.
21 Q. Like from a legal pad?
22 A. Yeah, or some sort or some type of
23 paper, maybe newspaper or something. It's a
24 common practice in the Monroe County Jail where
25 inmates do put paper over their light to deflect

**Page 12**

the brightness of the light.

Q. Even though it's a common practice in the jail, are inmates then told to remove the paper frequently from covering the light?

A. Not to my knowledge. I was in that cell for approximately a month and with -- they did tell me to remove it, but I said that I didn't put it there, so therefore I'm not taking it off, it's been there for over a month.

Q. Who was the first person who told you to remove it?

A. I believe Deputy Nicholas Manka.

Q. And when did he tell you to remove the paper from the light?

A. It was during lockdown when they're performing lockdown at the jail for the end of the night around 10:00, 10:30 or so p.m.

Q. And do you recall what day that was?

A. It would have been May 20th.

Q. So, the night before this incident; is that right?

A. That's correct.

Q. Did you tell Nick Manka anything when he asked you to remove the paper?

A. I told him that the paper has been

**Page 13**

there for a month and I'm not the one that put it there, I'm not taking it off.

Q. What did he say?

A. He said something, and I don't remember what he said, and then he walked away.

Q. Did he at any point return and ask you to remove it?

A. Yes, he did, yes, he did.

Q. What time did he return?

A. Sometime soon thereafter, maybe, maybe his next round or check.

Q. And he asked you to remove the paper again?

A. No. He stated that he was going to issue me a minor incident or discipline report and that I was going to be locked down in the cell for 23 hours for not taking it off.

Q. Did you respond to him at all when he told you that?

A. I don't recall.

Q. Did anyone else tell you to remove the paper?

A. The following, the following day, the 21st, yes.

Q. And who told you on the 21st?

**Page 14**

A. It was Sergeant Hendrickson. He was doing medication pass, I believe. He told me, he came and asked me if I wanted my medication; I told him no. And he stated that the paper on the light needs to come off, and I then stated that, again, I did not put it there, so therefore I'm not taking it off and he soon thereafter left.

Q. What time did that occur?

A. It was early in the morning, maybe 5:30 or so.

Q. Did Deputy Blanton ever tell you to remove it?

A. I don't recall.

Q. Is it possible that he did?

A. I don't know. Maybe.

Q. When Sergeant Hendrickson told you to remove the paper, did you remove it?

A. No, I did not. I went back to sleep. It was early in the morning.

Q. After coming back for the medication check, did Sergeant Hendrickson ask you to remove it at any point thereafter?

A. No. He asked me one time. That's during medication -- he offered me my medication

**Page 15**

and he stated that that paper needs to come off the light, and again I stated, "I'm not the one that put it there. It's been there for over a month."

Q. And therefore you weren't going to remove it?

A. Right.

Q. After sergeant Hendrickson told you to remove it, did anyone else tell you to remove it?

A. Sometime soon thereafter Lieutenant Conroy entered the housing block and he asked me that, to -- the paper needed to come down off the light. And then again I had told him, "I'm not the one that put the paper on the light. The paper has been there for a month. Therefore, I'm not taking it off. Maybe you should take it off."

Because the way the light is housed in the cell, I would have to get on the bed and try to jump or maneuver to try to grab the paper off the light simultaneously and that's, again, I feel that was going to cause maybe possibly a wrist injury or -- for whatever reasons. I believe that they have access to stuff, a ladder

Page 16

1  or a broom or something of that nature to take
2  it down their selves.
3     Q.  Are you aware of how other inmates get
4  the paper into the light?
5     A.  I've never personally observed an
6  inmate put paper on a light, but I'm guessing it
7  would have to be, if you're short like me,
8  you're going to have to jump off the bed and try
9  to put it on there.  Or if you're tall enough,
10 you can be on the bed and maybe reach over.
11    Q.  But you've never seen anyone do it?
12    A.  No, I have not.
13    Q.  When Lieutenant Conroy told you to
14 remove the paper from the light, did you do it?
15    A.  No, I did not.
16    Q.  Did Lieutenant Conroy tell you why he
17 wanted it removed?
18    A.  No, he did not.
19    Q.  He didn't mention it was a fire hazard?
20    A.  No, he did not.
21    Q.  So, Lieutenant Conroy told you to
22 remove the light, you told him again that you
23 didn't put the paper there and therefore you
24 weren't going to remove it?
25    A.  That's correct.

Page 17

1     Q.  And then you told him "You remove it,"
2  or how did that, what did you say to him?
3     A.  It was something along the lines, I
4  told him if they wanted the paper off the light,
5  that they should be the one to take it off
6  because I wasn't the one that put it there.
7     Q.  And did Lieutenant Conroy tell you that
8  if you didn't remove the paper from the light,
9  you would face disciplinary action?
10    A.  I think that was after I had stated
11 that I wasn't going to take it off, he said that
12 "You're going to be facing disciplinary action."
13    Q.  And what did you tell him in response,
14 if anything?
15    A.  I don't believe I said anything.  I
16 believe I said that he's making this -- he's
17 turning it -- I think I said something like an
18 analogy of, you're sweeping the floor trying to
19 build a house, you're trying to make it a bigger
20 issue than what it is, and he soon thereafter
21 left.
22    Q.  What happened after that?
23    A.  After that I was, it was early in the
24 morning, so I was, like, a sleep state and went
25 back to sleep.  And sometime later then they,

