## Page 1

```
STATE OF WISCONSIN    CIRCUIT COURT     LA CROSSE COUNTY

MICHAEL B. KINGSLEY,
         Plaintiff                    Case No: 10-CV-832

v.

LISA JOSVAI, PATRICIA FISH, ROBERT
CONROY, STAN HENDRICKSON, FRITZ
DEGNER, and KARL BLANTON,
         Defendants.
```

Deposition of **DR. JAMES DEMING**, a witness in the above-entitled action, taken at the instance of the Defendants, pursuant to notice of the examination and service of subpoena on Wednesday, November 16, 2011, commencing at 2:24 p.m. at the Monroe County Courthouse, 210 West Oak Street, Courthouse Annex Room 2, Sparta, WI 54656, pursuant to applicable Wisconsin Statutes, before and reported by Tawni M. Kind, Registered Merit Reporter.

* * * * *

COPY

Tawni Kind, RMR

## Page 2

**APPEARANCES**

ANDREW A. JONES, Whyte, Hirschboeck, Dudek, S.C., 555 East Wells Street, Suite 1900, Milwaukee, WI 53202-3819.

MICHAEL B. KINGSLEY, appeared via telephone.

**I N D E X**

| WITNESS | PAGE |
|---|---|
| **DR. JAMES DEMING** | |
| Direct Examination by Mr. Jones | 3 |
| Cross-examination by Mr. Kingsley | 20 |
| ReDirect Examination by Mr. Jones | 22 |

**EXHIBITS**

| | MARKED | OFFERED | REC'D |
|---|---|---|---|
| No. 1  Certified medical record | 3 | | |
| No. 2  Doctor's note | 3 | | |

Tawni Kind, RMR

## Page 3

(Exhibits 1 & 2 marked for identification).

THEREUPON,

**JAMES ROY DEMING,**

the witness, was duly sworn and testified as follows:

**DIRECT EXAMINATION**

BY MR. JONES:

Q   Doctor, could you please state your full name for the record?
A   James Roy Deming.
Q   And your business address?
A   Lake Tomah Clinic, 325 Butts Avenue, Tomah, Wisconsin.
Q   And you've been deposed before today, correct?
A   Yes.
Q   Just so we're on the same page as we start, if there's a question that I put to you that's not clear for whatever reason, please let me know and I'll try to ask a better question. Is that understood?
A   Yes.
Q   And you understand, of course, that you're under oath and sworn to tell the truth?
A   Yes.
Q   Is there any reason you can think of that you're not able to proceed with the deposition today?
A   No.
Q   You're a physician, correct?
A   Yes.

Tawni Kind, RMR

## Page 4

Q   What's your area of practice or specialty?
A   Family practice.
Q   And how long have you been licensed here in Wisconsin?
A   Twenty-six years.
Q   Are you licensed to practice anywhere other than Wisconsin?
A   No.
Q   Who's your current employer?
A   Franciscan Health Care.
Q   And how long have you worked for or at Franciscan?
A   Twenty-six years.
Q   And do you work out of one particular location?
A   Yes.
Q   Is that the Franciscan facility on Butts Avenue here in Sparta?
A   In Tomah.
Q   Tomah. I've had marked by the court reporter for the purposes of the deposition as Exhibit 1 a copy of the certified medical records provided by Franciscan Skemp regarding Mr. Kingsley. Have you seen those records before today?
A   Yes.
Q   Did you review them in preparation for today?
A   Yes.
Q   I've tabbed a couple pages. The second page that I tabbed is a note, a progress note from February 7th, 2011. Do you see that page?

