**Page 1**

STATE OF WISCONSIN    CIRCUIT COURT    LA CROSSE COUNTY

MICHAEL B. KINGSLEY,
    Plaintiff    Case No: 10-CV-832

v.

LISA JOSVAI, PATRICIA FISH, ROBERT CONROY, STAN HENDRICKSON, FRITZ DEGNER, and KARL BLANTON,
    Defendants.

Deposition of **DR. AARON BUTLER**, a witness in the above-entitled action, taken at the instance of the Defendants, pursuant to notice of the examination and service of subpoena on Wednesday, November 16, 2011, commencing at 3:15 p.m. at the Mayo Clinic Health System, 191 Theater Rd. Chiara Conference Room, Onalaska, WI 54650, pursuant to applicable Wisconsin Statutes, before and reported by Tawni M. Kind, Registered Merit Reporter.

* * * * *

Tawni Kind, RMR

**Page 2**

**APPEARANCES**

ANDREW A. JONES, Whyte, Hirschboeck, Dudek, S.C., 555 East Wells Street, Suite 1900, Milwaukee, WI 53202-3819.

MICHAEL B. KINGSLEY, appeared via telephone.

**INDEX**

| WITNESS | PAGE |
|---|---|
| **DR. AARON BUTLER** | |
| Direct Examination by Mr. Jones | 3 |
| Cross-examination by Mr. Kingsley | 17 |
| ReDirect Examination by Mr. Jones | 21 |

**EXHIBITS**

| | | MARKED | OFFERED | REC'D |
|---|---|---|---|---|
| No. 1 | Dr. Butler hand-written note | 13 | | |
| No. 2 | 4/27/11 Franciscan Skemp Appointment note | 13 | | |

Tawni Kind, RMR

**Page 3**

PROCEEDINGS

THEREUPON,

**AARON MICHAEL KOTTS BUTLER,**

the witness, was duly sworn and testified as follows:

**DIRECT EXAMINATION**

BY MR. JONES:

Q    Dr. Butler, could you please state your full name for the record.

A    Aaron Michael Kotts Butler.

Q    And your business address?

A    Is 800 West Avenue South, La Crosse, Wisconsin.

Q    Have you been deposed before today?

A    Yes, I have. Not in this particular case. Sorry.

Q    Understood. So you know the basic ground rules, but let me repeat them so we're clear moving forward.

If I ask you a question that's not clear, let me know and I'll try to ask a better question.

A    Absolutely.

Q    And you understand you're under oath to tell the truth?

A    Correct.

Q    Is there any reason you can think of you're not able to proceed with the deposition?

A    No.

Q    You're a physician?

A    Correct.

Tawni Kind, RMR

**Page 4**

Q    What kind of doctor?

A    Orthopedic surgeon.

Q    How long have you been a doctor?

A    Been going on nine years now.

Q    An you're licensed here in Wisconsin, obviously?

A    Correct.

Q    For nine years?

A    Yes.

Q    Are you now or have you ever been licensed anywhere else?

A    Also Minnesota and Florida.

Q    And how long have you been licensed in each of those states?

A    Florida was through residency, which would have been probably three or four years. Then I kept it active while I was up here. Minnesota has been at least, well, I'm still keeping it active now, so nine years.

Q    And where did you go to medical school?

A    In Madison.

Q    And where did you do your residency?

A    Gainesville, Florida.

Q    What was the institution down there?

A    University of Florida.

Q    You understand that we're here because of a lawsuit filed by an individual, Michael Kingsley?

A    Correct.

Q    Have you ever seen Mr. Kingsley as a patient?

Tawni Kind, RMR

6

1  A   I have, once, yes.
2  Q   And is that through your employment with Franciscan Skemp?
3  A   That's correct.
4  Q   What was the date of your care and treatment of Mr. Kingsley?
5  A   Looking back at the records, it looks like it was March 9th
6  of 2011.
7  Q   And where did you see him on that date?
8  A   Would have been in clinic at the Tomah Memorial Clinic.
9  Q   That's a Franciscan Skemp facility?
10 A   Correct. A satellite of -- I shouldn't say the Tomah
11 Memorial Clinic, but Tomah Clinic, a satellite of the hospital.
12 Sorry.
13 Q   Have you ever seen Mr. Kingsley before that date?
14 A   I have not.
15 Q   And have you ever seen him since?
16 A   I have not.
17 Q   In preparing for today's deposition, have you had a chance to
18 look at any medical records relating to Mr. Kingsley?
19 A   I have. I reviewed his initial note by Dr. Deming back in
20 February of this year, my clinical note, his EMG note, and then a
21 recent I believe emergency department note in September of this
22 year.
23 Q   The Dr. Deming note, that's a note from February 7th, 2011?
24 A   Correct. I think he has dated here would be the 12th as far
25 as date of the dictation was performed.

