# In The Matter Of:

*Michael B. Kingsley  vs.*
*Lisa Josvai, et al.*

---

*Deposition of FRITZ DEGNER*
*August 21, 2012*

---



## Verbatim Reporting, Limited

2 East Mifflin Street, Suite 102
Madison, WI  53703
(608) 255-7700  FAX (608) 255-7749

V·E·R·B·A·T·I·M
REPORTING, LIMITED
www. Verbatim-Madison.com

*Min-U-Script® with Word Index*

Michael B. Kingsley  vs.
Lisa Josvai, et al.

Deposition of FRITZ DEGNER
August 21, 2012

---

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF WISCONSIN

= = = = = = = = = = = = = = = = = = = = = = = = = = = =

MICHAEL B. KINGSLEY,

                    Plaintiff,

        -vs-                    Civil Action No. 10-CV-832

LISA JOSVAI, PATRICIA FISH,
ROBERT CONROY, STAN HENDRICKSON,
FRITZ DEGNER, and KARL BLANTON,

                    Defendants.

= = = = = = = = = = = = = = = = = = = = = = = = = = = =

Deposition of:
FRITZ DEGNER

Sparta, Wisconsin
August 21, 2012

Reported by:  Rowan L. Bright, RPR, CRR, CLR

---

Deposition of FRITZ DEGNER - 8/21/12                                    Page 3

1        DEPOSITION of FRITZ DEGNER, a witness of lawful
2   age, taken on behalf of the Plaintiff, wherein
3   Michael Kingsley is the Plaintiff and Lisa Josvai,
4   Patricia Fish, Robert Conroy, Stan Hendrickson,
5   Fritz Degner and Karl Blanton are the Defendants,
6   pending in the United States District Court for the
7   Western District of Wisconsin, pursuant to Notice,
8   before Rowan L. Bright, a Registered Professional
9   Reporter and Notary Public in and for the State of
10  Wisconsin, at the Best Western, 445 Theater Road, in
11  the City of Sparta, County of Monroe, and State of
12  Wisconsin, on the 21st day of August, 2012,
13  commencing at 2:06 in the afternoon.
14
15            A P P E A R A N C E S
16  EDWARD J. PARDON and JOEL F. GRAHAM, Attorneys
    MERCHANT & GOULD,
17       Ten East Doty Street, Suite 600, Madison,
         Wisconsin 53703-3376, appearing on behalf of the
         Plaintiff.
18       (608) 280-6750          epardon@merchantgould.com
19  ANDREW A. JONES, Attorney
    WHYTE HIRSCHBOECK DUDEK, S.C.,
20       555 East Wells Street, Suite 1900, Milwaukee,
         Wisconsin 53202-3819, appearing on behalf of the
21       Defendants.
         (414) 978-5445          ajones@whdlaw.com
22
23
24
25

---

Deposition of FRITZ DEGNER - 8/21/12                                    Page 2

1            I N D E X
2   WITNESS                                         Page(s)
3   FRITZ DEGNER
4       Examination by Mr. Pardon                        4
5
6
7            E X H I B I T S
8   No.     Description                          Identified
9   Exh 47   Map of Monroe County Jail                11
             (Confidential exhibit)
10
    Exh 48   Incident report 5/21/10                  46
11
    Exh 49   TASER use report                         78
12
    Exh 50   Written disciplinary action             86
13           (Confidential exhibit)
14
15       (Attached to the original transcript and
             copies provided to all counsel)
16
17
18       (Original transcript filed with Attorney Pardon
             and copy provided to Attorney Jones)
19
20
21
22
23
24
25

---

Deposition of FRITZ DEGNER - 8/21/12                                    Page 4

1                FRITZ DEGNER,
2           called as a witness, being first duly
3           sworn, testified on oath as follows:
4                EXAMINATION
5   By Mr. Pardon:
6   Q   Could you state your name, please.
7   A   Fritz A. Degner.
8   Q   Mr. Degner, what is your current employment
9       situation?
10  A   Deputy sheriff for Monroe County.
11  Q   How long have you been a deputy sheriff for
12      Monroe County?
13  A   Well, I've been a police officer for almost
14      21 years.
15  Q   I'll ask you about your employment history.  You
16      can work forwards or backwards, however you like.
17      Why don't you go backwards.  You're presently
18      with --
19  A   I'm presently with Monroe County.  I've been
20      working there full-time since May of 2002.  Prior
21      to that I worked part-time for the
22      sheriff's department starting in July of 1992.
23      I --
24  Q   The -- I'm sorry.  Go ahead.
25  A   And my prior employment was with the Sparta Police

---

Michael B. Kingsley  vs.
Lisa Josvai, et al.

Deposition of FRITZ DEGNER
August 21, 2012

Deposition of FRITZ DEGNER - 8/21/12                                   Page 5

1    Department from May of 2002 until -- I was
2    originally hired there in September of 1991.
3  Q  Prior to 1991, do you have any experience in law
4    enforcement?
5  A  No, just schooling.
6  Q  Is that when you graduated from school?
7  A  Yes.
8  Q  What is the highest level of education obtained
9    that you have?
10 A  I have a two-year Associate's Degree in police
11   science.
12 Q  When did you obtain that?
13 A  May of 1991.  Prior to that I was studying
14   microbiology at UW-La Crosse.
15 Q  Do you have any military experience?
16 A  Very short-term.
17 Q  What was that?
18 A  I had gone in in December of 1983, left for basic
19   training in June of 1984 and developed diabetes
20   while I was in boot camp and they said, "See ya."
21 Q  What was your employment between 1984 to 1991?
22 A  I was a high school student until August of '85.
23   I worked as -- worked in a used book store and
24   hobby shop.  I was a movie theater supervisor out
25   at Fort McCoy for a summer.  I was a ticket seller

Deposition of FRITZ DEGNER - 8/21/12                                   Page 6

1    out at Fort McCoy for a summer for the movie
2    theater, and I worked -- all of these were
3    part-time jobs -- and then worked at the PX on a
4    part-time basis as well out there.
5  Q  Since you've been a deputy sheriff with
6    Monroe County since May of 2002, have your job
7    duties changed?
8  A  What do you mean by --
9  Q  Have you held different positions working for
10   Monroe County --
11 A  Yes.
12 Q  -- since 2002?
13 A  I did a six-month period where I served as a
14   bailiff for Branch 2.
15 Q  When was that?
16 A  2010.
17 Q  You're aware that -- I'm sorry.  What are your
18   duties as a deputy sheriff for Monroe County?
19 A  Well, I investigate complaints as they're given to
20   me, enforce all traffic activity -- traffic
21   violations, criminal activities and such and
22   direct the patrol.
23 Q  You're aware that you're a defendant in a lawsuit
24   involving Michael Kingsley and yourself and
25   several other employees of Monroe County; correct?

Deposition of FRITZ DEGNER - 8/21/12                                   Page 7

1  A  Yes.
2  Q  And that's why you're testifying in this
3    deposition here today; correct?
4  A  Correct.
5  Q  Are you aware that that lawsuit concerns some
6    actions that occurred when Mr. Kingsley was moved
7    from a cell that he was in Monroe County Jail
8    to a receiving cell on the morning of May 21,
9    2010?
10 A  Correct.
11 Q  Can I refer to that as "the incident in question"
12   throughout this deposition?  When I say "the
13   incident in question," I'm referring to when
14   Mr. Kingsley was moved from his cell to the
15   receiving cell.
16 A  Yes.
17 Q  If we need to be more specific, we can be.
18 A  Sure.
19 Q  But just so I can generally refer to the incident,
20   we have that understanding?
21 A  Yes.
22 Q  On the day of the incident in question, were you a
23   deputy sheriff for Monroe County?
24 A  Yes, I was.
25 Q  I'll get back to that in a second.  Have you ever

Deposition of FRITZ DEGNER - 8/21/12                                   Page 8

1    testified in a deposition before?
2  A  No, I have not.
3  Q  Have you ever testified at a trial or a court
4    hearing before?
5  A  Yes, I have.
6  Q  About how many times?
7  A  I don't honestly know.
8  Q  Do you have a rough idea?  Are we talking
9    five times or a hundred times?
10 A  Maybe a hundred times.
11 Q  I'm getting ahead of myself.  Just to back up, if
12   you haven't testified at a deposition before, the
13   procedure's fairly simple.  I'll ask you
14   questions.  You're under oath.  If you don't
15   understand any of my questions, make sure you ask
16   me to clarify it.  From time to time, your
17   attorney might object.  You're still required to
18   answer the question, unless your attorney
19   instructs you not to answer the question.
20 A  Okay.
21 Q  You then said you testified, you weren't sure, but
22   maybe a hundred times in a court and/or at court
23   hearing.  Have you ever testified at a trial or a
24   court hearing for a matter that did not concern
25   your employment as a law enforcement officer?

Michael B. Kingsley  vs.
Lisa Josvai, et al.

Deposition of FRITZ DEGNER
August 21, 2012

| Deposition of FRITZ DEGNER - 8/21/12 | Page 9 |
|---|---|

1  A   I guess I don't understand.  As far as --
2  Q   Well --
3  A   Go ahead.  Go ahead and clarify.
4  Q   I imagine as a law enforcement officer you've been
5      called to testify about events that you've
6      witnessed in the course of your job duties many
7      times?
8  A   Right.
9  Q   Have you ever testified about the events related
10     to your personal life or matters that were not
11     related to -- that did not occur in the course of
12     your job duties?
13 A   No.
14 Q   What did you do to prepare for this deposition
15     today?
16 A   Reviewed notes -- not notes, but I reviewed my
17     report.  I reviewed video from the incident date,
18     looked at my -- the TASER report that I compiled
19     the day of the incident and, obviously, prepared
20     with the attorney.
21 Q   About how much time did you spend preparing?
22 A   Four or five hours.
23 Q   In addition to your report of the incident, did
24     you review anyone else's report of the incident?
25 A   No, I did not.

| Deposition of FRITZ DEGNER - 8/21/12 | Page 10 |
|---|---|

1  Q   Do you recall specifically what videos you looked
2      at, video or videos you looked at in preparation?
3  A   They had -- there was one that showed the cell
4      block area.  Then there was one that showed the
5      hallway.  I didn't completely watch through the
6      hallway area.  Then there was the receiving --
7      holding cell.  They change the names on us.  So if
8      I -- I may mess up what the terminology is.
9  Q   Okay.
10 A   I guess they refer to it as a holding cell.
11 Q   Is that also referred to as the receiving cell
12     sometimes?
13 A   When I first started law enforcement, the cell
14     that's out in our booking area was always the
15     receiving cell and all the rest of them are the
16     holding cells.  They've changed the name before.
17     I don't know.  I don't remember exactly.  But
18     anyway, the video from the holding cell area where
19     it showed Mr. Kingsley was brought in, and then
20     the video showing down into the -- into the
21     holding cell there.
22 Q   Just so we're clear, you've been handed what's
23     been marked both as Deposition Exhibit 38 as well
24     as Deposition Exhibit 17.
25 A   Yes.

| Deposition of FRITZ DEGNER - 8/21/12 | Page 11 |
|---|---|

1  Q   Do you recognize this as a map of a portion of the
2      Monroe County Jail?
3  A   That's what it appears to be.
4  Q   Do you see an area that has been marked with an
5      "R" on that map?
6          MR. JONES:  Just for the record,
7      Counsel, it's hard to see where the "R" is.
8      I know where it's supposed to be, but even I
9      can't see an "R."
10         MR. PARDON:  All right.  Well, what
11     I'm going to do, so we don't have a mucked up
12     record, is I'll give you another copy.  I
13     have written on portions of it in pen on the
14     lower right, DX 17 and DX 38.
15         (Exhibit No. 47 marked
16         for identification)
17 Q   I'm going to hand you what's been marked as
18     Exhibit 47.  I'm also going to hand you a pencil.
19     I'm going to ask you if you can just draw an arrow
20     pointing at what you're referring to as the
21     holding cell where Mr. Kingsley was brought into
22     on the morning of the incident in question.  You
23     can start from the side of the exhibit and draw it
24     into the black box into the area of -- somewhere
25     you can point to that and you can describe the

| Deposition of FRITZ DEGNER - 8/21/12 | Page 12 |
|---|---|

1      area where he was brought.  Why don't you make a
2      star in that area.
3  A   Okay.  (Indicating).
4  Q   You're referring to those as a holding cell?
5  A   That's what I've always known them as.
6  Q   If I refer to that during this deposition as a
7      receiving cell, can we have the understanding that
8      we're talking about the same area that you've
9      marked with a star?  Is that okay?
10         MR. JONES:  That's fine.  I'll just
11     make a note for the record.  Again, I don't
12     want to testify --
13         MR. PARDON:  That's fine.
14         MR. JONES:  Everyone has referred
15     to that area as the receiving cells.
16         THE WITNESS:  Okay.
17         MR. JONES:  So we've all become
18     accustomed to referring to that as the
19     receiving cells.
20 Q   And that's why.
21 A   No problem.
22 Q   That's fine.  You can set that aside for now.
23         MR. PARDON:  Apparently I referred
24     to this as Defendant's Deposition Exhibit and
25     I should have referred to this as Plaintiff's

Michael B. Kingsley   vs.
Lisa Josvai, et al.

Deposition of FRITZ DEGNER
August 21, 2012

1      Exhibit.  If I refer to anything in this
2      deposition as Defendant's Exhibit, I probably
3      meant to refer to it as Plaintiff's Exhibit.
4  Q   Is it my understanding that you were called to the
5      Monroe County Jail to assist with moving
6      Mr. Kingsley from his cell to a receiving cell on
7      the morning of the incident in question; is that
8      correct?
9  A   That's correct.
10 Q   What do you recall about that morning, beginning
11     from the beginning, like when you were first
12     called?  I'll ask you a different question.  When
13     did somebody call you?
14 A   I don't know exactly what time it was.  It was
15     late in the morning, early in the morning, late in
16     our shift, towards the end of our shift.
17 Q   So were you working a night shift?
18 A   Yes, I was.
19 Q   What shift were you working?  What were the hours?
20 A   11:00 p.m. to 7:30 a.m.
21 Q   So what were you told when you were asked to come
22     to the jail?
23 A   If I recall, the dispatcher just said to report to
24     the jail.  They needed assistance.
25 Q   Once you got to the jail, who did you talk to?

1  A   I believe it would be Sergeant --
2      Lieutenant Hendrickson now -- said at the time
3      they needed assistance moving the inmate from the
4      cell block to the receiving cells.
5  Q   What happened next?
6  A   We went back to -- went down the hallway to the
7      cell block.  I believe everybody was already
8      locked down at that point in time.  They opened up
9      the door.  Sergeant Hendrickson, Karl Blanton and
10     myself went in originally.  And then
11     Sergeant Shisler and Lieutenant Conroy would have
12     come down.
13         Then at that point in time, they were trying
14     to convince Mr. Kingsley to come back up to the --
15     the opening in the door so handcuffs could be
16     placed on him.  He refused to do it.  They tried a
17     number of -- tried to convince him to comply with
18     the order.
19         Mr. Kingsley was trying to -- basically he
20     was trying to dictate the way that things were
21     going to go; because I remember at one point I
22     told him, you know, "You're not in a position --
23     that's not how this works.  You do what we tell
24     you to do, and then we in turn do what you'd like
25     to do.  You're not in the position to control

1      this."
2  Q   I'm going to back up for a second and go back to
3      prior to your walking down the cell block to the
4      cell where Mr. Kingsley was in.  Did you have a
5      conversation with the jailers regarding why
6      Mr. Kingsley was causing a problem in the jail?
7      Did you have an understanding of what the problem
8      was?
9  A   I did at that time.  I don't recall what it was at
10     this point in time.
11 Q   Do you recall whether it involved his refusing to
12     take a paper off of a light in his cell?
13 A   That could be.
14 Q   You don't recall?
15 A   I don't recall.
16 Q   Prior to walking down into the cell area with the
17     other officers, did you have a discussion about
18     which officers were going to undertake certain
19     roles in the process of talking to Mr. Kingsley?
20 A   Yes.
21 Q   What was the discussion, and what was decided?
22 A   It was my understanding that Sergeant Hendrickson
23     and Deputy Blanton were going to be the ones who
24     had physical contact with him.  I was going to
25     cover with the TASER in case he became violent,

1      and I'm not sure exactly what discussion was had
2      at that point in time, what Sergeant Shisler or
3      Lieutenant Conroy were going to handle.
4  Q   What does it mean to cover with a TASER?  What
5      does that role entail?
6  A   From my perspective as a road officer, that means
7      while one officer is -- it's known as a contact
8      cover principle.  One officer is in contact with
9      the subject.  The other officer is covering them
10     to make sure that -- watching the hands, watching
11     their demeanor and how they're acting to be able
12     to intervene quickly in case something happens
13     within the contact.
14 Q   Does covering with the TASER entail letting the
15     subject know that you are ready to use the TASER,
16     if necessary?
17 A   It can mean that, yes.
18 Q   So when you walked down to the cell that
19     Mr. Kingsley was in with the other officers that
20     morning, do you recall whether you or anyone else
21     let Mr. Kingsley know that it was possible the
22     TASER could be used on him if he wasn't
23     cooperative?
24 A   Yes, I did.
25 Q   Was it you who let him know that?

Michael B. Kingsley  vs.
Lisa Josvai, et al.

Deposition of FRITZ DEGNER
August 21, 2012

1  A   I would have said that.
2  Q   How do you recall what you said?
3  A   I don't recall exactly what was said, as far as
4      how it was said or anything like that.  He would
5      have just been warned that if he didn't comply, he
6      could be TASE'd or will be TASE'd.
7  Q   Do you recall who walked into the cell first?
8  A   No, I don't.  I think it was Sergeant Hendrickson.
9  Q   I asked a bad question.  I want to back up in time
10     a little bit.  Do you recall specifically what
11     Sergeant Hendrickson or anyone else said to
12     Mr. Kingsley before the officers entered the cell
13     block?
14 A   Exactly what was said, no.
15 Q   Okay.
16 A   The gist of what was said was to get him to comply
17     and come to the door so he could be handcuffed so
18     we could move him.
19 Q   Do you recall whether Mr. Kingsley complied?
20 A   No, he did not.
21 Q   Do you recall what Mr. Kingsley did when he wasn't
22     complying?
23 A   Laid there on his bed.
24 Q   Did he say anything?
25 A   He was argumentative, back with -- everything that

1      he was told to do, he had an argument against,
2      that kind of thing.  I do know when I had told him
3      that if he didn't comply he could be TASE'd, he
4      said, "If I get TASE'd, I'm going to sue you."
5  Q   Did Mr. Kingsley make any threats to using physical
6      violence against any of the staff during this
7      time?
8  A   I don't recall that.
9  Q   You don't recall or --
10 A   I don't recall that he did.  Sorry.
11 Q   So you don't recall any specific statements by him
12     making any physical threats?
13 A   Correct.
14         MR. JONES:  Just a reminder.  Make
15     sure you wait until he's done with the
16     question before you answer, even if you know
17     what he's asking you.  It makes a clearer
18     record.
19         THE WITNESS:  Sure.
20 Q   So then officers entered the cell?
21 A   Yes.
22 Q   I'm going to back up again.  I apologize.  Did
23     Lieutenant Conroy say anything to him?
24 A   I don't know if he did or not.
25 Q   Then officers entered the cell; correct?

1  A   Correct.
2  Q   What happened after officers entered the cell?
3  A   They -- I don't remember if Mr. Kingsley was laid
4      on his back or if he was laying on his stomach at
5      the time.  I know they had to -- they would have
6      had to have him on his stomach to handcuff him.
7      Sergeant Hendrickson and Deputy Blanton went in
8      and handcuffed him; and during that time, I
9      stepped into the doorway of the cell and was
10     prepared, if he started fighting with them, to use
11     the TASER at that time.
12 Q   Do you recall whether you thought you might have
13     to use the TASER at that time?
14 A   Can you ask that again?
15 Q   Yes.  At any point when you were in the cell, did
16     you feel that there was a high probability that
17     you would have to use the TASER in the cell?
18         MR. JONES:  Just to clarify, we're
19     still in the cell, his original cell in the
20     cell block?
21         MR. PARDON:  We are still in the
22     original cell in the cell block, not the
23     receiving or the holding cell.
24 A   I would say -- well, yes, because I was prepared
25     to use it at any point in time, should something

1      happen.  When you're dealing with a potentially
2      volatile situation, you don't know when that's
3      going to happen.  So whether I thought I was going
4      to have to use it or not, no, I didn't think about
5      whether I was going to have to use it.  I was just
6      prepared to use it, if it was necessary to use it.
7  Q   Okay.  I understand.  Did you witness any of the
8      other officers putting the handcuffs on
9      Mr. Kingsley?
10 A   I didn't watch them putting the handcuffs on him.
11 Q   Do you know who put the handcuffs on?
12 A   No, I don't.
13 Q   So it would be fair to say you didn't see anybody
14     put the handcuffs on Mr. Kingsley when he was in
15     the cell; correct?  I just want to make sure I
16     understand.
17 A   Correct.
18 Q   Did you see Mr. Kingsley exhibiting any active or
19     passive resistance when he was in the cell?
20 A   Passive resistance.
21 Q   In what way?
22 A   Not complying with the lawful orders he was told
23     to do.
24 Q   Okay.
25 A   When he was being handcuffed, he was actively

Michael B. Kingsley  vs.
Lisa Josvai, et al.

