UNEDITED, UNPROOFREAD, UNCERTIFIED ROUGH DRAFT

PLEASE NOTE -

This transcript is a realtime production.
Because this instant transcript has not been edited,
proofread, finalized, indexed, or certified, THERE
WILL BE DISCREPANCIES in this form and the final
transcript.  There WILL ALSO BE DISCREPANCIES in page
and line numbers appearing on the instant transcript
and the edited, proofread, finalized and certified
transcript.

I UNDERSTAND THAT BY ACCEPTING THIS ROUGH
DRAFT, I AM ORDERING AND AGREEING TO PAY FOR THE
FINAL TRANSCRIPT.

I agree that upon receipt of the certified
transcript, this instant transcript will be
destroyed.
I agree not to cite from the uncertified
transcript for any proceeding, and will not file any
portion of this transcript with any court.
I further agree to use the instant transcript of
the proceedings only within my office or for use by

CitiCourt, LLC
801.532.3441

---

my experts, and not to share it with opposing
counsel.

Signature: _____  Date:_____
Witness Name: _____

CitiCourt, LLC
801.532.3441

---

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

MICHAEL B. KINGSLEY,          )
          Plaintiff,          )   Deposition of:
                              )
vs.                           )   JOHN G. PETERS, JR.,
                              )   PH.D.
LISA JOSVAI, PATRICIA         )
FISH, ROBERT CONROY,          )
STAN HENDRICKSON,             )
FRITZ DEGNER and KARL         )   Case No. 10-cv-832-bbc
BLANTON,                      )
          Defendant.          )

September 26, 2012 * 9:02 a.m.

Location:  Courtyard by Marriott
          10701 S. Holiday Park Drive
          Sandy, Utah

Reporter:  Dawn M. Perry, CSR
Notary Public in and for the State of Utah

---

A P P E A R A N C E S

FOR THE PLAINTIFF:

          Wendy M. Ward
          Joel F. Graham
          Attorneys at Law
          Merchant & Gould
          10 East Doty Street
          Suite 600
          Madison, Wisconsin  53703-3376
          (608) 280-6750
          (612) 332-9081 (fax)
          wward@merchantgould.com
          jfgraham@merchantgould.com

FOR THE DEFENDANTS:

          Timothy H. Posnanski
          Attorney at Law
          Whyte Hirschboeck Dudek S.C.
          555 East Wells Street
          Suite 1900
          Milwaukee, Wisconsin  53202-3819
          (414) 273-2100
          (414) 223-5000 (fax)
          tposnanski@whdlaw.com

CITICOURT, LLC
801.532.3441

INDEX

JOHN G. PETERS, JR.                                    PAGE

Examination by Ms. Ward                                 7

* * *

EXHIBITS

NO.          DESCRIPTION                               PAGE

1     Opinion Report                                    12

2     Certified Litigation Specialist (CLS)             15
      Application Form

3     LexisNexis, Cherry vs. City of                    51
      Philadelphia

4     LexisNexis, Brown vs. Burghart                    52

5     Opinion Report                                    62

6     LexisNexis, Wilson vs. Taser                      73
      International

7     LexisNexis, Hebert vs. Rodriguez                  76

8     LexisNexis, Heston vs. City of Salinas            77

9     Expert Report                                     79

10    Wisconsin Department of Justice Law              119
      Enforcement Standards Board
      Recommendations

11    Taser Protect Life, Instructor                   127
      Certification Course

12    Video (retained by counsel)                      148

13    Incident Report                                  148

14    Monroe County Supervisory Taser                  150
      International Use Report

15    Jail and Prisoner Legal Issues                   170

16    Defensive and Arrest Tactics                     174

17    Electronic Weapons                               182

18    Use-of-Force by the Numbers: 4, 8, 14            187

19    Summary Review of Kingsley Case by Brian         202
      Landers

20    Supplemental Opinion Report                      209

21    Introduction                                     226

22    Nomenclature-Handcuffs                           229

23    Chapter XXI, Handcuffs and the Law               233

24    Suicide and/or Medical Observation Form          256

25    Article, Liability Constraints on Human          267
      Restraints

* * *

PROCEEDINGS

JOHN G. PETERS, JR., PH.D.,

called as a witness, being first sworn,

was examined and testified as follows:

EXAMINATION

BY MS. WARD:

Q.    Good morning, Dr. Peters.

A.    Good morning.

Q.    You've been deposed before, correct?

A.    Yes.

Q.    I'm just going to give you a couple
reminders.  Wait for me to finish my questions before
you start your answers.  That makes it easier for the
court reporter to get everything down.  Give verbal
responses to questions instead of head nods --

A.    Right.

Q.    -- or head shakes.

If you answer my question, I'm going to
assume that you understood what I was asking.  So if
you need clarification, please ask me.

A.    Will do.

Q.    I'd be happy to do that for you.

And feel free to ask if you need a break
as well.

A.    Understood.

Q.    Okay.  Great.

So you understand that you are here at
today's deposition on behalf of the defendants in
this action?

A.    That's right.

Q.    And that you are here pursuant to
defendants' discovery obligations in this action?

A.    Yes.

Q.    And why are we in Sandy, Utah?

A.    We are in Sandy, Utah, primarily because
I'm teaching a four-day program here at the Sandy
Police Department.

Q.    Okay.

A.    And my understanding is that the
previously-scheduled deposition for the day after
labor day in Palm Springs, California, was vacated
and because of my tight training schedule, this is
one of two days that was open and this is the one
that was picked, and that's why we are here.

Q.    So what police department are you doing
training at?

A.    Sandy.

Q.    And what are the four training days?

A.    Yesterday and today is one instructor

```
 1    program.  And tomorrow and Friday is the second
 2    instructor program.
 3         Q.    So they didn't need you today?
 4         A.    I have an assistant I had to bring and
 5    he's covering for me today.  I taught yesterday and
 6    he's teaching today.
 7         Q.    Okay.  What is the subject of the course?
 8         A.    Yesterday and today's program is on
 9    excited delirium and agitated chaotic events.
10              The subject of tomorrow and Friday's
11    program is electronic control device and forensic
12    analyst, how to investigate events that involve
13    electronic control devices, which most people
14    generically refer to as a Taser.
15         Q.    What did you do to prepare for your
16    deposition today?
17         A.    Yesterday evening I just reviewed my
18    supplemental report and my preliminary report.
19              And counsel sent me -- the days are
20    blurring together -- I believe it was Monday
21    evening -- the deposition of Mr. Conroy and
22    Mr. Degner and I quickly reviewed those last night as
23    well.  And that -- that's basically it.
24         Q.    You reviewed the deposition transcripts
25    from their depositions?
```

```
 1         A.    Yes.
 2         Q.    And you received those on Monday?
 3         A.    I believe it was Monday.  I -- I spent
 4    most of -- I was in federal court Monday morning and
 5    I flew here Monday afternoon from the east coast and
 6    I did get in until 11:00 so I don't know if it came
 7    Monday or Tuesday, but I believe I opened it
 8    yesterday morning.
 9         Q.    Did you meet with Mr. Posnanski?
10         A.    Just this morning.  We met for the first
11    time this morning.
12         Q.    For how long?
13         A.    15, 20 minutes.  Not very long.
14         Q.    You said you were on the east coast for --
15    to be in court?
16         A.    Yes.
17         Q.    What was the matter that you were in court
18    for?
19         A.    It involved an alleged excessive force
20    claim by the plaintiff.  And the defendants were
21    deputy sheriffs of a Maryland sheriff's department.
22    And also the county was a defendant initially, and
23    the judge granted a directive verdict on that issue
24    on Friday, I believe.
25         Q.    So it was a jury trial?
```

```
 1         A.    Jury trial, yes.
 2         Q.    And are you testifying on behalf of
 3    plaintiffs or defendants?
 4         A.    Defendants in that case.
 5         Q.    What is the name of the plaintiff?
 6         A.    Wolfe, Rodney Wolfe, W-o-l-f-e.
 7         Q.    And the name of the defendants?
 8         A.    It was the Washington County -- initially
 9    it was the Washington County Sheriff's Department.
10    And then it was later amended to Washington County,
11    Maryland, Deputy Rohtzan, R-o-h-t-z-a-n, I believe,
12    and Deputy Footen, F-o-o-t-e-n.
13         Q.    All right.  We are going to mark our first
14    exhibit, your expert report.  While we are getting
15    that out, so the documents that you reviewed in
16    preparation for your deposition were your two reports
17    and then two deposition transcripts, Conroy's and
18    Degner's; is that right?
19         A.    Yes.
20         Q.    Anything else?
21         A.    Before I left the office I looked at the
22    POSC manual, the P-O-S-C manual, and I think that was
23    about it.
24         Q.    Was that provided by counsel?
25         A.    I had a copy but counsel also provided a
```

```
 1    copy.  I wanted to make sure I had the appropriate
 2    copy, and it turned out that what counsel provided
 3    and what I also had were the same year.  I think it
 4    was 2009.
 5              (EXHIBIT 1 WAS MARKED.)
 6         Q.    All right.  Do you recognize Exhibit 1 as
 7    your first expert opinion in this case?
 8         A.    Yes, I do.
 9         Q.    And this is your signature down here at
10    the bottom?
11         A.    Yes, it is.
12         Q.    And does this expert report, together with
13    your supplemental expert report, contain a complete
14    statement of your opinions and the basis of those
15    opinions?
16         A.    Yes.
17         Q.    And you stand by everything that you've
18    put in this report?
19         A.    Yes.
20         Q.    Is there anything you want to change as
21    you sit here today?
22         A.    This is the -- this doesn't contain the
23    supplemental report, right?
24         Q.    No, the supplemental report is not
25    contained in your first report.
```

1     A.    I think everything in here is fine.

2     Q.    All right.  If you could please turn to

3  your CV.

4     A.    CV.  I'm there.

5     Q.    Okay.  Is your CV current, sir?

6     A.    This is dated 12-3 of 2011.  I have a more

7  current CV and the only -- only thing that has

8  changed -- actually, two things have changed.  One

9  would be publications.  On page 29 of -- this CV,

10  the last publication is number 185.  I think I'm

11  closer to 200 today.

12         And the other update would be that since

13  that CV was prepared I've completed the requirements

14  for my California teaching credential in vocational

15  and career education.  And I finished that in June of

16  this year.

17     Q.    Okay.  The 15 new publications, would you

18  be willing to send us a listing of those new

19  publications?

20     A.    Oh, sure.  Yeah.  Not a problem.

21         And it's an approximate 15.  I can't say

22  for sure because I've just published five in the last

23  couple months, so...

24     Q.    Okay.  And if we could go to the education

25  section back on the first page of your CV.

1  '7 or '8.  I could find out specifically, but the

2  first certification was around 2007 or '8, because it

3  takes about a year, year and a half to take all the

4  programs that's required.

5     Q.    And when did you get the recertification

6  in police liability?

7     A.    I believe it was last year, 2011.

8     Q.    And when did you get originally certified

9  in corrections?

10     A.    Corrections would have been about 2008.

11     Q.    And the recertification for that one?

12     A.    Again, last year.

13     Q.    We are going to mark another exhibit here.

14         (EXHIBIT 2 WAS MARKED.)

15     Q.    I'm handing you Exhibit 2, Dr. Peters.  Do

16  you recognize this document?

17     A.    Yes.  This is a document prepared

18  originally by the Americans for Effective Law

19  Enforcement.  And this is the application form for

20  the Certified Litigation Specialist designation.

21     Q.    And have you filled out this form at some

22  point --

23     A.    Yes.

24     Q.    -- in connection with getting your

25  certifications?

1     A.    Sure.

2     Q.    Actually, right by your name you have

3  John G. Peters, junior, Ph.D, and then CLS.  What

4  does CLS stand to for.

5     A.    CLS is a acronym for Certified Litigation

6  Specialist.  Certified Litigation Specialist is a

7  designation that was developed by the Americans for

8  Effective Law Enforcement, which is a law enforcement

9  training and consulting group out of Chicago,

10  Illinois, actually, Park Ridge, Illinois.

11         And at the time I began the certification

12  process they had three specialties, three areas that

13  you could get your certification in.  One was in

14  employment law for the public sector.  That no longer

15  is available, although I originally attained that.

16         The second is in police liability.  I

17  obtained that and I've since recertified in that.

18         The second [sic] is corrections liability,

19  and I achieved that and also recertified in that.

20         And most recently is campus law

21  enforcement liability, and I obtained the

22  certification in that as well.

23     Q.    When did you obtain the original

24  certification in police liability?

25     A.    I would estimate it was in 2000 and either

1     A.    Yes, I have.

2     Q.    Okay.  And so it appears from the form

3  that in order to obtain the certification you attend

4  three seminars; is that right?

5     A.    There's three qualifying seminars per

6  specialization.  For example, in the Certified

7  Litigation Specialist program for corrections you

8  would attend -- today, using today's programs -- you

9  would attend what's called Module I for

10  Correctional -- Correction Law.  I think it's called

11  Corrections Legal Update and Issues.

12         Then you would attend Module II.  One's

13  offered every January.  Module II is offered every

14  March.  And then you -- most people would attend the

15  Internal Investigation and Discipline module that's

16  in December of every year.

17         So those would be the three that would go

18  to corrections.

19         For law enforcement you would probably

20  attend the Internal Investigation and Discipline

21  Seminar, the Lethal and Less Lethal Force seminar

22  that's offered in October.  And then you could attend

23  another one, or you could also attend -- originally

24  you attended a program called Police Civil Liability.

25  And then that program went away and it was replaced

```
 1   with an international conference that my training
 2   firm runs every fall in Las Vegas.  And that
 3   counts -- if people attend it, that would substitute
 4   for the police liability program -- course.
 5        Q.    So on number one on the form it says,
 6   "View and print the list of qualifying seminars."
 7             Do you see that?
 8        A.    Yes.
 9        Q.    And so you select, depending on the area
10   of certification that you are looking for, you select
11   qualifying seminars from a list, correct?
12        A.    Yes.  There is -- there is a list, and
13   that's what number three on this application form --
14   you will see there is a D and -- D, dash, and then
15   there is a number and a J dash and that type of
16   thing.
17        Q.    Uh-huh.
18        A.    Those are the seminar codes.  So if -- if,
19   for example, I was selecting Campus Law Enforcement
20   Litigation, I would put down two programs and I would
21   put down the Campus Law Enforcement qualifying
22   seminar, which is the fundamental requirement for
23   that.  And that Campus Law Enforcement seminar is
24   offered by an external group that is associated with
25   the Americans For Effective Law Enforcement.  I
```

```
 1        Q.    Okay.  All right.  Let's put that one away
 2   and go back again to your CV in Exhibit 1.
 3        A.    I'll put that in the center so I...
 4        Q.    So look at your Ph.D. dissertation.  It
 5   appears to be related to sexual harassment?
 6        A.    Correct.
 7        Q.    Does that dissertation have any relevance
 8   to the case, Mr. Kingsley versus the defendants in
 9   this case?
10        A.    Only from a correctional aspect that this
11   particular venue where I conducted the research was a
12   700-plus person sheriff's department that had a very
13   large jail and surprisingly, I guess is the best
14   adverb I can use, there were 700 -- as I remember, I
15   think there was 757 employees, and my survey was
16   returned by every employee, I think, except two who
17   were on vacation.  Many of those were in the
18   correctional facility and many my findings that were
19   of concern, probably is the best way to say it, were
20   in the jail.
21             Then I went -- the agreement I had with
22   the sheriff at that time was he would allow me to
23   conduct my research in the sheriff's department and
24   the jail, but at his discretion, upon publication of
25   the dissertation, I agreed that I would go down and
```

```
 1   believe that group is based in Delaware.
 2        Q.    So the qualifying seminars, about how long
 3   are they?  Are they one-day seminars?
 4        A.    No, they are two and a half days each.
 5        Q.    Okay.
 6        A.    With the exception of Campus Law
 7   Enforcement, I think that was four.  Maybe three and
 8   a half or four.
 9             Our program in Las Vegas is a full three
10   days.  AELE programs that AELE puts on itself are two
11   full days and then half of a third day.
12        Q.    So the seminars vary from two to four days
13   I think is what you said; is that right?
14        A.    Two and a half to four days, yes.
15        Q.    Okay.  And then a further qualification is
16   that you have to be familiar with the contents of two
17   CDs which are listed here; is that right?
18        A.    That's correct.
19        Q.    So you fill out the form and you send it
20   in and then you get the certification?
21        A.    If -- if you meet all the criteria, yes.
22        Q.    Right.  And those are three qualifying
23   seminars and familiar with -- familiarity with
24   contents of two CDs, right?
25        A.    Yes.
```

```
 1   train the entire department at no cost.  And to my
 2   surprise, he exercised that option.  So I went down
 3   and trained almost 600 people, most of whom were in
 4   the jail.  So it's probably not a direct link but
 5   concepts that would override would be administration
 6   of the jail, you know, how a jail operates.
 7             And from a force viewpoint, I found there
 8   was a percentage of female deputies who had been
 9   sexually assaulted or raped by other deputies in the
10   jail, primarily on the midnight shift.  So there was
11   some force issues involved but not the type of force
12   issue that we would have in this case.
13        Q.    To summarize, I think what you said was
14   the connection between your dissertation and this
15   case would be that it was -- a lot of your research
16   was conducted in a correction setting; is that right?
17        A.    Correct.
18        Q.    Okay.  And then there was some
19   non-relevant issues with female and male deputies; is
20   that fair to say?
21        A.    I think that's a fair statement.
22        Q.    How about the MBA, which is listed next in
23   education, is that relevant to the present case?
24        A.    It's not directly relevant to the present
25   case because there is no budgetary issues or anything
```

1  at hand that I can see.

2              Supervision, of course, would be part of

3  that, and that was part of the MBA program, was

4  leadership and supervision.  And the primary reason I

5  went for that business degree was to go into command.

6  My original goal was to be a police chief, and that's

7  why I went for a business degree.

8       Q.    So the MBA I guess would be relevant to

9  assessing how the leadership in this case handled the

10 situation.  Is that fair to say?

11      A.    Leadership and supervision, yes.

12      Q.    The master of science in public relations,

13 I guess same question, does that have relation or

14 relevance to the present case?

15      A.    No.

16      Q.    I'm not going to ask you about that for

17 the bachelor of science because that's pretty clear,

18 and the same for your associate's degree.

19            Now, the associate's degree, that wasn't

20 something that occurred as part of your bachelor's of

21 science or was it, I should ask?

22      A.    No.  I was -- I started my associate's

23 degree when I was clerical employee with the FBI in

24 Washington, DC.  I finished the associate's degree in

25 1972 and then I left the Bureau -- I had taken an

1  academic leave from the Bureau and then I went back

2  to the Bureau and then I left the Bureau later in '72

3  and I -- I got my associate's degree in '72 and I got

4  my certificate in corrections in '72.

5       Q.    Okay.  But I guess the question I was

6  asking is, it wasn't a part of your bachelor's

7  degree?

8       A.    No.  I'm sorry.  No, it wasn't.

9       Q.    Okay.

10      A.    My associate's degree I got in Virginia

11 and my bachelor's degree I transferred to the

12 University of Baltimore.  And at the time -- it's no

13 longer the case, the University in Maryland changed

14 the rules -- but at the time I went to the University

15 of Baltimore it was only an upper-level institution

16 so you had to have an associate's degree to go there.

17 So that -- it wasn't part of the same system.

18      Q.    Got it.

19            Okay.  And under the professional

20 experience category I have just -- I think just one

21 question for you there.  I take it back, I have more

22 than one question.

23            Of the organizations listed where you have

24 some profession experience, how many of those were

25 companies that were started or owned by you?

1       A.    The Institute for the Prevention of

2  In-Custody Deaths I started.  The Defensive Tactics

3  Institute I started.  John Peters and Associates I

4  started.

5             The United States Secret Service Defensive

6  Tactics Advisory Panel I did not start.  That was a

7  panel that was put together by the United States

8  Secret Service, specifically Special Agent John

9  Desmedt, and a uniformed secret service officer Danny

10 Cesare.  And I think his last name was spelled

11 C-e-s-a-r-e.

12            Reliapon Police Products I started and

13 then later sold.  The Institute for Liability

14 Management I did not start.  I had no ownership in

15 that.  That's Gallagher-Bassett Services in Itasca,

16 Illinois.

17            Impact Productions and Duplications, I was

18 one of seven founders of that group.  Tri-Sector

19 Professional Development was mine.

20            PR-24 International Institute was mine.

21 Public Systems Evaluation in Cambridge,

22 Massachusetts, was not mine.  It was started by

23 professors from MIT and Harvard.

24            Braintree Police Department obviously was

25 not mine.  That was part of the town of Braintree.

1       Q.    That was an administrative position that

2  you had with the town of Braintree?

3       A.    Yes.

4       Q.    Okay.

5       A.    The Waltham Police Academy was not mine.

6  That was -- at the time in Massachusetts they were

7  doing regionalized training academies, and Waltham

8  petitioned the Massachusetts Criminal Justice

9  Training Council and was designated an academy.  So I

10 did some work there.

11            The York County Sheriff's Department was a

12 department within the county of York, Pennsylvania.

13 The Northern York County Regional Police Department

14 was a entity within the area of Dover, Pennsylvania.

15 The Federal Bureau of Investigation is a federal

16 government organization.

17      Q.    You didn't start that?

18      A.    I didn't start that, no.  So...

19      Q.    Okay.  So correct me if I'm wrong, but it

20 appears to me from your CV that the last time you

21 were actually employed as a law enforcement officer

22 is in 1977 at York County, is that correct?

23      A.    Yes and no.  And I need to explain that

24 because it's -- it's -- it's just an oddity.

25            York County is the last time I was a sworn

1  police officer, where I actually went out and
2  arrested people and did that stuff.
3      Q.    Yeah, and that was actually what my
4  question was?
5      A.    Okay.  The Braintree Police Department, I
6  was a staff executive.  It was a civilian position
7  that rank-wise would have been equivalent to deputy
8  chief.  It was not a sworn position.  It was a
9  brand-new position and they took it out of the
10  command line because they wanted to keep it out of
11  the union.
12          However, once I took the position I was
13  commissioned under the commonwealth of Massachusetts
14  with a special police commission which gave me the
15  same authority as a Massachusetts state trooper.  So
16  I did carry a firearm if I wanted to, and many times
17  I did.  And it also gave me the authority, if I was
18  conducting an internal investigation or what have
19  you.  So it wasn't sworn but I had the special police
20  commission which basically is a derivative of being
21  sworn, so...
22      Q.    Have you ever been employed as a
23  corrections officer?
24      A.    Not as a corrections officer.  I've worked
25  in corrections with the sheriff's department.

1  Sheriff's department we were just deputies.  And if
2  we got assigned to corrections, we did corrections.
3  There was no correctional officer designation.
4      Q.    Similar to some of the officers involved
5  with Mr. Kingsley on -- at the incident in question?
6      A.    Yes, very similar.
7      Q.    Do you have a certification in law
8  enforcement?
9      A.    I'm not sure what you mean.
10      Q.    I'm not either.  Is there any -- is there
11  a certification for law enforcement?
12      A.    The only certification -- I guess there
13  is.  It would be -- from each individual state it --
14  like a police academy certification, firearms
15  certification, those types of things, which -- which
16  mine have since expired because I haven't kept up
17  with those.
18          Specific weaponry within law enforcement,
19  yes, I've been certified and maintained certification
20  as a defensive tactics instructor, a handcuff
21  instructor, a flashlight instructor, a restraint and
22  control instructor, Taser instructor.  I have a lot
23  of those types of independent certifications.  But
24  since leaving law enforcement I didn't keep any of my
25  commission -- what we would call commissioning

1  certification that kept you -- or I would say gave
2  you permission to make arrests, that type of thing,
3  because I don't do that anymore.
4      Q.    Okay.  So under your education you have
5  your associate's degree in applied science that we
6  talked about and then you also list a certificate in
7  corrections?
8      A.    Correct.
9      Q.    Can you explain what that certificate is?
10      A.    Sure.  The correctional field was evolving
11  in the early 1970s and there weren't many programs in
12  the country that awarded a degree in corrections.
13  Northern Virginia Community College had a certificate
14  in corrections where it was a one-year course of
15  taking correctional courses, criminology,
16  corrections, things that were very specific to the
17  correctional environment.
18          At the end of that one-year program, if
19  you successfully completed it you were awarded a
20  certificate in corrections.
21          Today there is actually a degree in
22  corrections that the community college offers and you
23  can go on and get a bachelor's, master's or doctorate
24  in criminology and corrections.  So that's what that
25  certificate involved.

1      Q.    And is there something that is parallel
2  for law enforcement in terms of an overall
3  certificate?
4      A.    People could have gone -- and people can
5  still do it today -- instead of getting a degree in
6  criminal justice they can get a certificate in
7  criminal justice.  So it would be analogous to that.
8  Two separate tracks but some schools offer the
9  certificate.
10      Q.    Did you graduate from a police academy?
11      A.    No.  When I was a police officer that was
12  not a requirement.  The only requirement was that I
13  went to the police academy for qualifications on
14  firearms and specialized weapons.
15      Q.    Okay.  Under the Academic Experience
16  heading on page four...
17      A.    Four.  Okay.
18      Q.    On the CV.
19          Are you currently teaching any courses?
20      A.    Not at the moment.  I just finished a
21  course a couple weeks ago at the University of
22  Phoenix, but I've not signed up for another one for
23  the fall.
24      Q.    And of the ones listed here, how many are
25  online only?

1     A.     At the University of Phoenix?

2     Q.     Well, of the courses -- or the -- the

3  Academic Experience heading lists different

4  institutions for which you have taught.

5     A.     Correct.

6     Q.     And of those listed here under this

7  heading, how many of those were online only?

8     A.     Online only would have been the fourth one

9  down, Walden University, then the sixth one down,

10 Walden Institute and then the seventh one down,

11 Capella University.  The last one on that page is

12 Capella University.  And that's it.  The rest were on

13 ground or classroom.

14    Q.     University of Phoenix courses that you've

15 taught have been at a building?

16    A.     At a building in Las Vegas.  Multiple

17 buildings, as a matter of fact, so...

18    Q.     All right.  I'm going to go now to your

19 presentations on page seven.

20    A.     Okay.

21    Q.     Now, would you say that of your

22 presentations listed in your CV, the majority is

23 related to excited delirium and sudden in-custody

24 death?

25    A.     There are so many here I haven't really

---

1  looked at that breakdown.  Many are.  Many are also

2  related to use of force, Taser.  But I would probably

3  say, if we put it on a scale, they would probably be

4  weighted more heavily toward excited delirium and --

5  and either in-custody deaths in jails or

6  arrest-related deaths in the field.

7     Q.     Would that be greater than 50 percent

8  related to those topics?

9     A.     I'd have to look at it.

10    Q.     Can you make an estimate without actually

11 counting?

12         MR. POSNANSKI:  If you are comfortable

13 doing it, go ahead, but I don't want you to guess.

14         THE WITNESS:  I would say the document

15 says what it is.  I would be glad to count them and

16 do it even at a break and come back and give it to

17 you but -- again, in the most recent time there has

18 been quite a few in that area.

19    Q.     (BY MS. WARD)  But you did say it was

20 weighted more heavily in that area?

21    A.     Yeah, I think that in the latter part, the

22 more current, yes, I think that is true because

23 that's really what is sort of the hot topic today,

24 so...

25    Q.     Okay.

---

1     A.     When you are invited to make presentations

2  many times it's based upon contemporary, relevant

3  issues, not something that's a hundred years old.

4     Q.     When was the last time you conducted a

5  presentation regarding the use of a Taser?

6     A.     The use of a Taser?

7     Q.     In any aspect of use of a Taser.

8     A.     Well, I -- if you count my testimony

9  Monday as a part of a presentation to a jury, that

10 would be the most current.

11    Q.     No, I don't count testimony.  I'm not

12 counting testimony.  Profession presentations.

13    A.     Profession presentations regarding the

14 Taser would have been yesterday here in Sandy.

15    Q.     And that was part of the course that

16 you're teaching?

17    A.     Yes.

18    Q.     So it was a part of a larger course, it

19 wasn't just a presentation specifically directed to

20 use of a Taser?

21    A.     It -- it was a topical area that we spent

22 probably two hours on yesterday of the eight hours.

23    Q.     In your CV how do you distinguish between

24 courses taught and presentations?

25    A.     Presentations are where I'm invited to

---

1  present.

2     Q.     Uh-huh.

3     A.     Courses I don't list on my CV because the

4  courses where I teach I -- I teach it almost every

5  week.  I wouldn't list all those.  I mean, there

6  would be just hundreds of them because I've been

7  doing this for 30 years.

8     Q.     So the part of the course that you did

9  yesterday, would you list that under presentations on

10 your CV?

11    A.     No, not at all.

12    Q.     So the type of presentation that you would

13 list on your CV, when was the last time you did one

14 of those types of presentations directed to the use

15 of the Taser?

16    A.     Okay.  I think I understand where

17 you're -- what you are saying there.

18         That was probably November of last year at

19 our conference and then also October of last year at

20 the AELE program, as far as presentations and not

21 courses.

22    Q.     Okay.  Are you a certified Taser

23 instructor?

24    A.     I am a certified Taser instructor.  I have

25 been through two master instructor schools, but I did

Case: 3:10-cv-00832-jdp  Document #: 125  Filed: 10/02/12  Page 9 of 71

1  not take the designation master instructor from the
2  manufacturer.  I kept it at the instructor level.
3       Q.   Why did you do that?
4       A.   Taser has a policy, if you will, from its
5  legal department, that they have announced publicly
6  that master instructors they do not consider
7  qualified to be expert witnesses.  And that's one
8  criterion that I use not to accept it.
9            The other is I don't meet the requirements
10 to be a master instructor as published by Taser
11 International.  So because I do a considerable amount
12 of work as an expert in the area of Taser cases, I
13 wanted the advanced knowledge and that's why I went
14 to the master instructor school.
15      Q.   What requirements that Taser publishes do
16 you not meet?
17      A.   I think -- and I'm not up to speed on the
18 latest requirements but it's generally you have to
19 teach, I think, 12 courses in your law enforcement
20 agency.  I believe you also have to be a sworn peace
21 officer.  And I don't meet those requirements but I
22 petitioned the folks at Taser, because I've done
23 quite a bit of -- of consulting and expert work in
24 Tasers and they -- they authorized me to attend.  I
25 paid for it.  They didn't give it to me gratis. I had

CITICOURT, LLC
801.532.3441

1  to pay like everybody else but -- and I have been
2  through two of those.
3       Q.   When was the last time you went through
4  one of the schools?
5       A.   2009.  I was scheduled for one this year,
6  2011, but this trial that just came up knocked me out
7  of that one so I will reschedule later in the fall.
8       Q.   Do you know why Taser says that master
9  instructors are not qualified to be expert witnesses?
10           MR. POSNANSKI:  Objection to the form.
11           You can answer.
12           THE WITNESS:  I don't know specifically.
13      Q.   (BY MS. WARD)  They don't publish any
14 criteria for --
15      A.   No, I think that's an internal rule and it
16 may appear to be a conflict.  I don't know.  Taser's
17 legal team I think looks for competency in a number
18 of areas, not just the ability to go teach a
19 particular device.  But you would have to ask them
20 specifically for their rationale behind that.
21      Q.   Okay.  So they haven't published anything
22 as to their reasoning behind that?
23      A.   No, it's just been talked in class.
24      Q.   Okay.  One quick question on page 15,
25 which is related to your publications, and

CITICOURT, LLC
801.532.3441

1  specifically texts.
2       A.   Yes.
3       Q.   Do you need to add anything to that list
4  or is that up to date?
5       A.   That is up to date.  The only -- and I'll
6  just mention this because some people might consider
7  it a text and other people might not, but we just
8  finished updating our workbook for excited delirium
9  for an international course that we are teaching and
10 that's basically the way we rewrote it.  Some might
11 consider it a text.  I just consider it a workbook.
12 But that would be the only thing.
13      Q.   So you put workbook under articles,
14 newsletter and handbooks?
15      A.   Correct.
16      Q.   Okay.  All right.  You are not qualified
17 to offer opinions on medical issues, correct?
18      A.   That's correct.
19      Q.   Have you ever conducted training for law
20 enforcement or corrections officers in Wisconsin on
21 any topic?
22      A.   Yes.
23      Q.   And what was that?
24      A.   Excited Delirium.  I've conducted training
25 at two technical institutes or colleges.  Wisconsin

CITICOURT, LLC
801.532.3441

1  has that designation, technical college or institute,
2  I forget which one it is.  And I taught one up in
3  Appleton area and then one south of Milwaukee.
4       Q.   And those were both related to excited
5  delirium?
6       A.   Yes.
7       Q.   Anything else?
8       A.   I've also presented -- if you'll just give
9  me a second to find it.
10           (Discussion off the record.)
11      A.   I've also presented for Lorman, which is
12 another educational group.  On page 15 of my
13 presentations, it would be seven -- seventh
14 presentation from the top, Interactive Mock Trial --
15 I'm sorry.  Eighth one down, Officer-Assisted
16 Suicide:  Liability Training and Municipal Concerns
17 in Milwaukee.
18           And then two below that, the Sexual
19 Harassment Research Findings in Law Enforcement.
20 That also was in Milwaukee.  And both of those I
21 presented.
22           And then the next one down was Police
23 Liability in Wisconsin, and that was also in
24 Milwaukee.  So I've done three other presentations in
25 Milwaukee through Lorman Educational Services.

CITICOURT, LLC
801.532.3441

1      Q.    And so four total it looks like, and they
2  are all on page 15?
3      A.    Yes.
4      Q.    Excited Delirium, Officer-Assisted
5  Suicide, Sexual Harassment and Police Liability?
6      A.    Correct.
7      Q.    And of those four the one -- the only one
8  relevant to this case would be the Police Liability
9  in Wisconsin, correct?
10     A.    No.
11     Q.    Okay.
12     A.    Excited Delirium was put on by the
13  insurance pool and we had, as I recall, probably
14  close to a hundred people there, including sheriffs,
15  correctional people and police officers.
16           The Sexual Harassment Findings, we had,
17  again, a mixed audience.  And Police Liability in
18  Wisconsin was also a mixed audience.  So we had
19  people from across the criminal justice system at
20  those.  I don't think we had any court people
21  specifically unless they were sheriff deputies who
22  might have worked in a court.
23     Q.    I'm not sure from your answer if you
24  understood the question.
25           Of those four -- I guess these are.

