UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

MICHAEL KINGLSEY,

       Plaintiff,

  –vs–                  Case No. 10–CV–832–BBC

STAN HENDRICKSON          Madison, Wisconsin
and FRITZ DEGNER,         October 15, 2012
                       1:14 p.m.
       Defendants.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

STENOGRAPHIC TRANSCRIPT OF SECOND DAY OF JURY TRIAL
AFTERNOON SESSION
HELD BEFORE DISTRICT JUDGE BARBARA B. CRABB, and a jury

APPEARANCES:

For the Plaintiff:  Merchant & Gould
                   BY:  EDWARD PARDON
                      WENDY WARD
                      JOEL GRAHAM
                   10 East Doty Street, Ste. 600
                   Madison, Wisconsin  53703

For the Defendants:  Whyte Hirschboeck Dudek
                   BY:  ANDREW JONES
                      TIMOTHY POSNANSKI
                   One East Main Street
                   Madison, Wisconsin  53703

Lynette Swenson   RMR, CRR, CBC
Federal Court Reporter
U.S. District Court   120 N. Henry St., Rm. 520
Madison, WI  53703   (608) 255–3821

1                          **I-N-D-E-X**

2    PLAINTIFF'S WITNESSES          EXAMINATION          PAGES

3    ROBERT CONROY       Cont'd direct by Mr. Jones    4-41
                         Cross by Mr. Pardon           41-48
4                        Redirect by Mr. Jones         49-51

5    BRIAN LANDERS       Direct by Mr. Pardon          50-113
                         Cross by Mr. Jones            113-161

6

7

8

9

10                      **E-X-H-I-B-I-T-S**

11   PLAINTIFF'S EXHIBITS                 IDENTIFIED/RECEIVED

12   Exhibit 9      DAAT Manual            69        69
             10     Monroe Co. policy      95        95
13           12     Hendrickson report     87        88
             14     Video                  78
14           43     Landers report         143       ---
             50     Jail policy            104       104
15           67     POSC Manual            92
             106    Landers CV             60        60
16

17   DEFENDANTS' EXHIBITS

18   Exhibit 509B   Photo - cell           26        27
             512    Shift log              38        39
19           513    Log                    35        35
             514    Medical notes          40        ---
20           517    POSC '09 Manual        128       297
             520    Video                  ---       21
21

22

23

24

25

1          (Continuation of jury trial — afternoon session)

2               THE COURT:  Mr. Jones.

3               MR. JONES:  On the handcuffing issue, as I

4      understand it, the point is just to show how one might

5      double lock a set of handcuffs, which I don't think we

6      have a problem with that.  But I do have a concern that

7      the jury needs to be told that what they're seeing is,

8      and maybe not in these words, how you would double lock

9      a set of handcuffs, all things being equal in a perfect

10     situation.  And it's not apples to apples with what was

11     occurring in the cell when Mr. Kingsley was being

12     handcuffed.

13              THE COURT:  Yeah, and I think that would be

14     most appropriately brought out by you on

15     cross-examination.

16              MR. JONES:  I certainly will.

17              THE COURT:  I don't think it's appropriate for

18     me to say that.  You know, if you want me to say

19     something like these are not the same -- we don't know

20     whether these are the same kinds of handcuffs that were

21     used.

22              MR. JONES:  I don't know that it's an issue in

23     terms of handcuffs A versus handcuffs B.  It's just that

24     it's a completely different circumstance.

25              THE COURT:  But I think that part should be

1    brought out by you.

2         MR. JONES:  We had talked about a particular

3    instruction.  You had suggested it, Ed.

4         MR. PARDON:  Yeah.  I mean if the Judge was

5    going to give an instruction, I would hope it would be

6    something very neutral like this is not necessarily the

7    situation that happens in a jail.  You know, we also can

8    illustrate -- I mean I'm sure Mr. Landers can also

9    explain that as well.  I mean I understand their

10   concern.

11        THE COURT:  All right.  If you would bring in

12   the jury.

13        (Jury drought in courtroom at 1:15 p.m.)

14        (Lieutenant Conroy resumes witness stand)

15        THE CLERK:  This Honorable Court is again in

16   session.  Please be seated and come to order.

17        THE COURT:  Mr. Jones.

18        MR. JONES:  Thank you, Judge.

19              CONTINUED DIRECT EXAMINATION

20   BY MR. JONES:

21   Q    Lieutenant, we have again up on the screen the

22   video from the cellblock, and I'm going to ask

23   Mr. Posnanski to go ahead and start playing it.

24        (Video played)

25        So who is it that's coming down the cellblock at

                   ROBERT CONROY - DIRECT

1    this point?

2    A    That's me.

3    Q    What are you doing here?

4    A    Somebody in the first cell asked me a question and

5    I stopped to answer the question before I made my way

6    down the rest of the block.

7    Q    Who's at the cellblock behind you at the other end?

8    A    I'm not sure.  Whoever was manipulating the doors

9    or closing the doors for me at that point.

10   Q    So where are you positioned -- in front of which

11   cell are you positioned now?

12   A    Currently positioned in front of Mr. Kingsley's

13   cell.  Directly in front of me is the sliding cell door.

14   To the left of that is the bars, and that's where his

15   head is, right next to those bars.

16          THE COURT:  I'm sorry, would you say that

17   again?

18          THE WITNESS:  Right next to the bars on the

19   left side of the sliding door is where Mr. Kingsley's

20   head is.

21          THE COURT:  Should we be able to see that?  See

22   his head?

23   BY MR. JONES:

24   Q    Can you see his head?

25   A    You cannot.

                    ROBERT CONROY - DIRECT

1           THE COURT:  Okay.

2   A     The way the position of the bars are or the way of

3   the camera.

4   Q     So before I start playing it again, is he directly

5   on the other side of the bars from you?

6   A     Correct.

7   Q     And his head is closer to the bars?

8   A     Correct.

9   Q     So can you tell us what's occurring at this point?

10  A     I'm trying to reason with Mr. Kingsley, say hey,

11  you know, can you just take the paper down?  I

12  understand, you know, that you were told to take it

13  down.  I think at one point I even motioned up there.

14        Mr. Kingsley came back and said he did not put it

15  there.  He was, under no uncertain terms, said he was

16  not going to take it down and told me that I could take

17  it down.

18  Q     What are you looking up at?

19  A     The light.  Pointing at the light and looking up at

20  it.

21  Q     How many times during this sequence did you ask him

22  to take it down?

23  A     The entire time we were talking to him about it I

24  was trying to get him to comply and he kept saying he

25  had not done anything wrong.  He didn't put it up there.

                ROBERT CONROY - DIRECT

1   It was there before he got in the cell.  He wasn't going

2   to take it down.

3   Q    So before we stopped the video, a white screen came

4   on.  It's gone now.  I'll ask you about it again when we

5   start up again.

6   A    Okay.

7   Q    It's your testimony that he never agreed to take

8   the light or the paper off the light; is that correct?

9   A    It's my testimony that he stated numerous times he

10  was not going to take it down.

11  Q    You also testified that he mentioned that he wasn't

12  the one who put it up; correct?

13  A    Correct.

14  Q    And I think you answered in response to one of

15  Mr. Pardon's questions that you didn't -- you didn't

16  disbelieve him at that point; correct?

17  A    I didn't disbelieve him, no.

18  Q    Did it matter to you whether or not he had put it

19  up there?

20  A    No.  The whole purpose was just to get him to take

21  it down.

22  Q    And did he tell you while you were in front of his

23  cell that he felt he was too short to take it down and

24  that it might present a danger to him to do that?

25  A    No, I don't recall that.  The light is -- I mean

                    ROBERT CONROY - DIRECT

1 you could stand on the bunk and touch the light.  It's

2 right -- centered in the cell right there.  You could

3 stand on the bunk and touch it, so...

4 Q    If he had said that to you, what would you have

5 done?

6 A    I would have done probably the same thing I did,

7 was "hey, we'll get you out of the cell and I'll take it

8 down," because I said that at one point.

9 Q    That's ultimately what you told him would happen;

10 correct?

11 A    Yes.

12 Q    And did he respond to that statement from you?

13 A    I told him in order for that -- in order for us to

14 do that, that we would have to move him to receiving for

15 a couple different reasons; one, to serve as

16 disciplinary sanctions that he was currently sitting,

17 and the other, so I could go in and do that.  And

18 Mr. Kingsley was not going to cooperate.

19 Q    What do you mean by the last part of your answer,

20 *Mr. Kingsley was not going to cooperate*?

21 A    He was not going to cooperate with the move from

22 the cell he's currently here in on the video to the

23 receiving cell to serve that disciplinary sanction for

24 failure to follow orders.

25 Q    Is that what you're saying he said?
                    ROBERT CONROY - DIRECT

1    A    That's what he was saying all along, that he wasn't

2    going to cooperate.

3    Q    Why, if you were going to take the paper down

4    yourself, why would it be necessary to move him from the

5    cell?

6    A    At least get him out of that cell was the purpose.

7    I wasn't going to go in there; that's the way we're

8    trained.  You don't go into a cell with an inmate in

9    there.

10   Q    And why would it be necessary, given what had

11   happened up until that point, that he be put somewhere

12   to serve out a discipline?

13   A    Well, we had to get in there and get that off the

14   light.  It had already been since the night prior, so...

15   Q    Maybe I asked a bad question.  Why would it be

16   necessary for him to serve any sort of discipline as a

17   result of what had happened?

18   A    For failure to follow directions of jail staff,

19   which is in the rule book in the jail.  It's for safety

20   and security of the jail.  If you go in and -- you know,

21   it's a safety and security issue.  You're telling

22   somebody to do something, they don't do it, and you

23   don't do anything about it, it tends to spread

24   throughout the blocks.  Then all of a sudden everybody

25   and nobody is doing anything.  So it's for the security

                    ROBERT CONROY - DIRECT

1  of the facility.

2  Q    So I believe you testified that you then left the

3  cellblock and told the other officers that it was going

4  to be necessary to come back in and move Mr. Kingsley?

5  A    Correct.

6  Q    And that's what happened; correct?

7  A    Yes.

8  Q    Why was it necessary for a group of officers to

9  assist in moving Mr. Kingsley?

10  A    One, for safety purposes.  That's the way we're

11  trained.  A show of presence sometimes gets people to

12  comply.  So we have the presence and the dialogue, and

13  at times that does get people to comply.

14  Q    I'm going to go back to the video.  Now the video

15  is playing, but we're seeing this screen.  What is this

16  screen?

17  A    That is the GeoVision screen I spoke about earlier

18  where it would show to fill in the time.  You see at the

19  bottom the time is still going, 5:21:10, so that's

20  filling in the blank space where there was not adequate

21  enough movement for it to record to the hard drive.

22  Q    So what are we watching at that point?

23  A    That's the second entry at 6:38.  The first to

24  enter is Sergeant Hendrickson, then Deputy Blanton and

25  Deputy Degner is behind him.  Sergeant Hendrickson is

ROBERT CONROY - DIRECT

1  trying to get him to come up to the door and back up to

2  the door so he can be handcuffed at this point.

3  Q    Now there are two officers at the other end of the

4  hallway, the walkway.  Who are those two individuals?

5  A    That would be Sergeant Shisler and myself.

6  Q    Could you hear what was being said by the officers

7  in front of the cell from where you were?

8  A    I could hear what the officers were saying.  I

9  could tell that Mr. Kingsley was saying stuff, but I

10 can't really make out what he was saying at this point.

11 Q    And what did you hear -- I'll back up.  Who was

12 doing the talking at that point?

13 A    Sergeant Hendrickson at this point.

14 Q    What you did you hear him saying?

15 A    To stand up and back up to the bars so he could get

16 handcuffed.  There's a pass through there, an open area

17 in the bars where you can stick your hands through and

18 you can actually get handcuffed through the bars.

19          THE COURT:  So at this point, it's not clear to

20 me, at this point the door to Mr. Kingsley's cell is

21 closed; is that correct?

22          THE WITNESS:  Correct.

23          THE COURT:  Okay.

24 BY MR. JONES:

25 Q    Are the doors to all of the cells closed at this

                    ROBERT CONROY - DIRECT

1  point?

2  A    They are.

3  Q    And those doors were first closed when you

4  originally came into the cellblock a few minutes before

5  this?

6  A    All except for Mr. Kingsley's.  His was closed

7  because he was on -- serving the discipline in here.

8  Q    Okay.  Let me back up.  When would Mr. Kingsley's

9  cell door have been closed pursuant to that original

10  discipline?

11  A    Before I arrived his door was closed.

12  Q    Okay.  And the other inmates' doors were open --

13  A    Correct.

14  Q    -- before you arrived?

15  A    Yeah, I believe so, yes.

16  Q    And then when you first came onto the cellblock,

17  the part of the video we saw originally, that's when

18  everyone else's doors were closed?

19  A    Yes.

20  Q    And at that point again all the doors were closed?

21  A    Correct.

22  Q    You were talking about what Sergeant Hendrickson

23  was saying to Mr. Kingsley.  Am I correct in

24  understanding that Sergeant Hendrickson would have been

25  able to put the cuffs on from this side, from his side

ROBERT CONROY - DIRECT

1    of the closed cell door if Mr. Kingsley had backed up to

2    the cell door?

3    A    There's an opening big enough to fit a tray through

4    for food and it's, I don't know, 4 inches by 12 inches.

5    So when you put your hands up there, you can reach

6    through and put handcuffs on, the officer can do that,

7    yes.

8    Q    Without opening the cell door.

9    A    Correct.

10   Q    Okay.  We'll start the video again.  Now at a point

11   a few seconds before where we stopped, a light started

12   to shine on the floor; correct?

13   A    Yes.

14   Q    Do you know what that light is from?

15   A    The light is from the taser that Deputy Degner was

16   holding.

17   Q    Okay.  And from where the light is does that tell

18   us anything about where the taser was pointed?

19   A    Towards the floor.

20   Q    That's because the light is shown in the direction

21   the taser is being pointed?

22   A    Correct.

23   Q    And it's Officer Degner with the taser?

24   A    Correct.

25   Q    I'd like you to watch that light while the video

                    ROBERT CONROY - DIRECT

1    plays.

2         (Video played)

3         Okay.  So we stopped the video, and what's

4    occurring at this point?

5    A    The door to Mr. Kingsley's cell is opening.

6    Q    At any point between -- at any point in the video

7    as we've watched the light, did you see that light being

8    pointed into the cell?

9    A    No.

10   Q    At any point while we watched that video did you

11   see the light being pointed at Mr. Kingsley?

12   A    No.

13   Q    So if the light wasn't pointed at Kingsley, was the

14   taser pointed at Mr. Kingsley at any point before the

15   cell door opened?

16   A    No.

17             MR. PARDON:  Objection.

18             THE COURT:  What was your objection?

19             MR. PARDON:  We're asking a witness to describe

20   a video, not necessarily what the witness witnessed.

21             THE COURT:  That's a good point.  You can ask

22   the question in terms of what he remembers.

23   BY MR. JONES:

24   Q    At any point before the cell door was opened did

25   you see Officer Degner point the taser at Mr. Kingsley?
                    ROBERT CONROY - DIRECT

1  A    No.

2  Q    So I'm going to move ahead a little.  What happened

3  after the cell door was opened?

4  A    Sergeant Hendrickson and Deputy Blanton entered the

5  cell.  Deputy Degner went to the doorway, I went around

6  to where I could observe him, and him being Mr. Kingsley

7  lying on the bunk.

8  Q    And where I stopped the video, at this point are

9  you shown on the screen?

10 A    I believe that's me just to the left.  Would be --

11 Q    Front left?

12 A    Front left, yes.

13 Q    And could you see inside the cell at this point?

14 A    Yes.

15 Q    And I want to be clear on what you saw or didn't

16 see when you were looking -- I'll back up.  Were you

17 looking inside the cell as the officers went in to

18 handcuff Mr. Kingsley?

19 A    Yes.

20 Q    And I want to be clear on what you saw or didn't

21 see.  Could you see anything relating to Mr. Kingsley's

22 physical movements during that time period?

23 A    Yes.

24 Q    And what did you see?

25 A    I saw his arms -- after I had told him to put his

ROBERT CONROY - DIRECT

1   arms behind his back, which I did at one point, he put

2   them kind of at the side of his buttocks, at the outer

3   side of his buttocks.  I could see that.  I could see

4   the tension in his arms.  That's what I could see.

5   Q    And did he move his arms from your observation when

6   the officers went in to handcuff him?

7   A    No, he kept them straight.

8   Q    So he kept them at his sides, not together behind

9   his back?

10  A    Correct.

11          THE COURT:  Who is coming down the hallway?

12          THE WITNESS:  I believe that's Sergeant Shisler

13  leaving.

14          THE COURT:  Oh, okay.

15          THE WITNESS:  Going back out.

16  BY MR. JONES:

17  Q    Why don't we go ahead and start the video again

18  from this spot.

19      (Video played)

20      So ultimately the officers did get the handcuffs on

21  Mr. Kingsley; correct?

22  A    Correct.

23  Q    And what occurred next?

24  A    They told him to stand.  Deputies told him to

25  stand.  He refused to stand.  Stated it was his -- his

ROBERT CONROY - DIRECT

1   foot hurt.  They tried to inquire what was wrong with

2   his foot.  He wouldn't answer.  So at that point they

3   proceeded to carry him out of the cell.

4   Q    From your observation as you were looking in the

5   cell, did you see anything happen to injure

6   Mr. Kingsley's foot as the officers put the handcuffs on

7   him?

8   A    No.

9   Q    You said that the officers asked him what was wrong

10  with his foot?

11  A    During this whole time from the time we entered at

12  6:38 until we left the receiving cell, when I asked

13  everybody to leave and leave the handcuffs on several

14  times, multiple times we asked him what was wrong with

15  his foot.  He would not answer.

16  Q    And specifically in the cell before he was removed

17  from the cell, did he give -- did the officers ask him

18  what was wrong with his foot?

19  A    Yes.

20  Q    Did Mr. Kingsley at any point before he was removed

21  from his original cell answer that question to say what

22  was wrong with his foot?

23  A    The only thing I ever recall Mr. Kingsley saying

24  about his foot is "my foot, my foot."

25  Q    And physically how was it -- who was it that

                     ROBERT CONROY - DIRECT

1  carried Mr. Kingsley out of the cell?

2  A    Sergeant Hendrickson and Deputy Blanton carried him

3  out of the cell.

4  Q    How did they carry him?

5  A    I believe it was under his arms, and Mr. Kingsley's

6  feet were kind of up.  He wouldn't straighten them out.

7  He kept them up.

8  Q    So what are we seeing as this video plays now?

9  A    That is Sergeant Shisler all the way down.  Then

10  Deputy Blanton, Sergeant Hendrickson, they're carrying

11  Mr. Kingsley.  I'm following behind, and then Deputy

12  Degner is behind me and he has the taser on it looks

13  like.

14  Q    So it's about 6:43 when you have him out of the

15  cellblock?

16  A    Correct.

17  Q    So what happened once he was out in the hallway?

18  A    Once he was out in the hallway, we laid him out on

19  the floor.  He was laying there face down.  We asked him

20  again what's wrong with your foot.  I asked him.  Other

21  officers asked him.  He wouldn't respond.  Just groaned

22  and like u-r-r-r kind of sounds.  Didn't sound like

23  painful sounds, but it was like a growl kind of.

24  Q    At any point in the hallway did he explain what was

25  wrong with his foot and why he was unable to walk?

ROBERT CONROY - DIRECT

1  A    No.  We asked him several times.  He wouldn't

2  answer us.

3  Q    I'd like to play another section of video for you.

4       (Video played)

5       So what advantage point do we have here?

6  A    This is from the main office of the jail looking

7  down that main hallway.  You're actually looking north

8  down that hallway.

9  Q    So looking back to that diagram we looked at

10 earlier, it's from the bottom of the diagram up to the

11 top of the diagram?

12 A    Correct.

13 Q    And there's audio on this recording; correct?

14 A    There is.

15 Q    So what happened from this point forward out in the

16 hallway?

17 A    Mr. Kingsley still wouldn't cooperate, wouldn't

18 talk to us.  We kept asking him -- I think there was

19 three of us, at least three of us that were asking him

20 which foot, what was wrong with his foot.  He wouldn't

21 answer.  At that point, we decided to pick him up and

22 carry him to receiving.  So there would have been two

23 people at his shoulders, and then I was at his left leg

24 and Sergeant Shisler was at his right leg.

25          MR. PARDON:  Excuse me, Your Honor.  May I
                   ROBERT CONROY - DIRECT

1    approach the bench for a moment?

2              THE COURT:  Sure.

3         (Discussion at side bar at 1:38 a.m.)

4              MR. PARDON:  I'm very sorry.  I don't want to

5    interrupt.  But I don't recall this being on our

6    exhibit.

7              THE COURT:  This particular video?

8              MR. PARDON:  This video.

9              MR. JONES:  It was on your exhibit.  If not,

10   I'll introduce it through our --

11             MR. PARDON:  Have I seen this video before?

12             MR. JONES:  Sure, you have.  It was produced

13   and it's on the copy of the disk that we gave you as our

14   exhibit.  It was produced in discovery.

15             MR. PARDON:  Well, I'm not aware of that, but

16   I'm not going to argue now in front of the jury now that

17   the thing is here.  But I guess why don't you -- why

18   don't you, when you're done, move to admit this.  I'm

19   sorry, if I'm mistaken I'm mistaken, but I don't ever

20   recall this being on anything.  So I mean I'll believe

21   you.

22             MR. JONES:  Okay.

23             MR. PARDON:  Thank you.

24        (End of side bar discussion at 1:40 p.m.)

25             THE COURT:  You may resume.
                  ROBERT CONROY - DIRECT

1          (video continued to be played)

2    BY MR. JONES:

3    Q    So you're making a turn here, a right turn from the

4    officer's perspective, and you're going where?