Page 18

1  about four or five jailers came to the cell, and
2  one had a taser pointed, had my head to the
3  bars, and they told me that I was going to
4  receiving, which is segregation, and to get up
5  and turn around and put my hands behind my back.
6  And I told them that I didn't feel comfortable
7  doing that because I had a taser pointed at me
8  and I didn't really -- I asked what for and why
9  was I going to the hole and Lieutenant Conroy
10 stated "For disobeying orders," and just to put
11 my hands behind my back, at which time I did
12 place my hands behind my back while I was laying
13 facedown prone on the, on the cell bed, and then
14 they came in.
15    Q.  What time was this?
16    A.  I don't know.  There's no clocks or
17 anything in there.
18    Q.  Who were the officers that came to your
19 cell?
20    A.  Lieutenant Conroy, Karl Blanton, I
21 think is how you spell it or say his name,
22 Stan Hendrickson, Deputy Fritz Digner or Degner.
23 I believe there was somebody that was in the
24 catwalk.  I don't know.  I just got provided
25 with discovery information, so I'm still going

Page 19

1  over it.  It's, like, 700 pages.  I might have
2  to do an amended complaint.
3     Q.  What did they tell you?
4     A.  They came, they came to the cell and
5  they told me to get up and put my hands behind
6  my back and I said, "What for?  I didn't do
7  anything wrong."  And they said, "You're going
8  to receiving for disobeying orders."  And I, I
9  might have said some other things like, "Well, I
10 don't believe that I did anything wrong."  And
11 then Lieutenant Conroy told me, "Just put your
12 hands behind your back."
13        And I told him -- because at the time
14 they had a taser, they had, like, a beam on the
15 taser and it was pointed right at my head when I
16 was laying down, and I felt for fear that if I
17 would make any sudden move when they told me to
18 get up and put my hands behind my back, that
19 they would justify that and taser.  So, I felt
20 just lay there like I was, not make any sudden
21 moves.  So, Lieutenant Conroy told me to put my
22 hands behind my back.  I put my hands behind my
23 back, then they came in.
24    Q.  Did they tell you what order or what
25 orders you were disobeying or you had disobeyed?

Page 20

1  Strike that. Did they tell you what orders you
2  had disobeyed?
3     A.  No.
4     Q.  Did you understand that it related to
5  the paper on the light?
6     A.  Yeah. I inferred that, okay, you guys
7  are taking me to receiving because obviously you
8  want me to take the paper off the light and I
9  didn't.
10    Q.  Did they ask you to stand against the
11 wall to be handcuffed?
12    A.  I don't -- I believe they told me to
13 get up and face backwards with my hands behind
14 my back, that's what I believe they told me, get
15 up off the bed, turn around, face the wall. I
16 believe that was their, their directive.
17    Q.  And as you said, you lied facedown in
18 your bunk and put your hands behind your back?
19    A.  That was the first -- they came to the
20 cell. I seen that there was four or five of
21 them. One had the taser pointed at my head
22 through the bars. The cell doors were locked,
23 but it's the bars, like old Alcatraz style. He
24 had the beam pointed at my head and I was in
25 fear if I would make any sudden movement, that I

Page 21

1  would have been tased, so therefore I didn't
2  want to make any sudden movements.
3        So, I did get up and turn my face
4  towards the wall, put my hands behind my back
5  and when they -- I was like, "What for? I
6  didn't do anything wrong." Lieutenant Conroy
7  said, "You're going to receiving. Put your
8  hands behind your back." So, at that time when
9  I was laying facedown on the bed, I put my hands
10 behind my back.
11    Q.  What happened next?
12    A.  The jailers entered the cell. They had
13 somebody open the door from the outside and they
14 entered the cell.
15    Q.  Did they cuff you?
16    A.  Yes, they did.
17    Q.  Where were you when you were cuffed?
18    A.  I was laying prone facedown on the cell
19 bed.
20    Q.  Did you allow yourself to be cuffed?
21    A.  Yes, I did. I had my, I had my hands
22 behind my back before they signaled for the door
23 to be opened, because for them to open the door,
24 someone else has to do it because it's in the
25 front of the block. So, they must have made

Page 22

1  something or told somebody to go do it or open
2  the door, but as soon as they came to my hands,
3  my hands were behind my back before they opened
4  the cell, or else I don't believe they would
5  have opened the cell.
6     Q.  What happened next?
7     A.  What happened next was that they, I
8  believe Deputy Blanton, Deputy Degner and
9  Deputy Hendrickson then entered the cell.
10 Hendrickson pounced on me, put his knee into my
11 back as to, like, I don't know, like, pin me
12 down. I believe Deputy Degner, the one that was
13 holding the taser, had the taser pointed at me
14 throughout the whole time. And Deputy Blanton
15 was holding my feet down.
16       And due to, you know, I don't, I don't
17 know how much Sergeant Hendrickson weighs, but
18 I'm guessing it's over 200 pounds. And I'm not
19 a skinny guy, so reaching up my hands behind my
20 back, I had them behind my back, so when they
21 put the handcuffs on, I was probably tensed up
22 because due to the weight on top of me and due
23 to the fact that my, me putting my hands behind
24 my back, as I have, I don't know, fatter or
25 huskier or whatever, it's kind of hard to put my