Tawni Kind, RMR

Page 6

```
1    A    Yes.
2    Q    Is that a progress note prepared by you?
3    A    Yes.
4    Q    And did you in fact see Mr. Kingsley on that date?
5    A    Yes.
6    Q    Were there any other occasions when you saw Mr. Kingsley as a
7    physician?
8    A    No.
9    Q    So this is the one and only time you saw Mr. Kingsley?
10   A    Correct.
11   Q    And you have not seen him since February 7th, 2011?
12   A    That is correct.
13   Q    How was it that you ended up seeing Mr. Kingsley this day,
14   February 7th, 2011?
15   A    I had an opening and they put his name on my schedule.
16   Q    And as I understand it -- well, let me back up. Was he
17   referred to you by someone else in the office or was he just coming
18   to the facility and you ended up having an opening that day?
19   A    I believe it was the latter.
20   Q    Have you discussed Mr. Kingsley's care with any of your other
21   colleagues at Franciscan?
22   A    No.
23   Q    Dr. Deming, do you know of a Dr. Butler at Franciscan?
24   A    Yes.
25   Q    And from your prior answer, you've never discussed
```

Tawni Kind, RMR

Page 6

```
1    Mr. Kingsley with Dr. Butler?
2    A    That is correct.
3    Q    And there's another physician who I'm sure I'm not going to be
4    able to pronounce his name, but did a Doctor -- well you know, you
5    probably know his name.
6    A    He goes by Dr. Bandy, the neurologist.
7    Q    Okay. Dr. Bandy, you ever discussed Mr. Kingsley or his care
8    with Dr. Bandy?
9    A    No.
10   Q    So what were Mr. Kingsley's complaints when you saw him on the
11   7th of February?
12   A    There were two issues. He had pain in both of his wrists,
13   particularly the right wrist, ever since he had been placed in
14   handcuffs while at the Monroe County jail in May of 2010. He
15   states that he immediately -- he stated that immediately when the
16   handcuffs were placed he began to have pain. He told me that he
17   objected to it but they left the cuffs on, and when they took them
18   off an hour later, the nurse noted that his hands looked purple.
19   And because of this constraining, he had tingling and painful
20   sensation in both wrists, right greater than left. He also had
21   discomfort in the right foot, which he stated was slammed against
22   the metal frame when he was forced off his bed. This pain was
23   worse when he was still, and was -- would go away when he was
24   moving around.
25   Q    So the two issues were the pain in his wrists and pain or
```

Tawni Kind, RMR

Page 7

```
1    discomfort in his right foot?
2    A    Yes.
3    Q    If I can just take them one at a time, starting with the foot.
4    Did he give you anymore detail than what you've already described
5    for me or what's stated in the subjective portion of your progress
6    notes as to how his foot was injured in the jail?
7    A    I do not remember talking with him in anymore detail than
8    that.
9    Q    Okay. So what he told you is that he was forced off of the
10   bed and his foot was slammed against the metal frame?
11   A    Yes.
12   Q    But beyond that there were no additional details that he gave
13   you or that you elicited from him?
14   A    I believe that is right. I don't recall any other details
15   at this time.
16   Q    And the pain that he was describing in his foot, can you
17   describe it to me anymore specifically than you already have?
18   A    I can describe where he had the pain while I examined him.
19   Q    That's what I'm looking for.
20   A    The ankle and foot appeared normal. On palpation, as I
21   touched the foot, he had tenderness on the front outside top of
22   the foot near the ankle, and technically that would be the
23   anterolateral dorsum. The range of motion was slightly
24   uncomfortable. So moving his ankle up and around would elicit
25   some discomfort. He was able to walk.
```

Tawni Kind, RMR

Page 8

```
1    Q    When you say it appeared normal, was there any swelling?
2    A    No.
3    Q    Was there any bruising?
4    A    No.
5    Q    Was there any structural damage to the foot that you were able
6    to observe on evaluation?
7    A    No.
8    Q    And the pain that he was relating to you was closer to the
9    ankle than the toes?
10   A    Correct.
11   Q    And it was, I think you said the top outside or top on the
12   right-hand side of the foot?
13   A    Yes.
14   Q    Did you ask him what the pain was on a scale of one to ten?
15   A    I do not think I did.
16   Q    Is there anything else you can tell me about the pain
17   Mr. Kingsley said he was experiencing in his right foot?
18   A    Not that I can think of.
19   Q    And did you reach any sort of diagnosis as to what was wrong
20   with his right foot other than that he was complaining of pain?
21   A    At that time I simply made a diagnosis of right ankle and
22   foot injury, which would be the same as a contusion or trauma.
23   Q    Do you know, the incident that Mr. Kingsley was complaining
24   about -- well, he did tell you it was in May of 2010?
25   A    Yes.
```