Tawni Kind, RMR

1  Q   But the office visit itself was on the 7th?
2  A   Uhm...
3  Q   Can you tell from the note?
4  A   I can't tell from this, no, unfortunately. It's dating
5  performed by Dr. Deming on February 12th, verified by him sometime
6  in August. There is another one here that says 2/7/2011 for the
7  clinic outpatient visit. So I guess I would go with that.
8  Q   As February 7th?
9  A   Yeah.
10 Q   Okay, and then you saw him on the 9th of March?
11 A   Correct.
12 Q   And then the EMG report you're referring to was from a
13 Dr. Bandy?
14 A   Bandy, yep.
15 Q   From April 20th of 2011?
16 A   Correct.
17 Q   And then what was the other record you looked at?
18 A   A note here by the emergency department, note by Dr. Manuel
19 Mendoza. And this looks like it was dated on 9/25. Well, hang
20 on. Yeah, 9/25 was the date of that visit.
21 Q   Dr. Deming's note, your office visit, and the EMG all relate
22 to a problem of carpal tunnel syndrome, correct?
23 A   Correct.
24 Q   The final progress note or office visit, did that relate at
25 all to carpal tunnel syndrome?

Tawni Kind, RMR

7

1  A   No. It was secondary to a neck jury.
2  Q   And what was the neck injury?
3  A   It says patient presents with complaint of neck pain. The
4  pain started about 45 minutes to an hour after he alleges that
5  another officer struck him on the left side of his neck with a
6  fist.
7  Q   Okay, and does that, the subject matter of that visit, does it
8  relate at all to anything you saw him for back in March of 2011?
9  A   No.
10 Q   Did you have the benefit of Dr. Deming's notes from the
11 February office visit when you saw Mr. Kingsley in March?
12 A   I did not.
13 Q   So you've only seen those more recently?
14 A   Since, correct.
15 Q   And was the first time you saw this in preparation for today?
16 A   Correct.
17 Q   And did you ever have the benefit of Dr. Bandy's EMG report?
18 A   After the fact, after you had contacted me for the
19 deposition, realizing we had not seen him back yet for the results
20 of that EMG study.
21 Q   So again, Dr. Bandy's EMG study report is something you first
22 saw in preparing for today?
23 A   Correct.
24 Q   Okay. So your office visit, what was the reason or what was
25 the subject of that office visit?

Tawni Kind, RMR

8

1  A   He came in, chief complaint of bilateral tingling and hand
2  numbness, right hand worse than the left.
3  Q   And in your visit with him that day, did he tell you at all
4  about the visit he had had with Dr. Deming?
5  A   No.
6  Q   So you had no -- you didn't even know that had occurred?
7  A   Correct.
8  Q   And what did he tell you about the source of that hand
9  numbness?
10 A   When asked specifically about any obvious incite injury or
11 trauma history, he mentioned, he mentioned the symptoms had been
12 going on for about a year, that he works at a car shop doing
13 detailing and other minor repairs on cars with his brother; and
14 short of that, we had no other source for his symptoms.
15 Q   So you specifically asked him questions designed to get at the
16 possible source of the problem?
17 A   Correct.
18 Q   And one of those questions you asked him was whether there had
19 ever been any sort of trauma or injury to either one or both of his
20 hands or wrists?
21 A   Correct.
22 Q   And he did not tell you of any specific trauma that had
23 occurred in response to that question?
24 A   Correct.
25 Q   I take it then he did not give you any information about an