Deposition of FRITZ DEGNER
August 21, 2012

---

Deposition of FRITZ DEGNER - 8/21/12                                    Page 21

1  resisting.  I know that because they had to tell
2  him to relax so they could put the handcuffs on
3  him and he was not providing them with placing his
4  hands behind his back like he was told to do.  He
5  had to physically maneuver his arms to put the
6  handcuffs on him.
7  Q  What's the basis of your testimony, that they have
8     to physically move his arms?
9  A  Because they were telling him to relax and let
10    them put the handcuffs on him.
11 Q  So it's based on your -- what you heard them say;
12    correct?
13 A  Correct.
14 Q  It's not based on what you saw; correct?
15 A  At that point in time, correct.
16 Q  Then what happened after the handcuffs were placed
17    on Mr. Kingsley?
18 A  He was told to stand up.
19 Q  Did he stand up?
20 A  No.
21 Q  How did he get out of the bunk and into the cell?
22 A  Into the walkway?
23 Q  Into the walkway.
24 A  He was physically picked up.
25 Q  Do you recall who physically picked him up?

---

Deposition of FRITZ DEGNER - 8/21/12                                    Page 22

1  A  It was Sergeant Hendrickson and Deputy Blanton who
2     picked him up.
3  Q  Where were you during this time?
4  A  I was standing at the doorway looking into the
5     cell block -- into the cell.
6  Q  Then what happened?  Where was he carried after
7     that?
8  A  Well, he was told to put his feet down.
9  Q  Okay.
10 A  And he refused to, so they carried him out into
11    the walkway and then carried him out into the main
12    hallway in the jail.
13 Q  Did he make any threats to use physical violence
14    during that time when he was carried from the bunk
15    out into the walkway?
16 A  Not that I recall, no.
17 Q  Did he exhibit any active resistance at that time?
18         MR. JONES:  Which point in time are
19    we talking about?
20         MR. PARDON:  Good question.  Thank
21    you.
22 Q  When he was carried from the bunk to the point he
23    was out -- from the point he was removed from the
24    bunk to the point he was carried out into the
25    hallway outside the cell door.

---

Deposition of FRITZ DEGNER - 8/21/12                                    Page 23

1  A  No.
2  Q  Then what happened after that?
3  A  Then he was laid down on the floor in the hallway.
4  Q  Then what happened?
5  A  He was complaining about having some pain in his
6     foot.  When he was asked about what foot, what
7     hurt, he basically didn't say -- he wouldn't tell
8     anybody what it was.  He complained about it, but
9     he wouldn't tell anybody what foot hurt or where
10    it hurt or anything like that.
11 Q  Okay.
12 A  So then it was -- well, since he's not going to
13    help us help him, we picked him up.  And at that
14    time it would have been Sergeant Hendrickson,
15    Deputy Blanton, Sergeant Shisler, and I believe
16    Lieutenant Conroy picked him up and carried him
17    into the receiving cell.
18 Q  Do you recall --
19 A  And I followed behind them.
20 Q  Do you recall where the officers were in relation
21    to his arms or legs?
22 A  No, not off the top of my head, I don't.
23 Q  When you identified officers who carried him, is
24    that based on what you actually recall or is that
25    based on your reading from the reports?

---

Deposition of FRITZ DEGNER - 8/21/12                                    Page 24

1  A  No.  That, I actually recall.
2  Q  Where did they carry him from there?
3  A  Carried him from the hallway floor to the
4     receiving cell and placed him on the, for lack of
5     a better term, bed, the concrete slab that's in
6     the receiving cell.
7  Q  I'm going to ask you about the process of going
8     from the cell to the receiving cell.  Do you know
9     approximately how far he would have been carried?
10 A  Can I look at that?
11 Q  Yes, of course.  You're looking at Exhibit 47.
12 A  All told, maybe 50 feet.
13 Q  Did Mr. Kingsley make any threats to harm anyone
14    while he was being carried from outside his cell
15    to the receiving cell?
16         MR. JONES:  Object to the form.
17    You can answer.
18 A  Not that I recall, as far as -- I don't remember.
19    The only thing I remember him saying was
20    complaining about his foot.
21 Q  Did Mr. Kingsley exhibit any active resistance
22    from the time he was carried -- during the process
23    of being carried from the hallway outside of his
24    cell up until he got to the receiving cell that
25    you're aware of?

---

Michael B. Kingsley  vs.
Lisa Josvai, et al.

Deposition of FRITZ DEGNER
August 21, 2012

1 A  Ask that again, please.

2 Q  Sure.  I'll ask it differently, so pay attention.

3    I'll ask a better question, I hope.

4 A  Okay.

5 Q  Did you observe Mr. Kingsley exhibit any active

6    resistance during the process of carrying him from

7    the hallway outside of his cell up to the

8    receiving cell?

9 A  No.

10 Q  Did you observe Mr. Kingsley exhibiting any

11    passive resistance from the time he was carried

12    outside of his cell to the receiving cell -- up to

13    the receiving cell?

14 A  Yes.

15 Q  What was the passive resistance you observed?

16 A  He wouldn't get up and walk.

17 Q  So he wasn't following the orders?

18 A  He wasn't following what he was told to do.

19 Q  Just so we're clear, when I say "Did you observe

20    any active resistance," what do you understand the

21    term "active resistance" to mean?

22 A  As far as active resistance, it would be where

23    he's struggling, where he's not allowing us to

24    maintain control of him, things along those lines.

25 Q  So would it be fair to say that from the time he

1    was carried from outside the cell door in the

2    hallway up to the point of the receiving cell that

3    he was allowing the officers to carry him?

4 A  Yes.

5 Q  Do you have an understanding of why he was taken

6    to the receiving cell?

7 A  I think you asked that before.  As far as the

8    reason --

9 Q  Yes.

10 A  -- behind it, I don't know, other than what you've

11    told me.

12 Q  Now, who was in charge of the process of moving

13    him outside of his cell down to the receiving

14    cell?

15 A  I'm not exactly certain.  It was either

16    Sergeant Hendrickson or Lieutenant Conroy.

17 Q  I want to back up again.  You're a road deputy,

18    meaning you were not a jail employee, per se, at

19    the time of the incident in question; right?

20 A  That's correct.

21 Q  Sergeant Shisler, I believe, was also a road

22    deputy; is that correct?

23 A  Yes, it is.

24 Q  When road deputies such as yourself have to go to

25    the jail to help with an incident such as the

1    incident in question, what is the line of

2    authority in terms of, do the jail employees have

3    authority over the actions of a road deputy acting

4    in the jail?

5 A  We usually defer that to them because we're --

6    we're in their side.  We don't know all the ins

7    and outs of how they handle or deal with inmates

8    and such on a day-to-day basis.  So when it comes

9    time for us to come off the road and assist in the

10    jail, usually whoever is the most senior or

11    whoever the supervisor is in the jail would be the

12    one who tells us how they want things done.

13       I do know of other instances where we've had

14    other people who have taken over, but they're

15    former jail employees who know things, know how

16    the operation is.

17 Q  You mean you do know of instances where road

18    deputies have taken over?

19 A  Correct.

20 Q  But they are former jail employees?

21 A  Yes.

22 Q  Going back then to when Mr. Kingsley and the other

23    officers reached this receiving cell, what did you

24    observe happen then?

25 A  Well, there was some maneuvering, having to

1    shuffle positions, because the doorway's not wide

2    enough to go three wide through.

3 Q  Okay.  So --

4 A  There was some rearranging of some positions.  I

5    know Lieutenant Conroy ended up hanging onto

6    Mr. Kingsley.  Sergeant Shisler, who had one of

7    his legs, ended up still with both the legs once

8    they were inside the cell and he was on the bed.

9    I believe originally Sergeant Hendrickson was at

10    the midsection and Deputy Blanton was at the head.

11    And I wasn't even in the cell at that time.

12 Q  Okay.

13 A  So -- and then Lieutenant Conroy had stepped back

14    into the doorway there.

15 Q  Let me back up again.  So he was carried into the

16    door; and as this shifting of positions of the

17    officers was going on, he was placed onto the

18    bunk, I guess you would call it?

19 A  Yes.

20 Q  Is that correct?

21 A  Yes.

22 Q  Where is the bunk in relation to the door?

23 A  You've got the doorway, and the bunk is off to the

24    left side of the door.

25 Q  As you enter the receiving cell from the hallway,

Michael B. Kingsley  vs.
Lisa Josvai, et al.

Deposition of FRITZ DEGNER
August 21, 2012

Deposition of FRITZ DEGNER - 8/21/12                                Page 29

1   the bunk is to the left; is that correct?
2 A   Correct.
3 Q   As the officers were shifting and as Mr. Kingsley
4   was placed onto the bunk, where were you then?
5 A   I was out in the hallway still.
6 Q   What happened after that?
7 A   Lieutenant Conroy stepped out of the way.  I don't
8   remember if I was -- if I was already in the cell
9   at the time before Sergeant Hendrickson and
10   Deputy Blanton switched positions.  I believe that
11   was done because Deputy Blanton was the one who
12   was going to remove the handcuffs from him.
13 Q   Okay.
14 A   He had the handcuff key.  And so then
15   Sergeant Hendrickson went to the head and
16   shoulders area.  Deputy Blanton was in the
17   midsection, and Sergeant Shisler was on the legs.
18   I was in the upper area, I guess, between
19   Sergeant Hendrickson and Deputy Blanton.
20 Q   What happened after that, after that shifting
21   occurred and you moved up to the head area?
22 A   That's when they were trying to remove the
23   handcuffs from him.
24 Q   Were people speaking to Mr. Kingsley?
25 A   Yes.

Deposition of FRITZ DEGNER - 8/21/12                                Page 30

1 Q   What were --
2 A   Telling him to relax, quit pulling on handcuffs,
3   quit resisting.
4 Q   Who was saying that?
5 A   Sergeant Hendrickson was saying it.  I believe I
6   said things, as well as -- along the same lines,
7   and I believe Deputy Blanton was saying the same
8   thing.
9 Q   Did Sergeant Shisler say anything that you recall?
10 A   I don't recall.
11 Q   Is it routine in a situation such as this one for
12   more than one officer to give instructions to a
13   subject?
14 A   I don't know if it's routine.  It happens.
15 Q   Are officers trained that it's better if one
16   officer does the primary talking with the subject?
17 A   It depends upon the training or if they have
18   received advanced training.
19 Q   Is it your understanding that that is a preferable
20   way to proceed?
21 A   Yes.
22 Q   Why is it a preferable way to proceed?
23 A   Because when more than one person's talking, it's
24   hard to concentrate and follow along, basically.
25 Q   Could it have been difficult for Mr. Kingsley to

Deposition of FRITZ DEGNER - 8/21/12                                Page 31

1   concentrate and follow along given that more than
2   one officer was talking?
3 A   Possibly.
4 Q   Now, did you observe any passive resistance on
5   Mr. Kingsley's part during the time that the
6   officers were telling him "Stop resisting"?
7 A   Not at that point in time.
8           MR. JONES:  I'm just going to make
9   sure we're clear.  We're now solidly in the
10   receiving cell?
11           MR. PARDON:  That's what I'm
12   talking about.  We're now solidly in the
13   receiving cell, and Deputy Degner has moved
14   up to the point where he's in between
15   Sergeant Hendrickson and Deputy Blanton.
16 Q   Do you understand that that's what I'm talking
17   about?
18 A   Yes.
19 Q   Did you observe any passive resistance from
20   Mr. Kingsley at that time?
21 A   No.
22 Q   Did you observe any active resistance from
23   Mr. Kingsley at that time?
24 A   Yes.
25 Q   What active resistance did you see from

Deposition of FRITZ DEGNER - 8/21/12                                Page 32

1   Mr. Kingsley at that time?
2 A   He was -- he was moving his shoulders around.
3   He -- at one point he had his head up, and I don't
4   know what he was trying to do with his head.
5   He -- obviously since there were multiple of us
6   telling him to stop resisting and to relax so we
7   could take the handcuffs off, what he was doing,
8   one of the things I did notice, is he was growling
9   like an animal.  It sounded like a bear growling.
10   He was pulling on the handcuffs like he was trying
11   to break them, is the impression that it gave me.
12 Q   By pulling on the handcuffs like he was trying to
13   break them, what do you mean?
14 A   His hands were behind his back (indicating), and
15   he's physically pulling against the chain.
16   Normally on a compliant, non-resistive person, the
17   chain would have play in it and it would be fairly
18   easy to manipulate the handcuffs together.  In
19   this case, it was not.  He was pulling on the
20   chain so tight that Deputy Blanton couldn't take
21   the handcuffs off.
22 Q   By pulling on the chain so tightly, do you mean
23   that he was moving his arms and wrists apart, like
24   apart from one another?
25 A   Right, the back of the hands which, I believe --

Verbatim Reporting, Limited
(608) 255.7700

Michael B. Kingsley  vs.
Lisa Josvai, et al.

Deposition of FRITZ DEGNER
August 21, 2012

---

Deposition of FRITZ DEGNER - 8/21/12                    Page 33

1   the way he should have been handcuffed was back of
2     the hand to the back of the hand, and he was
3     trying to bring his hands to the front of his body
4     by pulling them in opposite directions.
5  Q  Did you hear Mr. Kingsley make any physical --
6     threats of physical violence towards anybody in
7     the cell at that time?
8  A  No, I didn't.
9  Q  What happened next?
10 A  Somewhere's in there amongst all the telling him
11    to relax and such, that's when
12    Sergeant Hendrickson told me to TASE him.
13 Q  Prior to the time where Sergeant Hendrickson told
14    you to TASE him, did you have the TASER on?
15 A  Yes.
16 Q  What do you do when you turn the TASER on?
17 A  Well, before I turn the TASER on, the TASER has
18    what's known as an air cartridge on it.  It would
19    shoot out probes.  I remove that from the TASER,
20    which is done before you turn it on because a
21    static electricity spark could cause it to deploy.
22        So I took that off, and then you turn it on
23    by flipping the safety lever.  It has a safety
24    lever on the back of the upper rear of the TASER.
25    I flip that on, which then activates the light and

---

Deposition of FRITZ DEGNER - 8/21/12                    Page 34

1     the laser light.
2  Q  Do you know whether Mr. Kingsley saw that you had
3     activated the TASER light?
4  A  I don't know if he did or not.
5  Q  Did you tell him that you had activated it?
6  A  No.
7  Q  Did anybody make any statements like, you know,
8     "We're going to TASE you" or "We're going to use
9     the TASER"?
10 A  I don't know if anybody did.
11 Q  By the time Sergeant Hendrickson told you to
12    deploy the TASER on Mr. Kingsley, had you already
13    put the TASER -- well, I'll back up with my
14    question again.  You deployed the TASER on
15    Mr. Kingsley's right upper back; is that correct?
16 A  Yes, shoulder.
17 Q  You deployed a contact stun; is that correct?
18 A  Correct.
19 Q  In order to apply a contact stun, you must
20    physically place the weapon on the subject;
21    correct?
22 A  Correct.
23 Q  Had you placed the TASER on Mr. Kingsley's back
24    prior to the time that Sergeant Hendrickson told
25    you to deploy the TASER?

---

Deposition of FRITZ DEGNER - 8/21/12                    Page 35

1  A  I don't believe so.  From where I'm -- when I
2     looked at the video, it looked like he turned his
3     head towards me and that's when he said "TASER
4     him."  And then I stepped up -- I had to work in
5     between Deputy Blanton and put it on his shoulder.
6     And I think he was probably warned to relax again,
7     and then the TASER was applied at that time.
8  Q  Did Sergeant Hendrickson have to tell you a second
9     time to TASE him or --
10 A  He did not.
11 Q  Who did you view to be in charge of the situation
12    at the time that Sergeant Hendrickson told you to
13    deploy the TASER?
14 A  Sergeant Hendrickson.
15 Q  Did you agree with the instruction to deploy the
16    TASER?
17 A  Yes.
18 Q  Why?
19 A  He was actively resisting.  He was preventing us
20    from taking the handcuffs off him.  It's a safety
21    issue.  We need to get the handcuffs off of him
22    because if we leave him, he could get hurt.  He
23    has no way of catching himself.  And so, you know,
24    in that respect -- plus he was extremely agitated
25    and angry, so that's why we felt it was necessary.

---

Deposition of FRITZ DEGNER - 8/21/12                    Page 36

1  Q  If you hadn't agreed with an instruction to deploy
2     the TASER, would you have done so?
3  A  Re-ask that, if you would, please.
4  Q  Yes.  If you were in a situation similar to the
5     incident involved here and the individual who was
6     in charge of the incident told you to deploy the
7     TASER and if you found yourself in a situation
8     where you did not think it was appropriate to
9     deploy the TASER, would you still do it?
10 A  No.
11 Q  How would you handle that situation where you were
12    told to do something and you didn't think it was
13    appropriate to do it?
14 A  I'm not sure.  I would probably say it's not a
15    good idea.
16 Q  Have you ever had a situation like that occur?
17 A  I may have.  I don't remember specifically any
18    instances, but --
19 Q  Have you heard the term "resistive tension"?
20 A  I believe I have, yes.
21 Q  What does that mean?
22 A  That would be -- my feeling about it is it would
23    be the -- you can -- if I was to pull on your arm
24    where you would tighten up or pull against me,
25    that would be resistive tension in your arm.

---

Michael B. Kingsley   vs.
Lisa Josvai, et al.

Deposition of FRITZ DEGNER
August 21, 2012

1 Q   Is resistive tension active resistance?
2 A   Not at that point in time, no.
3 Q   Did you see Mr. Kingsley at any time in the
4     receiving cell attempt to bite anyone?
5 A   No.
6 Q   Did you see any situation where
7     Sergeant Hendrickson attempted to secure
8     Mr. Kingsley's head or upper body?
9 A   What do you mean by "secure"?
10 Q   Do some sort of a stabilizing move or some sort of
11     a compliance hold or move.
12 A   The reason why I ask is because I used the term
13     "secure" in my report.  And my meaning of "secure"
14     means the area they were in charge of, dealing
15     with, as far as securing.  I know
16     Sergeant Hendrickson was trying to control his
17     head and upper shoulders area.  I believe he
18     had -- at one point I remember seeing
19     Mr. Kingsley's head moving around; and then after
20     that, I believe Sergeant Hendrickson had put his
21     leg up.  It would have been the front of his shin
22     area across his shoulder and back.
23 Q   Just so it's clear, Sergeant Hendrickson put his
24     shin area across the back of Mr. Kingsley's head
25     or shoulder?

1 A   Yes.  His head would have been turned and -- so he
2     would have -- I'm trying to think of the best way
3     to demonstrate.
4 Q   You can just try to describe it.
5 A   As Mr. Kingsley's laying there on his stomach and
6     his head's turned this way (indicating) --
7 Q   When you say his head's turned "this way," would
8     that be to Mr. Kingsley's left?
9 A   Yes.  And so then Sergeant Hendrickson's leg would
10     have been up across the side of his face here, and
11     the knee would have been pretty much between the
12     shoulder blades, maybe a little bit more --
13 Q   So when you --
14        MR. JONES:  I'm sorry.  I'm not
15     sure he was done talking at this point.  Were
16     you finished with your answer?
17        THE WITNESS:  I think so.
18 Q   When you say that Sergeant Hendrickson put his leg
19     to this side of Kingsley's face or head, you were
20     pointing to the left; is that correct?
21 A   Yes.
22 Q   Did you see Sergeant Hendrickson strike
23     Mr. Kingsley at any point?
24 A   No.
25 Q   Could Sergeant Hendrickson have done so and you

1     had not seen it?
2 A   I don't know.
3 Q   Did you hear anyone say "TASE his ass"?
4 A   No.
5 Q   Do you know whether anyone said "TASE his ass"?
6 A   I didn't hear anybody say "TASE his ass."
7 Q   Why did you use a contact stun as opposed to using
8     probes?
9 A   I need you to clarify that one a little bit.  As
10     far as when you say "use probes," do you mean the
11     standard methodology of using what would be a
12     probe shot on a person?
13 Q   Yes.
14 A   Space.  There was no room for it.  The area would
15     not have allowed for me to put the laser dot on
16     Mr. Kingsley's back on where it would have got any
17     spread to perform any muscular disruption.  So
18     that's the reason I took the cartridge off and
19     used it for compliance rather than as far as
20     electromuscular disruption.
21 Q   At the time the TASER was deployed, do you believe
22     there would have been any other measures that
23     could have been used instead of a TASER to obtain
24     the desired result?
25 A   No.

1 Q   Could some sort of a compliance hold on the back
2     of Mr. Kingsley's head or in the head area have
3     been used?
4 A   No.
5 Q   Why not?
6 A   What?  What would have been used?  That's the -- I
7     mean, there's no pressure point.
8 Q   Could a pressure point, for example, have been
9     used?
10 A   Potentially, but --
11 Q   Would -- go ahead.
12 A   But I don't have -- would it have worked?  I don't
13     know.  I don't have to go through and use every
14     single tool that I'm trained to do before I decide
15     to go to another option.
16 Q   Okay.
17 A   We couldn't use pepper spray in there because we'd
18     have all been pepper sprayed.  The contamination
19     would have been horrendous in there.  We'd have
20     been dealing with another issue, not only trying
21     to get him out of the handcuffs but, you know, the
22     pepper spray contamination as well.
23        The compliance holds just would not have been
24     effective and, in turn, discovered any more
25     effective than using the compliance method of the

Michael B. Kingsley  vs.
Lisa Josvai, et al.

Deposition of FRITZ DEGNER
August 21, 2012

---

Deposition of FRITZ DEGNER - 8/21/12                    Page 41

1     TASER and the dry stun.
2  Q  I just want to make sure I understand.  Why do you
3     believe a compliance hold, for example, with a
4     pressure point, would not have been effective?
5  A  Based on the knowledge that I have from using the
6     TASER on it.
7  Q  Okay.
8  A  It's -- I guess it's an after-the-fact knowledge,
9     but --
10 Q  Sure.  Try not to look at it as an after-the-fact
11    matter, but try to look at it in terms of you're
12    there at the time.  You're trying to decide what
13    to do.  Was trying a pressure point technique
14    have been an option?
15 A  I don't believe so.
16 Q  Why?
17 A  Because prior to Sergeant Hendrickson having to
18    put his knee across Mr. Kingsley's head and onto
19    his shoulder, he was moving his head around.
20 Q  Okay.
21 A  That requires a somewhat -- it requires us to
22    provide a stable platform to do that.
23 Q  Had Sergeant Hendrickson controlled or stabilized
24    his head?
25 A  I don't know.