1      Q.    And did you talk about report-writing in
2  the officer-assisted suicide presentation?
3      A.    More than likely.  Officer-assisted
4  suicide is just another term for suicide by cop, so
5  I'm sure that there was discussion in there about
6  report-writing and, you know, what to include.
7      Q.    So other than these four, can you think of
8  any other presentations or training that you
9  conducted in Wisconsin?
10     A.    These four plus the two technical
11  institutes where we taught.  And I'll be
12  presenting -- or I'm scheduled to present in
13  Wisconsin Dells in a couple weeks so that would be
14  another one, but I haven't done it yet.
15     Q.    And what is the topic of that
16  presentation?
17     A.    That would be excited delirium and
18  agitated chaotic events.
19     Q.    Do you understand this case to involve
20  excited delirium?
21     A.    No.
22     Q.    Or sexual harassment?
23     A.    No, can't say that's there.
24     Q.    Officer-assisted suicide?
25     A.    No.

1  what -- are these presentations?
2      A.    Presentations, yes.
3      Q.    Do any of those have relevance to the
4  current case, the case, Mr. Kingsley versus the
5  defendants?  Topically.  Relevance topically.
6      A.    Topically, the only thing would be
7  report-writing, because we generally cover
8  report-writing issues and in some cases force issues
9  in those, so...
10     Q.    So are you saying report-writing and force
11  issues are a portion of each of these four
12  presentations?
13     A.    Generally that's correct.  I -- I would
14  have to actually go back and look to see what was
15  presented at the -- at those four, but generally
16  those are part of it.
17           It's a panel more -- I mean, there are
18  several of us who are presenting.  For example, in
19  the -- in the October 2007 conference that took place
20  in New Berlin, Wisconsin, there were, I think, five
21  of us on a panel and we presented and then it was
22  open for discussion.  So we talked about
23  report-writing, we talked about use of force, we
24  talked about different things to the -- to the
25  audience members who were there.

1      Q.    I think you said you looked at POSC manual
2  that you both had and was sent to you by counsel; is
3  that right?
4      A.    That is correct.
5      Q.    Prior to this case have you had any
6  occasion to review any training materials used by law
7  enforcement or corrections officers in Wisconsin?
8      A.    Several times.
9      Q.    What is POSC?
10     A.    POSC is the manual that focuses primarily
11  on -- I guess you would say public safety guidelines
12  for corrections.  It involves theories and concepts.
13  It also involves some recommendations, has a
14  checklist in the back for use of force reports.  It
15  has selected constitutional amendments that's also
16  reproduced in the book, along with guidelines for
17  subject control and -- I wouldn't call it an
18  instructional manual on, you know, how to put on
19  handcuffs or anything like that.  It's more of a
20  conceptual document and theoretical document.
21     Q.    And prior to this case why did you review
22  the POSC manual?
23     A.    Bob Willis is a very good friend of mine
24  and we've worked several cases in Wisconsin together.
25  And knowing Bob, and the cases that we've worked, he

```
 1    gave me a copy of that DAAT manual, POSC manual.  I
 2    mean, I've had these for quite a period of time.
 3        Q.    Do you know when he gave you those
 4    manuals?
 5        A.    Well, the one manual is dated 2009 so it
 6    would have been after it came out.
 7              The DAAT manual -- I have the original
 8    DAAT manual he gave me and then the modifications and
 9    updates to that, including the Wisconsin chiefs
10    recommended Taser guidelines.  So I got that from him
11    as well.
12        Q.    Did he ask you to do anything in
13    connection with giving you the manuals?
14        A.    Other than -- he didn't ask, but some of
15    the cases that -- that I've worked in Wisconsin --
16    obviously those manuals were an important part of the
17    officers' training so if Bob and I were co-experts on
18    a case, he would give them to me so I would have a
19    knowledge of what the officers were currently being
20    taught in Wisconsin.
21        Q.    And so you were an expert witness in a
22    Wisconsin-based case prior to this case?
23        A.    Yes.
24        Q.    What case was that?
25        A.    Oh, there has been several.  The Wade
```

```
 1    case.
 2        Q.    W-a-d-e?
 3        A.    Yes.  I think the first case I did in
 4    Wisconsin was in 1990.  So I've done several since
 5    then.
 6        Q.    How many?
 7        A.    I -- I couldn't tell you.  Maybe five,
 8    maybe six.  There was a Janesville case I remember
 9    that involved EMS.
10        Q.    Were those Wisconsin cases related to
11    constitutional violations?
12        A.    Yes.
13        Q.    Were they in federal court?
14        A.    Yes.
15        Q.    You say Bob Willis is your friend?
16        A.    Yes.
17        Q.    Does he teach at a technical college in
18    Green By a?
19        A.    He teaches at a technical college.  I -- I
20    think it's in Green By a.  I thought it was Fox
21    Valley but I can't remember where all these are in
22    the state.  I'm not that familiar with -- with the
23    state.
24        Q.    And what is DAAT, D-A-A-T?
25        A.    DAAT is the defensive -- what we would
```

```
 1    call in -- in the lexicon of the business, a
 2    defensive tactics instructional manual, which would
 3    involve information on use of force as well as
 4    defensive techniques.
 5        Q.    Are you familiar with the DAAT manual for
 6    Wisconsin?
 7        A.    Yes.
 8        Q.    And that would be relevant to training
 9    received by either corrections officers or officers
10    that work in jail settings?
11        A.    Generally that's correct.
12        Q.    Do you have an understanding as to the
13    differences between the POSC and DAAT curriculum?
14        A.    The DAAT curriculum is primarily targeted
15    for sworn law enforcement officers that would work
16    the street, where the other manual is primarily aimed
17    at correctional folks.  The DAAT manual is
18    instructional.  The other manual is more of
19    conceptual and theory.
20        Q.    Are you familiar with a disturbance
21    resolution model as it is used by Wisconsin law
22    enforcement?
23        A.    Yes, I am.
24        Q.    Do you know whether it's taught to
25    corrections and law enforcement officers in
```

```
 1    Wisconsin?
 2        A.    There is reference made basically that the
 3    POSC manual is somewhat of a companion manual to
 4    DAAT, and DAAT does include the Dispute Resolution
 5    Model.
 6        Q.    Have you ever been involved in conducting
 7    an investigation of a use of force incident at the
 8    request of a law enforcement agency or prison?
 9        A.    Yes.
10        Q.    And when was that?
11        A.    Well, my first one would have been at the
12    Braintree Police Department where I did internal
13    investigations and...
14        Q.    In the late '70s?
15        A.    In the late '70s.
16              And I've also been a consultant to the
17    Harris County Jail, which is the third largest jail
18    system in the United States.
19        Q.    It's in Texas?
20        A.    Texas, in Houston.  And I've looked at use
21    of force incidents there.
22              In many of the corrections cases that I've
23    worked there's always that element of looking at did
24    the officers, you know, meet the standard or not.  To
25    me, that's some what of an investigation.  It's not
```

1  that I actually went into an organization and did the

2  investigation.

3      Q.    Right.  That's what I'm asking about,

4  actually where you did it -- the organization asked

5  you to come in and investigate a use of force

6  incident not in connection with litigation but --

7      A.    Right.  It would have been the Harris

8  County Jail.  It would have also been the Braintree

9  Police Department.

10     Q.    Okay.  So when was the last time that you

11 had done one of those investigations?

12     A.    Oh, two years ago.

13     Q.    And that was with Harris County?

14     A.    Correct.

15     Q.    And what was the outcome of your

16 investigation?

17     A.    I did not find that the correctional

18 officers in that case used excessive force.

19     Q.    And, just generally, what were the

20 allegations in that case?

21     A.    Well, there were -- there were a couple of

22 incidents.  The one that stands out was two

23 correctional officers responded to two inmates who

24 were fighting.  A correctional officer -- first

25 correctional officer threw the inmate against a wall,

1  basically trying to separate them.  Then there was a

2  use of force after that.

3      Q.    Is that called a drive stun, typically?

4      A.    No.

5      Q.    Or, I'm sorry, vertical stun?

6      A.    Well, I think we are going to get into a

7  lot of trouble if we are going to go with names

8  because vertical stun in Wisconsin may be called

9  something else in Wyoming, which may be called

10 something else in Massachusetts so --

11     Q.    I understand.  We don't actually have to

12 go there.  I was just curious personally.

13     A.    No, it wasn't -- it would not be a

14 vertical stun as defined by Wisconsin.  This was

15 simply a push.  The officers ran up, pushed them in

16 the chest, separated them.  The officer went into the

17 wall.  There was an allegation actually filed by the

18 Department of Justice that it was an excessive force

19 incident.

20     I looked at it.  It was not excessive

21 force.  And part of the rationale for that was the

22 inmate later apologized to the correctional officers

23 for what he did.  He was disciplined for it and

24 accepted the discipline and said that he was in error

25 when he engaged in the fight.

1      Q.    Okay.  You briefly attended law school,

2  correct?

3      A.    That is correct.

4      Q.    You didn't finish the first semester,

5  correct?

6      A.    That's correct.

7      Q.    So you are not qualified to offer legal

8  opinions in litigation, correct?

9      A.    That's correct.

10     Q.    Okay.  All right.  Turning back to

11 Exhibit 1, which is your expert report, and back

12 to -- I don't know if it's technically part of your

13 CV or if it's just an addendum to your report.  It

14 has an appendix letter associated with it.  No, it

15 doesn't.  It's your listing of cases.  It says for --

16 that -- where you've testified for the last four

17 years.

18     A.    Yes.

19     Q.    Beginning in 2006.

20     A.    My understanding is that's part of the

21 rule requirement, so...

22     Q.    Yes.  So you are with me there, that part

23 of your report?

24     A.    Yes.  I've got it.

25     Q.    Is this listing complete and accurate as

1  of today?

2      A.    No.

3      Q.    I'm assuming you need to add some cases

4  that were more recent; is that correct?

5      A.    The Wolfe case as of Monday, yes, that

6  would be added.  And I believe there may be one other

7  case that involved a deposition.

8      Q.    In 2012?

9      A.    I believe in 2012.

10     Q.    Do you recall the name of the case?

11     A.    No.

12     Q.    It's this year?

13     A.    Yes.

14     Q.    Okay.

15     A.    I would have to look.

16     Q.    Okay.  If you recall at any point let me

17 know and we'll add it.

18     A.    Sure.

19     Q.    Now, on how many use of force cases have

20 you served as an expert witness?  And I'm not just

21 talking about testifying in a deposition or trial, I

22 mean total.

23         MR. POSNANSKI:  Objection.  Vague as to

24 time.

25     Q.    (BY MS. WARD)  Ever.

```
 1        A.    This would be an estimate but between 200
 2   and 250.
 3        Q.    So would you say that you are a
 4   professional expert witness?
 5              MR. POSNANSKI:  Objection to form.
 6              THE WITNESS:  I would answer it this way.
 7   My vocation is law enforcement training.  My
 8   avocation is consulting and expert witness work.  And
 9   because I get paid in most of those cases, I guess
10   you would say that that would qualify me as -- as a
11   professional, because I got paid.
12        Q.    (BY MS. WARD)  What percentage of your
13   personal income is derived from expert witness fees?
14        A.    It depends on the year.
15        Q.    How about 2011?
16        A.    I don't know because I had an extension
17   filed.
18        Q.    How about 2010?
19        A.    I would probably say about a third.
20        Q.    And can you make an estimate just sort of
21   based on overall, throughout your lifetime?
22        A.    I couldn't even begin to do that.
23        Q.    Okay.  Fair enough.
24              Now, just talking about the use of force
25   cases in which you've served as an expert witness.
```

```
 1   how many involved the use of a Taser?
 2        A.    Oh.  Again, it would be an estimate.
 3   Between 30 and 50.
 4        Q.    And of those cases -- now we are talking
 5   about Taser cases -- what percentage of the time were
 6   you serving as an expert for plaintiff?
 7        A.    About ten percent of the time.
 8        Q.    And so the other 90 percent then would be
 9   for the defendants?
10        A.    That -- that would be correct.
11        Q.    So have you ever served as an expert
12   witness on behalf of a prisoner or a pretrial deal
13   detainee in a Taser case?
14        A.    How do you define prisoner?
15        Q.    Let's see.  I will define prisoner as
16   someone who is subject to Eighth Amendment
17   standard --
18        A.    So if it's an Eighth Amendment, he is
19   convicted?
20        Q.    Yes, but I'm also including in the
21   question, pretrial detainees.
22        A.    If we include pretrial detainees -- and,
23   again, it depends on the federal circuit and how the
24   circuit defines pretrial detainees, but I would say
25   one or two, probably.  Not much more than that.  But,
```

```
 1   yes, I've had some of those cases.
 2        Q.    All right.  We are going to mark a couple
 3   more exhibits.
 4              (EXHIBIT 3 WAS MARKED.)
 5        Q.    We've just handed you Exhibit 3.  It's a
 6   case captioned, Cherry versus City of Philadelphia.
 7   Do you see that?
 8        A.    Yes.
 9        Q.    And do you recall this case?
10        A.    No.
11        Q.    You don't recall serving as an expert
12   witness in this case in 2002?
13        A.    No.  Gee.
14        Q.    You have no recollection of this case?
15              MR. POSNANSKI:  Objection.  Asked and
16   answered.
17              THE WITNESS:  No.
18        Q.    (BY MS. WARD)  Okay.  Well -- so then you
19   aren't aware that the Court ruled that your expert
20   report was conclusory and made a leap from inadequate
21   training of one officer to pattern and practice in
22   Philadelphia?
23        A.    I've never seen this --
24        Q.    Okay.
25        A.    -- so I wouldn't know.  I mean, obviously
```

```
 1   the Court ruled on it but I -- I never got a copy of
 2   this.
 3        Q.    And you don't recall whether you
 4   testified?
 5              MR. POSNANSKI:  Objection.  Asked and
 6   answered.
 7              THE WITNESS:  I -- I didn't testify at
 8   trial.  I don't even think I testified at deposition
 9   but I -- I have no knowledge.
10              MS. WARD:  Okay.  We are going to mark
11   another exhibit.
12              (EXHIBIT 4 WAS MARKED.)
13        Q.    Okay.  I've just handed you a case that's
14   captioned Brown versus Trooper Burghart?
15        A.    Yes.
16        Q.    Are you familiar with this case?
17        A.    Yes.
18        Q.    And it's recently decided.  Do you see
19   that, May 25th, 2012?
20        A.    Yes.
21        Q.    So recently.
22              Is your memory of the facts of this case
23   still pretty good?
24        A.    Yes.
25        Q.    Did this case go to trial?
```

```
 1        A.    Not to my knowledge.
 2        Q.    Yet.  As of yet, correct?  Has it gone to
 3   trial yet?
 4        A.    I haven't been told it's going to trial
 5   so...
 6        Q.    Have you seen this particular opinion?
 7   Maybe not in the LexisNexis form but in any form.
 8        A.    I received a -- and you may have to help
 9   me out here with what these are called but they are,
10   like, two- or three-paragraph summaries that are put
11   out in the local bar area.  Like, Philadelphia bar
12   puts out something.  And I got -- another lawyer
13   actually sent me this little two-paragraph blurb that
14   basically said, you know, I can't render legal
15   opinions but the issue of basically Taser deployment,
16   that was fine.  As I recall.  I mean, it was just a
17   couple paragraphs but I -- I haven't seen this
18   document.
19        Q.    So your opinion in this case was that the
20   use of a Taser was not reasonable, correct?
21        A.    That's correct.
22        Q.    And, in fact, you opined that it was
23   torture in the particular circumstances presented
24   here?
25        A.    That's right.
```

```
 1        Q.    And here the Court held that many of your
 2   opinions were not actually opinions, that they were
 3   facts, background facts that were styled as in your
 4   professional opinion?
 5        MR. POSNANSKI:  Objection to the form of
 6   the question.
 7        THE WITNESS:  I haven't read this so I'll
 8   have to go with...
 9        Q.    (BY MS. WARD)  You are not aware that the
10   Court held that?
11        A.    No, I'm not.
12        Q.    Are you aware that the Court held you
13   would not be permitted to testify as to what
14   particular officers knew?
15        A.    I --
16        MR. POSNANSKI:  Objection to the form of
17   the question.
18        THE WITNESS:  -- wasn't aware of that.
19        Q.    (BY MS. WARD)  You weren't aware of that,
20   okay.
21        And were you aware that the Court also
22   held that you would not be permitted to testify as to
23   the ultimate issue as to the reasonableness of the
24   force in that case?  Are you aware of that?
25        A.    I wasn't aware of that but every Court
```

```
 1   says that to me so -- I think all experts aren't
 2   allowed to opine on the ultimate issue, so...
 3        Q.    Did your opinion include anything directed
 4   to the ultimate issue?
 5        A.    Probably on the use of force, I probably
 6   said it wasn't -- I usually use the word "temperate."
 7   It wasn't a temperate use of force.  And then usually
 8   cited facts regarding that.
 9        Q.    What does "temperate" mean?
10        A.    Generally it's another word for
11   reasonable.
12        Q.    Okay.  Now, in this case you also opined
13   that the officers had other alternatives to the use
14   of the Taser, correct?
15        A.    Correct.
16        Q.    Waiting was one of those alternatives that
17   was available?
18        A.    Yes.
19        Q.    And do you believe that that's also true
20   in the incident with Mr. Kingsley?
21        A.    At what point in time?  Because the
22   deputies, according to my understanding of the facts,
23   did wait at one point in time.  They walked out of
24   the cell and left Mr. Kingsley lying there with
25   handcuffs on.  So they did wait in this case.
```

```
 1        Q.    But as an alternative to use of the Taser
 2   was that an option available to them?
 3        MR. POSNANSKI:  Objection to the form of
 4   the question.
 5        THE WITNESS:  I guess I would have to ask
 6   for clarification on -- on -- what do you mean by
 7   "wait"?
 8        Q.    (BY MS. WARD)  Leaving Mr. Kingsley alone
 9   in the cell.
10        A.    Eventually they did that.  At the time
11   they used force I -- I would say no, that wouldn't
12   have been a good option.
13        Q.    Why is that?
14        A.    He was resisting.
15        Q.    In the case of Brown versus Burghart was
16   Mr. Brown resisting at the time that you opined that
17   officers had available an alternative to wait?
18        A.    Well, we are talking two very, very
19   different set of facts here.
20        Q.    Uh-huh.
21        A.    I want to make that very clear on the
22   record.
23        In this case, Mr. Brown got clotheslined
24   off a motor bike and -- in the early morning hours
25   and they had two troopers.  He was not a pretrial
```

1  detainee, nor was he a convicted person.  So we are
2  operating under the Graham stand, not under a
3  Fourteenth or Eighth Amendment standard.
4       Q.   Uh-huh.
5       A.   And in this particular case I said yes,
6  they could have waited.  Mr. Brown wasn't really
7  going anywhere at that point.
8       Q.   The question was, was he resisting?
9       A.   According to the troopers he was getting
10 up off the ground so one would consider that.  I
11 guess, resisting lawful commands to stay on the
12 ground.
13      Q.   Now, in the circumstances presented here
14 in Brown versus Burghart, your opinion was that the
15 use of the Taser was deadly force, correct?
16      A.   Yes, because it ignited gas that burned
17 Mr. Brown very severely.  And it was a probe
18 deployment, unlike a drive stun that's in the current
19 case.
20      Q.   So with respect to the incident with
21 Mr. Brown, I think you said that he wasn't really
22 going anywhere, he was just getting up and that was
23 what the officers said was resistance in that case?
24      A.   As I recall the facts -- and it's been
25 months ago -- yes, when he got clotheslined off the

1  bike or the moped or -- it was a small, little
2  bike, I think that topped out at about 30 miles an
3  hour -- he turned into an apartment parking lot and
4  didn't see the chain across it and it knocked him off
5  the bike.  The bike flipped over and came down next
6  to him -- or reasonably close to him and it -- the
7  one trooper, as I recall, told him to either get on
8  the ground or stay on the ground and shot him with a
9  Taser.
10      At the end of that five-second probe
11 deployment I believe Mr. Brown was starting to get
12 up.  The second trooper who arrived on the scene shot
13 him with his Taser and Mr. Brown literally went down
14 in flames.
15      Q.   So that's why you say he wasn't going
16 anywhere, because he was laying there burning?
17      A.   Well, we can't take this out of context.
18 And I won't allow it to be taken out of context.
19 First of all, the Pennsylvania State Police trained
20 its troopers about flammable situations and flammable
21 environments.
22      Now, the troopers said they were never
23 taught that.  So they brought the instructor in from
24 Hershey and the instructor said, "Oh, no.  We covered
25 that."

1       In fact, the same slides that I talked
2  about in my report, the instructor from Hershey
3  talked about.  So they had instruction.  In a
4  flammable environment, don't use the Taser.  This was
5  potentially a flammable environment.  The bike was
6  flipped over.  It was next to him.  It's reasonable
7  to believe that gas was leaking from that.  Even
8  their own fire marshall who did the investigation
9  said the Taser could have ignited the flames.
10      So I think written we have that background
11 piece --
12      Q.   Uh-huh.
13      A.   -- then I think that goes to the opinion
14 that using the definition of deadly force, something
15 that's likely to cause serious bodily alarm or death,
16 then applies to the situation.
17      Q.   Okay.  With respect to the resistance of
18 the subject, however -- I want to isolate just that
19 element.  The troopers allege that Mr. Brown was
20 resisting and that he was getting up and not
21 following lawful orders.
22      And your opinion is that they should have
23 waited it out and not used the Taser in the flammable
24 circumstances, correct?
25      A.   Well, I'm saying that -- that they should

1  have waited, not used the Taser or gone in and
2  physically subdued him.  I mean, you've got the two
3  troopers and you got a guy who is intoxicated on
4  drugs or alcohol.  I mean, that's what we have.
5       Q.   And so was the environment that they were
6  in was less controlled than the environment
7  Mr. Kingsley was in, correct?
8       A.   I'd have to ask you to define "less
9  controlled."
10      Q.   They were outside, correct?
11      A.   They were.
12      Q.   The suspect was unrestrained, correct?
13      A.   That's correct.
14      Q.   Okay.  So less controlled in those two
15 aspects, I guess, so overall the situation was less
16 controlled, correct?
17      A.   I --
18      MR. POSNANSKI:  Objection to the form of
19 the question.
20      THE WITNESS:  I guess in a macro sense you
21 could say -- I mean, a dog could have ran out and bit
22 somebody.  I mean, in that sense it's less
23 controlled.  But I -- I'm not quite sure what you
24 mean by less controlled.
25      Q.   (BY MS. WARD)  Did the officers have any

1    knowledge of the suspect regarding how dangerous he
2    is or whether he had weapons?
3         A.    No.  They just knew that it was a
4    low-speed chase and he didn't stop for them.
5         Q.    And in the Kingsley case the officers knew
6    that Kingsley had no weapons, correct?
7              MR. POSNANSKI:  Objection to the form of
8    the question.
9              THE WITNESS:  I don't think you can make
10   that assumption in a jail.  There is always homemade
11   weapons in a jail.
12        Q.    (BY MS. WARD)  Do you know whether in the
13   incident with Mr. Kingsley if he was searched for
14   weapons at any point in the incident on May 21st?
15        A.    I don't recall that he was.
16        Q.    Okay.  We have been going over an hour and
17   I was about to switch exhibits.  Do you need a break?
18   I'm okay to keep going but I don't want to --
19        A.    I'm fine.  Ask the court reporter.  Maybe
20   she needs a break.
21              (Discussion off the record.)
22              (A break was taken from 10:18 a.m. to
23              10:24 a.m.)
24              MS. WARD:  We are going to mark another
25   exhibit.

1              (EXHIBIT 5 WAS MARKED.)
2         Q.    Okay.  Do you recognize Exhibit 5 as a
3    copy of your expert report in Brown versus Burghart?
4         A.    Yes.
5         Q.    And this is super minor but I'm just
6    wondering if there is a typo in the first paragraph
7    where it says, "Pursuant to Federal Rule of Civil
8    Procedure 26(1)(2)."  Is that supposed to say
9    something else?
10        A.    Yeah, I would say that's a typo.
11        Q.    Is it supposed to say 26(A)(2)?
12        A.    Yes.
13        Q.    And the date of this report is August 25th
14   of 2011, correct?
15        A.    That's what it shows, yes.
16        Q.    And that's before your first expert report
17   in this case, correct?
18        A.    Yes.
19        Q.    Dr. Peters, I noted that there is a lot of
20   paragraphs that are identical or similar to the
21   expert report that you submitted in this case.  Do
22   you use sort of the cut and paste technique when you
23   prepare your expert reports?
24        A.    If -- if the facts are similar and I've
25   written it before, sometimes I do.

1         Q.    So no need to go back and reinvent the
2    wheel, right?
3         A.    Again, it depends.  I mean -- for
4    example -- I'll just give you a quick example.  On
5    other page seven of Exhibit 5 where I talk about
6    Petrowski and some of those things, I've done the
7    literature review once and crafted the paragraph.  If
8    it applies, many times I will -- rather than go back
9    and start from square one, I'll use it again.
10        Q.    And some of the areas where you talk about
11   your experience, you cut and paste that from prior
12   reports as well, correct?
13        A.    You'd have to show me exactly what you are
14   referring to.
15        Q.    Let's see.  On page one of Exhibit 5, one
16   area is law enforcement training?
17        A.    Yes, that --
18        Q.    Did you use that in the Kingsley report as
19   well?
20        A.    Yeah, I change this from time to time but
21   generally it -- I use the -- pretty much the same
22   paragraphs because it's a preamble on a -- some of it
23   I change every time, so it would depend.
24        Q.    The opinion methodology, is that something
25   that you cut and paste from prior opinions?

1         A.    Yeah, because the methodology doesn't
2    change.
3         Q.    Okay.  So I want you to turn in Exhibit 5
4    to page seven, please.  So here you describe
5    Mr. Brown's actions -- or at least the testimony
6    regarding his actions during the incident with
7    Mr. Brown?
8         A.    Right.
9         Q.    And he's struggling with the officers
10   here, correct?
11        A.    Where on the page are we?
12        Q.    I'm on factor number one and you are
13   assessing whether he was not was an immediate threat
14   to the officers.
15        A.    Okay.
16        Q.    And you conclude that he was not, correct?
17        A.    Correct.
18        Q.    Because he was off the highway?
19        A.    Correct.
20        Q.    And so he wasn't a threat to motorists or
21   pedestrians, right?
22        A.    Correct.
23        Q.    And -- let's see.  You indicate here that
24   there was a struggle with Mr. Brown.
25        A.    Correct.

```
 1      Q.    And yet your opinion is that he was not an
 2 immediate threat to the troopers, correct?
 3      A.    Correct, as I defined that in those
 4 paragraphs.
 5      Q.    And you defined that how?
 6      A.    Mr. Brown didn't attempt to grab the
 7 trooper's pistol or other weapons.  The trooper
 8 didn't need any medical attention.
 9            And when I talk about the struggle, that
10 would refer to page 16 of my report where it talks
11 about Trooper Burghart struggled on the ground with
12 Mr. Brown, how he tried to physically grab him and
13 take him into custody and that they -- they
14 struggled.  And as Trooper Burghart told Mr. Brown to
15 place his hands behind his back and lie down, he
16 didn't.
17      Q.    So he didn't comply with the trooper's
18 orders?
19      A.    Correct.
20      Q.    I want to go back, though, to page
21 seven --
22      A.    Okay.
23      Q.    -- to whether he is a threat.  And you
24 said you define that in that he did not attempt to
25 grab weapons, correct?
```

```
 1      A.    Correct.
 2      Q.    So Mr. Kingsley didn't make any attempt to
 3 grab a weapon?
 4            MR. POSNANSKI:  Objection to the form of
 5 the question.
 6            We can continue a little bit on here but
 7 if we are going to evaluate his entire report and try
 8 and compare it to Kingsley I would prefer that we
 9 focus on this actual case.
10            MS. WARD:  And you have an objection?
11            MR. POSNANSKI:  Yes.
12            MS. WARD:  What is the basis of your
13 objection?
14            MR. POSNANSKI:  Objection to the form of
15 the question.
16            MS. WARD:  Okay.
17      Q.    Can you answer the question I asked?  Do
18 you remember the question I asked?
19      A.    I'm not sure.
20      Q.    Can you repeat the question I asked,
21 please?
22            I think I asked if Mr. Kingsley made an
23 attempt to grab weapons.
24      A.    No, but we are in two different
25 environments here.  In a corrections environment you
```

```
 1 are dealing with security and control and discipline.
 2 Here we are dealing with basically taking somebody
 3 into custody.
 4      Q.    So the assessment of whether there is an
 5 immediate threat is different in custody versus
 6 non-custody situations?
 7      A.    Can be.
 8      Q.    Is it here, with respect to these two
 9 cases?
10      A.    Well, the threat here -- we have a person
11 who initially was resisting.  In the Kingsley matter
12 we have a person who has been defiant for a period of
13 time and has put the correctional officers on notice
14 that I'm going to be defiant and I'm going to
15 continue to be defiant, which is against discipline,
16 control and order of a correctional facility.
17            So we have more history in the
18 correctional facility, I believe, the officers have,
19 because they know Mr. Kingsley, where here the
20 troopers were in a low-speed pursuit.
21      Q.    And how do you know the officers knew
22 Mr. Kingsley?
23      A.    Well, he was in the jail for a while and I
24 would assume that the correctional officers who
25 worked that floor came in contact with him on a daily
```

```
 1 basis.
 2      Q.    So that's just an assumption that you
 3 made?
 4      A.    I mean, I didn't read that in a
 5 deposition.  But if he's in the jail and you work the
 6 jail, more than likely you are going to come in
 7 contact with -- with the person.  And I believe
 8 the -- I want to say the lieutenant who went to
 9 Kingsley's cell and said, "Take the paper off the
10 light," and he refused and refused and they asked him
11 several times -- I mean, that's some history there of
12 defiance and -- and that's against -- most jails have
13 an inmate handbook.  The inmate handbook or a similar
14 document says that you are to abide by the lawful
15 commands of the deputies.
16      Q.    So the history you are referring to begins
17 on May 20th; is that correct?  For history of
18 defiance as you stated in your last answer?
19            MR. POSNANSKI:  Objection to the form of
20 the question.
21            THE WITNESS:  Let me just check.  You say
22 May 20th.  There is no year or anything else so just
23 let me check.
24            May 20th is when this incident occurred.
25 There may have been prior incidents with
```

Mr. Kingsley.

Q.    (BY MS. WARD)  Are you aware of any prior incidents with Mr. Kingsley?

A.    Not from the materials.

Q.    Did you read anything in any of the depositions that indicate the officers had prior knowledge of Mr. Kingsley?

MR. POSNANSKI:  Objection to the form of the question.

THE WITNESS:  I haven't gone through the two depositions thoroughly that I just received so I don't know if there is anything in there or not.

Q.    (BY MS. WARD)  So you made an assumption that the officers involved with Mr. Kingsley had prior experience with defiant behavior from him, correct?

MR. POSNANSKI:  Objection to the form of the question.

THE WITNESS:  No, that's not what I said. I said that when Mr. Kingsley said he wasn't going to take the paper, Lieutenant Conroy asked him to remove the paper.  And he said, "No, I'm not going to do it."

Q.    (BY MS. WARD)  That was the same day as the Taser incident, correct?

A.    That was the same day.  That's prior.

Q.    Right.

A.    That's prior to them going into the cell. So you know up front, in a corrections setting, that you have a defiant inmate.  That's all I'm saying.

Q.    Okay.  On page eight of this report there is an element that you list here where the circumstances surrounding the assessment of Mr. Brown on August 28th, 2008, tense, uncertain and rapidly evolving.

Now the question I have for you is with Mr. Kingsley were the circumstances tense, uncertain and rapidly evolving?

MR. POSNANSKI:  Objection to the form of the question.

THE WITNESS:  They were tense.  I don't think there was anything that's rapidly evolving. You know, the guy is in jail.  He was offering verbal and other resistance and told the deputies, "Go get the CERT team."

Okay.  They went and got other deputies and came in and did what they had to do.  I think it was tense but rapidly evolving?  I don't think it was rapid.

Q.    (BY MS. WARD)  How about uncertain?

A.    There is always an element of uncertainty.

Q.    So that's present in every case?

A.    I think it's present in -- in most cases. In some cases it's not, but I think in some indications it is.  I mean, there is cases that there is virtually not much uncertainty the because of the situation.

Q.    Okay.  Could you turn to page 16 in this report in Exhibit 5?  This is in your -- again, in your factual recitation.  And you indicate -- it's about the middle of the page -- that Mr. Brown was warned that he was going to be Tased.  Do you see that?  It's after the second heading on the page. "Trooper LaMaire drew his Taser X26" --

A.    Yes.

Q.    -- "and told Mr. Brown he was going to deploy it."

A.    Correct.

Q.    So is the warning a factor in assessment of whether a use of force is reasonable?

A.    No.  Not at all.

Q.    A warning isn't a factor?

A.    A use of force, depending on the situation, in a probe deployment -- and we have to make a distinction here.  Taser training says that if

you are going to do a probe deployment, it's recommended by the manufacture to say, "Taser, Taser, Taser" or to warn the person, "I'm going to use the Taser."  That's not the same recommendation in a drive stun.  Probe deployments cause neuromuscular incapacitation.  Drive stuns do not.

So we have two very different applications of the same device.  In drive stuns you don't have to -- even in the training it's not recommended that you say, "Okay, I'm going to, you know, drive stun you."

Q.    What training are you referring to?

A.    The Taser training.

Q.    Do you know if it's recommended in Wisconsin training at all?

A.    I'd have to go back and look at the document I referred to in my report on what the chiefs recommended.

Q.    So I'm not trying to test your memory, but just sitting here right now you don't know whether the Wisconsin requires a warning for a drive stun?

A.    I don't recall a drive stun.  I believe there is a warning for the probe deployment.  But I don't believe there is one for the drive stun.