5    A    Correct.  We're going into the receiving area, the

6    area just outside the cells in the receiving area.

7          (Video played)

8    Q    The video recordings that we've seen so far, those

9    are recordings that you have preserved off of the

10   recording system at the jail?

11   A    They're copies of, yes.

12   Q    And do they accurately depict what occurred in the

13   cellblock and in the main hallway of the jail that

14   morning?

15   A    They do.

16          MR. JONES:  I'd move the admission of those two

17   videos as Exhibit 520, Your Honor.

18          MR. PARDON:  No objection.

19          THE COURT:  Received.

20   BY MR. JONES:

21   Q    Earlier when Mr. Pardon was asking you questions,

22   we saw a recording of Mr. Kingsley then being carried

23   through the entryway of the receiving area of the jail;

24   correct?

25   A    Yes.

                    ROBERT CONROY - DIRECT

1  Q    And you were the officer carrying Mr. Kingsley or

2  supporting him at his left leg; correct?

3  A    Correct.

4  Q    As you were carrying Mr. Kingsley into the

5  receiving cell, what, if any, observations did you make

6  about the positioning of the handcuffs?

7  A    The positioning of the handcuffs at all?

8  Q    Yes.

9  A    That they were tight, and by tight I mean the chain

10 was taunt and that the one handcuff was kind of up

11 towards the middle of his hand.  His arms were pulling

12 them apart and the one handcuff was up, kind of leaning

13 towards the middle of his hand.

14 Q    And what, if anything, did the positioning of that

15 one handcuff tell you about how tight or loose they

16 were?

17 A    It was actually a little loose to be in that

18 position.

19 Q    If I understood your testimony from this morning,

20 you remained outside of the receiving cell when the

21 officers went in with Mr. Kingsley?

22 A    I stood in the doorway there.  I think Deputy

23 Degner was behind me for a minute, but I was in the

24 doorway.  Then when he went in, I kind of actually

25 backed out a step.  So I was just outside the doorway,

                    ROBERT CONROY – DIRECT

1  yes.

2  Q    And did you stay in the doorway for the remainder

3  of what happened in the receiving cell?

4  A    Yes.

5  Q    I think from your testimony earlier, I think this

6  is clear but I want to be sure.  Could you see

7  everything that was occurring in the receiving cell from

8  your advantage point?

9  A    No.  I couldn't see everything, no.

10  Q    And why was that?

11  A    It was blocked by deputies.  Their bodies were

12  actually blocking my view.  I'd have to look in between

13  them.

14  Q    You testified earlier that when the officers put

15  Mr. Kingsley into the receiving cell, they then

16  attempted to take the handcuffs off; correct?

17  A    Correct.

18  Q    Why were the officers attempting to remove the

19  handcuffs at that time?

20  A    We're trained never to leave somebody in a cell by

21  themselves with the handcuffs on, especially behind

22  their back because they could injure themselves.  If

23  they were to fall, they couldn't catch themselves;

24  really serious injury could come of it.  So that's the

25  way we're trained.

                    ROBERT CONROY - DIRECT

1  Q    Have you ever left someone in a cell with handcuffs

2  on before this incident?

3  A    I have in a holding cell where, you know, there's

4  an officer in there and they're being prepared for

5  transport I have, but never in a cell by themselves, no.

6  Q    You were asked some questions about what you saw or

7  didn't see Mr. Kingsley doing in the receiving cell?

8  A    Yes.

9  Q    And I think you testified that you could not see if

10 he tried to bite Sergeant Hendrickson; correct?

11 A    Correct.

12 Q    Do you know one way or the other whether he tried

13 to bite Sergeant Hendrickson?

14 A    Just off the conversation that Sergeant Hendrickson

15 and I had.

16 Q    I'm going off of what you could or could not see in

17 the receiving cell yourself.

18 A    I do not know.

19 Q    Is it possible that he did?

20 A    Yes.

21     MR. PARDON:  Objection.

22     THE COURT:  Sustained.  The jury will disregard

23 that.

24 BY MR. JONES:

25 Q    Could -- strike that.  What were the officers
              ROBERT CONROY - DIRECT

1  saying, if anything, to Mr. Kingsley as they were trying

2  to remove the handcuffs?

3  A    Multiple times "Stop resisting.  Just relax" was

4  said on a number of occasion.  I think "Mike, I'm going

5  to -- this is the last time.  Stop resisting.  Stop

6  resisting."

7  Q    Did you hear Mr. Kingsley make any -- did you hear

8  Mr. Kingsley say anything?

9  A    Yes.

10  Q    And what did you hear him say?

11  A    "Just leave the handcuffs on and get the fuck out,"

12  something to that effect.

13  Q    Did you hear him make any sounds as the officers

14  were trying to handcuff him?

15  A    Like an angry sound, like a g-r-r-r, you know, like

16  a growl-type sound.  Aggressive sound.

17  Q    Did you ever hear Mr. Kingsley say, while this was

18  going on in the receiving cell, that he was in pain?

19  A    No.

20  Q    Did you ever hear him say while this was going on

21  in the receiving cell that he could not comply with what

22  the officers were asking him to do?

23  A    No.

24  Q    As you were watching what was occurring in the

25  receiving cell, did you have any concerns as the senior
                    ROBERT CONROY - DIRECT

1  officer on the scene about what was happening?

2  A     The only concern I had at the point was the

3  possibility of injury.

4  Q     And what concern, if any, did you have on that

5  point?

6  A     Well, everything in that cell is concrete.  From

7  what I could see with Mr. Kingsley's movements, I could

8  see him -- his upper body going back and forth, kind of

9  like he was trying to, you know, I don't know, break a

10  grasp or something to get around the officers' control

11  measures.  You could see him lift his torso in an effort

12  to push away from the bunk, you know, kind of -- I was

13  worried.  You know, he could have rolled.  He could have

14  hit his head.  There's a two-inch metal lip on the side

15  of that bunk that somebody could have gotten hurt on.

16      Officers could have -- Sergeant Hendrickson, at the

17  time Sergeant Hendrickson could have -- you know, he had

18  his leg up there.  His leg could have came down, you

19  know, and hit that metal bar along the side of the bunk.

20  It sticks up about two inches.  The whole cell is

21  concrete.

22  Q     I'd like to show you a different exhibit, Exhibit

23  509B.  Do you recognize what's depicted in Exhibit 509B?

24  A     I do.  That's a receiving cell in the Monroe County

25  Jail.

                    ROBERT CONROY - DIRECT

1    Q    And is that the receiving cell Mr. Kingsley was put

2    in?

3    A    Yes.

4    Q    Do all the receiving cells look alike?

5    A    There's one that the toilet is in a different

6    position, but they generally would look the same, yes.

7    Q    Okay.  I think there's a second page to this

8    exhibit.  What does Exhibit 509B show?

9    A    That's a little closer of that cell, with the sink,

10   the toilet, the bunk.  The metal lip is that gray area

11   on the shelf above there.

12   Q    Does it accurately depict the inside of a receiving

13   cell in the Monroe County Jail?

14   A    It does.

15          MR. JONES:  I move for the admission of Exhibit

16   509B, Your Honor.

17          THE COURT:  Any objection?

18          MR. PARDON:  No objection.

19          MR. JONES:  May I publish it to the jury?

20          THE COURT:  You may.

21   BY MR. JONES:

22   Q    So again, the concrete bunk in the cell, where is

23   that depicted here?

24   A    It's on the left side, lower left side.  You can

25   see a little lip there towards the back of the cell.
                    ROBERT CONROY - DIRECT

1    That lip goes all the way around.  That's where the

2    mattress goes so it doesn't slide off.  But that's the

3    bunk.

4    Q    And the walls and the floor, what are they made out

5    of?

6    A    It's all concrete.

7    Q    And the material that the sink and the toilet are

8    encased in, what is that?

9    A    That's concrete.

10   Q    Mr. Kingsley did not punch anyone during this

11   incident, did he?

12   A    No.

13   Q    He didn't actually kick anyone during the incident,

14   did he?

15   A    No.

16   Q    And he never verbally said he was going to hurt

17   anybody, did he?

18   A    No.

19   Q    So can you explain why still there was a concern in

20   your mind of a risk of injury?

21   A    Well, as I said before, you know, it's not only a

22   risk to the injury of the officers, but a risk of injury

23   to Mr. Kingsley as well.  He could have rolled into that

24   concrete wall.  He could have hit his bunk or could have

25   hit his head on the bunk.  He could have rolled off.

                    ROBERT CONROY - DIRECT

1   You can see -- and I witnessed during that time as

2   Sergeant Hendrickson was trying to stabilize

3   Mr. Kingsley, you can see him adjusting his movements so

4   that, you know, based on Mr. Kingsley's movements, he's

5   trying to adjust his.  He's standing on one leg.  He

6   could have fallen.  He could have, you know, been hurt.

7   Mr. Kingsley could have started kicking, you know.

8   There's a variety of different injuries that could have

9   occurred.

10  Q    And in the video that Mr. Pardon played for you or

11  for us, where you were standing outside the receiving

12  cell and then we heard the audio of what was going on,

13  do you remember that video?

14  A    Yes.

15  Q    At some point during that video you made mention of

16  something you called *the chair*?

17  A    Yes.

18  Q    Can you tell us exactly what you were referring to?

19  A    A chair in that aspect is something we use.  It's

20  called a *restraint chair*.  And you sit down on it, the

21  back and seat are padded.  But in order to use that,

22  your arms are restrained to the arms of the chair and

23  your legs are restrained to the chair.  It's for, I

24  guess, uncontrollable subjects at that point and

25  suicidal subjects as well as, you know, to prevent

                    ROBERT CONROY - DIRECT

1  people from criminal damage to property, that kind of

2  thing.

3  Q    Can you put someone who is in handcuffs behind

4  their back in the restraint chair that you have at the

5  jail?

6  A    No, you'd have to remove them.

7       THE COURT:  Remove the handcuffs you're saying.

8       THE WITNESS:  Correct.

9  Q    And once the person is in the chair, how are their

10  arms restrained?

11  A    I believe they're nylon straps.

12  Q    Where are they restrained in the chair?

13  A    They're restrained one on each wrist; one that goes

14  around the ankles or each ankle; there's one that goes

15  over the belt and then it crisscrosses over the

16  shoulders.  So you're sitting there kind of like this.

17  (Indicating)

18  Q    So their hands have to be free and unrestrained in

19  order to put them in the chair.

20  A    Correct.

21  Q    You mentioned the chair during this incident in the

22  receiving cell.  You never put him in the chair, did

23  you?

24  A    No.

25  Q    Why not?

                    ROBERT CONROY - DIRECT

1    A    Because for that short period of time I thought it

2    might have been an option.  It just became not an option

3    when we couldn't get the handcuffs off.

4    Q    Now I think at some point you testified that you

5    directed that the officers stop trying to remove the

6    handcuffs?

7    A    Correct.

8    Q    And you directed them that you were just -- they

9    were going to exit the cell and leave the handcuffs on;

10   yes?

11   A    Yes.

12   Q    And there was some questions about a comment you

13   made that you said was, in essence, to the camera.  Do

14   you remember that?

15   A    Yes.

16   Q    And that was a reference that you made to this not

17   being punishment?

18   A    Yes.

19   Q    When you said it's not a punishment, what were you

20   referring to?

21   A    I wanted it on record that this is not a

22   punishment.  Handcuffs are never to be used as a

23   punishment.  Leaving somebody in a cell with handcuffs

24   on is never to be done as a punishment.  It's in our

25   policy that handcuffs are not to be used as a

ROBERT CONROY - DIRECT

1    punishment, and I wanted that to be clear.

2    Q    Were you leaving Mr. Kingsley in the receiving cell

3    with handcuffs on as a punishment or not?

4    A    No.

5    Q    Were you referring at all to the use of the taser

6    when you made the comment about *this is not a*

7    *punishment*?

8    A    No.

9    Q    Was there any force from your observation that was

10   used once you gave the order for the officers to leave

11   the receiving cell?

12   A    No.  There was no force used.

13   Q    And how long did Mr. Kingsley then stay in the

14   receiving cell with the handcuffs on?

15   A    Approximately 12 minutes.

16   Q    And during those 12 minutes was he monitored at

17   all?

18   A    He was.

19   Q    How?

20   A    By video in the jail office stream of this video,

21   continuous stream.  Whether it's recorded or not, you

22   can live view it from the office.

23   Q    And who was watching him?

24   A    I was.  Excuse me.  I was.

25   Q    And what did you observe in those 12 minutes?
                    ROBERT CONROY - DIRECT

1    A    One movement where he actually rolled to his left.

2    Minor movements other than that; whether it be his

3    fingers or something, but they were really minor.

4    Q    And at some point then, somebody went back to the

5    receiving cell?

6    A    Correct.  There was four of us.

7    Q    Who went back?

8    A    Deputy Bentinbau (ph), Deputy Tom Wilds, Deputy

9    Blanton, and myself.

10   Q    Why were different officers used or why did

11   different officers go back to the receiving cell than

12   were originally in the cell?

13   A    Shift changes at seven o'clock was one reason and

14   we had different officers there.  For another reason, I

15   thought it would be better that different officers went

16   back there and tried to de-escalate the situation.

17   Q    Why did you think that would be better?

18   A    At times sometimes when different officers go in, a

19   different rapport is generated between two people.  So I

20   thought I would give it a chance.

21   Q    And what happened when you went back to remove the

22   handcuffs?

23   A    Deputy Bentinbau went back and he secured the legs.

24   Deputy Tom Wilds secured the upper part of

25   Mr. Kingsley's body.  I took the handcuffs off, and I

                    ROBERT CONROY - DIRECT

1    believe Deputy Blanton came in, as I was taking the

2    handcuffs off, and secured Mr. Kingsley's right hand as

3    I was taking the other handcuff off his left land.

4    Q    Did anything else occur or was anything else

5    important in terms of removing the handcuffs?

6    A    Mr. Kingsley was still resisting.  He still had

7    resistive tension in his arms.  He still had clenched

8    fists, so he was still resistive.

9    Q    But you were able to get the cuffs off?

10   A    Yes.

11   Q    After the cuffs were removed, was Mr. Kingsley

12   monitored at all from that point forward?

13   A    He was monitored by video.  He was placed on an

14   administrative watch, 15-minute watch, and then I think

15   later that day that was changed to a half-an-hour watch.

16   The nurse was contacted and the nurse came and checked

17   on him as well.

18   Q    What was the purpose of putting him on a 15 and

19   then a 30-minute watch?

20   A    Just to observe him, to watch his actions.

21   Q    And how long did that continue?

22   A    The 15-minute watch I believe lasted until -- I

23   don't think it was quite 10:30 in the morning.  And the

24   30 -- then it went from a 15-minute to a 30-minute

25   watch, and then it continued for awhile.  I'm not sure

                    ROBERT CONROY - DIRECT

1  exactly how long.

2  Q     I'd like to show you what's been marked as Exhibit

3  513.  Can you tell us what Exhibit 513 is?

4  A     This is a -- this is a watch log, one of the logs

5  that we use in the jail when somebody is on a watch.

6  This is -- what you have to do in this case, depending

7  on if it's a 15, 30, 45-minute watch, at least in that

8  many increments -- if he's on a 15-minute watch, at

9  least once every 15 minutes you have to go *eyes on* where

10 you're actually seeing him.  There's nothing in the way.

11 The rest of the time it's on video, but at least every

12 15 minutes you'd have to actually be there to actually

13 physically see him.

14       And then if it was 30 minutes, every 30 minutes you

15 would have to actually be there.  So what you do is you

16 document the time, who did it, and a code, which is

17 basically what you saw at that time.

18            MR. JONES:  I move the admission of Exhibit

19 513.

20            MR. PARDON:  No objection.

21            THE COURT:  Received.

22            MR. JONES:  Permission to publish the exhibit.

23            THE COURT:  You may.

24 BY MR. JONES:

25 Q     So just to fill in the picture, what's shown in the
                    ROBERT CONROY - DIRECT

1    first column of the exhibit?  What's recorded rather.

2    A    The first column being the left-hand column.

3    Q    Yes.

4    A    That is the time that the -- you went to the cell

5    to check on him.

6    Q    And the second column from the left?

7    A    That is the badge number of the person who actually

8    checked on him.

9    Q    Okay.  And 1270, who is that?

10   A    1270 is Deputy Blanton.

11   Q    And who's 1277, if you remember?

12   A    You know, I don't know.

13   Q    And then the third column is code; correct?

14   A    Correct.  That's the observation code at the

15   bottom, which a lot of those are 17.  So then you look

16   at the bottom and you look under No. 17.  It says *alert*

17   *but quiet*, so that's the actions that he did at that

18   time.

19   Q    Okay.  And what time does the document reflect that

20   the watch was started?

21   A    0644.

22   Q    And what time does it reflect that the watch ended?

23   A    It looks like 1404, which would be 2:04 p.m.

24   Q    And in the code column of the exhibit there are

25   some written entries, but then there are some entries

                    ROBERT CONROY - DIRECT

1   that are only numbers; correct?

2   A    Correct.

3   Q    And the entries that have a 3 next to them, what

4   does that reflect?

5   A    That reflects that he was sleeping.

6   Q    And the entries that have a 17?

7   A    Alert but quiet.

8   Q    I think there's 121 at the end.  What does that

9   reflect?

10  A    Talking and seems fine.

11  Q    There's an entry at 7:05.  Do you see where I am

12  with an asterisk next to it?

13  A    Yes.

14  Q    What does that entry reflect?

15  A    I can't see what it actually says.  It looks like

16  it says *called*.

17  Q    Maybe we can zoom in on it a little bit.  So the

18  7:05 entry, what does that entry reflect?

19  A    *Called the nurse*.

20  Q    Why don't you go ahead and read the other

21  handwritten entries.

22  A    Looks like 644 he was *moved to receiving*.  0645 I

23  believe that says *was tased*.  At 648 I can only see

24  that -- it looks like *movement*, but I can't recall

25  what's after that.  659 it says *removed handcuffs*.  *Was*

                ROBERT CONROY - DIRECT

1  *breathing.  Saw chest rise.  Hands were a little red*

2  *from* -- can't see that.  *Circulation from being*

3  *handcuffed.*  That one word I can't make out.  Then it

4  says *move of arm under body.*

5  Q    You read part of the entry about the hands.  Could

6  you read the rest of the entry?  It goes over to the

7  left-hand column and continues.

8  A    Where it says *hands a little red from*, and that

9  word I can't make out, something, *circulation from being*

10 *handcuffed and resisting.*

11 Q    I'd like to show you Exhibit 512.  What is Exhibit

12 512?

13 A    Exhibit 512 is our shift log.  It's a computized

14 generated -- computer-generated shift log where we make

15 entries of cell checks, significant notations in the

16 jail.

17 Q    And for what day is this shift log?

18 A    May 21st, 2010.  It starts at ten minutes after

19 midnight.

20        MR. JONES:  I'd move the admission of 512, Your

21 Honor.

22        MR. PARDON:  I don't know if Lieutenant Conroy

23 knows anything about how these entries were made on this

24 shift log or if he made them or can testify as to what

25 they mean.

                    ROBERT CONROY - DIRECT

1          MR. JONES:  I can clarify, if necessary.

2          THE COURT:  All right.  Why don't you.

3   BY MR. JONES:

4   Q    How is it that officers, if you know, make entries

5   on the shift log?

6   A    They are generized -- or generated in the computer.

7   You put in your number -- you sign on, you put in your

8   number, and then you type in a comment.  Some of the

9   comments are already done like *cell checks*, you can just

10  hit cell checks and it will be automatically generated.

11  Once the comments are in there, you can't change them.

12  Q    And is this shift log created as part of the normal

13  operations of the jail each day?

14  A    Yes.  I believe it's required by code.

15  Q    Is it maintained by the jail as a normal part of

16  its admissions?

17  A    Yes.

18          MR. JONES:  I would move the admission of

19  Exhibit 512, Your Honor.

20          MR. PARDON:  No objection.

21          THE COURT:  Received.

22  BY MR. JONES:

23  Q    Were there any medical personnel on staff in the

24  jail back in May of 2010?

25  A    We had a county-employed nurse as well as a doctor.
                    ROBERT CONROY - DIRECT

1   Q     And the nurse, who was that?

2   A     Vicki Bethke.

3   Q     And is Ms. Bethke still employed by the county as a

4   nurse?

5   A     No.

6   Q     To your knowledge did Ms. Bethke see Mr. Kingsley

7   that day?

8   A     Yes.

9   Q     How did that come about?

10  A     After the incident, I believe I told Deputy Blanton

11  to call her and notify her so she could check on him.

12  Q     I'd like to show you what's been marked as Exhibit

13  514.  Do you recognize Exhibit 514?

14  A     Those are medical notes that we keep in the jail.

15  Q     And do you know how these medical notes were

16  generated?

17  A     Yeah.  They're handwritten by the jail nurse.

18  Q     And are these notes or notes of this type created

19  in the regular course of the nurse's duties for the

20  jail?

21  A     They are.

22  Q     And are they preserved by the Sheriff's Department

23  in the normal course of its business?

24  A     They're preserved in the medical unit and either

25  the medical staff or myself have the key for that.

                    ROBERT CONROY - DIRECT

1        MR. JONES:  I'd move the admission of Exhibit

2   514, Your Honor.

3        MR. PARDON:  I'm going to object.

4        THE COURT:  Sustained.

5   BY MR. JONES:

6   Q    Lieutenant Conroy, did Mr. Kingsley request any

7   medical tension -- medical attention from you that day?

8   A    No.

9        MR. JONES:  Those are all my questions.  Thank

10  you.