Page 23

1  hands close enough to get them like this because
2  these are the handcuffs that they put on like
3  this. And that's when they were trying to say
4  that you're resisting and quit resisting and I
5  told them that I wasn't resisting.
6     Q.  So, that all occurred on your bunk?
7     A.  That's correct.
8     Q.  And the officers came in,
9  Sergeant Hendrickson put his knee on your upper
10 back?
11    A.  Upper back, mid back, just --
12    Q.  And Deputy Blanton grabbed your legs?
13    A.  Yeah, they were holding my legs down.
14    Q.  He held them down?
15    A.  Or something like that.
16    Q.  You were facedown, so you couldn't see
17 what he was doing?
18    A.  Yeah, but I felt pressure on my legs,
19 yes.
20    Q.  Do you know who placed the cuffs on
21 you?
22    A.  I believe it was Hendrickson,
23 Sergeant Hendrickson.
24    Q.  So, he had his knee on your back while
25 trying to handcuff you?

**Page 24**

1  A. I believe so, yes.
2  Q. And because he had his knee on you, it
3  made it difficult for you to keep your hands
4  together behind your back?
5  A. It was a tensing, like, you know, jerk
6  and -- like that, but not only that, it's just
7  for the fact that, I don't know, like, my build
8  wouldn't able me to have my hands so close that
9  the handcuffs could fit, so they made it seem
10 like I was resisting and I was not resisting at
11 all. Before they even opened the cell I had my
12 hands behind my back. I didn't want to get
13 tased, that's the whole thing, because they had
14 the taser pointed at me. I didn't want to get
15 tased because they had the taser pointed at me.
16 Q. Did Sergeant Hendrickson then place the
17 handcuffs on you?
18 A. That's correct.
19 Q. What happened after the handcuffs were
20 placed on you?
21 A. They, the defendants, told me to get up
22 off the bed and I had told them that I couldn't
23 get up because, I don't know, if you're facedown
24 handcuffed, it was pretty hard for me to try to
25 get up, so -- and I don't know. They seemed

**Page 25**

1  like they were kind of irritated or agitated
2  that they felt that I was resisting when I
3  wasn't and they seemed to be frustrated with it.
4         So, in a pulling and dragging
5  motion they pulled and drug me off the bed and,
6  when doing so -- the bed, cell beds have a
7  frame, and my feet slapped against the frame
8  causing me to go to my knees complaining about
9  my foot being hurt.
10 Q. Who dragged you off the bed?
11 A. I believe it was an effort between
12 Sergeant Hendrickson and Deputy Blanton, and
13 Deputy Degner was holding the taser.
14 Q. So, at that time Degner still had the
15 taser. Was that pointed at you or was he just
16 holding it?
17 A. He had it pointed in his hand at me.
18 Q. How high is the bed off the floor?
19 A. I would say maybe, maybe two feet, two
20 and a half feet.
21 Q. So, they drag you off and your feet
22 slap the frame. What part of your feet hit the
23 frame?
24 A. Both actually, but it seemed to, my
25 right foot seemed to hit harder on the frame

**Page 26**

1  than my left foot did.
2  Q. And what part of your foot hit?
3  A. My toes and the side of my big toe.
4  Q. And so you fell to your knees in the
5  cell?
6  A. That's correct.
7  Q. Did you say anything?
8  A. I complained of my feet, my feet hurt,
9  my foot.
10 Q. What did they say in response?
11 A. I believe they said something, "You
12 need to get up and walk, you need to get up and
13 walk." I said, "I can't. My foot hurts." They
14 said, "If you don't walk, we'll drag you."
15 Q. And what happened next?
16 A. They drug me through the cell block and
17 into the jail main hallway and left me laying
18 there for a few moments, I guess, until they
19 could get a better grip around me or something
20 and carry me to receiving or segregation or the
21 hole.
22 Q. Did they carry you from your cell into
23 the main hallway?
24 A. No. They, they, they drug me from
25 south block out into the main hallway, then set

**Page 27**

1  me down so they could get a better grip or
2  something and carry me to segregation.
3  Q. So, they dragged you out of your cell
4  into the hallway, set you down and then carried
5  you into segregation?
6  A. That's correct.
7  Q. Who did you tell that your foot hurt?
8  A. I was quite belligerent, so I'm sure
9  all defendants heard that.
10 Q. And because your foot hurt, you
11 couldn't walk?
12 A. Correct. It was numb and stinging.
13 Q. So, they drag you into the main
14 hallway, set you down on your stomach?
15 A. That's correct.
16 Q. What happens next?
17 A. They put me down on my stomach and they
18 seemed to try to get a better grip, like, as one
19 deputy was on my left arm and one was on my
20 right and then others were, grabbed my feet and
21 carried me to segregation.
22 Q. So, four people carried you to
23 segregation?
24 A. I believe so.
25 Q. How many people removed you from the