Tawni Kind, RMR

1  Q   Did you recommend any follow-up treatment or evaluation for
2  Mr. Kingsley relating to the pain in his right foot?
3  A   I did recommend ice, 15 minutes, four times a day, an
4  elastic ankle brace.
5  Q   Anything beyond that?
6  A   And to follow-up if it did not improve with those
7  conservative measures, so.
8  Q   Okay. So you didn't recommend an x-ray?
9  A   Correct.
10 Q   Was there any objective evidence of an injury to his foot?
11 A   Part of -- objective being what I observed, I observed him
12 to complain of pain as I moved his foot around. Of course the
13 complaint was, that's a subjective finding. So I guess
14 technically that would be a purely subjective complaint. So no, I
15 would not have other objective evidence.
16 Q   And it's safe to say that you never saw any reports, medical
17 or otherwise, from the jail relating to what occurred during this
18 incident, correct?
19 A   That is correct.
20 Q   So if the nurse had seen him and made observations at the time
21 of the incident or following the incident, you didn't have the
22 benefit of the nurse's report or observations, correct?
23 A   That is correct.
24 Q   If Mr. Kingsley had complained at the time of pain in his toes
25 or at the front of his foot as a result of whatever occurred during

Tawni Kind, RMR

1  this incident, would that have been consistent with the pain that he
2  was complaining to you about in February of 2011?
3  A   No. What I observed examining him was tenderness over the
4  proximal foot and near the ankle rather than the toes.
5  Q   Going back to the first of the two issues, the pain in the
6  wrists, Mr. Kingsley, if my notes were right, was complaining of
7  pain in both wrists?
8  A   Yes.
9      MR. JONES:   Are you still there, Mr. Kingsley?
10     MR. KINGSLEY:   Yes, I am, sir.
11 BY MR. JONES:
12 Q   All right. And was it pain, was it tingling, or was it both?
13 A   Both.
14 Q   And if you recall, was he complaining about pain in his wrists
15 or was it pain in his hands?
16 A   Hand tingling and wrist pain.
17 Q   And that would be true both on the right side and the left
18 side?
19 A   Yes.
20 Q   And the right side was worse, you say, according to his
21 complaint?
22 A   Yes.
23 Q   I understand you did several tests or evaluations to examine
24 what he was describing to you; is that correct?
25 A   Yes.

Tawni Kind, RMR

1  Q   Can you explain for the record what you did to evaluate his
2  complaint of pain or tingling in his wrists and hands?
3  A   My examination of the wrists included examining them and
4  palpating or feeling the hands and wrists. There is a test where
5  the doctor taps on the wrist, palm, or surface, called Tinel's
6  sign, and that failed to elicit any pain on either side. There
7  was a test -- there is a test called Phalen's, P-H-A-L-E-N,
8  Phalen's sign where both wrists are bent down sharply so that the
9  hands point down and the arms are straight across in a line and
10 the wrists are bent in a flection motion at 90-degrees, and we
11 usually have the person hold that for up to 60 seconds. In ten
12 seconds of holding his hands like that, he complained of pain and
13 tingling. I'm sorry. He complained of tingling in the fingers
14 and wrists.
15 Q   Were there any other tests or evaluations you did to take a
16 look at what he was complaining about relative to his hands and
17 wrists?
18 A   No.
19 Q   And the wrists appeared normal to you on visual inspection and
20 palpation?
21 A   Correct.
22 Q   And did he complain of any tingling or pain when you were
23 palpating his wrists?
24 A   Not to my knowledge.
25 Q   And did you make anything out of the fact that Tinel's sign