Tawni Kind, RMR

## Page 9

1  incident that may or may not have occurred in the jail?
2  A    No, I wasn't even aware that he was even incarcerated at the
3  time we saw him, or had been.
4  Q    And then you asked him about his work history, I take it?
5  A    Correct.
6  Q    And that I assume is to understand whether the work he engaged
7  in involved repetitive hand motions?
8  A    Correct.
9  Q    And he told you what, again?
10 A    He said he worked in a car shop with his brother doing
11 detailing and some minor repairs on cars.
12 Q    Did he tell you he ever worked as a roofer?
13 A    Had not mentioned that, no.
14 Q    Would that have been relevant?
15 A    Less likely for carpal tunnel syndrome.
16 Q    Was there anything about his work in the car shop that was
17 relevant to your inquiries about the possible source of the carpal
18 tunnel syndrome?
19 A    Biggest risk factors we'll see with car and automotive
20 repairs is vibrative tool usage, sanding, things like that
21 increases the risk of carpal tunnel syndrome. Awkward and
22 repetitive movements of doing body work can irritate the medial
23 nerve and increase a risk of carpal tunnel syndrome.
24 Q    So what he told you about his work in the car shop is at least
25 consistent with the symptoms he was telling you about?

Tawni Kind, RMR

## Page 10

1  A    Correct.
2  Q    What other discussion did you have with Mr. Kingsley about the
3  possible source of his discomfort in his hand and wrists?
4  A    In looking through his history, that really was the only
5  thing that stuck out for us. He mentioned things including
6  numbness occurring at night, which is very consistent with carpal
7  tunnel syndrome. So I was confident with what the diagnose was
8  and our source-related work with that at that time is the
9  automotive usage.
10 Q    And he told you in the visit that the discomfort had been
11 occurring for --
12 A    About a year's duration or so.
13 Q    -- about a year?
14 A    Yeah.
15 Q    And did he offer any insight himself as to what he thought had
16 caused it?
17 A    Hadn't mentioned anything, no.
18 Q    By the way, how long did the office visit last?
19 A    Uhm, I would say usually for a typical new work up like this
20 and a discussion, we're probably looking at 20 minutes or so.
21 Q    Okay, and did you do any tests or evaluations in the office
22 visit to get at what he was complaining about?
23 A    Yeah. We did a physical exam on him.
24 Q    And any tests that are specific to diagnosing carpal tunnel?
25 A    Three different tests we did, including something called a

Tawni Kind, RMR

## Page 11

1  Tinel's test, which is tapping on the nerve, which made him
2  symptomatic. Doing a direct carpal compression test, which is a
3  compression on the nerve, which made him symptomatic. And also
4  something called a Phalen's test, which is P-H-A-L-E-N, and it has
5  to do with pressure in the tunnel that the nerve travels through
6  holding this position, and all three of those were provocative for
7  symptoms which fits with carpel tunnel syndrome.
8  Q    Are there different grades to a carpal tunnel diagnosis?
9  A    There are. It's really stratified more by the EMG study,
10 though.
11 Q    And here what did the EMG study show in terms of the grade?
12 A    Dr. Bandy's report on April 20th showed him to have a level
13 of Grade 1 out of four.
14 Q    Is that the least severe there is?
15 A    There is theoretically a zero stage, which is not truly a
16 diagnoses except for ten percent of the time it's a false
17 negative, which means ten percent of the people with a Grade 0
18 actually have it. He was Grade 1, so for brass tacks, basically
19 minimal, yes.
20 Q    And what was the course of treatment that you recommended?
21 A    Typically for a stage or Grade 1, if we'd seen him back I
22 would recommend night splinting with a wrist splint, ergonomic
23 changes at work, or anti-inflammatory usage. If that fails to
24 resolve the symptoms or issues, then we go ahead with an open
25 carpel tunnel release, actually surgically releasing the nerve.

Tawni Kind, RMR

## Page 12

1  Q    You haven't seen him again?
2  A    Correct.
3  Q    So you haven't had occasion to evaluate whether it's gotten
4  better or worse?
5  A    Correct.
6  Q    And you certainly didn't recommend surgery at that time?
7  A    Correct.
8  Q    And you're not in a position to say whether he should have
9  surgery now?
10 A    Correct.
11 Q    Is there any insight that you -- well, strike that.
12      I take it to the extent you reached a conclusion about the
13 cause of this carpal tunnel, your conclusion was that it most
14 likely would relate to his work with the car shop?
15 A    Correct.
16 Q    Did you reach any other conclusions about the cause of his
17 carpal tunnel syndrome?
18 A    No.
19 Q    I'm assuming not, but are you aware that Mr. Kingsley has
20 identified you as an expert witness on his behalf?
21 A    I was not aware of that until getting your letter for
22 deposition.
23 Q    So there hasn't been any contact between you and Mr. Kingsley
24 in terms of you serving in that capacity for him?
25 A    Correct. No, there has not.