---

Deposition of FRITZ DEGNER - 8/21/12                    Page 42

1  Q  If you don't know whether Sergeant Hendrickson had
2     stabilized his head, how can you say that his head
3     wasn't stabilized enough to do a compliance hold
4     or a pressure point of some kind?
5  A  What I mean is when -- with Sergeant Hendrickson
6     being where his leg was placed on his head, they
7     would have covered up the areas where the pressure
8     points would have been used.  And once he -- so he
9     would have had to move to come off of it to do it,
10    which would not allowed him to have control of the
11    head.
12 Q  Was there a means to maintain stabilization of his
13    head in order to prepare it for some sort of a
14    pressure point or compliance hold?
15 A  Re-ask that, please.
16        MR. PARDON:  Can you read it,
17    please?
18        (Question read)
19 A  Not without taking -- with Sergeant Hendrickson's
20    leg being on there, that's the only way his head
21    was going to stay stable in one position.  He
22    wasn't going to move it around and --
23 Q  Okay.
24 A  -- you know, if his leg was off of it, he would
25    have been free to move around and potentially try

---

Deposition of FRITZ DEGNER - 8/21/12                    Page 43

1     to bite at somebody or anything like that.
2  Q  So are there any other alternatives that could
3     have been used at that time, other than deploying
4     a TASER?
5  A  I don't feel there was.
6  Q  So basically the TASER was the only thing that
7     could be utilized at that point?
8  A  Yes.
9  Q  What about just walking away and leaving him in
10    handcuffs?
11 A  Well, that ended up being the end result and what
12    we ended up doing.  That's not a -- not a standard
13    protocol type of situation.  He stands up.  If
14    he's got handcuffs behind his back and he falls,
15    he can't catch himself.  It becomes a safety issue
16    for him, which I would see as more of an issue
17    than doing what we were doing, trying to get the
18    handcuffs off of him.
19 Q  After you deployed the TASER, what happened?
20 A  Explain what you mean.  At the time when I was --
21    when I activated it, or do you mean after that?
22 Q  After it was deployed.  What effect did deploying
23    the TASER on Mr. Kingsley have?  I'll ask that
24    question instead.
25 A  He groaned loudly and continued to be resistive in

---

Deposition of FRITZ DEGNER - 8/21/12                    Page 44

1     pulling against the handcuffs.
2  Q  Then what happened?
3  A  Then shortly after that, Lieutenant Conroy told
4     everybody, "We're just going to leave him and come
5     back and deal with it later."
6  Q  Would it be your view that in this instance the
7     TASER was not effective?
8  A  I would say that.
9  Q  After Lieutenant Conroy said "We're going to deal
10    with this later," you and the other deputies
11    exited the receiving cell; correct?
12 A  Correct.
13 Q  Where did you go after you exited the receiving
14    cell?  Well, I know you went into the hallway
15    outside the receiving cell.
16 A  What did I do after that?
17 Q  Yes.
18 A  I went downstairs and wrote my report on the
19    matter.
20 Q  Did you have any discussion or did you overhear
21    any discussion among the other deputies and jail
22    staff about the use of the TASER?
23 A  No.
24 Q  Did Lieutenant Conroy ask you why the TASER was
25    deployed?

---

Michael B. Kingsley  vs.
Lisa Josvai, et al.

1  A  I don't remember him asking me that at all.
2  Q  Did you hear Sergeant Hendrickson make any
3     statements with respect to why the TASER was
4     deployed?
5  A  No.
6  Q  Did you hear Sergeant Hendrickson make any
7     statements regarding his belief that Kingsley had
8     attempted or might have attempted to bite him?
9  A  No.
10          MR. PARDON: Let's take a short
11     break, maybe five, ten minutes.
12          (Recess)
13          (Exhibit No. 48 marked
14          for identification)
15          MR. PARDON: We're back on the
16     record.
17  Q  Deputy Degner, you've been handed what's been
18     marked as Deposition Exhibit 48. It's got the
19     production numbers of Monroe 649 through 652 on
20     it. Could you identify this document?
21  A  Mine has through 651.
22  Q  You're correct. It should be through 651. I
23     apologize. Just for the record, again,
24     Deposition Exhibit 48 is Monroe 649 through
25     Monroe 651. Go ahead.

1  A  This would be a copy of my incident report from
2     May 21, 2010.
3  Q  This is the incident in question that we've been
4     talking about; correct?
5  A  Yes.
6  Q  Did you write any other reports related to this
7     incident?
8  A  Yes, I did.
9  Q  What --
10  A  The TASER supervisor report.
11  Q  Other than the TASER supervisor report and this
12     particular incident report that's Exhibit 48, did
13     you write any other reports related to this
14     incident?
15  A  No, I did not.
16  Q  Did you talk to anybody before you wrote this
17     report?
18  A  No.
19  Q  Did you read anybody else's report of the incident
20     before you wrote this report?
21  A  No.
22  Q  You note that the report was first entered on
23     the 21st, made at 7:24 a.m. on the top line. Do
24     you see that on the first page?
25  A  Yes.

1  Q  Then it says it was edited several days later on
2     May 26. Do you see that?
3  A  Yes.
4  Q  Did you talk to anybody between the time you first
5     wrote it and when you edited it about the incident
6     in question?
7  A  No.
8  Q  That's fine. I don't have any other questions
9     about your report at this time. Actually, I do
10     because I thought of a question I was going to
11     ask. Referring to the second full paragraph on
12     page 649, and I'm going to also refer you to a
13     section about six lines down into the paragraph
14     where the sentence says, "He was then carried into
15     the receiving cell." Do you see that?
16  A  Yes.
17  Q  "And placed face down on the concrete slab"?
18  A  Yes.
19  Q  And then there are some further statements. I'm
20     going to refer you to the statement that says,
21     "Deputy Blanton attempted to remove the handcuffs
22     from Kingsley, comma, but Kingsley began to growl
23     and pull against the handcuffs making it so they
24     could not be removed." Do you see that?
25  A  Yes.

1  Q  Do you know whether the handcuffs were
2     doublelocked at that point?
3  A  I do not.
4  Q  Do you know whether they should have been
5     doublelocked at that point?
6          MR. JONES: Objection to the form.
7     You can answer.
8  A  In a perfect world, yes, they should have been.
9  Q  Why does one doublelock handcuffs in a perfect
10     world?
11  A  To prevent them from tightening down on whoever's
12     being restrained so they don't injure them
13     further.
14  Q  What circumstances would cause one to not
15     doublelock them?
16  A  On a resistive subject where -- usually where that
17     happens is if somebody is resisting and you don't
18     get the handcuffs -- one handcuff might go on this
19     way (indicating), but the other one went on a
20     different way so they're flipped and such. So
21     normally under circumstances where they would be
22     locked and removed at a later time, the
23     circumstances would dictate as to whether or not
24     they got locked or not.
25  Q  Is it only the orientation of the hands that would

Michael B. Kingsley  vs.
Lisa Josvai, et al.

Deposition of FRITZ DEGNER
August 21, 2012

1  dictate whether -- the wrists that would dictate
2  whether the cuffs should or should not be
3  doublelocked?
4  A  No, the situation itself is what dictates that.
5  Q  So the actual situation when the cuffs are placed
6  on?
7  A  Yes.
8  Q  In this case, the cuffs were placed on
9  Mr. Kingsley when he was still in his jail cell;
10 correct?
11 A  Correct.
12 Q  I think you said you didn't actually see the
13 actual placement at the time?
14 A  No.
15 Q  Could the cuffs have been doublelocked at any
16 point after that?
17 A  What do you mean?
18 Q  Well, for example, you testified that Mr. Kingsley
19 was brought out of his original cell --
20 A  Correct.
21 Q  -- and into the hallway outside of the cell.  And
22 then he was then carried to receiving?
23 A  Right.
24 Q  During that process, if he was not actively
25 resisting, could somebody have doublelocked his

1  handcuffs then?  Would that have been an
2  opportunity for somebody to doublelock the
3  handcuffs if they had not been doublelocked
4  originally?
5  A  I would say yes.
6  Q  If they had not been doublelocked originally,
7  would you say that they then should have been
8  doublelocked at the first reasonable opportunity?
9         MR. JONES:  Objection to the form.
10    You can answer.
11 A  Ask it again, please.
12 Q  Yes.  If Mr. Kingsley's cuffs had not been
13 doublelocked when they were originally put on,
14 would it have been an appropriate practice to
15 doublelock them at the first available opportunity
16 when it would be, perhaps, safer to do so?
17 A  Yes.
18 Q  At the time when Mr. Kingsley was in the hallway
19 would be one such opportunity potentially?
20 A  Yes.
21 Q  Now you can place 48 aside.  I'm going to now --
22 I've got my computer hooked up to a projector and
23 a screen on the wall here.  I'm going to show you
24 portions of exhibits that have been previously
25 marked, and those are audio and visual files from

1  some of the recordings of the incident in this
2  case.
3         The first file I'm going to open is a copy of
4  Deposition Exhibit 12.  It's also known to be
5  Exhibit A to the supplement of the declaration of
6  Lisa Josvai.
7         So I'm going to open some of the files on
8  this exhibit.  I'm going to first open a file that
9  is marked "Kingsley S2."  And before I do so, let
10 me just ask you:  Do you recall viewing a video or
11 audio file labeled "Kingsley S2"?
12 A  No.
13 Q  I've now opened the file, and I'll note that
14 there's a time and date stamp in the lower left.
15 It's dated May 21, 2010.  The time is 6:32:49.
16 And I'm just going to play a little bit of this,
17 and I'm going to ask if you recognize having
18 viewed this file previously.
19 A  Okay.
20         (Video played)
21 Q  So I'm going to move it forward, and then it's
22 playing.  And there's no audio to this file.
23 We're now at about 6:34:03.  Do you recognize
24 this?
25 A  Yes, I do.

1  Q  Have you viewed this file?
2  A  Yes.
3  Q  What is this?
4  A  This is the walkway in the cell block past all the
5  cells there.
6  Q  Have you viewed this file in relation to the
7  incident in question in this case?
8  A  Yes.
9  Q  I'm going to play a little bit more.
10         (Video played)
11 Q  We're now at 6:34:15.  Do you recognize what this
12 is?
13 A  It's still the same cell block, and there's
14 somebody coming down the hallway.
15 Q  Do you recognize if this file contains footage of
16 jail staff removing Mr. Kingsley from his cell and
17 carrying him down the hall?
18 A  Yes, if this is -- later on into it, that's where
19 it gets to it.
20 Q  I'm not going to ask any other questions about
21 this right now; okay?
22 A  Okay.
23 Q  I'm going to play one entitled "Kingsley Main
24 Hall," and I'll ask you -- this one, I think, is
25 an audio only file.  Did you listen to any audio

Michael B. Kingsley   vs.
Lisa Josvai, et al.

Deposition of FRITZ DEGNER
August 21, 2012

1    files in this case?
2  A  I did not.
3  Q  I'm not going to ask you about it then.
4  A  There was a video that said "Main hall," though.
5  Q  Well, we'll play it.
6          (Audio played)
7  Q  So the file is being played.  Is there anything on
8    the screen for you to view?
9  A  No.
10  Q  Do you hear the audio being played?
11  A  Yes.
12  Q  Do you recognize any of this?
13  A  No.
14  Q  I'm going to continue to play it and have you
15    listen.
16          (Audio played)
17  Q  All right.  I'm going to stop the audio on what
18    has been marked on the file as one minute and
19    14 seconds.  And shortly before that for perhaps
20    five to ten seconds, did you hear some questioning
21    about a foot?
22  A  I think that's what it said.
23  Q  Do you recognize this file or the sound in this
24    file as having anything in relation to the
25    incident where Mr. Kingsley was removed from his

1    cell?
2  A  I would presume so, but I've never heard it
3    before.  So I don't -- I don't know.
4  Q  I'm not going to ask you anything more about it
5    then.  I'm going to now open a file that has been
6    on an exhibit previously marked as
7    Deposition Exhibit 13, and it's also noted to be
8    Exhibit A to the Sewell declaration.  There's a
9    file in this exhibit that is labeled "Kingsley
10    5/21/2010."  Do you recall viewing a file labeled
11    "Kingsley 5/21/2010"?
12  A  No, I don't.
13  Q  I'll open it and play it.  If you recognize it
14    after we begin playing it, just let me know.
15          (Video played)
16  A  Yes, I do.
17  Q  Okay.  I'm going to stop it at 5/21/2010 at
18    6:44:18.  I played it from the beginning to that
19    point.  Do you recognize this file?
20  A  Yes, I do.
21  Q  Have you reviewed this file before?
22  A  Yes, I have.
23  Q  What is this?  Generally speaking, what's on this
24    file?
25  A  This would be the camera view of the receiving

1    cell and where Mr. Kingsley was carried into the
2    cell and placed onto the bed there.
3  Q  That's also audio associated with this file as
4    you've heard in this deposition; is that correct?
5  A  I've never heard the audio from this.
6  Q  Did you review this video clip at any time prior
7    to the initiation of this lawsuit?
8  A  No.
9  Q  Is the only time you've reviewed this video clip
10    in connection with preparing for a deposition?
11  A  Yes.
12  Q  Did you review this prior to filing any sort of
13    declaration in the case?
14  A  No.
15  Q  When do you recall approximately the first time
16    viewing this video clip?
17  A  About 9:00 this morning.
18  Q  What I'm going to do then is I'm going to back it
19    up to the beginning, and I'm going to play it
20    again.  I will stop it periodically and ask you
21    questions about events and note the time on it.
22  A  Okay.
23  Q  If you feel you need to see it again before you
24    answer the question or look at it further ahead,
25    by all means, ask.

1  A  Okay.
2  Q  All right?  So we're beginning at 5/21/2010,
3    6:44:04.  I'll begin playing the file.
4          (Video played)
5  Q  Okay.  I've stopped the file at 6:44:36.  Could
6    you identify the individuals that are here at this
7    time?
8  A  Starting at the lower left, it would be
9    Sergeant Shisler, next would be Deputy Blanton,
10    and the upper left would be Sergeant Hendrickson
11    and then upper right would be myself.
12  Q  I'll continue now playing from 6:44:36.
13          (Video played)
14  Q  Okay.  Now, I've let it play through to 6:45:48,
15    and you've been watching.  Have you deployed the
16    TASER by this time?
17  A  I just did at that point.
18  Q  Shortly before 6:45:48; correct?
19  A  Correct.
20  Q  I'm going to back it up now.  I thought as we were
21    playing it, it would be better for you to see a
22    larger portion of it in context.  So I'm going to
23    back up and ask you questions about certain parts
24    of it; okay?
25  A  Okay.

Michael B. Kingsley  vs.
Lisa Josvai, et al.

Deposition of FRITZ DEGNER
August 21, 2012

Deposition of FRITZ DEGNER - 8/21/12                    Page 57

1 Q  So I'm starting it at 6:44:22.  I'm moving forward
2     again from there.  Now, I've stopped it at
3     6:44:29.  During the segment I played, did you
4     observe any passive or active resistance on
5     Mr. Kingsley's part?
6 A  Can you replay it, please?
7 Q  Sure.  I'll start again at 6:44:22.
8             MR. PARDON:  Could you tell me what
9         segment I played?
10            (Question read)
11 Q  I'm playing the beginning at 6:44:22.
12            (Video played)
13 Q  Did you observe any active or passive resistance
14     at that point?
15 A  I saw him squirming around there.
16 Q  I should have asked, at this point you're not in
17     the picture; correct?
18 A  No, I'm not.
19 Q  Where were you?
20 A  Where Sergeant Shisler is there at the lower left
21     of the screen, there's a wall there.  I'm outside
22     and around the corner of that.
23 Q  I'll go forward then.  I'm going to go forward
24     from this point.  I'd like you to tell me where
25     you observe any active resistance on

Deposition of FRITZ DEGNER - 8/21/12                    Page 58

1     Mr. Kingsley's part.  Tell me to stop it; all
2     right?
3 A  Okay.
4 Q  If you're also able to, I'd like you to tell me at
5     what point Sergeant Hendrickson tells you to
6     deploy the TASER.  Can you do both of those things
7     at the same time, or should I ask you those
8     separately?
9 A  Let's do them separately.
10 Q  Start out with pointing out active resistance on
11     Mr. Kingsley's part.  We'll start with 6:44:29.
12            (Video played)
13 A  Right there.
14 Q  I'm sorry.  I stopped it a second after you did.
15     I stopped it at 6:44:38.  What did you observe?
16 A  It's not so much what I observed.  I'm going by
17     what basically what I heard.  We were telling him
18     to do something with his foot; and he wasn't
19     apparently doing it, and it caused him to have to
20     raise his voice.
21 Q  So that you would clarify as active resistance?
22 A  I would.
23 Q  You were in the cell at that point in time?
24 A  Just coming in.
25 Q  Again, I'm moving forward now from 6:44:38.

Deposition of FRITZ DEGNER - 8/21/12                    Page 59

1             (Video played)
2 A  Stop.
3 Q  You've asked me to stop it at 6:44:51.  What did
4     you observe?
5 A  Just prior to that, there's a point where you can
6     see him arch back with his head.
7 Q  "Him" being Mr. Kingsley?
8 A  Mr. Kingsley.
9 Q  I'll play that again, and you tell me what second
10     you see that at.
11            MR. PARDON:  Go ahead.
12            MR. JONES:  I don't know if this
13        will be true as you start to play it; but
14        there's a date and time stamp, and then
15        there's also a running indicator of where we
16        are in the video segment itself.
17            MR. PARDON:  I'm referring to the
18        date and time stamp.
19            MR. JONES:  I know, but they're
20        over each other --
21            MR. PARDON:  Let's go off the
22        record for a second.
23            (Discussion held off the record)
24            (Question read)
25 Q  I'm going to start playing at 8:44:43 [sic], and

Deposition of FRITZ DEGNER - 8/21/12                    Page 60

1     you tell me at what point you're referring to when
2     you say the head is arching back.
3            MR. JONES:  You mean 6:44:43?
4            MR. PARDON:  I do.  Thank you.
5            (Video played)
6 A  It looked like it was 49.
7 Q  So 6:44:49 approximately; correct?
8 A  Within a second, yes.  I'm trying to watch the
9     clock and watch --
10 Q  I understand.  I understand.  I'll continue it,
11     and you point out any instances of active
12     resistance you see; okay?  I'll get the pointer
13     out of the way as quick as I can.
14            (Video played)
15 A  I think through this whole segment he's --
16 Q  I've stopped it now because you've said something
17     at 6:45:17.  Go ahead.
18 A  Through the segment he's squirming.  I'm not sure
19     if this is where Deputy Blanton was trying to
20     remove the handcuffs from him at this point in
21     time; but obviously where I'm at, I'm not looking
22     at him specifically.  So -- not that I can see him
23     all that well to begin with.
24 Q  You can't see him all that well to begin with; but
25     throughout the segment, you believe he may be

Michael B. Kingsley  vs.
Lisa Josvai, et al.

Deposition of FRITZ DEGNER
August 21, 2012

---

Deposition of FRITZ DEGNER - 8/21/12                                    Page 61

1   actively resisting because of the statements that
2   the deputies are making?
3 A   Yes.
4 Q   But you can't see that yourself?
5 A   No.
6 Q   Continuing on then from 6:45:17.  I'll begin to
7   play it again.
8           (Video played)
9 A   Stop.
10 Q   You asked me to stop, and I did it within one or
11   two seconds at 6:45:37.
12 A   Obviously from the video you can't see what it
13   was, but once Sergeant Hendrickson moved and
14   Deputy Blanton moved and when I came in to put the
15   TASER on him at that point in time, there I could
16   physically see him struggling and moving his torso
17   about.  And that's where I could see where he was
18   pulling against the handcuffs.
19 Q   So he was moving his torso about at this time?
20 A   Yes.
21 Q   Despite the fact that Sergeant Hendrickson had,
22   what looks like, his shin or his knee on him?
23 A   Yes.
24 Q   I'll continue now at 6:45:37.
25           (Video played)

---

Deposition of FRITZ DEGNER - 8/21/12                                    Page 62

1 Q   Okay.  I've stopped it at 6:45:48.  Does it appear
2   that you deployed the TASER at 6:45:48?
3 A   I think I may be incorrect with the deployment of
4   the TASER.  I thought -- you could hear him growl
5   before and then he growled again and made some
6   other noise with it.  I guess I would have to see
7   the video in the entirety as to whether -- because
8   the copy of the version I saw did not have sound
9   with it.
10     So the copy that I saw, the only way that I
11   could tell when the TASER was deployed was from
12   the sound it made; but it was the camera view from
13   out of the hallway there, not this view.
14 Q   So the copy that -- did you see this view?
15 A   I've seen this video with this view without sound.
16 Q   I see.
17 A   I've never heard the sound sequence for this.  The
18   only way I've heard the sound sequence is from the
19   camera that is in the hallway area of the
20   receiving cells and what sound is emanating out of
21   the cell.
22 Q   I see.  Okay.  I understand.  So you're not sure
23   whether you've deployed the TASER at this point?
24 A   No.
25 Q   Let me continue it for a little bit, and then --

---

Deposition of FRITZ DEGNER - 8/21/12                                    Page 63

1 A   I thought the sound was pretty distinctive from
2   the other video I saw that did have sound with it.
3 Q   Let me continue it from 6:45:48, and you can tell
4   me whether it helps you to determine whether
5   you've deployed the TASER by this time.
6 A   Okay.
7           (Video played)
8 A   Stop.
9 Q   You've asked me to stop.  It's now at 6:46:10.
10   You asked me to stop at about 6:46:08.  Go ahead.
11 A   At this point in time when I had my left hand down
12   by my side and I brought it up, what I did is I
13   put it on his back.  So at this point in time --
14   as far as, again, you can't see it on the video
15   because you can't see because of all of us, but he
16   was, again, squirming and moving.  He can't move a
17   lot, but he's still -- still moving the shoulder
18   area.
19     And that's where he's still pulling on the --
20   because I could feel the muscles in his back
21   arching and -- arching is not the word I'm looking
22   for -- flexing where he's trying to pull his hands
23   apart in opposite directions.
24 Q   As of this point, do you know whether you have
25   deployed the TASER?