Q.    Okay.  You can put Exhibit 5 away.

```
1        A.    Okay.
2              (EXHIBIT 6 WAS MARKED.)
3        Q.    We've just handed you Exhibit 6.  And this
4  is a case captioned Wendy Wilson versus Taser
5  International.
6        A.    Okay.
7        Q.    And this is an opinion from the District
8  of Colorado that issued on September 21st of 2010.
9  Do you see that?
10       A.    Yes.
11       Q.    So within the last two years?
12       A.    Fair.
13       Q.    Do you recall the facts of this case?
14       A.    No, I -- I don't.
15       Q.    Do you recall your opinion in this case?
16       A.    No.
17       Q.    Are you aware that the judge excluded
18  portions of your opinion for lacking adequate factual
19  underpinnings?
20       A.    No, I've never seen this document.
21       Q.    Were you aware that your Court -- that the
22  Court excluded your opinion regarding the legal
23  standard as beyond your area of expertise?
24             MR. POSNANSKI:  Objection to the form of
25  the question.  Asked and answered.
```

```
1              THE WITNESS:  Again, I've not seen this
2  but as I previously said, usually the courts will say
3  you can't opine on legal issues.
4        Q.    (BY MS. WARD)  And are you aware that the
5  Court indicated that you would not be permitted to
6  opine on what government officials know, correct?
7              MR. POSNANSKI:  Objection to the form of
8  the question.
9              THE WITNESS:  Again, I haven't -- haven't
10  seen this.  If -- and this is Colorado, correct?
11       Q.    (BY MS. WARD)  Yeah.
12       A.    As I recall -- now, I'm not a hundred
13  percent sure on this, but as I recall, all the
14  plaintiffs experts were excluded in this case and
15  only two of us on the defense side were permitted to
16  testify, Dr. Mark Kroll and myself.  Everyone else
17  was excluded.  So while there may have been certain
18  opinions that the Court said that I -- I couldn't
19  discuss, I was not excluded, as I remember this case.
20  And I've never seen this document but as I remember
21  the Colorado case, I think this is the only case I
22  had in Colorado involving a Taser.  Two of us
23  survived Daubert challenges and the rest were
24  eliminated.
25       Q.    So you testified at trial in this case?
```

```
1        A.    No.
2        Q.    And why not?
3        A.    I don't know if there was a trial.
4        Q.    You just said you were permitted to
5  testify.
6        A.    No, no, no.  I -- if I said that, what I
7  meant was, the other experts were excluded.  I
8  believe Dr. Kroll and I were permitted to testify.
9  We weren't excluded under Daubert.  Some of our
10  opinions may have been but I don't -- I didn't go to
11  Colorado and testify in this case.
12       Q.    Did you testify at a deposition in this
13  case?
14       A.    I don't recall testifying at all in this
15  case.
16       Q.    Okay.  So some of your opinions survived
17  the challenge but not all of them, correct?
18       A.    That's a fair statement.
19       Q.    So whether or not you've seen this actual
20  document in any form, you weren't aware of which
21  particular opinions were excluded before coming here
22  today?
23       A.    No.  Usually --
24       Q.    So the attorney you were working with
25  didn't share that with you?
```

```
1        A.    Well, there were several attorneys in this
2  case and I -- all I got -- if this is the case that
3  I'm remembering, all I received was an e-mail saying
4  you and Kroll survived the Daubert challenge on most
5  of your opinions.  We exclude the plaintiff's
6  experts.  That's what I remember.  And, again, I'm
7  not sure it was this case.  But I normally don't get
8  court -- opinions from the court.
9        Q.    Okay.  We are going to mark Exhibit 7.
10             (EXHIBIT 7 WAS MARKED.)
11       Q.    We've just handed you Exhibit 7.  And this
12  is a case captioned Hebert versus Rodriguez, et al,
13  correct?
14       A.    Yes.
15       Q.    Do you recall this case?
16       A.    Yes, I do.
17       Q.    Okay.  And in this case the Court rejected
18  your expert opinion in its entirety, correct?
19       A.    That's correct.  And I might add as a
20  footnote to that that counsel that I was working for
21  is of the opinion that it was a politically-based
22  decision because plaintiff's counsel -- or defense
23  counsel didn't have an expert.  Whether that's true
24  or not, I don't know.
25       Q.    Okay.  We are going to mark another
```

exhibit.

(EXHIBIT 8 WAS MARKED.)

Q.    All right.  We just handed you what's
marked as Exhibit 8 and the caption is Heston versus
City of Salinas?

A.    Yes.

Q.    From the Northern District of California,
correct?

A.    Correct.

Q.    Do you recall this case?

A.    Yes, I'm familiar with the Heston case.

Q.    Are you aware that the Court held that
portions of your promote contained inappropriate
analysis and non-expert opinion?

A.    Again, I've never seen this document and I
wasn't told that.

Q.    Are you aware that the Court indicated
that it wanted to conduct a hearing to establish
ground rules for your testimony at trial?

A.    No, I wasn't aware of that.  I didn't
testify at trial.

Q.    Did you testify at a hearing regarding
your expert opinion?

A.    No.

Q.    Did you ever learn of the outcome of this

case?

A.    Taser lost the warnings portion earned a
product liability theory, I'm told.  I wasn't there.

Q.    Okay.  And you were representing -- or you
were testifying on behalf of Taser International?

A.    Yes.

I might note that on page four of this it
says the Court denies plaintiff's motion to exclude
the testimony of Dr. Peters so I -- again, this is
the first time I've seen this but if -- if the Court
denied their motion to exclude my testimony, I --
obviously I was permitted to testify.  And I was at
the airport on the way to testify when counsel made
the decision logistically not to have me testify on
warnings because I was told plaintiff's expert didn't
raise that issue in his case in chief.

Q.    On page four the Court found that portions
of your expert report contained inappropriate
analysis and non-expert opinion, correct?

MR. POSNANSKI:  Objection.  Asked and
answered.

THE WITNESS:  That's what it says, but it
doesn't say what it is.  I mean, I have no idea what
the Court's referring to.

Q.    (BY MS. WARD)  Yeah.  Okay.

A.    Maybe you could enlighten me if you know,
but I don't.

Q.    Well, that's not really appropriate so
we'll just move on.

We are going to mark another exhibit.

(EXHIBIT 9 WAS MARKED.)

Q.    I've just handed you what we've marked as
Exhibit 9.  Do you recognize Exhibit 9 as your expert
opinion in Rosenberg v. Homoki?

A.    Yes.

Q.    Do you recall this case?

A.    I remember the caption of it.  If I can
just take a look at this I'll...

Q.    Sure.  Yeah, you can take all the time you
need.  I don't want to rush you.

A.    Yes, I do remember this case.

Q.    Okay.  And one of your opinions in this
case is that the use of a baton against a plaintiff
was unreasonable, correct?

MR. POSNANSKI:  Objection to the form of
the question.

THE WITNESS:  Could you direct me to where
that opinion is?

Q.    (BY MS. WARD)  It's sort of the gist of
your entire opinion.

A.    Well, counsel, "gist" is open to a lot of
interpretations.  I would like to see where that
opinion is.

Q.    That's fair enough.  Let's see.  I'll
withdraw that question.

A.    Okay.

Q.    You recall that the case was about the use
of a baton against the plaintiff, correct?

A.    Yes, that's correct.

Q.    And you were testifying on behalf of the
plaintiff, correct?  You were working as an expert
for the plaintiff?

A.    Correct.

Q.    Okay.

A.    I don't believe I testified in this case.

Q.    I want you to go to -- gees, pagination
isn't very clear.  Well, it is at the top.  Okay.
5 of 28.

A.    5 of 28.  Okay.

Q.    And I'm actually looking at the first
paragraph.  It's a partial paragraph continued from
page four.  And there is a discussion of Lawrence
Sherman and some of his research.

Do you see that?

A.    Yes.

1   Q.    And you mention here the code of silence,
2   correct?
3   A.    Yes.
4   Q.    Can you tell me what that is?
5   A.    The code of silence is a concept that
6   originally originated with the Mafia and then was
7   brought into some law enforcement organizations, New
8   York City specifically, with the Serpico case, where
9   officers would band together -- certain officers, not
10  all.  But the rogue officers would get together and
11  collaborate to either cover up or not share
12  information, and it's called the code of silence,
13  that they just remain silent on -- on certain issues
14  or as the report -- that paragraph suggests, peer
15  group secrecy.  And it's based on loyalty and not
16  wanting to testify or offer information that might
17  harm another officer.  And that -- this concept
18  really came to light in the Serpico case in New York
19  City.
20  Q.    And in the case at issue here, where you
21  were opining in Exhibit 9, there was some testimony
22  that you were relying on regarding the particular
23  officers here in the code of silence, correct?
24  A.    Again, you'd have to point out where that
25  is.  I -- this was exhibit...

1   reported.  I don't think they were protecting
2   anybody.
3   Q.    (BY MS. WARD)  Why do you think that?
4   A.    I didn't see where the -- where the
5   conflict -- when I look at a police report or a
6   correctional report or any report and they are all
7   worded the same way and they all read the same way
8   and the paragraphs are all formatted the same way,
9   that usually raises a red flag that, Hey, these guys
10  probably got together in the back room and discussed
11  their testimony -- or not their testimony but the
12  facts that took place.  I didn't see that
13  in this case but that's ultimately a conclusion for
14  the trier of fact, not me.  I don't determine
15  credibility.
16        In this case that we were discussing,
17  Exhibit 9, there was testimony from one of the
18  officers that there was the code of silence and peer
19  group secrecy.  And I had prior knowledge of other
20  events in this department where that took place.  I
21  didn't find any of that in the Kingsley case so
22  that issue, in my mind, never was an issue.
23  Q.    You don't know if there was a code of
24  silence in that department, correct?
25  MR. POSNANSKI:  Objection.  Vague.

1   Q.    Nine.
2   A.    Nine.  Oh, I'm sorry.  Exhibit 9, with
3   Rosenberg.  I'm sorry, I thought you were talking
4   about the Kingsley matter.
5   Q.    I'm about to.  It's on the same page where
6   you discuss the code of silence.
7   A.    Yes, and there was some testimony
8   regarding that.
9   Q.    Right.  And there is no such testimony in
10  this case, correct?  Kingsley.  Sorry.  I need to be
11  clear.
12  A.    I didn't see any, no.
13  Q.    Okay.  How -- let me think a minute.  Is
14  it likely that the officers involved in the incident
15  with Mr. Kingsley would be loyal to Officers Degner
16  and Hendrickson, if possible?
17  MR. POSNANSKI:  Objection to the form of
18  the question.  Objection, foundation.
19  THE WITNESS:  Which officers?  I mean,
20  there is a whole department of officers.
21  Q.    (BY MS. WARD)  The officers who filed
22  incident reports in the Kingsley case.
23  MR. POSNANSKI:  Same objections.
24  THE WITNESS:  I don't think they're -- I
25  don't think they are unethical in -- in what they

1   THE WITNESS:  No, and I wouldn't know.
2   Q.    (BY MS. WARD)  The fact that you had
3   officer testimony here is rare; is that fair?
4   MR. POSNANSKI:  Objection to the form of
5   the question.
6   MS. WARD:  Let me withdraw that.
7   Q.    It kind of goes against what the code of
8   silence is all about for someone to actually go on
9   record as stating that it's present, correct?
10  MR. POSNANSKI:  Objection to the form of
11  the question.
12  THE WITNESS:  Having taught ethics and
13  having taught this subject, in an organization that's
14  rampant with the code of silence, I would agree with
15  you.
16        In organizations that are professional and
17  the code of silence doesn't exist, there is no reason
18  not to tell the truth.  And what we are really
19  talking about here is telling the truth.  And
20  videotape doesn't lie and we have a video in this
21  matter.  There wasn't a video tape in the Rosenberg
22  case.
23  Q.    (BY MS. WARD)  Uh-huh.
24  A.    So I think -- I think we are comparing
25  apples to rocks.  I'm not even sure we are in the

1  fruit family at this point.  But that would be my
2  answer to your question.
3      Q.    But it is true that the code of silence is
4  a sociological phenomenon that exists in police
5  organizations, correct?
6      A.    It is a sociological phenomenon.  It can
7  exist in any organization.  It can exist in a law
8  firm.  It can exist in a corporate setting.  It can
9  exist in government.  It can exist anywhere.
10     Q.    All right.  I want you to turn to page 14
11 of 28 in this report.
12     A.    Okay.
13     Q.    And I'm again looking at the first partial
14 paragraph and the last sentence.  If Mr. Rosenberg's
15 version of the facts is true, Officer Homoki, in your
16 professional opinion, had no justification for the
17 striking of Mr. Rosenberg with a baton based on the
18 totality of the circumstances.  Correct?
19     A.    Correct.
20     Q.    And that is sort of the first question I
21 asked you, that this was your opinion in this case,
22 right?
23     A.    I don't understand that question.
24     Q.    I'll withdraw it.
25     A.    Okay.

1  incapacitation.  There is no difference, in fact, it
2  was probably less invasive to have the Taser applied
3  to his back than to apply a
4  pressure point or to pinch him or -- I mean, those
5  are all certainly good options.  But I think of the
6  Taser in this case, when we are talking about just
7  drive stun -- a drive stun delivers between .5 and
8  .76 volts per pulse to the human body.  That's less
9  than a AA battery.  It's not going to kill you.  It's
10 not going to do anything except hurt a little bit.
11     So the bite -- the alleged biting or, in
12 your hypothetical, the non-biting, that's really not
13 an issue to me because it's the resistance, and the
14 video showed the resistance.
15     Q.    Okay.  We'll take a look at the video and
16 I can have you point out to me where the resistance
17 is, but you understand that's disputed by
18 Mr. Kingsley, correct?
19     A.    Yes, I do.  Yes.
20     Q.    And in your answer you gave me I think you
21 said your -- that the Taser was a reasonable use of
22 force was based on the fact that he was resisting so
23 I want you to assume that he was not resisting.
24     A.    Okay.
25     Q.    Okay.  And now given those two things, was

1      Q.    Okay.  So I want to talk about the
2  Kingsley for a minute and I want you to accept two
3  things that Mr. Kingsley says.  Number one, that he
4  was not resisting.
5      A.    Okay.
6      Q.    And, number two, he did not move as if to
7  bite but only to speak.
8      Now, given those two things, was the use
9  of the Taser on Kingsley objectively unreasonable?
10     MR. POSNANSKI:  Objection to the form of
11 the question.
12     THE WITNESS:  No, it was appropriate.
13     Q.    (BY MS. WARD)  even with those two
14 assumptions?
15     A.    Even with those two assumptions.
16     Q.    Okay.  Explain your answer.
17     A.    Well, first of all, you gave me a
18 hypothetical and your hypothetical asked me to assume
19 two facts, two facts that are very different from
20 what the video showed.
21     Now, I'm not going to get into the biting
22 aspects because there was a head movement and to me
23 the biting wasn't that big of a deal overall but he
24 was resisting.  The Taser was used as a pain
25 compliance device.  It was not used for neuromuscular

1  the use of the Taser on Mr. Kingsley objectively
2  unreasonable?
3      A.    I can't answer that.
4      Q.    Why is that?
5      A.    Because it's an incomplete hypothetical.
6      Q.    What do you mean by "incomplete
7  hypothetical"?
8      A.    If he's not resisting, then why couldn't
9  the deputies take off the handcuffs or put the
10 handcuffs on or -- it's incomplete.  I mean, I have
11 to have more facts.  Just to say, Okay, let's
12 subtract these two and give me the sum, it doesn't
13 work that way.
14     Q.    Okay.  Well, let me put it to you this
15 way.  In this report you made a conclusion based on
16 selecting one of the parties' version of the facts,
17 correct?
18     A.    Where are we in this report?
19     Q.    The sentence we read before, the exchange
20 about the hypothetical took place, the first
21 paragraph, last sentence, page 14 of 28.
22     A.    Can I -- in which case?
23     Q.    I'm sorry.  Okay.  We'll back up.
24     A.    Are we in Rosenberg or are we in Kingsley.
25     Q.    Well, we are kind of in both so I'm

1  looking at page 14 of 28.

2  　　A.　　Of which report?

3  　　Q.　　The exhibit in front of you, Rosenberg,

4  nine. Oh, you put it away.

5  　　A.　　I put it away. That's why I'm asking.

6  I'm just a little confused and need guidance.

7  　　　　　Okay, page 14. I'm there.

8  　　Q.　　And then at the top of that page, the last

9  sentence of the first partial paragraph, you accepted

10  Mr. Rosenberg's version of the facts as true in

11  rendering your opinion, correct?

12  　　A.　　Well, unless we went to different grammar

13  schools, when I say if Mr. Rosenberg's version of the

14  facts is true, I don't think I accepted that at all.

15  What I'm saying is in the alternative here, if

16  Rosenberg's version is accurate, then there was no

17  justification.

18  　　Q.　　Okay. But you were willing to provide a

19  conclusion accepting one version of the facts,

20  correct?

21  　　　　　MR. POSNANSKI: Objection to the form of

22  the question.

23  　　Q.　　(BY MS. WARD) You were willing to provide

24  a conclusion under one version of the facts.

25  　　A.　　I provided an opinion saying that if

1  Mr. Rosenberg -- if Mr. Rosenberg's version of the

2  facts is true, then it wasn't an appropriate use of

3  force. The reverse of that is if Mr. Rosenberg's

4  version isn't true, then it was appropriate.

5  　　Q.　　Okay. So I'm really just asking you to

6  sort of do that same thing that you did in the

7  Rosenberg case in terms of analysis --

8  　　A.　　Okay.

9  　　Q.　　-- in the Kingsley case. I want you to

10  accept Mr. Kingsley's version of the facts that he

11  was not resisting and that he did not move his mouth

12  to bite.

13  　　　　　So given those two things, his version of

14  the facts, is the use of the Taser on him objectively

15  unreasonable?

16  　　　　　MR. POSNANSKI: Objection to the form of

17  the question.

18  　　　　　THE WITNESS: And, again, I would have to

19  ask -- because in Rosenberg I had the complete

20  file --

21  　　Q.　　(BY MS. WARD) Uh-huh.

22  　　A.　　-- in your hypothetical, what were the

23  deputies trying to do? What was their lawful

24  objective at that point?

25  　　Q.　　Let me ask that of you. What was the

1  deputies' lawful objective with Mr. Kingsley?

2  　　A.　　If -- if they were trying to get him

3  handcuffed and he was resisting -- and you are saying

4  to assume he wasn't resisting -- if he wasn't

5  resisting at all and they said, "Put your hands

6  behind your back," and he did, and they cuffed him

7  without any resistance whatsoever, then there would

8  not have been use -- appropriate to use the Taser.

9  　　Q.　　Okay. So the time that he was Tasered he

10  had had handcuffs on already, correct?

11  　　A.　　Yes.

12  　　Q.　　So what was the lawful objective of the

13  use of the Taser at that point?

14  　　A.　　To move him out of the cell.

15  　　Q.　　He was in receiving, correct? When he was

16  Tasered.

17  　　A.　　He was in a cell. They were going to move

18  him to another cell.

19  　　Q.　　Okay. So your understanding is he was in

20  the cell block when he was Tasered?

21  　　A.　　Let me go back to the facts. I'm getting

22  confused based on your partial hypothetical.

23  　　　　　To set the record straight. It was the

24  removal of the handcuffs. He was handcuffed. He was

25  in receiving cell three.

1  　　Q.　　Okay. So accepting his version of the

2  facts, is the use of the Taser on him unreasonable

3  objectively?

4  　　　　　MR. POSNANSKI: Objection to the form of

5  the question.

6  　　　　　THE WITNESS: If he wasn't resisting at

7  all, nothing, and they could just unkey the cuffs and

8  take them off, but they decided to use the Taser, for

9  whatever reason, no, that wouldn't be appropriate.

10  　　Q.　　(BY MS. WARD) Okay. And now -- I think

11  you said in one of your prior answers that the biting

12  was really not a big deal. You did include it in

13  your opinion, though, correct?

14  　　A.　　I included it in my report, sure, because

15  it was an element that was discussed.

16  　　Q.　　Did you rely on that element in forming

17  your conclusion that the use of the Taser was

18  appropriate?

19  　　A.　　Ultimately, no, because I didn't see

20  anything in the record, unless there is something

21  that I missed. And, again, I didn't get through the

22  last two depositions in detail. But I didn't see

23  where Mr. Kingsley bit anybody. I didn't see where a

24  bite actually took place. So ultimately I mentioned

25  it because it was mentioned. If, in fact, he were

1  trying to bite somebody, it was an attempt, but I
2  didn't see anything in the record where he actually
3  bit anybody. So, to me -- I mentioned it so at a
4  deposition you or someone else wouldn't say, Well,
5  did you see where it's alleged that he tried to bite
6  somebody?
7        And then I'd say, Well, I didn't put it
8  in, and then we'd go through this whole line of
9  questioning again.
10       Q.    Well, that actually is my next question.
11  Did you see in the video anywhere Mr. Kingsley
12  attempted to bite Sergeant Hendrickson or any of the
13  officers?
14       A.    I'd have to review that video again.
15       Q.    Okay, we'll do that.
16       A.    It's been a while since I've looked at it.
17       Q.    Okay, we'll do that.
18             The Rosenberg case was about the use of a
19  baton, correct?
20       A.    I think it was the use of a baton. There
21  may have been some other physical use of force and
22  I -- I don't remember completely, but I thought there
23  was a canine involved as well, but I could be wrong
24  on that.
25       Q.    Is the use of a baton greater use of force

1  than a Taser in drive stun mode or lesser use of
2  force?
3        A.    Well, I'm going to answer that two ways.
4  Because a baton can be used for restraint and control
5  purposes, it would be about the same. If the baton
6  is used as a striking tool, then it's way above the
7  use of the Taser.
8        But if I took the baton and held it -- and
9  I'm going to hold this pen horizontally -- and I
10  place the barrel of that baton in closed mode, such
11  as an asp baton, over the wrist and I squeeze for
12  pain compliance, that would be the equivalent of the
13  Taser drive stun.
14       If I took the baton and opened it or even
15  in closed mode struck someone with it, that would be
16  much higher on the force level than -- than a drive
17  stun.
18       Q.    Okay. Understood.
19             Okay. If we could turn to page 16 of 28.
20       A.    Of Rosenberg?
21       Q.    Yes, of Rosenberg.
22       A.    Okay.
23       Q.    In the second full paragraph it states
24  that "Mr. Golazeski testified that Mr. Rosenberg
25  appeared to be in pain. He was kind of moaning and

1  not standing fully upright. I mean, he looked like
2  he was in a lot of pain."
3        Okay. So here you relied on testimony
4  that the subject was moaning as an indication of
5  pain, correct?
6        A.    Yes.
7        Q.    And you opined that the officer should
8  have gotten medical attention for Mr. Rosenberg?
9        A.    I said that they -- they failed to
10  immediately transport Rosenberg to a hospital for his
11  injuries.
12       Q.    Okay. And you also state that all
13  prisoner complaints of serious injury or physical
14  problems should be taken seriously and medical aid
15  summoned immediately, correct?
16       A.    Yes, serious injuries, absolutely.
17       Q.    And for that statement you say IACP,
18  right?
19       A.    The International Association of Chiefs of
20  Police National Law Enforcement Policy Center
21  regarding prisoner transport. And this is in the
22  field where law enforcement officers are preparing to
23  transport someone whom they've arrested.
24       Q.    Do you have any opinion as to whether the
25  officers in the Kingsley case should have taken his

1  complaints of injury seriously?
2        MR. POSNANSKI: Objection to the form of
3  the question. Misstates evidence.
4        THE WITNESS: As -- I recall that
5  Mr. Kingsley said he couldn't walk because his foot
6  hurt him.
7        Q.    (BY MS. WARD) Uh-huh.
8        A.    That's the only thing I see regarding the
9  injury to Mr. Kingsley.
10       Q.    At the point at which Mr. Kingsley said
11  his foot hurt, should the officers have requested
12  that he receive medical attention?
13       MR. POSNANSKI: Objection to the form of
14  the question.
15       THE WITNESS: It depends on the policy of
16  the jail. You know, inmates a lot of times will
17  complain of all sorts of issues. If it wasn't a
18  broken foot -- I mean, obviously broken, you know, at
19  some point you would notify medical staff and they
20  would come up. But do you have to do it immediately?
21  It depends on the situation and what the officers
22  knew at the time and what the inmate said at the
23  time.
24       Q.    (BY MS. WARD) Is there a particular
25  policy that you are aware of that indicates whether

1    Mr. Kingsley should have received medical attention
2    when he made the complaint about his foot?
3        A.    No.
4            MR. POSNANSKI:  Objection to the form of
5    the question.
6        Q.    (BY MS. WARD)  You are not aware of any
7    such policy?
8        A.    No, I'm not.
9        Q.    I do want to go at this point back to your
10   expert opinion in the Kingsley case, which is
11   Exhibit 1.
12       A.    Okay.
13       Q.    And we are at about another hour.  Is this
14   a good -- let's just take a two-minute, three-minute
15   break.
16            (A break was taken from 11:10 a.m. to
17            11:15 a.m.)
18       Q.    Just a couple general questions.
19            Have you ever been worked with Whyte
20   Hirschboeck before this case?
21       A.    No.
22       Q.    Have you ever worked with Mr. Jones before
23   this case?  Do you know who I mean when I say
24   Mr. Jones?
25       A.    I have no idea who Mr. Jones is.

1        Q.    Andrew Jones, the attorney that is working
2    on this case?
3        A.    (Witness shakes head.)
4        Q.    Have you ever been worked with
5    Mr. Posnanski before?  Do you know who that is?
6        A.    He is to my left but, no, I -- i just met
7    him for the first time this morning, so...
8        Q.    When were you first contacted to work on
9    this case?
10       A.    Prior to December of 2011.
11       Q.    And do you know if it was a cold call or
12   if there was a referral?  Are you aware of how they
13   came to be aware of you?
14       A.    I can't remember if it was a telephone
15   call or an e-mail.  I -- I don't know.  I would
16   presume it was probably a phone call.
17       Q.    But do you know how they came to know
18   about you?
19       A.    No.  I have no idea.
20       Q.    How much time have you spent on this case
21   to date?  Let's not count today.
22       A.    I would have to go back and look at my
23   records.  I'm not sure.
24       Q.    Do you keep, you know, hour-by-hour
25   records of your time?

1        A.    In -- in this case, yes.
2        Q.    Do you bill Whyte Hirschboeck with an
3    invoice on a periodic basis?
4        A.    Not a periodic basis.  Generally on a --
5    on a product basis.  In other words, if I did a --
6    my -- boy.  If I had completed my initial report,
7    then I would bill them for that report.  If it were
8    my follow-up report, then it would be for that, that
9    type of thing, but I don't have a monthly retainer or
10   anything like that.
11       Q.    Okay.  Understood.
12            Do you provide itemized invoices to Whyte
13   Hirschboeck?
14       A.    Generally it's by hour.  May not be broken
15   down, you know, by a specific day, but usually it is.
16   It usually lists, you know, this day, this many
17   hours, that type of thing.
18       Q.    Do you include descriptions of the tasks
19   that you performed?
20       A.    I don't know, because I rarely do hourly
21   billing.  I usually do flat rate billing.  So I would
22   have to go back and look at those invoices.
23       Q.    Okay.  Let's talk about your first expert
24   report again, Exhibit 1.  I want to just talk about
25   the process of preparing this document.  Did you

1    author this document?
2        A.    Yes, I did.
3        Q.    And would that be 100 percent?
4        A.    One hundred percent.
5        Q.    How did you go about putting this
6    together?
7        A.    My customary practice is I read all the
8    materials that have been sent to me.  If there is
9    video or audio files sent to me, I either watch those
10   or listen to them.
11            The first thing I do is write a summary of
12   the facts.  And I try very seriously to put a
13   reference behind each sentence where I got that
14   information.
15            Then depending on what the issues are, for
16   instance, use of force or policies and procedures or
17   equipment or what have you, then generally I go to
18   the appropriate treatises or training materials or
19   what have you.  I review those and then I pull that
20   together and write my opinions.  And then, of course,
21   I list the documents reviewed and, you know, the
22   other things that are generally associated with a
23   report.
24       Q.    Do you talk with counsel while you are
25   preparing your report?

1    A.    Generally not, unless I have a specific
2  question.
3    Q.    Did you rely on any assumptions that
4  counsel provided to you in preparing your report?
5    A.    No, I've learned that's a very bad
6  practice.
7    Q.    Did you talk to any of the officers that
8  were involved in the incident?
9    A.    No.
10    Q.    Why not?
11    A.    I thought the -- the information that was
12  provided was -- was appropriate for the decisions
13  rendered.  And the primary reason I didn't contact
14  them -- and I wouldn't contact them directly anyway;
15  I would go through counsel -- was the videotape I
16  thought was fairly conclusive.  And inclusive.
17    Q.    Did you go to the Monroe County Jail?
18    A.    No, I haven't.
19    Q.    Have you ever been in the Monroe County
20  Jail?
21    A.    I don't think so.
22    Q.    All right.  On page one of your opinion,
23  at the bottom you've got a it copyrighted 2011 and
24  then ARR?
25    A.    Correct.

1    Q.    Why did you copyright your opinion?
2    A.    Well, I don't copyright the opinions, I
3  copyright the document.
4    Q.    Why did you copyright the document?
5    A.    That's just a practice I do because these
6  are published, they become public knowledge and I've
7  had other experts copy and paste some of my work over
8  the years, so it's just a standard practice I do.
9    Q.    Have you ever contacted another expert
10  that has copied your work about the copyright
11  violation?
12    A.    There has been occasions where I've called
13  people and said, "This looks vaguely familiar and I'd
14  appreciate if you wouldn't do that."
15    Q.    Okay.  Understood.
16       All right.  On the second page of your
17  opinion report you have a section headed Right to
18  Amend?
19    A.    Correct.
20    Q.    Have you seen anything since this report,
21  this first report dated December 16th, 2011, that
22  causes you to want to amend anything in this report?
23    A.    Well, I filed a supplemental report so I
24  guess -- I guess I -- I didn't really amend the
25  opinions in this report, I added to those in the

1  supplemental report, I guess is the best way do say
2  it.
3    Q.    Right.  I understand that, but the
4  question is a little different.  It's have you seen
5  anything since you drafted this that makes you want
6  to change anything in this document.
7    A.    No.
8    Q.    Okay.  All right.  Page three of the
9  report.  And I'm looking at the top partial
10  paragraph.  And you already told me that you didn't
11  conduct interviews of the involved officers.  But you
12  also list that conducting observations is a
13  methodology used in social science, correct?
14    A.    Yes.
15    Q.    Did you conduct any observations?
16    A.    The only observation was to watch the
17  video.
18    Q.    Okay.  All right.  Now let's get into your
19  incident opinions.
20       Your first opinion is that applying an ECD
21  drive stun to the back of a resistive Mr. Kingsley
22  was temperate and consistent with ECD training,
23  national force standards, jail standards and
24  guidelines, correct?
25    A.    Correct.

1    Q.    What ECD training are you referring to?
2    A.    Generally the manufacturer's initial
3  training for instructors on the use of electronic
4  control devices, whether it's Taser or other
5  manufacturers.
6    Q.    Okay.  And when you say "national force
7  standards," what do you mean by that?
8    A.    Generally supreme court decisions.
9    Q.    And what do you mean by "jail standards"?
10    A.    Jail standards could be state jail
11  standards.  It could be departmental jail standards.
12  It could be the recommended standard of the American
13  Jail Association or the American Correctional
14  Association, which although they are called
15  standards, they are really guidelines and that's why
16  at the end there I put "and guidelines."
17    Q.    So you were referring to all of those
18  sources in this opinion heading?
19    A.    Yes.
20    Q.    Okay.  All right.  Now, the first sentence
21  is, "A Wisconsin deputy sheriff knows that the amount
22  of force used must be in relationship to the need for
23  using force."
24       Correct?
25    A.    Correct.

Q.   And you cite Hill 2008?

A.   Yes.

Q.   That's not a Wisconsin source, correct?

A.   No, Hill is not a Wisconsin source.

Q.   And do you know whether Hill 2008 is used to train Wisconsin deputy sheriffs?

A.   Yes.

Q.   So hill 2008 is used to train Wisconsin deputy sheriffs?

A.   Carrie Hill is the -- as an attorney, Carrie Hill primarily specializes in correctional training and has conducted training all over the country.  So it's not that Hill is the standard, it's that Hill teaches the correctional forced.

Q.   Okay.  But Hill 2008 refers to a specific document, correct?

A.   Correct.

Q.   Do you know whether that document is used to train Wisconsin deputy sheriffs or correctional officers?

A.   I know it's been used to train people who have attended Carrie Hill's training programs from Wisconsin.  Now, whether they took it back and used it in their specific training, I would have no knowledge of that.

Q.   And you don't know whether the officers involved in the incident with Kingsley have ever reviewed Hill 2008, correct?

A.   I don't know if they've reviewed hill 2008.  But when you look at the correctional manual, the POSC manual, it references the same cases in there that Carrie Hill references in her work.  So -- so they are the same.  I'm just using Hill as a reference point rather than Hill showed up and trained these people.

Q.   Okay.  And the sentence states that it's your opinion of what a deputy sheriff knows, correct?

A.   Yeah, knows based on the DAAT manual and based on the POSC manual.  I mean, I reviewed those and they said that's what these guys were trained in, so...

Q.   So this is actually just referring to the training that you assume they receive, correct?

A.   Correct.

Q.   Okay.  And you cite the DAAT manual here from March of 2007?

A.   Correct.

Q.   So I guess you would agree, then, that the DAAT manual is relevant to the use of force in correction settings, correct?

A.   Part of it is, yes.

Q.   Which part?

A.   Well, I think the part, you know, that talks about the lawful authority of police or correctional officers, the techniques that -- that the DAAT manual includes certainly would be relevant.  I think those sections would certainly apply in this particular case.

Q.   Okay.  And then the last sentence in that paragraph again is what correctional officers know but, again, you are referring to what you assume they were trained, based on the materials you reviewed, correct?

A.   The last sentence in that paragraph?

Q.   Yes.

A.   Yeah.  Again, you know, jailers and deputy sheriffs who are trained in correctional standards, as evidenced by the manuals I reviewed, in Wisconsin would know that, yes.