11       THE COURT:  Mr. Pardon, anything else?

12       MR. PARDON:  Yes.  A few questions, Your Honor.

13                   CROSS-EXAMINATION

14  BY MR. PARDON:

15  Q    Lieutenant Conroy, you were able to remember a lot

16  more of Mr. Kingsley's actions when Mr. Jones asked you

17  about them than what I did; correct?

18       MR. JONES:  Objection.  Argumentative.

19       THE COURT:  Sustained.

20  BY MR. PARDON:

21  Q    When you first got in to the jail, when you first

22  came into the jail on the morning of the 21st, you spoke

23  with Sergeant Hendrickson about Mr. Kingsley; correct?

24  A    Correct.

25  Q    And I think you testified that Sergeant Hendrickson

                    ROBERT CONROY - CROSS

1  had told you about a comment that Mr. Kingsley

2  supposedly made about the CERT team was going to have to

3  come in; correct?

4  A    I believe he told me that on the phone, yes.

5  Q    Okay.  And you personally never heard that comment

6  from Mr. Kingsley; correct?

7  A    No.

8  Q    In fact, it was your understanding that Sergeant

9  Hendrickson had not actually heard that Mr. Kingsley

10  made that comment; isn't that correct?

11  A    Correct.

12  Q    And you -- after you came in and spoke with

13  Sergeant Hendrickson, at some point you had a briefing

14  with the other officers that were going to go into the

15  cell to move Mr. Kingsley; correct?

16  A    After I spoke to Mr. Kingsley I met with the other

17  officers, yes.

18  Q    In fact, you don't even know if the CERT team

19  comment was raised at the briefing; right?

20  A    What briefing?

21  Q    The briefing you had with the officers before you

22  went to move Mr. Kingsley from the cell.

23  A    I don't believe it was.

24  Q    Okay.  So it wasn't really that big of a concern at

25  the time right before you went into the cell; correct?

                    ROBERT CONROY - CROSS

1    A    I think it was a concern, yes.

2    Q    It wasn't enough of a concern that you had raised

3    it and discussed it with the other officers right before

4    you went in; correct?

5    A    I believe they already knew.  I was briefed by

6    those officers that it happened.

7    Q    Okay.  I just want to make sure I understand.  You

8    don't know that the comment about the CERT team wasn't

9    even discussed before you went into the cell; correct?

10    A    Right beforehand, no.

11    Q    Okay.  And you indicated that when the officers

12    went into the cell, Sergeant Hendrickson and Deputy

13    Blanton to do handcuffing, that Mr. Kingsley kept his

14    arms straight; right?

15    A    He kept them straight and by the side of his

16    buttocks, yes.

17    Q    And he was tensing his straight arms; is that your

18    testimony?

19    A    He was tensing his arms.

20    Q    Okay.  But you didn't again actually see the

21    handcuffing procedure; correct?

22    A    The actual handcuffs going on, no.  I saw his arms.

23    Q    All right.  And just to back up a little bit, when

24    you spoke with Mr. Kingsley personally, you know, on

25    your own, and you talked about removing the paper and

                    ROBERT CONROY - CROSS

1   the fact that he was going to go to receiving, it's

2   correct to say that a decision had already been made to

3   send him to receiving; correct?

4   A    When I originally went in to speak to him, no, that

5   decision wasn't made in my head, no.

6   Q    Okay.  Could you take out your deposition, please.

7   A    Yes.

8   Q    I direct you to page 36 of your deposition.  And

9   again, you were under oath when you gave a deposition

10  here in this case; correct?

11  A    Yes.

12  Q    I'm going to read, beginning at line 12 of page 36.

13  And if you could look at the context.  This is in

14  reference to your discussion with Mr. Kingsley; is it

15  not?

16  A    Starting at Number 12 or -- Do you want me to back

17  up a little bit?

18  Q    Well, starting at Number 12, we're talking about

19  your conversation with Mr. Kingsley; correct?

20  A    Correct.

21  Q    All right.

22       MR. JONES:  Objection, Your Honor.  I don't

23  think this is a proper use of a deposition.

24       THE COURT:  Sustained.

25  BY MR. PARDON:

                ROBERT CONROY - CROSS

1  Q    Had a decision been made to move Mr. Kingsley to

2  receiving for a 23-hour lockdown because Deputy Manka

3  had issued a minor violation report?

4  A    No.

5       MR. PARDON:  Your Honor, may I proceed to read

6  a portion of the deposition at this time?

7       THE COURT:  Is this in an attempt to impeach

8  Mr. Conroy?

9       MR. PARDON:  Yes.

10      THE COURT:  You may.

11 BY MR. PARDON:

12 Q    All right.  So turning to line 12 of page 36, the

13 question was asked to you:

14      "Question:  So the reason to take him to receiving

15 it sounds like was two-fold:  Number one was so he would

16 not be in the cells so you could remove the paper; and

17 number two, discipline for violating jail rules.  Is

18 that correct?

19      "Answer:  At that time, yes.  His placement in

20 receiving would be the 24-hour lockdown, I believe it

21 was, that Deputy Manka had issued.  So that would have

22 been, during that conversation, that would have been the

23 reasoning, yes."

24      Is that what you testified under oath then?

25 A    That is what I testified.  But there is -- if I may

                    ROBERT CONROY - CROSS

1  clarify.

2          THE COURT:  Your lawyer will have -- not your

3  lawyer, but the defendants' lawyer will have an

4  opportunity to ask you some more questions.

5  BY MR. PARDON:

6  Q    All right.  You mentioned at one point while

7  Mr. Kingsley was in the receiving cell that you

8  considered the use of the chair; correct?

9  A    Correct.

10  Q    And at the time you considered the use of the

11  chair, he was in handcuffs; correct?

12  A    Correct.

13  Q    All right.  In fact, you also made an observation

14  about the position of Mr. Kingsley's handcuffs before he

15  was carried into the cell, and you testified they were a

16  little loose; correct?

17  A    Correct.

18  Q    You didn't say anything in any incident report you

19  wrote about his handcuffs being a little loose; did you?

20  A    No.

21  Q    And in preparation for your testimony in this case,

22  you, in fact, read an expert disclosure by a Mr. Landers

23  on behalf of the plaintiff; didn't you?

24  A    I read one expert testimony, the one that you

25  provided.  That's the one I read.
                    ROBERT CONROY - CROSS

1   Q    Okay.  And that had something to do with, in part

2   at least, about the potential tightness of the

3   handcuffs; didn't it?

4   A    I believe it did.

5   Q    Okay.  You also had a conversation, I just want to

6   be clear, with Sergeant Hendrickson right after you

7   exited the receiving cell in which you asked him why the

8   taser was used; correct?

9   A    Yes.

10  Q    All right.  Did the tone of that question go

11  something like what were you doing?  Why did you use the

12  taser?

13  A    No.  It was the tone that I'm using right now.

14  Q    Okay.  And you also said that you thought you heard

15  Sergeant Hendrickson state that Mr. Kingsley had tried

16  to bite him in the past; right?

17  A    In a certain cell entry?

18  Q    Right, yes.  Right after that you --

19  A    Yeah.  I put that in my report, yes.

20  Q    Okay.  And just to be clear, a month later you

21  wrote, in response to Mr. Kingsley's request to have

22  that changed, that your report of what you heard was an

23  accurate account of what was said.  Isn't that what you

24  said; correct?

25  A    Paraphrased, but yes.

                    ROBERT CONROY - CROSS

1  Q    Okay.  And in preparing for your testimony in this

2  case, you, in fact, had a conversation with Sergeant

3  Hendrickson, didn't you, in which Sergeant Hendrickson

4  told you that he had testified otherwise; that he never

5  made that comment.  Isn't that correct?

6  A    I asked him and he stated he did not make that

7  comment, yes.

8  Q    So you were aware that Sergeant Hendrickson had

9  provided that testimony in a deposition when you

10 testified in this case?

11 A    Yes.

12 Q    And I think you also testified that you save, in

13 the Monroe County Jail, you save videos of -- do you

14 save videos of any significant event that occurs?

15 A    Yes.

16 Q    To your knowledge, is there any video of you

17 removing the handcuffs from Mr. Kingsley when he went

18 back in 15 or 20 minutes later or whatever it was?

19 A    I believe there is.

20 Q    We haven't seen it here today, have we?

21 A    Not today, no.

22      MR. PARDON:  No further questions.

23      THE COURT:  Mr. Jones.

24      MR. JONES:  Just a few.

25                REDIRECT EXAMINATION
                ROBERT CONROY - CROSS

BY MR. JONES:

Q    You ruled out at some point using the chair, quote unquote, *the chair*, with Mr. Kingsley; correct?

A    Correct.

Q    Why did you rule out using the chair?

A    Because we couldn't get him under control to put him into the chair; couldn't get his handcuffs off.  It just wasn't a viable option.

Q    What is the fact of the matter as to whether or not you had decided that Mr. Kingsley would be moved to receiving when you went back to talk to him originally the morning of May 21st?

A    When I went back to speak to Mr. Kingsley originally, it was to get him to take the light down. He could have served that 23-hour lockdown in his cell had he done that.  As we progressed through this, then there were other considerations that came to mind when we had to move him out.  So not only would he have to be removed from his cell and placed in receiving to face that 23-hour lockdown that Deputy Manka served, but also discipline for failure to follow other orders and having to remove him from the cell, there was additional discipline.  That's why we removed or we took him out, removed him from the cell and put him in the receiving area.

                    ROBERT CONROY - REDIRECT

1  Q    So when you went back to talk to Mr. Kingsley, was

2  he already on a disciplinary lockdown?

3  A    Yes.

4  Q    And clarify for us why was that?

5  A    For failure to follow orders of staff.  He didn't

6  take the paper down when he was told to do so multiple

7  times by staff.

8  Q    By whom originally -- well, let me back up.  Who

9  put him on that and when?

10 A    Deputy Manka the previous night.

11 Q    Okay.  And is that why, when we looked at the video

12 of the cell doors closing on south block as you entered

13 into the cellblock, is that why all the doors closed

14 except Mr. Kingsley's?

15 A    Correct, because he was already serving that

16 discipline.

17 Q    And then was there further discipline to be issued

18 as a result of his failure to follow your orders?

19 A    Correct.  A minor discipline is something that is

20 23 hours or less.  A major discipline is more than 24

21 hours.  At that point, we generally take them out of the

22 place where they're housed in and at that point we'll

23 put them in receiving.  And then he could serve that

24 time consecutive to the original discipline for failure

25 to follow Deputy Manka's orders.

                    ROBERT CONROY - REDIRECT

1    Q    Was there any discipline to be imposed other than

2    these lockdowns and the segregation in the receiving

3    cell?  Or was that it?

4    A    No other discipline, just a lockdown.

5              MR. JONES:  Thank you.

6              THE COURT:  You may step down.

7         (Witness excused at 2:21 p.m.)

8              THE COURT:  Mr. Pardon, you may call your next

9    witness.

10             MR. PARDON:  All right.  Your Honor --

11             MR. JONES:  I'm sorry, I didn't mean to

12   interrupt, but this witness was under subpoena.  Is he

13   released from that subpoena?

14             MR. PARDON:  Yes.

15             THE COURT:  You're free to leave the building.

16             MR. PARDON:  Your Honor, we call Mr. Brian

17   Landers.

18        **BRIAN LANDERS, PLAINTIFF'S WITNESS, SWORN,**

19                     <u>DIRECT EXAMINATION</u>

20   BY MR. PARDON:

21   Q    Good afternoon.

22   A    Good afternoon.

23   Q    Could you state your name.

24   A    Brian Landers.

25   Q    Mr. Landers, what is your present employment
                     BRIAN LANDERS - DIRECT

1   position?

2   A     I am the criminal justice chair for Madison

3   College.

4   Q     And Madison College, just for the benefit of our

5   jury, has that been referred to as any other names?

6   A     Yes.  Madison Area Technical College.

7   Q     MATC?

8   A     MATC, correct.

9   Q     Do you have any other positions that you presently

10  hold?

11  A     I co-own a company called *BlueboardIT*, and I'm also

12  an elected official.  I'm the mayor of the City of

13  Wisconsin Dells.

14  Q     Could you briefly describe your educational

15  background.

16  A     I have a social degree studies from MATC.  I also

17  have a bachelor of science in criminal justice and

18  prelaw from Mt. Senario College.  And I also attended

19  the 500 -- or the 400-hour at that time Basic Law

20  Enforcement Recruit Academy at MATC.

21  Q     All right.  And do you have any direct experience

22  in law enforcement?

23  A     Yes.  I served 18 years with the Wisconsin Dells

24  Police Department.

25  Q     And when was that?
                    BRIAN LANDERS - DIRECT

1   A    From 1992 to the end of 2010.

2   Q    Okay.  And what in general were your duties as a

3   police officer?

4   A    General patrol duties.  Investigative duties.  As I

5   advanced through the Department, I became a canine

6   handler for about eight-and-a-half years.  I was on the

7   drug unit.  I was assigned to the county drug units as

8   well in Sauk and Columbia County.  I was in charge of

9   Department training.

10      I was promoted to Lieutenant in 2003 through 2008.

11  In 2008 I was promoted to Lieutenant.  Part of my duties

12  as a sergeant were supervision of patrol staff,

13  supervision of nonpatrol staff, as well our dispatch.

14  Part of my duties as Lieutenant was to do policy

15  guidance, assessment budgeting.

16      We also had a municipal lockup, so duties included

17  administration of the municipal lockup as well.

18  Q    Just to clarify I think you said you became a

19  Lieutenant in 2003.

20  A    I'm sorry.  Sergeant.  I was promoted to Sergeant

21  from 2003 to 2005 or 2003 to 2008 and then 2008 I was

22  promoted to Lieutenant.

23  Q    Okay.  And did part of your training as a police

24  officer involve the appropriate use of force?

25  A    Yes, it did.
                    BRIAN LANDERS - DIRECT

1 Q    Did you ever have occasion to use force or consider

2 the use of force while you were a police officer?

3 A    Many times.

4 Q    Did you ever have occasion to use a taser on anyone

5 while you were a police officer?

6 A    Yes, I did.

7 Q    And have you ever yourself been tased?

8 A    Yes, I have.

9 Q    What does it feel like?

10 A    It hurts.

11 Q    And as part of your duties in the Wisconsin Dells

12 Police Department, did you have occasion to have access

13 to a jail?

14 A    Yes.  The City of Wisconsin Dells actually sits on

15 four different counties:  Sauk, Columbia, Juneau and

16 Adams.  So we had to be familiar with the jail

17 procedures in all four of those jails.  That included

18 taking people to the jail; sometimes we'd have to pick

19 them up to transport them to other places; sometimes

20 we'd have to interview people at the jail.  So we had to

21 be familiar with those jails, as well as our municipal

22 lockup as well.

23 Q    Okay.  Now, you mentioned that you're on the

24 faculty of Madison College or MATC, formerly known as

25 MATC.  How long have you been on the faculty?
                    BRIAN LANDERS - DIRECT

1   A    I was part-time since 2000 and then I was hired

2   full time in December of -- actually technically

3   September of 2010.

4   Q    Okay.  And what are your present duties at Madison

5   College?

6   A    As criminal justice chair, the bulk of my duties

7   include the administration of The Law Enforcement

8   Academy, The Jail Academy and the specialized training.

9   Specialized training is when a police officer gets done

10  with their basic training, then they go through

11  specialized training to keep up their certifications or

12  to get an advance knowledge or training in a specific

13  skill.

14       Part -- I also teach within the Law Enforcement

15  Academy, and part of my duties when initially hired and

16  still carry with me today is I'm kind of the course

17  coordinator and lead professor of a course called

18  *Introductions to Corrections* which is a course that's

19  trained in the associate degree portion of the Madison

20  Area Technical College.

21  Q    Have you ever heard of something called -- that's

22  colloquially called the *DAAT Manual*?

23  A    Yes.

24  Q    What does DAAT stand for?

25  A    DAAT is an acronym.  D-A-A-T.  It stands for

                    BRIAN LANDERS - DIRECT

1 *Defensive And Arrest Tactics.*

2 Q    Do you do any instruction with respect to the DAAT

3 Manual?

4 A    Yes.  I've been a DAAT instructor since 2000.  I've

5 been the lead instructor for MATC in their DAAT program

6 since 2003, and was also appointed as a master

7 instructor of defensive tactics.

8 Q    Okay.  Just to back up a bit, what professions are

9 you preparing the students that you're teaching at

10 Madison College?

11 A    Wide variety.  Our students go on to become police

12 officers, sheriff's deputies, jailers, correctional

13 employees at both the state and federal level, federal

14 law enforcement, probation, courts, sometimes private

15 security.

16 Q    Okay.  And how many officers have you personally

17 trained?

18 A    Well over a thousand.

19 Q    Just to help us if there's any -- to be clear, are

20 there any differences between corrections officers,

21 jailers, and police officers?

22 A    Yeah.  Police officers are officers that work on

23 patrol.  They work the street.  Jailers are people that

24 work through -- usually through a county sheriff's

25 Office that are assigned to work in a jail setting.

                    BRIAN LANDERS - DIRECT

1   Correctional officers are -- usually that term is

2   referred to people that work in the profession of

3   corrections at the state or federal level working in

4   prisons.

5   Q    All right.  And would a police officer or a

6   sheriff's deputy be qualified to work in a jail, in a

7   county jail?

8   A    They would be qualified.  The qualifications are

9   higher for law enforcement than they are for jailers

10  per se; not to say the professionalism should not be

11  equal, but they would be qualified.  But if they were

12  going to work as a jailer full time, then they would

13  have to attend and complete the Jail Academy.

14  Q    All right.  You talked earlier about the Defensive

15  And Arrest Tactics Manual.  Could you describe a little

16  bit more about what that is?

17  A    The Defensive And Arrest Tactics Manual is kind of

18  the guide or the Bible for use of force in Wisconsin.

19  Every single police officer in the State of Wisconsin,

20  when they go through the academy, has to be trained in

21  defense and arrest tactics.  The manual is just that.

22  It's the training manual for every single law

23  enforcement officer in Wisconsin.

24  Q    All right.  And have you personally played any role

25  in developing the content of the DAAT Manual?

                    BRIAN LANDERS - DIRECT

1    A     Yes, I have.

2    Q     And how so?

3    A     I've been appointed by the -- I was a State of

4    Wisconsin, Department of Justice, Division and Training

5    in Standards as a member of the Tactical Advisory

6    Committee.  The Tactical Advisory Committee is the

7    committee that shaped law enforcement training,

8    including the authoring, distribution, and regulations

9    of training anything related to defensive and arrest

10   tactics as a statewide curriculum.

11   Q     And as part of your role on the Wisconsin DOJ

12   Tactical Advisory Committee, have you assisted in

13   preparation of other manuals that are used?

14   A     Yes.  Under our guidance, not only is DAAT's

15   curriculum part of our program, but the state firearms

16   curriculum; the tactical response curriculum, which

17   would be something like a active shooter or the school

18   shooting; and also the electronic control device

19   training and curriculum.

20   Q     And electronic control device, does that include a

21   TASER?

22   A     Yeah.  It's the state's name for a TASER.

23   Q     Okay.  Are there differences in the way that law

24   enforcement officers or police officers are trained in

25   use-of-force principles as opposed to the way jail
                    BRIAN LANDERS - DIRECT

1  officers are trained?

2  A    No.  There's different topics:  Defensive and

3  arrest tactics is meant more for law enforcement

4  training.  Jailers have to go through what we call POSC,

5  which is P-O-S-C.  It's an acronym for Principles of

6  Subject Control.

7        Out of the physical requirements, when somebody

8  goes through an academy, they're required to have a

9  physical testing, besides a written exam, but to make

10 sure that all the competencies, that they know have to

11 do the different skills required.  Out of the 50

12 requirements in POSC, and I believe there's 49 in DAATs,

13 they're almost 99% identical.  But the major difference

14 between POSC in jail and DAAT in law enforcement is a

15 lot of the -- some of the tactics like group handcuffing

16 or escorting a person from point A to point B.  There's

17 more emphasis on doing it as a team or as a group in a

18 jail than there is in DAAT.

19       The theory is is that a lot of police officers,

20 especially in Wisconsin, work in rural or isolated

21 areas, so there's more of an emphasis on how to take

22 care of yourself when you're on your own.

23 Q    Okay.  And you sort of said this, but what's the

24 relationship between POSC and DAAT Manuals?

25 A    The relationship is that there's a separate

                    BRIAN LANDERS - DIRECT

1  committee, the POSC Committee that the state appoints.

2  Back a couple years ago, I want to say somewhere around

3  2010, they decided to shape their manual in line with

4  the DAAT Manual so that there's almost seamless training

5  between the two.

6  Q    Okay.  I'm going to refer you to Plaintiff's

7  Exhibit 1067, if you could find that in your binder,

8  please.  Sorry about the bulkiness.

9  A    That's okay.  I believe I have it.

10 Q    Okay.  Could you describe what Plaintiff's Exhibit

11 106 is.

12 A    It would be my curriculum vitae or my resume.

13 Q    And does this accurately reflect your employment

14 and educational experience?

15 A    Yes, it does.

16      MR. PARDON:  Your Honor, I move to admit

17 Plaintiff's Exhibit 106.

18      MR. JONES:  No objection.

19      THE COURT:  Received.

20      MR. PARDON:  May I publish it then for the

21 jury?

22      THE COURT:  Any objection?

23      MR. JONES:  No.

24      THE COURT:  You may.

25 BY MR. PARDON:

                    BRIAN LANDERS - DIRECT

1  Q     All right.  I'm going to direct your attention to

2  the second page of your resume.  Now again, I have put

3  yellow markings on the copy here that I'm showing the

4  jury and you.  I'd like to highlight a couple of things

5  and I'm going to refer to the section on instructor

6  certifications.  Can you describe what are instructor

7  certifications?