Page 28

1  cell?
2      A.  I believe -- that pulled me off the
3  segregation bed?
4      Q.  Not the segregation bed.  How many
5  people -- you said you were dragged out of your
6  cell.  Who dragged you?  How many people dragged
7  you?
8      A.  It was Defendant Hendrickson and
9  Defendant Blanton.
10     Q.  Do you know who the four people were
11 that carried you into the cell?
12     A.  I believe it was Defendant Hendrickson,
13 Defendant Blanton, Defendant Conroy and
14 Defendant Degner.
15     Q.  So, these four individuals carry you
16 into the segregation cell.  What happens next?
17     A.  They placed me facedown on the concrete
18 bed.  They got in there and again they went to,
19 Defendant Hendrickson went to put his knee in my
20 back and Defendant, I believe, Blanton was
21 holding my feet and Defendant Degner was holding
22 the taser.  And it seemed like they were trying
23 to take the handcuffs off and the handcuffs were
24 so tight at that time that it seemed like they
25 were having difficulty in trying to get the key

Page 29

1  in there or something.
2          And due to Sergeant Hendrickson's
3  force on me, it made my body tense up and I
4  lifted my head up because he was, like, applying
5  all this weight on my back, and I lifted my head
6  up and he slammed it down onto the concrete cell
7  bed.  And then at that moment I just heard,
8  "Tase his ass."  And then without no warning,
9  Deputy Degner shot me with the taser.
10     Q.  Who said "tase his ass"?
11     A.  Defendant Hendrickson.
12     Q.  At some point in time did you yell at
13 Sergeant Hendrickson to get the fuck off you?
14     A.  Yes, that's correct.
15     Q.  When did that occur?
16     A.  After it seemed like just the pressure
17 of him putting all his weight onto me.  It was
18 difficult -- I was, like, you know, I felt like
19 I was suffocating.  And then after he -- I
20 lifted my head, he slammed it down, is when I
21 said, "Get the 'F' off me."  And then that's
22 when he said "tase his ass" and then I was
23 tased.
24     Q.  What happened next?
25     A.  I believe after I was tased, I heard

Page 30

1  Defendant Conroy state, "Get out of there.  Just
2  leave him in there."  And they all left me
3  laying there with the handcuffs on.
4      Q.  Did Lieutenant Conroy tell you that if
5  they didn't get the handcuffs off, they would
6  have to leave the cell and leave them on?
7      A.  I didn't hear him say -- I just heard
8  him say, "Leave him in there with them on there"
9  or "Get out of there."
10     Q.  Did you tell Lieutenant Conroy at any
11 point or the other officers in the cell, fine,
12 leave?
13     A.  I don't -- I said, I know I said, "Get
14 the 'F' off me."  I don't recall if I, if I
15 said, fine, leave.  It's about the same thing,
16 fine, leave, get the "F" off me.
17     Q.  Well, I'm wondering if there were two
18 separate statements.
19     A.  I don't know.  I know there was one for
20 sure.  I said, "Get the 'F' off me."
21     Q.  How long did they leave you in the cell
22 with the handcuffs on?
23     A.  I don't know.  For a long time.  If I
24 would have to guess, it would be 30 to 45
25 minutes.