Tawni Kind, RMR

1  was negative but Phalen's sign was positive?
2  A   That happens sometimes for some reason. That's partly why
3  we like to add more than one test.
4  Q   The pain he was describing to you, was he telling you that
5  that had basically been continuous or persisted all along between
6  when this incident occurred in May 2010 and your visit in
7  February of 2011?
8  A   I believe that he had experienced the pain and tingling
9  regularly ever since the handcuffing incident.
10 Q   And did he describe any other manifestations or ways that this
11 was bothering him other than his description that it had kept him
12 awake occasionally?
13 A   I don't recall any other symptoms at that time.
14 Q   Do you know how long Mr. Kingsley was in handcuffs on that
15 occasion?
16 A   He told me that he had had his hands placed in the handcuffs
17 for one hour behind his back.
18 Q   And do you know how tight the handcuffs were?
19 A   No.
20 Q   Other than his description that they were tight?
21 A   I don't have any direct evidence of that.
22 Q   Okay, and do you know why he was in handcuffs on that
23 occasion?
24 A   We did not discuss the reasons behind that.
25 Q   And do you know how many times before that occasion he had

Tawni Kind, RMR

14

1  been in handcuffs?
2  A    I do not think that I talked about that with him.
3  Q    Okay, and do you know how many times between May 2010,
4  whenever that month this incident occurred, and your visit with him
5  in February 2011, how often he had been in handcuffs?
6  A    I presumed no other episodes. I was led to believe that
7  that was the crowning event that, or the tipping event that
8  started this.
9  Q    When you say you were led to believe, you were led to believe
10 by Mr. Kingsley's history as he gave it to you?
11 A    Correct. That was my presumption after I was done visiting
12 with him.
13 Q    Did you discuss with Mr. Kingsley any other history he had had
14 of injury or discomfort with his right foot?
15 A    I do not believe we talked about any other injury.
16 Q    Did you discuss with Mr. Kingsley any other history of pain or
17 discomfort he had had with either of his hands or wrists?
18 A    I do not see it documented so I have to presume that I did
19 not talk about that with him.
20 Q    For instance, do you know what Mr. Kingsley was doing for a
21 living as of February 2011?
22 A    I don't think we talked about that. I did not document
23 anything about that and I do not recall.
24 Q    Do you know whether whatever he was doing then for a living or
25 historically done for a living involved repetitive motions of either

Tawni Kind, RMR

---

15

1  of his hand or wrists?
2  A    I believe I remember seeing in research here that he's a
3  roofer, which of course would have a heavy use of the hands, but I
4  do not recall that that was a part of our visit.
5  Q    Did you discuss with him any other possible sources of the
6  discomfort he was having in his wrists other than his relaying to
7  you that he believed it had started with this incident in the jail?
8  A    No.
9  Q    And you note here an impression you reached relating to his
10 wrist or wrists, correct, that is carpal tunnel syndrome?
11 A    Yes.
12 Q    When you use the word impression, is that a diagnosis or do
13 you mean something different?
14 A    Impression would be synonymous with assessment or diagnosis.
15 Q    And did you -- I'm sorry. I thought you had noted in here.
16 Were you diagnosing him with carpal tunnel in both wrists?
17 A    Yes.
18 Q    And your recommendation was what?
19 A    Overnight splints; and during the daytime, as able, ice 15
20 minutes four times a day for several days at least; and to
21 consider seeing an orthopedist for a shot or surgery if he did not
22 improve with conservative measures.
23 Q    In your evaluation of Mr. Kingsley and your reaching the
24 conclusion that he had carpal tunnel syndrome, were you -- did you
25 reach a conclusion as to what the cause of the carpal tunnel