Tawni Kind, RMR

14

```
1    Q    And there hasn't been any communication at all between you and
2    Mr. Kingsley following your March 2011 office visit?
3    A    That's correct, no.
4         (Exhibits #1, #2 marked for identification).
5  BY MR. JONES:
6    Q    I'm just going to show you two exhibits.
7    A    Okay.
8         MR. JONES:  The first one, Mr. Kingsley, is
9    what you had sent to me as your Deposition Exhibit
10   "B".
11        MR. KINGSLEY:  Okay.
12 BY MR. JONES:
13   Q    Have you ever seen this before, Dr. Butler?
14   A    This is a hand-written note by me, must have been after the
15   fact of the EMG, saying we need to follow-up with him, and I'm
16   assuming that likely meant that a phone call was made about the
17   result, and our policy is that the patient needs to come back in
18   for those results.  That is my signature on there.
19   Q    And is that a note to Mr. Kingsley?
20   A    That's a note to my nursing staff to let he or whoever was
21   contacting him to make him aware that he would need to follow up
22   with us for discussion or treatment option.
23   Q    So this is an internal note?
24   A    Correct.
25   Q    And your note is basically relating what Dr. Bandy's EMG
```

Tawni Kind, RMR

```
1    showed and indicating that as a result there should be follow-up?
2    A    Correct.
3    Q    And then if you look at the second document.
4    A    Uh-huh.
5         MR. JONES:  Mr. Kingsley, this is, it's
6    numbered as Monroe Five-four-two.  It's just an
7    appointment note from Franciscan Skemp for
8    April 27th, 2011.
9         MR. KINGSLEY:  Okay.  I know what you're
10   referring to.
11        MR. JONES:  Okay.  I've correctly stated what
12   this is, yes?  Are you still there, Mr. Kingsley?
13        MR. KINGSLEY:  Yes, yes.  With me
14   incarcerated, I was unable to --
15        MR. JONES:  I got it.
16 BY MR. JONES:
17   Q    Just so the record is clear, Dr. Butler, is this an
18   appointment note for Franciscan, correct?
19   A    Correct, yeah, it's a copy of an appointment card that would
20   have been made or sent.
21   Q    And this is for an appointment with you April 27th?
22   A    Correct.
23   Q    Of 2011?
24   A    Correct.
25   Q    And I take it from your earlier answers you did not see him on
```

Tawni Kind, RMR

15

```
1    that date?
2    A    That is correct.  I did not see him.
3    Q    It would be helpful if I could see the copy of your office
4    visit notes.
5    A    Yep.
6    Q    Since I haven't seen those before.
7         MR. KINGSLEY:  Just to state here I only have
8    about five minutes left.
9         MR. JONES:  Understood.  I'm almost done.
10 BY MR. JONES:
11   Q    Why did you ask him about neck pain?
12   A    Typically when neurologic symptoms are existing in the hand
13   or fingers, two potential sources are directly at the hand with
14   connection of the nerve.  We can have disc compression in the neck
15   causing what's called radicular symptoms, and that could either
16   solely cause the problems in the hand or actually magnify the
17   carpal tunnel like symptoms.
18   Q    And you did not observe any decrease in level of strength,
19   correct?
20   A    Correct.
21   Q    And you didn't see any signs of muscular atrophy either?
22   A    Correct.
23   Q    The fact that the hands were cool and clammy to the touch, was
24   that important?
25   A    Not necessarily a consistent issue with carpal tunnel
```