---

Deposition of FRITZ DEGNER - 8/21/12                                    Page 64

1 A   Not, I have not.
2 Q   We'll continue on from 6:46:10.
3           MR. PARDON:  One second.  I'm going
4   to go off the record for a second.
5           MR. JONES:  They're filling an ice
6   bucket.
7           (Discussion held off the record)
8 Q   Let's try to go ahead from 6:46:10.
9           (Video played)
10 A   Stop.
11 Q   We've stopped it now at your request at 6:46:35.
12 A   Going back to the question you asked previously
13   where I thought I had deployed the TASER, we
14   didn't hear it in that sequence that we've played
15   since then, so I would say at that point in time
16   back when I originally thought I had used it was
17   when it was used.  So --
18 Q   You're talking about several sequences ago, so I'm
19   going to go back to that timeframe.  I will start
20   it at 6:45:41 because the previous sequence we're
21   talking about ended at 6:45:48.  So I'm going to
22   play that.
23           (Video played)
24 A   Okay.  Right there.  Just prior to that.
25 Q   I've stopped it at 6:45:48, and you've indicated

---

Michael B. Kingsley  vs.
Lisa Josvai, et al.

Deposition of FRITZ DEGNER
August 21, 2012

1    that -- what have you observed?
2  A  It's where Sergeant Hendrickson turned his head
3    towards me and said to TASE him.  And then I
4    applied the TASER.
5  Q  You may now have answered one of the questions I
6    asked earlier, which is:  When did
7    Sergeant Hendrickson tell you to deploy the TASER?
8    It sounds like it was practically immediately
9    before deploying the TASER?
10  A  Correct.
11  Q  Again, just so we have a clear record, I'm going
12    to play this segment between 6:45:42 and 6:45:48,
13    and you tell me if you believe the TASER was
14    deployed during that segment.
15  A  All right.
16         (Video played)
17  A  There, at 46.
18  Q  It was at 6:45:46, you believe, that the TASER was
19    deployed?
20  A  Yes.
21  Q  You indicated that Sergeant Hendrickson told you
22    to deploy the TASER immediately prior to that?
23  A  You can hear him say it.
24  Q  Let's see if we can hear that.  I'll start it at
25    6:45:42.  Point to him or say "now," if you're

1    able to see him or when you hear it.
2         (Video played)
3  A  You were too close to it.  You have to back up
4    farther.
5  Q  Okay.  We tried it once and weren't able to
6    identify it.  I'm going to back it up to 6:45:34
7    and play it through, and you can identify it.
8    Please identify it then, if you can.
9         (Video played)
10  A  Just prior to that.
11  Q  When you say "just prior to that," you mean just
12    prior to pointing the TASER?
13  A  6:45:45, you can see Sergeant Hendrickson turn his
14    head and that's where he said "TASE him now" or
15    "TASE him."
16  Q  Is that the only time that Sergeant Hendrickson
17    instructed you to deploy the TASER?
18  A  Yes.
19  Q  Did you have any verbal communication or
20    non-verbal communication with him prior to that
21    time when you were in the receiving cell and where
22    he indicated that a TASER should be deployed?
23  A  Not that I recall.
24  Q  In your view, was Sergeant Hendrickson telling you
25    to deploy the TASER or was he telling you it was

1    okay to deploy the TASER?
2  A  No, he was telling me to.
3  Q  I'm going to back it up a little bit to 6:44:53,
4    and I have a couple of other questions about some
5    of the events on there.
6         (Video played)
7  Q  Okay.  I've stopped the video at 6:45:32.  Did you
8    observe that, in the few seconds before 6:45:32,
9    you sort of moved your hand into the area and
10    indicated that you were going to -- well, did you
11    see that you indicate -- I'm going to start over.
12    It's getting late.
13    What were you doing in the seconds before
14    6:45:32?
15  A  Standing there.
16  Q  Do you see that you have placed your hand between
17    Sergeant Hendrickson and Deputy Blanton?
18  A  Yes.
19  Q  Why did you do that?
20  A  To place the TASER on Mr. Kingsley's shoulder.
21  Q  Did Sergeant Hendrickson instruct you to place the
22    TASER on Kingsley's shoulder at that time?
23  A  I don't recall him telling me that or -- I think I
24    did it on my own.
25  Q  I guess that's my question, is:  Did you do that

1    on your own?
2  A  I believe so.
3  Q  Do you know why you did that on your own?
4  A  Based on the -- how he was still actively
5    resisting removing the handcuffs from him, I guess
6    I was hoping that he might -- you know, he would
7    feel that on his shoulder and that he might comply
8    with what they were telling you to do originally.
9  Q  Did you tell him that you had put the TASER on his
10    shoulder?
11  A  I don't recall if I did or not.
12  Q  Did anybody tell him that?
13  A  I don't know.
14  Q  Do you recall anybody telling him that if he
15    didn't comply at this point a TASER would be
16    deployed on him?
17  A  I don't recall.
18  Q  Do you believe that you may have given the idea to
19    Sergeant Hendrickson to deploy the TASER?
20         MR. JONES:  Object to the form.
21    You can answer.
22  A  Re-ask it, please.
23  Q  Do you believe that you may have given
24    Sergeant Hendrickson the idea that the TASER
25    should be deployed?

Michael B. Kingsley  vs.
Lisa Josvai, et al.

Deposition of FRITZ DEGNER
August 21, 2012

---

Deposition of FRITZ DEGNER - 8/21/12                                Page 69

1           MR. JONES: Same objection.
2  A  No, I don't.
3  Q  Do you believe -- maybe I'll ask a better
4     question.  Do you believe that by inserting your
5     arm in there and placing the TASER on
6     Mr. Kingsley's shoulder that you may have provided
7     the impetus for Sergeant Hendrickson to decide to
8     use the TASER?
9           MR. JONES: Same objection.  You
10        can answer.
11 A  I don't know.
12 Q  You didn't discuss using the TASER directly with
13    Sergeant Hendrickson prior to that, did you?
14 A  No.
15 Q  I'm going to play it through for another half a
16    minute or so.  I may have some other questions.
17    So we're going to start again at 6:45:32; okay?
18 A  Okay.
19          (Video played)
20 Q  Okay.  Now, I've stopped it at 6:46:15.  For about
21    eight to ten seconds prior to that, did you hear a
22    voice saying, "All right.  Here's the deal.  We're
23    going to leave him here"?
24 A  Yes.
25 Q  Do you know who that was?

---

Deposition of FRITZ DEGNER - 8/21/12                                Page 70

1  A  Lieutenant Conroy.
2  Q  Do you know why Lieutenant Conroy decided that the
3     team should leave Mr. Kingsley without taking any
4     further action?
5  A  No, I don't.
6  Q  All right.  I'm going to continue playing it.
7           (Video played)
8  Q  Okay.  I've stopped it at 6:46:20.  Did you hear
9     Lieutenant Conroy say, "It's not a punishment"?
10 A  I would have to hear it again.
11 Q  Okay.  I'll play it again.  You know what?  I'm
12    going to retract that question.  I'm going to play
13    this again and ask you a different question.  I'm
14    going to start at 6:46:03.
15          (Video played)
16 Q  You've heard -- I've now stopped it at 6:46:15.
17    I've played a 12-second segment.  You heard
18    Lieutenant Conroy's voice for much of that;
19    correct?
20 A  Yes.
21 Q  Lieutenant Conroy was -- what was
22    Lieutenant Conroy saying?
23 A  He was saying we're going to leave him and that if
24    he wants the cuffs off, he can back up to the
25    door.

---

Deposition of FRITZ DEGNER - 8/21/12                                Page 71

1  Q  Who was he talking to when he said that?
2     Lieutenant Conroy?
3  A  I assume all of us.
4  Q  He was talking to the staff members?
5  A  Yes.
6  Q  All right.  I'm going to continue to play it from
7     6:46:15 continuing on from there.
8           (Video played)
9  Q  All right.  I've stopped it at 6:46:21.  Did you
10    hear Lieutenant Conroy say, at 6:46:18, "It's not
11    a punishment"?
12 A  Yes.
13 Q  Who was Lieutenant Conroy speaking to at that
14    time?
15 A  I don't know.  You'd have to replay it again.
16 Q  Do you recall him saying that, aside from this
17    video and audio?  Do you recall him saying "It's
18    not a punishment"?
19 A  Are you referring to, like, when I wrote my
20    report?
21 Q  No.  I'm referring to the actual day in question.
22 A  No, I don't remember.  I wasn't -- go ahead and
23    finish.
24 Q  No, that was my question.  So is the first time
25    you have had the fact that he said "It's not a

---

Deposition of FRITZ DEGNER - 8/21/12                                Page 72

1     punishment" called to your attention in connection
2     with reviewing this video and audio right now?
3  A  Yes.
4  Q  Prior to reviewing this video and audio, do you
5     recall him making that statement?
6  A  No, I don't.
7  Q  I'll play it again beginning with 6:46:13, and you
8     tell me if you can tell who Lieutenant Conroy is
9     talking to.
10          (Video played)
11 Q  Okay.  I've stopped it again at 6:46:21.  My
12    question is:  Do you know who Lieutenant Conroy
13    was talking to at 6:46:21 when he said "It's not a
14    punishment"?
15 A  Based on the statement made prior to that, I would
16    say it's to Mr. Kingsley.
17 Q  What statement did he make to Mr. Kingsley?
18 A  He told him to back up to the door to take the
19    handcuffs off.
20 Q  That was immediately before he made the statement?
21    I'll play it from 6:46:14.  When he says the part
22    about coming back to the door, I'd like you to
23    stop it; okay?
24          (Video played)
25 A  Right there.

---

Michael B. Kingsley  vs.
Lisa Josvai, et al.

Deposition of FRITZ DEGNER
August 21, 2012

Deposition of FRITZ DEGNER - 8/21/12                    Page 73

1  Q   So I've stopped it at 6:46:17, and you've made
2      reference to Lieutenant Conroy saying basically
3      he'll take the handcuffs off when he backs up to
4      the door.  Is Lieutenant Conroy talking to
5      Mr. Kingsley at that point or to --
6  A   You'll have to go farther back there where you
7      went.
8  Q   Okay.  I don't think we need to go that far back.
9      I'll go at 6:46:04, and I'll play the segment
10     through.  And my question to you is:  When
11     Lieutenant Conroy says something about backing up
12     to the door and removing handcuffs, who is he
13     talking to?  All right?  I'm playing it from
14     6:46:04.
15             (Video played)
16 Q   Okay.  I've stopped it at 6:46:22.  Do you know
17     who Lieutenant Conroy was talking to when he
18     referred to removing the cuffs?
19 A   Then I believe -- in the context of where it is
20     now, he was speaking to us.  We're going to leave
21     him there; and when he wants to have the cuffs
22     off, he'll back up to the door.
23 Q   His next statement then was, "It's not a
24     punishment"; correct?
25 A   Correct.

Deposition of FRITZ DEGNER - 8/21/12                    Page 74

1  Q   Who was he talking to when he said "It's not a
2      punishment"?
3  A   I assume us because he didn't directly address
4      Mr. Kingsley.
5  Q   Do you know why he said that?
6  A   Because it's not.  Leaving them in handcuffs is
7      not a punishment and it's not normal protocol.
8  Q   Could he be talking to the fact that you were not
9      going to continue efforts at restraining him
10     further or controlling him further because
11     TASE'ing him was not intended to be a punishment?
12             MR. JONES:  I'm going to object to
13         the form of the question.  I'm not sure what
14         you're asking, and you're also asking him
15         what's in the lieutenant's mind.  But you can
16         go ahead and answer.
17             MR. PARDON:  Go ahead.
18             (Question read)
19 A   I presume so.
20 Q   All right.  I don't have any other questions about
21     this, so we can close this exhibit and turn on the
22     lights.
23             MR. PARDON:  Thanks, Joel.
24 Q   I want to follow up with a couple of questions
25     that I meant to ask earlier when I asked you about

Deposition of FRITZ DEGNER - 8/21/12                    Page 75

1      preparing for this deposition.  Did you, in
2      preparing for this deposition, read any
3      transcripts?
4  A   No, I did not.
5  Q   Did you talk to anybody else who had been deposed
6      in this case about their depositions?
7  A   No.
8  Q   Are you aware of the testimony that any of the
9      other defendants or deponents in this case
10     provided in their deposition?
11 A   No, I'm not.
12 Q   Did you know Mr. Kingsley prior to the incident in
13     question in this lawsuit?
14 A   I knew of him.  The only other prior dealing I had
15     with him was a traffic accident where he was the
16     operator of a vehicle, but he had left the scene
17     before I got there.
18 Q   Do you know whether Mr. Kingsley had any
19     particular reputation among the staff in the jail?
20 A   No, I don't.
21 Q   Do you know whether Mr. Kingsley had any
22     particular reputation in the community?
23 A   No.
24 Q   Are you aware of any previous disciplinary actions
25     involving Mr. Kingsley prior to the incident in

Deposition of FRITZ DEGNER - 8/21/12                    Page 76

1      question?
2  A   Within the jail?
3  Q   Yes.
4  A   No, I don't.
5  Q   Are you aware of Mr. Kingsley's arrest and/or
6      conviction record prior to the incident in
7      question?
8  A   No.
9  Q   Do you know why he was in jail?
10 A   Not a clue.
11 Q   Do you know whether Mr. Kingsley was a difficult
12     person to deal with?
13 A   No, I don't.  I have to ask a clarification.  When
14     you asked about -- you asked something about
15     dealing with him prior to or something -- there
16     was an incident, and I don't know if it was prior
17     to this or if it was post this incident, where him
18     and another inmate were in the receiving cell area
19     and there was an issue dealing with them.  They
20     were covering up the camera or the light or
21     something like that.  But I don't know if it
22     was -- like I said, I don't know if it was prior
23     to this or post this.
24 Q   Are you aware of whether Mr. Kingsley had a
25     reputation for being physically violent?

Michael B. Kingsley  vs.
Lisa Josvai, et al.

---

1  A   Not off the top of my head, no.
2  Q   You certainly did not know of any instances where
3      he'd been physically violent prior to the incident
4      in question?
5  A   No.
6  Q   Have you read any expert reports that have been
7      filed in this case?
8  A   No.
9  Q   Have you read a report by one individual named
10     Brian Landers?
11 A   No.
12 Q   Do you know an individual named Brian Landers?
13 A   No.
14 Q   Have you read an expert report by an individual
15     named John Peters?
16 A   No.
17 Q   Do you know of an individual named John Peters?
18 A   No, I don't.
19 Q   Do you know whether this particular incident in
20     question received any sort of further review by
21     the sheriff's department?
22 A   No.
23 Q   Have you ever been investigated for using
24     excessive force?
25 A   No, I haven't.

---

1  Q   Have you ever been disciplined or recommended for
2      discipline for using excessive force?
3  A   No, I have not.
4  Q   Have you ever been investigated for using or
5      allegedly using a TASER inappropriately --
6  A   No.
7  Q   -- other than the instance we're talking about
8      today?
9  A   No, I have not.
10            (Exhibit No. 49 marked
11             for identification)
12 Q   You have been handed what has been marked as
13     Plaintiff's 49.  It is a document with Bates stamp
14     Monroe 675 through Monroe 678.  Take a moment to
15     review it; and after you've done so, if you're
16     able to identify it, please do so.
17 A   This would appear to be a copy of the original
18     TASER use report that I completed.
19 Q   That is in relation to the incident in question
20     for this lawsuit; correct?
21 A   Yes, it is.
22 Q   Do you routinely fill out these reports after you
23     deploy a TASER on someone?
24 A   Every single time.
25 Q   Turning your attention to the second page on

---

1      Monroe 676, the fourth line up from the bottom, do
2      you see there's a line that says "TASER use"?
3      There's a box that says, "Success," and then
4      there's a box that says, "Failure."  Do you see
5      that?
6  A   Yes.
7  Q   Neither one of the boxes is checked.  Do you see
8      that?
9  A   Yes.
10 Q   Do you know why neither one of the boxes is
11     checked?
12 A   Because I didn't know at the time whether to
13     consider it a successful -- it was successful or
14     not.  The TASER performed successfully; however,
15     as I said before, would I deem the use of --
16     having used the TASER at that point in time a
17     success, no.  So I didn't know what the question
18     was asking at the time.
19 Q   So you didn't know whether it meant literally did
20     the gun physically deploy or was the use
21     successful on the subject?
22 A   Correct.
23 Q   Are these reports that you fill out after using a
24     TASER reviewed by anyone in the sheriff's
25     department?

---

1  A   They are supposed to go to our TASER instructors;
2      and after re-reading our policy, I see that it's
3      supposed to go to the lieutenant for review as
4      well.  Any -- every time that I've deployed it,
5      I've completed one and leave a copy for the TASER
6      instructors.  I leave a copy for the sheriff and
7      probably the lieutenant as well, but for sure I've
8      always left one for the sheriff.
9  Q   Are you aware of the results of any of the review
10     that may have been conducted into this particular
11     incident?
12 A   No, I am not.
13 Q   Did you ever receive any feedback on the report
14     that you filled out?
15 A   No, I did not.
16 Q   In using the TASER, did you employ some sort of
17     procedure where you download information from the
18     TASER after it's used?
19 A   I do not.  I give the TASER to one of the
20     instructors, and they download logs every time
21     that the TASER -- the trigger has been pulled on
22     the TASER.
23 Q   I guess you may have answered my next question.
24     But what information can the instructors tell, if
25     you know, after a download?

---

Michael B. Kingsley  vs.
Lisa Josvai, et al.

Deposition of FRITZ DEGNER
August 21, 2012

1  A  It shows the date the TASER was activated, how
2     long it was activated for as far as -- I think
3     that's what's on the sheets.
4  Q  Do you know how long the TASER was activated for
5     in this instance with Mr. Kingsley?
6  A  I do not.
7  Q  Not with respect to the download information, but
8     do you know how long you deployed it for?
9  A  I don't know how long the actual time period of
10    the cycle -- I mean, the cycle's five seconds.
11 Q  Okay.
12 A  If I -- I know I pulled the trigger one time.
13    Whether the full five seconds, I don't know if I
14    did or not.
15 Q  Does it always go the full five seconds after it's
16    pulled?
17 A  As long as I don't turn it off or thumb down the
18    power switch.
19 Q  Why don't you describe how that works.  So when
20    you deploy it, do you pull a trigger?
21 A  Yes.
22 Q  And then do you hold the trigger down, or do you
23    release the trigger right away?
24 A  Well, you can do it both ways.  But if you don't
25    release the trigger right away -- if you pull it,

1     release the trigger, it will go for five seconds
2     and it will quit.
3  Q  Okay.
4  A  If you hold the trigger back, it will continue to
5     go until you let go of the trigger.  So it could
6     go beyond the five seconds.
7  Q  It could go beyond five seconds if you continue to
8     hold the trigger?
9  A  If you continue to hold the trigger.
10 Q  In this instance, just to be clear, what did you
11    do?  Did you hold the trigger, or did you just
12    pull it?
13 A  I just pulled it one time and released it.
14 Q  It's your understanding it's supposed to stop
15    after five seconds if you do that?
16 A  Correct.
17 Q  Are you aware of a grievance Mr. Kingsley filled
18    out in relation to this incident?
19 A  No.
20 Q  Have you ever had any contact with Mr. Kingsley
21    since this incident, the incident in question
22    today?
23 A  Going back to the one with the -- whatever
24    incident was in the receiving cells there, that's
25    the only direct contact.  I've taken a complaint

1     on him since he was released from incarceration
2     last year, in the spring.
3  Q  Have you ever discussed the lawsuit with
4     Mr. Kingsley?
5  A  No, I have not.
6  Q  Have you ever been reprimanded?
7  A  Yes, I have.
8  Q  How many times?
9  A  In what respects, I guess, are you -- I've -- go
10    ahead.
11 Q  Well, what respects are there for being
12    reprimanded?
13 A  Well, I mean, a written or a suspension-type
14    situation.  I've been suspended one time.  That
15    was for -- I used a day of sick leave that night
16    and then as it was discovered, I had not
17    previously been aware of, I failed to apply for
18    outside employment.  So that was a combination of
19    those two things that led to the one day of
20    suspension from that.  Otherwise, I've had a
21    couple of -- I've been written up before.
22 Q  Let me just ask you briefly about the incident
23    that you had a one-day suspension.  If I
24    understand what you're saying, you were teaching a
25    course somewhere else; correct?