Q.   Did you review any training records for any of the individual officers involved in the incident with Mr. Kingsley?

A.   I don't recall reviewing those.

Q.   Do you know if you received them?

A.   I don't believe I did.

Q.   Okay.  In any event, you didn't list them on your case-specific materials on page 11, correct?

A.   No.  If I would have received them, they would have been listed, so I don't recall receiving them.

Q.   Okay.  All right.  And then the next paragraph here you state that "After the deputies who were attempting to control and remove the handcuffs could not control the resisting Mr. Kingsley" -- okay, my question is, how was he not controlled?

A.   He was resisting.

Q.   So he was handcuffed, correct?

A.   That doesn't control anybody.

Q.   Handcuffs does not control anybody?

A.   Handcuffs are a temporary restraint device.  They don't control anybody.  I can tell you about officers who were shot and killed by handcuffed prisoners.  I can tell you about correctional officers who were stuck in the gut with homemade weapons with people handcuffed.

Q.   Okay.  So he was not controlled because he was exhibiting resistive tension, correct?

A.   He was resisting.

Q.   How was he resisting?

A.   He was moving around.

Q.   So the deputies were not in control of him
because he was moving around?  That's your opinion?

A.   Correct.  They weren't in total control of
him.

Q.   Okay.

A.   Handcuffs don't control people.  They are
training restraining devices.

Q.   If he wasn't resisting, would he have been
under the control of the officers?

A.   Well, if he wasn't resisting, he wasn't
resisting.  That -- that's illogical.

That's just the buzz of the phone.

Q.   Do you need a break?

A.   No.

Q.   I guess what I'm getting at, though, is
the lack of control is related solely to his
resistance, correct?

A.   They were trying to take off the handcuffs
and couldn't because he was resisting.  Had he not
been resisting, there would not have been a control
issue.

Q.   Okay.  The next paragraph.  "The ECD drive
stun intervention option was performed only after the
intervention options of presence" -- and then there
is a parenthetical -- "dialogue" -- same -- "and

control alternatives."

Do you see that part?

A.   Yes.

Q.   What was the show of presence here?

A.   Correctional officers.

Q.   The presence of the four officers in the
cell?

A.   Yes.

Q.   And the additional officer outside of the
receiving cell?

A.   Yes.

Q.   Okay.  What about dialogue?

A.   They told him to stop resisting.  They --
I mean, they -- it was just verbal either commands or
discussion from the -- from the officers.

Q.   What about control alternatives?

A.   Well, control alternatives would include,
but they are not limited to, pressure points,
physical control, grabbing the person, use of an ECD
in drive stun mode.  I mean, those are all control
options.

Q.   But here what was used?  What control
alternatives were used with respect to Mr. Kingsley?
Not just in general, what are control alternatives,
but which were the ones used in this case?

A.   Well, they physically grabbed him.  They
physically tried to remove the cuffs.  They put a
knee in his back to hold him down.  I mean, those
would be the physical control options that they
deployed that weren't successful.

Q.   Okay.  And then the sentence continues
onto the next page that those control alternatives or
intervention options "failed to stop Mr. Kingsley
from grunting and resisting their efforts to remove
the handcuffs."

A.   Correct.

Q.   Do you know if he was told to stop
grunting?

A.   I don't think officers would tell somebody
to stop grunting.

Q.   Is grunting a form resistance?

A.   It's often associated with resistance
because as you are resisting, many times if you are
trying to exude strength you do make a grunting is
no.  I mean, that -- that's often associated with
that.

Just like lifting weights, you try to lift
a barbell off the floor with weights, a lot of times
you will grunt.  It gives you that little bit of
extra strength.

In Martial Arts when you make an exhaling
sound it tightens the body and gives you extra
strength.

So grunting is often associated with the
use of more force.

Q.   Did you consider whether the grunting was
an indication of pain rather than resistance?

A.   I can't say that I -- I looked at grunting
as a -- as an outcome of pain.  Usually people don't
grunt when they are in pain unless they are dropped
on or something like that, and then you force air out
of their body or something.  I mean, that could be,
but I didn't really look at a that.

Q.   How about groaning, do you groan when you
are in pain?

A.   Yeah, you can groan when you are in pain.

Q.   Okay.  And the sounds that Kingsley is
making the jury can access as to whether that's pain
sounds or not, correct?

A.   Correct, that's...

Q.   Okay.  And, now, do you dispute that he
actually was in pain at any point in the incident?

A.   I don't dispute it.  He may have been in
pain.  I mean, handcuffs aren't marshmallows.  I
mean, they are steel.  I mean, they -- they can hurt.

1  And when you resist and move around, yeah, he, more

2  than likely, could have been in pain.

3       Q.    And his foot could have been hit on the

4  bed and caused him pain, correct?

5       A.    It could have been.

6       Q.    You don't know that that did not happen,

7  correct?

8       A.    No.

9       Q.    And the Taser hurts, right?

10      A.    Taser hurts.

11      Q.    And he groaned when the Taser contacted

12  his shoulder, correct?

13      A.    As --

14           MR. POSNANSKI:  Objection to the form of

15  the question.

16           THE WITNESS:  As I groan when I'm shocked

17  with a Taser too.

18      Q.    (BY MS. WARD)  Okay.  So he could have

19  been in pain during the incident?

20      A.    Yeah, he could have been in pain.

21      Q.    Okay.  If his resistance was involuntary

22  due to pain rather than an attempt to disobey, for

23  lack of a better word, the officers, does that change

24  your opinion as to whether the use of force was

25  temperate?

1       A.    I can't really answer that question the

2  way it's asked.  And the reason is, at some point in

3  time the Taser was applied and that was pain so I

4  guess we'd have to separate it out more.  It's like a

5  venn diagram, the circles are overlapping and your

6  question is right in the middle of that.

7       Q.    I'm not sure I understand what you don't

8  understand.  Let me just try to rephrase it.

9       A.    Okay.

10      Q.    And let's take the Taser out of it.  Let's

11  take everything that happened up to the Taser,

12  because I think that's the more relevant alleged

13  resistance.

14           If he was in pain and exhibited resistive

15  tension due to his pain --

16      A.    Pain from what?

17      Q.    Either his foot or the handcuffs.

18      A.    Okay.

19      Q.    Or being carried down the hall by his

20  arms.

21      A.    Okay.

22      Q.    Due to anything.  If the resistive tension

23  in his body was due to his pain and not to his desire

24  to thwart the officers' commands -- I'm not thinking

25  of good words here, but does that change your view as

1  to whether the use of the Taser was appropriate?

2           MR. POSNANSKI:  Objection to the form of

3  the question.

4           THE WITNESS:  I'm confused.  You started

5  this by saying we are not going to talk about the

6  Taser and you end the question with is it Taser

7  appropriate.  I'm confused.

8       Q.    (BY MS. WARD)  Okay.  I understand your

9  confusion.  The pain I'm talking about is not related

10  to the Taser but the use of the force is what's

11  really going on at the end of the question, the use

12  of the Taser as force.

13      A.    Okay, I see where you are going.  Okay.

14  Thank you.

15           It doesn't change my opinion at all

16  because he was told to stop resisting.  And he didn't

17  verbalize to anybody that, Hey, it's -- it's the pain

18  in my foot that's causing me to do this, it's the

19  pain in the handcuffs.  The pain of the handcuffs are

20  going to be there, if it was there at all.  And I

21  don't think we can start slicing the bread so thin

22  that, Well, he said the handcuffs hurt so that

23  justifies his tension.  No.

24           I think the video speaks for itself on a

25  lot of that.  And, as I recall, Mr. Kingsley refused

1  medical attention at the end of this.  So if he

2  refused it at the end, I'm not sure there was a lot

3  of pain associated with this throughout.  I'm not

4  Mr. Kingsley; he would have to answer that, but being

5  in pain from handcuffs doesn't legitimize resistance

6  against correctional officers.  I guess that's what

7  I'm saying.

8       Q.    Is an involuntary pain response -- let me

9  ask it again.  Let me withdraw that.

10           Is resistive tension a possible

11  involuntary response to pain?

12           MR. POSNANSKI:  Objection to the form of

13  the question.

14           THE WITNESS:  That's hard to answer.  I

15  mean, that -- it depends on the type of pain.  It

16  depends on the location of the pain.  It would depend

17  what the cause of the pain was.  I mean, if somebody

18  kicked you in -- kicked a male in the groin and then

19  you told him to stand up right away, yeah, there

20  would probably be some resistance there; he wouldn't

21  be able to get up.

22           But if you are talking about pain around

23  the wrist causing resistive tension to the entire

24  body, I'm not so sure that -- that would be

25  associated.

```
 1      Q.    (BY MS. WARD)  Would resistive tension in
 2  the arms be a response to pain in the wrists?
 3          MR. POSNANSKI:  Objection to the form of
 4  the question.
 5          THE WITNESS:  It depends on the type of
 6  resistive tension.  I can have resistive tension by
 7  muscle rigidity.  But I would think that if my
 8  tension was a function of the pain and somebody was
 9  trying to take the cuffs off, I would be really happy
10  to get those cuffs off and try everything I could do
11  to cooperate to make it easier to get those cuffs
12  off, not the opposite.
13      Q.    (BY MS. WARD)  But doesn't that fact make
14  it more likely that the resistive tension in
15  Mr. Kingsley's arms was actually due to pain and not
16  voluntary?
17          MR. POSNANSKI:  Objection to the form of
18  the question.
19          THE WITNESS:  No, I don't think so,
20  because it went on too long.
21      Q.    (BY MS. WARD)  Okay.  You agree that it's
22  possible that the resistive tension in Mr. Kingsley's
23  arms could have been involuntary?
24      A.    I don't know.  And to me it doesn't matter
25  because it's what the officers knew at the time, not
```

```
 1  with 20/20 hindsight, not with hypotheticals.  They
 2  are trying to take the cuffs off this guy.  He's
 3  resisting them.  That's what they know.
 4      Q.    Are you aware from your review of the
 5  video or any of the incident reports or materials --
 6  any of the materials that you looked at in this case
 7  whether Mr. Kingsley said at any point during the
 8  incident that he was not resisting?
 9      A.    I don't recall those specific words.
10      Q.    Okay.  Would that change your opinion, if
11  he did say that and that was clear from some of the
12  evidence in the case?
13      A.    Well, not resisting at one point in time.
14  I mean, this event went on for a bit.  Clearly when
15  they left the cell and came back he wasn't resisting.
16  I would agree with that.
17      Q.    So you just don't know if he said that.
18  You don't recall seeing that in any of the materials?
19      A.    I don't independently recall it.  It may
20  be in my report.  I don't recall it.  I don't recall
21  hearing it on the video but...
22      Q.    Okay.  That's fair.
23          All right.  You cite the DAAT manual from
24  March of 2010, correct?
25      A.    What page, counsel?
```

```
 1      Q.    I'm sorry.  I know where I am but I don't
 2  convey that accurately sometimes.
 3          We are at the place that we just sort of
 4  left off, at the last paragraph on page three,
 5  bridging to page four.
 6      A.    Okay, thank you.
 7      Q.    Okay.  Then, you know, the sentence ends
 8  here, "Failed to stop Mr. Kingsley from grunting and
 9  resisting their efforts to remove the handcuffs."
10      A.    Correct.
11      Q.    Then you say DAAT from March of 2007 at
12  page eight?
13      A.    Yes.
14      Q.    Do you know if that is the version of DAAT
15  that was in effect at the time of the incident?
16      A.    I don't.
17      Q.    Okay.  And at the end of the paragraph you
18  cite the Wisconsin Department of Justice Advisory
19  Committee Recommendations for Training for Employment
20  of an Electronic Control Device by Law Enforcement
21  Officers in Wisconsin -- that's a mouthful -- from
22  June 7th of 2005?
23      A.    Correct.
24      Q.    Okay.  Let's take a look at that document.
25          (EXHIBIT 10 WAS MARKED.)
```

```
 1      Q.    Is this the document that you were
 2  referring to in your expert report?
 3      A.    Yes.
 4      Q.    And I believe you reference this in your
 5  references section of your report as well, correct?
 6  On page six?  Yes?
 7      A.    Yeah, most likely I did.  Yes.
 8      Q.    Now, on page three of that document...
 9      A.    Okay.
10      Q.    You see that -- under the Representing
11  Training Practitioners is listed a Bryan Landers of
12  Wisconsin Dells PD?
13      A.    Yes.
14      Q.    Do you understand that to be plaintiff's
15  expert in this case?
16      A.    Yes.
17      Q.    And he was involved in preparing these
18  recommendations, correct?  In some way, as he's
19  listed here.
20      A.    Well, he is listed.  That doesn't really
21  tell me much but he was there.  It says Representing
22  Training Practitioners.  I'm not sure what that means
23  but, yes, he was there.
24      Q.    Do you believe that -- the fact that he
25  was involved with the preparation of this document in
```

```
 1   some way makes him more qualified to opine on it than
 2   you?
 3            MR. POSNANSKI:  Objection to the form of
 4   the question.
 5        Q.   (BY MS. WARD)  You can answer.
 6        A.   I don't recall Mr. Landers being a Taser
 7   instructor.  And if you are not a Taser instructor,
 8   then that tells me the only thing you are opining on
 9   is maybe collateral issues regarding use of force.
10        Q.   So you believe Mr. Landers is not a Taser
11   instructor?
12        A.   I didn't recall seeing that.  I think he
13   took some Taser courses, I think some user-level
14   courses.
15        Q.   You don't know whether he's trained
16   Wisconsin corrections or law enforcement officers in
17   use of the Taser?
18            MR. POSNANSKI:  Objection to the form of
19   the question.
20            Go ahead.
21            THE WITNESS:  That I don't.  I haven't
22   seen any training records of who he may have trained.
23        Q.   (BY MS. WARD)  Okay.  Why don't you turn
24   to page five.
25        A.   Okay.
```

```
 1        Q.   Understand bullet point five, second
 2   paragraph.
 3        A.   Oh, okay.  I see where you are.  Got you.
 4        Q.   It says, "Active resistance occurs when an
 5   officer encounters behavior which physically
 6   counteracts his or her attempt to control and which
 7   creates risk of bodily harm to the officer, subject
 8   or other person."
 9            Now, is it your opinion that this
10   definition is consistent with saying that
11   Mr. Kingsley was actively resisting on the day of the
12   incident?
13        A.   Absolutely.
14        Q.   And tell me why.
15        A.   Because the next paragraph defines bodily
16   harm by the Wisconsin statute as physical pain or
17   injury.
18        Q.   Uh-huh.
19        A.   Any time you are trying to unhandcuff
20   someone and they are resisting, if you get your
21   fingers caught in the chain because of their
22   movements, there is a risk of injury, even serious
23   injury.
24            And as this document defines active
25   resistance, it doesn't say anything about the
```

```
 1        Q.   And this is the Disturbance Resolution
 2   model that we talked about earlier, correct?
 3        A.   Yes.
 4        Q.   And the recommendation of this committee
 5   is that an electronic control device would be at the
 6   same level as OC spray, correct?
 7        A.   Yes.
 8        Q.   Do you know where Monroe County places the
 9   use of an ECD device in the use of force continuum?
10        A.   Independently, no.  Sitting here, I don't
11   recall.
12        Q.   Did you review any Monroe County policies
13   in your work in this case?
14        A.   I don't recall that I did.
15        Q.   Okay.  And they are not listed in your
16   references section in either of your reports,
17   correct?
18        A.   No.
19        Q.   Do you know how Wisconsin defines active
20   resistance?
21        A.   I'm trying to recall from the DAAT manual,
22   and I thought I put that in my report.
23        Q.   Well, let me direct you in this document
24   to page seven.
25        A.   Okay.
```

```
 1   seriousness of the injury, it says "which creates
 2   risk of bodily harm to the officer."  So certainly
 3   that applies and it certainly applies in this case.
 4        Q.   Does the risk have to be more than a
 5   possibility?  Does it have to actually be imminent
 6   risk?
 7        A.   No.  Risk is risk.  It's not outcome-
 8   determinative.
 9        Q.   Okay.
10        A.   This is just risk.
11        Q.   So any level of risk?
12        A.   Well, not -- no, not any level of risk.
13   It says risk of bodily harm.  That's not any level of
14   risk.  That's qualified as creates risk of bodily
15   harm.  It doesn't say significant risk, doesn't say
16   minimal risk, it just says risk.
17        Q.   So a very low risk of bodily harm would
18   qualify as active resistance; is that your opinion?
19        A.   Yes.
20        Q.   Okay.  Let's go back to your expert
21   report.  Again, it's --
22        A.   So we are finished with Exhibit 10?
23        Q.   Yes.
24        A.   Okay, thank you.
25        Q.   We are back in Exhibit 1, your expert
```

1    report.

2        A.    Okay.

3        Q.    The second full paragraph starts with, "In

4    contrast to an ECD probe deployment."

5        A.    This is on page four?

6        Q.    Yes.

7        A.    Okay.

8        Q.    And now you are citing -- well, you are

9    talking about that the drive stun mode doesn't cause

10   NMI, correct?

11       A.    Correct.

12       Q.    And for that you cite Version 13 of the

13   Taser International Instructor Lesson Plan from May

14   of 2006, correct?

15       A.    Correct.

16       Q.    At the end of the paragraph you cite

17   Version 17 from May of 2010, correct?

18       A.    Yes.

19       Q.    Why did you cite both versions of the

20   Taser International Instructor Lesson Plan?

21       A.    I cited them both because I made the

22   assumption that the officer wasn't trained -- the

23   correctional officer wasn't trained the day he used

24   it. So I went back to 2006 to show continuity that

25   this was the training definition from 2006 through

1    Version 17, which was in effect on May of 2010. So I

2    gave a range, basically, saying, look, this -- this

3    is kind of the start and the end of this.

4        Q.    So between the two manuals, the training

5    standards would be in there somewhere?

6        A.    Right. They are all the same.

7    Neuromuscular incapacitation isn't caused by drive

8    stun. And I went back to 2006. I made the

9    assumption, as part of this opinion, that the officer

10   wasn't trained the day of the use of the device, that

11   he was trained prior to that. So I just picked 2006

12   as Version 13 and then I picked Version 17, which was

13   in effect 2010.

14       Q.    Is there a Version 14?

15       A.    There is 14, 15 and 16.

16       Q.    And why didn't you use one of those?

17       A.    Because they are all the same.

18       Q.    Identical?

19       A.    They are not identical but drive stun is a

20   drive stun. It doesn't change. Drive stuns do not

21   cause neuromuscular incapacitation. Whether that was

22   in Version 1 or in the current version of 18, it just

23   doesn't change.

24       Q.    Was Version 16 the likely version in

25   effect before May 1st, 2010?

1        A.    Yes.

2        Q.    All right. I want to look at the Version

3    17. And I don't think we have two copies of this due

4    to a copying error.

5              Is that correct?

6              MR. GRAHAM: Yes, it is.

7              (EXHIBIT 11 WAS MARKED.)

8        Q.    (BY MS. WARD) There is tabs in there

9    because the Taser manual is not paginated and I

10   didn't want us to have to count slides --

11       A.    Thank you.

12       Q.    -- for hundreds of pages.

13             So what I wanted to look at is I think the

14   source of where -- of your citation, I think,

15   although you were citing Version 13. The first tab,

16   the middle bullet point, "The drive stun will

17   typically not cause NMI, only pain compliance,"

18   correct?

19       A.    Correct.

20       Q.    And the statement in your report says it

21   will not cause NMI and generally does not cause

22   incapacitation. It's slightly different than what's

23   in Version 17, correct?

24       A.    It is, but this is referring to something

25   else too.

1        Q.    Okay. With Mr. Kingsley, would using the

2    probes have been preferred for an NMI effect?

3        A.    No.

4        Q.    Why?

5        A.    Probe spread is about one foot for every

6    seven feet of distance. When the probes come out of

7    the cartridge they come out at an angle like this and

8    they separate, if you will. So from a distance of

9    approximately you to me right now, about seven feet,

10   more or less, if I shot you with the Taser, the

11   probes would go about a foot apart.

12             The deputies would have had to have

13   stepped back seven or eight feet to deploy the Taser.

14   Mr. Kingsley's handcuffed. There would have been no

15   point in doing that.

16             Had they done the probe deployment, say

17   within six inches -- and my hand -- just for the

18   record is about six inches from defense counsel -- at

19   this point it wouldn't have gotten a spread.

20             The only way to really effect

21   neuromuscular incapacitation is with the spread. So

22   the wider the spread, the more there is a

23   neuromuscular incapacitation. That's the first

24   problem.

25             The second problem is if I deploy the

1   Taser in probe mode, the wires would have come out
2   and the wires would have come out and because of the
3   deputies' proximity they, too, could have been
4   shocked by getting tangled up in the wires.  It would
5   have been very impractical to do a probe shot.  There
6   was no reason to do a probe deployment.
7       Q.   Okay.  Let's go to the next tab in the
8   document.
9       A.   Oh, sorry.
10      Q.   Yeah, the color photo of someone's back.
11          So the drive stun mode is a pain
12  compliance technique, correct?
13      A.   Generally.  And let me just explain that,
14  because it ties into the previous tabbed page.
15          If I aim the Taser at somebody and a probe
16  missed but one probe connected, it's not going to be
17  effective because I haven't completed the circuit.
18  I've got a probe off here in space that's not
19  completing the circuit.
20      Q.   Uh-huh.
21      A.   But if I take the Taser and I drive stun
22  you, it completes the circuit.  So the drive stun --
23  the application of the drive stun isn't going to
24  cause neuromuscular incapacitation at that local
25  area.  But because it completes the circuit where the

1   probe is, it will cause NMI up where the probe is.
2       Q.   Uh-huh.
3       A.   So that's why on the previous statement I
4   said it -- it's close.  You can effect NMI if you do
5   what's called a three-point contact, where you are
6   completing the circuit.  That circuit will cause NMI,
7   say, up to the back where the probe is.  But where
8   you have it down on the calf, it's not going to cause
9   necessarily NMI at the calf, it's only going to be
10  pain compliance.  So that's the difference in the
11  application.
12      Q.   Okay.  So let me see if I can unwrap what
13  you just said.
14          Two questions.  Could the officers in the
15  incident with Mr. Kingsley have used the Taser in a
16  manner to cause NMI?
17      A.   Could they have?  If they used a probe
18  deployment, sure.  But at that close distance, it
19  probably wouldn't have caused NMI.
20      Q.   Okay.  Second question.  Use of the Taser
21  in drive stun mode without use of the probes is a
22  pain compliance technique, correct?
23      A.   Yes.
24      Q.   So it's painful, correct?
25      A.   Yes.

1       Q.   And it can leave marks on the body; is
2   that right?
3       A.   It can.
4       Q.   Have you ever been Tased?
5       A.   Many, many times.
6       Q.   Really?  Can you describe what the pain
7   feels like?
8       A.   Well, in a probe mode -- or just drive
9   stun?
10      Q.   Just drive stun?
11      A.   It feels like a bee sting.
12      Q.   Okay.
13      A.   That's what it feels like until it's
14  removed.  So when it's applied to you it's -- you can
15  feel the electricity.  Probably the best analogy I
16  can give -- there is probably two analogies I can
17  give you.  One is -- is -- and maybe girls didn't do
18  it at this age but boys did take a nine-volt battery
19  and put it on your tongue and you got shocked.  I
20  mean, that's basically what it was.
21          Or in high school you had a Van de Graaff
22  generator in your chemistry class and you put your
23  hand on it and you felt the electricity come up your
24  article, it's not that pervasive, it's just localized
25  and it feels like a bee sting.

1       Q.   A bee sting is a little, tiny point,
2   correct?
3       A.   Yeah, generally.
4       Q.   And a Taser -- what is the surface area of
5   the Taser drive stun on the skin, the skin contact
6   surface area size-wise?
7       A.   About the size of a BB.  Very small.
8       Q.   And that's specifically the X26 Taser?
9       A.   They are all the same.
10      Q.   Okay.
11      A.   I take that back.  The M26 and the X26 are
12  the same.  The X3 and the X2 are different.
13      Q.   And X3, X2 are newer models?
14      A.   Yes.
15      Q.   When you were Tased in -- without the
16  probes in drive stun mode, does it leave a mark?
17      A.   It depends on the person.  It depends --
18  there is a lot of variables there.  If I'm wearing a
19  jacket or I'm wearing heavy clothing it may or may
20  not.  If I'm wearing a T-shirt or I don't have a
21  shirt on, it might.  Basically the way it was
22  explained to me is, is the electricity goes through
23  the skin, it causes a histamine effect.  And that's
24  what causes the little bump that we see on your
25  second tab photograph there.

**Page 133**

1     If it's left on for an extended duration

2  of time it's called a friction abrasion.  It would

3  basically be the same as -- in the room where we are

4  in there is carpet on the floor and you drug your

5  elbow across the carpet, the heat would create a

6  friction abrasion.  And it could scab over.

7     Q.    Do you know whether know Mr. Kingsley had

8  any marks on his skin after the drive stun?

9     A.    I didn't see any photographs so I wouldn't

10  know.

11     Q.    Okay.  Would it have been good practice to

12  take photographs of the Tased area?

13     MR. POSNANSKI:  Objection to the form of

14  the question.

15     THE WITNESS:  Well, in a drive stun,

16  generally not, unless the person complained that, you

17  know, he felt like it -- you know, he got burned or

18  something, which was, again, not likely.

19     Now, if the person said, Hey, you did the

20  drive stun on my groin area, you know, you might want

21  to take photographs of that.  But, generally -- and,

22  again, it's agency policy.  It's really what the

23  agency determines at that point through policy, take

24  pictures, not take pictures, when to take pictures,

25  when not to take pictures, if they take them at all.

**Page 134**

1     Q.    (BY MS. WARD)  Do you know what the

2  applicable policy was in effect at the time of the

3  Kingsley incident?

4     A.    No.

5     MR. POSNANSKI:  Objection to the form of

6  the question.

7     Q.    (BY MS. WARD)  Okay.  Let's put the Taser

8  manual away.  Go back to your expert report.

9     A.    Okay.

10     Q.    Exhibit 1.  Okay.  We are going to go to

11  the next paragraph there.

12     A.    On page four?

13     Q.    On page four, where we were.

14     A.    Okay.

15     Q.    And it starts with, "A content analysis of

16  the recorded video segments."

17     A.    Yes.

18     Q.    Does that mean you watched the video?

19     A.    Yes.

20     Q.    Okay.  Now, the jury can watch the video

21  and come to a different conclusion than you, correct?

22     A.    Or the same, you're right.

23     Q.    Okay.  Now, you say the video shows the

24  removal of an actively resisting, and then you say --

25  that is in parentheses -- "a decision made by

**Page 135**

1  Mr. Kingsley to become dead weight and become

2  uncooperative with the deputies."

3     A.    Yes.

4     Q.    Okay.

5     MR. POSNANSKI:  Just for clarification, I

6  think it says "be uncooperative." not "become

7  uncooperative."

8     MS. WARD:  Oh, I'm sorry.  That's true.

9  Let me say it again.

10     Q.    "I.e., a decision made by Mr. Kingsley to

11  become dead weight and be uncooperative with the

12  deputies."

13     A.    That's correct.

14     Q.    Does becoming dead weight fit into

15  Wisconsin's definition of active resistance that we

16  reviewed a couple minutes ago?

17     A.    I would say it does.

18     Q.    And then watching the video also

19  identified that at least one deputy repeatedly told

20  Mr. Kingsley to stop resisting.

21     Do you see that?

22     A.    Where are you?  I'm sorry, I...

23     Q.    It's a long sentence.

24     A.    Which paragraph?

25     Q.    The same paragraph we were just

**Page 136**

1  discussing.

2     A.    Okay.

3     Q.    It starts with "A content analysis."

4     A.    Okay.

5     Q.    So you are saying you watched the video

6  and you saw on the video or heard on the video that

7  at least one deputy repeatedly told Mr. Kingsley to

8  stop resisting, and you cite the Hendrickson incident

9  report, correct?

10     A.    Correct.

11     Q.    Okay.  And my question is, are officers

12  trained, either formally or informally, to repeatedly

13  tell subjects to stop resisting during use of force

14  incidents?

15     A.    Contemporary training would be yes, that

16  you -- it's recommended that you do.  In come cases

17  you can't but it's recommended that you do.

18     Older training, 25 years ago, maybe not,

19  but the more contemporary training, yes.  It's a

20  recommendation.

21     Q.    And the difference is based on the fact

22  that more use of force incidents are captured on

23  videotape?

24     A.    No, I don't think that's the reason.

25  Videotapes are a relatively new phenomenon when it

```
 1   comes to cell phones and that type of thing.  I think
 2   it's mostly for putting the suspect on notice, "stop
 3   resisting."  And then you can articulate that in your
 4   report, "Look, I told you to stop resisting.  You
 5   made a conscious decision not to stop resisting so
 6   that led me to use additional levels of force,"
 7   whatever those levels might have been.  Or if they
 8   chose to do that.
 9        Q.   And I think we already talked about this
10   but do you recall after he was told to stop resisting
11   whether Mr. Kingsley said at any point, "I'm not
12   resisting"?
13             MR. POSNANSKI:  Objection.  Asked and
14   answered.
15             MS. WARD:  I guess I did ask.
16             THE WITNESS:  I think I said I don't
17   recall.
18        Q.   (BY MS. WARD)  Okay.  Fair enough.
19             And you want to look at the next sentence
20   in that paragraph.  You cite to Hendrickson's report
21   again for the part where Mr. Hendrickson states that
22   Mr. Kingsley physically resisted the placing of a
23   second hand in the handcuffs.
24        A.   Right.
25        Q.   Is that accurate?  Okay.
```

```
 1   person is resisting you that you can't and shouldn't
 2   put your knee on a person's back or across their
 3   legs.  Every defensive tactics manual I've ever seen
 4   or reviewed suggests that.
 5        Q.   How about the applicable Wisconsin
 6   manuals, POSC and DAAT?
 7        A.   Well, POSC doesn't have techniques in it.
 8   It's not an instructional manual.  It's a
 9   theoretical, conceptual document.
10        Q.   Same for DAAT?
11        A.   No, DAAT's specific.
12        Q.   But is there -- is there anything that
13   goes to this point in the DAAT manual?
14        A.   For controlling somebody, sure, you can
15   lay cross their legs, you can put your knee across
16   their legs.
17        Q.   Aren't we talking about upper back here?
18        A.   Well, I think -- if I'm reading the same
19   sentence you are, the placing of a knee and the lower
20   leg across the upper back, yes.  I'm sorry, I see
21   where you are going.  I said leg.  The leg can be
22   used to put on the upper back.  That's recommended.
23        Q.   And that's in the DAAT manual?
24        A.   I couldn't tell you the page number on
25   that but I'm fairly positive that it's in there as a
```

```
 1        So you understand Mr. Kingsley disputes
 2   this, correct?
 3        A.   Yes.
 4        Q.   And so you credited the officer's version
 5   here rather than Mr. Kingsley's version?
 6        A.   I just recited the officer's version here.
 7        Q.   You didn't recite Mr. Kingsley's version,
 8   though, correct?
 9        A.   I didn't put that in that paragraph, you
10   are correct.
11        Q.   And that part of the incident isn't shown
12   in the video, correct?
13        A.   That's correct.
14        Q.   Let's move to the next paragraph.  And my
15   question there is related to the last sentence.  "The
16   placing of a knee and the lower leg across
17   Mr. Kingsley's upper back is consistent with national
18   correctional training."
19             Do you see that?
20        A.   Correct.
21        Q.   And there is no such thing as national
22   correctional training, correct?
23        A.   Well, there is no national standards for
24   correctional training, but I don't know of any
25   defensive tactics program that doesn't say that a
```

```
 1   control -- for controlling people from moving around.
 2        Q.   Okay, so -- we just covered this, but your
 3   opinion is that Mr. Kingsley was resisting when he
 4   was in the receiving cell, correct?
 5        A.   Yes.
 6        Q.   Now, for the force to be reasonable -- and
 7   by force I mean the application of the Taser -- he
 8   had to be resisting when he was Tased, correct?
 9        A.   I'd have to ask you to define "resisting."
10        Q.   Well, let me turn that around and ask you,
11   was Mr. Kingsley resisting when he was Tased?
12        A.   In my opinion, he was not being
13   cooperative and he was -- in that not being
14   cooperative, his actions caused the officers to
15   decide to use -- use the Taser.
16        Q.   So was he actively resisting when he was
17   Tased?
18        A.   In the resistance that I saw, and
19   according to the definition that we reviewed earlier,
20   yes.
21        Q.   Okay.  Now let's watch the video.  Unless
22   anyone needs a break.  We are at about another hour.
23        A.   Can I take a --
24        Q.   Yes.
25        A.   Just a quick break.
```

1    Q.    Yes.  That's fine.  I have to as well.

2          (A break was taken from 12:09 p.m. to

3    12:14 p.m.)

4    Q.    We are looking at a still shot of the

5    receiving cell that Mr. Kingsley was carried to on

6    the 21st, correct?

7    A.    Correct.

8    Q.    I'm going to have Joel run the video and

9    what I would like you to do is tell me if you can see

10   resistance on the part of Mr. Kingsley at any point.

11   A.    Okay.

12   Q.    And when you see it, you can stop the

13   video.  Just say "stop" and then we'll talk about it.

14   A.    Okay.

15   Q.    Okay.  Go ahead.

16   A.    Stop.  There is resistance right there.

17   They got to carry him in.

18   Q.    Okay.  So carrying him in is resistance?

19   A.    He is dead weight.

20   Q.    Okay.  Keep going.

21   A.    All right, stop.  I think the officer told

22   him to relax.

23   Q.    Okay.  I want you to focus on

24   Mr. Kingsley.  Stop only when you see him resisting.

25   Can you see Mr. Kingsley in this shot?

1    A.    Not in that shot, no.

2    Q.    Okay.  So not what the officer said, but

3    in that shot did you see any resistance?

4    A.    I can't see him so the answer would be no.

5    Q.    Okay.  Continue.

6    A.    Stop.  When Mr. Kingsley says, "Get the

7    fuck out," I think that's resistance.  That's verbal

8    resistance.

9    Q.    Okay.  Continue, please.  Stop.

10         Did you hear Mr. Kingsley say, "I am not

11   resisting"?