8  A     These are specific certifications that are provided

9  either through the State of Wisconsin Department of

10  Justice; sometimes there are private entities that will

11  also certify you in certain areas.

12  Q     Okay.  And I'd like to call your attention to the

13  second highlighted portion I have there.  What's a

14  master instructor of defensive tactics?

15  A     That is somebody that has to be appointed through a

16  technical college or training academy.  Actually they're

17  referred to by a technical college or a training academy

18  to the Department of Justice of somebody who has

19  advanced knowledge or training in the use of defensive

20  tactics and the training of defensive tactics to become

21  a trainer.

22      The Department of Justice Training and Standards

23  then reviews that and if they feel the person is

24  qualified, they will appoint them as a master

25  instructor.

                    BRIAN LANDERS - DIRECT

1   Q      And you have that certification?

2   A      Yes.

3   Q      Okay.  And the second highlighted thing I have a

4   few lines down says *report writing instructor*.  Do you

5   see that?

6   A      Yes, I do.

7   Q      What certification is that?  What's that about?

8   A      That's another -- you have to submit kind of an

9   application resume to the Department of Justice, again

10  outlining your training and experience and education,

11  and the training and standards board meets and if they

12  feel that you're qualified to teach this, then you are

13  certified as a report writing instructor.

14  Q      And I'm going to refer you to the final

15  certification I have highlighted.  Do you see the one

16  that says *TASER instructor*?

17  A      Yes.

18  Q      And previously what's that?

19  A      That would be a private vendor outside the State of

20  Wisconsin, Taser International, that if you go through

21  their training course, then you are certified as a TASER

22  instructor if you go through the instructor level

23  course.

24  Q      You can set the resume aside here for now.  Have

25  you evaluated use-of-force issues before?

                    BRIAN LANDERS - DIRECT

1   A    Yes, I have.

2   Q    All right.  Have you ever testified in a case like

3   this before?

4   A    No, I have not.

5   Q    Okay.  What were you asked to do in connection with

6   this case, Mr. Landers?

7   A    Give me one second.

8   Q    Okay.  I apologize.

9   A    That's okay.  Excuse me.  I was asked to do -- to

10  review this incident and establish an opinion, and I've

11  established an opinion based upon the three incidents.

12  The first incident that I've established an opinion on

13  was that the use of the taser was unreasonable.

14       The second --

15            MR. JONES:  Objection, Your Honor.

16            THE COURT:  I'm sorry.  Did you object?

17            MR. JONES:  I did object.  May I approach?

18            THE COURT:  You may.

19       (Discussion at side bar at 2:35 p.m.)

20            MR. JONES:  This has been covered in part in

21  the motions in limine, but I wanted to renew my

22  objection to the witness testifying about what is

23  reasonable and unreasonable.

24            THE COURT:  What is --

25            MR. JONES:  What is reasonable force or what is

                    BRIAN LANDERS - DIRECT

1    unreasonable force.  We think that's essentially a legal

2    conclusion and that he should not be permitted to

3    testify to it.  I do have citations if that would assist

4    the Court.

5         MR. PARDON:  I think the answer to your motion

6    in limine, to the motion in limine was an accurate

7    description of the law.  I think he can testify.  He's

8    talking about what the standards are, how officers are

9    expected to act, and he's going to testify whether

10   that's reasonable.

11        THE COURT:  Right.  We'll stick with that, with

12   the ruling.  Okay.

13      (End of side bar discussion at 2:35 p.m.)

14   BY MR. PARDON:

15   Q    Getting back to where we were, let me reask the

16   question.  What were you asked to do in connection with

17   this case?

18   A    I was asked to review the case and establish an

19   opinion based upon my review, and my opinion was that --

20   my first opinion was that the use of the taser was

21   unreasonable.

22      My second opinion that I've established is that the

23   handcuffing that was done on Mr. Kingsley was not done

24   appropriately and could have led to the handcuffs not

25   being applied appropriately to tension in the arms of

                    BRIAN LANDERS - DIRECT

1  Mr. Kingsley.

2      The last opinion that I've established was that the

3  control tactics done by Sergeant Hendrickson in the

4  receiving cell of Mr. Kingsley were also unreasonable.

5  Q    Okay.  I'm going to ask you more detail about those

6  opinions in a bit.  But I would just like to back up a

7  little bit and say what things did you do personally to

8  come to those conclusions?

9  A    I reviewed the incident reports that were supplied

10  to me.  I reviewed the videos that were supplied to me.

11  I also reviewed the policies by Monroe County.  I've

12  reviewed the deposition of Mr. Kingsley.  I've also used

13  the -- used the State training manuals that were present

14  at the time of the incident.  And I used my own training

15  and experience to establish my opinion.

16  Q    Okay.  Did you review the training records of the

17  officers in this case as well?

18  A    Yes, I did.

19  Q    All right.  All right.  I'd like to turn now to

20  your opinion on the use of the taser, and if you could

21  summarize why do you believe that the use of the taser

22  on Mr. Kingsley under this circumstance was

23  unreasonable?

24  A    The use of a taser is -- a taser is a weapon.  The

25  use of a taser in our state and also throughout many

                    BRIAN LANDERS - DIRECT

1   other states requires that there has to be a component

2   of active resistance, and active resistance has a very

3   clear definition.  That definition is that active

4   resistance is a person physically counteracting the

5   control tactics of an officer with a component that

6   presents a real threat of bodily harm to that officer.

7   I did not see that there was active resistance.

8   Q    I'm going to again ask you -- we're going to get to

9   that in more detail, but we've been using a lot of these

10  terms and I just want to make sure that folks

11  understand.

12       First of all, can you just briefly explain what a

13  taser is?

14  A    A taser is an electronic control device or it's a

15  handheld device.  It looks very similar to a gun, but

16  it's not a gun.  It contains an electronic charge that's

17  powered by what they call a *digital powered magazine*,

18  which is kind of a fancy term for a battery pack.

19       That battery pack, when the taser is turned on and

20  the trigger is depressed, will send an electronic

21  current through a positive and negative probe.  The

22  current tasers that are used today have cartridges that

23  affix onto the end of the device, and inside those

24  cartridges are two probes connected through a copper

25  wire that go back to compressed nitrogen.  So when the

                    BRIAN LANDERS - DIRECT

1  trigger is pulled, if the cartridge is in place, it will

2  fire those probes out of the cartridge to the target.

3  Lacking the cartridge, the taser can still be used as

4  kind of a stun gun, if you will.

5      At the very end of it, there's a positive and

6  negative probe.  When you touch it to the skin of a

7  person, then they feel the electricity.

8  Q    Okay.  So what's the difference between what

9  happens to a person who's hit by a taser when they've

10  been struck by the probes versus what happens when

11  they've been stunned?

12  A    When they're hit with the probes, the probes

13  actually have to go in or make contact with the skin and

14  what that does is it starts to interfere with the nerve

15  signals between the brain and the major muscle groups.

16  Everybody understand that your brain, when you talk,

17  move, blink and all that, all of that is being

18  controlled through electricity conducted from the brain

19  to nerve endings.

20      What the taser has done is they have pretty much

21  isolated the wavy wave of the brain impulses with the

22  nerves, and it interrupts that.  It jams them, if you

23  will.  So when the probes actually make contact and go

24  into the body, even though they go in for a very short

25  amount, it interrupts the ability for the brain to speak

BRIAN LANDERS - DIRECT

1  with major muscle groups, so the major muscle groups

2  tend to lock up.

3      Lacking the probes actually going into the body,

4  that doesn't cause that muscular disruption.  So if you

5  were to just take a taser, take the cartridge off, press

6  it to somebody's skin, you're not getting that muscle

7  disruption I talked about, but you are getting pain from

8  the electricity.

9  Q    Do you know how the taser was deployed in this

10  case?

11  A    Yeah, it would have been without the cartridge,

12  which is commonly referred to as a drive stun.

13  Q    And that's the mode that causes pain; correct?

14  A    Correct.

15  Q    Now you also say that Mr. Kingsley did not show

16  active resistance; correct?

17  A    Correct.

18  Q    Is that a term that has a specific meaning?

19  A    Yes, it does.

20  Q    All right.  I want to ask you if you could turn to

21  Plaintiff's Exhibit 9 in your binder.  So that should be

22  in your first binder.

23  A    Okay.

24  Q    Can you identify what Plaintiff's Exhibit 9 is?

25  A    This is the Defensive and Arrest Tactics Manual

                    BRIAN LANDERS – DIRECT

1  from August 2007.

2  Q    Is that the basic manual that was in effect at the

3  time of the incident here?

4  A    Yes, it is.

5  Q    And did you use this in considering your opinion in

6  this case?

7  A    Yes, I did.

8  Q    All right.

9         MR. PARDON:  Your Honor, I move to admit

10  Plaintiff's Exhibit 9.

11         MR. JONES:  No objection.

12         THE COURT:  It's received.

13         MR. PARDON:  If I could then publish it to the

14  jury.

15  BY MR. PARDON:

16  Q    I'm going to refer to specific pages, so I'm going

17  to refer you to page -- the third page of the Manual.

18  I'll put that up here.  And are you there yet?  It's

19  like little roman numeral iii?

20  A    Yes.

21  Q    The third page of the Manual, can you -- I've

22  highlighted something on the screen here that I'm

23  showing both yourself and the jury.  And is that you?

24  A    Yes, that is.

25  Q    And why are you listed here?
                    BRIAN LANDERS - DIRECT

1   A    Because I was a member of the Tactical Advisory

2   Committee that authored this Manual.

3   Q    Okay.  You indicated the term *active resistance* has

4   a specific meaning.  Could describe some terms that

5   refer to resistance and what they mean?

6   A    Some terms?

7   Q    Well, could you describe what is active resistance?

8   A    Active resistance is resistance, physical

9   resistance that physically counteracts an officer's

10  ability to take a person into custody or control a

11  person that also presents an element of bodily harm to

12  that officer.

13  Q    Okay.  Could you turn to page 105 of the Manual.

14  A    Okay.

15  Q    Do you see that I highlighted the term *active*

16  *resistance* in this section of the Manual?

17  A    Yes, I see that.

18  Q    And is this what you were referring to when you

19  talk about active resistance?

20  A    Yes, it is.

21  Q    Have you heard the term *passive resistance*?

22  A    Yes, I have.

23  Q    What does passive resistance mean?

24  A    It means it's noncompliant but yet nonthreatening

25  behavior.

                    BRIAN LANDERS - DIRECT

1   Q    And again, could you turn to page 118 of the

2   Manual.

3   A    I'm there.

4   Q    Okay.  And do you see the term *passive resistance*

5   highlighted there?

6   A    Yes, I do.

7   Q    And is that what you're talking about?

8   A    Yes, it is.

9   Q    Could you turn to page 35 of that Manual, please.

10  I'm going to put up a portion of that page that refers

11  to control alternatives.  It's about halfway down and

12  I've highlighted specifically two different paragraphs.

13  One that begins with *passive resistance* and one that

14  begins with *active resistance*.  Do you see that?

15  A    Yes, I do.

16  Q    Can you describe or explain what is being

17  highlighted here?

18  A    What's being highlighted is to try to give the

19  student an understanding of the difference between

20  passive and active resistance.  People are different

21  types of learners, so sometimes they can learn better by

22  visualizing.  So what we've done is we try to give some

23  examples in which a student can maybe get a light bulb

24  turned on to say okay, I understand what they mean here

25  between passive and active resistance.
                    BRIAN LANDERS - DIRECT

1   Q    Now, referring to this here, as well as your own

2   experience, can you provide some examples of what would

3   cause -- of things that are commonly taught to

4   constitute passive resistance as well as active

5   resistance?

6   A    Sure.  A passive resistance would be something like

7   let's say somebody is outside protesting the federal

8   court; them sitting on the stairs with their arms

9   crossed saying I'm not going to leave, but yet they're

10  not showing any signs or indication that they're going

11  to intentionally harm that officer.

12       Another example that was in the news recently was

13  the example of the pepper spraying of the UC Santa

14  Barbara students during the sit-in for the 99% protest,

15  I believe, or the occupied protest.  So that would be an

16  example of passive resistance.

17       Active resistance would be something that, again,

18  physically counteracts an officer's ability to take

19  them, to control or take the person into custody and

20  presents a level of bodily harm.  An officer tells

21  somebody you're under arrest and they turn around in a

22  boxing stance or a fighting stance.  Maybe an officer is

23  trying to take a person into custody and the person gets

24  up and violently pulls their arms away or they are

25  directed to the ground and they get up back up again and

BRIAN LANDERS - DIRECT

1  they're showing a repetitive action to fight the

2  officer.

3  Q    Okay.  Thank you.  I'd like to ask you about

4  another term.  Have you heard the term *resistive*

5  *tension*?

6  A    Yes, I have.

7  Q    And what is resistive tension?

8  A    It's the level of agitation in a person's body.

9  Q    And what is the relationship between terms like

10  passive or active resistance and the term resistive

11  tension?

12  A    Resistive tension is used to be an indicator for

13  officers, not only for the potential for a situation to

14  escalate, but they'll also consider the entire

15  circumstances, the entire environment.  If an officer

16  goes hands on and touches a person, they might feel

17  resistance; tension.  An officer has to understand what

18  is that tension caused from.  For instance, a person

19  standing outside on the street watching their home burn

20  down, the officer has to move that person away so the

21  firefighters can get in there.  An officer might feel

22  resistive tension.  Doesn't necessarily mean that that

23  person is going to harm the officer.

24  Q    You may have answered my question, but the question

25  is does -- one of the questions I have is does -- if

BRIAN LANDERS - DIRECT

1  somebody is exhibiting resistive tension, does that

2  necessarily mean they are exhibiting active resistance?

3  A    No.  It's a case-by-case basis.

4  Q    All right.  We'll get into this further, but based

5  on your review of the incident, how would you

6  characterize Mr. Kingsley's actions at the time he was

7  tased by Officer Degner in terms of resistance he may

8  have been offering?

9  A    I would say either no resistance or passive.

10 Q    Was he exhibiting active resistance?

11 A    No.

12 Q    All right.  Now you've talked about the fact that

13 tasers are not supposed to be used unless there's active

14 resistance.  Are there guidelines for the type of force

15 that officers can use in Wisconsin?

16 A    Yes.

17 Q    Okay.  And could you turn to page 29 of the DAAT

18 Manual.  Exhibit 9.  I'll put it up here, a portion of

19 page 29 up here.  Let me know when you're there.

20 A    I am here.

21 Q    Could you explain generally what's being depicted

22 on this chart of page 29 of the DAAT Manual.

23 A    This is the intervention options.  The intervention

24 options are basically where the tactics of a police

25 officer or a jailer would -- where it would fall in

                    BRIAN LANDERS - DIRECT

1    line.  What we call a *Disturbance Resolution Model*.  A

2    Disturbance Resolution Model is a blanket model for all

3    police officers and jailers to understand when use of

4    force is appropriate.

5    Q    Okay.  Could you briefly describe some of the modes

6    that are described here and what their purpose is.

7    A    Sure.  The first mode is *presence*, which is

8    displaying authority.  It's a, you know, police officer

9    or jailer shows up.  You know, just their presence alone

10   can get people to comply or maybe deter people from

11   doing something they shouldn't be doing.

12       Dialogue is to verbally persuade, which presence

13   and dialogue combined, having an officer talking to a

14   person or possibly using heavy commands upon a person,

15   trying to get them to comply.

16       Then there's control alternatives.  Control

17   alternatives are used when there's passive or active

18   resistance or threats.

19       And the next would be protective alternatives,

20   which is going to be used when you have continued

21   ongoing resistance or there's definitely assaultive

22   behavior.  An officer is being injured right now.

23       And then lastly is deadly force, which is to stop

24   the threat.

25   Q    Okay.  Could you turn to page 32 of the Manual, and

                     BRIAN LANDERS - DIRECT

1  specifically I'm referring you to the section that says
2  *Dialogue*.  Do you see that section?
3  A    Yes, I do.
4  Q    And do you see that it continues on to page 33 of
5  the Manual?
6  A    Yes.
7  Q    All right.  And I'm going to refer you to part of
8  page 33, the portion I have highlighted here on the
9  screen.
10       What is being described here in the highlighted
11  portion of the Manual?
12  A    In each mode, you know, with maybe the exception of
13  presence and deadly force, there are varying levels of
14  tactics that officers can use, from a lower level to a
15  higher level, and that's what this is describing; that
16  an officer's verbalizationd skills alone can get people
17  to comply or provide them information.  So this is kind
18  of describing a low level to a higher level of
19  verbalization.
20  Q    I'd like to refer to a higher level where you talk
21  -- where you mentioned about control alternatives.  Can
22  you talk about what some of the control alternatives
23  are.
24  A    Again, there's lower levels and there's higher
25  levels.  Some of the lower levels would be pressure

BRIAN LANDERS – DIRECT

1   points.  There's a mandibular pressure point behind a

2   person's ear that could be used.  Some of the higher

3   levels would be decentralizations of taking a person

4   that's standing up and forcing them or directing them to

5   the ground.  And then there's also the use of a taser or

6   pepper spray in the controlled alternatives portion of

7   our Manual.

8   Q    I'm going to refer you to page 41 of the Manual.

9   A    Okay.

10   Q    When you get there, and in particular to the

11   portion I've highlighted, what is being described here

12   in the highlighted portion?

13   A    When we talk about control alternatives and control

14   devices, control devices in the State of Wisconsin are

15   pepper spray and tasers or ECDs.  What this basically

16   says is you are permitted to use these as a police

17   officer only when you encounter active resistance or the

18   threat of active resistance.  Nothing less.

19   Q    Okay.  And just again, briefly how does this relate

20   to Mr. Kingsley's case?

21   A    There was no active resistance when the taser was

22   used.

23   Q    Okay.  Why do you think there was no active

24   resistance when the taser was used?

25   A    Well, I did not see anything in the video and there

                    BRIAN LANDERS - DIRECT

1    was nothing in the reports that articulated that there

2    was active resistance.

3    Q    Okay.  I'd like to walk you through a couple of the

4    videos, but in light of the fact -- I'll ask you briefly

5    did you view the video in which Mr. Kingsley was carried

6    out of his cell and down the hallway?

7    A    Yes.

8    Q    And in fact, did you see that video today in the

9    courtroom?

10   A    Yes, I did.

11   Q    And is there anything on that video that indicated

12   to you that Mr. Kingsley was exhibiting active

13   resistance?

14   A    No.

15   Q    All right.  I'm going to refer you to Plaintiff's

16   Exhibit 14, and this is the video of the receiving cell,

17   which I understand is the subject of a stipulation for

18   admissibility.

19           MR. JONES:  Yes.

20           MR. PARDON:  Could you turn on the laptop?

21   Q    Did you rely on this video in part in forming your

22   opinions in this case?

23   A    Yes, I did.

24   Q    And by the way, can you tell us what the

25   blacked-out area in the video is?
                    BRIAN LANDERS - DIRECT

1    A    That's usually set there by the monitoring company

2    in cooperation with the jail staff.  Behind that is the

3    toilet, so it gives the inmate some privacy when they're

4    using the toilet.

5    Q    Okay.  I'm going to play this video for the jury to

6    watch.  It's going to take a couple of minutes, but I

7    would like everyone to see it, as well as yourself.

8         (Video played          2:56-2:59 p.m.)

9    Q    I'm going to stop it there.  Just so we're clear,

10   are you able to identify the point on the video when the

11   taser began to be deployed?

12   A    It appears to me that the taser was employed right

13   around 6:46:46, I believe somewhere around that, 6:45,

14   6:46.

15   Q    Okay.  What I'll do is I'll play a short segment of

16   it, and just so we're all clear, if you could point out

17   where that begins if you're able to see it.  Okay?

18   A    Okay.

19        (Video played)

20   A    Right about there.

21   Q    So when you said *right about there* --

22   A    6:45:46.

23   Q    Okay.  Thank you.  I'd like to discuss your

24   professional observations of the video.  What aspects of

25   this video led you to the conclusion that Mr. Kingsley
                    BRIAN LANDERS - DIRECT

1  was not exhibiting active resistance?

2  A    I don't see a physical threat to the officers

3  there.  I see a man that is handcuffed behind his back

4  laying face down in a bunk with weight or pressure from

5  the officers, and there's no physical harm presented to

6  the officers.

7  Q    All right.  I'm going to move to a segment of the

8  film where I asked you about some movements that

9  Mr. Kingsley made with his upper body.  So if you would

10 bear with me while I fuddle with the computer here and

11 get to the point that I want to start, I appreciate

12 that.

13      Okay.  I'm going to begin it at 6:44:34 and I'm

14 going to play it for a little bit.  So beginning at

15 6:44:34.

16      (Video played)

17      All right.  Now I've stopped the video at 6:44:52,

18 and I'd like to ask you did you see Mr. Kingsley's head

19 or upper body make any movements there?

20 A    Yeah.  Lifting off of the bunk.

21 Q    Okay.  And first of all, based on your reports or

22 review of your reports from this case, do you know which

23 person is at Mr. Kingsley's head?

24 A    I believe that would be Sergeant Hendrickson.

25 Q    Are you aware there was some mention in the

                    BRIAN LANDERS - DIRECT

1    incident reports in this case about a concern that

2    Mr. Kingsley might try to bite someone?

3    A    Yes.

4    Q    All right.  Does it appear to you from your

5    professional review of the video that the actions of

6    Sergeant Hendrickson around the time that Mr. Kingsley

7    was moving his head are consistent with someone who is

8    concerned about being bitten?

9    A    No.

10           MR. JONES:  Objection.  Competence.

11   Foundation.

12           THE COURT:  Overruled.

13   BY MR. PARDON?

14   Q    Why?

15   A    Anyone concerned about being bitten is going to pay

16   attention to the person.  You're not going to stand away

17   from them.  You're going to try to control their head.