Page 31

1      Q.  And then at some point they re-entered
2  the cell and removed the cuffs?
3      A.  I believe so, yes.
4      Q.  Who did that?
5      A.  I don't know.
6      Q.  Do you know when that occurred?
7      A.  Again, I would have to say, I don't
8  know, 30 to 45 minutes.  I don't know.
9      Q.  Is it fair to say because there's no
10 clock, you don't really have any idea in terms
11 of how long --
12     A.  I mean forever.  It seemed like it was
13 forever.  When you've got handcuffs behind your
14 back and it's cutting off circulation and it's
15 quite painful, it seems like forever when you're
16 left in that position.
17     Q.  But you don't have any idea how long it
18 really was?
19     A.  No, I don't.
20     Q.  Were you conscious when they came in
21 and removed the handcuffs?
22     A.  I don't remember.
23     Q.  So, you might have dozed off?
24     A.  Yeah, I don't know.
25     Q.  After the handcuffs were removed, the

```
                                        32
 1   nurse came to see you, correct?
 2      A.  I believe so.
 3      Q.  And you refused to see her; is that
 4   right?
 5      A.  Yeah. I was irritated with jail staff.
 6   I didn't want to talk to anybody.
 7      Q.  You didn't ask for any medical
 8   attention for your wrists, right?
 9      A.  I didn't -- not at that time, no, I
10   didn't. I was irritated with jail staff. I
11   didn't even want to talk to anybody.
12      Q.  And you didn't ask for any medical
13   attention for your foot for the same reasons,
14   right?
15      A.  Yes.
16      Q.  And you didn't ask for any medical
17   attention for the area of the body where you
18   were tased; is that right?
19      A.  Again, I refused to talk to anybody.
20      Q.  Where were you tased?
21      A.  In my back.
22      Q.  Upper right back?
23      A.  I believe so.
24      Q.  And after the incident you didn't
25   request any medical attention for injuries
```

```
                                        33
 1   caused by what you feel was the excessive force,
 2   correct?
 3      A.  I don't remember.
 4      Q.  So, as we go through the incident,
 5   officers come into your cell, they remove you
 6   from your cell bed, drag you out of the cell,
 7   set you down in the hallway and then carry you
 8   into the segregation cell; is that right?
 9      A.  That's correct.
10      Q.  So, there was, as we go through trying
11   to kind of isolate what happened, it didn't
12   appear there was any excessive force in your
13   cell; is that right?
14      A.  Well, due to, I mean, them pulling me
15   and dragging me off the bed, I believe it was
16   quite excessive the way they went about doing
17   that.
18      Q.  So, you think that dragging you off the
19   bed was use of excessive force?
20      A.  Yes.
21      Q.  Anything else that happened in the
22   cell?
23      A.  And, I mean, my feet slammed hard
24   against the bed frame.
25      Q.  And that happened when they were
```

```
                                        34
 1   dragging you from the bed, right?
 2      A.  That's correct.
 3      Q.  Anything else that happened in the cell
 4   you think was excessive force?
 5      A.  Dragging me, dragging me.
 6      Q.  And at that point they dragged you
 7   because you couldn't walk, is that right,
 8   because you hit your feet?
 9      A.  Right. I told them that I couldn't
10   walk.
11      Q.  So, in order to move you, they either
12   had to drag or carry you; is that right?
13      A.  Either -- I believe that they have
14   other means. They have wheelchairs. I don't
15   know. You know, they have, you know, restraint
16   chairs or something. I don't know. You know, I
17   don't know what they all have. I'm sure there's
18   other means they could have went about it.
19      Q.  And there was no excessive force in the
20   hallway while they were dragging or carrying
21   you, right?
22      A.  The only thing, the handcuffs being
23   tight, that's about it.
24      Q.  But then really this incident boils
25   down to the use of the taser in the segregation
```

```
                                        35
 1   cell, right?
 2      A.  While handcuffed, yes.
 3      Q.  Were you fighting or struggling with
 4   the officers when they tried to take the
 5   handcuffs off?
 6      A.  No, I was not.
 7      Q.  But they had difficulty getting the
 8   handcuffs off you, right?
 9      A.  I don't know for sure, but it appeared
10   that way. Or I don't know what they were doing.
11   They ended up making the handcuffs tighter,
12   that's what I inferred from it, because they
13   were trying to -- whatever. They kept on
14   clicking down and made the handcuffs tighter.
15      Q.  So, they were struggling to get the
16   handcuffs off you and it ended up making the
17   handcuffs tighter?
18      A.  I believe so.
19      Q.  Did they say anything to you?
20      A.  I don't recall them saying anything to
21   me. I think they said that "Quit resisting" or
22   something, and I wasn't resisting at all. I
23   mean, I'm sure the videotape and the video will
24   clearly show that I was not resisting at all. I
25   was handcuffed behind my back with jail staff on
```

11 (Pages 32 to 35)

### Page 36

1  top of me, so there's not any room for
2  resistance.
3      The handcuffs being tight and the
4  tension of Defendant Hendrickson and them
5  applying their weight on me caused me -- they
6  were trying to justify that, is my belief, as me
7  resisting when it was just tensing up due to the
8  fact that Sergeant Hendrickson had his weight on
9  me.
10    Q.  What were your injuries from this
11 incident?
12    A.  I was -- currently, now?
13    Q.  Well, let's do both.  What were your
14 injuries from the incident immediately after the
15 incident?
16    A.  My head was slammed on the concrete
17 bed.  My hands were purple, bluish cut off from
18 circulation due to the handcuffs being
19 excessively tight.  And there was, afterwards,
20 some pain in my right foot.
21    Q.  What about now?
22    A.  Now it's -- I've been diagnosed with
23 carpal tunnel syndrome within my right hand due
24 to handcuffs.
25    Q.  And you believe that stems from this

### Page 37

1  incident?
2     A.  That's correct.
3     Q.  Anything else?
4     A.  No.
5     Q.  What damages do you feel you suffered
6  from this incident?
7     A.  I feel that my hands are, my right hand
8  is numb all the time and at times it's hard for
9  me to write or hard to feel, you know, hot, cold
10 sensations.  And I've been told that I got to
11 have surgery on it to clear the, whatever, I
12 don't know the medical technical terms, but they
13 told me that, the orthopaedic specialist told me
14 that it's about 98 percent effective that your
15 hand goes back to not being numb and --
16    Q.  Who diagnosed you with carpal tunnel
17 syndrome?
18    A.  It was the Tomah Lake Clinic,
19 Dr. Butler, Dr. Deming.
20    Q.  When did that occur?
21    A.  Early of 2011.
22    Q.  And which doctor recommended surgery?
23    A.  I believe it was Dr. Butler was the one
24 who told me he would actually be performing it
25 and that he's performed hundreds of them.