Tawni Kind, RMR

---

15

1  syndrome was?
2  A    No.
3  Q    Did you reach a conclusion as to what the cause of whatever
4  discomfort he was having in his right foot was?
5  A    No.
6  Q    And I assume -- well, I think you had mentioned that -- strike
7  that.
8       The report by Dr. Bandy, that's not something you saw in the
9  course of your care or treatment of Mr. Kingsley, correct?
10 A    Correct.
11      MR. KINGSLEY:    I object to these, Doctor,
12 regarding Attorney Jones' assumptions on regarding
13 Dr. Bandy who is not present, so.
14      MR. JONES:    And your objection is noted for
15 the record. Okay?
16      MR. KINGSLEY:    Yep.
17 BY MR. JONES:
18 Q    In your review of the records before today, did you take a
19 look at Dr. Bandy's report?
20 A    Yes.
21 Q    And he concluded that there was carpal tunnel syndrome in the
22 right hand or wrist, correct?
23 A    Yes.
24 Q    But not the left?
25 A    Correct.

Tawni Kind, RMR

---

16

1  Q    And he described it as Grade, I think 1, or mild carpal tunnel
2  syndrome?
3  A    Correct.
4  Q    Can you describe what that differentiation means? Do you
5  know?
6  A    Yes. Mild inflammation and mild symptoms. Does that help?
7  Q    What other grades are there of carpal tunnel syndrome?
8  A    I believe -- I do not read EMG's myself, but I believe there
9  would be three grades. The third degree would be the most severe
10 possible. The first degree, the most mild possible. And second,
11 somewhere in between.
12 Q    And in performing his evaluation, Dr. Bandy didn't reach a
13 conclusion as to the cause of the mild carpal tunnel syndrome in the
14 right hand and wrist, correct?
15 A    Correct.
16 Q    If I could show you what was marked as Exhibit 2.
17      Mr. Kingsley, this is the Doctor's note that went to the
18 jail. I think you had sent it to me as one of the exhibits you
19 wanted to use.
20      MR. KINGSLEY:    Regarding the EMG final report?
21      MR. JONES:    This is the one dated
22 February 7th, 2011.
23      MR. KINGSLEY:    Okay. The Dr. Deming decision?
24      MR. JONES:    Yes. You marked it as your
25 Deposition Exhibit "A".

Tawni Kind, RMR

18

1  MR. KINGSLEY: Yeah, that's correct.
2  MR. JONES: Okay.
3  BY MR. JONES:
4  Q   Is this a note that you prepared, Dr. Deming?
5  A   Yes.
6  Q   And this was as a result of your visit with Mr. Kingsley on
7  February 7th?
8  A   Yes.
9  Q   And the note essentially says because of carpal tunnel,
10 Mr. Kingsley shouldn't have his hands cuffed behind him, correct?
11 A   Correct.
12 Q   And he then, on patient instructions, you basically describe
13 the plan that's described in your progress note that you've
14 testified to in terms of follow-up care, correct?
15 A   Correct.
16 Q   Was there a particular reason that you wrote the note that he
17 shouldn't have his hands cuffed behind him?
18 A   He had requested a note.
19 Q   And was there, is there medical significance to having your
20 hands cuffed behind you, as far as you were concerned, relative to
21 your evaluation of Mr. Kingsley?
22 A   His medical condition was likely to be made worse by
23 constricting the hands in handcuffs behind his back. Based on the
24 story that he had told me at the time, and based on his findings,
25 it was logical to assume that the cuffs, by virtue of the