Tawni Kind, RMR

16

```
1    syndrome, so.
2    Q    What does it mean that the Tinel's test was grossly positive?
3    A    That means tapping on the nerve reproduced symptoms down
4    into the finger and hands.  So as we tap up in the forearm, he was
5    getting symptomatic numbness and tingling in the finger.
6    Q    And what does it mean that the exam of the bilateral upper
7    extremity showed two plus pulses?
8    A    It means he had good pounding pulses on both sides
9    asymmetrically.  So unlikely to be secondary to blood flow issues
10   to the hand causing the symptoms.
11        MR. JONES:  Okay.  Those are all the questions
12   I have.  Do you have any questions, Mr. Kingsley?
13        MR. KINGSLEY:  Yes, I do.  As stated, first I
14   would like to establish and or have the record
15   reflect a brief statement of the foregoing case is
16   that --
17        MR. JONES:  Could I make a suggestion,
18   Mr. Kingsley, since we're short on time?
19        MR. KINGSLEY:  Yes.
20        MR. JONES:  Is that if you're going to repeat
21   what you said in Dr. Deming's deposition, there's
22   really no reason for it.
23        MR. KINGSLEY:  Okay.
24        MR. JONES:  I mean, again, you can say
25   whatever you want to say, but the reason we're
```

Tawni Kind, RMR

## Page 18

1    doing this is so that we all can ask Dr. Butler
2    questions.
3            MR. KINGSLEY:  Right, right, and I'm trying to
4    get that established through the questions.
5            Okay, and this, Michael Kingsley claims that
6    he sustained serious injury arising out of such
7    excessive force, specifically due to handcuffs
8    being placed on him behind his back excessively
9    tight and being left with the handcuffs on, cutting
10   off circulation for a long period time.
11           With that being established, I'm ready to
12   proceed with questions for the orthopedic
13   specialist, Dr. Butler.
14                    CROSS-EXAMINATION
15   BY MR. KINGSLEY:
16   Q     Greetings, Dr. Butler.
17   A     Hi.
18   Q     On March 9th, as stated, you did conduct an examination of
19   Michael Kingsley; is that correct?
20   A     That is correct.
21   Q     And on March 9th, 2011, did you conclude, and is it your
22   opinion that Michael Kingsley was showing signs of carpal tunnel
23   syndrome?
24   A     That is correct.
25   Q     During the March 9th, 2011 meeting and upon your examination

                          Tawni Kind, RMR

## Page 17

1    of Michael Kingsley, is it your practice to conduct a consultation
2    regarding your findings and treatment options during that initial
3    visit?
4    A     To discuss potential causes and treatment options?  Yes.
5    Q     And during this initial meeting or consultation, did you
6    explain to Michael Kingsley that carpal tunnel syndrome is a
7    chronically -- or a chronic condition?
8    A     That it can potentially be that, yes.
9    Q     So when you're stating chronically, it's long lasting or long
10   duration?
11   A     Correct.
12   Q     And as stated in the final diagnosis and conclusions on the
13   EMG, a Grade 1 or mild carpal tunnel syndrome could simultaneously
14   go to a 2 or 3?
15   A     That it could progress to greater severity?
16   Q     Yes.
17   A     Potentially.
18   Q     And if you would, on March 9th, 2011, did you explain to
19   Michael Kingsley carpal tunnel syndrome is highly curable through
20   surgery?
21   A     If it is of the severity needing surgical intervention, yes,
22   that there are very good results with the release, yes.
23   Q     And as an orthopedic surgeon or specialist, how many carpal
24   tunnel surgeries have you performed?
25   A     Probably over 3 to 400.

                          Tawni Kind, RMR

## Page 19

1    Q     And over the 3 to 400 carpal tunnel surgeries you performed,
2    what was the success rate on that?  Can you speculate or can you?
3    A     I would have to say better than a 95% chance of excellent
4    results with it.
5    Q     And through your career as an orthopedic surgeon and carpal
6    tunnel syndrome surgery you conducted, the success rate of the
7    surgery you have conducted, like you said, are very high?
8    A     That is correct, yes.
9    Q     And okay.  Hold on.  I'm trying to get this done as fast as
10   possible.  I'm sorry.
11           And with regards to after performing the carpal tunnel
12   syndrome surgery, is it your recommendation that a patient be
13   excused from work for a period of time?
14   A     Depending on the work environment they're in, yes, it may
15   require either a limited work status, modified, and or avoiding
16   work for a period of time, yes.
17   Q     And is there any type of rehabilitation process, like a
18   specialist they may have to see?
19   A     Typically we don't need occupational therapy or any other
20   therapy beyond just standard healing time.
21   Q     Okay.  Doctor, drawing from reasonable inferences combined
22   with your medical expert opinion regarding the excessive use of
23   tight handcuffs for a long period of time cutting off circulation,
24   would that cause carpal tunnel syndrome or would it conclude your
25   diagnosis as stated and in the injury report?