1  A  Yes.
2  Q  Where was that?
3  A  Green Lake County.
4  Q  And you called in sick and you were not sick.  Is
5     that what happened?
6  A  That's a matter of debate.
7  Q  Okay.
8  A  But --
9  Q  Why is it a matter of debate?
10 A  Because I felt that when I called in sick that I
11    was justified in using a sick day for that.
12 Q  Using a sick day -- why were you justified in
13    using a sick day, because you had an injury or
14    because you just felt like it was appropriate to
15    use a sick day for that?
16 A  Because I had an injury.
17 Q  What was your injury that you called in sick for?
18           MR. JONES: You can tell him
19       generally what the injury was.
20           THE WITNESS: Okay.
21 A  I had rotator cuff issues.  And shoulders -- part
22    of the training, they were using me for
23    handcuffing, and they kept pulling my arms behind
24    my back and aggravated my right shoulder.
25 Q  You had an interview or there was an investigation

Michael B. Kingsley  vs.
Lisa Josvai, et al.

Deposition of FRITZ DEGNER
August 21, 2012

| Deposition of FRITZ DEGNER - 8/21/12 | Page 85 |
|---|---|

1    that resulted in you being suspended for one day?
2 A   Yes.
3 Q   Is it true that during the investigation you told
4    the sheriff that you didn't call in because you
5    didn't know you were scheduled as an instructor
6    until you showed up at the training?
7 A   That would not be what I said.
8 Q   What did you say?
9        MR. JONES: I'll object to the form
10      of the question.  What did he say to what?
11 Q   Do you understand the question?
12 A   No.
13 Q   Did you tell the sheriff during an investigation
14    into the incident that you didn't call in sick
15    until late in the day the day you called in sick
16    because you didn't know you were scheduled to work
17    as an instructor until you showed up at the
18    training that day?
19 A   I don't recall ever saying that.
20        (Exhibit No. 50 marked
21        for identification)
22        (Confidential portion begins)
23
24
25

| Deposition of FRITZ DEGNER - 8/21/12 | Page 89 |
|---|---|

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20        (Confidential portion ends)
21 Q   Have you been reprimanded with respect to any
22    other events or instances during your employment
23    with Monroe County?
24 A   Well, I missed a court date one time.
25 Q   In fact, you received a written reprimand at one

| Deposition of FRITZ DEGNER - 8/21/12 | Page 90 |
|---|---|

1    point when you failed to respond to a subpoena to
2    show up for a court date; is that correct?
3 A   That's correct.
4 Q   In fact, one of the lieutenants had to send a
5    deputy to your house to find you; is that correct?
6 A   I was sleeping, yes.
7 Q   Have you ever been counseled about having
8    excessive absences?
9 A   Excessive absences?  No.
10 Q   From work?
11 A   No.  I've had -- well, I'll rephrase that.  What
12    do you mean by "counseled about"?  On performance
13    evaluations --
14 Q   Yes, that's what I mean.
15 A   -- there have been -- that was the one thing that
16    was repeatedly brought up since the performance
17    evaluations were started within the agency.
18 Q   What specifically was repeatedly brought up?
19 A   About using sick leave.
20 Q   Was it particularly for using sick leave on
21    surrounding weekends?
22 A   I don't remember if they were or not.  It could
23    very well be, but you also have to understand we
24    work a four-day workweek.  You have a 50/50 shot.
25    It's either going to fall on your days off, or

| Deposition of FRITZ DEGNER - 8/21/12 | Page 91 |
|---|---|

1    it's going to fall on your weekend.
2 Q   Have you been trained in the use of a TASER?
3 A   Yes, I have.
4 Q   A couple of other follow-up questions.  Have you
5    ever had a civil judgment against you?
6 A   Yes.
7 Q   What was it?
8 A   It was for Gunderson Lutheran, healthcare.  It was
9    a combination, altogether thing, involving medical
10    bills.
11 Q   Have you ever been arrested for a criminal
12    offense?
13 A   No, I have not.
14 Q   Have you ever been arrested for writing checks for
15    insufficient funds?
16 A   No, I have not.
17 Q   Have you ever been charged with writing checks for
18    insufficient funds?
19 A   I was issued a citation for that.
20 Q   What's the difference between issued a citation
21    and being arrested?
22 A   Arrested is a custodial matter.  That would
23    involve being brought to the jail and being booked
24    in, potentially.
25 Q   So you were issued a citation for --

Verbatim Reporting, Limited
(608) 255.7700

Michael B. Kingsley  vs.
Lisa Josvai, et al.

---

Deposition of FRITZ DEGNER - 8/21/12                                    Page 92

1  A   I got a ticket in the mail.
2  Q   What happened with respect to that citation?
3  A   They were dismissed.
4  Q   Why was it dismissed?
5  A   The District Attorney's Office dismissed them.
6  Q   Do you know why the District Attorney's Office
7      dismissed them?
8  A   They have a program, so I went through the
9      program.
10 Q   What was the program?
11 A   I don't remember what it's called.  It's something
12     that the District Attorney's Office offers in
13     regards to bad checks.
14 Q   Would you consider writing bad checks to be
15     actions that involve dishonesty?
16 A   Yes.
17 Q   Did the incident where you received a citation
18     involve dishonest actions on your part?
19 A   I didn't believe so.
20 Q   Why not?
21 A   The circumstances surrounding the situation.
22 Q   What about the circumstances surrounding the
23     situation leads you to believe that the actions
24     did not involve dishonesty?
25 A   It was a clerical error on our part, my wife's

---

Deposition of FRITZ DEGNER - 8/21/12                                    Page 93

1      part and my part, in regards to our checkbook.
2      What you don't understand about this and what
3      wasn't taken into consideration was my wife worked
4      over in Fond du Lac at Taycheedah.  At the time,
5      we were writing checks out of the same checkbook.
6      She's gone for seven days at a time.  We didn't
7      reconcile the checkbook in that time period.  And
8      so where I thought I had funds available when I
9      wrote the two checks I wrote, it turned out
10     there wasn't funds available because of the checks
11     that she had written that had gone through.
12         So the two places that I wrote the checks to,
13     one was All American, one was a gas station.  The
14     gas station sent me a letter said, you know, "You
15     have a check."  I called them.  I had made
16     arrangements to pay it, and All American never
17     contacted me.  They sent it straight to our office
18     at the time.
19         And so when it happened, I was in total and
20     utter shock.  I thought I had made arrangements to
21     take care of the thing because I had certainly not
22     intended to write them a bad check.  But when I
23     came into pay it, they said, "We sent this to the
24     District Attorney's Office."
25         As far as the gas station one goes and the

---

Deposition of FRITZ DEGNER - 8/21/12                                    Page 94

1      other one, I received another notice from
2      Piggly Wiggly, that said -- because there was
3      actually about four or five checks that I had
4      written.  I took care of those right away with
5      them as soon as I got paid.  You know, I called
6      them, made arrangements to take care of it.  But
7      the other two didn't -- it just didn't work out
8      that way.
9  Q   What kind of a program did you have to participate
10     in in order to have the citation dismissed?
11 A   It was -- I think it was -- the DA's Office gave
12     me a packet of things that I had to go through and
13     complete.
14 Q   Was it class work or --
15 A   Basically it was class work.  It was part of a bad
16     check program.  You're talking five-plus years
17     ago, and I don't recall everything that was within
18     it.
19 Q   Other than the incident in question involving
20     Mr. Kingsley, you've deployed a TASER on other
21     occasions; is that correct?
22 A   Yes, I have.
23 Q   About how many times?
24 A   About ten times.
25 Q   Have you ever deployed, other than the incident

---

Deposition of FRITZ DEGNER - 8/21/12                                    Page 95

1      involving Mr. Kingsley, a TASER on somebody who
2      was in handcuffs?
3  A   Yes, I have.
4  Q   How many times?
5  A   At least twice.
6  Q   What was involved in those circumstances?  You
7      don't have to name the person, but generally the
8      circumstances.
9  A   I don't remember the names anyways.  The first one
10     was a lady that was arrested at a scene.  One of
11     the other officers had handcuffed her and placed
12     her in the backseat of my squad car.  The next
13     thing I know, she kicked the window out of my
14     squad car and was halfway out of the car window at
15     the time when I got pulled over.
16         We wrestled her -- basically wrestled her to
17     the ground.  She had been able to slip one of the
18     handcuffs off her hand and had a weapon in her
19     hand with the loose handcuff.  She was TASE'd with
20     a dry stun in the same shoulder area Mr. Kingsley
21     was.
22 Q   But at the time you TASE'd her, at least one of
23     the cuffs was removed from her hand?
24 A   Yes.
25 Q   And she had shortly before kicked the glass out of

---

Verbatim Reporting, Limited
                                     (608) 255.7700

Case: 3:10-cv-00832-jdp   Document #: 110   Filed: 09/19/12   Page 25 of 36

Michael B. Kingsley  vs.
Lisa Josvai, et al.

Deposition of FRITZ DEGNER
August 21, 2012

Deposition of FRITZ DEGNER - 8/21/12                Page 96

1    your squad car window?
2  A  Yes.
3  Q  Certainly with respect to the incident with
4     Mr. Kingsley, he had not gotten out of the
5     handcuffs when he was TASE'd; correct?
6  A  No.
7  Q  And he had not kicked the glass out of a squad car
8     window when he was TASE'd; correct?
9  A  No.
10 Q  What about the other incident that you remember?
11 A  I was transporting -- it was a domestic.  I had to
12    already fight with the suspect on it in the house.
13    I got him in the car, put him in the seatbelt.  He
14    got the seatbelt off, and he was trying to kick
15    out the window of the squad car.  He was warned
16    multiple times not to continue to try and kick the
17    car and damage the car, and he was TASE'd.
18 Q  And he was in handcuffs when he was TASE'd?
19 A  Yes, he was.  And that was appropriate for him.
20 Q  And that was appropriate for him?
21 A  Yes.
22 Q  Shortly before that, he had kicked the windows out
23    of the squad car?
24 A  He didn't kick them out, but he was trying.
25 Q  Do you know a former Deputy Manka, Nicholas Manka?

Deposition of FRITZ DEGNER - 8/21/12                Page 97

1  A  Yes.
2  Q  Do you know that he is no longer with the
3     sheriff's department?
4  A  Yes, I do.
5  Q  Do you know why he is not?
6  A  I have not an idea.
7        MR. PARDON:  Why don't you give us
8     five or ten minutes.
9        MR. JONES:  Sure.  As we go into a
10    break, Exhibit 50, I see was produced or
11    marked as confidential, which means it was
12    produced pursuant to the protective order.
13    So I'd ask that this exhibit be segregated as
14    well.  It wasn't very long, but the testimony
15    relating to this exhibit, that that's
16    segregated from the main transcript.
17       MR. PARDON:  That's fine.
18    (Recess)
19       MR. PARDON:  We have no further
20    questions for Deputy Degner.
21       MR. JONES:  I do not have any
22    questions.
23
24    (Deposition adjourned at 4:52 p.m.)
25

Deposition of FRITZ DEGNER - 8/21/12                Page 98

1  STATE OF WISCONSIN        )
2  COUNTY OF DANE            )  ss.
3        I, Rowan L. Bright, a Certified Realtime
4  Reporter, Certified LiveNote Reporter, Registered
5  Professional Reporter and Notary Public duly
6  commissioned and qualified in and for the State of
7  Wisconsin, do hereby certify that pursuant to notice,
8  there came before me on the 21st day of August, 2012,
9  at 2:06 in the afternoon, at Best Western, 445
10 Theater Road, the City of Sparta, County of Monroe,
11 and State of Wisconsin, the following named person,
12 to wit:  FRITZ DEGNER, who was by me duly sworn to
13 testify to  the truth and nothing but the truth of his
14 knowledge touching and concerning the matters in
15 controversy in this cause; that he was thereupon
16 carefully examined upon his oath and his examination
17 reduced to typewriting with computer-aided
18 transcription; that the deposition is a true record
19 of the testimony given by the witness; and that
20 reading and signing was waived.
21       I further certify that I am neither attorney or
22 counsel for, nor related to or employed by any of the
23 parties to the action in which this deposition is
24 taken and further that I am not a relative or
25 employee of any attorney or counsel employed by the

Deposition of FRITZ DEGNER - 8/21/12                Page 99

1  parties hereto or financially interested in the
2  action.
3        In witness whereof I have hereunto set my
4  hand and affixed my notarial seal this 30th day of
5  August, 2012.
6
7
8        _____
                Certified Realtime Reporter,
                Notary Public, State of Wisconsin
9  My commission expires
10 November 21, 2015.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Case: 3:10-cv-00832-jdp   Document #: 110   Filed: 09/19/12   Page 26 of 36

Michael B. Kingsley  vs.
Lisa Josvai, et al.

Deposition of FRITZ DEGNER
August 21, 2012

**[**

**[sic] (1)**
59:25

**A**

**able (6)**
16:11;58:4;66:1,5;
78:16;95:17
**absences (2)**
90:8,9
**accident (1)**
75:15
**accustomed (1)**
12:18
**across (4)**
37:22,24;38:10;41:18
**acting (2)**
16:11;27:3
**action (1)**
70:4
**actions (6)**
7:6;27:3;75:24;92:15,
18,23
**activated (6)**
34:3,5;43:21;81:1,2,4
**activates (1)**
33:25
**active (16)**
20:18;22:17;24:21;
25:5,20,21,22;31:22,25;
37:1;57:4,13,25;58:10,
21;60:11
**actively (5)**
20:25;35:19;49:24;
61:1;68:4
**activities (1)**
6:21
**activity (1)**
6:20
**actual (4)**
49:5,13;71:21;81:9
**actually (5)**
23:24;24:1;47:9;49:12;
94:3
**addition (1)**
9:23
**address (1)**
74:3
**adjourned (1)**
97:24
**advanced (1)**
30:18
**after-the-fact (2)**
41:8,10
**Again (28)**
12:11;18:22;19:14;
25:1;26:17;28:15;34:14;
35:6;45:23;50:11;55:20,
23;57:2,7;58:25;59:9;
61:7;62:5;63:14,16;

65:11;69:17;70:10,11,13;
71:15;72:7,11
**against (8)**
18:1,6;32:15;36:24;
44:1;47:23;61:18;91:5
**agency (1)**
90:17
**aggravated (1)**
84:24
**agitated (1)**
35:24
**ago (2)**
64:18;94:17
**agree (1)**
35:15
**agreed (1)**
36:1
**ahead (15)**
4:24;8:11;9:3,3;40:11;
45:25;55:24;59:11;
60:17;63:10;64:8;71:22;
74:16,17;83:10
**air (1)**
33:18
**allegedly (1)**
78:5
**allowed (2)**
39:15;42:10
**allowing (2)**
25:23;26:3
**almost (1)**
4:13
**along (4)**
25:24;30:6,24;31:1
**alternatives (1)**
43:2
**altogether (1)**
91:9
**always (4)**
10:14;12:5;80:8;81:15
**American (2)**
93:13,16
**among (2)**
44:21;75:19
**amongst (1)**
33:10
**and/or (2)**
8:22;76:5
**angry (1)**
35:25
**animal (1)**
32:9
**answered (2)**
65:5;80:23
**anyways (1)**
95:9
**apart (3)**
32:23,24;63:23
**apologize (1)**
18:22;45:23
**Apparently (1)**
12:23;58:19
**appear (2)**

62:1;78:17
**appears (1)**
11:3
**applied (2)**
35:7;65:4
**apply (2)**
34:19;83:17
**appropriate (6)**
36:8,13;50:14;84:14;
96:19,20
**approximately (3)**
24:9;55:15;60:7
**arch (1)**
59:6
**arching (3)**
60:2;63:21,21
**area (25)**
10:4,6,14,18;11:4,24;
12:1,2,8,15;15:16;29:16,
18,21;37:14,17,22,24;
39:14;40:2;62:19;63:18;
67:9;76:18;95:20
**areas (1)**
42:7
**argument (1)**
18:1
**argumentative (1)**
17:25
**arm (3)**
36:23,25;69:5
**arms (5)**
21:5,8;23:21;32:23;
84:23
**around (7)**
32:2;37:19;41:19;
42:22,25;57:15,22
**arrangements (3)**
93:16,20;94:6
**arrest (1)**
76:5
**arrested (5)**
91:11,14,21,22;95:10
**arrow (1)**
11:19
**aside (3)**
12:22;50:21;71:16
**ass (3)**
39:3,5,6
**assist (2)**
13:5;27:9
**assistance (2)**
13:24;14:3
**associated (1)**
55:3
**Associate's (1)**
5:10
**assume (2)**
71:3;74:3
**attempt (1)**
37:4
**attempted (4)**
37:7;45:8,8;47:21
**attention (3)**

25:2;72:1;78:25
**Attorney's (4)**
92:5,6,12;93:24
**audio (14)**
50:25;51:11,22;52:25,
25;53:6,10,16,17;55:3,5;
71:17;72:2,4
**August (1)**
5:22
**authority (2)**
27:2,3
**available (3)**
50:15;93:8,10
**aware (11)**
6:17,23;7:5;24:25;
75:8,24;76:5,24;80:9;
82:17;83:17
**away (4)**
43:9;81:23,25;94:4

**B**

**back (52)**
7:25;8:11;14:6,14;
15:2,2;17:9,25;18:22;
19:4;21:4;26:17;27:22;
28:13,15;32:14,25;33:1,
2,24;34:13,15,23;37:22,
24;39:16;40:1;43:14;
44:5;45:15;55:18;56:20,
23;59:6;60:2;63:13,20;
64:12,16,19;66:3,6;67:3;
70:24;72:18,22;73:6,8,
22;82:4,23;84:24
**backing (1)**
73:11
**backs (1)**
73:3
**backseat (1)**
95:12
**backwards (2)**
4:16,17
**bad (5)**
17:9;92:13,14;93:22;
94:15
**bailiff (1)**
6:14
**based (7)**
21:11,14;23:24,25;
41:5;68:4;72:15
**basic (1)**
5:18
**basically (8)**
14:19;23:7;30:24;43:6;
58:17;73:2;94:15;95:16
**basis (3)**
6:4;21:7;27:8
**Bates (1)**
78:13
**bear (1)**
32:9
**became (1)**
15:25

**become (1)**
12:17
**becomes (1)**
43:15
**bed (4)**
17:23;24:5;28:8;55:2
**began (1)**
47:22
**begin (5)**
54:14;56:3;60:23,24;
61:6
**beginning (7)**
13:10,11;54:18;55:19;
56:2;57:11;72:7
**begins (1)**
85:22
**behind (6)**
21:4;23:19;26:10;
32:14;43:14;84:23
**belief (1)**
45:7
**best (1)**
38:2
**better (5)**
24:5;25:3;30:15;56:21;
69:3
**beyond (2)**
82:6,7
**bills (1)**
91:10
**bit (7)**
17:10;38:12;39:9;
51:16;52:9;62:25;67:3
**bite (1)**
37:4;43:1;45:8
**black (1)**
11:24
**blades (1)**
38:12
**Blanton (19)**
14:9;15:23;19:7;22:1;
23:15;28:10;29:10,11,16,
19;30:7;31:15;32:20;
35:5;47:21;56:9;60:19;
61:14;67:17
**block (10)**
10:4;14:4,7;15:3;
17:13;19:20,22;22:5;
52:4,13
**body (2)**
33:3;37:8
**book (1)**
5:23
**booked (1)**
91:23
**booking (1)**
10:14
**boot (1)**
5:20
**both (4)**
10:23;28:7;58:6;81:24
**bottom (1)**
79:1

Michael B. Kingsley  vs.
Lisa Josvai, et al.