12   A.    I heard him say that.

13   Q.    Okay.

14   A.    I think your rule applies to both.  If we

15   can't use verbal on the officer, then we can't use

16   verbal on Mr. Kingsley so it cancels each other out.

17   Q.    Well, I was just asking about that as a

18   separate question to the question about show me where

19   resistance.

20   A.    I understand that.  I'm anticipating

21   cross-examination so I just want to make the record

22   clear.

23   Q.    Okay.  No problem.  Let's continue on with

24   the exercise of you showing me when you see

25   resistance from Mr. Kingsley.

1          Stop the video, please.  Okay.  Again,

2    this is not going to the question of can you see

3    Mr. Kingsley resisting, but it's a separate question.

4    Can you identify the officers in the shot starting

5    from the top and going down on the left side of the

6    cell as we look at it?

7    A.    No.

8    Q.    How about the officer on the right-hand

9    side of the cell with no hair?

10   A.    I think that's the lieutenant.  I believe.

11   I could be wrong.  I'm not sure.

12   Q.    Lieutenant Conroy?

13   A.    Conroy, I believe.

14   Q.    Okay.  Do you know?

15   A.    I don't know for sure, no.

16   Q.    Okay.  All right.  Let's continue on with

17   showing me where Mr. Kingsley is resisting.

18         Continue, Joel.  Does that screen go all

19   the way to the end, Joel?

20         MR. GRAHAM:  No.

21         MS. WARD:  No?  Okay.

22         Okay.  Then that's the end of the video

23   so -- can we go off record for a second?

24         (Discussion off the record.)

25   Q.    (BY MS. WARD)  So when you watched the

1    video you have identified Mr. Kingsley becoming dead

2    weight and a verbal statement he made as being the

3    resistance that you could observe in the video,

4    correct?

5    A.    Correct.

6    Q.    And do either of those acts of resistance

7    cause an immediate tangible threat to the officers?

8          MR. POSNANSKI:  Objection to the form of

9    the question.

10         THE WITNESS:  Well, the dead weight would,

11   by Wisconsin definition.

12   Q.    (BY MS. WARD)  How so?

13   A.    Risk of injury to the officers.

14   Q.    How would they be injured by carrying

15   Mr. Kingsley?

16         MR. POSNANSKI:  Objection to the form of

17   the question.

18         THE WITNESS:  Could be a back injury.

19   Could be finger injuries.  We are talking risk here,

20   we are not talking specific injuries.

21   Q.    (BY MS. WARD)  Well, the question was

22   "threat."  Was there a threat to their safety?

23         MR. POSNANSKI:  Objection to the form of

24   the question.

25         THE WITNESS:  I think when you are a dead

1  weight you are a threat to somebody's safety,
2  potentially.
3      Q.     (BY MS. WARD)  Potentially?
4          MR. POSNANSKI:  Same objection.
5          THE WITNESS:  We can't look at this in
6  isolation.  We have to look at it as the flow of the
7  event.  If -- if a suspect or, in this case, an
8  inmate, chooses to become dead weight, that shows
9  intent on the inmate to not be cooperative.
10          According to the Wisconsin definition of
11  active resistance, it's the risk of causing injury.
12  If I'm holding somebody and they suddenly go dead
13  weight, I could be injured doing that.  There is a
14  huge risk of injury there.
15          And if I've got to drag them into a cell,
16  there is more of a risk of injury, because at any
17  given moment that person could decide to become
18  active and stop being dead weight.  So from an
19  officer safety viewpoint, looking at it from the
20  perspective of officer safety, the risk is there.
21  That's what I'm discussing.
22      Q.     (BY MS. WARD)  Mr. Kingsley wasn't dead
23  weight or being carried when he was contacted with
24  the Taser, correct?
25          MR. POSNANSKI:  Objection to the form of

1  were very close to the wall of that cell.  If
2  Mr. Kingsley would have -- he didn't -- or he didn't
3  appear to -- and it wasn't reported that he did --
4  but if I'm trying to remove that cuff and he suddenly
5  rolled and caught my fingers in it, I could suffer an
6  injury from the cuff, I could have had my head driven
7  into the wall.  I mean, there is a lot of
8  possibilities.  Granted, they didn't take place.  But
9  from an officer who's looking out for his or her own
10  safety, those are factors you have to consider from
11  an officer safety viewpoint.  So resistance is a
12  threat.
13      Q.     (BY MS. WARD)  And the form of the
14  resistance at that point was the tensing of the arms,
15  according to the officers, correct?
16      A.     Correct.
17      Q.     All right.  Now I want to go to the next
18  page of your report, page five.
19      A.     Okay.
20      Q.     And the first sentence at the top of the
21  page.  Oh, I'm sorry I -- put that on pause.
22          Did we mark the video.
23          THE REPORTER:  No.
24          MS. WARD:  We would like to mark the video
25  as Peters Exhibit 12?

1          (EXHIBIT 12 WAS MARKED.)
2      Q.     (BY MS. WARD)  So looking at page five of
3  your report, it says at the top, "It was only after
4  Mr. Kingsley turned his head towards Sergeant
5  Hendrickson's leg, which caused Sergeant Hendrickson
6  to believe that Mr. Kingsley was going to bite him,
7  that Deputy Degner applied his ECD to Mr. Kingsley
8  for a standard five-second application."
9          And then there is a parenthetical, "at
10  approximately 6:45 a.m."
11          Is that accurate?
12      A.     Yes.
13      Q.     Okay.  You don't know what Sergeant
14  Hendrickson believed, correct?
15      A.     No, only from what he -- what his report
16  said.
17      Q.     Okay.  And is it your testimony that his
18  incident report says he believed he was going to be
19  bitten?
20      A.     I'd have to go back and look at the actual
21  incident report.
22      Q.     Okay, let's do that.
23          (EXHIBIT 13 WAS MARKED.)
24      Q.     I've just handed you what we marked as
25  Exhibit 13.  Do you recognize this as a copy of

---

1  the question.
2          THE WITNESS:  He was on the bunk.
3      Q.     (BY MS. WARD)  Correct.  So he wasn't
4  being carried.
5      A.     Right, but that wasn't your previous
6  question.
7      Q.     At the time he was Tased was there an
8  immediate threat to the officers from Mr. Kingsley's
9  resistance?
10          MR. POSNANSKI:  Objection to the form of
11  the question.
12          THE WITNESS:  Immediate threat -- he was
13  resisting, according to the officers.  Doing a drive
14  stun may have mitigated that resistance so they could
15  have removed the handcuffs.  So the threat was
16  consistent -- consistently there but in a different
17  format.
18      Q.     (BY MS. WARD)  What was the format of the
19  threat when he was Tased?
20          MR. POSNANSKI:  Objection to the form of
21  the question.
22          THE WITNESS:  The act of resistance of not
23  letting them remove the cuffs.  See, one of the
24  things I think we have to look at here in the video
25  was very, very, very clear on this.  Those officers

1  Sergeant Hendrickson's incident report regarding the

2  incidental with Mr. Kingsley?

3      A.    Yes.

4      Q.    And you can take your time in responding

5  to the question, but does this report anywhere say

6  that Sergeant Hendrickson believed that Mr. Kingsley

7  was going to bite him at any point in the incident?

8      A.    It says Mr. Kingsley -- this is page three

9  of the report.  "Mr. Kingsley turned his head toward

10  my leg and I immediately secured his head with my

11  right hand to be avoid being bitten."

12      Q.    Okay.  So that's your evidence that

13  Mr. -- Sergeant Hendrickson believed he was going to

14  be bitten?

15      A.    That's in this report, but I think we

16  can't -- I think we need to also look at Monroe

17  County Supervisory Taser International Use Report,

18  which I also cited at the end of that sentence.

19      Q.    Okay, we can do that.

20          Is there anything else in this report that

21  supports the statement that Sergeant Hendrickson

22  believed he was going to be bitten?

23      A.    No, that's it.

24      Q.    Okay.  Let's look at the other report that

25  you referenced, the Supervisory Taser Report.

---

1      A.    Are we finished with Exhibit 13?

2      Q.    Yeah, you can put that one aside.

3      A.    Okay.

4          (EXHIBIT 14 WAS MARKED.)

5      Q.    We just handed you Exhibit 14.  Same

6  question.  Point to anything in this report that

7  suggests that -- I'm sorry -- that supports your

8  statement that Sergeant Hendrickson believed he was

9  going to be bitten.

10      A.    No, it doesn't say anything about the

11  bite.  I think I used this to support the fact that

12  the Taser was used.

13      Q.    Okay.  And the sentence that we just read

14  in your expert report, Exhibit 1, it was -- it states

15  that it was only after Mr. Kingsley turned his head

16  towards Sergeant Hendrickson's leg that the Taser was

17  used, correct?

18      A.    Correct.

19      Q.    So I want to look at the video again.  And

20  I apologize for doing this again but I'm going to

21  have a different question as we review the video.

22  Let's just go off the record to set that up.  But I

23  promise it's the last time we'll look at it.

24          (A break was taken from 12:32 p.m. to

25          12:33 p.m.)

---

1          We are going to watch it again and my

2  question this time is -- I want to show you where

3  the Taser is directly in response to Kingsley moving

4  as if to bite.

5      A.    Okay.

6      Q.    Okay.  We scan stop the video because my

7  question went up to the point of the Tasing.

8          At any point right before the application

9  of the Taser did you see Mr. Kingsley move as if to

10  bite Sergeant Hendrickson?

11      A.    Just prior to the stopping of the video

12  there was some movement but you can't tell when the

13  Taser application was made so I -- based on the video

14  you really can't tell.

15      Q.    You can't tell when the Taser was

16  deployed?

17      A.    No, you can see the article go in but that

18  doesn't necessarily indicate when the application was

19  made.

20      Q.    Is there a sound that a Taser makes when

21  it's deployed that you can hear in the video?

22      A.    Not in drive stun mode.

23      Q.    It's silent?

24      A.    If it's full contact, yes, you don't hear

25  much at all.

---

1      Q.    Okay.  Is it reasonable to assume that

2  when the article went in that that was the moment at

3  which Mr. Kingsley was Tased?

4      A.    I would say it's reasonable to assume

5  that -- close proximity to that but not the moment

6  the article was put in.

7      Q.    Okay.  Why don't we do this, Joel.  Can

8  you go back a little bit?  If you can look at the

9  time stamps and tell me between when and when he was

10  Tased.

11      A.    I don't know because you can't see it

12  against his body.

13      Q.    Okay.

14      A.    There is no way of knowing that.

15      Q.    But you can see the Taser at other parts

16  and you know that it's not against his body, correct?

17      A.    Correct.

18      Q.    Okay.  The point at which he could

19  possibly be being Tased, when it starts and when it

20  ends, I want you to tell me what the time stamp says,

21  based on what you observe in the video.

22      A.    Stop.

23      Q.    Okay?

24      A.    Somewhere around 6:45 it looks like, what,

25  33?

1    Q.    Okay.  And that's the time stamp on the
2 video itself and not the computer program, for the
3 record?
4    A.    Correct.
5    Q.    Okay.  And now when there's -- you know,
6 when it's no longer possible that he's being Tased.
7    A.    All right.  6 -- stop there at 6:45, about
8 46.  Mr. Kingsley makes sort of a growing sound,
9 which may indicate that the Taser used then, but we
10 know it was only a five-second cycle for the
11 deployment so -- again, you can't really see contact
12 made.  But from the sound, that would possibly
13 indicate that that that's when it took place.
14    Q.    And "the sound," you mean the sound
15 Mr. Kingsley made?
16    A.    Right.
17    Q.    Okay.  Is it -- you want to hit start
18 again?  Is it still possible that he is being Tased
19 right now?  Just based on Mr. Conroy's -- I'm
20 sorry -- who was standing --
21    A.    No, you can't -- I don't think anybody
22 could say that one way or the other.
23    Q.    Tell me when you can see the Taser again,
24 when you know it's not being used.
25        Oh, that's not going to work.

1    Q.    Sergeant Hendrickson is turned away from
2 Mr. Kingsley's head, correct?
3    A.    I can't see Mr. Kingsley's head.
4    Q.    Do you know where it is in proximate --
5 proximity to where Mr. Hendrickson is standing?
6    A.    It would probably be either directly below
7 him or to the right of him.
8    Q.    Okay.  And he is turning in this direction
9 at that point, correct?
10    A.    His head is.
11    Q.    Okay.  Is his head turning in that manner
12 consistent with a fear that he is going to be bitten
13 at that exact moment, 6:45:28 on the time stamp?
14    A.    I couldn't answer that.
15    Q.    Why not?
16    A.    I don't know what he's seeing.
17    Q.    You don't know what he's seeing?
18    A.    Correct.
19    Q.    Could he be seeing Mr. Kingsley moving as
20 if to bite him, the way his eyes are pointed?
21        MR. POSNANSKI:  Objection to the form of
22 the question.
23        THE WITNESS:  That video is so dark I
24 don't think -- I can't see where the sergeant's eyes
25 are looking.  If you can point that out to me, I

1 would be glad to consider it but...
2    Q.    (BY MS. WARD)  His head is turned away
3 from Mr. Kingsley's head, correct?
4    A.    In that still shot where you stopped it,
5 yes, it's turned to the -- kind of left, I guess.
6        Now it's back at 6:45:23.
7    Q.    And it's still away at 6:45:25, correct?
8    A.    When you say "still away," it went back at
9 23 and it went back at 25 so it wasn't away the
10 entire time.
11    Q.    Why don't we do this, because this was
12 earlier in time when he was looking at him.  Maybe
13 you can identify when he turns his head to look away.
14        He is clearly looking at Mr. Kingsley's
15 head here, correct?  Or his head is turned such that
16 he could see Mr. Kingsley's head, correct?
17    A.    It appears to be that.
18    Q.    Okay.  Tell me when he looks away, the
19 time stamp.  First, when he first looks away.
20    A.    There.
21    Q.    Okay.  6:45:11.
22    A.    Okay.
23    Q.    And play.
24    A.    Now he is back.
25    Q.    Okay, at 6:45:15, so for about four

1        So at 6:46 --
2    A.    Right there.
3    Q.    -- that's being held against his back.
4 Right.  So when it comes off his back at 6:46, that's
5 when you know it's not Tasing him, right?
6    A.    No, that's when you know it's not in
7 contact with his back.
8    Q.    Okay.
9    A.    We don't know in that time frame when the
10 five-second deployment took place.
11    Q.    Okay.  But we did define a start and an
12 end for the possible deployment time, right?
13    A.    Well, we defined when the article went in,
14 when it could have been placed.
15    Q.    Right.
16    A.    But we don't know exactly in that time
17 frame when that five-second duration --
18    Q.    I understand.
19    A.    I associated it with Mr. Kingsley's
20 grunting, I guess we could call it.
21    Q.    Okay.  Understood.  Okay.
22        Now, Joel, I want you to go back one more
23 time.
24        Okay.  This is 6:45:28, correct?
25    A.    Correct.

1    seconds he looked away, correct?
2        A.    Okay.
3        Q.    Right.  Play again, Joel.
4        A.    Looked away.
5        Q.    And he looked away again at...
6        A.    About 18.
7        Q.    At 18.  Play.
8        A.    Look back at 20.
9        Q.    So for about two seconds again he looked
10   away, correct?
11       A.    Yeah.
12       Q.    Okay.  Stop.
13       A.    About 23 he looked away again.
14       Q.    Okay.  Stop.
15       A.    Back at about 31.
16       Q.    Okay.  23:31 is eight seconds, correct?
17       A.    Correct.
18       Q.    So he was looking away for about eight
19   seconds, correct?
20       A.    Correct.
21       Q.    Okay.  And then we are at the point where
22   we have identified he possibly was Tased, correct?
23       A.    Correct.
24       Q.    Okay.  Stop.
25       A.    But I think just prior to that you see the

1    voice is what.
2        Q.    Would it help you to see it again or you
3    think that wouldn't even be helpful?
4        A.    I can't see lips moving, unless you can.
5    I -- I can't see that.
6        Q.    Okay.  So it wouldn't be helpful to watch
7    it again?
8        A.    We can watch it again.
9        Q.    Okay.  I guess the question just is, is he
10   talking when his head moves back, the point at which
11   you wanted to identify?
12             MR. POSNANSKI:  Is who talking?
13             MS. WARD:  Sergeant Hendrickson.
14             THE WITNESS:  There we go.
15       Q.    (BY MS. WARD)  And the arm moves in and
16   his head moves back as he is talking to Mr. Kingsley.
17       A.    There we go.  Arm moves up -- now there is
18   where his head turned.
19       Q.    Okay.  Now let's hear if he is talking.
20   Sergeant Hendrickson.
21             Okay, stop.
22             "Are you going to relax," do you know who
23   is saying that?
24       A.    I have no idea.  You got -- you got four
25   heads turned away from the camera.

1    sergeant really look down and to the right as if
2    something took place.  I don't think we can ignore
3    that head movement.
4        Q.    Okay.  Let -- let's explore that a minute.
5    Okay.  Go.  So he is looking at Mr. Kingsley?
6        A.    Before that.
7        Q.    Okay.  Go back, Joel.
8        A.    Yeah, start from there.
9        Q.    Stop.
10       A.    It's before that.
11       Q.    Yeah.  No, that's fine.
12       A.    Yeah, start it from there.  That will be
13   fine.  I'll just tell you where to stop it, if that's
14   okay.  It's where he turned his head before the --
15   right about the time that the bald-headed fellow
16   moved in.  I don't know his name.
17       Q.    Okay.  So you understand that this is
18   Sergeant Hendrickson, correct?
19       A.    Yes.
20       Q.    And when he turned his head in, when the
21   bald-headed fellow moved in, he was talking to
22   Mr. Kingsley, correct?
23       A.    I don't know if he was talking or not.  I
24   don't know whose voice.  I never heard these guys
25   speak other than on this video so I don't know whose

1        Q.    Okay.
2        A.    You can't see lips on any of them so I
3    don't know.
4        Q.    That's fair.
5             Do you know who said "Tase him"?  Same
6    response?
7        A.    Yeah, I can't tell who.
8        Q.    Okay.  We are done with the video.
9             Okay.  We'll move to the next paragraph in
10   Exhibit 1.  Actually, I want to go back to the first
11   paragraph.
12       A.    We are still on page five?
13       Q.    On page five.
14       A.    Okay.
15       Q.    First full paragraph.  And about a third
16   of the way through the paragraph the sentence begins,
17   "At approximately 6:47 a.m. Deputy Blanton
18   double-locked the handcuffs so they would not tighten
19   on Mr. Kingsley's wrist, either intentionally or
20   unintentionally," correct?
21       A.    Right.
22       Q.    Okay.  Is it your opinion that this was
23   the first opportunity for double-locking to be
24   practical?
25       A.    I'm not sure what you mean by

"opportunity."

Q.    What don't you understand about "opportunity"? From the time he was handcuffed until 6:47 a.m., was that 6:47 the first opportunity for the officers to double-lock the handcuffs?

A.    Theoretically, you could have, I guess, double-locked them at any point during that, but you were dragging him, he was being resistant, so there is no requirement to double-lock immediately.

The recommended training standard is that you double-lock when it's safe and reasonable. And they double-locked it.

In corrections, when you move people from cell to cell, most of the time you don't double-lock them because you are anticipating a very short walk, you know, 10, 12 steps, 15 steps, put them on, take them off, life's good.

Q.    We'll talk more about the double-locking in your supplemental opinion because I think that's where you really focus on that. But the question is just with respect to 6:47, you said the standard is when it's safe and practical --

A.    Yes.

Q.    -- is that correct?

A.    (Witness nods head.)

Q.    Okay. And then the next sentence says, "Mr. Kingsley had threatened jail staff and told them they better call the CERT," correctional emergency response team?

A.    Correct.

Q.    And that was reported by Sergeant Hendrickson and Deputy Manka, correct?

A.    Correct.

Q.    Okay. Can you explain to me how they better call the CERT -- how is that a threat?

A.    If you are in a correctional facility and you are an inmate, you are going to lose because you're just baiting people now and telling them, "I'm going to fight you, you better call the CERT team because I'm not going to cooperate. My mental state" -- generally when people make that statement is go bring -- bring the troops, because we are going to duke it out.

And there is not many inmates in a correctional facility who are going to win that challenge. So you've told the officers, "I'm not cooperating. In fact, I'm going to fight you. Go bring the CERT team because you're going to need a lot of help."

So I think that speaks volumes to the

Q.    So is it your opinion that 6:47 was the first moment that it was safe and practical to double-lock?

A.    Whether it was the first moment I couldn't tell because the video doesn't capture some of it. But from Mr. Kingsley's behavior, being dead weight and what have you, yes, I think it would be safe and practical to double-lock it when he's on the bunk.

Q.    Okay. All right. Let's talk about the next paragraph. It begins with, "In my professional opinion."

A.    Okay.

Q.    "The force used prior to the ECD on Mr. Kingsley was consistent with Wisconsin law enforcement training and was temperate, given the totality of the circumstances."

So this paragraph you are talking about not the application of the Taser but the force that was used prior to the drive stun, correct?

A.    Yes.

Q.    Okay.

A.    And an ECD application is at the end of that paragraph. But it's -- it's all the circumstances there, so the front part is mostly the prior.

officers, we are going to have a problem.

Q.    Okay. The exchange where Mr. Kingsley said, "Better call the CERT team," that wasn't in the video, correct?

A.    Correct.

Q.    It wasn't in any audio that you reviewed, correct?

A.    Correct.

Q.    And the incident reports report that that happened -- that he made that statement that after he was told to remove the light -- the paper from his light, correct?

A.    Correct. So is it possible that "Better call in the CERT team because there is a paper on my light" could have been sarcasm?

MR. POSNANSKI: Objection to the form of the question.

THE WITNESS: I guess anything is possible, but my experience is, that wouldn't be sarcasm.

Q.    (BY MS. WARD) Do you know if Mr. Kingsley is a smart ass?

MR. POSNANSKI: Objection to the form of the question.

THE WITNESS: No.

Q.   (BY MS. WARD)  Okay.  So it's possible
that he could have just been being sarcastic and it
could have been stated in a sarcastic manner,
correct?

MR. POSNANSKI:  Object to the form of the
question.

THE WITNESS:  I guess anything is
possible, but he's not very bright if he said that.

Q.   (BY MS. WARD)  Maybe so.

All right.  I want to just talk again
about this movement as if to bite because you have in
the next sentence here in the middle the paragraph,
"After Mr. Kingsley turned his head towards Sergeant
Hendrickson as if to bite him" -- did you see in the
video -- we just watched it a few times?  Did you see
Mr. Kingsley chomping?

A.   No, you couldn't see Kingsley's head at
all.

Q.   Okay.

A.   I'm going from the reports.

Q.   Okay.  And for report being the statement
in Sergeant Hendrickson's report that you found?

A.   Correct.

Q.   Now, you state that "The ECD drive stun
application to Mr. Kingsley's right upper back area

know whether the officers had preexisting opinions or
attitudes regarding Mr. Kingsley or any experiences
with Mr. Kingsley.

A.   Boy, that's a multi-issued question.
If -- if they had prior contact with Mr. Kingsley and
here was combative and he wasn't cooperate, that
would certainly go to your mindset when you first
approached him.  I don't think that goes to a mindset
to being sadistic or malicious or anything else.  I
mean, this is of the standard under pretrial
detainees.  I just didn't see that.

Q.   The question of whether the drive stun was
applied for sadistic, malicious or punitive purposes
is a question for the jury, correct?

A.   Of course.

Q.   Okay.  The last paragraph on this page,
page five, in the last sentence you state that "The
ECO drive stun and empty hand control techniques used
by the deputies on Mr. Kingsley did not cause him
injury."

Now, what is the basis for that statement?

A.   He didn't go to the hospital for broken
bones.  He didn't go to the hospital for anything
that -- that appeared to be caused by the drive stun.
The drive stun doesn't cause those type of injuries.

was a pain compliance intervention option that was
temporary, consistent with Wisconsin and national law
enforcement training and did not appear to be applied
for sadistic, malicious or punitive purposes,"
correct?

A.   Correct.

Q.   Now, in order to know if it was applied
for sadistic, malicious or punitive purposes,
wouldn't you have to know the officer's state of
mind?

A.   You would.  And that statement that I made
there is based on the objective evidence that nobody
was calling him names.  It wasn't applied longer than
the five seconds.  Nobody was telling him this is a
payback.

I don't know what was in the officer's
mind.  The officer would have to testify to that.
But from the objective evidence from the video I
didn't find anything that would suggest that the
officers were sadistic, malicious or punitive.

Q.   From the information that you were
supplied, correct?

A.   And from the objective evidence of the
video.

Q.   Right.  Would it be relevant for you to

The empty hand control -- all they did was
pull him into the cell and put him on a bunk.  I
didn't see any medical records that anything like
this caused any injuries.

Q.   Were you provided with any medical
records?

A.   Let me see what I listed.

MR. POSNANSKI:  Objection to the form of
the question.

THE WITNESS:  I don't believe I was.

Q.   (BY MS. WARD)  In any event, you are not
qualified to give a medical opinion, correct?

A.   Correct.

Q.   And when you say it did not cause him
injury, do you equate pain with injury?

A.   No, pain is pain.

Q.   Pain is not injury?

A.   No, I don't think that's equal to injury.
If I have a headache, that's pain.  I wouldn't call
that an injury.  I mean, that's my interpretation of
it.  When you get a flu shot are you injured?  I
would say no.  Does it hurt?  For maybe a split
second.

Q.   Injuries can cause pain, correct?

A.   Yes, some injuries can cause pain.  Sure.

Q.    All right.  Let's turn to page six.  We've
got references here.

A.    Correct.

Q.    The first one you list is -- well, before
we do that; you didn't cite the POSC manual here,
correct?

A.    No, I didn't.

Q.    And you also didn't cite it in your
supplemental opinion, correct?

A.    Correct.

Q.    Do you intend to rely on anything in the
POSC manual for purposes of giving your expert
opinion at trial?

A.    Only if -- if asked about it, because what
was in the POSC manual is mostly just a recitation of
the standards under the Fourteenth and Eighth
Amendment.  Those are mentioned, and it wasn't
specific.  The POSC manual wasn't instructive on
techniques or anything like that, so that's why I
didn't make reference to it.  I mean, I read it but I
didn't make reference to it.

Q.    You also didn't cite Wisconsin's ECD
training guide.  Did you consider that reference?

A.    A separate training guide, no, I didn't.

Q.    For the use of ECDs?

---

A.    Just what was mentioned on the advisory
committee recommendations.

Q.    And then the last item in your list of
references is the DAAT manual from March of 2007?

A.    Correct.

Q.    Did you consider the August of 2007
version of the DAAT manual?

A.    I didn't have that, no.

Q.    All right.  Now, the first thing you list
is Hill 2010.

A.    Correct.

Q.    And I'm going to mark that.  I think I'm
going to mark what was produced as that document.

(EXHIBIT 15 WAS MARKED.)

Q.    And I know we talked a little bit about
who Carrie Hill was earlier today.  But in looking at
Exhibit 15, can you tell me why you referenced this
document in your expert report?

A.    Well, I referenced it for a couple of
reasons.  As you will see on page 50-1, it talks
about the federal court standards.

Q.    The title of the presentation is Failure
to Protect, correct?

A.    Yes.

Q.    And that's not applicable to the present

---

case, correct?

A.    Well, the title is not applicable but the
information is applicable.

Q.    Does the title indicate the subject matter
of the presentation?

A.    The title -- I'm sorry.

MR. POSNANSKI:  Objection to the form of
the question.  I think it misstates the presentation.

THE WITNESS:  You have to understand, at
an AELE program Carrie Hill presents generally
between 8 and 12 hours and things are fluid.  And
this compartmentalization or chapters or sections or
whatever you want to call it is just that.

I was looking at this for the various
standards, number one, to list.  And then if you look
at page 50-4, we are looking at use of force by staff
and it lists several reasons that staff could use
force.

Then at part II of that page lists the use
of force factors, and that's why I picked those,
because Carrie Hill talks about that and expounds on
it from a use of force viewpoint as well.  So it's
not neatly compartmentalized.  She doesn't have a
section that says, okay, this is use of force.  She
talks about it in sort of a general approach, and

---

this was the section that I -- I listed.

Q.    (BY MS. WARD)  Do you know -- the part
that you pointed to on page 50-4, the use of force by
staff, and then you pointed to reasons and use of
force factors -- do you know if there is anything
inconsistent listed here with the Wisconsin training
manuals?

A.    No, it's -- it's pretty much the same if
we are looking at the Fourteenth and the Eighth
Amendment.  Shock to conscience is not the standard
under the Fourth Amendment.  So there are some
inconsistencies.

Malicious and sadistic is not an issue
under the Fourth Amendment.  The intent of the
officer is not a factor under the Fourth Amendment
under Graham versus Connor.  So there are some
differences here when we are looking at just
corrections and not the seizure of a free person.

Q.    The question was not that, it was are
there any differences here in -- between reasons to
use that force and use of force factors -- factors
listed by Miss Hill and listed in the DAAT and POSC
manuals?  Do you know?  Have you compared?

A.    I have compared, and I answered that
question.

Q.    And they are the same?

MR. POSNANSKI:  Objection to the form of the question.

THE WITNESS:  If you take the POSC manual, it talks about Graham versus Connor and it also mentions the Fourteenth and Eighth Amendment.  What I'm saying here is these apply to the Fourteenth and Eighth, not the Fourth.  The same with the DAAT manual.

Q.    (BY MS. WARD)  The DAAT manual applies with --

 A.    The DAAT manual primarily talks about the seizure of a free person under Graham versus Connor, which is not the applicable standard in this case.

Q.    But you cited to the DAAT manual, correct?

A.    I cited to the DAAT manual specifically on some of the techniques because the POSC manual doesn't -- isn't instructive on techniques.

Q.    Okay.  Let's look at the DAAT manual one more time.  I want to look at that.  I think we previously marked it.

Is that right, Joel?

MR. GRAHAM:  Uh-huh.

MS. WARD:  Specifically, we didn't mark it -- the August 2007 DAAT manual.

that.

Q.    Actually, I don't.  Okay.  Why don't you give the answer you want to give.

A.    No, it's not the answer I want to give, it's based on the facts.

I don't think you know what an escort hold is, so let's start there.  An escort hold is where officers come in on the side and grab an article.  And it's usually done on both sides of the body.  In this case they couldn't do that because Mr. Kingsley was on a bunk and there was a wall on the other side.

Q.    Okay.

A.    This is a recommended technique that's not in the correctional world.  Because if you look at it, to apply the technique, have two officers establish a rear escort holds, one on each side of the subject.  That is a physical impossibility in this case.

Number two.  If a third officer is available, he or she should take up a defensive stance at the subject's level three, stabilizing the subject with the reaction hand on the subject's upper back.

Okay.  Number three.  Stabilize the subject against the wall or other flat surface.  We

(EXHIBIT 16 WAS MARKED.)

Q.    Do you know if there is any difference that are relevant to your opinion between this manual and the DAAT manual that you cited in your report?

A.    I haven't seen this version so I couldn't answer that.

Q.    Okay.  I want you to turn to page 89.

A.    Okay.

Q.    And there is a heading for Multiple Officer Handcuff Removal.

Do you see that?

A.    Correct.

Q.    And it states in the paragraph that it's designed for uncooperative subjects, correct?

A.    Okay.

Q.    Are you familiar with that procedure?

A.    Yes.

Q.    And in the incident with Mr. Kingsley we had multiple officers, correct?

A.    We did.

Q.    And did they utilize this technique in their attempts to remove Mr. Kingsley's handcuffs?

A.    Well --

Q.    Yes or no.

A.    I can't answer it yes or no, and you know

have that in this case.  He is stabilized, for lack of a better term, on the concrete bunk.  Inside shoulders to stabilize the upper body and their inside knees to stabilize the subject's knees across the surface.

And I think there was some mention in the record that they did put knees across the leg.

Remove the handcuffs.  Okay.  And after the handcuffs have been removed, coordinate their exit from the cell or other containment area.

Well, the officers followed most of this but they couldn't do the escort hold on both sides.  If you can't do the escort hold on both sides, you have one side of the body that isn't under control.

Q.    So your testimony is they did this in part to the extent that they could under the circumstances?

A.    Yes.

Q.    Is that your testimony?

A.    Yes.

Q.    Okay.  All right.  I want to look at the next page in your expert opinion.  It's Appendix A.  It's a summary of facts.  Exhibit 1.

A.    Okay.

Q.    And my question for you is, when you

1  compiled your summary of facts did you utilize the
2  Court's summary judgment opinion in any manner?
3       A.    I'm sorry.
4            MR. POSNANSKI:  Objection to the form of
5  the question.  I don't -- just for clarification, the
6  Court hadn't rendered its decision when he submitted
7  his first report.  I don't know if that will help.
8            MS. WARD:  It does, actually.
9       Q.    Have you seen the Court's summary judgment
10  opinion?
11      A.    No.
12      Q.    Have you relied on it in any way?
13      A.    No.
14      Q.    Okay.  Let's go to Appendix B on page 11.
15      A.    Okay.
16      Q.    My first question is, is this a complete
17  list of the case-specific materials you've reviewed
18  or considered?
19            MR. POSNANSKI:  Objection to the form of
20  the question.  Vague as to time.
21            THE WITNESS:  Yes, at the time of this
22  report these were the materials that were provided
23  that -- that I reviewed in the development of the
24  opinion or opinions.
25      Q.    (BY MS. WARD)  And these were all provided

1       by counsel?
2       A.    Yes.
3       Q.    Have you reviewed anything since the
4  report that are case-specific materials?
5       A.    Since this report?
6       Q.    Since this was compiled, this Appendix B.
7       A.    My supplemental report may contain other
8  documents.  I'd have to look at the supplemental
9  report.  And I -- and to answer that more fully, the
10  two depositions I just got this week I did quickly
11  peruse.
12      Q.    Okay.  So those were Conroy and Degner?
13      A.    Degner, correct.
14      Q.    And you've skimmed those transcripts?
15      A.    Yes.
16      Q.    Okay.  Can you think of anything else that
17  you reviewed since this was compiled?
18      A.    No, other than what might be listed in my
19  supplemental.
20      Q.    Okay, understood.  Have you reviewed any
21  motions in limine --
22      A.    No.
23      Q.    -- filed by either party?
24      A.    No.  I haven't been provided with any of
25  that.