18   You're going to be directing your attention at them.

19   There were several times just prior to that taser being

20   used that Sergeant Hendrickson isn't doing any of those

21   things.  He's letting Mr. Kingsley move his head a

22   little bit.  He takes control of the head and he lets it

23   go.  He takes control and lets it go.  If you're worried

24   about being bitten, you don't do that.

25   Q    Okay.  Do you think that Mr. Kingsley, lifting his
                    BRIAN LANDERS - DIRECT

1  head in these instances here, constitutes aggression or

2  active resistance?

3  A    No.

4  Q    Why?

5  A    There's no -- again, there's no threat of

6  intentional bodily harm from a person just lifting their

7  head off a bunk.

8  Q    All right.  Let me ask you about some of the noise

9  you heard on the video.  Did you hear Mr. Kingsley

10 grunting and groaning?

11 A    Sure.

12 Q    Did you hear him at one point swearing at the

13 officers?

14 A    Yes, I did.

15 Q    All right.  Does Mr. Kingsley's yelling or grunting

16 or groaning or swearing constitute a threat that would

17 make you say he's exhibiting active resistance that

18 would justify the use of a taser?

19 A    That in and of itself, no.

20 Q    Why not?

21 A    Well, because other parts of our manual are just

22 applications of what you learn in your experience is

23 that people are going to say things and people are going

24 to express their frustrations in a different way doesn't

25 necessarily mean that they're a live threat to my bodily

BRIAN LANDERS - DIRECT

1   harm.  The old adage sticks and stones may break my

2   bones, but names don't hurt me.  You've got to have

3   thick skin as a police officer.

4   Q    Are officers, in fact, taught appropriate verbal

5   skills?

6   A    Yes, they are.

7   Q    In your opinion, were appropriate verbal skills

8   used here?

9   A    No.

10   Q    And why is that?

11   A    Well, when you're dealing with somebody who is

12   agitated to this level and you have the ability to

13   control them by outnumbering them in a semi-secure place

14   of a county jail, talking to them and being more

15   reasonable, when someone is shouting and another person

16   is shouting, it just kind of escalates the tension in

17   the environment.

18        I mean using a calmer approach -- and that's why in

19   our Disturbance Resolution Manual we talk about that and

20   the verbalization manual, we talk about using lesser

21   means of verbalizing to try to de-escalate or calm a

22   person.

23   Q    All right.  Do you know what the deputies have said

24   in their incident reports about the reason why the taser

25   was applied?

                    BRIAN LANDERS - DIRECT

1    A    I read the incident reports, yes.

2    Q    Okay.  And what is your understanding of the

3    reasoning described in the incident reports?

4    A    They described that there's resistance.

5    Q    Okay.  Did you understand as to whether they were

6    attempting to remove the handcuffs?

7    A    Yes.

8    Q    Is it your understanding that they were attempting

9    to overcome resistance so that the handcuffs could be

10   removed?

11   A    Yes.

12   Q    All right.  And in your view does that explanation

13   comply with professional standards?

14   A    No.  If a person is actively resisting you and you

15   feel this person is going to present bodily harm to you,

16   I know I would question them why are you taking the

17   handcuffs off.  So they can become more combative and

18   have more fighting skill?  It just does not make sense

19   to me.

20   Q    All right.  Just assume for a second that

21   Mr. Kingsley for some reason, he didn't want his

22   handcuffs removed; he was, in fact, tensing them up and

23   tried to prevent them from being removed.  Are there

24   other options that the deputies could have used in this

25   situation instead of a taser?

                    BRIAN LANDERS - DIRECT

1    A    Yes.

2    Q    What?

3    A    I guess the next option is just time.  Cooler

4    heads.  Trying to resolve it a little bit more

5    peacefully.  Another option that was discussed was the

6    use of a chair.  I don't know what all Monroe County has

7    available to them, but it's very clear to me that there

8    was no active resistance.  Using a little bit more time

9    and diplomacy might have resolved this.

10   Q    And again, just to be clear, is it preferable to

11   leave somebody in handcuffs alone?

12   A    No.

13   Q    What would you do, in fact, if you were to back off

14   a little bit?  How would you handle that situation?

15   A    Well, there's something that -- and I believe that

16   one of the -- that Lieutenant Conroy touched on

17   override.  Override is when you see -- and this is also

18   trained in other areas of the academies -- override is

19   when you see that officers are getting frustrated.

20   They're having problems dealing with somebody.  So maybe

21   somebody, kind of a new face, a new approach can step in

22   there and try to take over.  So there's an officer

23   override factor that, you know, maybe Lieutenant Conroy

24   could have stepped in and said back out from here.  And

25   Mr. Kingsley, let's discuss this.  Take a time out, if

                    BRIAN LANDERS - DIRECT

1    you will.  That's one area that you can use.

2        Another area is that you can maintain observation

3    of him or maybe having somebody close by and just give

4    him a little time right now.  I just don't see that.

5    You know, what is the urgency here.

6    Q    Okay.  I'd like to ask you about the incident

7    reports that you said you reviewed.  First of all, are

8    you -- are you familiar with procedures that officers

9    use to write incident reports?

10   A    Yes.

11   Q    All right.  And in general, how should an officer

12   writing an incident report involving the use-of-force

13   document that use?

14   A    Well, they need to articulate their use of force.

15   First thing they have to do is identify the actions

16   factually as to why they had to use the force.

17       The next thing they do is they have to identify

18   what tactics they used to respond to that level.

19       Last thing that they would do is to describe

20   whether there was follow-through procedures, whether

21   that's medical or just talking to the person, calming

22   them down, whatever that they would use as well.  All

23   that has to be factual.

24   Q    And in writing about an incident report, would you

25   expect that an officer would sort of describe the worst

1  behavior that a subject had exhibited in justifying use

2  of force?

3  A    An officer would describe all the behavior that

4  would go into their justification for the use of force.

5  Q    Now, you've reviewed the incident reports filed by

6  the officers in this case; correct?

7  A    Yes, I have.

8  Q    And in your view, did any of those reports describe

9  what you would characterize as active resistance?

10  A    No.

11  Q    All right.  I'd like to look at some of these

12  reports if you can, so I'm going to ask you first to

13  look to Plaintiff's Exhibit 12.

14  A    Okay.  I'm here.

15  Q    And could you describe to me what Plaintiff's

16  Exhibit 12 is.

17  A    It appears to be the incident report from Sergeant

18  Hendrickson.

19  Q    And you considered this in forming your opinion?

20  A    Right.

21        MR. PARDON:  We're going to move to admit this

22  report.

23        MR. JONES:  No objection.

24        MR. PARDON:  If I may publish it to the jury

25  then on the document camera.  May I ask for -- may I

                    BRIAN LANDERS - DIRECT

1   have it published to the jury, Your Honor?

2            THE COURT:  Oh, yes.  It's received.

3            MR. PARDON:  Thank you.

4   BY MR. PARDON:

5   Q     Could you turn to page three of the report.  Now,

6   this will be admitted, so the jury will get to look at

7   it.  So, I'm going to ask you to describe what is being

8   -- what it says here; and in fact, if you want to read

9   it out loud, that's okay too.

10  A     What I did in forming my opinion is I kind of broke

11  these things down.  For instance, the first sentence in

12  there "Mr. Kingsley became physically resistive," comma.

13  That is a very broad and vague interpretation.  What is

14  physically resistive?  Struggling and trying to get up?

15  I really didn't see that on the video.  And again, it's

16  just not well articulated here.

17       "He was told to stop, relax, and stop resisting

18  numerous times."  That's definitely documented on the

19  video.  He continued to resist and would not comply with

20  any order given to him.

21       "I placed my knee and lower leg across

22  Mr. Kingsley's upper back and applied pressure to help

23  maintain control and keep him from resisting and

24  struggling with officers."  Again, kind of vague and

25  not --

                    BRIAN LANDERS - DIRECT

1            MR. JONES:  I'm going to object to the

2   testimony.  Vagueness of the report.  It's irrelevant.

3            THE COURT:  I'm sorry, I can't hear you.

4            MR. JONES:  Objection.  Relevance.

5            THE COURT:  Sustained.

6   BY MR. PARDON:

7   Q    In your view, Mr. Landers, is this an adequate

8   description of Mr. Kingsley's behavior such that it

9   would justify -- that would describe active resistance?

10            MR. JONES:  Objection, Your Honor.  Relevance.

11            THE COURT:  Sustained.

12   BY MR. PARDON:

13   Q    Okay.  We can set this aside then for a second.

14            MR. PARDON:  Your Honor, may I approach the

15   bench for a second?

16            THE COURT:  You may.  Actually we'll take a

17   recess at this time and we can take it up.  We'll send

18   the jury out and then we'll take it up.  Fifteen

19   minutes.  Please remember not to talk about the case.

20   Leave your notepads on your chairs.

21        (Jury excused from courtroom at 3:13 p.m.)

22            THE COURT:  Mr. Pardon.

23            MR. PARDON:  I'm going to embarrass myself,

24   Your Honor, and state that I don't understand the

25   objection and I don't understand the ruling, and I'm
                    BRIAN LANDERS - DIRECT

1   wondering if I could --

2           THE COURT:  My understanding was that Mr. Jones

3   was objecting to the fact that Mr. Landers was just

4   reading the report and analyzing the report as to

5   whether that was enough to justify the actions that were

6   taken by the officers.  It seemed to me that that was an

7   appropriate objection.  We saw what was happening in the

8   video.  At least that was my understanding of what you

9   were objecting to Mr. Jones.

10          MR. JONES:  That was my objection.

11          MR. PARDON:  Okay.  And I guess my point was

12  that Mr. Landers is an instructor who knows the sorts of

13  things that police officers are supposed to write in a

14  report and how they're supposed to justify what they're

15  doing, and in his view, the descriptions don't do that.

16  That's what I was trying to get across.  The

17  descriptions do not adequately describe active

18  resistance.

19          THE COURT:  Well, that may be a failure of the

20  report writer, but I think we should be looking at what

21  actually happened and whether that justified what was

22  done rather than Mr. Hendrickson's or somebody else's

23  view or idea of what happened.

24          MR. PARDON:  Okay.  Thank you.

25          THE COURT:  Okay.  We'll resume in 13 minutes.
                    BRIAN LANDERS - DIRECT

 1     (Recess              3:15-3:28 p.m.)

 2     (Jury brought in courtroom at 3:28 p.m.)

 3         THE COURT:  Mr. Pardon.

 4         MR. PARDON:  Thank you, Your Honor.

 5  BY MR. PARDON:

 6  Q    Mr. Landers, are you aware that the night before

 7  this incident Mr. Kingsley had made a comment about

 8  calling out the CERT team?

 9  A    Yes.  I did read that in the report.

10  Q    Okay.  Does this indicate to you that

11  Mr. Kingsley's actions in the receiving cell represented

12  a threat to the officers?

13  A    No.

14  Q    And why not?

15  A    Officers are judged on the use of force at the

16  instant they use their force.  They can use background

17  information as precursory information or what we call

18  *threat assessment*, but that statement was made many

19  hours ago and it doesn't match the physical observations

20  that they were presenting at the time.

21  Q    Now you heard testimony today about how

22  Mr. Kingsley was not cooperating in terms of not

23  following instructions; correct?

24  A    Yes.

25  Q    All right.  Does that mean that there's a potential
                    BRIAN LANDERS - DIRECT

1  for threat or active resistance?

2  A    No.  There's a difference between a risk and a

3  threat.  Risk, I mean every police officer that walks

4  around can say that everybody is a risk to them,

5  therefore they can use whatever force they want.  That's

6  why we have justifications for force.  That's why we

7  have training.  That's why we try to, you know, instill

8  the theory in officers, starting out at the beginning of

9  their careers in the academies, that there's a

10  difference between a risk.  Your job is inherently

11  risky.

12      There's that, and then there's actual live threats.

13  Those threats are based upon your observations, your

14  training and experience, and you must react to them in a

15  very reasonable manner.

16  Q    Okay.  Could you look at Plaintiff's Exhibit 67,

17  please.

18  A    Okay.

19  Q    Could you identify what Plaintiff's Exhibit 67 is?

20  A    It's the Principles Of Subject Control Manual from

21  June of 2012.

22  Q    And is that sometimes referring to as the POSC

23  Manual you described?

24  A    Yes, it is.

25  Q    And did you utilize this Manual in forming your

                    BRIAN LANDERS - DIRECT

1    opinions in this case?

2    A    Yes, I did.

3         MR. PARDON:  I move to admit Plaintiff's

4    Exhibit 67.

5         MR. JONES:  I'm going to object on the grounds

6    that it's dated June 2012, two years after the incident.

7         MR. PARDON:  I can do a follow-up question if

8    you want.

9         THE COURT:  All right.

10   BY MR. PARDON:

11   Q    Does the version that's dated 2012 differ

12   significantly from the version that was in effect in May

13   of 2010?

14   A    No.  They just basically try to make it more in

15   line to the DAAT Manual.

16        THE COURT:  I'm sorry, they make it more what?

17        THE WITNESS:  I'm sorry.  They were trying to

18   make it more in line with the Defensive and Arrest

19   Tactics Manual, but the theories and the tactics are

20   still the same.

21   BY MR. PARDON:

22   Q    Does it differ in any way that you believe is

23   relevant to your assessment in this case?

24   A    No, it does not.

25        MR. PARDON:  Your Honor, I would move --
                    BRIAN LANDERS - DIRECT

 1          THE COURT:  You still object?

 2          MR. JONES:  I still object.

 3          THE COURT:  The objection is sustained.

 4   BY MR. PARDON:

 5   Q    Okay.  Could you turn to -- we'll close that off.

 6   Could you turn to Plaintiff's Exhibit 10.  That will

 7   probably be in the first binder.

 8        Actually before I ask you any questions about this

 9   incident, I'd like to ask you of your knowledge with

10   respect to the POSC Manual that was in effect as of May

11   2010.  Does the POSC Manual say anything in particular

12   about the use of force in a jail setting that you think

13   is relevant to your field in this case?

14   A    Could you be more specific?

15   Q    Does the POSC Manual say anything with respect to

16   the ability to wait out incidents that may be of

17   relevance to your opinion in this case?

18   A    Yeah.  Understand that both POSC and DAAT use the

19   Disturbance Resolution Model.  The Disturbance

20   Resolution Model is that guide that I spoke of that each

21   one of those draws from.  And then the tactics on how

22   you apply your force are very similar in both areas.

23   What POSC kind of goes into more detail with is that

24   because you are working in a jail setting where although

25   people can have make-shift weapons, there are riots and
                    BRIAN LANDERS - DIRECT

1    things like that, you're still working in a more

2    controlled environment than you are when you're working

3    in the street or a back alley or somebody's bedroom

4    trying to take them into custody.  So there's a stronger

5    emphasis in POSC to weed out incidents instead of being

6    more quick to use force.

7    Q    Okay.  Turning your attention to Plaintiff's

8    Exhibit 10 that I just asked you to look at.  Could you

9    describe what Plaintiff's Exhibit 10 is.

10   A    It's the Monroe County Jail Use-of-Force Policy.

11   Q    Did you take this into account in considering your

12   opinions in this case?

13   A    Yes, I did.

14          MR. PARDON:  Your Honor, I'm going to move to

15   admit Plaintiff's Exhibit 10.

16          THE COURT:  Objection any?

17          MR. JONES:  No objection, Judge.

18          THE COURT:  Received.

19   BY MR. PARDON:

20   Q    All right.  Did you review this policy?

21   A    Yes, I did.

22   Q    And how is this policy relevant to your opinion in

23   this case?

24   A    It's relevant that by state, state statute, every

25   agency is required in the State of Wisconsin -- by every

                    BRIAN LANDERS - DIRECT

1    agency I mean a law enforcement agency, including

2    sheriff's departments as Monroe County is -- they're

3    required by state statutory to have a policy on use of

4    force.  What policies are in the State of Wisconsin is

5    they are expectations of performance for their

6    employees.

7         So upon reviewing this, I basically wanted to put

8    myself in the shoes of the Monroe County deputy as to

9    what was their expectation of performance in this

10   incident.

11   Q    Okay.  Could you turn to page 36 of the policy.

12   A    That would be Monroe 36?

13   Q    Monroe 36.  I'm sorry.  It says Monroe and then

14   there's a bunch of zeros and it ends in 36.

15   A    Okay.

16   Q    I'm calling your attention to this paragraph that's

17   down at the bottom of the page that I have placed a

18   yellow highlighter next to on the document camera here.

19        What is being described there?

20   A    It's being -- what's being described is -- it's an

21   older version of the Disturbance Resolution Model.

22   Q    Okay.  And does it continue on to page 37?

23   A    Yes, it does.

24   Q    Okay.  And with respect to page 37, is there

25   anything here that informs your opinion about whether
                    BRIAN LANDERS - DIRECT

1  the deputies complied with the Monroe County policy in

2  this case?

3  A    In particular attention is No. 4, "Intermediate

4  weapon and the use of a stun device or an electronic

5  security belt."

6          MR. JONES:  I'm going to object to the

7  testimony, Your Honor, as being irrelevant.

8          MR. PARDON:  May I?

9          THE COURT:  Mr. Pardon.  Oh, I thought you

10  wanted to be heard.

11          MR. PARDON:  I do.

12          THE COURT:  Okay.  Go ahead.

13          MR. PARDON:  I mean it's in his report and it's

14  relevant to the expectations of how force was to be

15  used.

16          THE COURT:  I'll overrule the objection.  I

17  think this is appropriate testimony.

18  BY MR. PARDON:

19  Q    Okay.  You were referring to Sec. 4 I think of the

20  report.  How does that inform your opinions in this

21  case?

22  A    It informs my opinions that the expectation of

23  performance by Monroe County employees was that the

24  intermediate weapon, which would be in today's language

25  -- actually language at the time, but it was not

                    BRIAN LANDERS - DIRECT

1  updated, would be protective alternative.  So what

2  they've essentially done is they said that where the

3  state has said that you can use a taser or a stun device

4  at a level of control alternatives which is -- control

5  alternatives would again be when you're facing active

6  resistance or threat, they put it at one level even

7  higher.  Now --

8          THE COURT:  I'm sorry, when you say *they*, who

9  are you talking about?

10          THE WITNESS:  Monroe County.  I'm sorry, Ma'am.

11  They put that at one level higher.  So this is at a

12  level that is in today's time, you would be faced with

13  ongoing resistance or assaultive behavior in which you

14  really have a definitive fear that you're going to be

15  seriously hurt by this person.

16      So what Monroe County did is they told their

17  deputies even though the state is saying this, you can

18  use the taser at a lower level, we expect you to use it

19  at an even higher level, which would be equal to use of

20  a baton.

21  BY MR. PARDON:

22  Q   All right.  Set that aside then.  Just briefly

23  again then, could you, just to sum it up, summarize your

24  opinion about why the use of the taser was not

25  appropriate in this case?
                    BRIAN LANDERS - DIRECT

1    A    There was no active resistance.  There was no

2    intentional threat of bodily harm against any of the

3    deputies that were there.

4    Q    All right.  I'd like to ask you about a second

5    opinion you expressed in this case.  You testified

6    earlier that the handcuffs were improperly applied.  Do

7    you recall that?

8    A    Yes, I do.

9    Q    All right.  And that that, in fact, may have led

10   to -- it was possible that that led to tension and pain

11   on the part of Mr. Kingsley.  Do you recall that?

12   A    Yes.

13   Q    All right.  And just to be clear, are you saying

14   that there was resistive tension by Mr. Kingsley?

15   A    I'm just saying that that was what was reported in

16   the officers' reports.

17   Q    Now you said that the handcuffs were put on

18   improperly and I'm wondering if you could just describe

19   and perhaps demonstrate to the jury a proper means of

20   putting on a handcuff.

21   A    Okay.  Handcuffs are generally placed on a person

22   in either a compliant or noncompliant fashion, whatever

23   the subject is exhibiting at the time.  In a compliant

24   fashion, officers are trained how to verbalize with the

25   person, how to stabilize a person, how they move in to

                    BRIAN LANDERS - DIRECT

1  approach and then apply the handcuffs in a way that it's

2  consistent with training.

3       One thing that -- let me jump to a noncompliant.  A

4  noncompliant is usually trained when a person is on the

5  ground, whether they were directed to the ground or

6  forced to the ground.  And then there's certain

7  stabilization tactics that officers use to try to keep

8  them on the ground so they can commence handcuffing.

9  When the handcuffs are applied, there's two key things

10 that must be done in both the compliant and noncompliant

11 situation.  And it has to be done when it's feasible; if

12 there's time that allows this to occur.  When a person

13 is compliant -- when the handcuffs are applied in a

14 compliant fashion, I really struggle to try to find a

15 time when there's not enough time to do this, but the

16 two things that they have to do is check the fit of the

17 handcuffs and then do what we call a double or a safety

18 locking of the handcuffs.  What this does is it prevents

19 the handcuffing from tightening up on the subject's

20 wrist.

21 Q    Did you bring any handcuffs with you today that you

22 could demonstrate that?

23 A    Yes, I did.

24      MR. PARDON:  Your Honor, if I may, I would like

25 us to stand and perhaps Mr. Landers could just -- I'll

                    BRIAN LANDERS - DIRECT

1  go like this and he can demonstrate on my hands.  Would

2  that be --

3        THE COURT:  All right.

4  BY MR. PARDON:

5  Q    You brought the keys, I hope.

6  A    I did.  The handcuffs have a single -- single

7  strand and double strand and the teeth go in the

8  ratchet.  The handcuff -- obviously you can kind of see

9  by the teeth of the ratchet, there's kind of a floating

10  device in there that kind of catches it so it doesn't

11  allow to pull back out.  When you double lock it, you in

12  essence put another catch in there in the teeth that

13  don't allow it to move either out or forward so they

14  can't tighten.  So right now I'm checking both of

15  these --

16        MR. JONES:  Your Honor, could I ask that

17  Mr. Landers sort of orient himself so that my clients

18  can see what it is that he's doing?  He has his back to

19  the defendants.  Maybe if he stands in front of the

20  witness stand --

21        THE COURT:  Right.  Why don't you stay to the

22  side of microphone.  You can use the microphone on the

23  witness stand.  You can still be standing up.  Just be

24  sure that the jurors can see you.