### Page 38

1     Q.  I want to move on to your due process
2  claim.  The due process claim really arises out
3  of incidents that occurred on May 22, 2010; is
4  that right?
5     A.  The 22nd, that's correct.
6     Q.  So, that's the day after the incident
7  where you were removed from your cell and placed
8  in segregation?
9     A.  That's correct.
10    Q.  On May 22nd Sergeant Fish came and gave
11 you a Major Violation Report; is that right?
12    A.  That's correct.
13    Q.  I want to show you what's been marked
14 for purposes of identification as Exhibit 1.
15    A.  That is true and accurate.
16    Q.  So, this is the Major Violation Report
17 that Sergeant Fish gave you; is that right?
18    A.  That's correct.
19    Q.  And it identifies four violations; is
20 that right?
21    A.  That's correct.
22    Q.  Failure to follow orders, resisting,
23 disorderly conduct and causing jail disruption?
24    A.  That's correct.
25    Q.  What did Sergeant Fish tell you when

### Page 39

1  she -- strike that.  Did she actually give you
2  this form?  Did she show it to you?
3     A.  Yes, she did.
4     Q.  And what did she tell you?
5     A.  She told me that she was going to be
6  conducting the disciplinary hearing.  And I
7  asked that -- I inquired about the disciplinary
8  hearing because this is something new to me at
9  the Monroe County Jail, and I had asked her to
10 explain this piece of paper in process to me.
11    Q.  And what did she say?
12    A.  She said that I could either have a
13 hearing or I could waive a hearing, and then she
14 went on to tell me that based off the Incident
15 Reports, that, and talking to Defendant Conroy,
16 that she was going to give me 10 days'
17 segregation.
18    Q.  For the four alleged rule violations?
19    A.  That's correct.  And at that point I
20 said that, well, I inquired, "What's the point
21 of having a hearing when it seems to me, though,
22 you have your mind made up without the hearing?"
23    Q.  So, she told you she was going to give
24 you 10 days in segregation as discipline for the
25 four alleged rule violations; is that right?

40

1  A. Yeah, yeah. She said that after her
2  and Lieutenant Conroy had talked.
3  Q. And she had reviewed the Incident
4  Reports prepared by the other officers?
5  A. I don't know if she -- she said, yeah,
6  based off the Incident Reports.
7  Q. This occurred at the segregation cell;
8  is that right?
9  A. That's correct.
10  Q. And then she stated you could have a
11  hearing, but you said basically what's the
12  point, right?
13  A. I said -- well, I inquired about the
14  rights, about what's my rights, what can I do.
15  And she, then that's when she went on to tell
16  me, based off the incidents reports and after
17  her talking to Defendant Conroy, that she felt
18  that 10 days was appropriate. I then handed
19  the, this Exhibit 1 back to Defendant Fish and
20  stated that I didn't understand my hearing
21  rights, as though it seems you had your mind
22  made up, if I had a hearing or if I didn't have
23  a hearing, I would get the 10 days regardless.
24  Q. And did you sign Exhibit 1?
25  A. No, I did not.

41

1  Q. Did you refuse to sign Exhibit 1?
2  A. No, I did not.
3  Q. So, that's just Sergeant Fish writing
4  that you refused to sign Exhibit 1?
5  A. I believe that's who signed. I don't
6  know if she signed refused, but I'm guessing she
7  did. It's her signature at the bottom.
8  Q. Well, you didn't initial either that
9  you waived your right to a hearing or you wanted
10  to have a hearing; is that right?
11  A. At that point after that I handed the
12  violation, Exhibit 1, back to Defendant Fish
13  saying that I did not understand my hearing
14  rights and asked Defendant Fish if she knew the
15  policies and procedures about conducting proper
16  disciplinary hearings. And it seemed as though
17  she got agitated and stated, "No. Do you?" and
18  then left.
19  Q. So, at that time you didn't choose to
20  have a disciplinary hearing, right?
21  A. I wanted the hearing, but if -- seeings
22  like it was already prejudicial because the fact
23  that it didn't matter if I had the hearing or
24  not, I was going to get 10 days because her mind
25  was already made up before I even wanted to have

42

1  a hearing, before I even had access to the
2  Incident Reports.
3  Q. So, because you believed her mind was
4  already made up, you decided not to have a
5  hearing at this point because what was the point
6  in having a hearing?
7  A. I wanted the hearing.
8  Q. When she came to see you when she
9  initially gave you Exhibit 1, did you tell
10  Sergeant Fish that you wanted the hearing?
11  A. I don't recall if I said I wanted the
12  hearing. She came and said that she will be
13  conducting the hearing.
14  Q. At some later point in time you did
15  tell her you wanted a hearing, right?
16  A. Yes. After the, after she had left and
17  I told her that I didn't understand my hearing
18  rights and she said -- I asked her about the
19  whole does she know how to conduct a proper
20  disciplinary hearing, and I seen her in the
21  hallway and I told her that I did want my
22  hearing.
23  Q. When did that occur?
24  A. Sometime soon, soon after, after she
25  had left. It seemed like she was frustrated

43

1  with me being kind of argumentative towards her
2  about having, conducting a proper hearing.
3  Q. So, your first conversation she hands
4  you the Major Violation Report, which has been
5  marked as Exhibit 1, and tells you you can
6  either have a hearing or waive your right to a
7  hearing but she would be conducting it and after
8  her review of the Incident Reports and her
9  conversations with Lieutenant Conroy, she was
10  going to impose 10 days in segregation; is that
11  right?
12  A. That's correct.
13  Q. And in that first conversation you told
14  her you didn't understand your hearing rights
15  and did not sign Exhibit 1, is that right, or
16  initial whether or not to have a hearing?
17  A. Yeah. I handed it back to her and said
18  I don't understand it.
19  Q. And in that first conversation you
20  didn't tell her you wanted to have a hearing?
21  A. She came there saying that that's her
22  purpose, was conducting the hearing, because I
23  guess it's their policy within 24 hours to
24  conduct a hearing, so the hearing was going to
25  happen regardless.