Tawni Kind, RMR

---

1  straining with the arms behind the back, that it pulled harder
2  than normal on the handcuffs, and that for him it caused some
3  injury.
4  Q   When, during your evaluation of him, did he ask you to write a
5  note stating that he shouldn't be handcuffed behind his back again?
6  A   I don't recall if that was early on or later in the visit,
7  but I would only have written a note like that if requested.
8  Q   Basically you're saying, well, if he's right and this occurred
9  because of the incident and the way he was handcuffed, then he
10 shouldn't be handcuffed behind his back again?
11 A   Correct.
12 Q   Because it may exacerbate the condition?
13 A   Correct.
14 Q   Okay, and you have no knowledge of what Mr. Kingsley's
15 condition is currently relative to carpal tunnel, correct?
16 A   Correct.
17 Q   Or his right foot, correct?
18 A   Correct.
19 Q   Is there anything that was discussed between you and
20 Mr. Kingsley in your evaluation of him that we haven't gone over?
21 A   I recall and I documented our discussing the fact that the
22 best way to have him not be handcuffed would be to not be arrested
23 again.
24 Q   And his reaction to that was what?
25 A   He said he agreed.

Tawni Kind, RMR

---

19

1  Q   Was there anything else that was part of the discussion
2  between you and Mr. Kingsley or part of your care and treatment of
3  him that we haven't discussed already?
4  A   Not that I recall.
5  Q   Okay. Thank you. That's all I have.
6  MR. JONES: Mr. Kingsley, if you have any
7  questions you should ask them now.
8  MR. KINGSLEY: Okay. Okay. First I would
9  like to establish and or have this record to
10 reflect a brief statement for my case.
11     I, Michael B. Kingsley, am the plaintiff in
12 this case. I have filed a civil lawsuit action on
13 several different claims subject of this
14 disposition (sic) regarding my claims of the use of
15 excessive force by Monroe County jail staff.
16     Kingsley claims that he sustained serious
17 injury arising out of such excessive force
18 specifically due to handcuffs being placed on him
19 behind his back excessively tight and being left
20 with the handcuffs cutting off circulation for a
21 long period of time.
22     Now with that being established, I'm ready to proceed with a
23 few questions for Dr. Denning.
24 MR. JONES: Go ahead.
25

Tawni Kind, RMR

---

20

1           CROSS-EXAMINATION
2  BY MR. KINGSLEY:
3  Q   Good afternoon, Dr. Deming.
4  A   Good afternoon, Mike.
5  Q   As your -- throughout the course of your 26 years of
6  practicing medicine or being a physician, you've become aware of
7  carpal tunnel syndrome, that's correct?
8  A   Yes.
9  Q   And as a licensed doctor, you're familiar with certain
10 symptoms of carpal tunnel syndrome; is that correct?
11 A   Yes.
12 Q   And for the most part, most symptoms are quite similar; is
13 that correct?
14 A   Quite often, yes.
15 Q   And due to -- and would you explain the different type of
16 symptoms of carpal tunnel syndrome in layman's terms? All I got is
17 a high school education.
18 A   The most common symptoms of carpal tunnel syndrome are pain
19 at the wrist and numbness and tingling that may go down to the
20 fingertips, or up the forearm, or up the arm.
21 Q   Okay. On February 7th, 2011 when you met with myself, you did
22 in fact conclude that I -- through your opinion and conclusion, that
23 I did have carpal tunnel syndrome; is that correct?
24 A   Yes.
25 Q   And marked as my Disposition (sic) Exhibit "A-1", that is true

Tawni Kind, RMR

---

**22**

1  and accurate to the best of your knowledge, and you signed that; is
2  that correct?
3  A    Yes.
4        MR. JONES:   I'll just note that what you were
5  referring to as Deposition Exhibit "A-1" or "1-A"
6  is actually marked as Exhibit 2.
7        MR. KINGSLEY:   Okay. Well, as long as we got
8  the --
9        MR. JONES:   Yep, it's clear.
10       MR. KINGSLEY:   Okay. As long as that's clear.
11 BY MR. KINGSLEY:
12 Q    Dr. Deming, drawing off reasonable inferences and combined
13 with what I discussed with you on February 7th, would your medical
14 opinion regarding excessive use of tight handcuffs for a long period
15 of time, cutting off circulation, would that cause carpal tunnel
16 syndrome?
17 A    That is a possible cause of carpal tunnel syndrome, yes.
18 Q    Or it would lead as to the final report as Dr. Bandy and
19 Dr. Butler's final report regarding the EMG is Grade "A" or Grade 1
20 mild carpal tunnel syndrome; is that correct?
21 A    Yes.
22       MR. KINGSLEY:   Okay. Hold on. I think I just
23 have maybe one or two more questions for you,
24 Dr. Deming, I believe -- no. Thank you for your
25 time and attention, Dr. Deming. I don't have