                          Tawni Kind, RMR

## Page 20

1            MR. JONES:  Object to the form of the
2    question.  Lack of foundation.  You can go ahead
3    and answer, though.
4            THE WITNESS:  Okay.  Typically it is unlikely
5    to be a cause long-term with this duration of
6    symptoms with a single contact issue like this.  So
7    it would be unlikely.
8    BY MR. KINGSLEY:
9    Q     So it's unlikely for excessively tightened handcuffs for a
10   long period of time to lead to carpal tunnel syndrome?
11   A     It would have to be an extended period of exposure time, not
12   a single event, but we're talking about over weeks and months to
13   cause issues like that, typically.
14   Q     With regard to cutting off circulation?
15   A     We cut off circulation for upwards of two to three hours at
16   a time for hand surgery on a routine basis and we don't see these
17   types of symptoms.  So I would opine it is unlikely from that.
18   Q     Okay, but it is your final diagnosis and conclusion that I've
19   been diagnosed with Grade 1, or mild carpal tunnel syndrome; is that
20   correct?
21   A     I would agree, yes.
22   Q     Thank you for your time and attention in this matter, Doctor.
23   A     My pleasure.
24           MR. JONES:  Just about one minute of
25   additional questions, Mr. Kingsley.

                          Tawni Kind, RMR

```
 1            MR. KINGSLEY:  Yes.
 2                  REDIRECT EXAMINATION
 3   BY MR. JONES:
 4       Q    Carpal tunnel syndrome can be chronic?
 5       A    Correct.
 6       Q    Do you know whether Mr. Kingsley's is chronic?
 7       A    Difficult to determine.  Sometimes we will see changes on
 8   the EMG study.  They did not, at least on Dr. Bandy's summation,
 9   show any what we call chronic denervation symptoms.  So hard to
10   tell whether this has been an extended period of time or shortly,
11   based on the study.
12       Q    You don't know based on the limited information you have?
13       A    Correct.  It doesn't show in his study at the present time
14   that it's a chronic process.
15       Q    Carpal tunnel, I think you've said, can progress to be of
16   greater severity?
17       A    Or it can hold steady or it can resolve.
18       Q    Do you know which has occurred with Mr. Kingsley?
19       A    Having not seen him back, I'm not sure.
20       Q    Carpal tunnel may require surgery, correct?
21       A    Correct.
22       Q    Do you know whether Mr. Kingsley's does?
23       A    Having not seen him, again, can't tell you for sure.  Based
24   on symptoms and duration, if he still was symptomatic to the same
25   degree or more, there might be likelihood of having to do a
```

Tawni Kind, RMR

```
 1   release.
 2       Q    If?
 3       A    Yeah.
 4       Q    But you don't know?
 5       A    I don't know, having not seen him.
 6            MR. JONES:  That's all I have.  Thank you.
 7   Anything else, Mr. Kingsley?
 8            MR. KINGSLEY:  No.  Thank you.
 9            (Concluded).
```

Tawni Kind, RMR

23

                        **CERTIFICATE**

STATE OF WISCONSIN

COUNTY OF LA CROSSE

         I hereby certify that I reported the
deposition of **AARON MICHAEL BUTLER**, on the 16th day
of November, 2011, in Onalaska, Wisconsin, and that
the witness was by me first duly sworn to tell the
whole truth; that the testimony was transcribed
under my direction and is a true and complete
record, to the best of my ability, of the testimony
of the witness;
         That the cost of the original has been
charged to the party who noticed the deposition,
and that all parties who ordered such copies have
been charged at the same rate for such copies;
         That I am not a relative or employee or
attorney or counsel of the parties or a relative or
employee of such attorney or counsel; that I am not
financially interested in the action and have no
contract with the parties, attorneys, or persons
with an interest in the action that affects or has
a substantial tendency to affect my impartiality.

         WITNESS MY HAND AND SEAL THIS 1st DAY OF
DECEMBER, 2011.

_____
Tawni M. Kind, RMR
3061 Edgewater Lane
La Crosse, Wisconsin, 54603

My commission expires:

_____

Tawni Kind, RMR