Deposition of FRITZ DEGNER
August 21, 2012

**box (3)**
11:24;79:3,4
**boxes (2)**
79:7,10
**Branch (1)**
6:14
**break (4)**
32:11,13;45:11;97:10
**Brian (2)**
77:10,12
**briefly (1)**
83:22
**bring (1)**
33:3
**brought (8)**
10:19;11:21;12:1;
49:19;63:12;90:16,18;
91:23
**bucket (1)**
64:6
**bunk (9)**
21:21;22:14,22,24;
28:18,22,23;29:1,4

**C**

**call (4)**
13:13;28:18;85:4,14
**called (12)**
4:2;9:5;13:4,12;72:1;
84:4,10,17;85:15;92:11;
93:15;94:5
**came (2)**
61:14;93:23
**camera (4)**
54:25;62:12,19;76:20
**camp (1)**
5:20
**can (41)**
4:16;7:11,17,19;11:19,
23,25,25;12:7,22;16:17;
19:14;24:10,17;36:23;
38:4;42:2,16;48:7;50:10,
21;57:6;58:6;59:5;60:13,
22;63:3;65:23,24;66:7,8,
13;68:21;69:10;70:24;
72:8;74:15,21;80:24;
81:24;84:18
**car (10)**
95:12,14,14;96:1,7,13,
15,17,17,23
**care (3)**
93:21;94:4,6
**carried (19)**
22:6,10,11,14,22,24;
23:16,23;24:3,9,14,22,23;
25:11;26:1;28:15;47:14;
49:22;55:1
**carry (2)**
24:2;26:3
**carrying (2)**
25:6;52:17
**cartridge (2)**

33:18;39:18
**case (11)**
15:25;16:12;32:19;
49:8;51:2;52:7;53:1;
55:13;75:6,9;77:7
**catch (1)**
43:15
**catching (1)**
35:23
**cause (2)**
33:21;48:14
**caused (1)**
58:19
**causing (1)**
15:6
**cell (89)**
7:7,8,14,15;10:3,7,10,
11,13,15,18,21;11:21;
12:4,7;13:6,6,14:4,7;
15:3,4,12,16;16:18;17:7,
12;18:20,25;19:2,9,15,17,
19,19,20,22,22,23;20:15,
19;21:21;22:5,5,25;
23:17;24:4,6,8,8,14,15,
24,24;25:7,8,12,12,13;
26:1,2,6,13,14;27:23;
28:8,11,25;29:8;31:10,
13;33:7;37:4;44:11,14,
15;47:15;49:9,19,21;
52:4,13,16;54:1;55:1,2;
58:23;62:21;66:21;76:18
**cells (7)**
10:16;12:15,19;14:4;
52:5;62:20;82:24
**certain (3)**
15:18;26:15;56:23
**certainly (3)**
77:2;93:21;96:3
**chain (3)**
32:15,17,20,22
**change (1)**
10:7
**changed (2)**
6:7;10:16
**charge (4)**
26:12;35:11;36:6;
37:14
**charged (1)**
91:17
**check (3)**
93:15,22;94:16
**checkbook (3)**
93:1,5,7
**checked (2)**
79:7,11
**checks (9)**
91:14,17;92:13,14;
93:5,9,10,12;94:3
**circumstances (7)**
48:14,21,23;92:21,22;
95:6,8
**citation (6)**
91:19,20,25;92:2,17;

94:10
**civil (1)**
91:5
**clarification (1)**
76:13
**clarify (5)**
8:16;9:3;19:18;39:9;
58:21
**class (2)**
94:14,15
**clear (6)**
10:22;25:19;31:9;
37:23;65:11;82:10
**clearer (1)**
18:17
**clerical (1)**
92:25
**clip (3)**
55:6,9,16
**clock (1)**
60:9
**close (2)**
66:3;74:21
**clue (1)**
76:10
**combination (1)**
83:18;91:9
**coming (3)**
52:14;58:24;72:22
**comma (1)**
47:22
**communication (2)**
66:19,20
**community (1)**
75:22
**compiled (1)**
9:18
**complained (1)**
23:8
**complaining (2)**
23:5;24:20
**complaint (1)**
82:25
**complaints (1)**
6:19
**complete (1)**
94:13
**completed (2)**
78:18;80:5
**completely (1)**
10:5
**compliance (8)**
37:11;39:19;40:1,23,
25;41:3;42:3,14
**compliant (1)**
32:16
**complied (1)**
17:19
**comply (6)**
14:17;17:5,16;18:3;
68:7,15
**complying (2)**
17:22;20:22

**computer (1)**
50:22
**concentrate (2)**
30:24;31:1
**concern (1)**
8:24
**concerns (1)**
7:5
**concrete (2)**
24:5;47:17
**conducted (1)**
80:10
**Confidential (3)**
85:22;89:20;97:11
**connection (2)**
55:10;72:1
**Conroy (25)**
14:11;16:3;18:23;
23:16;26:16;28:5,13;
29:7;44:3,9,24;70:1,2,9,
21,22;71:2,10,13;72:8,
12;73:2,4,11,17
**Conroy's (1)**
70:18
**consider (2)**
79:13;92:14
**consideration (1)**
93:3
**contact (9)**
15:24;16:7,8,13;34:17,
19;39:7;82:20,25
**contacted (1)**
93:17
**contains (1)**
52:15
**contamination (2)**
40:18,22
**context (2)**
56:22;73:19
**continue (14)**
53:14;56:12;60:10;
61:24;62:25;63:3;64:2;
70:6;71:6;74:9;82:4,7,9;
96:16
**continued (1)**
43:25
**Continuing (2)**
61:6;71:7
**control (4)**
14:25;25:24;37:16;
42:10
**controlled (1)**
41:23
**controlling (1)**
74:10
**conversation (1)**
15:5
**conviction (1)**
76:6
**convince (2)**
14:14,17
**cooperative (1)**
16:23

**copy (9)**
11:12;46:1;51:3;62:8,
10,14;78:17;80:5,6
**corner (1)**
57:22
**Counsel (1)**
11:7
**counseled (2)**
90:7,12
**County (13)**
4:10,12,19;6:6,10,18,
25;7:7,23;11:2;13:5;
84:3;89:23
**couple (4)**
67:4;74:24;83:21;91:4
**course (4)**
9:6,11;24:11;83:25
**court (6)**
8:3,22,22,24;89:24;
90:2
**cover (3)**
15:25;16:4,8
**covered (1)**
42:7
**covering (3)**
16:9,14;76:20
**criminal (2)**
6:21;91:11
**Crosse (1)**
5:14
**cuff (1)**
84:21
**cuffs (9)**
49:2,5,8,15;50:12;
70:24;73:18,21;95:23
**current (1)**
4:8
**custodial (1)**
91:22
**cycle (1)**
81:10
**cycle's (1)**
81:10

**D**

**damage (1)**
96:17
**DA's (1)**
94:11
**date (7)**
9:17;51:14;59:14,18;
81:1;89:24;90:2
**dated (1)**
51:15
**day (13)**
7:22;9:19;71:21;83:15,
19;84:11,12,13,15;85:1,
15,15,18
**days (3)**
47:1;90:25;93:6
**day-to-day (1)**
27:8

Michael B. Kingsley  vs.
Lisa Josvai, et al.

Deposition of FRITZ DEGNER
August 21, 2012

**deal (5)**
27:7;44:5,9;69:22;
76:12
**dealing (6)**
20:1;37:14;40:20;
75:14;76:15,19
**debate (2)**
84:6,9
**December (1)**
5:18
**decide (3)**
40:14;41:12;69:7
**decided (2)**
15:21;70:2
**declaration (3)**
51:5;54:8;55:13
**deem (1)**
79:15
**defendant (1)**
6:23
**defendants (1)**
75:9
**Defendant's (2)**
12:24;13:2
**defer (1)**
27:5
**DEGNER (6)**
4:1,7,8;31:13;45:17;
97:20
**Degree (1)**
5:10
**demeanor (1)**
16:11
**demonstrate (1)**
38:3
**department (5)**
4:22;5:1;77:21;79:25;
97:3
**depends (1)**
30:17
**deploy (18)**
33:21;34:12,25;35:13,
15;36:1,6,9;58:6;65:7,22;
66:17,25;67:1;68:19;
78:23;79:20;81:20
**deployed (23)**
34:14,17;39:21;43:19,
22;44:25;45:4;56:15;
62:2,11,23;63:5,25;
64:13;65:14,19;66:22;
68:16,25;80:4;81:8;
94:20,25
**deploying (3)**
43:3,22;65:9
**deployment (1)**
62:3
**deponents (1)**
75:9
**deposed (1)**
75:5
**deposition (20)**
7:3,12;8:1,12;9:14;
10:23,24;12:6,24;13:2;

45:18,24;51:4;54:7;55:4,
10;75:1,2,10;97:24
**depositions (1)**
75:6
**deputies (5)**
26:24;27:18;44:10,21;
61:2
**Deputy (31)**
4:10,11;6:5,18;7:23;
15:23;19:7;22:1;23:15;
26:17,22;27:3;28:10;
29:10,11,16,19;30:7;
31:13,15;32:20;35:5;
45:17;47:21;56:9;60:19;
61:14;67:17;90:5;96:25;
97:20
**describe (3)**
11:25;38:4;81:19
**desired (1)**
39:24
**Despite (1)**
61:21
**determine (1)**
63:4
**developed (1)**
5:19
**diabetes (1)**
5:19
**dictate (4)**
14:20;48:23;49:1,1
**dictates (1)**
49:4
**difference (1)**
91:20
**different (4)**
6:9;13:12;48:20;70:13
**differently (1)**
25:2
**difficult (2)**
30:25;76:11
**direct (2)**
6:22;82:25
**directions (2)**
33:4;63:23
**directly (2)**
69:12;74:3
**disciplinary (1)**
75:24
**discipline (1)**
78:2
**disciplined (1)**
78:1
**discovered (1)**
40:24;83:16
**discuss (1)**
69:12
**discussed (1)**
83:3
**discussion (7)**
15:17,21;16:1;44:20,
21;59:23;64:7
**dishonest (1)**
92:18

**dishonesty (2)**
92:15,24
**dismissed (5)**
92:3,4,5,7;94:10
**dispatcher (1)**
13:23
**disruption (2)**
39:17,20
**distinctive (1)**
63:1
**District (4)**
92:5,6,12;93:24
**document (2)**
45:20;78:13
**domestic (1)**
96:11
**done (8)**
18:15;27:12;29:11;
33:20;36:2;38:15,25;
78:15
**door (14)**
14:9,15;17:17;22:25;
26:1;28:16,22,24;70:25;
72:18,22;73:4,12,22
**doorway (4)**
19:9;22:4;28:14,23
**doorway's (1)**
28:1
**dot (1)**
39:15
**doublelock (4)**
48:9,15;50:2,15
**doublelocked (9)**
48:2,5;49:3,15,25;50:3,
6,8,13
**down (18)**
10:20;14:6,8,12;15:3,
16;16:18;22:8;23:3;
26:13;47:13,17;48:11;
52:14,17;63:11;81:17,22
**download (1)**
80:17,20,25;81:7
**downstairs (1)**
44:18
**draw (2)**
11:19,23
**dry (2)**
41:1;95:20
**du (1)**
93:4
**duly (1)**
4:2
**during (14)**
12:6;18:6;19:8;22:3,
14;24:22;25:6;31:5;
49:24;57:3;65:14;85:3,
13;89:22
**duties (4)**
6:7,18;9:6,12
**DX (2)**
11:14,14

**E**

**earlier (2)**
65:6;74:25
**early (1)**
13:15
**easy (1)**
32:18
**edited (2)**
47:1,5
**education (1)**
5:8
**effect (1)**
43:22
**effective (4)**
40:24,25;41:4;44:7
**efforts (1)**
74:9
**eight (1)**
69:21
**either (2)**
26:15;90:25
**electricity (1)**
33:21
**electromuscular (1)**
39:20
**else (4)**
16:20;17:11;75:5;
83:25
**else's (2)**
9:24;46:19
**emanating (1)**
62:20
**employ (1)**
80:16
**employee (1)**
26:18
**employees (4)**
6:25;27:2,15,20
**employment (7)**
4:8,15,25;5:21;8:25;
83:18;89:22
**end (2)**
13:16;43:11
**ended (5)**
28:5,7;43:11,12;64:21
**ends (1)**
89:20
**enforce (1)**
6:20
**enforcement (4)**
5:4;8:25;9:4;10:13
**enough (1)**
28:2;42:3
**entail (2)**
16:5,14
**enter (1)**
28:25
**entered (5)**
17:12;18:20,25;19:2;
46:22
**entirety (1)**

62:7
**entitled (1)**
52:23
**error (1)**
92:25
**evaluations (2)**
90:13,17
**even (3)**
11:8;18:16;28:11
**events (5)**
9:5,9;55:21;67:5;89:22
**everybody (1)**
14:7;44:4
**Everyone (1)**
12:14
**exactly (6)**
10:17;13:14;16:1;17:3,
14;26:15
**EXAMINATION (1)**
4:4
**example (3)**
40:8;41:3;49:18
**excessive (1)**
77:24;78:2;90:8,9
**Exhibit (30)**
10:23,24;11:15,18,23;
12:24;13:1,2,3;22:17;
24:11,21;25:5;45:13,18,
24;46:12;51:4,5,8;54:6,7,
8,9;74:21;78:10;85:20;
97:10,13,15
**exhibiting (2)**
20:18;25:10
**exhibits (1)**
50:24
**exited (2)**
44:11,13
**experience (2)**
5:3,15
**expert (2)**
77:6,14
**Explain (1)**
43:20
**extremely (1)**
35:24

**F**

**face (3)**
38:10,19;47:17
**fact (5)**
61:21;71:25;74:8;
89:25;90:4
**failed (2)**
83:17;90:1
**Failure (1)**
79:4
**fair (2)**
20:13;25:25
**fairly (2)**
8:13;32:17
**fall (2)**
90:25;91:1

Case: 3:10-cv-00832-jdp   Document #: 110   Filed: 09/19/12   Page 29 of 36

Michael B. Kingsley  vs.
Lisa Josvai, et al.

Deposition of FRITZ DEGNER
August 21, 2012

**falls (1)**
43:14
**far (13)**
9:1;17:3;24:9,18;
25:22;26:7;37:15;39:10,
19;63:14;73:8;81:2;
93:25
**farther (1)**
66:4;73:6
**feedback (1)**
80:13
**feel (5)**
19:16;43:5;55:23;
63:20;68:7
**feeling (1)**
36:22
**feet (2)**
22:8;24:12
**felt (3)**
35:25;84:10,14
**few (1)**
67:8
**fight (1)**
96:12
**fighting (1)**
19:10
**file (23)**
51:3,8,11,13,18,22;
52:1,6,15,25;53:7,18,23,
24;54:5,9,10,19,21,24;
55:3;56:3,5
**filed (1)**
77:7
**files (3)**
50:25;51:7;53:1
**filing (1)**
55:12
**fill (2)**
78:22;79:23
**filled (2)**
80:14;82:17
**filling (1)**
64:5
**find (1)**
90:5
**fine (5)**
12:10,13,22;47:8;97:17
**finish (1)**
71:23
**finished (1)**
38:16
**first (14)**
4:2;10:13;13:11;17:7;
46:22,24;47:4;50:8,15;
51:3,8;55:15;71:24;95:9
**five (3)**
8:9;9:22;45:11;53:20;
81:10,13,15;82:1,6,7,15;
94:3;97:8
**five-plus (1)**
94:16
**flexing (1)**
63:22

**flip (1)**
33:25
**flipped (1)**
48:20
**flipping (1)**
33:23
**floor (2)**
23:3;24:3
**follow (3)**
30:24;31:1;74:24
**followed (1)**
23:19
**following (2)**
25:17,18
**follows (1)**
4:3
**follow-up (1)**
91:4
**Fond (1)**
93:4
**foot (6)**
23:6,6,9;24:20;53:21;
58:18
**footage (1)**
52:15
**force (2)**
77:24;78:2
**form (6)**
24:16;48:6;50:9;68:20;
74:13;85:9
**former (3)**
27:15,20;96:25
**Fort (2)**
5:25;6:1
**forward (5)**
51:21;57:1,23,23;58:25
**forwards (1)**
4:16
**found (1)**
36:7
**Four (2)**
9:22;94:3
**four-day (1)**
90:24
**fourth (1)**
79:1
**free (1)**
42:25
**FRITZ (2)**
4:1,7
**front (2)**
33:3;37:21
**full (3)**
47:11;81:13,15
**full-time (1)**
4:20
**funds (4)**
91:15,18;93:8,10
**further (8)**
47:19;48:13;55:24;
70:4;74:10,10;77:20;
97:19

**G**

**gas (3)**
93:13,14,25
**gave (2)**
32:11;94:11
**generally (4)**
7:19;54:23;84:19;95:7
**gets (1)**
52:19
**gist (1)**
17:16
**given (4)**
6:19;31:1;68:18,23
**glass (2)**
95:25;96:7
**goes (1)**
93:25
**Good (2)**
22:20;36:15
**graduated (1)**
5:6
**Green (1)**
84:3
**grievance (1)**
82:17
**groaned (1)**
43:25
**ground (1)**
95:17
**growl (2)**
47:22;62:4
**growled (1)**
62:5
**growling (2)**
32:8,9
**guess (10)**
9:1;10:10;28:18;29:18;
41:8;62:6;67:25;68:5;
80:23;83:9
**gun (1)**
79:20
**Gunderson (1)**
91:8

**H**

**half (1)**
69:15
**halfway (1)**
95:14
**hall (3)**
52:17,24;53:4
**hallway (18)**
10:5,6;14:6;22:12,25;
23:3;24:3,23;25:7;26:2;
28:25;29:5;44:14;49:21;
50:18;52:14;62:13,19
**hand (10)**
11:17,18;33:2,2;63:11;
67:9,16;95:18,19,23
**handcuff (4)**

19:6;29:14;48:18;
95:19
**handcuffed (5)**
17:17;19:8;20:25;33:1;
95:11
**handcuffing (1)**
84:23
**handcuffs (42)**
14:15;20:8,10,11,14;
21:2,6,10,16;29:12,23;
30:2;32:7,10,12,18,21;
35:20,21;40:21;43:10,14,
18;44:1;47:21,23;48:1,9,
18;50:1,3;60:20;61:18;
68:5;72:19;73:3,12;74:6;
95:2,18;96:5,18
**handed (3)**
10:22;45:17;78:12
**handle (3)**
16:3;27:7;36:11
**hands (7)**
16:10;21:4;32:14,25;
33:3;48:25;63:22
**hanging (1)**
28:5
**happen (3)**
20:1,3;27:24
**happened (14)**
14:5;19:2;21:16;22:6;
23:2,4;29:6,20;33:9;
43:19;44:2;84:5;92:2;
93:19
**happens (3)**
16:12;30:14;48:17
**hard (2)**
11:7;30:24
**harm (1)**
24:13
**head (29)**
23:22;28:10;29:15,21;
32:3,4;35:3;37:8,17,19,
24;38:1,19;40:2,2;41:18,
19,24;42:2,2,6,11,13,20;
59:6;60:2;65:2;66:14;
77:1
**head's (2)**
38:6,7
**healthcare (1)**
91:8
**hear (16)**
33:5;39:3,6;45:2,6;
53:10,20;62:4;64:14;
65:23,24;66:1;69:21;
70:8,10;71:10
**heard (10)**
21:11;36:19;54:2;55:4,
5;58:17;62:17,18;70:16,
17
**hearing (3)**
8:4,23,24
**held (3)**
6:9;59:23;64:7
**help (3)**

23:13,13;26:25
**helps (1)**
63:4
**Hendrickson (51)**
14:2,9;15:22;17:8,11;
19:7;22:1;23:14;26:16;
28:9;29:9,15,19;30:5;
31:15;33:12,13;34:11,24;
35:8,12,14;37:7,16,20,23;
38:18,22,25;41:17,23;
42:1,5;45:2,6;56:10;58:5;
61:13,21;65:2,7,21;
66:13,16,24;67:17,21;
68:19,24;69:7,13
**Hendrickson's (2)**
38:9;42:19
**Here's (1)**
69:22
**high (2)**
5:22;19:16
**highest (1)**
5:8
**himself (2)**
35:23;43:15
**hired (1)**
5:2
**history (1)**
4:15
**hobby (1)**
5:24
**hold (10)**
37:11;40:1;41:3;42:3,
14;81:22;82:4,8,9,11
**holding (8)**
10:7,10,16,18,21;
11:21;12:4;19:23
**holds (1)**
40:23
**honestly (1)**
8:7
**hooked (1)**
50:22
**hope (1)**
25:3
**hoping (1)**
68:6
**horrendous (1)**
40:19
**hours (2)**
9:22;13:19
**house (2)**
90:5;96:12
**hundred (3)**
8:9,10,22
**hurt (4)**
23:7,9,10;35:22

**I**

**ice (1)**
64:5
**idea (5)**
8:8;36:15;68:18,24;

Michael B. Kingsley  vs.
Lisa Josvai, et al.