1       Q.    Okay.  Do you personally own a Taser?
2       A.    Yes.
3       Q.    For what purpose?
4       A.    It was sent to me after a master
5  instructor school.
6       Q.    What model?
7       A.    X3.
8       Q.    Is it just one that you own?
9       A.    Yes.
10      Q.    Okay.  In the incident with
11  Mr. Kingsley -- I'm going to present another
12  hypothetical to you.  I want you to assume that there
13  was no Taser available.  Could you go through the
14  options that the officers would have had or what they
15  could have done to attempt to stop resistance or gain
16  control?
17      A.    I think pretty much what they did.
18  Holding him down.  Putting a knee across the shoulder
19  area.  Trying to remove the cuffs.
20            And if that wasn't practical and they
21  couldn't get the cuffs off at that point, was, you
22  know, tell Mr. Kingsley, "Look, if you don't
23  cooperate, we are just going to leave you for a bit
24  and you'll eventually calm down and we'll come back."
25      Q.    So that was a reasonable option for the

1       circumstances that were presented?
2       A.    That's certainly an option, not having the
3  Taser device.
4       Q.    Would hitting Mr. Kingsley with a baton
5  have been a reasonable use of force under the
6  circumstances?  And I mean a strike, a baton strike.
7       A.    No, I don't think so.
8       Q.    Okay.  The use of a Taser can be
9  considered a deadly force in some circumstances,
10  correct?  I think we looked at one in the Brown
11  versus Burghart case.
12      A.    It could, especially under the -- the
13  definition of deadly force, causing serious bodily
14  injury.  If -- if you shot it into the person's eye,
15  that would be a serious bodily injury so that would
16  certainly coincide with the definition.
17      Q.    And if it's used around flammable
18  materials is another way it could be deadly force --
19      A.    Correct.
20      Q.    -- correct?
21            What if it's applied to a face-down,
22  restrained person?
23      A.    Drive stun is not deadly force.
24      Q.    Okay.
25      A.    There is no science anywhere that would

1    suggest that a drive stun causes anything more than

2    just temporary pain.

3        Q.    The use of a Taser on restrained persons,

4    that -- let me rephrase.

5        Some jurisdictions require elevated

6    justification for use of a Taser on a restrained

7    person, correct?

8        MR. POSNANSKI:  Objection to the form of

9    the question.

10        THE WITNESS:  When you say "some

11    jurisdictions," are you talking about governmental

12    entities, federal courts?  What's your definition of

13    a jurisdiction.

14        Q.    (BY MS. WARD)  Let's see.  States,

15    agencies or departments.

16        A.    Well, some departments might require it.

17        Q.    Do some states require it?

18        A.    Some states -- some -- like the State of

19    Florida has a specific statute that addresses Taser

20    usage, somewhat limiting to active resistance.  But

21    that's mostly, I believe, aimed at the officers in

22    the field.

23        Q.    Okay.

24        A.    So some departments could have -- I mean,

25    they can set their usage standard wherever they want

---

1    to.  I mean, that's up to them.

2        Q.    But you acknowledge that there are some

3    states that do require elevated justification for the

4    use of a Taser on someone in restraints, correct?

5        MR. POSNANSKI:  Objection to the form of

6    the question.

7        THE WITNESS:  What do you mean by

8    "elevated"?  I guess that's where I've having a

9    little bit -- I think know what you mean but...

10        Q.    (BY MS. WARD)  Well, why don't we just

11    take a look at a document.

12        A.    Okay.  That may help.

13        (EXHIBIT 17 WAS MARKED.)

14        Q.    We've just handed you Exhibit 17.

15        A.    Okay.

16        Q.    Do you recognize Exhibit 17?

17        A.    Yes.  This is from the Law Instructor's

18    Guide from -- that was written by Judge Emory Plitt.

19        Q.    Do you know Judge Plitt?

20        A.    I know him very well.

21        Q.    How do you know him?

22        A.    He is the course director for all the AELE

23    programs, and I'm on the faculty of AELE.  I'm on the

24    academic advisory board for AELE which Judge Plitt

25    chairs.

---

1        Q.    So is it your opinion that he's an

2    authoritative source with respect to issues

3    surrounding use of force?

4        A.    I would certainly consider him to be,

5    given his background.

6        Q.    And also for use of ECDs?

7        A.    I -- I don't know how much Judge Plitt

8    knows about ECDs other than what he's read.  I don't

9    think he's been through a school or training or

10    anything like that.  At least I'm not aware of it.

11        Q.    Okay.  But how about the legal issues with

12    respect to ECD use?

13        A.    I would certainly think that he would be

14    up to speed on that.

15        Q.    Okay.  And on page two, the paragraph

16    starts, "There are some other issues with such

17    devices that suggest that such devices should not be

18    used.  They include."  And then I want to point you

19    to first number three, "Punitively."

20        Do you agree that ECDs should not be used

21    punitively?

22        A.    Absolutely I agree.

23        Q.    Okay.  And number four.  "When a person is

24    already handcuffed or otherwise restrained or

25    passive."

---

1        Do you see that?

2        A.    I see that.

3        Q.    Do you agree that ECDs should not be used

4    when a person is already handcuffed or otherwise

5    restrained or passive?

6        A.    Not as a blanket statement, no.

7        Q.    Okay.

8        A.    There are exceptions.

9        Q.    Okay.  Explain, please.

10        A.    Well, again, you can have a person who is

11    handcuffed and who is still combative, who is still

12    resistive.  And the top sentence on this suggests

13    that -- it says "suggest that such devices should not

14    be used," but it doesn't say in probe or drive stun

15    mode.  Drive stun mode is generally considered

16    acceptable when somebody is resistive and handcuffed

17    or restrained.

18        Q.    But Judge Plitt doesn't make a distinction

19    between probe mode and stun mode, correct?

20        A.    In this document he doesn't.

21        Q.    Okay.  Could you turn the page to page

22    three?  And I want to focus your attention to the

23    paragraph beginning with, "Other legal issues in

24    civil litigation concerning such devices include."

25    And then I want to direct you to number four.

1      A.    Okay.

2      Q.    "Use of such device when the offense is a

3  minor one, the subject does not pose any threat and

4  is not armed or otherwise dangerous, and did not try

5  to flee will likely to be found unreasonable."

6            Do you see that?

7      A.    Yes.

8      Q.    Does that describe the incident with

9  Mr. Kingsley?

10           MR. POSNANSKI:  Objection to the form of

11  the question.

12           THE WITNESS:  No, I wouldn't say it

13  describes it completely.

14     Q.    (BY MS. WARD)  Okay.  What is different

15  about that statement and the incident with

16  Mr. Kingsley?

17     A.    Mr. Kingsley did pose a threat.  I think

18  he -- his behavior certainly could have been

19  dangerous to the officers.  I agree he wasn't trying

20  to knee so...

21     Q.    Was the offense a minor one?

22     A.    I don't --

23           MR. POSNANSKI:  Objection to the form of

24  the question.

25           THE WITNESS:  I don't know if he was

1            (EXHIBIT 18 WAS MARKED.)

2      Q.    So we've just handed you what we marked as

3  Exhibit 18.  Do you recognize Exhibit 18?

4      A.    Yes.  That's our Use-of-Force by the

5  Numbers program.

6      Q.    Okay.  And you compiled this information

7  in this workbook, correct?

8      A.    I was part of the workbook compilation,

9  yes.

10     Q.    Did you author any portions of it?

11     A.    Various portions.

12     Q.    Let's go to page 17 of 200.  And there is

13  a slide in the middle labeled Observations.

14           Do you see that?

15     A.    Yes.

16     Q.    And there you note that "Law enforcement

17  officers and agencies will make mistakes," correct?

18     A.    Yes.

19     Q.    And, "There are bad law enforcement

20  officers."

21           Do you see that?

22     A.    Yes.

23     Q.    Why did you include that in the materials?

24     A.    Because it's true.  Some officers are

25  rogue officers.  Some officers and some agencies do

1  criminally charged afterwards.  I don't recall

2  reading anything about that.

3      Q.    (BY MS. WARD)  Let's focus on the offense

4  of having a paper on his light that he refused to

5  remove.  Is that a minor offense?

6            MR. POSNANSKI:  Objection to the form of

7  the question.

8            THE WITNESS:  It depends on the

9  correctional facility.  If the rule is you can't have

10  paper on your light and you openly defy that -- I

11  mean, paper on a light cold cause a fire.

12     Q.    (BY MS. WARD)  Uh-huh.

13     A.    Again, it's discipline and security inside

14  jails.  That's the standard that correctional

15  officers are to enforce.  And that's hazardous.

16     Q.    Okay.  So with respect to the statement by

17  Mr. -- I'm sorry -- by Judge Plitt, that things that

18  might possibly be different from the Kingsley case

19  are that the offense may not have been minor?

20     A.    Correct.

21     Q.    And the subject did pose a threat?

22     A.    Correct.

23     Q.    Okay.  And it was the threat -- well,

24  strike that.

25           Okay.  I want to mark another document.

1  make mistakes in the carrying out of their duties.  I

2  mean, that's been pretty clearly established since

3  law enforcement began.

4      Q.    Okay.  I want you to turn to 63 of 200.

5  And I want to focus on the top slide there for a

6  minute.

7      A.    Okay.

8      Q.    "Possible versus immediate threat."

9            Do you see that?

10     A.    Yes.

11     Q.    And the bullet points there are, "Each

12  application of force must be justified."

13     A.    Correct.

14     Q.    "A simple statement by an officer that he

15  fears for his safety or the safety of others is not

16  enough."

17     A.    Correct.

18     Q.    "There must be objective factors to

19  justify such a concern," correct?

20     A.    Correct.

21     Q.    Okay.  So is the sort of point of the

22  slide that possible threat is insufficient to justify

23  a use of force?

24           MR. POSNANSKI:  Objection to the form of

25  the question.

Case: 3:10-cv-00832-jdp  Document #: 125  Filed: 10/02/19  Page 48 of 71

1     THE WITNESS:  The intent of the slide is
2 that if an officer, for example, says, "The passenger
3 had beer bottles at his feet that the passenger could
4 have used," that's not considered generally good
5 enough.  There has to be more of an immediacy.  There
6 has to be not what could have, should have, wold
7 have, but more what are the objective factors, what
8 did that passenger do with those bottles that caused
9 the threat to the officer.
10    Q.   (BY MS. WARD)  Okay.  So let's focus on
11 the reasoning given for the use of force of --
12 related to that Mr. Kingsley could have bit the
13 officer.  Does that fall within the category of the
14 possibly or could have been with respect to
15 characterizing the threat?
16    A.   Well, I think if it could have -- if there
17 wasn't any objective manifestation that he
18 attempted -- people could always potentially bite
19 you.  I don't think that's good enough.  I think it
20 would have to be a manifestation.
21    Q.   Okay.  And are you aware of a
22 manifestation in the incident with Mr. Kingsley?
23    A.   Other than what was in the reports, no.
24    Q.   Okay.  And the report said that he
25 controlled his head so that he couldn't be bitten.

---

1 right?
2    A.   I thought I read in one of the reports
3 that Mr. Kingsley turned his head, but I -- I could
4 be wrong on that.  I'd have to refer back to my own
5 report.
6    Q.   Okay.  In any event, if the justification
7 was only that he could have bitten, that would be
8 insufficient, correct?
9    A.   Insufficient for...
10    Q.   Justifying the threat -- or the use of
11 force based on the threat.
12    MR. POSNANSKI:  Objection to the form of
13 the question.
14    THE WITNESS:  If that's the only thing
15 that was being done and he didn't try to bite him, I
16 would agree.  But the objective evidence is that
17 Mr. Kingsley was actively resisting the officers and
18 the alleged biting was just one variable, among many.
19    Q.   (BY MS. WARD)  Let's see if I can
20 understand your opinion.  So I have a mouth, right?
21    A.   Okay.
22    Q.   And I'm sitting here right now and I could
23 bite Joel, correct?
24    A.   You could.
25    Q.   So what would I have to overtly,

---

1 objectively do to make it reasonable to use force on
2 me in terms of some action that I could take that
3 would make it more immediate, is the word used on the
4 slide, that I'm going to bite him?
5    MR. POSNANSKI:  Objection to the form of
6 the question.
7    THE WITNESS:  If -- if you announced, "I'm
8 going to bite this person," and turned and moved in a
9 direction to do that -- I don't have to wait until
10 you do bite him.  The objective evidence, I think to
11 a person who is trained, would say she is going to
12 bite him and I would use -- or the person could use
13 force to prevent that.
14    Q.   (BY MS. WARD)  Okay.  Anything else that
15 would be objectively immediate threat?  So
16 announcing -- you just stated if I announce I was
17 going to bite him and moved toward him, that would be
18 objective evidence?
19    A.   I think that's objective evidence.  I
20 don't have to wait until you bite him.
21    Q.   Right.
22    A.   Now, if you moved toward -- Joel, right?
23 If you moved toward him and he ran away and now there
24 is no more threat, then we'd have to reassess the
25 force options.

---

1    Q.   Okay.  If I turned toward him and made a
2 chomping motion with my jaw would that -- would that
3 be an immediate threat -- objectively immediate
4 threat?
5    MR. POSNANSKI:  Objection to the form of
6 the question.
7    THE WITNESS:  If you were sitting there as
8 you are today and turned and chomped and said
9 nothing else and did nothing else, I would probably
10 say no.
11    But if you said, "I'm going to bite you,"
12 and then you turned and chomped, I think that's
13 objective evidence that -- to use some force option
14 to prevent that.
15    But, remember, when we are talking about
16 biting -- and this is something else that I don't
17 think we can ignore.  When we are talking biting --
18 if biting took place -- if you bit Joel, what -- what
19 I, the officer, now have to contend with is
20 bloodborne pathogens and that opens up a whole other
21 bag of worms.  Joel could have Hepatitis C.  Joel
22 could have AIDS.  Joel could have a communicable
23 disease.  I've got to deal with that now.  And in
24 separating that, if there is blood everywhere, I'm at
25 risk and you are at risk and anybody else in the room

1  is at risk.

2          So it's not just preventing you from

3  biting. There is others aspects that come in from

4  the pathogens level as well.

5      Q.   (BY MS. WARD)  So the bloodborne pathogen

6  part of the hypothetical you just gave is something

7  that would be possible, not something that would be

8  an objectively immediate threat, correct?  That's

9  like the beer cans on the floor that might get

10 thrown, right?  Because you don't know that Joel has

11 AIDS, correct?

12     A.   I don't know have to know that Joey has

13 AIDS. All I have to do is follow the bloodborne

14 pathogens standards because once blood comes out,

15 I've got a pathogen issue.

16     Q.   Well, where there is no blood out yet, no

17 one has been bitten, so we are just talking about

18 threat.

19     A.   If you just said, "I'm going to bite him,"

20 and sat there, no, I'm not going to do anything about

21 that. But I'm going to be thinking about that.

22     Q.   Okay. So maybe you could just clarify for

23 me, then, the difference between possible threat and

24 an objectively immediate threat.

25          MR. POSNANSKI: Objection to the form of

---

1  the question.

2          THE WITNESS: Possible threat is, as I

3  said, you got beer bottles at your feet, but I didn't

4  do anything and that's a -- that's a possible threat.

5  I mean, you could, in your mind, say, "Actually, he

6  could pick up a beer bottle and throw it at me,"

7  hypothetically. Versus the passenger picks up the

8  beer bottle, raises an article to throw it at you;

9  now there is an immediate threat. I've got to

10 respond.

11     Q.   Okay. So with respect to the incident

12 with Mr. Kingsley specifically was it a possible

13 threat that he could bite or was it an immediate --

14 objectively immediate threat of him biting?

15     A.   Based on what the officer's report was, I

16 would say that -- that it was an immediate threat.

17     Q.   Okay. That -- well, why don't we look at

18 it again. It was Hendrickson's report, Exhibit 13 in

19 your pile.

20     A.   Okay, I've got it.

21     Q.   Describe for me where the report indicates

22 to you that there was an immediate threat of a bite

23 by Mr. Kingsley.

24     A.   It said, "Mr. Kingsley turned his head

25 toward my leg" -- this is page three.

---

1      Q.   Uh-huh.

2      A.   -- "and I immediately secured his head

3  with my right hand to avoid being bit."

4      Q.   Okay. Turning his head toward the leg.

5  Is that an immediate -- objectively immediate threat

6  of being bitten?

7      A.   I think it's reasonable for an officer to

8  conclude that.

9      Q.   Just a head turn without an announcement

10 of bitting?

11          MR. POSNANSKI: Objection to the form of

12 the question.

13          THE WITNESS: Well, Mr. Kingsley would

14 have to be really stupid to say, "I am going to bite

15 you" before he did it. I don't think that even is

16 logical.

17     Q.   (BY MS. WARD) Okay. So turning of the

18 head, isn't that more like the beer bottles on the

19 floor?

20     A.   Not in this situation.

21     Q.   Why is that?

22     A.   Because the officer's leg's right there.

23 They are trying to uncuff a actively resisting

24 prisoner and that had turned. Again, we don't have

25 to wait to be bitten.

---

1      Q.   Isn't it only a possible threat that he

2  could bite at that point?

3          MR. POSNANSKI: Objection to the form of

4  the question.

5          THE WITNESS: I think when you are that

6  close it's a realistic threat.

7      Q.   (BY MS. WARD) So the objective evidence

8  suggests that he was -- there was an immediate threat

9  of Sergeant Hendrickson being bitten by Mr. Kingsley?

10          MR. POSNANSKI: Objection to the form of

11 the question.

12          THE WITNESS: I am saying based on the

13 report. He said, "Kingsley turned his head toward my

14 leg." That caused the officer to believe that he was

15 going to be bitten. If -- as far as you and I are

16 away, if you turned your head toward me, I wouldn't

17 think I was going to be bitten even though that's a

18 possibility. But when we are in a close proximity

19 and my leg is next to your head, I think it's

20 reasonable to conclude that I could be bitten.

21     Q.   (BY MS. WARD) Did you read Sergeant

22 Hendrickson's deposition transcript?

23     A.   If it's on my list, I did. I may have got

24 that afterwards. They may be in my supplemental

25 report. I don't remember.

1    Q.    Sitting here, do you recall whether you
2  read Sergeant Hendrickson's --
3    A.    Sitting here today no, I don't recall.
4    Q.    Okay.  I want to go back for a minute to
5  Exhibit 18, which is your force by numbers workbook.
6  Okay.  On page 81 of 200.  Strike that.
7          Could we please go to page 86 of 200.
8    A.    Okay.
9    Q.    There is a slide in the middle that says:
10 Subject/Officer factors."
11         Do you see that?
12   A.    Correct.
13   Q.    And what does Subject/Officer Factors
14 refer to?
15   A.    It refers to the variables that may be
16 present in any given force situation, particularly as
17 this section starts out on report-writing.  This
18 particular section of the workbook deals with
19 report-writing primarily.
20   Q.    Uh-huh.
21   A.    And some of the factors that officers need
22 to consider in that report would be, for example, the
23 height and weight of the suspect, the gender and age.
24 You know, those are things we are just trying to get
25 them to not forget.

1    Q.    Subject/Officer Factors are a
2  consideration in evaluating the use of force
3  incident, correct?
4    A.    Subject/Officer Factors are, in
5  report-writing merely reporting how many officers
6  were there and the subject and what the behaviors may
7  have been.  This isn't an assessment of force.  This
8  is a report-writing.
9    Q.    So Subject/Officer Factors in your
10 testimony is that only applies to what should you put
11 in a report?
12   A.    I didn't say that.
13   Q.    Okay.  What did you say?
14   A.    I said this section of the workbook talks
15 about report-writing, what officers would report.
16 That's the focus of this.
17         For example -- maybe this will clear it
18 up.  Let's take Mr. Kingsley.  We have three officers
19 physically engaged with Mr. Kingsley trying to remove
20 handcuffs and they can't do it.  That would be the
21 report.  "Three of us tried to take the handcuffs off
22 and we couldn't do it."  That's what officers would
23 report.
24   Q.    Do you know Mr. Kingsley's height and
25 weight?

1    A.    I do.  I think.  I had mentioned it in my
2  report.
3    Q.    You are referring to Exhibit 1?
4    A.    Yes.  He was five foot seven inches in
5  height and weight 170 pounds.
6    Q.    Do you know the height and weight of the
7  officers involved in the incident?
8    A.    No.
9    Q.    You didn't consider that?
10         MR. POSNANSKI:  Objection to the form of
11 the question.
12         THE WITNESS:  I didn't consider it because
13 the video showed that Mr. Kingsley looked pretty
14 buff, and these three guys couldn't get the cuffs
15 off.
16   Q.    (BY MS. WARD)  Okay.  Do you know if
17 Mr. Kingsley had any tattoos?
18   A.    I don't.  I don't have anything that I can
19 locate in my report that would suggest he had
20 tattoos.  At least I don't see anything in here.
21   Q.    So, in any event, you don't discuss
22 Subject/Officer Factors in your expert opinion,
23 correct?
24         MR. POSNANSKI:  Objection to the form of
25 the question.  Vague.

1    Q.    (BY MS. WARD)  As a factor, per se.
2          MR. POSNANSKI:  For what?
3          MS. WARD:  Do you have an objection?
4          MR. POSNANSKI:  Objection, relevance.
5          THE WITNESS:  I did discuss Subject/
6  Officer Factors.  The report talks about the number
7  of officers.  It talks about the number of subjects.
8  It discussed the height and weight of Mr. Kingsley.
9  It discussed the gender and age of Mr. Kingsley.
10   Q.    (BY MS. WARD)  But not the officers,
11 correct?
12   A.    That information I didn't have at that
13 time.
14   Q.    Okay.  Would you go to page 89 of 200 in
15 the workbook?
16   A.    Okay.
17   Q.    The top side is directed to taking
18 photographs?
19   A.    Uh-huh (affirmative).
20   Q.    And it recommends taking photographs in
21 situations where there is use of force, correct?
22   A.    No, it says where there is injury.
23   Q.    Okay.
24   A.    None of the officers was injured in this
25 case, so there was no need to take photographs of

1    them.

2        Q.    Okay.  How about Mr. Kingsley?  Was there

3    any need to take photographs of Mr. Kingsley?

4        A.    No.  Mr. Kingsley complained of a foot

5    injury, denied medical treatment.  And a drive stun

6    is not going to be -- I mean, it was up to the

7    officers, I guess, if they wanted to take the

8    picture, but it wouldn't be something that we would

9    necessarily recommend.  We are talking mostly here

10   about officers who are in a real knock-down, drag-out

11   fight.

12       Q.    Do you know if there is any objective

13   evidence of injury to Mr. Kingsley?

14       A.    Sitting here today, no, I don't.  Other

15   than what was in the complaint that was filed.

16       Q.    Okay.

17             (A break was taken from 1:42 p.m. to

18             2:26 p.m.)

19       Q.    Good afternoon.

20       A.    Good afternoon.

21       Q.    I just wanted to clear up one thing that

22   we talked about before the lunch break.

23             Now, did you testify that you had not seen

24   the Court's summary judgment order in this case?

25       A.    That's correct.

---

1        Q.    Okay.

2        A.    I didn't even know there was one, so...

3        Q.    Okay.  So if you hadn't seen it or you

4    didn't know of it, then you certainly didn't consider

5    it with respect to formulating your expert opinion in

6    the case.

7        A.    Correct.

8        Q.    Okay.  All right.  Dr. Peters, I want to

9    take a look at another document that you did

10   consider, and that's the expert report of

11   Mr. Landers.

12             (EXHIBIT 19 WAS MARKED.)

13       Q.    Do you recognize Exhibit 19 as one of the

14   documents that you reviewed in connection with your

15   expert opinion in this case?

16       A.    Yes.

17       Q.    And I just have a couple questions about

18   Mr. Landers' report.  And what I'm really focusing on

19   here is trying to laser focus the areas on which you

20   don't agree.  So I'm just going to ask you a series

21   of -- actually, I'm going to present some of his

22   statements and ask you if you agree.  So that's what

23   this next series of questions is going to be --

24       A.    Okay.

25       Q.    -- geared toward.

---

1             So on page five, which is the beginning of

2    Mr. Landers' opinion, the second sentence after

3    Opinion says, "In supplied reports there is no

4    mention that the handcuffs were placed on

5    Mr. Kingsley in the correct manner and checked for

6    proper fit."

7             Do you agree with that?

8        A.    As I recall, that's accurate.

9        Q.    Okay.  The last sentence in that

10   paragraph, "For 12 minutes it is physically possible

11   that the handcuffs could have tightened through the

12   weight or force exerted on Mr. Kingsley during him

13   being carried or during the actions when he was

14   placed on the bunk in receiving."

15             Do you agree with that statement?

16       A.    No, I don't.

17       Q.    Why?

18       A.    If -- if he were carried or if he were

19   pulled, or whatever you want to call that, that

20   wouldn't cause the handcuffs to tighten.  The only

21   way handcuffs could tighten is if the single bar had

22   pressure on it to ratchet tighter.  Tightness is not

23   a function of time, it's a function of pressure.

24       Q.    Is it physically possible that the

25   handcuffs could have tightened during the 12 minutes

---

1    that they were not double-locked?

2        A.    If pressure were applied to them it's

3    possible, but absent pressure, no.

4        Q.    And is it your opinion that there was

5    pressure or not pressure?  I'm just trying to

6    clarify.

7        A.    I didn't find where there was any

8    pressure.  And the statement made by Mr. Landers just

9    talks about force being exerted to Mr. Kingsley.

10   Holding him by the arms or pulling him by the arms

11   isn't going to make the handcuffs tighter.  You would

12   physically have to have pressure on the single bar.

13       Q.    Is it physically possible that something

14   happened during that 12 minutes that could have

15   caused tightening of the handcuffs?  And now not the

16   reasons that Mr. Landers gives but anything.  Is it

17   just physically possible that the handcuffs could

18   have tightened in that 12-minute period?

19       A.    If there was pressure applied to the

20   single bar.

21       Q.    Okay.  The next paragraph indicates that

22   "Lieutenant Conroy's report indicates that

23   Mr. Kingsley's handcuffs were eventually removed at

24   6:59 a.m."

25             I'm assuming you agree with that.

1    A.    Yes.

2    Q.    "In addition, the pressure and the

3    tightness of the handcuffs described as painful and

4    excessive by Mr. Kingsley during his deposition is

5    the only articulation of the matter in which the

6    handcuffs were applied."

7          Do you agree with that?

8    A.    As worded, yes.

9    Q.    Okay.  So let's go back to the 12-minute

10   period.  If the handcuffs had been double-locked at

11   the time that they were initially applied, it would

12   not have been physically possible for them to have

13   tightened in the 12 minutes, correct?

14   A.    As a general rule that's true, unless the

15   handcuffs would have been -- in other words, I could

16   be -- I can have a pair of double-locked handcuff and

17   if I smack them on this table, it might dislodge the

18   double-lock actuator, which could theoretically make

19   them tighten.  But absent any action like that,

20   you're correct.

21   Q.    Okay.  All right.  Turning to page six.

22   The second full paragraph states that "Considering

23   this event took place in a jail setting, and without

24   a pressing hazard, the deputies would have had ample

25   time to check the cuffs for proper fit and

1    double-lock them for Kingsley's well-being and their

2    own personal safety."

3          Do you agree with that statement?

4    A.    I don't know what Mr. Landers means by a

5    pressing hazard.  I think when you have an inmate who

6    is offering active resistance, you have a pressing

7    hazard.  And I think that's even more evidenced by

8    the fact that when they went to take the handcuffs

9    off, there was resistance.  So I don't know what he's

10   referring to as a pressing hazard.

11   Q.    So you disagree with that statement?

12   A.    Correct.

13   Q.    If you could look at page ten.  The

14   very -- there is a -- the page starts with a partial

15   sentence and then there is a sentence thereafter that

16   states, "I would suspect an officer being fearful of

17   biting or any injury would not look away from the

18   subject he is dealing with."

19         Do you agree with that statement?

20   A.    No, not at all.

21   Q.    Why?

22   A.    I think an officer has to be cognizant of

23   all the stimuli that's around him and looking at

24   other officers as well.  I mean, this -- that's a

25   statement that is almost unbelievable.  It doesn't

1    say at what point in time.  It -- it -- the officer

2    did look away for a couple seconds and looked back.

3    We have been through that.  We discussed that

4    earlier, prior to lunch.

5          And fearful of biting, I think fearful of

6    biting happens at the moment.  It's not something

7    that, you know, you're a psychic and think, you know,

8    This is going to happen in five minutes so I'm not

9    going to look away."  That's just an odd statement.

10   Q.    Okay.  On page 12, the second full

11   paragraph begins with "Wisconsin law enforcement

12   officers."

13   A.    Yes.

14   Q.    The second sentence states, "There is

15   special emphasis in jail settings to attempt to use

16   minimal force tactics when time permits."

17         Do you agree with that statement?

18   A.    No.

19   Q.    Why?

20   A.    There is no requirement to use minimal

21   force.  That's not the standard.

22   Q.    Okay.  The statement is it's an emphasis,

23   not a standard.  So with that in mind, that there is

24   an emphasis in jail settings to attempt to use

25   minimal force when time permits, do you agree with

1    it?

2    A.    No.

3    Q.    As phrased that way?

4    A.    No, not at all.

5    Q.    Why is that?

6    A.    First of all, what does special emphasis

7    mean?  Who put the special emphasis?  It would have

8    been very helpful if Mr. Landers would have cited

9    sources for his opinion, but he didn't.  He's just

10   throwing stuff on a page.

11         So we have here that there is a special

12   emphasis in jail settings.  What jail settings?

13   Federal jail settings?  State jail settings?

14   Lockups?  Holding cells?  "To attempt to use minimal

15   force tactics when time permits."  I don't even know

16   what that means.

17   Q.    Okay.  The paragraph starts with

18   "Wisconsin law enforcement officers."

19         Do you see that?

20   A.    Right.

21   Q.    So is it reasonable to assume Mr. Landers

22   was talking about Wisconsin, special emphasize in

23   Wisconsin?

24         MR. POSNANSKI:  Objection to the form of

25   the question.

```
 1        THE WITNESS:  One could say that.  But
 2   even that first sentence -- he says they must match
 3   the threat level.  No, that's not the standard.  You
 4   don't match.  This is incomprehensible.  If -- when
 5   you say match, you punch me in the face, then I punch
 6   you back in the face.  That's matching.  That is not
 7   the standard for force.  Never has been, never will
 8   be.
 9        Then he leaps to there is special emphasis
10   in jail settings.  It doesn't say Wisconsin
11   correctional officers.  It doesn't say in Wisconsin.
12   It just says there is special emphasis in jail
13   settings.  There is jail settings all over the
14   country.
15        Q.   Okay, but the incident took place in a
16   Wisconsin jail, correct?
17        A.   Yes, it did.
18        Q.   And Mr. Landers does have the materials
19   considered appendix to his report, correct?
20        A.   He does, but he doesn't reference things
21   in his opinion that would lead you to a specific
22   source.  It's all by implication.
23        Q.   Okay.  I want to mark another exhibit.
24             (EXHIBIT 20 WAS MARKED.)
25        Q.   Do you recognize Exhibit 20 as your
```

```
 1   supplemental opinion in this matter?
 2        A.   Yes.
 3        Q.   And together with your first opinion that
 4   we went through this morning, do the two reports
 5   contain a complete statement of your opinions and the
 6   basis for your opinions in this case?
 7        A.   Yes.
 8        Q.   And do you stand by the opinions stated in
 9   this document?
10        A.   Yes.
11        Q.   Do you want to change anything in this
12   document, sitting here today?
13        A.   Not that I recall, no.
14        Q.   And that's your signature on page one,
15   correct?
16        A.   Yes, it is.
17        Q.   Okay.  So turning to the first page, you
18   add some case-specific documents reviewed/considered,
19   correct?
20        A.   Yes.
21        Q.   So what you considered and reviewed in
22   your preliminary report, Appendix B, plus
23   Mr. Landers' report, correct?
24        A.   Correct.
25        Q.   And additional depositions of officers,
```

```
 1   correct?
 2        A.   Correct.
 3        Q.   And you don't specify which officer
 4   depositions you reviewed, correct?
 5        A.   It's not attached here so apparently it
 6   was an oversight under documents reviewed.
 7        Q.   Can you tell me sitting here what of --
 8   which of the officer depositions you reviewed in
 9   addition to Conroy and Degner, which you told me this
10   morning?
11        A.   No.  I'd have to go back and look.
12        Q.   Could you provide that listing to us?
13        A.   Sure.
14        Q.   Okay.  The Focus of Analysis paragraph,
15   the middle sentence, I guess, second sentence, "The
16   analysis includes the force used by Monroe County,
17   Wisconsin, correctional officers and Deputy Sheriff
18   Fritz A. Degner, specifically the application of
19   handcuffs to Mr. Kingsley and knee placement on his
20   back area to help control him in addition to related
21   issues."
22        Do you see that sentence?
23        A.   Yes.
24        Q.   What are the related issues you are
25   talking about?
```

```
 1        A.   Just the environmental issues that were --
 2   that were present.  Application of handcuffs is one
 3   issue.  Double-locking might be a related issue.  The
 4   uncuffing is a related issue.  The leaving of the
 5   cell is a related issue.  That's what related
 6   issues -- I'm referencing.
 7        Q.   Okay.  Turning to page two, which is your
 8   Incident Supplemental Opinions.
 9        A.   Correct.
10        Q.   Your first opinion is "The handcuffing of
11   Mr. Kingsley was consistent with national
12   contemporary handcuffing techniques and training,"
13   correct?
14        A.   Correct.
15        Q.   Now, are there national handcuffing
16   techniques and training?
17        A.   Yes.
18        Q.   And what are they?
19        A.   Well, I guess to start, we would start
20   with the National Institute of Justice Standards on
21   handcuffs and the use of NIJ approved standards for
22   handcuffs.  Now, that would be a national standard
23   that would be in place regarding the equipment.
24        The second national training issue would
25   be how to hold the handcuffs, how to grip the
```

```
 1    handcuffs, how to apply the handcuffs, how to
 2    double-lock the handcuffs, how to remove the
 3    handcuffs. I mean, those are broad categories. But
 4    those are all national training issues.
 5        Q.    What national standards dictate how those
 6    things are done?
 7        A.    Standards is different than training.
 8    There are no national standards other than what the
 9    courts have decided in the respective federal
10    districts. But I believe in all the federal
11    districts there is reference made to overly tight
12    handcuffs and when officers may be liable for those
13    overly-tight handcuffs.
14        Q.    Do you have any training materials that
15    are national in scope, in other words, used in the
16    entire nation?
17        A.    Probably the International Association of
18    Chiefs of Police Training Key on Handcuffs. The
19    National Institute of Standards on Handcuff
20    Certification.
21           I wrote a text of 304 pages on handcuffs
22    that's used by a lot of agencies across the United
23    States. Not all, obviously, but --
24        Q.    Can you name some agencies that use that
25    text?
```

```
 1        A.    Honolulu, Hawaii is one. At the time the
 2    Albuquerque Police Department. I mean, there has
 3    been several. I mean, there's -- I couldn't go into
 4    each one because I don't know if they are still using
 5    it today but --
 6        Q.    So do you know of any agencies or
 7    departments that are using that book today to train
 8    officers today?
 9        A.    Yeah, there is still -- still quite a few.
10    I mean, we still sell the book and -- or I don't sell
11    the book but it's still being sold and officers -- we
12    still get in classes, they say, "Hey, I still use
13    your handcuffs materials from when the book was
14    written."
15           Now, the -- the book offers various
16    techniques and instruction and history and a number
17    of things. What agencies decide to use from it, it's
18    up to them, not up to me. But we still do handcuff
19    training and people still buy the book and...
20        Q.    Are you aware of a particular agency or
21    department that uses your book to train?
22        A.    Honolulu Police Department had four of
23    them on the shelf when I was there. California
24    agencies.
25        Q.    When were you in Honolulu?
```

```
 1        A.    I was first in Honolulu in 19 -- well,
 2    before the book came out, in the early '80s. And I
 3    was most recently in Honolulu in February of this
 4    year.
 5        Q.    And the book was still out in February of
 6    this year?
 7        A.    It's still -- still selling.
 8        Q.    And it's still being used by the Honolulu
 9    Police Department to train officers?
10        A.    I don't know that specifically because I
11    wasn't at the PD this trip. People don't usually use
12    an entire book. The model has changed over time.
13    People go to training classes to become certified as
14    instructors. And 25 years ago people would generally
15    go take your program, go back, use what they thought
16    was important. The model shifted now that people go
17    to a number of instructor programs and then go back
18    and blend from various sources. And a lot of states
19    have taken over training guidelines today and issue
20    state mandates and --
21        Q.    And that's true in Wisconsin, correct?
22        A.    Yes, that is.
23        Q.    Do you know of other books on handcuffing
24    that are in print?
25        A.    One by John Desmedt. An officer from
```

```
 1    Chicago coauthored a text called Speed Cuffing that
 2    came out also I think in the 1980s.
 3        Q.    And I'm not sure if you answered my
 4    question so I'm going to ask again.
 5           Are you aware of any particular agency or
 6    department that specifically uses your book to train
 7    officers today?
 8        A.    I couldn't answer that.
 9        Q.    Okay.
10        A.    There is 19,000 law enforcement agencies
11    in the United States, so I couldn't answer that.
12        Q.    So you don't know?
13        A.    That's a fair assessment.
14        Q.    Okay. I want to look again at the
15    supplemental report, in the same paragraph.
16    Actually, it's the paragraph after the heading we
17    were just looking at. I guess it's number one, and
18    then about halfway through that paragraph there is a
19    sentence that starts, "When a pretrial detainee is
20    handcuffed for the purpose of moving him to another
21    location, double-locking of the handcuffs is often
22    not done immediately because of the expectation of
23    fast prisoner relocation," correct?
24        A.    Correct.
25        Q.    What is the basis for that statement?
```

        A.    Personal experience and having conducted
training of correctional officers for 30 years.

        Q.    You don't say the source for that
statement?

        A.    No, it's my experience.

        Q.    Okay.  So you're unaware of a source that
would support that statement?

        MR. POSNANSKI:  Objection to the form of
the question.