25        THE WITNESS:  Does this work better?  Can you
                    BRIAN LANDERS - DIRECT

1    still see?  So I was just explaining that the handcuffs

2    kind of ratchet through.  And then by double locking,

3    which different handcuffs have different mechanisms to

4    double lock.  In this particular model, there's a little

5    hole there and usually the tip of a handcuff key has a

6    pin on it, and by pressing the pin into the hole, it

7    double locks it so it can't tighten up.

8    BY MR. PARDON:

9    Q    Do you want to just illustrate how to apply them?

10             THE COURT:  Wait.  The jurors have to see it.

11        (Handcuffs are applied)

12   A    That's how they're properly applied.  I check for

13   fit and I do a lock on the handcuffs.

14   Q    Could you please unlock them.

15        (Handcuffs removed)

16        Thank you.  Mr. Landers, how do you know that the

17   cuffs were not applied properly in this case?

18   A    Two reasons.  One is that they were not initially

19   reported to be properly applied.  Second is that I

20   believe Deputy Blanton in his incident report, after the

21   taser was applied, described that he then double locked

22   the handcuffs at that time.

23   Q    Okay.  So if he double locked the handcuffs at that

24   time, that means that they weren't locked earlier;

25   correct?

                    BRIAN LANDERS - DIRECT

1   A    You can't double lock them twice.

2   Q    Okay.  And how could the improper handcuffing have

3   contributed to any tension or pain in this case by

4   Mr. Kingsley -- on Mr. Kingsley's part?

5   A    They could be tightened with any amount of pressure

6   on the single strand of the handcuff.  The handcuffs are

7   not comfortable to begin with.  That is why it's very

8   important and it's stressed in the training, the double

9   lock or safety check, to check for fit, and double lock

10  the handcuffs to prevent the handcuff from tightening,

11  whether that's intentional or just through the movement

12  of a person.

13  Q    Okay.  Does the fact that Mr. Kingsley didn't

14  specifically complain to the deputies that his cuffs

15  were too tight, does that have any effect on your

16  opinion here?

17  A    No.

18  Q    And why not?

19  A    Well, people will, I guess, take and relate pain in

20  different manners.  You know, my personal experience is

21  that not everybody will say that they're in pain for

22  whatever reason.

23  Q    Okay.  Were there any indications in the videotape

24  to you that you witnessed that Mr. Kingsley may have had

25  the handcuffs on too tight; that the handcuffs may have

BRIAN LANDERS - DIRECT

1  been on too tightly?

2  A    There were several points in the video:  The

3  growling; kind of the exertion of his voice in kind of a

4  grumbling manner would be an indicator to me that there

5  might be something wrong.

6  Q    Okay.  Could you turn to Plaintiff's Exhibit 50.

7  A    Okay.

8  Q    Could you identify that what that is?

9  A    This is the Monroe County Jail policy on the use of

10  restraints.

11  Q    And did you consider this in forming your opinions

12  in this case?

13  A    Yes, I did.

14        MR. PARDON:  Your Honor, I'd move to admit

15  Plaintiff's Exhibit 50.

16        MR. JONES:  No objection.

17        THE COURT:  Received.

18  BY MR. PARDON:

19  Q    Could you turn to page 60 of the report -- of the

20  policy.  It's the one that says *Monroe 60* on the bottom.

21  A    Okay.

22  Q    I've highlighted page 60 on the document camera

23  here with my highlighter, that is now wearing out.

24  Could you now describe this portion of the policy and

25  how that affects your view in this case?

                    BRIAN LANDERS - DIRECT

1    A    Again, the policy is an expectation of performance

2    by the deputies that work there, and the expectation of

3    performance was an employee should be watching for signs

4    that the restraints were not applied appropriately.

5    Q    And is that what this policy says?

6    A    Yes.

7    Q    You can set that aside.  Now Mr. Landers, are there

8    circumstances where it would be acceptable not to double

9    lock or safety lock with handcuffs?

10   A    Oh, definitely.

11   Q    What kind of circumstances would that be?

12   A    When you're in -- you need to immediately remove

13   somebody.  For instance, if an officer is involved in a

14   high speed chase and stops a vehicle and they're drawing

15   a person out at gunpoint but there's other people in the

16   vehicle that they're still worried about.  There might

17   be a case where another officer comes in and does the

18   handcuffing of the first person drawn out and get them

19   out of the line of fire and then do the safety lock and

20   double locking, checking for fit once they're behind

21   like another squad car or something that presents some

22   cover to the officers.

23   Q    Do you believe there was any circumstance in this

24   case that would justify not safety locking of the

25   handcuffs initially?
                    BRIAN LANDERS - DIRECT

1  A    No.

2  Q    And why is that?

3  A    They had plenty -- apparently plenty of time to

4  apply the fit and double lock the handcuffs.  There

5  didn't appear to be any rush.

6  Q    In any of the incident reports you reviewed, was

7  there any documentation of any reason for not safety

8  locking the handcuffs initially?

9  A    I saw no other pressing hazards.

10  Q    Okay.  I'd like to ask you now about a third

11  opinion you expressed and that concerns the control

12  tactics used by Sergeant Hendrickson in the receiving

13  cell.  Do you recall providing that opinion?

14  A    Yes.

15  Q    Could you briefly just summarize that again?

16  A    That the control tactics were unreasonable.

17  Q    Yes.  And why is that?

18  A    Some of the force used by Sergeant Hendrickson upon

19  Mr. Kingsley was not articulated as to reasoning why,

20  and then also the placement of his knee on

21  Mr. Kingsley's spine/neck area.

22  Q    Okay.  I'd like you to turn to Plaintiff's Exhibit

23  108.  That's likely in the second binder.  It's in the

24  third binder which you probably figured out by now.

25  A    I found it.
                    BRIAN LANDERS - DIRECT

1    Q    Could you briefly describe what Plaintiff's Exhibit

2    108 is.

3    A    It's a diagram of a human body that is used in both

4    the DAAT and POSC training that show sensitive areas on

5    the body.

6    Q    All right.  And did you consider this in forming

7    your opinion in this case?

8    A    Yes.

9         MR. PARDON:  Your Honor, I move to admit

10   Plaintiff's Exhibit 108.

11        MR. JONES:  No objection.

12        THE COURT:  Received.

13        MR. PARDON:  Thank you.

14   BY MR. PARDON:

15   Q    Okay.  You now see Plaintiff's Exhibit 108 on the

16   screen here.  Could you describe what -- how this is

17   relevant to your opinion in this case?

18   A    Yeah.  This diagram again is used in defensive

19   tactics and in POSC to demonstrate areas on the human

20   body that have a high propensity for injury.  So

21   therefore throughout the training, we teach the students

22   that the application of force upon these vital areas

23   must have a high level within a Disturbance Resolution

24   Model.

25   Q    Okay.  And are there areas here that are described

                    BRIAN LANDERS - DIRECT

1  as areas where you have a high propensity for injury and

2  would be better not to use -- not to apply pressure to?

3  A    Yes.  Particularly the head, the neck, the spinal

4  area, the center of the chest cavity and the groin.

5  Q    Okay.  Thank you.  I'm going to -- you can take

6  this down, and I'm going to ask if we could now have the

7  camera switched back to the laptop.

8       I'd like to look at the video again with you with

9  respect to your third opinion and I'd like to discuss

10 this with respect to your opinion about Sergeant

11 Hendrickson's tactics.  Let me just get this to the

12 location I would like to stop it or start it with.

13      All right.  For the record I've started it at

14 6:44:25 and I'm going to play it forward a little bit.

15      (Video played)

16      All right.  Now I've now stopped the video at

17 6:44:30 and I'm wondering if you could describe what

18 you've observed with respect to Sergeant Hendrickson's

19 control tactics.

20 A    It appears as if his left foot is on the ground and

21 his right knee is on the center of Mr. Kingsley's back

22 or spine area.

23 Q    Do you know how long that remains there?

24 A    No.  I believe at a certain point he moves it or

25 shifts.

                    BRIAN LANDERS - DIRECT

1    Q    Okay.  So we'll go ahead and I'm going to start the

2    video again.

3         (Video played)

4         All right.  Now I've just stopped the video at

5    6:44:51 and I'm wondering if you could describe what you

6    have observed here and how that relates to your opinion

7    with respect to the control tactics.

8    A    It appeared that Mr. Kingsley lifted his head off

9    the bunk and Sergeant Hendrickson's response was to -- I

10   don't know how to describe it other than a downward

11   thrust or force of his head, neck or spine area back

12   into the bunk, along with it appears both hands and his

13   knee.

14   Q    Okay.  And is this articulated anywhere in the

15   reports that you -- anywhere in Sergeant Hendrickson's

16   report?

17   A    No, it's not.

18   Q    Should it be?

19   A    It's an application of force.  It should be.

20   Q    I'm going to play the video ahead for a little bit.

21        (Video played)

22        All right.  Now, I've stopped it at 6:45:11.  Is

23   there anything that you observed in that segment that

24   bears on the control tactics used by Sergeant

25   Hendrickson?

                    BRIAN LANDERS - DIRECT

1   A    It appears that there appears to be several more

2   motions.  The video was hard to tell, but at least you

3   can tell by the torso of Sergeant Kingsley that there

4   appears to be kind of a motion forward and downward --

5          THE COURT:  Did you mean -- you didn't mean

6   Sergeant --

7          THE WITNESS:  I meant Sergeant Hendrickson.

8   I'm sorry.  Motions forward and downward by Sergeant

9   Hendrickson on Mr. Kingsley, as well as the knee right

10  now is somewhere near the upper torso or neck area.

11         MR. JONES:  Object to the testimony, Your

12  Honor.  From the video you can't tell where the knee is.

13         THE COURT:  I'm sorry, you can't tell what?

14         MR. JONES:  He just testified where Sergeant

15  Hendrickson's knee was at this point in the video and my

16  objection is --

17         THE COURT:  Sustained.

18         MR. JONES:  -- you really can't see that.

19         THE COURT:  Sustained.

20  BY MR. PARDON:

21  Q    Okay.  With respect to the downward thrusting

22  motion that you described, should that be articulated in

23  the incident reports?

24         MR. JONES:  Objection.  Irrelevant.

25         THE COURT:  Sustained.
                    BRIAN LANDERS - DIRECT

1  BY MR. PARDON:

2  Q    Okay.  I'm going to play the video ahead a little

3  bit.

4       (Video played)

5       Now, can you observe Sergeant Hendrickson's knee at

6  this -- the position of his right leg at this point?

7  A    I can observe the position of his right leg appears

8  to be somewhere on Mr. Kingsley.

9  Q    Now, I'm going to ask you to then watch the video

10  and describe if there's any point at which you can

11  identify where Sergeant Hendrickson's leg is and how

12  that may impact your opinion with respect to the control

13  tactics used.

14       (Video played)

15  A    Right there.

16  Q    Okay.  And when you said *right there*, I've now

17  stopped it at 6:46:24.  I'm going to actually move it

18  ahead a little bit.

19       (Video played)

20       And I've now stopped it at 6:46:26.  Can you

21  identify where Sergeant Hendrickson's knee is here?

22            MR. JONES:  Objection, Your Honor.

23            THE COURT:  Sustained.

24  BY MR. PARDON:

25  Q    Do you have an opinion about whether the placement

BRIAN LANDERS - DIRECT

1  of Sergeant Hendrickson's knee is appropriate here?

2          MR. JONES:  Objection, Your Honor.

3          THE COURT:  Sustained.

4  BY MR. PARDON:

5  Q    All right.  Now Mr. Kingsley testified that

6  Sergeant Hendrickson slammed his head into the bunk.

7  Are you saying that --

8          MR. JONES:  Objection.  I don't think that was

9  his testimony.  Mischaracterizes the testimony.

10         THE COURT:  Sustained.

11         MR. PARDON:  I apologize.  I didn't mean to

12  mischaracterize any testimony.

13  BY MR. PARDON:

14  Q    Are you saying that the two downward thrusting

15  motions that you've observed here constitute slamming

16  Mr. Kingsley's head into anything?

17         MR. JONES:  Objection.

18         THE COURT:  Sustained.

19  BY MR. PARDON:

20  Q    Do the two downward thrusting motions that you

21  described, are they a trained technique?

22  A    No.

23  Q    And in your view, were they justified under the

24  circumstances here?

25  A    There was no articulation to what those were, so --

               BRIAN LANDERS - DIRECT

1              MR. JONES:  Objection.  Move to strike.

2              THE COURT:  Overruled.

3              THE WITNESS:  There were no articulations of

4    what those were in the report, so I don't know what that

5    tactic was or what the intent was.

6    BY MR. PARDON:

7    Q    All right.  And given the level of activity of

8    Mr. Kingsley, do you believe that they fit -- were

9    justified?

10   A    No.

11   Q    All right.  To finish up, I would just like, if you

12   could reiterate for the jury -- well, that's fine.  I'm

13   not going to ask you that question.  I have one final

14   question.

15        Can you explain why you agreed to testify in this

16   case?

17             MR. JONES:  Objection.  Relevance.

18             THE COURT:  Sustained.

19             MR. PARDON:  Okay.  I have no further

20   questions, Your Honor.          (4:02 p.m.)

21             THE COURT:  Mr. Jones.

22             MR. JONES:  Thank you, Judge.

23                    CROSS-EXAMINATION

24   BY MR. JONES:

25   Q    If you could bear with me for just one second as I
                    BRIAN LANDERS - CROSS

1   get my place.

2   A     Certainly.

3   Q     There have been a lot of -- if we could remove the

4   exhibit from the -- thank you.

5        You've been asked obviously a lot of questions

6   about training in Wisconsin; correct?

7   A     Correct.

8   Q     And you were asked a number of questions about a

9   couple of policies of the Sheriff's Department or the

10  Jail; correct?

11  A     Correct.

12  Q     And I think you were asked some questions about

13  some or at least one of the reports written by one of

14  the officers; correct?

15  A     Correct.

16  Q     In your experience -- well, one more question.  You

17  also testified that certain elements of force that were

18  used in this instance, in your opinion, were

19  unreasonable; correct?

20  A     Correct.

21  Q     In your experience, the fact that an officer does

22  not follow his training to a tee, that does not

23  necessarily mean that the force used by the officer was

24  unreasonable; correct?

25  A     Correct.
                    BRIAN LANDERS - CROSS

1  Q    The fact that an officer does not follow his or her

2  department's policies, written policies to a tee, that

3  does not necessarily mean that any force used by the

4  officer was unreasonable; correct?

5  A    Correct.

6  Q    And an officer's report writing skills, whether

7  they're good or bad, does not mean necessarily that the

8  officer used unreasonable force; correct?

9  A    Correct.

10  Q    You offered an opinion about the way that the

11  handcuffs were applied in this incident; correct?

12  A    Yes.

13  Q    You did a demonstration with Mr. Kingsley's counsel

14  of how you might put a pair of handcuffs on an

15  individual; correct?

16  A    Yes.

17  Q    And when you did that, Mr. Pardon was standing with

18  his arms outstretched towards you; correct?

19  A    Correct.

20  Q    And his hands were a distance apart that you were

21  able to put the handcuffs on both; correct?

22  A    Correct.

23  Q    Mr. Pardon, as you were doing that, didn't move his

24  hands at all; did he?

25  A    No, he did not.

                    BRIAN LANDERS - CROSS

1    Q    He did not have his arms or hands extended at his

2    sides; did he?

3    A    No, he did not.

4    Q    He did not have the muscles in his arms flexed; did

5    he?

6    A    Not that I could feel.

7    Q    And Mr. Pardon didn't move his hands at all; did

8    he?

9    A    No.

10   Q    And correct me if I'm wrong, but even with

11   Mr. Pardon standing there with his hands outstretched

12   and not moving, it's not all that easy to get the key in

13   and out of the handcuff; is it?

14   A    Generally speaking, no.

15   Q    It's a small hole and a small key; correct?

16   A    Yeah.

17   Q    And if an individual is moving his arms around as

18   you're trying to get a key in to get the handcuff off,

19   that makes it tough to get the key into the hole;

20   correct?

21   A    Definitely.

22   Q    And if the handcuffs go on a subject where --

23   strike that.  Let me back up.

24        The handcuffs have a flat face, correct, where the

25   hole is for the key?

                    BRIAN LANDERS - CROSS

1  A    Yes.

2  Q    And the hole for the key is on one side of the flat

3  face, but not the other; correct?

4  A    That all depends upon the model of the handcuff.

5  Q    The ones you were using as a demonstration have a

6  keyhole on one side only; correct?

7  A    Correct.

8  Q    Sometimes in a difficult situation an officer may

9  put the handcuffs on where the face -- where the hole is

10 is facing one way on one hand, but facing the other way

11 on the other hand; correct?

12 A    Sure.

13 Q    That can happen, can't it?

14 A    Yes, it can.

15 Q    Particularly if the subject is making it difficult

16 for the officer to put the handcuffs on in the first

17 place; correct?

18 A    It can happen in any application of handcuffs.

19 Q    And when that's true, the officer is going to have

20 to go to one side and handcuff the other, and then the

21 other side to unlock the second cuff; correct?

22 A    Can you explain that?  I don't know what you mean

23 by one side.

24 Q    That question was not very good I'll admit.  If the

25 keyhole is facing one way on one cuff and the other way

                    BRIAN LANDERS - CROSS

1  on the second cuff, the officer is going to have to go

2  at it from both sides to get those cuffs unlocked;

3  correct?

4  A    On both sides of the handcuff.

5  Q    Yes.

6  A    Yes.

7  Q    Now the opinion you're offering is that -- well,

8  you obviously were not there; correct?

9  A    Correct.

10 Q    And you have no personal knowledge as to whether

11 those handcuffs were double locked when Sergeant

12 Hendrickson put them on Mr. Kingsley; correct?

13 A    Correct.

14 Q    All you can go off of is what isn't in Sergeant

15 Hendrickson's report and the wording of Deputy Blanton's

16 report; right?

17 A    Correct.

18 Q    And then the opinion you're offering is that if

19 they were not double locked, it's possible that they

20 tightened over the course of the events; correct?

21 A    Correct.

22 Q    You are not telling us that you have any opinion as

23 to whether or not the cuffs actually tightened.

24 A    Correct.

25 Q    You don't have an opinion on that subject.
                    BRIAN LANDERS - CROSS

1   A    No.

2   Q    Can't say one way or the other.

3   A    No, I can't.

4   Q    And you have no personal knowledge as to whether

5   the cuffs were actually checked by Sergeant Hendrickson

6   for fit; correct?

7   A    Correct.

8   Q    You talked about how if handcuffs aren't double

9   locked, certain movements or pressure on the cuff may

10  cause it to tighten; correct?

11  A    Correct.

12  Q    And I would assume that there are lots of variables

13  where there might be pressure on a handcuff such that if

14  it's not tightened -- if it's not locked, it might

15  tighten; correct?

16  A    Correct.

17  Q    And if a handcuffed prisoner declines to walk and

18  officers carry the prisoner as a result, that might

19  cause the handcuffs to tighten; is that what you're

20  saying?  Or would you agree?

21  A    I would say it's possible.

22  Q    It's possible.  If a handcuffed prisoner pulls his

23  hands or arms apart while he's handcuffed, that might

24  cause the cuffs to tighten if they're not double locked;

25  correct?

                    BRIAN LANDERS - CROSS

1    A    If there's exerting force upon the single strand,

2    then yes, it's possible.

3    Q    If a handcuffed prisoner moves his hands around a

4    lot when they're not double locked, that might cause the

5    cuffs to tighten; correct?

6    A    If there's exerting force upon the single strand.

7    Q    Same thing if a prisoner moves his torso or his

8    upper body around if the handcuffs aren't double locked;

9    correct?

10   A    Same response.

11   Q    It's possible.

12   A    It's possible.

13   Q    But absent some sort of defect in the cuffs, if

14   they are double locked they will not tighten; correct?

15   A    Correct.

16   Q    Regardless of what the officer does and regardless

17   of what the subject does; correct?

18   A    If they are properly double locked and there's no

19   defect in the cuff, then they should not tighten.

20   Q    So if Sergeant Hendrickson hadn't double locked the

21   cuffs back in the original cell back in south block,

22   they would not have tightened over the course of the

23   events, assuming there wasn't a defect with the cuffs?

24   A    Correct.

25   Q    And if an officer does double lock the cuffs, he

                    BRIAN LANDERS - CROSS

1  would have no reason to suspect that they were

2  tightening; correct?

3  A    That they were tightening?

4  Q    Yes.

5  A    Correct.

6  Q    And if he double locks them and checks them for

7  fit, he would have no reason to believe that the fit

8  would change, would he?

9  A    If he was the one who did it; correct.

10 Q    He could basically rule out the handcuffs

11 tightening as a reason for however the subject was

12 behaving; correct?

13 A    Unless there was a defect with the cuff.

14 Q    Now obviously you've both today and before today

15 seen and heard the recording of what occurred in the

16 receiving cell; yes?

17 A    Yes.

18 Q    And you would agree that there's nothing that

19 Mr. Kingsley said that was recorded to the effect that

20 -- where he was telling the officers verbally that the

21 handcuffs were too tight; correct?