44

1  Q. So, it's your understanding that she
2  was there to conduct the hearing, that was the
3  hearing?
4  A. Yeah, that was the hearing according --
5  well, that's what it appears to be now because
6  she made her decision after talking to
7  Defendant Conroy.
8  Q. Did you actually discuss the details of
9  the incident that occurred on May 21st with
10 Sergeant Fish when she delivered the Major
11 Violation Report?
12 A. I had asked her -- she had mentioned
13 Incident Reports. She said that she read the
14 Incident Reports, and I asked her if I could
15 have copies of those Incident Reports and she
16 then stated that she was in the process of
17 editing them. And then I was in an
18 argumentative state and asked her, "What do you
19 mean you're editing your reports?" "Oh, you
20 know, I put in there an 'of' or a 'the' or this
21 or that." And I just kind of got upset about
22 that because it's altering what really happened
23 because an of or a the can change the whole
24 outcome of anything. And I was not provided
25 with the Incident Reports until sometime later.

45

1  Q. And then you told her essentially
2  what's the point of having a hearing, you've
3  already made your mind up?
4  A. I said, yeah, I said, "You've already
5  said that I'm going to get 10 days, so, you
6  know, if I wanted the hearing or not, it doesn't
7  matter." Because, you know, I didn't refuse to
8  have a hearing.
9  Q. Did you refuse to sign Exhibit 1?
10 A. No, I did not. I, at that time I
11 handed it back to her and said I didn't
12 understand my disciplinary hearing rights. She
13 took it from me and then that's when I was
14 talking about the Incident Reports and then
15 about witnesses that were in the cell block, and
16 I asked her about the -- does she know how to
17 conduct a proper disciplinary hearing. And then
18 she got kind of offensive and offended by that
19 and said, "No. Do you?" And then walked away.
20     And then sometime soon thereafter I
21 seen her walking in the jail hallway and I asked
22 her if I could speak to her and I said, "May I
23 have a disciplinary hearing? I want the
24 disciplinary hearing." She said, "No. You
25 refused." I said, "No, I did not refuse." And

46

1  then at that time I said, "Well, then I would
2  like to appeal."
3  Q. So, after she told you that you
4  couldn't have a hearing because you refused to
5  have a hearing, you told her you wanted to
6  appeal her decision?
7  A. Right.
8  Q. And were you allowed to appeal that
9  decision?
10 A. Yes.
11 Q. And who handled this appeal?
12 A. Defendant Josvai, I believe is how you
13 say her name.
14 Q. Josvai, J-O-S-V-A-I.
15 A. Josvai.
16 Q. Did Sergeant Fish tell you who was
17 going to be handling your appeal?
18 A. I think she did. She said that
19 Defendant Josvai would. I don't know if I have
20 a copy of that disciplinary in here, unless you
21 have it.
22 Q. I think I do. And when did the appeal
23 occur?
24 A. The following, in the morning.
25 Q. May 23rd?

47

1  A. That's correct. I don't have it in
2  here.
3       (Exhibit Number 3 was marked for
4       identification by the reporter)
5  Q. I'm going to show you what's been
6  marked for purposes of identification as
7  Exhibit 3.
8  A. That's true and correct.
9  Q. So, Exhibit 3 is a true and correct
10 copy of the Major Discipline Appeal?
11 A. That's correct.
12 Q. So, is this accurate that on Sunday,
13 May 23, 2010 at approximately 7:40 you met with
14 Chief Deputy Lisa Josvai?
15 A. That's correct.
16 Q. And what was the purpose of the appeal?
17 A. The purpose of the appeal was to appeal
18 Defendant Fish's findings.
19 Q. And what was the result of the appeal?
20 A. The result of the appeal was that
21 pretty much she didn't want to, in my opinion,
22 didn't want to hear anything that I had to say
23 about, regarding not having access to the
24 Incident Reports, not being able to call
25 witnesses. Her only objective was to make sure

48

1  that the disciplinary hearing of Defendant Fish
2  standed and stated that if she could, she would
3  give me, in fact, 40 days, not 10 days and soon
4  thereafter left and said it stands.
5     Q.  So, the purpose of the appeal was just
6  to determine if the sanctions imposed by
7  Sergeant Fish were appropriate?
8     A.  That's correct.
9     Q.  And Lisa Josvai determined that it was
10 appropriate?
11    A.  Yeah.  I guess due to her appeal, she
12 said it was.
13    Q.  Did you say anything else to
14 Lisa Josvai during the appeal?
15    A.  I explained to her how I wasn't, I
16 didn't have access to the Incident Reports and
17 witnesses and I felt that I didn't have, you
18 know, a proper hearing.  And it seems like she
19 disregarded my concerns and said that, "Well, if
20 I could, I'd give you 40 days.  I'd give you 10
21 days for each offense, but I'm not going to."
22 And then soon thereafter she left the
23 segregation area.
24    Q.  And then on May 24, 2010 the discipline
25 was voided, right?