*Tawni Kind, RMR*

---

1  anything further for you.
2        THE WITNESS:   Mike, and I need to clarify. I
3  realize now at the time I did not notice a
4  difference in the symptoms of the two sides.
5  Earlier I had made a statement that I thought right
6  was worse than left. I don't know if that has any
7  bearing on anything, but I thought I better note
8  that the accurate record reflects that there was
9  not a difference.
10       MR. JONES:   Thank you for clarifying. I just
11 have a couple of follow-up and I hopefully will be
12 done.
13                    REDIRECT EXAMINATION
14 BY MR. JONES:
15 Q    You're saying that, if I understand you correctly, you're
16 saying that trauma to the wrist or wrists is a potential cause of
17 carpal tunnel syndrome, correct?
18 A    Yes.
19 Q    What are the other potential causes of carpal tunnel syndrome?
20 A    Overuse, repetitive motion.
21 Q    Are there other recognized causes of carpal tunnel syndrome,
22 at least that you're aware of?
23 A    I'd have to ponder for a while. I imagine there are some,
24 for instance overheating, other unusual things that I'm not
25 thinking of right now, but possibly.

*Tawni Kind, RMR*

---

**23**

1  Q    Okay. What's the most common cause of carpal tunnel syndrome?
2  A    Repetitive motion.
3  Q    And I think you've already testified to this, but just to be
4  sure we're clear, you're not offering an opinion, you didn't reach a
5  conclusion in your one office visit with Mr. Kingsley what the cause
6  of his carpal tunnel syndrome was, correct?
7  A    You can't do that. At the time of the visit, I could make a
8  diagnosis based on my findings, and it fit with his story, but one
9  can't know exactly what caused it just from an examination like
10 that.
11 Q    And how long did that examination take? How long did it last?
12 A    The examination itself or the office visit?
13 Q    Well, let's do both. The office visit first.
14 A    The office visit probably lasted 20 to 25 minutes.
15 Q    And the examination portion of that visit?
16 A    Approximately five to seven minutes.
17       MR. JONES:   Okay. That's all I have.
18 Appreciate it, again.
19       Anything else, Mr. Kingsley?
20       MR. KINGSLEY:   Not at this time.
21       MR. JONES:   So we'll go off the record now.
22       (Concluded).

*Tawni Kind, RMR*

---

**24**

**CERTIFICATE**

STATE OF WISCONSIN
COUNTY OF LA CROSSE

I hereby certify that I reported the deposition of **DR. JAMES DEMING**, on the 16th day of November, 2011, in Sparta, Wisconsin, and that the witness was by me first duly sworn to tell the whole truth; that the testimony was transcribed under my direction and is a true and complete record, to the best of my ability, of the testimony of the witness;

That the cost of the original has been charged to the party who noticed the deposition, and that all parties who ordered such copies have been charged at the same rate for such copies;

That I am not a relative or employee or attorney or counsel of the parties or a relative or employee of such attorney or counsel; that I am not financially interested in the action and have no contract with the parties, attorneys or persons with an interest in the action that affects or has a substantial tendency to affect my impartiality.

WITNESS MY HAND AND SEAL THIS 30th DAY OF NOVEMBER, 2011.

_____
Tawni M. Kind, RMR
3061 Edgewater Lane
La Crosse, Wisconsin, 54603

My commission expires:
_____

*Tawni Kind, RMR*