Deposition of FRITZ DEGNER
August 21, 2012

97:6
**identification (4)**
11:16;45:14;78:11;
85:21
**identified (1)**
23:23
**identify (6)**
45:20;56:6;66:6,7,8;
78:16
**imagine (1)**
9:4
**immediately (3)**
65:8;22;72:20
**impetus (1)**
69:7
**impression (1)**
32:11
**inappropriately (1)**
78:5
**incarceration (1)**
83:1
**incident (45)**
7:11,13,19,22;9:17,19,
23,24;11:22;13:7;26:19,
25;27:1;36:5,6;46:1,3,7,
12,14,19;47:5;51:1;52:7;
53:25;75:12,25;76:6,16,
17;77:3,19;78:19;80:11;
82:18,21,21,24;83:22;
85:14;92:17;94:19,25;
96:3,10
**incorrect (1)**
62:3
**indicate (1)**
67:11
**indicated (4)**
64:25;65:21;66:22;
67:10
**Indicating (4)**
12:3;32:14;38:6;48:19
**indicator (1)**
59:15
**individual (5)**
36:5;77:9,12,14,17
**individuals (1)**
56:6
**information (3)**
80:17,24;81:7
**initiation (1)**
55:7
**injure (1)**
48:12
**injury (4)**
84:13,16,17,19
**inmate (2)**
14:3;76:18
**inmates (1)**
27:7
**ins (1)**
27:6
**inserting (1)**
69:4
**inside (1)**

28:8
**instance (4)**
44:6;78:7;81:5;82:10
**instances (6)**
27:13,17;36:18;60:11;
77:2;89:22
**instead (2)**
39:23;43:24
**instruct (1)**
67:21
**instructed (1)**
66:17
**instruction (2)**
35:15;36:1
**instructions (1)**
30:12
**instructor (2)**
85:5,17
**instructors (4)**
80:1,6,20,24
**instructs (1)**
8:19
**insufficient (2)**
91:15,18
**intended (2)**
74:11;93:22
**intervene (1)**
16:12
**interview (1)**
84:25
**into (32)**
10:20,20;11:21,24,24;
15:16;17:7;19:9;21:21,
22,23;22:4,5,10,11,15,24;
23:17;28:14,15;44:14;
47:13,14;49:21;52:18;
55:1;67:9;80:10;85:14;
93:3,23;97:9
**investigate (1)**
6:19
**investigated (2)**
77:23;78:4
**investigation (3)**
84:25;85:3,13
**involve (4)**
91:23;92:15,18,24
**involved (7)**
15:11;36:5;95:6
**involving (5)**
6:24;75:25;91:9;94:19;
95:1
**issue (5)**
35:21;40:20;43:15,16;
76:19
**issued (3)**
91:19,20,25
**issues (1)**
84:21

**J**

**Jail (23)**
7:7;11:2;13:5,22,24,25;

15:6;22:12;26:18,25;
27:2,4,10,11,15,20;44:21;
49:9;52:16;75:19;76:2,9;
91:23
**jailers (1)**
15:5
**job (3)**
6:6;9:6,12
**jobs (1)**
6:3
**Joel (1)**
74:23
**John (2)**
77:15,17
**JONES (24)**
11:6;12:10,14,17;
18:14;19:18;22:18;
24:16;31:8;38:14;48:6;
50:9;59:12,19;60:3;64:5;
68:20;69:1,9;74:12;
84:18;85:9;97:9,21
**Josvai (1)**
51:6
**judgment (1)**
91:5
**July (1)**
4:22
**June (1)**
5:19
**justified (2)**
84:11,12

**K**

**Karl (1)**
14:9
**kept (1)**
84:23
**key (1)**
29:14
**kick (3)**
96:14,16,24
**kicked (4)**
95:13,25;96:7,22
**kind (3)**
18:2;42:4;94:9
**Kingsley (75)**
6:24;7:6,14;10:19;
11:21;13:6;14:14,19;
15:4,6,19;16:19,21;
17:12,19,21;18:5;19:3;
20:9,14,18;21:17;24:13,
21;25:5,10;27:22;28:6;
29:3,24;30:25;31:20,23;
32:1;33:5;34:2,12;37:3;
38:23;43:23;45:7;47:22,
22;49:9,18;50:18;51:9,
11;52:16,23;53:25;54:9,
11;55:1;59:7,8;70:3;
72:16,17;73:5;74:4;
75:12,18,21,25;76:11,24;
81:5;82:17,20;83:4;
94:20;95:1,20;96:4

**Kingsley's (20)**
31:5;34:15,23;37:8,19,
24;38:5,8,19;39:16;40:2;
41:18;50:12;57:5;58:1,
11;67:20,22;69:6;76:5
**knee (3)**
38:11;41:18;61:22
**knew (1)**
75:14
**knowledge (2)**
41:5,8
**known (4)**
12:5;16:7;33:18;51:4

**L**

**labeled (3)**
51:11;54:9,10
**Lac (1)**
93:4
**lack (1)**
24:4
**lady (1)**
95:10
**Laid (3)**
17:23;19:3;23:3
**Lake (1)**
84:3
**Landers (2)**
77:10,12
**larger (1)**
56:22
**laser (2)**
34:1;39:15
**last (1)**
83:2
**late (4)**
13:15,15;67:12;85:15
**later (5)**
44:5,10;47:1;48:22;
52:18
**law (4)**
5:3;8:25;9:4;10:13
**lawful (1)**
20:22
**lawsuit (6)**
6:23;7:5;55:7;75:13;
78:20;83:3
**laying (2)**
19:4;38:5
**leads (1)**
92:23
**least (2)**
95:5,22
**leave (11)**
35:22;44:4;69:23;70:3,
23;73:20;80:5,6;83:15;
90:19,20
**leaving (2)**
43:9;74:6
**led (1)**
83:19
**left (12)**

5:18;28:24;29:1;38:8,
20;51:14;56:8,10;57:20;
63:11;75:16;80:8
**leg (6)**
37:21;38:9,18;42:6,20,
24
**legs (4)**
23:21;28:7,7;29:17
**letter (1)**
93:14
**letting (1)**
16:14
**level (1)**
5:8
**lever (2)**
33:23,24
**Lieutenant (29)**
14:2,11;16:3;18:23;
23:16;26:16;28:5,13;
29:7;44:3,9,24;70:1,2,9,
18,21,22;71:2,10,13;72:8,
12;73:2,4,11,17;80:3,7
**lieutenants (1)**
90:4
**lieutenant's (1)**
74:15
**life (1)**
9:10
**light (5)**
15:12;33:25;34:1,3;
76:20
**lights (1)**
74:22
**line (4)**
27:1;46:23;79:1,2
**lines (3)**
25:24;30:6;47:13
**Lisa (1)**
51:6
**listen (2)**
52:25;53:15
**literally (1)**
79:19
**little (7)**
17:10;38:12;39:9;
51:16;52:9;62:25;67:3
**locked (3)**
14:8;48:22,24
**logs (1)**
80:20
**long (7)**
4:11;81:2,4,8,9,17;
97:14
**longer (1)**
97:2
**look (4)**
24:10;41:10,11;55:24
**looked (6)**
9:18;10:1,2;35:2,2;
60:6
**looking (3)**
22:4;24:11;60:21;
63:21

Case: 3:10-cv-00832-jdp   Document #: 110   Filed: 09/19/12   Page 31 of 36

Michael B. Kingsley  vs.
Lisa Josvai, et al.

Deposition of FRITZ DEGNER
August 21, 2012

**looks (1)**
61:22
**loose (1)**
95:19
**lot (1)**
63:17
**loudly (1)**
43:25
**lower (4)**
11:14;51:14;56:8;
57:20
**Lutheran (1)**
91:8

**M**

**mail (1)**
92:1
**main (4)**
22:11;52:23;53:4;
97:16
**maintain (2)**
25:24;42:12
**makes (1)**
18:17
**making (4)**
18:12;47:23;61:2;72:5
**maneuver (1)**
21:5
**maneuvering (1)**
27:25
**manipulate (1)**
32:18
**Manka (2)**
96:25,25
**many (5)**
8:6;9:6;83:8;94:23;
95:4
**map (2)**
11:1,5
**marked (15)**
10:23;11:4,15,17;12:9;
45:13,18;50:25;51:9;
53:18;54:6;78:10,12;
85:20;97:11
**matter (6)**
8:24;41:11;44:19;84:6,
9;91:22
**matters (1)**
9:10
**May (19)**
4:20;5:1,13;6:6;7:8;
10:8;36:17;46:2;47:2;
51:15;60:25;62:3;65:5;
68:18,23;69:6,16;80:10,
23
**Maybe (6)**
8:10,22;24:12;38:12;
45:11;69:3
**McCoy (2)**
5:25;6:1
**mean (21)**
6:8;16:4,17;25:21;

27:17;32:13,22;36:21;
37:9;39:10;40:7;42:5;
43:20,21;49:17;60:3;
66:11;81:10;83:13;90:12,
14
**meaning (2)**
26:18;37:13
**means (5)**
16:6;37:14;42:12;
55:25;97:11
**meant (3)**
13:3;74:25;79:19
**measures (1)**
39:22
**medical (1)**
91:9
**members (1)**
71:4
**mess (1)**
10:8
**method (1)**
40:25
**methodology (1)**
39:11
**Michael (1)**
6:24
**microbiology (1)**
5:14
**midsection (2)**
28:10;29:17
**might (6)**
8:17;19:12;45:8;48:18;
68:6,7
**military (1)**
5:15
**mind (1)**
74:15
**Mine (1)**
45:21
**minute (1)**
53:18;69:16
**minutes (2)**
45:11;97:8
**missed (1)**
89:24
**moment (1)**
78:14
**Monroe (18)**
4:10,12,19;6:6,10,18,
25;7:7,23;11:2;13:5;
45:19,24,25;78:14,14;
79:1;89:23
**more (9)**
7:17;30:12,23;31:1;
38:12;40:24;43:16;52:9;
54:4
**morning (8)**
7:8;11:22;13:7,10,15,
15;16:20;55:17
**most (1)**
27:10
**move (9)**
17:18;21:8;37:10,11;

42:9,22,25;51:21;63:16
**moved (7)**
7:6,14;29:21;31:13;
61:13,14;67:9
**movie (2)**
5:24;6:1
**moving (13)**
13:5;14:3;26:12;32:2,
23;37:19;41:19;57:1;
58:25;61:16,19;63:16,17
**much (4)**
9:21;38:11;58:16;
70:18
**mucked (1)**
11:11
**multiple (2)**
32:5;96:16
**muscles (1)**
63:20
**muscular (1)**
39:17
**must (1)**
34:19
**myself (3)**
8:11;14:10;56:11

**N**

**name (3)**
4:6;10:16;95:7
**named (4)**
77:9,12,15,17
**names (2)**
10:7;95:9
**necessary (3)**
16:16;20:6;35:25
**need (5)**
7:17;35:21;39:9;55:23;
73:8
**needed (2)**
13:24;14:3
**Neither (2)**
79:7,10
**next (6)**
14:5;33:9;56:9;73:23;
80:23;95:12
**Nicholas (1)**
96:25
**night (2)**
13:17;83:15
**noise (1)**
62:6
**non-resistive (1)**
32:16
**non-verbal (1)**
66:20
**normal (1)**
74:7
**Normally (2)**
32:16;48:21
**note (4)**
12:11;46:22;51:13;
55:21

**noted (1)**
54:7
**notes (2)**
9:16,16
**notice (2)**
32:8;94:1
**number (1)**
14:17
**numbers (1)**
45:19

**O**

**oath (2)**
4:3;8:14
**object (5)**
8:17;24:16;68:20;
74:12;85:9
**Objection (4)**
48:6;50:9;69:1,9
**observe (13)**
25:5,10,19;27:24;31:4,
19,22;57:4,13,25;58:15;
59:4;67:8
**observed (3)**
25:15;58:16;65:1
**obtain (2)**
5:12;39:23
**obtained (1)**
5:8
**obviously (4)**
9:19;32:5;60:21;61:12
**occasions (1)**
94:21
**occur (2)**
9:11;36:16
**occurred (2)**
7:6;29:21
**off (26)**
15:12;23:22;27:9;
28:23;32:7,21;33:22;
35:20,21;39:18;42:9,24;
43:18;59:21,23;64:4,7;
70:24;72:19;73:3,22;
77:1;81:17;90:25;95:18;
96:14
**offense (1)**
91:12
**offers (1)**
92:12
**Office (6)**
92:5,6,12;93:17,24;
94:11
**officer (10)**
4:13;8:25;9:4;16:6,7,8,
9;30:12,16;31:2
**officers (17)**
15:17,18;16:19;17:12;
18:20,25;19:2;20:8;
23:20,23;26:3;27:23;
28:17;29:3;30:15;31:6;
95:11
**Once (5)**

13:25;28:7;42:8;61:13;
66:5
**one (54)**
10:3,4;14:21;16:7,8;
27:12;28:6;29:11;30:11,
12,15,23;31:2;32:3,8,24;
37:18;39:9;42:21;48:9,
14,18,19;50:19;52:23,24;
53:18;61:10;64:3;65:5;
77:9;79:7,10;80:5,8,19;
81:12;82:13,23;83:14,19;
85:1;89:24,25;90:4,15;
93:13,13,25;94:1;95:9,
10,17,22
**one-day (1)**
83:23
**ones (1)**
15:23
**only (12)**
24:19;40:20;42:20;
43:6;48:25;52:25;55:9;
62:10,18;66:16;75:14;
82:25
**onto (5)**
28:5,17;29:4;41:18;
55:2
**open (5)**
51:3,7,8;54:5,13
**opened (2)**
14:8;51:13
**opening (1)**
14:15
**operation (1)**
27:16
**operator (1)**
75:16
**opportunity (4)**
50:2,8,15,19
**opposed (1)**
39:7
**opposite (2)**
33:4;63:23
**option (2)**
40:15;41:14
**order (5)**
14:18;34:19;42:13;
94:10;97:12
**orders (2)**
20:22;25:17
**orientation (1)**
48:25
**original (4)**
19:19,22;49:19;78:17
**originally (5)**
5:2;14:10;28:9;50:4,6,
13;64:16;68:8
**Otherwise (1)**
83:20
**out (36)**
5:24;6:1,4;10:14;
21:21;22:10,11,15,23,24;
29:5,7;33:19;40:21;
49:19;58:10,10;60:11,13;

Case: 3:10-cv-00832-jdp   Document #: 110   Filed: 09/19/12   Page 32 of 36

Michael B. Kingsley  vs.
Lisa Josvai, et al.

Deposition of FRITZ DEGNER
August 21, 2012

62:13,20;78:22;79:23;
80:14;82:18;93:5,9;94:7;
95:13,14,25;96:4,7,15,22,
24
**outs (1)**
27:7
**outside (11)**
22:25;24:14,23;25:7,
12;26:1,13;44:15;49:21;
57:21;83:18
**over (7)**
27:3,14,18;59:20;
67:11;93:4;95:15
**overhear (1)**
44:20
**own (3)**
67:24;68:1,3

**P**

**packet (1)**
94:12
**page (3)**
46:24;47:12;78:25
**paid (1)**
94:5
**pain (1)**
23:5
**paper (1)**
15:12
**paragraph (2)**
47:11,13
**Pardon (21)**
4:5;11:10;12:13,23;
19:21;22:20;31:11;
42:16;45:10,15;57:8;
59:11,17,21;60:4;64:3;
74:17,23;97:7,17,19
**part (11)**
31:5;57:5;58:1,11;
72:21;84:21;92:18,25;
93:1,1;94:15
**participate (1)**
94:9
**particular (5)**
46:12;75:19,22;77:19;
80:10
**particularly (1)**
90:20
**parts (1)**
56:23
**part-time (3)**
4:21;6:3,4
**passive (8)**
20:19,20;25:11,15;
31:4,19;57:4,13
**past (1)**
52:4
**patrol (1)**
6:22
**pay (3)**
25:2;93:16,23
**pen (1)**

11:13
**pencil (1)**
11:18
**people (2)**
27:14;29:24
**pepper (3)**
40:17,18,22
**per (1)**
26:18
**perfect (2)**
48:8,9
**perform (1)**
39:17
**performance (2)**
90:12,16
**performed (1)**
79:14
**perhaps (2)**
50:16;53:19
**period (3)**
6:13;81:9;93:7
**periodically (1)**
55:20
**person (4)**
32:16;39:12;76:12;
95:7
**personal (1)**
9:10
**person's (1)**
30:23
**perspective (1)**
16:6
**Peters (2)**
77:15,17
**physical (6)**
15:24;18:5,12;22:13;
33:5,6
**physically (10)**
21:5,8,24,25;32:15;
34:20;61:16;76:25;77:3;
79:20
**picked (5)**
21:24,25;22:2;23:13,16
**picture (1)**
57:17
**Piggly (1)**
94:2
**place (4)**
34:20;50:21;67:20,21
**placed (13)**
14:16;21:16;24:4;
28:17;29:4;34:23;42:6;
47:17;49:5,8;55:2;67:16;
95:11
**placement (1)**
49:13
**places (1)**
93:12
**placing (2)**
21:3;69:5
**Plaintiff's (1)**
12:25;13:3;78:13
**platform (1)**

41:22
**play (22)**
32:17;51:16;52:9,23;
53:5,14;54:13;55:19;
56:14;59:9,13;61:7;
64:22;65:12;66:7;69:15;
70:11,12;71:6;72:7,21;
73:9
**played (35)**
51:20;52:10;53:6,7,10,
16;54:15,18;56:4,13;
57:3,9,12;58:12;59:1;
60:5,14;61:8,25;63:7;
64:9,14,23;65:16;66:2,9;
67:6;69:19;70:7,15,17;
71:8;72:10,24;73:15
**playing (9)**
51:22;54:14;56:3,12,
21;57:11;59:25;70:6;
73:13
**please (10)**
4:6;25:1;36:3;42:15,
17;50:11;57:6;66:8;
68:22;78:16
**plus (1)**
35:24
**pm (2)**
13:20;97:24
**point (53)**
11:25;14:8,13,21;
15:10;16:2;19:15,25;
21:15;22:18,22,23,24;
26:2;31:7,14;32:3;37:2,
18;38:15,23;40:7,8;41:4,
13;42:4,14;43:7;48:2,5;
49:16;54:19;56:17;57:14,
16,24;58:5,23;59:5;60:1,
11,20;61:15;62:23;63:11,
13,24;64:15;65:25;68:15;
73:5;79:16;90:1
**pointer (1)**
60:12
**pointing (4)**
11:20;38:20;58:10;
66:12
**points (1)**
42:8
**police (3)**
4:13,25;5:10
**policy (1)**
80:2
**portion (4)**
11:1;56:22;85:22;
89:20
**portions (2)**
11:13;50:24
**position (3)**
14:22,25;42:21
**positions (5)**
6:9;28:1,4,16;29:10
**possible (1)**
16:21
**Possibly (1)**

31:3
**post (2)**
76:17,23
**potentially (5)**
20:1;40:10;42:25;
50:19;91:24
**power (1)**
81:18
**practically (1)**
65:8
**practice (1)**
50:14
**preferable (2)**
30:19,22
**preparation (1)**
10:2
**prepare (2)**
9:14;42:13
**prepared (4)**
9:19;19:10,24;20:6
**preparing (4)**
9:21;55:10;75:1,2
**presently (2)**
4:17,19
**pressure (7)**
40:7,8;41:4,13;42:4,7,
14
**presume (2)**
54:2;74:19
**pretty (2)**
38:11;63:1
**prevent (1)**
48:11
**preventing (1)**
35:19
**previous (2)**
64:20;75:24
**previously (5)**
50:24;51:18;54:6;
64:12;83:17
**primary (1)**
30:16
**principle (1)**
16:8
**Prior (30)**
4:20,25;5:3,13;15:3,16;
33:13;34:24;41:17;55:6,
12;59:5;64:24;65:22;
66:10,11,12,20;69:13,21;
72:4,15;75:12,14,25;
76:6,15,16,22;77:3
**probability (1)**
19:16
**probably (4)**
13:2;35:6;36:14;80:7
**probe (1)**
39:12
**probes (3)**
33:19;39:8,10
**problem (3)**
12:21;15:6,7
**procedure (1)**
80:17

**procedure's (1)**
8:13
**proceed (2)**
30:20,22
**process (6)**
15:19;24:7,22;25:6;
26:12;49:24
**produced (1)**
97:10,12
**production (1)**
45:19
**program (5)**
92:8,9,10;94:9,16
**projector (1)**
50:22
**protective (1)**
97:12
**protocol (2)**
43:13;74:7
**provide (1)**
41:22
**provided (2)**
69:6;75:10
**providing (1)**
21:3
**pull (7)**
36:23,24;47:23;63:22;
81:20,25;82:12
**pulled (5)**
80:21;81:12,16;82:13;
95:15
**pulling (11)**
30:2;32:10,12,15,19,
22;33:4;44:1;61:18;
63:19;84:23
**punishment (9)**
70:9;71:11,18;72:1,14;
73:24;74:2,7,11
**pursuant (1)**
97:12
**put (18)**
20:11,14;21:2,5,10;
22:8;34:13;35:5;37:20,
23;38:18;39:15;41:18;
50:13;61:14;63:13;68:9;
96:13
**putting (2)**
20:8,10
**PX (1)**
6:3

**Q**

**quick (1)**
60:13
**quickly (1)**
16:12
**quit (3)**
30:2,3;82:2

**R**

**raise (1)**

Case: 3:10-cv-00832-jdp   Document #: 110   Filed: 09/19/12   Page 33 of 36

Michael B. Kingsley  vs.
Lisa Josvai, et al.

Deposition of FRITZ DEGNER
August 21, 2012

58:20
**rather (1)**
39:19
**reached (1)**
27:23
**read (10)**
42:16,18;46:19;57:10;
59:24;74:18;75:2;77:6,9,
14
**reading (1)**
23:25
**ready (1)**
16:15
**rear (1)**
33:24
**rearranging (1)**
28:4
**Re-ask (3)**
36:3;42:15;68:22
**reason (3)**
26:8;37:12;39:18
**reasonable (1)**
50:8
**recall (41)**
10:1;13:10,23;15:9,11,
14,15;16:20;17:2,3,7,10,
19,21;18:8,9,10,11;
19:12;21:25;22:16;23:18,
20,24;24:1,18;30:9,10;
51:10;54:10;55:15;
66:23;67:23;68:11,14,17;
71:16,17;72:5;85:19;
94:17
**receive (1)**
80:13
**received (5)**
30:18;77:20;89:25;
92:17;94:1
**receiving (38)**
7:8,15;10:6,11,15;12:7,
15,19;13:6;14:4,19;23;
23:17;24:4,6,8,15,24;
25:8,12,13;26:2,6,13;
27:23;28:25;31:10,13;
37:4;44:11,13,15;47:15;
49:22;54:25;62:20;
66:21;76:18;82:24
**Recess (2)**
45:12;97:18
**recognize (9)**
11:1;51:17,23;52:11,
15;53:12,23;54:13,19
**recommended (1)**
78:1
**reconcile (1)**
93:7
**record (12)**
11:6,12;12:11;18:18;
45:16,23;59:22,23;64:4,
7;65:11;76:6
**recordings (1)**
51:1
**refer (8)**

7:11,19;10:10;12:6;
13:1,3;47:12,20
**reference (1)**
73:2
**referred (5)**
10:11;12:14,23,25;
73:18
**referring (9)**
7:13;11:20;12:4,18;
47:11;59:17;60:1;71:19,
21
**refused (2)**
14:16;22:10
**refusing (1)**
15:11
**regarding (2)**
15:5;45:7
**regards (2)**
92:13;93:1
**related (4)**
9:9,11;46:6,13
**relating (1)**
97:15
**relation (6)**
23:20;28:22;52:6;
53:24;78:19;82:18
**relax (6)**
21:2,9;30:2;32:6;
33:11;35:6
**release (3)**
81:23,25;82:1
**released (2)**
82:13;83:1
**remember (14)**
10:17;14:21;19:3;
24:18,19;29:8;36:17;
37:18;45:1;71:22;90:22;
92:11;95:9;96:10
**reminder (1)**
18:14
**remove (5)**
29:12,22;33:19;47:21;
60:20
**removed (5)**
22:23;47:24;48:22;
53:25;95:23
**removing (4)**
52:16;68:5;73:12,18
**repeatedly (2)**
90:16,18
**rephrase (1)**
90:11
**replay (2)**
57:6;71:15
**report (21)**
9:17,18,23,24;13:23;
37:13;44:18;46:1,10,11,
12,17,19,20,22;47:9;
71:20;77:9,14;78:18;
80:13
**reports (6)**
23:25;46:6,13;77:6;
78:22;79:23