        THE WITNESS:  I couldn't point to a
specific source sitting here.  I'm sure I could find
one.

        Q.    (BY MS. WARD)  Okay.  So are you saying
that there is an exception to the rule that handcuffs
should be double-locked as soon as practical and safe
for transport in a jail when there's an expectation
of fast relocation?

        A.    That's not what this sentence says and
that's not what I said.

        Q.    Okay.  So you are saying it's not an
exception to the general rule?

        A.    No, you said transport.  We are not
transporting anybody.  Transport in corrections has a
very specific meaning.

        Q.    Okay.  Strike my last question, then.  I

didn't realize I using a loaded word.

        Let me ask you this.  Do you believe that
there is an exception when a prisoner is relocated to
another location in a jail to the rule about
double-locking?

        A.    Let me answer it this way, because your
question so is broad I can't answer it.

        If you are moving prisoner A from cell one
to cell three, most jails are not going to
double-lock the handcuffs to move them 25 or 30 feet.

        If I am moving a prisoner from one jail
cell to another building in the same complex, which
your question invited, yes, then you would probably
double-lock the handcuffs if it was an extended
period of time.  But when you are looking at short
periods of time, generally the handcuffs are not
double-locked.

        Q.    So if handcuffs were employed too loosely,
for example, would that create a risk of escape by
the prisoner?

        A.    It would, but that's not double-locking.
That's a totally separate issue.

        Q.    Okay.  Let's assume the same question with
check for fit and double-lock.

        A.    Okay.  What's the question?

        Q.    That's a fair question.  I don't even know
myself.

        Let me put it to you this way.  Agree or
disagree.  There can't be an exception for moving
prisoners in a jail to the rule that cuffs should be
checked for fit and double-locked because if they
were too loose that would create a risk of escape,
correct?

        MR. POSNANSKI:  Objection to the form of
the question.

        THE WITNESS:  It would -- you have a
compound subject there.  I can break that apart.
Yes, you would want to check for fit to make sure
they are not too loose or too tight.  That's part
one.

        Part two, double-locking, is a separate
issue completely.  That could take place -- if it
were safe and reasonable at the time you could do it.
If you were going to take time in transporting these
people you could do it.  I mean, if it took some
time.  But, again, if you are just walking across the
hallway, you are probably not going to take the time
to double-lock.

        Q.    So you are saying it's acceptable for
travel of a short distance in a prison to not

double-lock --

        A.    Yes.

        Q.    -- immediately?

        A.    That's correct.  It's acceptable in the
field of law enforcement that if you handcuff
somebody, you may not double-lock right away.

        Q.    Okay.  The next paragraph under number one
starts off with, "Assuming the handcuffs were not
initially double-locked."

        A.    Correct.

        Q.    That's a fact, right, the handcuffs were
not initially double-locked, correct?

        MR. POSNANSKI:  Objection to the form of
the question.

        THE WITNESS:  It appears from the
statements made in the reports that they weren't
initially double-locked.

        Q.    (BY MS. WARD)  Okay.  So you don't have to
assume it, you know that the handcuffs weren't
initially double-locked because they were
double-locked at 6:47?

        A.    Correct.

        Q.    Okay.  Now, do you know of any reason that
the officers could not double-lock the handcuffs
before they carried Mr. Kingsley out of his cell?

1    A.    I don't know of any.

2    Q.    Okay.  Is there any reason that they

3  couldn't have checked for fit before taking him out

4  of his cell?

5    A.    I don't have any information that they

6  didn't check for fit.

7    Q.    Do you have any information that they did

8  check for fit?

9    A.    No, but he didn't slip out of them so I

10  imagine they were on well enough.

11    Q.    They were on well or tight, correct?

12    MR. POSNANSKI:  Objection to the form of

13  the question.

14    THE WITNESS:  They were on.

15    Q.    (BY MS. WARD)  They could have been tight.

16    MR. POSNANSKI:  Objection to the form of

17  the question.

18    THE WITNESS:  I guess they could have been

19  tight or they could not have been tight.

20    Q.    (BY MS. WARD)  So the answer to my

21  question was yes, they could have been too tight?

22    A.    No, the answer to your question is they

23  may have been tight or they may not have been tight.

24  I have no information one way or the other.

25    Q.    I think that answered the question.

---

1  that cause a short delay in the double-locking of the

2  handcuffs?

3    A.    When you're trying to escort somebody and

4  that person, for whatever reason, collapses and

5  becomes dead weight, your immediate concern is to get

6  that person from point A to point B and try to do

7  that as -- as quickly as possible and as safely as

8  possible.  Because once you put that person into the

9  next cell, you basically have them where you want

10  that person to be.  That prisoner now is in the cell

11  where you want that person to go.

12    So when you have that type of dead weight,

13  your options are, okay, we are going to leave this

14  person on the ground.  If he's on the ground on his

15  back we can't double-lock.  If he's on his stomach we

16  have now got to relift him up.  We may get kicked in

17  the process.  I mean, there is a lot of variables

18  there.  So the best way to minimize those is to grab

19  this person and take him to the next cell.  Because

20  if he's being carried, he's probably not kicking.  If

21  he's being carried, he is still dead weight.  You've

22  minimized his ability to really hurt you.  Didn't

23  eliminate it but you minimized it.  And you get him

24  over there as quickly and as safely as you can.

25    Plus, remember, we are in a correctional

---

1  environment here.  Other inmates can see what's going

2  on and they may start acting out.  I mean, these are

3  all concerns that we have to worry about in the

4  corrections field.

5    Q.    In the incident with Mr. Kingsley the

6  other inmates were locked down, correct?

7    A.    Being locked down doesn't mean they can't

8  create a ruckus.

9    Q.    Let me go back to something that you said

10  in your last answer.

11    When Mr. Kingsley was initially handcuffed

12  was he resisting?

13    A.    Let me go back to my report and look.

14    I just have that at 6:40 he was

15  handcuffed.

16    Q.    Do you know whether he put his hands

17  behind his back to be handcuffed?

18    MR. POSNANSKI:  Objection to the form of

19  the question.

20    THE WITNESS:  Yeah, he complied.  He was

21  told to put his hands behind his back and he

22  complied.  But kept them far enough apart so the

23  handcuffs could not be applied.  And that's page one

24  of Conroy's incident report.  So there wasn't total

25  cooperation.

---

1    Q.    Did you see any indication in any of the

2  reports or any of the materials that you reviewed

3  that the officers were under any kind of time

4  constraint when they moved Mr. Kingsley from his cell

5  to the receiving cell?

6    MR. POSNANSKI:  Objection to the form of

7  the question.

8    THE WITNESS:  The only time constraint

9  that would have been in place would have been driven

10  by Mr. Kingsley's uncooperation.

11    Q.    (BY MS. WARD)  How did that create a time

12  constraint?

13    A.    You want to move a recalcitrant prisoner

14  from point A to point B as quickly as you can.

15    Q.    Why?

16    A.    Safety primarily.

17    Q.    Okay.  Well, let's explore that a little

18  bit.

19    In that same paragraph you state that "The

20  choice to become dead weight was solely

21  Mr. Kingsley's, which also caused a short delay in

22  the double-locking of his handcuffs," right?

23    A.    Correct.

24    Q.    Now, how did his -- let's leave aside

25  whether it was voluntary or involuntary.  But how did

1    And then as soon as Mr. Kingsley was
2  handcuffed, he refused to go out the door so you --
3    Q.    (BY MS. WARD)  Stop a second.
4    So he was laying face-down on his bunk
5  when they got him handcuffed, correct?
6    A.    Yes.
7    Q.    And so when he was first handcuffed he
8  wasn't dead weight, correct?  He wasn't being
9  carried, correct?
10    A.    No, he wasn't being carried.
11    Q.    Okay.  So is there any reason that at that
12  point they couldn't have checked for fit and
13  double-locked the cuffs?
14    A.    Again, it's a practice that we are only
15  moving the guy from point A to B.  This
16  double-locking shouldn't even be an issue at this
17  point because we are just taking him to the next --
18  to another cell.
19    Q.    Okay, but the question, is there any
20  reason that it couldn't have happened right then?
21    A.    You would have to ask the officers that.
22    Q.    Okay.
23    A.    I don't know what else was going on, if
24  anything.
25    Q.    Okay.  Or Mr. Kingsley?

1    MR. POSNANSKI:  Objection to the form of
2  the question.
3    THE WITNESS:  Unless Kingsley is trained
4  in handcuffing techniques and the policy of that
5  sheriff's department and has had the training these
6  officers have had, I wouldn't ask Mr. Kingsley
7  anything.
8    Q.    (BY MS. WARD)  Well, you said what was
9  going on at that moment.  He had some information
10  about what was going on at that moment, correct?
11    A.    Yeah, the information that was going on
12  was we have a defiant prisoner.  We have a prisoner
13  who is not playing by the rules.  We have a prisoner
14  who is not cooperating with the deputies.  That's
15  what was going on, and that heightens the threat
16  level to the correctional officers.
17    Q.    Okay.  That's the correctional officer's
18  report, that's the basis for that statement that he
19  was not cooperative, correct?
20    MR. POSNANSKI:  Objection to the form of
21  the question.
22    THE WITNESS:  Correct.
23    Q.    (BY MS. WARD)  Okay.  Let's look at your
24  handcuff book.  So we'll mark this exhibit.
25    (EXHIBIT 21 WAS MARKED.)

1    Q.    Okay.  Do you recognize Exhibit 21 as the
2  Introduction from your technical handcuffing book?
3    A.    Yes.
4    Q.    Now, it was copyrighted in 1988, correct?
5    A.    I believe it was.
6    Q.    If you want to check we have the --
7    A.    Well, there was, I think, a date in the
8  book of '89, and I can't remember if I copyrighted
9  the manuscript or copyrighted the book.  I can't
10  remember.
11    Q.    I'm handing you the book.
12    A.    That's 88.  Yes.
13    Q.    Okay.  And, actually, on the record you
14  can have this back.
15    So '88 was -- I should have done the
16  math -- 24 years ago, correct?
17    A.    Sounds right.
18    Q.    So is there anything in the book that you
19  would change in the book, sitting here today?
20    A.    Oh, there is several things I would change
21  in the book.
22    Q.    Such as?
23    A.    I would add the new handcuff models that
24  have come on the market.  I would probably add some
25  other restraint devices that are on the market.  I

1  would probably take out one of the standing handcuff
2  techniques.  That would probably be about it.
3    Q.    Okay.  In looking at the introduction that
4  we photocopied here, the last sentence of the second
5  full paragraph, the first paragraph, is Handcuffs,
6  and then the second paragraph is, "The mere mention."
7  And then I wanted to go to the end of that paragraph.
8  It says, "And you can still laugh about the time that
9  you or a friend tried to handcuff a person, only to
10  discover that after the suspect screamed out in pain,
11  the handcuffs were double-locked."
12    A.    Correct.
13    Q.    Do you mean to say that they were not
14  double-locked, or is this correct?
15    A.    That's an absolute correct statement.
16    Q.    Okay.  So the -- well, can you explain it
17  to me?  I'm not even going to try and ask a question
18  because I don't understand it.  So is your little
19  hypothetical where the handcuffs were too tight and
20  then double-locked?
21    A.    No.
22    Q.    Okay.  Go ahead and tell me what it means.
23    A.    Handcuffs can double-lock without you
24  doing it.
25    Q.    Okay.

1    A.    So more than once handcuffs were taken out
2  of a pouch, the single bar was locked into place and
3  they were applied to a wrist and they didn't move.
4  So it's like hitting the person's wrist with a steel
5  bar that didn't move.
6    Q.    Okay.
7    A.    That's what that means.
8    Q.    Okay. Now I understand. All right. I'm
9  going to mark another exhibit.
10    A.    Are we finished with Exhibit 21 for now?
11    Q.    Yes, we are.
12    A.    Thank you.
13          (EXHIBIT 22 WAS MARKED.)
14    Q.    Exhibit 22 is also from your book,
15  correct?
16    A.    Yes, it is.
17    Q.    And it appears to be a diagram of two
18  different, I guess for lack of a better word, models
19  of handcuffs?
20    A.    The top one is a chain-style model. The
21  bottom is a hinged-style model.
22    Q.    Okay. Do you know which type of handcuff
23  was used with Mr. Kingsley on the day of the
24  incident?
25    A.    I believe it was chain-style.

1    Q.    Okay.
2    A.    The pawl -- and it depends on the
3  manufacturer of the handcuffs. Most pawls are
4  solidly stamped pieces of metal. Some are
5  independent, three-part systems, but they all operate
6  the same. Those ratchet -- the teeth -- we'll call
7  it teeth for simplicity -- the teeth go in and engage
8  the pawl.
9    Q.    Uh-huh.
10    A.    So as the teeth slide over the pawl the
11  hook into position. The purpose of the pawl is so
12  that the handcuff can't pull back.
13          Now, the handcuff -- because of the pawl,
14  unless it's broken, the handcuff, that single bar or
15  that blade cannot come back out and open.
16    Q.    Okay. Using single bar synonymously with
17  blade?
18    A.    Yes.
19    Q.    Okay.
20    A.    So the handcuff goes around the wrist. It
21  won't come off the wrist unless the pawl is broken.
22  But the single bar can get tighter if the handcuff
23  isn't double-locked.
24    Q.    So it's a one-way movement that's
25  permissible --

1    A.    Correct.
2    Q.    -- or possible is what I meant to say.
3    A.    Correct.
4    Q.    Okay.
5    A.    Now, if we go to the top of that
6  right-hand piece where you see double-lock mechanism,
7  the double-lock mechanism is a detent button. And to
8  the left of that you see the handcuff key. And on
9  the tip of the handcuff key is a called a double-lock
10  actuator.
11    Q.    Okay.
12    A.    You take that tip of the handcuff key and
13  you push it into this detent button and that moves a
14  bar -- which you see in a broken line there -- that
15  moves a bar underneath the pawl itself.
16          Now, the pawl, when you -- if you were to
17  unlock a handcuff, this is what it looks like. The
18  pawl is on top and there is springs underneath it.
19  So when I turn the key to unlock the handcuff, the
20  pawl drops down so the handcuff can be removed.
21          When you double-lock it, there is a bar
22  that goes under those springs so it won't come down
23  and it won't allow the handcuff to get tighter and it
24  wouldn't allow the handcuff to open. That's what a
25  double-lock -- that's how a double-lock works.

1    Q.    And what is the basis for that belief?
2    A.    I thought I read that somewhere. I may be
3  wrong. And it wouldn't matter; they basically
4  operate the same.
5    Q.    Okay. Can you explain, now that I'm
6  looking at a diagram to explain what the terms you
7  were using, what they are? Can you explain that how
8  double-locking works?
9    A.    Sure. The -- if we take the top diagram,
10  the chain-style handcuffs, because that has the
11  representation that will make it easiest to explain.
12    Q.    Okay.
13    A.    If we look at the right handcuff.
14    Q.    Yep.
15    A.    You'll see there is a little sawtooth,
16  dotted line at the bottom of those cheek plates
17  called a pawl, p-a-w-l.
18    Q.    Yes.
19    A.    The pawl is -- if you think of it as a
20  sawtooth going up and down, the single bar, or the
21  ratchet of the handcuff, where you see to the right
22  of the word pawl, you see the word ratchet --
23    Q.    Yep.
24    A.    -- those teeth slide between the two
25  plates of the handcuff and they engage the pawl.

1    Q.    So you push the top of the key just --
2    it's kind of a one insert into that little hole and
3    it engages the mechanism?
4    A.    Yes.
5    Q.    Okay,
6    A.    Then to disengage the mechanism, you would
7    put the key into the keyway -- which we would call a
8    keyhole -- you would turn it to the left, which would
9    push back that double-lock mechanism.  And then you
10    would turn the key to the right which would unlock
11    the handcuff.
12    Q.    Okay.  So double-locking is just in and
13    out, and unlocking is put in the key, turn and turn?
14    A.    Correct.
15    Q.    Okay.  All right.  I'm going to mark
16    another exhibit from your book.  In hindsight, I
17    would have put the book exhibits altogether but...
18            (EXHIBIT 23 WAS MARKED.)
19    Q.    Okay.  Do you recognize Exhibit 23 as
20    Chapter XXI from your book?
21    A.    Yes.
22    Q.    Okay.  Turning to page 254.
23    A.    Okay.
24    Q.    So you provide here a diagram,
25    Exhibit 21-4, to assist in describing the intangible

1    force.
2    Q.    So to take the example of a baton, you
3    were saying earlier it can be used to restrain the
4    arms?
5    A.    It could be used to restrain the arms or
6    for control purposes.  That -- that would be a level
7    three usage.
8            If I struck someone with it -- let's say I
9    hit them in the article.
10    Q.    That would be a level five?
11    A.    That would be a level five.  And if I hit
12    them --
13    Q.    If you hit them in the head --
14    A.    That would be a level six.
15    Q.    Okay.  All right.  And the use of the
16    Taser in -- with the probes would be under what
17    level?
18    A.    Probe deployment generally would also
19    be -- historically it would be somewhere either
20    levels three, or some agencies may put it at five,
21    depending on the situation.  After April of this
22    year, depending on the location of the deployment, it
23    could even be up at number six.
24    Q.    And you are talking about with probes?
25    A.    With probes.  But I have to qualify the

1    use of force, correct?
2    A.    Correct.
3    Q.    And it represents your attempt to make the
4    use of force concepts more tangible?
5    A.    Correct.
6    Q.    Where on this range of response continuum
7    would you place use of a Taser?  In drive stun mode,
8    to be more specific.
9    A.    Drive stun, level three.
10    Q.    Level three.  So the same as handcuffs?
11    A.    Yes.
12    Q.    Same as impact tools?
13    A.    Correct.
14    Q.    And same as empty hand?
15    A.    Correct.
16    Q.    What are impact tools?
17    A.    Impact tools would consist of batons, it
18    would consist of flashlights, other restraint devices
19    if you used only for control and restraint purposes,
20    not striking purposes.
21    Q.    So impact tools appears under number three
22    because they can be used for restrain, and they
23    appear also under number five because they can
24    actually be used to hit.
25    A.    Right, and also number six for deadly

1    number six.  There was a research study that came out
2    in April of this year that said if there is a probe
3    deployment over the transcardiac vector, as defined
4    by Dr. Webster in his research, this cardiologist
5    concluded that the Taser could cause either
6    ventricular fibrillation or ventricular tachycardia.
7            The cardiologist also said in his research
8    that any other part of the body is fine, shoot them
9    in the back, shoot them in the legs -- this is all
10    probe now.  He said drive stuns don't have effect.
11    That's not going to cause any heart problems.  But he
12    did qualify it for that transcardiac vector location
13    in the chest.
14    Q.    Okay.  So under temporary incapacitation
15    one of the listed responses is electronics.  What is
16    that?
17    A.    Electronics could be -- again, it could be
18    the use of handheld stun guns.  It could be -- there
19    was a device that was manufactured about this time
20    that was a electronic stun device that would
21    telescope out to about ten feet and you could pin
22    somebody into the wall and apply it.  Those devices
23    are no longer made.  In fact, we don't even use this
24    continuum anymore.  Since Graham versus Connor came
25    out the book was actually -- manuscript was written

1  before Graham was decided so since Graham we no
2  longer use the continuum.
3       Q.   So one of the things you might wish to
4  change with your book sitting here today is you would
5  take out the Range of Response Continuum?
6       A.   Yeah, we would -- we would rewrite most of
7  that chapter to comply to the constitutional
8  standards rather than a continuum that's used as a
9  training aid.  Continuums are mostly training aids.
10 That's all they really are.  They are not legal
11 standards.  But, again, this book was written
12 pre-Graham so this was the norm for the industry at
13 that time, to use continuums.
14      Q.   So you do state in the paragraph above it,
15 though, that it was helpful in describing the
16 utilities of force to a jury, correct?
17      A.   Again, it's a training aid, so, sure.
18 It's helpful at times to use it to describe to a
19 jury.  It's just like describing it to police
20 officers going through training.
21      Q.   Is there anything inconsistent with the
22 diagram and the constitutional law that you are aware
23 of?
24      A.   Well, the diagram doesn't include
25 everything.  That's the biggest issue.  And -- for

1  of the other cases came along, it clarified it, so
2  these really aren't needed today.
3       Q.   Okay.  Could you turn to 256?  And I want
4  you so keep your finger on 254 because I'm going to
5  go back and forth.
6       A.   Okay.
7       Q.   There is a diagram on 256, Exhibit 21-5.
8       A.   Right.
9       Q.   Now, the way this was meant to be used is
10 with 21-4, right?  In terms of the numbers?  The
11 officers use the force, one through six along the
12 bottom?
13      A.   Yes.
14      Q.   Okay.  So I think that you said that Taser
15 and drive stun is like number three, correct?
16      A.   Correct.
17      Q.   And where would you place Mr. Kingsley's
18 action on the X axis?  Y axis, I'm sorry.
19      A.   On the Y axis I would put it as active
20 resistance or struggling.
21      Q.   So sort of the situation lines up right
22 where the dotted lines are shown in the diagram?
23      A.   Yeah, pretty much.
24      Q.   So if we were to assume that
25 Mr. Kingsley's actions were less than struggling, if

1  example, if I pulled out a Taser and activated it and
2  you heard the sparking and you heard the noise, that
3  would really be equivalent to a verbal command.  So
4  you could really put Tasers there.
5       I could also pull out the Taser and just
6  put a red dot on you and if you saw that, that would
7  be equivalent to presence.
8       If I deployed it or used it in drive stun,
9  that would probably be the equivalent of number
10 three.
11      If it struck you in the eye and I did that
12 intentionally, that would probably be number six.
13 And that's the problem with continuums; you can have
14 a particular device multi-placed on a continuum, but
15 what happens is some people like to pigeonhole it in
16 one spot.  It's a fluid device, it's not a pigeonhole
17 device.
18      Q.   It's like lawyers, maybe?
19      A.   No, I don't -- I don't necessarily think
20 lawyers.  I think that's -- when you look at the
21 history of why the continuum was developed, it was
22 lack of guidance by the courts so people developed
23 these to help explain and -- and, again, it's a
24 training aid.  It's not a legal standard.
25      And then when Graham came along and some

1  they were more passive resistance, then a number
2  three use of force would be an escalation, correct?
3       A.   No.
4       Q.   Okay.  What would it be?
5       A.   It would probably be appropriate under the
6  circumstances.  Remember, number -- level three,
7  according to Exhibit 21-4 on page 254, includes empty
8  hand techniques and handcuffing.  So even at passive
9  resistance you are probably going to handcuff the
10 person so -- in fact, this is a very good
11 representation on why Mr. Landers -- if you have to
12 match force is illogical.
13      Q.   We'll talk about that in a minute.  I'm
14 still trying to understand your last answer.
15      So I'm talking about the officer's use of
16 the Taser.  Would that be considered, on your
17 diagram, an escalation if Mr. Kingsley's actions were
18 viewed as passive resistance?  Not the handcuff
19 and -- I'm specifically talking about the use of the
20 Taser on Mr. Kingsley.  What you told me was a number
21 three.
22      A.   I told you if it were in here, yes, it
23 would be a number three, as it could be a number one,
24 a two or a six.
25      Q.   Well, I guess I'm asking you to place it.

```
 1      A.    I just did.
 2      Q.    The use of the Taser on Mr. Kingsley, is
 3  it a one, a two, a three or a six?
 4      A.    If it was pulled out and just used, it
 5  would fall under number three as a drive stun.  Same
 6  as empty hand control.
 7      Q.    The application of the Taser to
 8  Mr. Kingsley's shoulder area and discharge of it is a
 9  number three, correct?
10      A.    Yes.
11      Q.    Okay.  So my question is, if
12  Mr. Kingsley's actions were viewed as less than
13  struggling, then the use of the Taser would be an
14  escalation vis-a-vis Mr. Kingsley's actions, correct?
15      A.    In drive stun mode I would say no.  In
16  probe mode, possibly.  If Mr. Kingsley were sitting
17  in this chair and said, "I'm not moving," drive stun
18  application would be the equivalent of empty hand
19  control, grabbing him under the arms and lifting him
20  up.  It would be the same.
21      Q.    I think in the prior response you
22  definitively said you would classify it as a number
23  three, correct?
24      A.    A drive stun would be a number three.
25      Q.    Okay.  And now I want you to assume that
```

```
 1  instead of struggling, Mr. Kingsley's actions were
 2  between struggling and passive on your Y axis.
 3      A.    Okay.
 4      Q.    Then would the use of force by the
 5  officers, being a number three, be considered an
 6  escalation on this diagram?
 7      A.    I think I understand what you are saying.
 8  The use of the Taser would be more than a verbal
 9  command.
10      Q.    So would it be an escalation vis-à-vis the
11  actions of Mr. Kingsley?
12      A.    It would be a level --
13      MR. POSNANSKI:  Objection to the form of
14  the question.
15      Go ahead.
16      THE WITNESS:  It would be a level higher
17  than verbal commands.
18      Q.    (BY MS. WARD)  Would it be an escalation?
19      MR. POSNANSKI:  Same objection.
20      THE WITNESS:  Using a device would -- or
21  empty hands would be an escalation over verbal
22  commands.  I mean, it's a higher force option.
23      Q.    (BY MS. WARD)  Well, maybe -- let me ask
24  it to you this way because I don't know if you are
25  understanding.
```

```
 1      The diagonal line that goes across your
 2  figure --
 3      A.    Right.
 4      Q.    -- on page 256, it's labeled escalation.
 5      A.    Correct.
 6      Q.    So how is this figure to be used in terms
 7  of trying to assess the use of force versus the
 8  action of the violator, as its labeled here?
 9      A.    Well, as -- above that exhibit number,
10  Exhibit 21-5 says, this shows escalation of force as
11  a straight line rather than a staircase.  As the
12  violator's use of force increases, so might your
13  level of force.
14      Q.    Okay.  So your level of force might also
15  decrease, which would be a deescalation, correct?
16      A.    It could.
17      Q.    So it is reasonable to deescalate also,
18  right?
19      A.    In some cases, sure, it's reasonable to
20  deescalate.  Absolutely.
21      Q.    Okay.  Would it have been reasonable to
22  deescalate rather than Tase Mr. Kingsley?
23      A.    Rather than what?
24      Q.    Tase.  Apply the Taser to Mr. Kingsley's
25  shoulder and let it rip.
```

```
 1      MR. POSNANSKI:  Objection to the form of
 2  the question.
 3      THE WITNESS:  Well, I don't think applying
 4  the Taser to Mr. Kingsley's shoulder caused anything
 5  to rip.  I just wanted to clarify that on the record.
 6      Q.    (BY MS. WARD)  Yeah, that was a bad
 7  question.  Let me rephrase my question because I used
 8  slang instead of regular wording.
 9      Can you read the question I asked and I'll
10  put it in proper words.
11      (Record was read as follows:  "Would it
12      have been reasonable to deescalate rather than
13      Tase Mr. Kingsley?
14      "Answer.  Rather than what?
15      "Question.  Tase.  Apply the Taser to
16      Mr. Kingsley's shoulder and let it rip.")
17      MS. WARD:  Okay.
18      Q.    So by "let it rip" I mean put it on his
19  shoulder and activate it.
20      A.    Okay.  That's a decision that the officers
21  would have to make at that point in time.  And if
22  they believed that the Taser would help in the
23  unhandcuffing of Mr. Kingsley, fine.  Could they have
24  left at that point?  Sure.  But that's their call.
25      Q.    Okay.  You can put that exhibit away.  Why
```

1   don't we take a five-minute break.

2       A.    Okay.

3           (A break was taken from 3:24 p.m. to

4   3:30 p.m.)

5       Q.    Just one housekeeping matter before we get

6   back into the testimony.  I'm returning the

7   Use-of-Force by the Numbers original book and the

8   original training CD for the police, Use of Force Law

9   Instructors Guide by Judge Plitt.  There you go.

10          MR. POSNANSKI:  You want your book back?

11          THE WITNESS:  Just hang onto it in case --

12  we might need it down the road for trial or

13  something.

14      Q.    (BY MS. WARD)  Okay.  Let's go back to

15  your supplemental expert report at page three, and

16  we'll look at your second opinion in your

17  supplemental report.

18      A.    Okay.

19      Q.    "Placing a knee into the back of

20  Mr. Kingsley to help control him is consistent with

21  national restraint and control standards and also

22  consistent with Wisconsin restraint and control

23  standards."

24          What source did you use for the Wisconsin

25  restraint and control standards?

---

1       A.    It would have been either the DAAT

2   manual -- probably the DAAT manual.

3       Q.    Okay.  All right.  Now, the first sentence

4   under number two states, "Plaintiff's expert,

5   Mr. Landers, is wrong when he opined that Wisconsin

6   law enforcement officers must match the threat level

7   to the force they apply in an objectively reasonable

8   manner."

9           You say that, right?

10      A.    Correct.

11      Q.    Okay.  So is it -- the threat level, is

12  that something that you could equate to the need for

13  force?

14      A.    I don't understand your question.

15      Q.    Well, as it's stated here, which is a

16  direct quote from Mr. Landers -- is another way that

17  he could have said it, "match the need for force to

18  the amount of force used"?

19      A.    The -- the --

20          MR. POSNANSKI:  Objection to the form of

21  the question.

22          You can answer.

23          THE WITNESS:  Matching force to the

24  situation isn't -- isn't the standard, from what he

25  wrote.

---

1       Q.    (BY MS. WARD)  Is a threat level a synonym

2   for need for force?

3           MR. POSNANSKI:  Objection to the form of

4   the question.

5           THE WITNESS:  Threat level in some cases

6   would dictate the response of an officer.  You have

7   force options, and one of those options you would

8   pick in response to the perceived threat level.

9       Q.    (BY MS. WARD)  Okay.  Is that what

10  Mr. Landers was saying?

11          MR. POSNANSKI:  Objection to the form of

12  the question.

13          THE WITNESS:  I'm not sure what his -- his

14  thinking was, but what he wrote was you match the

15  threat level to the force.

16      Q.    (BY MS. WARD)  So your problem is with the

17  word "match," correct?