22 A    He didn't make any statements like that, no.

23 Q    He didn't say, in other words, "the handcuffs are

24 too tight."

25 A    Correct.
                    BRIAN LANDERS - CROSS

1  Q     Now obviously he made sounds while he was in the

2  receiving cell.  We hear that on the recording; correct?

3  A     Correct.

4  Q     And you testified today that you thought those

5  sounds were indicative of him being in pain; correct?

6          MR. PARDON:  Objection.  Mischaracterizes the

7  testimony.

8          THE COURT:  Sustained.

9  BY MR. JONES:

10 Q     Do you know one way or the other what the sounds

11 that Mr. Kingsley was making meant?

12 A     No.

13 Q     And that's true even though you've looked at that

14 video and listened to that audio on numerous times;

15 correct?

16 A     Correct.

17 Q     You obviously agree that the officers were trying

18 to take the handcuffs off; correct?

19 A     That's what was reported.

20 Q     And you have no reason to doubt that?

21 A     No, I don't.

22 Q     And you would agree that being in handcuffs can be

23 dangerous for a person; yes?

24 A     In certain situations, yes.

25 Q     If you're left in a cell -- I'll be more specific.

                    BRIAN LANDERS - CROSS

1  If you're left in a cell like that receiving cell with
2  your hands handcuffed behind your back, that can pose a
3  risk to you as the person in handcuffs; yes?
4  A    There would have to be more factors.
5  Q    A person in handcuffs with their hands handcuffed
6  behind their back, they lose the ability to maintain
7  their balance with their arms and hands; correct?
8  A    I guess first, I can't testify what a person -- the
9  balance or dexterity of a person.  Are you saying this
10 person left alone?
11 Q    Yes.
12 A    A person being guarded?  I guess I don't know what
13 your question is.
14 Q    All right.  I'll try to be more specific.  If a
15 person is left alone, no one in the cell with him, in a
16 receiving cell like the one used in this case with their
17 hands cuffed behind their back, is that person at any
18 risk in that situation?
19 A    Yes.
20 Q    And the risk is that the person could stumble or
21 lose their balance, being handcuffed behind their backs,
22 and injures themselves as a result; correct?
23 A    Correct.
24 Q    You have never worked as a corrections officer, am
25 I right?
                    BRIAN LANDERS - CROSS

1   A      Correct.

2   Q      And the Wisconsin Dells Police Department where you

3   worked for a number of years does not operate a jail;

4   correct?

5   A      Correct.

6   Q      The police department has a holding cell; correct?

7   A      Two.

8   Q      Two holding cells.  I stand corrected.  And those

9   holding cells are used to detain people who have been

10  arrested before they're transported to a secure lockup;

11  correct?

12  A      Correct.

13  Q      And people don't stay in those holding cells for

14  more than four hours; correct?

15  A      Correct.

16  Q      So what did you mean when you testified that in

17  your experience you have administered a lockup?

18  A      We still have to go through a booking procedure.

19  We still have to put people in and take people out of

20  that cell.

21  Q      So what you were testifying to is administering, so

22  to speak, those temporary holding cells at the police

23  department?

24  A      Yes.

25  Q      Now I think you talked about, when talking about
                         BRIAN LANDERS - CROSS

1  your experience, experience you've had with jails run by

2  the four counties that are contiguous with Wisconsin

3  Dells; correct?

4  A    Correct.

5  Q    You never actually worked in any of those jails;

6  correct?

7  A    No.

8  Q    My statement was correct?

9  A    Well, I've never worked for those jails.  I was

10 employed when I was in those jails and whether I was

11 booking or interviewing, I mean that's technically

12 working in that jail.

13 Q    You didn't work as a jailer in one of those jails;

14 did you?

15 A    No, I did not.

16 Q    You do not have any experience using a taser or

17 another electronic control device in a jail setting, do

18 you?

19 A    No.

20 Q    When officers are trained to get their

21 certification as corrections officers in Wisconsin, they

22 attend something that called *jail school*; right?

23 A    I guess for point of clarification, I think of a

24 connectional officer as somebody who works in a jail or,

25 I'm sorry, a prison.  So I would --

                    BRIAN LANDERS - CROSS

1  Q    Let me ask it a different way because you can say

2  that.  When someone becomes trained in Wisconsin to be a

3  jailer, so to work in a county jail --

4  A    Yes.

5  Q    -- that training is through what people generally

6  refer to as *jail school*; correct?

7  A    Yes.

8  Q    And that's a training program that lasts more than

9  100 hours; correct?

10 A    I'd say there are 120 or 160 hours, depending upon

11 the program.

12 Q    It changes from time to time; correct?

13 A    It doesn't change, it just depends on what

14 technical college or what academy, how they facilitate

15 the program.

16 Q    You have never taught any courses as part of that

17 formal jail school; correct?

18 A    Correct.

19 Q    We've talked about something called *POSC*,

20 Principles of Subject Control; yes?

21 A    Yes.

22 Q    And that is a training guide that is used to train

23 jailers, if I've got the phrase right, in Wisconsin;

24 yes?

25 A    Yes.

                    BRIAN LANDERS - CROSS

1    Q    You have never taught any courses about the POSC

2    training guide; correct?

3    A    Correct.

4    Q    And there was -- you were asked some questions

5    about your role in developing the DAAT training guide;

6    yes?

7    A    Yes.

8    Q    And your name is, in fact, in the DAAT training

9    guide; correct?

10   A    Correct.

11   Q    Your name is not in the POSC training guide, is it?

12   A    No, it's not.

13   Q    You were not involved in writing or developing

14   POSC, were you?

15   A    No.

16   Q    And jail school does not include training under the

17   DAAT training guide, does it?

18   A    Is it specific -- are you saying is DAAT taught in

19   the jail school?

20   Q    Do they use DAAT, the training guide itself, in

21   jail school?

22   A    Well, the current POSC is based upon the DAAT

23   training.

24   Q    But they use POSC, it's not DAAT.

25   A    Correct.
                    BRIAN LANDERS - CROSS

1  Q    Your highest level of education is a bachelor of

2  science?

3  A    Correct.

4  Q    Have you ever published any professional articles

5  or textbooks?

6  A    No.

7  Q    And you're serving as a paid expert in this

8  instance; correct?

9  A    Yes.

10  Q    I'd like to ask you about some materials in POSC.

11  If I could show you Exhibit 517.  It will actually show

12  up on -- it should show up on your screen.

13       Do you recognize at least the first page of this

14  exhibit?

15  A    It's the POSC Manual from June 2009.

16  Q    So was this the manual that was in place and being

17  used at the time of the incident with Mr. Kingsley in

18  May 2010?

19  A    It should have been.

20  Q    If I could refer you --

21       MR. JONES:  Actually I would move the admission

22  of 517, Your Honor.

23       MR. PARDON:  No objection.

24       THE COURT:  Received.

25  BY MR. JONES:
                    BRIAN LANDERS - CROSS

1    Q     If I could refer you to page two.  Under POSC,

2    jailers in Wisconsin are trained that they are

3    authorized to use force to obtain legitimate

4    correctional objectives; correct?

5    A     Correct.

6    Q     That's on the bottom of page two?  I'll highlight

7    that for you.

8    A     Yeah, I see it.  Correct, I'm sorry.

9    Q     And under POSC, jailers are trained that legitimate

10   correctional objectives include moving an inmate, an

11   unwilling inmate from one location to another; correct?

12   A     That's correct.

13   Q     And they're also trained that a legitimate

14   objective for the use of force would be to prevent an

15   inmate from harming himself or herself; correct?

16   A     That's correct.

17   Q     They're also trained the legitimate objective for

18   using force is to gain control of a resistive or

19   combative inmate?

20   A     Correct.

21   Q     And they're also trained that a legitimate

22   objective to use force is to defend yourself or

23   themselves from physical assault.

24   A     Correct.

25   Q     Patrol officers in Wisconsin, so law enforcement
                        BRIAN LANDERS - CROSS

1   officers out patrolling the community, they receive

2   similar training under DAAT; correct?

3   A    Correct.

4   Q    They are trained that they can use, legitimately

5   use force to obtain and achieve control of a resistive

6   subject?

7   A    Correct.

8   Q    And they are trained that they can legitimately use

9   force to defend themselves or others?

10  A    Correct.

11  Q    Force is obviously necessary at times; correct?

12  A    Yes.

13  Q    There are times when even the most skilled officer,

14  corrections officer, jailer or a law enforcement officer

15  is unable to get voluntary compliance from a subject;

16  yes?

17  A    Yes.

18  Q    And in those instances, force is sometimes

19  necessary to get that control and achieve a legitimate

20  law enforcement objective; yes?

21  A    Yes.

22  Q    You talked about a Disturbance Resolution Model;

23  yes?

24  A    Yes.

25  Q    And there was testimony about different modes

                    BRIAN LANDERS - CROSS

1    within the Disturbance Resolution Model?

2    A    Yes.

3    Q    And one of the modes would be *presence*; yes?

4    A    Yes.

5    Q    A second would be *dialogue*?

6    A    Yes.

7    Q    A third would be *control alternatives*?

8    A    Yes.

9    Q    A fourth would be *protective alternatives*?

10   A    Yes.

11   Q    Such as the use of a baton?

12   A    Correct.

13   Q    And the first and highest would be the use of

14   deadly force; correct?

15   A    Correct.

16   Q    Control alternatives.  That's in the middle of this

17   force Disturbance Resolution Model; yes?

18   A    Yes.

19   Q    So in theory, that comes after presence and

20   dialogue; yes?

21   A    Yes.

22   Q    And control alternatives includes tasers; yes?

23   A    Yes.

24   Q    It includes all forms of electronic control

25   devices; yes?
                        BRIAN LANDERS - CROSS

1    A    Yes.

2    Q    But officers are trained -- let me be more

3    specific.  Jailers are trained that they do not need to

4    go step-by-step through that Disturbance Resolution

5    Model; correct?

6    A    Correct.

7    Q    They do not have to necessarily first use presence

8    or dialogue before they can use a control alternative

9    like a taser; correct?

10   A    Correct.

11   Q    You've offered an opinion about the control

12   techniques used by Sergeant Hendrickson in the receiving

13   cell; correct?

14   A    Correct.

15   Q    And that has specifically to do with wherever he

16   had placed his knee on Mr. Kingsley or his shin on

17   Mr. Kingsley; correct?

18   A    Partly, yes.

19   Q    Okay.  And the other part had to do with what

20   you've described, I think, as downward motions by Mr. --

21   Sergeant Hendrickson on Mr. Kingsley; correct?

22   A    Correct.

23   Q    Now you testified, when Mr. Pardon was asking you

24   questions, that you weren't sure what those downward

25   motions by Sergeant Hendrickson were; didn't you?

                    BRIAN LANDERS - CROSS

1  A    Yes.

2  Q    And I think your words were they weren't well

3  articulated; correct?

4  A    I'd have to refresh, but something to that, yes.

5  Q    And you're telling us as you're sitting here today

6  that you're not sure what Sergeant Hendrickson was doing

7  at that point; correct?

8  A    Correct.

9  Q    And you would agree that it is difficult to tell on

10  the video exactly what was occurring at that point;

11  correct?

12  A    Correct.

13  Q    Even though you don't know what he was doing and

14  it's hard to tell on the video what was occurring,

15  you're offering us the opinion, the sworn testimony that

16  you believe that force was unreasonable?

17          MR. PARDON:  Objection.

18          THE COURT:  Overruled.

19  BY MR. JONES:

20  Q    Is that correct?

21  A    Correct.

22  Q    Now are you aware that Sergeant Hendrickson has

23  said that he had his leg across Mr. Kingsley's shoulders

24  and upper back and not directly on his spine or neck?

25  Are you aware of that?
                    BRIAN LANDERS - CROSS

1  A    Can you repeat that question?

2  Q    Sure.  Are you aware that Sergeant Hendrickson has

3  said that he didn't have his knee directly on

4  Mr. Kingsley's spine or neck, but instead he had it

5  across his shoulders or upper back?

6  A    I guess I'm not certain where he said that.

7  Q    So you don't know one way or the other.

8  A    That's not what I'm saying.

9  Q    You're not sure if he said that -- has said that?

10  A    I'm not certain that he said that, no.

11  Q    And you obviously would agree -- we've watched the

12  video -- that it's very difficult to tell exactly where

13  Sergeant Hendrickson's leg is on Mr. Kingsley for a

14  great deal of the video; correct?

15          MR. PARDON:  Objection.  He didn't watch --

16          THE COURT:  Overruled.

17          THE WITNESS:  Can you repeat the question?

18          MR. JONES:  Sure.  Gladly.

19  BY MR. JONES:

20  Q    You would agree that it is extremely hard to

21  tell -- strike that.  Let me rephrase.

22      You would agree that it is hard to tell where

23  Mr. Hendrickson's shin or leg is on Mr. Kingsley for a

24  great deal of the video; correct?

25  A    I am basing my opinion that there is a length of
                    BRIAN LANDERS - CROSS

1  time on the video where it's clear to me that the knee

2  is over his spine.

3  Q    Do you mean over his spine or on his spine?

4  A    It appears to be on his spine.

5  Q    Do you mean that the knee was directly on the spine

6  or do you mean just that the leg was across his upper

7  back?

8  A    From the video that I witnessed, it appeared to me

9  that the knee was on his spine.

10  Q    So when we go to the video or if we look at the

11  video, what you're saying is that we're going to be able

12  to see that Mr. -- Sergeant Hendrickson's knee, so the

13  knee itself, was directly on Mr. Kingsley's spine?

14  A    That's my observation.

15  Q    And so necessarily, because of anatomy, that means

16  that you say you can see the knee was directly in the

17  middle of Mr. Kingsley's back.

18  A    That's my observation.

19  Q    And do you know whether Mr. Kingsley moved at all

20  underneath Sergeant Hendrickson when he had his knee

21  wherever it was on him?

22  A    At the point of the video where I can see the knee

23  on the spine, it did not appear that Mr. Kingsley moved.

24  Q    Well sure, if you stop the video.  So that, as you

25  say, you can see where his knee was, he's obviously not

BRIAN LANDERS - CROSS

1  moving when you stop the video; yes?

2  A    Correct.

3  Q    And so are you saying that you can tell one way or

4  the other when you restart the video whether

5  Mr. Kingsley was moving underneath Sergeant Hendrickson?

6  A    When you back that video up, it does not appear

7  that the torso is moving.

8  Q    And your testimony is that you can actually see the

9  torso one way or the other?

10 A    At certain points throughout the video you can.

11 Q    And you can tell that the torso wasn't moving at

12 all in between those points on the video?

13 A    Well, considering that there's -- that you have

14 Sergeant Hendrickson in that position, you have Deputy

15 Blanton in that position, and Deputy Shisler in that

16 position, one area that we're looking at is what is the

17 reaction of those three people on Mr. Kingsley.  If he

18 is moving his torso about, I would expect to see them to

19 be moving with him.

20 Q    What I'm actually asking you though is whether you

21 can see the torso moving given where the officers are in

22 between Mr. Kingsley and the camera.  That's what I'm

23 asking you.

24 A    At certain points you can.

25 Q    And in between those points, your testimony is that

                    BRIAN LANDERS - CROSS

1  you can tell -- you can actually see whether or not

2  Mr. Kingsley's upper body is moving?

3  A    In between certain points, no, you can't.  It's

4  obstructed by the other deputies.

5  Q    And so for much of the video, you can't actually

6  tell whether Mr. Kingsley is moving his torso, can you?

7  A    Tell or observe?  Can you tell?

8  Q    All right.  I'll ask a better question.  For much

9  of the video you can't actually see whether or not

10  Mr. Kingsley's torso is moving underneath Sergeant

11  Hendrickson?

12  A    No.

13  Q    I'd like to go back to the video.  I'm actually

14  going to start it at 6:44:25, close to there.  So

15  6:44:30.  That's where I've stopped it.  And I believe

16  you testified when Mr. Pardon was asking you questions

17  that you can see that Sergeant Hendrickson's knee is

18  directly in the center of Mr. Kingsley's back and on his

19  spine; is that correct?  That's what you testified to?

20  A    I would have to, I guess, hear my testimony again

21  regarding that specific question.

22  Q    Okay.  Well --

23        MR. PARDON:  And I'll object because this is

24  not the point at which I asked the question.

25  Q    Well, let me ask you, because the record will show

                    BRIAN LANDERS - CROSS

1    what it shows.  But at 6:44:30, can you tell where

2    Sergeant Hendrickson's knee is, whether it's on the

3    spine or someplace else?

4    A    I believe it's on his back.

5    Q    On his back.  But you're not saying it's directly

6    on his spine?

7    A    It does not appear to be directly centered on his

8    back, no.

9    Q    It's across his upper back from one side to the

10   other; correct?

11   A    I don't know where exactly his weight distribution

12   is, but appears to be that the knee is over or on the

13   back.

14   Q    His leg from his knee to his ankle is placed across

15   Mr. Kingsley's back; correct?

16   A    Well, from his right side, yes.

17   Q    From Mr. Kingsley's right side to some point on the

18   left side of the upper back; correct?

19   A    To the center left, yes.

20   Q    And I think you've just testified to this, but you

21   don't know how much weight Sergeant Hendrickson is

22   actually putting on Mr. Kingsley at this point; do you?

23   A    No.

24   Q    And that's true the entire time in the receiving

25   cell that he has his leg or shin on Mr. Kingsley's back;

                      BRIAN LANDERS - CROSS

1 correct?

2 A     Correct.

3 Q     I'm going to play it forward to 6:44:51.

4       (Video played)

5       Stop there.  So I believe you testified that at

6 this point, 6:44:51 and just immediately before there,

7 Sergeant Hendrickson pushed down in what you described

8 as a not well articulated motion on his --

9 Mr. Kingsley's head, neck or spine.  That was your

10 testimony; correct?

11 A     Correct.

12 Q     And your testimony -- why don't we go back a few

13 seconds and play it again.

14       (Video played)

15       Your testimony is you can tell it was on his head,

16 neck or spine and not on his back?

17 A     I said it appears to be in that area.

18 Q     You said in the area of his head, neck or spine;

19 correct?

20 A     In the area, yes.

21 Q     Okay.  It could also have been on his upper back;

22 correct?

23 A     Could have been.

24 Q     It could have been on his shoulders; correct?

25 A     Could have been.
                    BRIAN LANDERS - CROSS

1    Q    By the way,at any point up until this point in the

2    video, did you get any more clarity as to where exactly

3    his leg was on Mr. Kingsley's back?

4    A    Up until this point?  I would have to, I guess,

5    review the -- can you --

6            MR. JONES:  I'll withdraw the question.

7    A    Thank you.

8    Q    We'll continue forward from here.

9            (Video played)

10           At any point between when we first started playing

11   back again and now, can you tell where Sergeant

12   Hendrickson's leg is on Mr. Kingsley?

13   A    Specifically, no.

14   Q    You can't see.

15   A    No.

16           (Video played    6:45:45)

17   Q    Can you tell at all as we play it forward whether

18   Mr. Kingsley is moving?

19   A    No.

20   Q    Can you see him moving?

21   A    Does not appear that he's moving.

22           (Video played    6:45:56)

23   Q    I asked you could you tell; could you see whether

24   he was moving.

25           MR. PARDON:  Objection.  Is it tell or see?
                 BRIAN LANDERS - CROSS

1          MR. JONES:  Okay, I may have asked different --

2    used different words.

3    BY MR. JONES:

4    Q    Can you see at any point as we've been playing the

5    video forward from where we first started whether or not

6    Mr. Kingsley is moving under Sergeant Hendrickson?

7    A    I can see a portion of Mr. Kingsley's thigh and

8    that does not appear to be moving.

9    Q    Are you saying --

10   A    I also don't see any of the deputies controlling

11   the torso to be moving.

12   Q    Can you see Mr. Kingsley here?

13   A    I can see a portion of Mr. Kingsley.  I can see the

14   red jail suit between Deputy Shisler and Deputy Blanton.

15   Q    Right now?

16   A    On my video I can.

17   Q    Can you just use words, tell us where you see it?

18   A    To the left shoulder going down towards the bicep

19   elbow area of Deputy Blanton and to the right shoulder

20   going down to the elbow area of Deputy Shisler it

21   appears that there's the red jumpsuit of Mr. Kingsley.

22   Q    And your testimony is that you're able to tell from

23   there whether or not you can actual see Mr. Kingsley

24   moving?

25   A    You've asked me if I can see Mr. Kingsley and I can
                    BRIAN LANDERS - CROSS

1   see a portion of Mr. Kingsley.

2   Q    Can you tell from what you can see of Mr. Kingsley

3   what he was doing with the officers?

4   A    It appears that he's laying face down on the bunk.

5   Q    Can you see from that little bit whether or not

6   he's moving?

7   A    That portion right there does not appear to be

8   moving.

9       (Video continued    6:46:29)

10   Q    At any point up until we just stopped it now, is it

11   your testimony you can tell that Sergeant Hendrickson's

12   knee is directly centered on Mr. Kingsley's spine?

13   A    If you back up, I believe that was the point of my

14   earlier testimony.  I said it appeared to me that his

15   right knee appeared to be by the spine.

16   Q    See if we capture it here.

17       (Video played)

18   A    Right there.    (6:46:26)

19   Q    So your testimony is that you can tell that

20   Sergeant Hendrickson's knee in that picture is directly

21   over Mr. Kingsley's spine?

22   A    It appears to me it is.

23   Q    Okay.  Do you know how much pressure Sergeant

24   Hendrickson was exerting with his lower leg at that part

25   of the video?

                    BRIAN LANDERS - CROSS

1    A    No.

2         MR. JONES:  We can close out the video.

3    Q    Officers are trained in Wisconsin that it's okay to

4    use their legs to stabilize subjects to the ground when

5    they are using handcuffing techniques; correct?