49

1     A.  I don't know.
2     Q.  You were returned to a regular cell on
3  May 24, 2010?
4     A.  I don't know.
5     Q.  You don't know, you don't recall?
6     A.  Right, I don't recall.
7     Q.  You weren't in segregation for the full
8  10 days that Sergeant Fish had initially
9  decided, though, right?
10    A.  I don't think so, no, I wasn't.
11    Q.  Is it possible that you were returned
12 to your regular cell on May 24, 2010?
13    A.  I wasn't returned to the regular cell,
14 but I was in a different --
15    Q.  You were released from segregation on
16 May 24, 2010?
17    A.  I don't, I don't know for sure if it
18 was.
19    Q.  It's possible you were released from
20 segregation on May 24, 2010?
21    A.  Maybe.
22    Q.  I'm going to show you what's been
23 marked for purposes of identification as
24 Exhibit 2.  This is very similar to Exhibit 1,
25 but there's a notation on the bottom right that

50

1  I want to draw your attention to.  To my reading
2  it looks like "Off sanctions per 1265, 5/24/10.
3     A.  Yeah, I see that.
4     Q.  Does that refresh your recollection at
5  all as to whether or not you were released from
6  segregation on May 24, 2010?
7     A.  No.
8     Q.  Do you know who 1265 is?
9     A.  No.  I'm sure it's an officer or
10 something, officer's number.
11    Q.  How do you feel you were injured from
12 the denial of your due process rights?
13    A.  Because I was denied a fair hearing.
14    Q.  And what do you feel you had to endure
15 because of the denial of a fair hearing?
16    A.  I wasn't able to have access to the
17 Incident Reports, call witnesses to -- you know,
18 on my behalf.  I wasn't able to tell my side of
19 the events.  And the findings of the hearing
20 officer are inadequate.  They don't say
21 anything.  If you look at the bottom of the
22 sheet, it just says Sergeant Fish, the offense
23 was committed as charged, 10 days receiving.  I
24 said, "It doesn't say why."  And I, when I was
25 talking to them, Defendant Fish and Josvai, I

51

1  stated that I wasn't resisting, I wasn't
2  disorderly conduct, I didn't cause a jail
3  disturbance, but it didn't seem to matter.
4     Q.  If you had had a fair hearing, what
5  would have gone on in that hearing?
6     A.  I would have been able to present,
7  refute the Incident Reports.  I would have had
8  people that were in the cell block testify to
9  what they either seen or heard.
10    Q.  Who was in the cell block?
11    A.  I know Nicholas Lazinski was within the
12 cell block, Nate Keller was in the cell block
13 and, I believe, Leroy Woodworth.  There's, I
14 believe, somebody else.  I don't remember who it
15 was.
16    Q.  Do you know whether or not they
17 witnessed the event on May 21, 2010?
18    A.  They witnessed part of it or heard a
19 part of it.
20    Q.  Which part?
21    A.  The jail staff entering into the cell,
22 them telling me -- dragging me through the cell
23 block, that I had injured my foot, that I said
24 that I was not resisting, that --
25    Q.  Did they witness the various officers

```
                                                           52
 1   tell you to remove the paper from the light?
 2       A.  I believe they either -- if they
 3   weren't sleeping. It was quite early in the
 4   morning, so I -- maybe they did, maybe they
 5   didn't hear it. If they were awake, they
 6   probably heard it.
 7       Q.  What about the night before?
 8       A.  I -- they may have. I don't know for
 9   sure, but I would have liked to say they heard
10   it.
11       Q.  You refused to remove the paper from
12   the light; is that right?
13       A.  I didn't put it there, so I'm not going
14   to take it off, that's correct. My right as a
15   pretrial detainee is to only clean. I don't
16   have to follow any other orders but to keep my
17   quarters clean. I'm sure if you want to dig
18   into it enough, there's case law on it.
19           MR. POSNANSKI: I have no further
20   questions.
21           (Deposition was concluded at
22       10:45 a.m.)
23
24
25
```

```
                                                           53
 1   STATE OF WISCONSIN )
                       ) ss.
 2   COUNTY OF MONROE  )
 3
           I, CHRISTAL A. HANSEN, a
 4   Registered Professional Reporter and Notary
     Public in and for the State of Wisconsin, do
 5   hereby certify that the foregoing deposition was
     taken before me at the Monroe County Jail, 210
 6   West Oak Street, City of Sparta, County of
     Monroe and State of Wisconsin, on the 14th day
 7   of July 2011, that it was taken at the request
     of the Defendants, upon verbal interrogatories;
 8   that it was taken in shorthand by me, a
     competent court reporter and disinterested
 9   person, approved by all parties in interest and
     thereafter converted to typewriting using
10   computer-aided transcription; that said
     deposition is a true record of the deponent's
11   testimony; that the appearances were as shown on
     page 3 of the deposition; that said
12   MICHAEL B. KINGSLEY, before examination was
     sworn by me to tell the truth, the whole truth,
13   and nothing but the truth relative to said
     cause.
14
         Dated July 30, 2011.
15
16            Christal A Hansen
              Registered Professional Reporter
17            Notary Public, State of Wisconsin
18
19
20
21
22
23
24
25
```

16 (Pages 52 to 53)