**reprimand (1)**
89:25
**reprimanded (3)**
83:6,12;89:21
**reputation (3)**
75:19,22;76:25
**request (1)**
64:11
**required (1)**
8:17
**requires (2)**
41:21,21
**re-reading (1)**
80:2
**resistance (21)**
20:19,20;22:17;24:21;
25:6,11,15,20,21,22;31:4,
19,22,25;37:1,57:4,13,
25;58:10,21;60:12
**resisting (9)**
21:1;30:3;31:6;32:6;
35:19;48:17;49:25;61:1;
68:5
**resistive (5)**
36:19,25;37:1;43:25;
48:16
**respect (6)**
35:24;45:3;81:7;89:21;
92:2;96:3
**respects (2)**
83:9,11
**respond (1)**
90:1
**rest (1)**
10:15
**restrained (1)**
48:12
**restraining (1)**
74:9
**result (2)**
39:24;43:11
**resulted (1)**
85:1
**results (1)**
80:9
**retract (1)**
70:12
**review (7)**
9:24;55:6,12;77:20;
78:15;80:3,9
**Reviewed (6)**
9:16,16,17;54:21;55:9;
79:24
**reviewing (2)**
72:2,4
**Right (27)**
9:8;11:10,14;26:19;
32:25;34:15;49:23;
52:21;53:17;56:2,11;
58:2,13;64:24;65:15;
69:22;70:6;71:6,9;72:2,
25;73:13;74:20;81:23,25;
84:24;94:4

**road (7)**
16:6;26:17,21,24;27:3,
9,17
**role (1)**
16:5
**roles (1)**
15:19
**room (1)**
39:14
**rotator (1)**
84:21
**rough (1)**
8:8
**routine (2)**
30:11,14
**routinely (1)**
78:22
**running (1)**
59:15

## S

**S2 (2)**
51:9,11
**safer (1)**
50:16
**safety (4)**
33:23,23;35:20;43:15
**same (9)**
12:8;30:6,7;52:13;
58:7;69:1,9;93:5;95:20
**saw (6)**
21:14;34:2;57:15;62:8,
10;63:2
**saying (12)**
24:19;30:4,5,7;69:22;
70:22,23;71:16,17;73:2;
83:24;85:19
**scene (2)**
75:16;95:10
**scheduled (2)**
85:5,16
**school (2)**
5:6,22
**schooling (1)**
5:5
**science (1)**
5:11
**screen (3)**
50:23;53:8;57:21
**se (1)**
26:18
**seatbelt (2)**
96:13,14
**second (11)**
7:25;15:2;35:8;47:11;
58:14;59:9,22;60:8;64:3,
4;78:25
**seconds (13)**
53:19,20;61:11;67:8,
13;69:21;81:10,13,15;
82:1,6,7,15
**section (1)**

47:13
**secure (4)**
37:7,9,13,13
**securing (1)**
37:15
**seeing (1)**
37:18
**segment (10)**
57:3,9;59:16;60:15,18,
25;65:12,14;70:17;73:9
**segregated (2)**
97:13,16
**seller (1)**
5:25
**send (1)**
90:4
**senior (1)**
27:10
**sent (3)**
93:14,17,23
**sentence (1)**
47:14
**separately (2)**
58:8,9
**September (1)**
5:2
**sequence (4)**
62:17,18;64:14,20
**sequences (1)**
64:18
**Sergeant (62)**
14:1,9,11;15:22;16:2;
17:8,11;19:7;22:1;23:14,
15;26:16,21;28:6,9;29:9,
15,17,19;30:5,9;31:15;
33:12,13;34:11,24;35:8,
12,14;37:7,16,20,23;38:9,
18,22,25;41:17,23;42:1,5,
19;45:2,6;56:9,10;57:20;
58:5;61:13,21;65:2,7,21;
66:13,16,24;67:17,21;
68:19,24;69:7,13
**served (1)**
6:13
**set (1)**
12:22
**seven (1)**
93:6
**several (3)**
6:25;47:1;64:18
**Sewell (1)**
54:8
**sheets (1)**
81:3
**sheriff (9)**
4:10,11;6:5,18;7:23;
80:6,8;85:4,13
**sheriff's (4)**
4:22;77:21;79:24;97:3
**shift (4)**
13:16,16,17,19
**shifting (3)**
28:16;29:3,20

Michael B. Kingsley  vs.
Lisa Josvai, et al.

Deposition of FRITZ DEGNER
August 21, 2012

**shin (3)**
37:21,24;61:22
**Shisler (9)**
14:11;16:2;23:15;
26:21;28:6;29:17;30:9;
56:9;57:20
**shock (1)**
93:20
**shoot (1)**
33:19
**shop (1)**
5:24
**short (1)**
45:10
**shortly (5)**
44:3;53:19;56:18;
95:25;96:22
**short-term (1)**
5:16
**shot (2)**
39:12;90:24
**shoulder (14)**
34:16;35:5;37:22,25;
38:12;41:19;63:17;67:20,
22;68:7,10;69:6;84:24;
95:20
**shoulders (4)**
29:16;32:2;37:17;
84:21
**show (2)**
50:23;90:2
**showed (5)**
10:3,4,19;85:6,17
**showing (1)**
10:20
**shows (1)**
81:1
**shuffle (1)**
28:1
**sick (13)**
83:15;84:4,4,10,11,12,
13,15,17;85:14,15;90:19,
20
**side (6)**
11:23;27:6;28:24;
38:10,19;63:12
**similar (1)**
36:4
**simple (1)**
8:13
**single (2)**
40:14;78:24
**situation (15)**
4:9;20:2;30:11;35:11;
36:4,7,11,16;37:6;43:13;
49:4,5;83:14;92:21,23
**six (1)**
47:13
**six-month (1)**
6:13
**slab (2)**
24:5;47:17
**sleeping (1)**

**90:6**
**slip (1)**
95:17
**solidly (2)**
31:9,12
**somebody (7)**
13:13;43:1;48:17;
49:25;50:2;52:14;95:1
**someone (1)**
78:23
**sometimes (1)**
10:12
**somewhat (1)**
41:21
**somewhere (2)**
11:24;83:25
**Somewhere's (1)**
33:10
**soon (1)**
94:5
**sorry (5)**
4:24;6:17;18:10;38:14;
58:14
**sort (8)**
37:10,10;40:1;42:13;
55:12;67:9;77:20;80:16
**sound (9)**
53:23;62:8,12,15,17,
18,20;63:1,2
**sounded (1)**
32:9
**sounds (1)**
65:8
**Space (1)**
39:14
**spark (1)**
33:21
**Sparta (1)**
4:25
**speaking (4)**
29:24;54:23;71:13;
73:20
**specific (2)**
7:17;18:11
**specifically (5)**
10:1;17:10;36:17;
60:22;90:18
**spend (1)**
9:21
**spray (2)**
40:17,22
**sprayed (1)**
40:18
**spread (1)**
39:17
**spring (1)**
83:2
**squad (6)**
95:12,14;96:1,7,15,23
**squirming (3)**
57:15;60:18;63:16
**stabilization (1)**
42:12

**stabilized (3)**
41:23;42:2,3
**stabilizing (1)**
37:10
**stable (2)**
41:22;42:21
**staff (5)**
18:6;44:22;52:16;71:4;
75:19
**stamp (4)**
51:14;59:14,18;78:13
**stand (2)**
21:18,19
**standard (2)**
39:11;43:12
**standing (2)**
22:4;67:15
**stands (1)**
43:13
**star (2)**
12:2,9
**start (11)**
11:23;57:7;58:10,11;
59:13,25;64:19;65:24;
67:11;69:17;70:14
**started (3)**
10:13;19:10;90:17
**starting (3)**
4:22;56:8;57:1
**state (1)**
4:6
**statement (6)**
47:20;72:5,15,17,20;
73:23
**statements (6)**
18:11;34:7;45:3,7;
47:19;61:1
**static (1)**
33:21
**station (3)**
93:13,14,25
**stay (1)**
42:21
**stepped (4)**
19:9;28:13;29:7;35:4
**still (12)**
8:17;19:19,21;28:7;
29:5;36:9;49:9;52:13;
63:17,17,19;68:4
**stomach (3)**
19:4,6;38:5
**Stop (16)**
31:6;32:6;53:17;54:17;
55:20;58:1;59:2,3;61:9,
10;63:8,9,10;64:10;
72:23;82:14
**stopped (16)**
56:5;57:2;58:14,15;
60:16;62:1;64:11,25;
67:7;69:20;70:8,16;71:9;
72:11;73:1,16
**store (1)**
5:23

**straight (1)**
93:17
**strike (1)**
38:22
**struggling (2)**
25:23;61:16
**student (1)**
5:22
**studying (1)**
5:13
**stun (5)**
34:17,19;39:7;41:1;
95:20
**subject (7)**
16:9;15:30:13,16;
34:20;48:16;79:21
**subpoena (1)**
90:1
**Success (2)**
79:3,17
**successful (3)**
79:13,13,21
**successfully (1)**
79:14
**sue (1)**
18:4
**summer (2)**
5:25;6:1
**supervisor (4)**
5:24;27:11;46:10,11
**supplement (1)**
51:5
**supposed (4)**
11:8;80:1,3;82:14
**Sure (20)**
7:18;8:15,21;16:1,10;
18:15,19;20:15;25:2;
31:9;36:14;38:15;41:2,
10;57:7;60:18;62:22;
74:13;80:7;97:9
**surrounding (3)**
90:21;92:21,22
**suspect (1)**
96:12
**suspended (2)**
83:14;85:1
**suspension (2)**
83:20,23
**suspension-type (1)**
83:13
**switch (1)**
81:18
**switched (1)**
29:10
**sworn (1)**
4:3

**T**

**talk (4)**
13:25;46:16;47:4;75:5
**talking (24)**
8:8;12:8;15:19;22:19;

30:16,23;31:2,12,16;
38:15;46:4;64:18,21;
71:1,4;72:9,13;73:4,13,
17;74:1,8;78:7;94:16
**TASE (10)**
33:12,14;34:8;35:9;
39:3,5,6;65:3;66:14,15
**TASE'd (10)**
17:6,6;18:3,4;95:19,22;
96:5,8,17,18
**TASE'ing (1)**
74:11
**TASER (92)**
9:18;15:25;16:4,14,15,
22;19:11,13,17;33:14,16,
17,17,19,24;34:3,9,12,13,
14,23,25;35:3,7,13,16;
36:2,7,9;39:21,23;41:1,6;
43:4,6,19,23;44:7,22,24;
45:3;46:10,11;56:16;
58:6;61:15;62:2,4,11,23;
63:5,25;64:13;65:4,7,9,
13,18,22;66:12,17,22,25;
67:1,20,22;68:9,15,19,24;
69:5,8,12;78:5,18,23;
79:2,14,16,24;80:1,5,16,
18,19,21,22;81:1,4;91:2;
94:20;95:1
**Taycheedah (1)**
93:4
**teaching (1)**
83:24
**team (1)**
70:3
**technique (1)**
41:13
**telling (12)**
21:9;30:2;31:6;32:6;
33:10;58:17;66:24,25;
67:2,23;68:8,14
**tells (2)**
27:12;58:5
**ten (5)**
45:11;53:20;69:21;
94:24;97:8
**tension (3)**
36:19,25;37:1
**term (4)**
24:5;25:21;36:19;
37:12
**terminology (1)**
10:8
**terms (2)**
27:2;41:11
**testified (8)**
4:3;8:1,3,12,21,23;9:9;
49:18
**testify (2)**
9:5;12:12
**testifying (1)**
7:2
**testimony (3)**
21:7;75:8;97:14

Case: 3:10-cv-00832-jdp   Document #: 110   Filed: 09/19/12   Page 35 of 36

Michael B. Kingsley  vs.
Lisa Josvai, et al.

Deposition of FRITZ DEGNER
August 21, 2012

**Thanks (1)**
74:23
**theater (2)**
5:24;6:2
**though (1)**
53:4
**thought (10)**
19:12;20:3;47:10;
56:20;62:4;63:1;64:13,
16;93:8,20
**threats (5)**
18:5,12;22:13;24:13;
33:6
**three (1)**
28:2
**throughout (2)**
7:12;60:25
**thumb (1)**
81:17
**ticket (2)**
5:25;92:1
**tight (1)**
32:20
**tighten (1)**
36:24
**tightening (1)**
48:11
**tightly (1)**
32:22
**timeframe (1)**
64:19
**times (11)**
8:6,9,9,10,22;9:7;83:8;
94:23,24;95:4;96:16
**today (4)**
7:3;9:15;78:8;82:22
**together (1)**
32:18
**told (22)**
13:21;14:22;18:1,2;
20:22;21:4,18;22:8;
24:12;25:18;26:11;33:12,
13;34:11,24;35:12;36:6,
12;44:3;65:21;72:18;
85:3
**took (3)**
33:22;39:18;94:4
**tool (1)**
40:14
**top (3)**
23:22;46:23;77:1
**torso (2)**
61:16,19
**total (1)**
93:19
**towards (4)**
13:16;33:6;35:3;65:3
**traffic (3)**
6:20,20;75:15
**trained (3)**
30:15;40:14;91:2
**training (6)**
5:19;30:17,18;84:22;

85:6,18
**transcript (1)**
97:16
**transcripts (1)**
75:3
**transporting (1)**
96:11
**trial (2)**
8:3,23
**tried (3)**
14:16,17;66:5
**trigger (12)**
80:21;81:12,20,22,23,
25;82:1,4,5,8,9,11
**true (2)**
59:13;85:3
**try (6)**
38:4;41:10,11;42:25;
64:8;96:16
**trying (19)**
14:13,19,20;29:22;
32:4,10,12;33:3;37:16;
38:2;40:20;41:12,13;
43:17;60:8,19;63:22;
96:14,24
**turn (9)**
14:24;33:16,17,20,22;
40:24;66:13;74:21;81:17
**turned (6)**
35:2;38:1,6,7;65:2;
93:9
**Turning (1)**
78:25
**twice (1)**
95:5
**two (5)**
61:11;83:19;93:9,12;
94:7
**two-year (1)**
5:10
**type (1)**
43:13

## U

**under (2)**
8:14;48:21
**undertake (1)**
15:18
**unless (1)**
8:18
**up (58)**
8:11;10:8;11:11;14:8,
14;15:2;17:9;18:22;
21:18,19,24,25;22:2;
23:13,16;24:24;25:7,12,
16;26:2,17;28:5,7,15;
29:21;31:14;32:3;34:13;
35:4;36:24;37:21;38:10;
42:7;43:11,12,13;50:22;
55:19;56:20,23;63:12;
66:3,6;67:3;70:24;72:18;
73:3,11,22;74:24;76:20;

79:1;83:21;85:6,17;90:2,
16,18
**upon (1)**
30:17
**upper (7)**
29:18;33:24;34:15;
37:8,17;56:10,11
**use (24)**
16:15;18:5;19:10,13,
17,25;20:4,5,6,6;22:13;
34:8;39:7,10;40:13,17;
44:22;69:8;78:18;79:2,
15,20;84:15;91:2
**used (15)**
5:23;16:22;37:12;
39:19,23;40:3,6,9;42:8;
43:3;64:16,17;79:16;
80:18;83:15
**using (17)**
39:7,11;40:25;41:5;
69:12;77:23;78:2,4,5;
79:23;80:16;84:11,12,13,
22;90:19,20
**usually (3)**
27:5,10;48:16
**utilized (1)**
43:7
**utter (1)**
93:20
**UW-La (1)**
5:14

## V

**vehicle (1)**
75:16
**verbal (1)**
66:19
**version (1)**
62:8
**video (46)**
9:17;10:2,18,20;35:2;
51:10,20;52:10;53:4;
54:15;55:6,9,16;56:4,13;
57:12;58:12;59:1,16;
60:5,14;61:8,12,25;62:7,
15;63:2,7,14;64:9,23;
65:16;66:2,9;67:6,7;
69:19;70:7,15;71:8,17;
72:2,4,10,24;73:15
**videos (2)**
10:1,2
**view (9)**
35:11;44:6;53:8;54:25;
62:12,13,14,15;66:24
**viewed (3)**
51:18;52:1,6
**viewing (3)**
51:10;54:10;55:16
**violations (1)**
6:21
**violence (3)**
18:6;22:13;33:6

**violent (3)**
15:25;76:25;77:3
**visual (1)**
50:25
**voice (3)**
58:20;69:22;70:18
**volatile (1)**
20:2

## W

**wait (1)**
18:15
**walk (1)**
25:16
**walked (2)**
16:18;17:7
**walking (3)**
15:3,16;43:9
**walkway (5)**
21:22,23;22:11,15;52:4
**wall (2)**
50:23;57:21
**wants (2)**
70:24;73:21
**warned (2)**
17:5;35:6;96:15
**watch (4)**
10:5;20:10;60:8,9
**watching (3)**
16:10,10;56:15
**way (17)**
14:20;20:21;29:7;
30:20,22;33:1;35:23;
38:2,6,7;42:20;48:19,20;
60:13;62:10,18;94:8
**ways (1)**
81:24
**weapon (2)**
34:20;95:18
**weekend (1)**
91:1
**weekends (1)**
90:21
**weren't (2)**
8:21;66:5
**what's (9)**
10:22;11:17;21:7;
33:18;45:17;54:23;
74:15;81:3;91:20
**whoever's (1)**
48:11
**whole (1)**
60:15
**wide (2)**
28:1,2
**wife (1)**
93:3
**wife's (1)**
92:25
**Wiggly (1)**
94:2
**window (5)**

95:13,14;96:1,8,15
**windows (1)**
96:22
**within (6)**
16:13;60:8;61:10;76:2;
90:17;94:17
**without (3)**
42:19;62:15;70:3
**witness (6)**
4:2;12:16;18:19;20:7;
38:17;84:20
**witnessed (1)**
9:6
**word (1)**
63:21
**work (8)**
4:16;35:4;85:16;90:10,
24;94:7,14,15
**worked (7)**
4:21;5:23,23;6:2,3;
40:12;93:3
**working (4)**
4:20;6:9;13:17,19
**works (2)**
14:23;81:19
**workweek (1)**
90:24
**world (2)**
48:8,10
**wrestled (2)**
95:16,16
**wrists (2)**
32:23;49:1
**write (3)**
46:6,13;93:22
**writing (4)**
91:14,17;92:14;93:5
**written (6)**
11:13;83:13,21;89:25;
93:11;94:4
**wrote (8)**
44:18;46:16,20;47:5;
71:19;93:9,9,12

## Y

**ya (1)**
5:20
**year (1)**
83:2
**years (2)**
4:14;94:16

## 1

**11:00 (1)**
13:20
**12 (1)**
51:4
**12-second (1)**
70:17
**13 (1)**
54:7

Case: 3:10-cv-00832-jdp   Document #: 110   Filed: 09/19/12   Page 36 of 36

Michael B. Kingsley  vs.
Lisa Josvai, et al.

Deposition of FRITZ DEGNER
August 21, 2012

**14 (1)**
  53:19
**17 (2)**
  10:24;11:14
**1983 (1)**
  5:18
**1984 (2)**
  5:19,21
**1991 (4)**
  5:2,3,13,21
**1992 (1)**
  4:22

### 2

**2 (1)**
  6:14
**2002 (4)**
  4:20;5:1;6:6,12
**2010 (4)**
  6:16;7:9;46:2;51:15
**21 (4)**
  4:14;7:8;46:2;51:15
**21st (1)**
  46:23
**26 (1)**
  47:2

### 3

**38 (2)**
  10:23;11:14

### 4

**4:52 (1)**
  97:24
**46 (1)**
  65:17
**47 (3)**
  11:15,18;24:11
**48 (5)**
  45:13,18,24;46:12;
  50:21
**49 (3)**
  60:6;78:10,13

### 5

**5/21/2010 (4)**
  54:10,11,17;56:2
**50 (3)**
  24:12;85:20;97:10
**50/50 (1)**
  90:24

### 6

**6:32:49 (1)**
  51:15
**6:34:03 (1)**
  51:23
**6:34:15 (1)**

52:11
**6:44:04 (1)**
  56:3
**6:44:18 (1)**
  54:18
**6:44:22 (3)**
  57:1,7,11
**6:44:29 (2)**
  57:3;58:11
**6:44:36 (2)**
  56:5,12
**6:44:38 (2)**
  58:15,25
**6:44:43 (1)**
  60:3
**6:44:49 (1)**
  60:7
**6:44:51 (1)**
  59:3
**6:44:53 (1)**
  67:3
**6:45:17 (2)**
  60:17;61:6
**6:45:32 (4)**
  67:7,8,14;69:17
**6:45:37 (2)**
  61:11,24
**6:45:41 (1)**
  64:20
**6:45:42 (2)**
  65:12,25
**6:45:45 (1)**
  66:13
**6:45:46 (1)**
  65:18
**6:45:48 (8)**
  56:14,18;62:1,2;63:3;
  64:21,25;65:12
**6:46:03 (1)**
  70:14
**6:46:04 (2)**
  73:9,14
**6:46:08 (1)**
  63:10
**6:46:10 (3)**
  63:9;64:2,8
**6:46:13 (1)**
  72:7
**6:46:14 (1)**
  72:21
**6:46:15 (3)**
  69:20;70:16;71:7
**6:46:17 (1)**
  73:1
**6:46:18 (1)**
  71:10
**6:46:20 (1)**
  70:8
**6:46:21 (3)**
  71:9;72:11,13
**6:46:22 (1)**
  73:16
**6:46:35 (1)**

64:11
**649 (3)**
  45:19,24;47:12
**651 (3)**
  45:21,22,25
**652 (1)**
  45:19
**675 (1)**
  78:14
**676 (1)**
  79:1
**678 (1)**
  78:14

### 7

**7:24 (1)**
  46:23
**7:30 (1)**
  13:20

### 8

**8:44:43 (1)**
  59:25
**85 (1)**
  5:22

### 9

**9:00 (1)**
  55:17