18      A.    I have two problems.  You don't match the

19  threat level to the force; you match the force to the

20  threat level.  Well, I take that back, too, because

21  you don't match them, you respond to the threat with

22  force but you don't match it.  I mean, you don't --

23  the way I interpreted what he said here is that you

24  match.  In other words, if he punches you, you punch

25  him.

---

1       Q.    You don't know if that's what he meant,

2   though, correct?

3       A.    Well, he is the one who is trying to

4   articulate this so I'm just going with what he wrote.

5       Q.    Okay.  You give an example, though,

6   following that statement.  "For example, according to

7   Mr. Landers, if an inmate yells, the correctional

8   officer must match and yell back."

9           Now, that's not Mr. Landers' example,

10  correct, that's your example?

11      A.    Mr. Landers didn't give an example.

12      Q.    Correct, but this says "according to

13  Mr. Landers" and I'm just trying to clarify that "for

14  example" is yours, correct?

15      A.    Yes, that is.

16      Q.    Okay.  And you don't know what he meant by

17  the statement, you are just confused by the matching,

18  correct?

19          MR. POSNANSKI:  Objection to the form of

20  the question.

21          THE WITNESS:  The fact that he didn't

22  articulate it any better than that, I have to go with

23  what's there.

24      Q.    (BY MS. WARD)  Okay.  There is a couple

25  places under number two where you state what a

1  Wisconsin deputy sheriff knows, in the second
2  paragraph, and what correctional officers know in the
3  third paragraph?
4       A.    From their training, correct.
5       Q.    So you are not talking about what they
6  actually know, but you are talking about what you
7  understand their training to be, correct?
8       A.    Correct.
9       Q.    Let's turn the page to page four.  The
10  first full paragraph that begins, "It is well
11  understood."
12      A.    Okay.
13      Q.    I just need to clarification on a
14  sentence. I think a word might be missing.
15      It starts -- it's, like, the third or
16  forth sentence. I'm not sure. It starts with, "In
17  the instant matter."
18      Do you see that?
19      A.    I'll find it. Hang on.
20      Oh, yes. There it is.
21      Q.    Okay. Then the next -- "In the instant
22  matter, the decision to use on Mr. Kingsley."
23      Is there a word missing? The decision to
24  use what?
25      A.    Now I'm lost again. Where are we? Oh, we

1  are in this paragraph. Sorry.
2       "The decision to use force." I guess the
3  word force is missing.
4       Q.    Okay. Thank you.
5       A.    Sorry about that.
6       Q.    So the statement is that the decision was
7  based on what the officers are taught during their
8  use of force training, correct?
9       A.    Right, and then it explains what the
10  five...
11      Q.    Factors are?
12      A.    Correct.
13      Q.    Do you know whether the officers in this
14  case actually based their decision on those factors?
15      A.    I don't know. That's what their training
16  would have consisted of. So I don't know if they ran
17  through these five factors or not.
18      Q.    Okay. Did you see any evidence of
19  analysis of those factors in their incident reports?
20      MR. POSNANSKI: Objection to the form of
21  the question.
22      THE WITNESS: I would say yes, I did see
23  it. I saw it in the absence of higher levels of
24  force, if that makes sense. In other words, I saw it
25  in the absence of what they didn't do versus what

1  they did do.
2       Q.    (BY MS. WARD) I think I understand what
3  you are saying.
4       All right. And then you proceed to
5  analyze the factors yourself after that paragraph,
6  right?
7       A.    Correct.
8       Q.    Okay. "What was the need/reason for the
9  force?"
10      And you say, "Mr. Kingsley's intentional
11  failure to comply with correctional officer orders in
12  addition to jail rule regulations."
13      And that appears to be an incomplete
14  sentence. Are you just answering the question or are
15  you -- why don't you tell me what that means.
16      A.    Well, what was the need or reason for the
17  use of force?
18      And my answer was Mr. Kingsley's
19  intentional failure to comply with correctional
20  officer orders. In addition, basically the jail rule
21  regulations. Every jail has some rules for the
22  inmates. And one of those rules is that you'll
23  comply with a lawful order of a correctional officer.
24  He didn't comply with those.
25      In addition to intentionally becoming dead

1  weight, Mr. Kingsley also resisted the correctional
2  officers.
3       Q.    Okay. So those two things that you list
4  there, those are explained more fully in your first
5  report, correct?
6       A.    Yes, they are.
7       Q.    Then the second factor, I guess, "What was
8  the relationship between the need to use the force
9  and the amount of force that was actually used?"
10      A.    Correct.
11      Q.    Okay. And your answer there is, "The
12  officers reported and the video showed the
13  correctional officers' application of force was
14  consistent with their training. Ultimately the trier
15  of fact will answer this question."
16      What were they -- what were they trained
17  that's consistent with what you observed in the
18  video?
19      A.    Well, they used presence. They used
20  verbal commands. They used handcuffs. A Taser was
21  deployed and then they left. So all of that's
22  contained in the various training that Wisconsin
23  officers receive.
24      Q.    So the next question, "Was the force used
25  in a good faith effort to restore or maintain

1  discipline or order, or used maliciously and
2  sadistically for the purpose of causing harm?"
3         And then you state, "The video showed the
4  officers using force to maintain discipline and/or
5  order."
6         How does the video show that?
7     A.    I think the video shows that the inmates
8  don't run the asylum.
9     Q.    How does the video show that?
10    A.    Mr. Kingsley was resisting.  Mr. Kingsley
11 was dead weight.  And if he fell to the ground or
12 resisted, and that created a disturbance and people
13 just walked away, then he would be running the
14 program, not the correctional officers who have the
15 responsibility to run the program.
16        So, again, we go back to the two basic
17 premises of corrections, is to maintain order and
18 discipline.  And by becoming dead weight, by refusing
19 the officers' commands, that created disorder and
20 they were trying to maintain that order.
21    Q.    So what evidence would be available if the
22 officers were maliciously and sadistically trying to
23 harm Mr. Kingsley?  What would you expect to see
24 under those circumstances?
25    A.    I would expect to see -- from a physical

1  force level, possibly kicking, punching.
2         From an equipment viewpoint, multiple
3  Taser deployments.
4         From a verbal viewpoint, maybe phrases
5  such as, "This will teach you a lesson" or "this
6  will" -- you know, those types of things I think
7  would manifest themselves to give a basis for
8  malicious or sadistic-type force applications.
9     Q.    You wouldn't expect to see anything in the
10 incident reports that would be consistent with
11 sadistic or malicious use of force, correct?
12    A.    I would agree with that.  Usually officers
13 don't put those things down.
14    Q.    And these factors that you analyze here in
15 the report, that need/reason for the use of force,
16 relationship, where did you get those factors?
17    A.    These are known as the Hudson five.  From
18 the Hudson case.
19    Q.    And you just used the Hudson case on your
20 own?  You weren't provided the Hudson case by
21 counsel, correct?
22    A.    Counsel didn't provide me any legal cases.
23 This came from my training and certification as a --
24 in the CLS program and from teaching force.  And I
25 believe the Hudson five is also mentioned in our use

1  of force manual.
2     Q.    What use of force manual?
3     A.    Use-of-Force by the Numbers.
4     Q.    Oh, okay.
5     A.    Sorry.  I called it a manual and it's
6  really a workbook.
7     Q.    Okay.  The next question, "What was the
8  extent of the injury inflicted?"
9         And you state, "The video fails to show
10 Mr. Kingsley receiving an injury?"
11        And I think we already talked about you
12 distinguished the pain you felt from the Taser from
13 an injury that he received, correct?
14    A.    Correct.
15    Q.    And then you -- you reiterate that
16 Mr. Kingsley has made a claim that the handcuffs were
17 overly tight and allegedly caused injury to his
18 wrist?
19    A.    Correct.
20    Q.    Now, did you credit that statement when
21 you said that the video failed to show him receiving
22 an injury?
23    A.    I'm not sure I follow your question.
24    Q.    Did you assume that that was correct,
25 Mr. Kingsley's claim that his wrist was injured by

1  overtight handcuffs?
2         MR. POSNANSKI:  Objection to the form of
3  the question.
4         THE WITNESS:  I'm not making a credibility
5  determination there.  I just stated what I saw on the
6  video and then I stated the claim of Mr. Kingsley.  I
7  tried to balance that out and say, Look, I didn't see
8  anything in the video and Mr. Kingsley made this
9  claim."  So I tried to balance it out there.
10    Q.    (BY MS. WARD)  Did you see any evidence of
11 injury to Mr. Kingsley, excluding the video?
12    A.    I haven't, no.
13        (EXHIBIT 24 WAS MARKED.)
14    Q.    Do you recognize Exhibit 24?
15    A.    Yes.  This is a suicide or medical
16 observation form.
17    Q.    And you reviewed this document in
18 connection with preparing your expert opinion in this
19 case?
20    A.    Yes.
21    Q.    Okay.  And then do you see the line at
22 06:59 and it lists in the next column some badge
23 numbers and the code says "removed handcuffs"?
24    A.    Yes.
25    Q.    The next two lines are taken up with text

1    that says, "Was breathing. Saw chest rise. Hands
2    were a little red from poor circulation from being
3    handcuffed and resisting."
4         Did I read that accurately?
5    A.    Yes, you did.
6    Q.    Okay. So there is an observation in the
7    record that he had red hands, correct?
8    A.    Correct.
9    Q.    In your experience would his hands have
10   been red if the handcuffs had been checked for fit
11   and double-locked immediately when they were applied?
12   A.    Could have been.
13   Q.    They could have been red?
14   A.    Yes.
15   Q.    Do the red hands indicate to you that it's
16   possible that Mr. Kingsley did have an injury
17   consistent with his claims?
18   A.    Not with simply red hands. I can -- I can
19   put handcuffs on my wrists today and it will --
20   they'll turn red, but I don't have an injury. And I
21   could leave them on there for 20 minutes and I
22   wouldn't have an injury.
23   Q.    And it would -- what would the red hands
24   indicate?
25   A.    It would indicate possible circulatory

1    restrictions but that's not correlated to injury in
2    any way.
3    Q.    Is it inconsistent with a claim of injury?
4    A.    No. People's hands turn red. Some
5    people's hands turn red because they have blood
6    pressure issues possibly. I mean, there might be
7    dermatological issues. I don't know. I just know
8    that people's hands can turn red from handcuffs being
9    applied.
10   Q.    Would it have been helpful if a photo had
11   been taken of his hands and wrists?
12        MR. POSNANSKI: Objection to the form of
13   the question.
14        THE WITNESS: It certainly wouldn't have
15   been harmful. But I don't see anything in this
16   record where Mr. Kingsley complained. There was
17   nothing on the video that said that Mr. Kingsley
18   said, "Hey, my hands hurt. The cuffs are too tight."
19   I haven't seen anything in the record -- and maybe
20   there is something that I haven't been given, but I
21   haven't found anything in the record where
22   Mr. Kingsley put the officers on notice that the
23   handcuffs were too tight. So red hands, in my
24   opinion, wouldn't be indicative of overly tight
25   handcuffs.

1    Q.    (BY MS. WARD) But it's not inconsistent
2    with overly tight handcuffs, correct?
3    A.    In some cases it may not be.
4    Q.    And Mr. Kingsley did groan throughout the
5    incident, correct?
6    A.    Yes.
7    Q.    In a manner that some people could
8    interpret as pain, correct?
9         MR. POSNANSKI: Objection to the form of
10   the question.
11        THE WITNESS: Yeah, I would agree with
12   that.
13   Q.    (BY MS. WARD) All right. Let's turn to
14   page five in your supplemental expert report. You're
15   talking again about Mr. Landers' opinion regarding
16   the amount of force, correct?
17   A.    Correct.
18   Q.    The last sentence in the first paragraph
19   states that "The Wisconsin DAAT manual instructed
20   officers to use only the necessary body weight on the
21   subject or secure him or her to the ground with
22   respect to handcuffing," correct?
23   A.    Correct.
24   Q.    Now, that statement is actually consistent
25   with Mr. Landers' opinion, correct?

1         MR. POSNANSKI: Objection to the form of
2    the question.
3         MS. WARD: Let me withdraw that.
4    Q.    Do you know how much pressure was applied
5    to Mr. Kingsley's back?
6    A.    No one knows.
7    Q.    You can't see it in the video, correct?
8    A.    No one knows how much pressure was applied
9    to his back. Can't be measured.
10   Q.    As a matter of physics or -- why can't it
11   be measured?
12   A.    In order to measure how much pressure
13   would be applied to someone's back you would have to
14   know the density of the back muscle, you would have
15   to know the angle of the leg and where it was placed.
16   You would have to know what portion of the leg was
17   placed. And an error that's often made is if the
18   officer weighs 150 pounds and puts a knee on this
19   person that 150 pounds of pressure was there, where
20   we know scientifically that's not even close to the
21   amount of weight that was placed there.
22        So there is a number of variables that
23   have to go into the calculation. And in a situation
24   like this, I could put my hand on someone and keep it
25   rigid. And if they raised up, they're putting the

1   pressure on, not me. So where you are having a
2   resisting party, the resisting party may be creating
3   some of that pressure him or herself. So we have no
4   way of actually knowing and it -- it's -- we have
5   been -- I have been through this before and the
6   studies that have been done so far have shown that
7   you can put approximately 250 pounds directly onto
8   the back and it's -- it doesn't have any adverse
9   effect on breathing or what have you. So that would
10  be my answer to that question.
11       Q.   Is that statistic assuming that the
12  subject has got no preexisting breathing problems,
13  I'm assuming?
14       MR. POSNANSKI:  Objection to the form of
15  the question.
16       THE WITNESS:  The people were screened for
17  the study, obviously, and whether they were screened
18  for breathing problems, I don't recall whether that
19  was discussed in the article.
20       Q.   (BY MS. WARD)  Can you cite the author of
21  the study?
22       A.   The author would have been Ted Chan, Gary
23  Vilke, Tom Newman and three or four other medical
24  doctors.
25       Q.   What publication would that be in?

1       A.   Oh, I'd have to go look for that. They
2   are with the University of -- USC, San Diego School
3   of Medicine.
4       Q.   Okay. Well -- so your opinion is no one
5   knows how much force was placed on Mr. Kingsley's
6   back to secure him to the ground when he was.
7       A.   I'm saying -- exactly. Nobody knows an
8   exact number, unless the person is standing on the
9   back. If you were standing on the back and you weigh
10  150 pounds, then you have got 150 pounds on the back.
11  But short of that there is -- it's almost impossible
12  to do a calculation in a dynamic situation where you
13  have the suspect resist or, in this case, the
14  prisoner resisting, along with officer putting some
15  weight on the person.
16       Q.   Leaving aside, you know, sort of the
17  scientific exactitude of getting an exact measurement
18  of the number, there is one person that knows what
19  the pressure felt like, correct?
20       A.   Probably.
21       Q.   Mr. Kingsley?
22       A.   Right.
23       Q.   Right.
24       A.   And if you are saying felt is exact, I
25  would disagree with that as well.

1       Q.   I think I actually qualified my question
2   with saying it wasn't scientifically exact. So I
3   mean just in a rough sense the person that does know
4   what the pressure felt like would be Mr. Kingsley,
5   correct?
6       A.   Well, he claims to that. I would agree
7   with that.
8       Q.   Okay. The next paragraph, target areas.
9   You talk about Mr. Landers' use of the target area
10  chart?
11       A.   Correct.
12       Q.   And then you state here that "Because
13  video is one-dimensional it is hard to determine how
14  Mr. Landers concluded that Sergeant Hendrickson's
15  right knee is indeed on Kingsley's spine/neck area."
16       A.   Correct.
17       Q.   So my first question is, the video is --
18  did you mean to say two-dimensional?
19       A.   No.
20       Q.   Is one dimension a dot?
21       A.   No, one dimension is not a dot. There is
22  no depth in the video.
23       Q.   So that's the third dimension. There is
24  height and width, correct?
25       A.   There is height and width. If you want to

1   use that as the example, sure.
2       Q.   So the video is two-dimensional, correct?
3       A.   Well, if we are talking height and width,
4   that's two areas of measurement. That's not depth.
5   That's not -- that -- I'm talking about depth.
6       Q.   Right. So if the video were a 3-D video,
7   then that would be three dimensions and that would,
8   in your opinion, enable someone to determine where
9   Sergeant Hendrickson's knee was placed, correct?
10       MR. POSNANSKI:  Objection to the form of
11  the question.
12       Go ahead.
13       THE WITNESS:  3-D would be better.
14       Q.   (BY MS. WARD)  Okay. So your opinion is
15  that the video does not show the placement of
16  Sergeant Hendrickson's right knee, correct?
17       A.   Correct. I mean, it shows it up toward
18  the top of Mr. Kingsley but it doesn't show exactly
19  where.
20       Q.   And then the last paragraph, the very last
21  sentence, "It appears the basis for Mr. Landers'
22  opinion is based on the misapplication of a training
23  standard," correct? That's what's stated in your
24  opinion?
25       A.   Correct.

Q.    And by training standard, you mean legal standard, correct?

A.    Well, I guess it would depend on if the legal standard is taught as part of the training standard, then I would probably combine those, but I was looking at it strictly from a training standard.

Q.    What is a training standard?

A.    A training standard would be what was taught by either the State or the department with regard to, in this case, force.

Q.    Okay. So what this last sentence -- substituting that definition in -- should say is, "It appears the basis for Mr. Landers' opinion is based on misapplication of his understanding of how the officers were trained regarding the standard, the legal standard"?

A.    If he has a misunderstanding of how they were trained, then he shouldn't be opining.

Q.    And it's your opinion that he has misapplied a legal standard, correct?

A.    He used Graham versus Connor. That's not the standard for pretrial detainees.

Q.    Okay. That's your opinion, correct?

A.    That's the State of Wisconsin's opinion.

Q.    Okay. Where is --

Q.    Do you understand what is meant by improper use of the handcuffs?

A.    Could mean anything.

Q.    Can handcuffs be used in a way that would classify that use as deadly force?

A.    Yes.

Q.    And that would be improper?

A.    Not necessarily. We teach techniques where you can use handcuffs to kill somebody in a life or death situation, and that's certainly a proper use of force.

Q.    Do you agree that handcuffs should always be checked for fit and double-locked as soon as practical after they are applied?

A.    When it's safe and practical. Not just practical, but when it's safe and practical.

Q.    All right. Let's mark another exhibit.

(EXHIBIT 25 WAS MARKED.)

Q.    Do you recognize this article, Dr. Peters?

A.    Yes.

Q.    You are one of the authors on this article?

A.    Yes.

Q.    Do you list this article in your CV?

A.    It should be there.

A.    It's in the POSC manual. It's very clear. He made a mistake.

Q.    Your opinion is he made a mistake, correct?

A.    Or he didn't understand it, one of the two.

Q.    Okay. Do you agree that the improper usage of handcuffs by officers can result in serious injury?

A.    I would agree with that. And I would also agree that the proper use of handcuffs could result in serious injury.

Q.    Do you agree that the improper use of handcuffs can cause nerve damage?

A.    In some cases.

Q.    Do you agree that the improper use of handcuffs can cause long-term loss or impairment of the functioning of the hands?

MR. POSNANSKI: Objection to the form of the question.

THE WITNESS: I've read in the literature where that has taken place.

Q.    (BY MS. WARD) Do you agree that improper use of handcuffs can be classified as deadly force?

A.    Improper use. That is pretty broad.

Q.    Why don't we take a look at your CV, which is part of Exhibit 1, and let me know if you can identify it. I don't doubt you. I just couldn't find it.

A.    It may not be there. I don't know. I -- I thought I put every article down. I may have missed one or two. I don't know. The articles are listed chronologically, if that helps.

Q.    Can you just take a look and see if you can locate it in your CV?

A.    Do I have my own CV here?

Q.    Your CV is part of Exhibit 1 which is your first opinion.

A.    Oh, okay. Thank you.

Let's see. Number 103. Legal Constraints on Human Restraints. Page 22.

Q.    Okay. And that is in the Police Chief, March 1993?

A.    Yes.

Q.    And this is not the Police Chief, correct?

A.    No, this is just -- it appears to be a reprint on Mr. Brave's website. That's what it appears to be. But the original article was in the Police Chief magazine.

Q.    Okay. So the Laaw International, Inc., is

```
 1    Mr. Brave's organization?
 2        A.    Yes.
 3        Q.    What is that organization?
 4        A.    I have no idea.  He does expert witness
 5    cases and -- I don't know what all Mr. Brave does
 6    through that.
 7        Q.    Okay.  Do you know Mr. Brave?
 8        A.    Yes.
 9        Q.    Are you friends?
10        A.    I would say that the -- we associate -- we
11    are associates over the years.
12        Q.    Okay.  Let's look at the last paragraph on
13    that first page.  The second sentence of that
14    paragraph states, "Let's first examine an injury to
15    the restrained person by the improper application or
16    use of the restraints."
17        A.    Okay.
18        Q.    So here it's using the phrase improper
19    application or use of the restraints, correct?
20        A.    Okay.  Yes.
21        Q.    "Either the handcuffs are placed on the
22    person too tightly, the officer fails to double-lock
23    the handcuffs and the cuffs are inadvertently or
24    intentionally tightened, causing injury to the
25    person's wrists or the handcuffs remain on the person
```

```
 1        A.    I think it would depend on the
 2    circumstances.  I think in some cases one could say
 3    that -- you know, if I put somebody in handcuffs and
 4    just left the cuffs on them for an hour and during
 5    that time frame the person said, "Hey, the handcuffs
 6    are too tight, they are hurting me," and I ignored
 7    it, I think then one could maybe argue that it was
 8    too long.  But to put them on and -- in a field
 9    application and be distracted by something else and
10    then come back, I -- I don't -- I think it's going to
11    be a case by case basis.
12        Q.    Okay.  If you could turn to page four of
13    seven of this reprint of your article.
14        A.    Well, I wouldn't call this a reprint.  I
15    don't know if it's factually been reproduced on
16    Mr. Brave's website, so...
17        Q.    Do you have any reason to believe he
18    altered the article from what it -- or how it
19    appeared when it was originally published?
20        A.    I -- I don't know.  I haven't read this on
21    his website.
22        Q.    Okay.  Well, if we read something that you
23    don't believe was in the original article or that you
24    disagree with, let me know, okay?
25        A.    I'm not sure I remember what I wrote
```

```
 1    almost 20 years ago.  But if see something that jumps
 2    out, I'll let you know.
 3        Q.    Okay, thanks.
 4              So on this page there is an action plan
 5    for risk reduction, is one of headings.  Do you see
 6    that?
 7        A.    Correct.
 8        Q.    The last bullet point in that section
 9    states, "Direct officers to always check restraint
10    tightness," correct?  That's what it says?
11        A.    Not on my page.  This is under Action
12    Plan?
13        Q.    Under Action Plan and then there is four
14    bullet points on this page and the last one --
15        A.    I only have three bullet points.
16              MR. POSNANSKI:  I only have three.
17              THE WITNESS:  I only have three.  I don't
18    have four.
19              MS. WARD:  Okay, can we go off the record
20    a minute?
21              (Discussion off the record.)
22        Q.    (BY MS. WARD)  There is a bullet point on
23    I believe the next page of your article that states,
24    "Direct officers to always check restraint
25    tightness."
```

```
 1    for an unreasonable period of time."
 2              Correct?
 3        A.    Correct.
 4        Q.    Okay.  So this is sort of setting up the
 5    issue.  Injury can occur if the handcuffs are too
 6    tight, correct?
 7        A.    Yes.
 8        Q.    And then what would constitute an
 9    unreasonable period of time?
10        A.    I don't think there is an exact time frame
11    for that.
12        Q.    Okay.  What was meant by "unreasonable
13    period of time" when it was used here in the article?
14        A.    Just that.  It would depend on the
15    circumstances.  It would depend on a number of
16    variables.  If there were a standard such as ten
17    minutes, five minutes, three minutes or an hour, I'm
18    sure that would have been put down.
19        Q.    So there is no standard for the
20    determination of what an unreasonable period of time
21    for a subject to be in handcuffs is, correct?
22        A.    I'm not aware of any, and I think in 1993
23    we weren't aware of any.
24        Q.    Okay.  It would depend on the
25    circumstances?
```

1    Do you see that bullet point?
2    A.    Yes.
3    Q.    Okay.  We are going to talk about that
4  paragraph.
5    A.    Okay.
6    Q.    So that states that "In order to avoid
7  handcuff injuries or handcuff neuropathy caused by
8  overtightening the cuffs, the tightness of the cuffs
9  must be checked prior to double-locking," correct?
10    A.    Correct.
11    Q.    And in the incident with Mr. Kingsley
12  there is no notation in the incident report that the
13  handcuffs were ever checked for fit, correct?
14    A.    I didn't see anything.
15    Q.    Okay.  Then the next bullet point -- and
16  I'm not sure what page it's on in your exhibit but
17  it's headed, "Direct officers to always double-lock
18  metallic restraints."
19    Do you see that?
20    A.    Correct.
21    Q.    And this states, "Handcuffs must be
22  double-locked as soon as practicable after their
23  application," correct?
24    A.    Correct.
25    Q.    So it doesn't say safe and practicable, it

1  her report that upon complaint the cuffs were
2  checked," correct?
3    A.    Correct.
4    Q.    Okay.  I'm going to -- I don't know what
5  page it is in your exhibit, but there is a heading,
6  "And don't forgot training."
7    A.    Yes, I've got it.  It's on the next page.
8    Q.    Okay.  In here you note other training
9  considerations for law enforcement departments,
10  correct?  Includes other things that should be
11  included in training?
12    A.    Yes.
13    Q.    And number four is the avoidance of
14  placing a knee on the neck of a retrained person,
15  correct?
16    A.    That's correct.
17    Q.    Number six is Double-locking?
18    A.    Correct.
19    Q.    Seven is Restraint Tightness?
20    A.    Correct.
21    Q.    And eight is Restraint Removal Techniques?
22    A.    Correct.
23    Q.    So your opinion is those techniques should
24  be taught to law enforcement officers, correct?
25    A.    Correct.

1  just says practicable, correct?
2    A.    That's what it says.
3    Q.    And so do you -- strike that.
4    The next sentence is that "If handcuffs
5  are not double-locked they may be tightened
6  accidently or intentionally by the restrained
7  person," correct?
8    A.    Correct.
9    Q.    So failure to double-lock can cause
10  accidental tightening, correct?
11    MR. POSNANSKI:  Objection.  Asked and
12  answered.
13    THE WITNESS:  I'm sorry, failure to
14  double-lock...
15    Q.    (BY MS. WARD)  Can cause accidental
16  tightening.
17    A.    I would say that accident -- accidental
18  tightening can take place sometimes when the
19  handcuffs are not double-locked.  But I wouldn't say
20  the failure to double-lock causes the tightening.
21  I'm just rephrasing it that the -- that it's -- the
22  handcuffs can get tight if they are not
23  double-locked.  I would agree with that.
24    Q.    The article in the next bullet point
25  states that "The officer should document in his or

1    Q.    And how does the avoidance of placing a
2  knee on the neck of a restrained person minimize the
3  risk of liability?
4    A.    It's pretty well accepted that putting the
5  knee on the neck of somebody could cause injury to
6  the neck area or the spinal column.  So it's
7  generally taught by everyone that you don't put a
8  knee on the neck of an individual.  And that's a
9  general guideline.  I mean, in life or death
10  situations it may be different, but generally you
11  don't put a knee on the neck.
12    Q.    And how does double-locking minimize risk
13  of liability?
14    A.    It minimizes risk of liability if you are
15  transporting somebody in a patrol car and they sit on
16  their handcuffs and they get tight.  It just
17  eliminates that from taking place.
18    Q.    So does the double-locking minimize risk
19  of liability in transport situations primarily?
20    A.    It can be transport.  It could be if the
21  person is sitting in a chair at the department.  I
22  mean, it's always a good idea to double-lock the
23  handcuffs if you are going to have those handcuffs on
24  a person for a period of time.
25    Q.    What period of time?

1      A.     Again, it's case-by-case dependent.  And
2  I'll go back to, if I'm just taking the guy from cell
3  A to cell B, I'm probably not going to double-lock
4  the handcuffs.
5      Q.     When you train correctional officers on
6  proper use of handcuffs do you actually make the
7  statement that if you are just going to move them a
8  couple cells over there is no need to check for fit
9  or double-lock?
10     A.     Well, now you've added a variable.
11     Q.     I asked the question?
12     A.     No, you added a variable from the previous
13 discussion, and that is to check fit.  You should
14 always check for fit.
15     Q.     Immediately?
16     A.     Generally, unless it's not safe or it's
17 not practical.  Sometimes you just want to get the
18 cuffs on.  If it's a fight, you get the cuffs on and
19 you check it when you check it, because you've got
20 other issues to deal with.
21           But in a non -- eventful situation, I'll
22 use the term, where you've got multiple fights going
23 on and a number of other things, you put them on,
24 it's -- you always try to check for tightness, for
25 two reasons, as we discussed earlier, one, that they

1      Q.     The question was how long it took to get
2  him from his cell to the receiving cell.
3      A.     Oh, I'm sorry.
4      Q.     Do you have any idea of that time period?
5      A.     From cell to cell, that's what you are
6  asking.  I misunderstood.  About two minutes.
7      Q.     Including setting him down in the hallway?
8      A.     Just about two minutes, from what the
9  timeline shows.
10     Q.     Where did you get that timeline?
11     A.     Conroy's incident report said that at
12 approximately 6:42:15 Kingsley was carried out of his
13 cell.  Conroy's incident report said he was placed on
14 a bunk in cell three at about 6:44.  So that's about
15 two minutes.
16     Q.     So that figure comes from Lieutenant
17 Conroy's incident report?
18     A.     Yes.
19     Q.     Okay.  Back to the Liability Constraints
20 on Human Restraints, which is Exhibit 25, and the
21 training issues to help with liability risk.
22           Number seven is Restraint Tightness.
23     A.     Number seven?  I'm sorry, what page are
24 you on?
25     Q.     That's not going to help.  I'm under the

1  section that's titled, "And don't forgot training."
2      A.     Oh, okay.
3      Q.     And then it enumerates nine things that --
4      A.     Correct.
5      Q.     Okay.  How does number seven, Restraint
6  Tightness, minimize risk of liability?
7      A.     Well, if you have somebody who the
8  handcuffs are on too tightly or the handcuffs -- the
9  person's wrist so large that when you put them on
10 they are just tight, you need to monitor that.  And
11 if the person complains, if possible, readjust it.
12 In some cases you can't readjust it because a person
13 who has a great, big wrist and you have one size
14 handcuff, you are just kind of stuck for the moment.
15     Q.     And number eight, Restraint Removal
16 Techniques?
17     A.     Well, you want to teach restraint removal
18 techniques because that would be something that
19 officers would have to know, how do you take them
20 off.  You teach them how to put them on, teach them
21 how to take it off.
22           Can you cover every possible removal
23 technique?  Probably not, but you can give them some
24 general guidelines to do that.
25     Q.     Okay.  And with respect to number four,

---

Right column top page:

1  won't come off and, two, that they are not too tight.
2      Q.     In the incident with Mr. Kingsley you
3  understand that he was carried down the hall
4  initially and then set down on his stomach in the
5  hallway?
6      A.     Yes.
7      Q.     Would it have been safe and practical
8  to -- practicable to double-lock his handcuffs at
9  that point?
10     A.     If Mr. Kingsley wasn't rolling around and
11 doing things, it could have been done at that point,
12 I presume.
13     Q.     Did you see any indication in the incident
14 reports that he was rolling around and doing things
15 at that point?
16     A.     I don't recall seeing anything.
17     Q.     Do you know how far it was from
18 Mr. Kingsley's cell to the receiving cell?
19     A.     I don't think I read a distance, no.
20     Q.     Do you know the length of time that passed
21 between extracting Mr. Kingsley from his cell and
22 entrance into the receiving cell?
23     A.     Just let me look at my report.  I think it
24 was around 12 minutes or something like that from the
25 time he was cuffed to the uncuffing.  As I recall.

```
 1   six, seven, and eight, is it your understanding that
 2   the officers in the incident with Mr. Kingsley were
 3   trained in those techniques?
 4        A.    My understanding is that the officers were
 5   trained according to the Wisconsin standards and the
 6   DAAT manual covers handcuffing, so I would conclude
 7   from that that they were.
 8        Q.    You assumed for the purposes of your
 9   opinion that the officers all learned the techniques
10   that were in the manuals, correct?
11        A.    I believe that's what -- I think
12   Mr. Landers said that that's what they were trained
13   in, so...
14             MS. WARD:  Okay.  Let's take a short
15   break.  I might be getting very close to the end.
16             (A break was taken from 4:17 p.m. to
17             4:29 p.m.)
18             MS. WARD:  Dr. Peters, I have no further
19   questions.  Thank you for your time today.
20             THE WITNESS:  You're welcome.
21             MR. POSNANSKI:  I have no questions.
22             (Deposition concluded at 4:29 p.m.)
23                        * * *
24
25
```

CITICOURT, LLC
801.532.3441

---

```
 1             REPORTER'S CERTIFICATE
 2
 3   STATE OF UTAH      )
                        )  ss.
 4   COUNTY OF SALT LAKE )
 5        I, Dawn M. Perry, Certified Shorthand
     Reporter and Notary Public in and for the State of
 6   Utah, do hereby certify:
 7        That on September 26, 2012, prior to being
     examined, the witness, JOHN G. PETERS, JR., PH.D.,
 8   was duly sworn by me to tell the truth, the whole
     truth, and nothing but the truth;
 9        That the testimony of said witness was
     reported by me in stenotype and thereafter
10   transcribed, and that a full, true, and correct
     transcription of said testimony is set forth in the
11   preceding pages;
12        That in accordance with Rule 30(e), no
     request having been made for the witness to read and
13   sign the transcript, the original transcript was
     sealed and delivered to Wendy M. Ward, Attorney at
14   Law, for safekeeping.
15        I further certify that I am not kin or
     otherwise associated with any of the parties to said
16   cause of action and that I am not interested in the
     outcome thereof.
17        WITNESS MY HAND AND OFFICIAL SEAL this 1st
18   day of October, 2012.
19
20
21
22
23             _____
               Dawn M. Perry, CSR
24             Notary Public
               Residing in Salt Lake County
25
```

CITICOURT, LLC
801.532.3441