6         THE COURT:  I'm sorry, when they are using

7    what?

8         MR. JONES:  Handcuffing techniques.

9         THE WITNESS:  Yes.

10   BY MR. JONES:

11   Q    You have said as much in your written opinions in

12   this case; correct?

13   A    I'm sorry, what was that again, sir?

14   Q    You wrote a report with your opinions in this case;

15   correct?

16   A    Correct.

17   Q    I'd like to show you a portion -- I'd like to show

18   you Plaintiff's Exhibit 43.  This is the first page of

19   your written report, right, Mr. Landers?

20   A    Yes.

21   Q    I'd like to refer you to page 15.

22   A    Okay.

23   Q    And this is still in your written report; correct?

24   A    Yes.

25   Q    You wrote in your written report in this case as

                    BRIAN LANDERS - CROSS

1  follows, am I right?  I'll just go ahead and read at the

2  bottom of page 15.  "The use of one's leg and weight is

3  acceptable in ground handcuffing and multiple officer

4  ground handcuffing techniques to stabilize a person to

5  the ground when they are resisting or potentially

6  dangerous."  Correct?  You wrote that.

7  A    Correct.

8  Q    You went on to write:  "The placement of any

9  portion of the leg or knee is specifically advised to

10 remain off the spine and neck area and to be placed upon

11 the opposite shoulder muscle; not -- to not only provide

12 greater control, but to also reduce potentially -- a

13 potential of injury."  Correct?

14 A    Correct.

15 Q    Those were your words; correct?

16 A    Correct.

17 Q    Now there's no evidence that Sergeant Hendrickson

18 actually struck Mr. Kingsley; is there?

19 A    Nothing that I observed, no.

20 Q    He didn't punch him.

21 A    Nothing that I observed or what was reported, no.

22 Q    He didn't hit him in the head?

23 A    Nothing reported.

24 Q    Didn't hit him or punch him in the spine; correct?

25 A    Nothing reported.
                    BRIAN LANDERS - CROSS

1  Q    You are familiar with the term *unarmed strike*

2  *technique*?

3  A    Yes.

4  Q    That's essentially when an officer uses his or her

5  empty hand to strike a subject; correct?

6  A    In general, yes.

7  Q    And there's no evidence that Sergeant Hendrickson

8  used any unarmed strike techniques on Mr. Kingsley;

9  correct?

10 A    There was nothing reported.

11        MR. JONES:  If we could pull up Exhibit 108,

12 Plaintiff's Exhibit 108.  Publish it to the jury if we

13 can.

14 Q    Exhibit 108 again was this diagram of target areas;

15 correct?

16 A    Correct.

17 Q    And it specifically identifies that the target

18 areas for unarmed strike techniques; correct?

19 A    Correct.

20 Q    A focused strike, is that another name for an

21 unarmed strike technique?

22 A    Yes.

23 Q    So focused strikes were not used here; correct?

24 A    There was nothing reported.

25 Q    You didn't see anything on the video either?

                    BRIAN LANDERS - CROSS

1   A     That wasn't a trained focus strike?

2   Q     That was a focused strike.

3   A     No.

4   Q     If we could pull up Exhibit 517 at page 57.  This

5   is page 57 of the POSC Manual; correct?

6   A     Correct.

7   Q     And we actually go back to 56.  It's a section that

8   starts on 56 and rounds off to 57 talking about active

9   counter measures; correct?

10  A     Correct.

11  Q     Which would include blocking and striking

12  techniques; yes?

13  A     Yes.

14  Q     So defensively blocking someone or striking them;

15  correct?

16  A     Correct.

17  Q     If we then go to page 57, the second paragraph, if

18  we can highlight that paragraph.  The first -- the top

19  paragraph on what's shown, this is the POSC training

20  guide talking about focused strikes; correct?

21  A     Correct.

22  Q     And it refers to an Appendix F for target areas for

23  focused strikes; correct?

24  A     Correct.

25  Q     And that Appendix F is Exhibit 108 that we were

BRIAN LANDERS - CROSS

1  talking about previously; correct?

2  A    Yes, it is.

3  Q    So the POSC guide is training officers how to use

4  focused strikes and it gives them a guide as to where

5  they should or shouldn't hit someone; correct?

6  A    Correct.

7  Q    And it uses an exhibit, the one that you referred

8  to, as an exhibit about where they should or shouldn't

9  hit someone; correct?

10 A    In this instance, yes.

11 Q    And no one hit anyone in what happened with

12 Mr. Kingsley in the receiving cell; correct?

13 A    Nothing that was reported.

14 Q    Officers are trained at times that it is

15 appropriate to use their hands to stabilize or restrain

16 a subject's head; correct?

17 A    Yes.

18 Q    There are times where that might be appropriate?

19 A    Yes.

20 Q    And there are times when it's appropriate to use

21 what I think you referred to as a *pressure point* where

22 you are directly placing pressure on a very specific

23 part of an individual's head; correct?

24 A    Correct.

25 Q    And in fact, just below the jaw line; correct?
                    BRIAN LANDERS - CROSS

1    A    That's one, yes.

2    Q    That's one pressure point.

3    A    Right.

4    Q    And that's trained to officers in the State of

5    Wisconsin?

6    A    Yes.

7    Q    And that is a recognized use of force; a trained

8    use of force.

9    A    Yes.

10   Q    And a pressure point technique, that falls within

11   control alternatives; correct?

12   A    Yes.

13   Q    That is a technique that can be used to respond to

14   passive resistance; correct?

15   A    Yes.

16   Q    So at a lower level than an ECD; correct?

17   A    Yes.

18   Q    You offered the opinion, I think, that the officers

19   might have been more patient with Mr. Kingsley; correct?

20   A    Can you repeat that?  I'm sorry.  I couldn't hear

21   the last part.

22   Q    I'm sorry.  I was probably looking down.  You

23   offered the opinion that the officers should have used

24   more patience with Mr. Kingsley; correct?

25   A    That was an option.
                  BRIAN LANDERS - CROSS

1    Q    You're saying it's an option.  Are you also saying

2    that they should have done that or not?

3    A    No.  I'm saying it was asked of me what would have

4    been an option and based upon my training and

5    experience, I felt that was an option.

6    Q    But you're not telling us the opinion -- that you

7    have the opinion that they should have used more

8    patience.  You're just saying it's an option.

9    A    Based on my training and experience that probably

10   would have been the prevailing option.

11   Q    I think your words were they should have used a

12   *calmer approach*; correct?

13   A    Correct.

14   Q    Now from your understanding of events, you

15   recognize that four different officers went to speak to

16   Mr. Kingsley about him removing the paper from the

17   light; correct?

18   A    Correct.

19   Q    And that was over the course of something like

20   eight to ten hours; correct?

21   A    Correct.

22   Q    It was only after they had -- four different people

23   had gone to talk to him about that that they decided to

24   actually move him from the cell; correct?

25   A    Correct.

                    BRIAN LANDERS - CROSS

1   Q    And you're not offering the opinion that they

2   shouldn't have moved him; correct?

3   A    No.

4   Q    Now, we've talked about previously that it's

5   potentially dangerous to leave an inmate in a receiving

6   cell or any cell with handcuffs on; correct?

7   A    Unattended?

8   Q    Sure.

9   A    Yes.

10  Q    And so at least in theory it was a good idea for

11  the officers to try and take the handcuffs off

12  Mr. Kingsley when they put him in the receiving cell;

13  correct?

14  A    Yes.

15  Q    And you obviously agree or you heard that they told

16  him a number of times to relax so they could take the

17  cuffs off; yes?

18  A    Yes.

19  Q    And for whatever reason, that wasn't working;

20  correct?

21  A    On video, no.

22  Q    And you heard the officers giving him those

23  directives on the audio recording; yes?

24  A    Yes.

25  Q    And is there something wrong with the way the

                    BRIAN LANDERS - CROSS

1   officers were communicating with him in the receiving

2   cell?

3   A     Could you be more specific?

4   Q     Do you have an opinion as to whether the officers

5   communicated with Mr. Kingsley in an appropriate or

6   inappropriate fashion in the receiving cell?

7   A     Well, relative to the disturbance resolution, it

8   would appear that they were using heavy control talk:

9   Short loud commands; trying to verbally stun,

10  psychologically stun in the process.  I felt that could

11  have been a softer, lesser, more of a persuasion

12  dialogue technique, a calmer technique.

13  Q     You're saying they should have used a softer

14  approach in terms of their verbalization?

15  A     I'm saying it was an option.

16  Q     Did they use heavy control talk the entire time he

17  was in the receiving cell?

18  A     Throughout portions of it, I would say the vast

19  majority of the portions, yes.

20  Q     We're going to go back to the video.  I'm going to

21  play you the video from the hallway itself.

22        (Video played)

23        So we fast forward it until we get to the cell.

24  A     There was a portion just prior to that though.

25  Q     We'll go back up.  Somebody said "What's wrong with

                    BRIAN LANDERS - CROSS

1  that.  Was that heavy control talk or was that calm?

2  A    I'm sorry, somebody said what?

3  Q    What's wrong with that.

4  A    I would say that that's probably search talk,

5  asking a person details about how they're doing.

6  Q    Okay.  Continue.

7       (Video played)

8       Was that heavy control talk?

9  A    I would say that's light control talk.

10      (Video played  6:44:25)

11 Q    Was that heavy control talk?

12 A    It stopped at, I believe, one of the deputies said

13 "Move your foot, Mike."  But there was something

14 starting right after that.   (6:44:29)

15 Q    We'll play it forward.

16      (Video played)

17      Was that heavy control talk?

18 A    That's heavy control talk.

19      (Video played)

20 Q    That was heavy control talk.

21 A    That's heavy control talk.

22      (Video played)

23 Q    Was that heavy control talk?

24 A    I would say it's light control.   (6:44:57)

25 Q    Okay.
                    BRIAN LANDERS - CROSS

1       (Video played)

2        I know we cut off in the middle, but before that,

3   was that heavy controlled talk?

4   A    I would say it's continued light control.

5       (Video played)

6   Q    That was heavy control?

7   A    Heavy control.

8       (Video played)

9   Q    Heavy control talk?

10  A    Light.

11      (Video played)

12  Q    Still light control talk?

13  A    Yeah.

14      (Video played)

15  Q    Not control talk.

16  A    Persuasion.

17      (Video played)

18  Q    Why don't you tell us the next time you hear heavy

19  control talk.

20  A    Right there.  (6:45:34)

21  Q    Okay.

22      (Video played)

23  A    I would say that's border.

24      (Video played)

25  A    That's heavy control.
                    BRIAN LANDERS - CROSS

1       (Video played)

2   A   Heavy control.

3   Q   Officers are trained that there are times when it

4   is appropriate to use heavy control talk; yes?

5   A   Yes.

6   Q   And heavy control talk is appropriate if light

7   control talk fails to get the subject to cooperate or

8   the situation requires immediate compliance; yes?

9   A   Yes.

10  Q   And officers are trained that when using heavy

11  control talk, their physical presence, their tone of

12  voice, and their words all must convey intensity and

13  commitment; correct?

14  A   Correct.

15  Q   And they're also trained that they may issue

16  ultimatums; correct?

17  A   Correct.

18  Q   They are training they may issue ultimatums in

19  which they can clearly indicate that the subject has to

20  comply.

21  A   Correct.

22  Q   POSC also teaches jailers that they should

23  accomplish the objective of control as quickly as

24  possible to ensure the safety of officers and inmates;

25  correct?

                    BRIAN LANDERS - CROSS

1    A     In a general concept, yes.

2    Q     Jail officers are trained that they should

3    accomplish the correctional objective of control as

4    quickly as possible with minimal chance of injury or

5    death to officers, inmates or others; correct?

6    A     That's one of the bullet points, yes.

7    Q     If we could turn to page 13.  Jail officers are

8    also trained that control is not a 50/50 proposition;

9    correct?

10   A     Yes.

11   Q     They are trained that controls requires them to be

12   in charge and that physical encounters between officers

13   and inmates need not be a fair, equal contest; correct?

14   A     Correct.

15   Q     They are trained that it is not a game or a

16   sporting event; correct?

17   A     Correct.

18   Q     And they are trained as a matter of safety, they

19   are required to control the situation as quickly as

20   possible to ensure their safety and the safety of

21   others, including the subject they are trying to

22   control; correct?

23   A     Correct.

24   Q     They are trained that the longer a confrontation

25   lasts, the greater the likelihood of injury to all

                    BRIAN LANDERS - CROSS

1   parties; yes?

2   A     Yes.  If you notice, this describes the second

3   principle of POSC.  The first principle was

4   verbalization skills.

5   Q     Fair enough.  Officers, jailers that is, are also

6   trained that they always have to maintain a position of

7   advantage with respect to the subject; correct?

8   A     Correct.

9   Q     And they are trained that that means that they may

10  escalate to a higher level of force than the inmate is

11  using; correct?

12  A     Correct.

13  Q     We talked about -- not we, you talked about some

14  different types of resistance; correct?

15  A     Yes.

16  Q     One thing you talked about was resistive tension;

17  correct?

18  A     Yes.

19  Q     And do I have it right that resistive tension would

20  be something like arms being flexed?

21  A     It could be, yes.

22  Q     Could be?

23  A     Yeah.

24  Q     And do I have it right that resistive tension is an

25  indicator of a potential to escalate?

                    BRIAN LANDERS - CROSS

1    A    Yes.

2    Q    And officers are trained to take that into account

3    in assessing the level of threat?

4    A    Yes.

5    Q    And you talked about active resistance; correct?

6    A    Yes.

7    Q    Active resistance or rather officers are trained

8    that active resistance is when there's behavior that

9    physically counteracts the officer's attempt to control

10   and which creates a risk of bodily harm to the officer,

11   subject or other person; correct?

12   A    Correct.

13   Q    And that the training guide for law enforcement

14   officers uses essentially the same definition.

15   A    Yes.

16   Q    So two things:  Physical behavior that physically

17   counteracts and a risk of bodily harm; correct?

18   A    Correct.

19   Q    If we could go to page 53.  So this is -- this is a

20   description of control alternatives; correct?

21   A    Correct.

22   Q    Now this definition, which we've just talked about,

23   does not actually -- the way it's written does not

24   actually require -- strike that.

25        The definition of active resistance as it's trained
                    BRIAN LANDERS - CROSS

1  to jailers in Wisconsin does not depend on the reason

2  that the subject is engaging in the behavior; correct?

3  A    Could you be more specific to that?

4  Q    The definition as to what constitutes active

5  resistance does not depend on the subject's motivation;

6  correct?

7  A    The definition of active resistance as it relates

8  to bodily harm further describes the Statute 940.19,

9  which is the intent to cause the bodily harm.

10  Q    What we've highlighted here and what's shown to the

11  jury in this instance, that is a definition of active

12  resistance drawn directly from the POSC training guide;

13  correct?

14  A    It's repeated, but you notice it does have a

15  footnote of 17.

16  Q    We'll come to the footnote.  I don't want to skip

17  over the footnote.

18  A    All right.

19  Q    The definition that you are seeing there is a

20  definition of active resistance that officers are

21  trained on; correct?

22  A    Yes, it's a definition.

23  Q    And that definition does not include any qualifier

24  that the existence of active resistance depends on the

25  motivation of the subject; correct?

                    BRIAN LANDERS - CROSS

1    A    I would say it does, related to the portion of the

2    statute that's required.  There must be an intent to

3    harm.

4    Q    So you're talking about the footnote?

5    A    I'm talking about my knowledge of the active

6    resistance definition is two-fold.  The second part of

7    the bodily harm directly relates in the training manuals

8    to the statute of the intent to cause that bodily harm.

9    Q    Okay.  But does this definition talk about intent?

10   A    Well, if you talk about what is the definition of

11   bodily harm, it does.

12   Q    Okay.  So let's see if footnote 17 defines what

13   bodily harm is.  I am going to refer down to the bottom

14   of the same page, 53.  We'll highlight for you.  This is

15   footnote 17; correct?

16   A    Correct.

17   Q    And it defines what bodily harm is; correct?

18   A    At the time that this was authored it did.

19   Q    Okay.  Well, this again is the POSC training guide

20   that would be in place on May 21st, 2010; correct?

21   A    Correct.

22   Q    And so footnote 17 that you said was important to

23   look at defines bodily harm by reference to a state

24   statute as "physical pain or injury, illness or any

25   impairment of physical condition"; correct?

                    BRIAN LANDERS - CROSS

1  A    That's what the footnote is.  I don't know if

2  that's the correct statute at the time.

3  Q    Okay.  Well, this is what jailers, who are being

4  trained in Wisconsin at the time of this incident, were

5  told as to what bodily harm meant; correct?

6  A    Possibly.

7  Q    Well, I don't understand.  You've testified that

8  this is the POSC training guide that was in place at the

9  time of the incident; correct?

10 A    Correct.

11 Q    And so a jailer being trained about using force in

12 Wisconsin at that time, if they read this definition,

13 footnote 17, this is what they were told as to what

14 bodily harm meant; correct?

15 A    I can't testify to what a jailer was told in their

16 training academy.

17 Q    That's because you don't do POSC training; correct?

18 A    Correct.

19 Q    Okay.  But you can testify as to what the words on

20 this page say; correct?

21 A    Yeah, I can read them.

22 Q    And the definition here given of bodily harm does

23 not depend upon the subject's motivation or intent;

24 correct?

25 A    Can you repeat that?

                    BRIAN LANDERS - CROSS

1   Q    Sure.  The definition of bodily harm that's shown

2   here does not depend on the subject's motivation or

3   intent.  Am I correct?

4   A    Well, it appears that this is a portion of the

5   statute, not the statute in entirety.

6   Q    Okay.  But I'm not asking that.  I'm asking if the

7   words on the page depend on the subject's intent.

8   A    From the wording on that?  No.

9   Q    And that's --

10          THE COURT:  I think at this point I'm going to

11  end the day.  I think it's been a long and tense day.

12  Everybody is tired.  We'll start tomorrow fresh, I hope,

13  at nine o'clock.

14          MR. PARDON:  Your Honor, may I have a word at

15  side bar?

16          THE COURT:  Oh, is there a problem?

17      (Discussion at side bar at 5:05 p.m.)

18          MR. PARDON:  I'm very, very sorry.  I had no

19  idea that Mr. Conroy --

20          MR. JONES:  I hear white noise.

21          THE COURT:  You can speak up.

22          MR. PARDON:  I'm sorry, Your Honor, but

23  Mr. Landers cannot be here until 11 a.m. tomorrow

24  morning.  I had no idea that his testimony would go that

25  long.
                    BRIAN LANDERS - CROSS

1          THE COURT:  Do you have any other people you

2    could be calling in the morning?

3          MR. PARDON:  We'll be resting our case after

4    Mr. Landers.

5          THE COURT:  Do you have anyone you can call at

6    nine o'clock?

7          MR. JONES:  We could begin our case if that's

8    what Your Honor -- if that's what we need to do.  I

9    obviously would prefer not to begin our case before

10   plaintiff's case is over.

11         MR. PARDON:  I don't know how much longer

12   you're going to be.

13         MR. JONES:  I haven't taken stock in my outline

14   as to how much longer I'm going to be.

15         THE COURT:  You're going to rest after

16   Mr. Landers?

17         MR. PARDON:  Yes.

18         THE COURT:  How long is your case going to

19   take?

20         MR. JONES:  We have, I believe, three officers

21   who will testify:  Deputy Blanton, the one taking the

22   handcuffs off, the two defendants, and then you remember

23   we have our expert who can't be here until Wednesday

24   morning first thing.  So we would be, I guess, taking

25   four witnesses from 11 p.m. on -- 11 a.m. on tomorrow.

1       THE COURT:  Why don't we just start at two

2  o'clock tomorrow afternoon.  I've got other things

3  scheduled.  That a problem for Mr. Landers?

4       MR. PARDON:  I think he told me he is available

5  between 11 and 2:30.  And he's available --

6       THE COURT:  He is only available from 11 to 2?

7       MR. PARDON:  2:30 yeah.  I'm very sorry, I just

8  had no idea Mr. Conroy would take so long.

9       THE COURT:  That's okay.  We'll start at 11.

10       MR. JONES:  Okay.  Fine.  Thank you.

11    (End of side bar discussion at 5:08 p.m.)

12       THE COURT:  Okay.  We have a few scheduling

13  problems, so we will not be starting until eleven

14  o'clock tomorrow, and you can plan on a late lunch

15  because I have a number of matters I have to take care

16  of over the lunch hour, other proceedings.

17    And we should get well along tomorrow.  Close to

18  finishing.  Okay.  Not completely, we'll have a little

19  bit on Wednesday morning.  All right.

20       Anything else at this time?

21       MR. PARDON:  No, Your Honor.

22       THE COURT:  Okay.  Please remember not to talk

23  about the case.  Leave your notepads on your chairs.

24    (Jury excused from courtroom at 5:10 p.m.)

25       THE COURT:  All right.  Court will adjourn.

1          (Proceedings concluded at 5:10 p.m.)

2

3                          * * * * *

4       I, LYNETTE SWENSON, Certified Realtime and Merit

5  Reporter in and for the State of Wisconsin, certify that

6  the foregoing is a true and accurate record of the

7  proceedings held on the 15th day of October 2012 before

8  the Honorable Barbara B. Crabb, District Judge for the

9  Western District of Wisconsin, in my presence and

10 reduced to writing in accordance with my stenographic

11 notes made at said time and place.

12 Dated this 29th day of October 2012.

13

14

15          /s/_____

16          Lynette Swenson, RMR, CRR, CBC
                 Federal Court Reporter

17

18

19

20 The foregoing certification of this transcript does not
   apply to any reproduction of the same by any means
21 unless under the direct control and/or direction of the
   certifying reporter.
22

23

24

25