UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * *

MICHAEL KINGLSEY,

      Plaintiff,

  -vs-                      Case No. 10-CV-832-BBC

STAN HENDRICKSON           Madison, Wisconsin
and FRITZ DEGNER           October 16, 2012
      Defendants.       1:46 p.m.

* * * * * * * * * * * * * * * * * * * * * * * * * *

STENOGRAPHIC TRANSCRIPT OF THIRD DAY OF JURY TRIAL
AFTERNOON SESSION
HELD BEFORE DISTRICT JUDGE BARBARA B. CRABB, and a jury

APPEARANCES:

For the Plaintiff:  Merchant & Gould
                  BY:  EDWARD PARDON
                      WENDY WARD
                      JOEL GRAHAM
                10 East Doty Street, Ste. 600
                Madison, Wisconsin  53703

For the Defendants:  Whyte Hirschboeck Dudek
                  BY:  ANDREW JONES
                      TIMOTHY POSNANSKI
                One East Main Street
                Madison, Wisconsin  53703

Lynette Swenson   RMR, CRR, CBC
Federal Court Reporter
U.S. District Court  120 N. Henry St., Rm. 520
Madison, WI  53703  (608) 255-3821

1                         I-N-D-E-X

2    DEFENDANTS' WITNESSES              EXAMINATION        PAGES

3    KARL BLANTON              Cross by Ms. Ward          3-10
                               Redirect by Mr. Posnanski  10-13
4    STANLEY HENDRICKSON       Direct by Mr. Jones        14-44
                               Cross by Mr. Pardon        44-58
5                              Redirect by Mr. Jones      58-61
     FRITZ DEGNER              Direct by Mr. Jones        62-79
6                              Cross by Ms. Ward          80-91
                               Redirect by Mr. Jones      91-93
7                              Recross by Ms. Ward          93

8

9

10                       E-X-H-I-B-I-T-S

11   PLAINTIFF'S EXHIBITS               IDENTIFIED/RECEIVED

12   Exhibit 37     Taser Report            90          90

13   DEFENDANTS' EXHIBITS

14   Exhibit 510B    Floor plan             29          30

15

16

17                         *  *  *  *  *

18           THE COURT:  Any reason not to bring the jury in

19   at this time?  Thank you.

20        (Jury brought in courtroom at 1:46 p.m.)

21           THE CLERK:  This Honorable Court is again in

22   session.  Please be seated and come to order.

23           MR. POSNANSKI:  I have no further questions for

24   Mr. Blanton.

25           THE COURT:  Ms. Ward.

<u>CROSS-EXAMINATION</u>

BY MS. WARD:

Q    Good afternoon, Mr. Blanton.

A    Good afternoon.

Q    I'm going to have to get used to calling you

Mr. Blanton instead of Deputy Blanton, but forgive me if

I say Deputy.

A    Yes, sir.

Q    Prior to the incident on May 21st, 2010 --

        THE COURT:  Why don't you pull the microphone

over just a little closer.

        MS. WARD:  Sure.

Q    -- your experience with Mr. Kingsley had been that

he was cooperative; right?

A    Prior to the incident, yes.

Q    And you hadn't had any real issues with him;

correct?

A    No.

Q    And you certainly hadn't had any experience where

Mr. Kingsley had been violent; correct?

A    Correct.

Q    Now you testified on direct that when you tried to

talk to Mr. Kingsley in the early morning about removing

the paper over the light, he didn't respond to you;

correct?

                KARL BLANTON - CROSS

1    A    That's correct.

2    Q    He certainly didn't threaten you; correct?

3    A    Correct.

4    Q    Now when the group of you went into Mr. Kingsley's

5    cell, he complied with the order to put his hands behind

6    his back; correct?

7    A    I believe so, yes.

8    Q    And when you and Sergeant Hendrickson tried to help

9    him stand, he dropped to his knees; right?

10   A    Yes.

11   Q    And I think you said on direct you offered him a

12   wheelchair?

13   A    That would have been an option, yes.

14   Q    You didn't put that in your incident report,

15   correct --

16   A    No, I didn't.

17   Q    -- that you offered him a wheelchair?

18   A    No, I did not.

19   Q    And you didn't know one way or the other whether he

20   was hurt; right?

21   A    That is correct.

22   Q    Now when Mr. Kingsley was being carried into the

23   receiving cell, you did not believe that Mr. Kingsley

24   was struggling or resisting at that point; correct?

25   A    Not while going into the cell, no.
                    KARL BLANTON - CROSS

1  Q    Okay.  Now I want to talk about the level of threat

2  presented by Mr. Kingsley when he was in the receiving

3  cell.

4  A    Okay.

5  Q    There were five officers present when he was placed

6  in the receiving cell; correct?

7  A    Yes.

8  Q    Four inside and one outside?

9  A    Yes.

10 Q    And so you would agree with me, would you not, that

11 throughout the incident with Mr. Kingsley, the officers

12 had an advantage due to outnumbering Mr. Kingsley;

13 correct?

14 A    Would I consider that an advantage?  Or -- I

15 wouldn't consider that an advantage.  He's outnumbered,

16 yes.

17 Q    And you don't consider that an advantage?

18 A    Not depending on the person.  Every person is

19 different, whether it's an advantage or not.

20 Q    Okay.  Do you remember when I took your deposition

21 in this case?

22 A    Sure.

23 Q    Okay.  And you were under oath at that time; right?

24 A    Yes.

25 Q    The deposition is up there in the binder that's

                    KARL BLANTON - CROSS

1    marked depositions.  If you could turn in that binder to

2    your deposition to page 108.  Let me know when you get

3    there.

4    A    Is this under my name?

5    Q    Yes, it's under your name.  They're alphabetical.

6    A    Yep.  What page number?

7    Q    108.  Are you there?

8    A    No, I'm not.

9            THE COURT:  Oh, are those -- that's the

10   compressed version?

11           THE WITNESS:  Yes, I would believe so.

12           THE COURT:  Don't look at the bottom of the

13   page, but look at the bottom of each little section and

14   you'll see a page number.

15           THE WITNESS:  Yeah, it only shows page 30 is

16   the last page number.

17   BY MS. WARD:

18   Q    I'm sorry, sir.  There's two portions to your

19   deposition.  One was confidential and one was not.  So

20   we need to look at the nonconfidential portion of your

21   deposition.

22   A    Page 108?

23   Q    So you're with me?

24   A    Yes.

25   Q    And then at line 22 of page 108, as part of the
                         KARL BLANTON - CROSS

1   question I was asking you:   "But it states in the

2   second paragraph," we were looking at a document

3   together, "the most obvious difference is the number of

4   participants on each side of the equation.  One officer

5   facing three subjects is in a much different position

6   than the same officer and two partners facing a lone

7   subject."  And then it says, "In general, having greater

8   numbers gives you an advantage."

9        And I ask:  "So you would agree with me that the

10  officers had the advantage in the situation with

11  Mr. Kingsley; correct?

12       "Answer:  Yes."

13       Did I ask you that question and did you give me

14  that answer?

15  A    Yes.

16  Q    And you're six three; correct?

17  A    Six four.  Yes, Ma'am.

18  Q    And 230 pounds or so?

19  A    Yes, Ma'am.

20  Q    And you would also agree with me that because

21  Mr. Kingsley was prone and in handcuffs, the threat

22  level was less than if he had been unrestrained and

23  standing; correct?

24  A    Yes.

25  Q    And it's true, is it not, that Mr. Kingsley was

                    KARL BLANTON - CROSS

1  under some level of control because he was handcuffed?

2  A    Yes.

3  Q    Now Mr. Kingsley did not make any verbal threats to

4  officers or anyone else at the time during the incident;

5  correct?

6  A    That's correct.

7  Q    And you didn't feel unsafe at any point in the

8  incident with Mr. Kingsley; correct?

9  A    That is correct.

10  Q    Now in the receiving cell you were the officer that

11  was trying to take Mr. Kingsley's handcuffs off;

12  correct?

13  A    Correct.

14  Q    And the reason you were taking his handcuffs off is

15  that it is common practice so he doesn't hurt himself;

16  correct?

17  A    Correct.

18  Q    And you had concluded that at that point it would

19  be appropriate to try to take his handcuffs off;

20  correct?

21  A    Correct.

22  Q    And Mr. Kingsley was not verbally warned in any way

23  that noncompliance would result in him being tased, was

24  he?  Verbally warned.

25  A    Can you restate that, please?

                    KARL BLANTON - CROSS

1    Q    Yes.  Do you want me to restate it or do you want

2    me to say it again?

3    A    Say it again, please.

4    Q    Mr. Kingsley was not verbally warned in any way

5    that noncompliance would result in him being tased;

6    correct?

7    A    Correct.

8    Q    And you don't have or you didn't have an opinion

9    either way whether the use of the taser on Mr. Kingsley

10   on May 21st of 2010 was necessary; correct?

11   A    Correct.

12   Q    And there were alternatives to the taser such as

13   other empty-hand controls that could have been used;

14   correct?

15   A    Correct.

16   Q    Now just before you left the cell, you safety

17   locked the cuffs so they wouldn't tighten up anymore;

18   correct?

19   A    Correct.

20   Q    And I think you testified on direct that

21   Mr. Kingsley had been making sounds throughout the

22   incident; right?

23   A    Correct.

24   Q    And I think you said he sounded angry or that he

25   was making sounds in anger; correct?

                    KARL BLANTON - CROSS

1  A     Correct.

2  Q     You didn't use the word anger or angry in your

3  incident report; correct?

4  A     Correct.

5  Q     I just have a couple more questions, Mr. Blanton.

6  A     Sure.

7  Q     As of the time of your deposition in this case, you

8  had not had an occasion to use a taser on a subject in

9  the course of your duties as an officer; correct?

10 A     Correct.

11 Q     And before the incident with Mr. Kingsley, you had

12 never witnessed an officer applying a taser to a

13 handcuffed inmate or subject; correct?

14 A     Correct.

15        MS. WARD:  Nothing further.

16        THE COURT:  Mr. Posnanski.

17        MR. POSNANSKI:  Thank you, Your Honor.

18                REDIRECT EXAMINATION

19 BY MR. POSNANSKI:

20 Q     Mr. Blanton, you were just asked some questions

21 about whether or not you felt unsafe during this

22 incident with Mr. Kingsley.  Do you recall that

23 testimony?

24 A     Yes.

25 Q     Even though you didn't feel that you were unsafe,
                 KARL BLANTON - REDIRECT

1    did you still believe there was a risk posed to both the

2    officers and to Mr. Kingsley?

3              MS. WARD:  Objection.  Leading.

4              THE COURT:  Sustained.

5    BY MR. POSNANSKI:

6    Q    Mr. Blanton, in the receiving cell can you describe

7    what Mr. Kingsley was doing again?

8    A    In the receiving cell, as we were trying to get the

9    handcuffs off, once again Mr. Kingsley was pulling;

10   tensing up; lifting up his upper torso; trying to pull

11   his hands apart; wiggling his hands; kind of just

12   swaying on his belly left to right a little bit;

13   grunting, which I took as anger and frustration which

14   made it very difficult at that time to get the handcuffs

15   off.

16   Q    Did Mr. Kingsley's conduct -- strike that.

17        Were you concerned at all by Mr. Kingsley's

18   conduct?

19   A    I was concerned, yes.

20   Q    Why?

21   A    Just because most reasonable people would want the

22   cuffs off, and he, I felt, was resisting to let us all

23   achieve that objective to get the handcuffs off.  So he

24   was struggling and making it unsafe.

25   Q    Why was that a concern?
                    KARL BLANTON - REDIRECT

1  A    That's a concern for his safety and the officers'

2  safety that were in the cell at that time.

3  Q    So even though you did not feel unsafe, you still

4  had concerns about the safety of Mr. Kingsley and the

5  officers?

6  A    That's correct.

7  Q    Now you were asked questions regarding whether or

8  not Mr. Kingsley was verbally warned whether or not he

9  would be tased.  Do you recall that?

10 A    I do.

11 Q    Was Mr. Kingsley given any verbal instructions?

12 A    He was multiple times asked to stop resisting; stop

13 fighting us; let's get this resolved; let's get the

14 cuffs off; multiple times trying to reason with

15 Mr. Kingsley.

16 Q    You were asked whether or not you had an opinion

17 one way or another with respect to the decision to use

18 the taser.  Do you recall that?

19 A    Yes, I do.

20 Q    That was not your decision to use the taser; right?

21 A    That is correct.

22 Q    In the questioning by counsel, you were asked

23 whether or not you safety locked Mr. Kingsley's

24 handcuffs.  Do you recall that?

25 A    That's correct.
                    KARL BLANTON - REDIRECT

1  Q    Do you know whether the handcuffs had already been

2  safety locked when you did that?

3  A    I'm not 100% sure on that now.

4  Q    So they may have?

5  A    They may have, yes.

6          MR. POSNANSKI:  Thank you, Mr. Blanton.

7          THE WITNESS:  Yes.

8          MS. WARD:  May I have one moment, Your Honor,

9  just to consult?

10          THE COURT:  You may.

11      (Pause)

12          MS. WARD:  We have nothing further.

13          THE COURT:  You may step down.

14          MR. POSNANSKI:  Your Honor, this witness was

15  under a subpoena.

16          THE COURT:  That's what I was just going to

17  ask.  Any reason that he should not be discharged?

18          MS. WARD:  No, he may be discharged.

19          THE COURT:  You are discharged; free to leave

20  the building and go about your business.

21          THE WITNESS:  Thank you.

22          MS. WARD:  Thank you, Mr. Blanton.

23      (Witness excused at 2:00 p.m.)

24          MR. JONES:  We'd like to called Sergeant

25  Hendrickson, Your Honor.
              KARL BLANTON - REDIRECT

1      **STANLEY HENDRICKSON, DEFENDANT, SWORN,**

2                      DIRECT EXAMINATION

3  BY MR. JONES:

4  Q    Would you please state your full name for the

5  record.

6  A    Stanley Vernon Hendrickson, Junior.

7  Q    And you're employed by Monroe County?

8  A    That's correct.

9  Q    By the Sheriff's Department?

10 A    Correct.

11 Q    What's your current rank?

12 A    Lieutenant.

13 Q    Do you mind if I call you Sergeant since that was

14 your rank at the time of the incident?

15 A    That's fine.

16 Q    And how long have you worked for the Sheriff's

17 Department?

18 A    Since August of 2000.

19 Q    And you said you were a Lieutenant.  What's your

20 current job?

21 A    I am the Jail Administrator for the Monroe County

22 Jail.

23 Q    How long have you been the Administrator?

24 A    Since June 30th of last year.

25 Q    What does it mean to be the Jail Administrator?
                    STANLEY HENDRICKSON – DIRECT

1    A     I'm in charge of the day-to-day operations of the

2    jail and the staff that works in the jail.

3    Q     What was the position you held before you became

4    the Jail Administrator?

5    A     I was the Jail Sergeant, third shift supervisor.

6    Q     And I take it that was your rank at the time?

7    A     Yes.

8    Q     And how long did you serve as Jail Sergeant?

9    A     From October 1st of 2003 until June 30th of last

10   year.

11   Q     So about eight years?

12   A     Correct.

13   Q     And what was your job -- what were your job duties

14   as a Jail Sergeant?

15   A     I was in charge of the operation of my shift and

16   the staff that was underneath me.

17   Q     On a typically shift how many staff would be under

18   your supervision?

19   A     Two besides myself.

20   Q     What ranks would those two individuals hold?

21   A     They would be just regular jailers.

22              THE COURT:  Could you pull your chair up closer

23   and speak into the microphone?

24              THE WITNESS:  Yes, Ma'am.

25              THE COURT:  You can move it if it's more
                    STANLEY HENDRICKSON - DIRECT

1    comfortable for you.

2    Q    What was your job and rank at the Sheriff's

3    Department before you became a Sergeant?

4    A    I was a jailer.

5    Q    And that was for about three years?

6    A    Correct.

7    Q    How old are you?

8    A    I am 48.

9    Q    And where did you grow up?

10   A    My first ten years we lived here in Wisconsin and

11   then my family moved to Hot Springs, South Dakota.

12   Q    And briefly what is your educational background?

13   A    I graduated from high school at Hot Springs High

14   School, went to college, went to college for roughly

15   two-and-a-half years, and then went into the military.

16   Q    And are you certified by the State of Wisconsin as

17   a corrections officer?

18   A    Yes, I am.

19   Q    How long have you held that certification?

20   A    Since October -- in 2001.  I don't know the exact

21   month.

22   Q    And you were on duty on May 21st, 2010?

23   A    Yes, I was.

24   Q    And what was your shift that day?

25   A    I was the third shift supervisor.
                STANLEY HENDRICKSON - DIRECT

1  Q    And so when would you have come on and how long was

2  your shift scheduled to last that day?

3  A    I would have began my shift at 2300 or 11 p.m. on

4  the 20th of May and it would have ended at 7:30 in the

5  morning on the 21st.

6  Q    And at some point on either of those two days did

7  you become aware that there was some sort of situation

8  with Mr. Kingsley?

9  A    Yes, I did.

10 Q    And when did you first learn that?

11 A    Deputy Manka approached me when I came on shift and

12 explained there was an issue of Mr. Kingsley not

13 removing paper off the light and that he was going to

14 write him on a minor rule violation.

15 Q    So this would have been on shift change at eleven

16 o'clock on the 20th?

17 A    Correct.

18 Q    What specifically did Deputy Manka tell you?

19      MR. PARDON:  Objection.  Hearsay.

20      THE COURT:  Sustained.

21      MR. JONES:  Your Honor, I believe it goes to

22 the information that this officer had to take the

23 actions he did.

24      THE COURT:  If it's limited to that, you may

25 answer.
                    STANLEY HENDRICKSON - DIRECT

1  BY MR. JONES:

2  Q    Do you remember what I asked you?

3  A    Could you repeat the question?

4  Q    What did Officer Manka tell me?

5  A    He told me that the paper was still on the light.

6  It needed to come down yet, and I agreed.  And he also

7  told me that Mr. Kingsley had made a statement about

8  better call the CERT team.

9  Q    What did you make of that comment, if anything?

10  A    I took it seriously.  We don't take threats like

11  that or statements like that lightly.

12  Q    Did Officer --

13  A    We don't have the luxury to take them lightly.

14  Q    Did Officer Manka tell you it was a joke?

15  A    No, he did not.

16         MR. PARDON:  Objection.

17         THE COURT:  Overruled.

18  BY MR. JONES:

19  Q    So what did you do once you learned this

20  information from Officer Manka?

21  A    Since it was after lockdown, I decided that we

22  could deal with it in the morning after open up.

23  Q    Why did you think it was something that could wait

24  until the morning?

25  A    I didn't see a sense of urgency at that time.
                STANLEY HENDRICKSON - DIRECT

1   Q     At some point, did you, in fact, seek to have him

2   take the paper down?

3   A     Yes, I did.

4   Q     When was that?

5   A     The following morning during my medication pass.

6   Q     And so tell us what occurred.

7   A     I went back to deliver medications to Mr. Kingsley.

8   He refused to take his meds.  Then I began a

9   conversation with him on removing the paper.

10  Q     Let me ask you:  Had anyone gone to talk to

11  Mr. Kingsley about the paper and the light after Officer

12  Manka but before you did?

13  A     Deputy Blanton did.

14  Q     And did Deputy Blanton tell you anything about what

15  happened when he spoke to Mr. Kingsley?

16  A     That it was unsuccessful.

17  Q     And so you then went to speak to him?

18  A     Correct.

19  Q     And this was during the medication rounds?

20  A     Yes.

21  Q     And for the record, can you tell us what you're

22  referring to by medication rounds?

23  A     We pass medications to inmates at certain times

24  during the day and I was in charge of doing medication

25  pass at that time, that morning.

STANLEY HENDRICKSON - DIRECT

1  Q    And what time was that again?

2  A    Approximately 5:50, 5:45.

3  Q    And did you talk to Mr. Kingsley?

4  A    Yes, I did.

5  Q    And can you relate to us the substance of that

6  conversation?

7  A    I asked him to remove the paper.  He made comments

8  he didn't put it up there, he wasn't going to do it.  I

9  told him I understood what he was saying, but he still

10  needed to remove the paper, and he continued to state

11  that he was not going to do it and eventually just

12  stopped talking to me.

13  Q    At any point in that conversation did he indicate a

14  willingness to do what you had asked him to do?

15  A    No, he did not.

16  Q    At any point during that conversation did you give

17  him a direct order to remove --

18  A    Yes.

19  Q    -- the paper?

20  A    Yes, I did.

21  Q    At any point in that conversation did he tell you

22  he was willing to do it, but he didn't think he was tall

23  enough?

24  A    No, he did not.

25  Q    Did that ever come up in your -- any of your

                    STANLEY HENDRICKSON - DIRECT

1  communications with Mr. Kingsley about the paper over

2  the light?

3  A      No.

4  Q      Why was it necessary in your mind to have

5  Mr. Kingsley take the piece of paper down in the first

6  place?

7  A      Visibility into the cell.  You have to look through

8  a couple sets of bars to see him and it hinders our

9  ability to see them and a possible fire hazard.

10  Q      Did you think it was an emergency?

11  A      Not at the time, no.

12  Q      You referred to Deputy Manka talking about issuing

13  a minor discipline to Mr. Kingsley as a result of his

14  conversation with him?

15  A      Yes.

16  Q      Did you consider that minor discipline was

17  appropriate given what had occurred?

18  A      Yes.

19  Q      Why was it necessary to issue discipline to

20  Mr. Kingsley as a result of what had occurred?

21  A      Failure to follow staff direction.

22  Q      Why does that warrant any form of discipline?

23  A      If we have inmates that don't follow staff

24  direction and it gets out throughout the facility, we

25  have no order.  No control.  Hence safety security

                    STANLEY HENDRICKSON - DIRECT

1  issues.

2  Q    Why is it important to have control and order in

3  the jail?

4  A    Due for safety and security issues.  If you do not

5  have control, you're going to have people basically

6  doing what they want to do and they're supposed to be in

7  a controlled environment.

8  Q    So what did you do -- let me ask you first:  Was

9  there anything more to your conversation with

10  Mr. Kingsley about 5:45/5:50 on the 21st that you

11  haven't already told us about?

12  A    After attempting to get Mr. Kingsley to remove the

13  paper, I gave him firm command tones to take the paper

14  down now, which he did not do.  And I said, "Don't make

15  this into something it shouldn't be."  And he returned

16  with a reply and said, "No, you are."

17  Q    What happened next?

18  A    That's when I left to finish medication.  We'll

19  deal with it after that.  I informed Sergeant Blanton to

20  call for backup too.

21  Q    Why did you tell Officer Blanton to call for

22  backup?

23  A    In cases where there's just a few of us on and we

24  need backup in case the individual decides to become

25  combative, resistive, for whatever reason, we call for

STANLEY HENDRICKSON - DIRECT

1  backup from the road, assistance from the road.

2      We also use it as a show of force to hopefully

3  persuade them that you've got five people standing in

4  front of you, it's time to change your mind.

5  Q    Mr. Kingsley hadn't -- he hadn't threatened to

6  assault you, had he?

7  A    No.

8  Q    He hadn't told you that he was going to physically

9  resist, had he?

10 A    No, he didn't say he was.

11 Q    So can you explain why then it was still necessary

12 to have backup?

13 A    Due to Mr. Kingsley's refusal to take the paper

14 down, I determined that he would be facing more charges

15 or more disciplinary action for failure to follow staff

16 directions and we were going to move him to a receiving

17 cell so we could get the paper off, and he would be

18 facing future discipline.

19 Q    What's the next thing that happened in connection

20 with this set of events?

21 A    I called Lieutenant Conroy to inform him of the

22 events that had happened so far and he stated that he

23 was on his way in.

24 Q    And he came in; correct?

25 A    That's correct.
              STANLEY HENDRICKSON - DIRECT

1   Q    And he went to see Mr. Kingsley; correct?

2   A    This is correct.

3   Q    You weren't in the cellblock when he did that;

4   correct?

5   A    I don't remember if I was the one standing just

6   inside or in the doorway.

7   Q    Okay.  What did Lieutenant Conroy tell you, if

8   anything, after he had been to see Mr. Kingsley?

9   A    As we exited south block, when Lieutenant Conroy

10  exited south block, his statement was --

11          MR. PARDON:  I'm going to object to this as

12  hearsay.

13          MR. JONES:  For the same reason as before.

14          THE COURT:  Sustained.

15  BY MR. JONES:

16  Q    What occurred after Lieutenant Conroy exited the

17  cellblock?

18  A    He informed us that Mr. Kingsley would be going to

19  receiving.

20  Q    And at some point you and other officers, five

21  officers total, went to the cellblock to Mr. Kingsley's

22  cell?

23  A    Correct.

24  Q    And what happened once you were outside

25  Mr. Kingsley's cell?
                    STANLEY HENDRICKSON - DIRECT

1  A    We again tried to talk him into taking the light

2  [verbatim] down and cooperate with us.  And that he was

3  going to receiving.

4  Q    What did you specifically say to him?

5  A    I told him to stand up, back up to the door, so he

6  could be handcuffed.

7  Q    And did he do that?

8  A    No, he did not.

9  Q    Did he tell you -- did he say anything in response

10 to that?

11 A    I believe his comments were, "I didn't do nothing

12 wrong.  I didn't do nothing wrong."

13 Q    Did he otherwise explain to you why he wouldn't

14 stand up and -- with his back to the cell door as you

15 had requested?

16 A    No.

17 Q    At some point you and Officer Blanton went into the

18 cell; correct?

19 A    Correct.

20 Q    Can you tell us what happened once you went into

21 the cell with Officer Blanton?

22 A    I was going to do the handcuffing and Deputy

23 Blanton was going to maintain control of the lower body.

24 As I attempted to put the first handcuff on,

25 Mr. Kingsley became resistive, tensing, moving his arm,

STANLEY HENDRICKSON - DIRECT

1  hindering me from actually get the cuffs on.  I got the

2  one cuff on and had difficulty getting the second on.

3  Deputy Blanton had to assist me in gaining control of

4  the arms so we could place it in the cuff.

5  Q    You were ultimately able to get the cuff on though?

6  A    Yes, we were.

7  Q    What happened from that point forward?

8  A    We told Mr. Kingsley to help us get him up into a

9  sitting position is what we were attempting to do.  We

10 got him up in the sitting position, went to pull -- have

11 him stand up, and that's when he started claiming his

12 foot.  His comments were "My foot, my foot."

13      We asked him numerous times what's wrong with your

14 foot, what's wrong with your foot, which foot, to no

15 response.

16 Q    Did you or Officer Blanton drag Mr. Kingsley off of

17 his bunk?

18 A    No.

19 Q    Did you drag him from the bunk onto the floor?

20 A    No, we did not.

21 Q    How did you respond to Mr. Kingsley's, if you did,

22 Mr. Kingsley's statements about his foot?

23 A    We continued asking him which foot?  What's wrong

24 with your foot?

25 Q    Did he respond?
                STANLEY HENDRICKSON - DIRECT

1   A    No.

2   Q    Did he tell you what was wrong with his foot?

3   A    No, he didn't.

4   Q    Did he tell you which foot it was?

5   A    No.

6   Q    Did he tell you how it was hurt?

7   A    No.

8   Q    In the course of handcuffing Mr. Kingsley, did you

9   see anything happen that injured his foot?

10  A    No, I did not.

11  Q    At some point, you and Officer Blanton carried

12  Mr. Kingsley from the cell?

13  A    That's correct.

14  Q    Can you, in your own words, tell us how you carried

15  him?

16  A    Well, when he wouldn't get up and move on his own,

17  we decided to carry him down and out of the cell.  I

18  believe Officer Blanton had him underneath his left arm,

19  I had his underneath his right arm, and we were carrying

20  him that way.  His knees and lower legs were behind him

21  dragging.

22  Q    And you carried him from the cell out into the main

23  hall of the jail; correct?

24  A    Correct.

25  Q    Who was the officer who actually put the handcuffs

                    STANLEY HENDRICKSON - DIRECT

1  on?

2  A    I got the first one on and then with assistance

3  from Deputy Blanton we got the second one in the cuff.

4  Q    They were your handcuffs?

5  A    Yes.

6  Q    And did you double lock the handcuffs before you

7  left the cell?

8  A    I believe I did.

9  Q    And what -- did you check them for fit?

10  A    I would have slipped my finger near the handcuff,

11  yes.

12  Q    What are you doing when you're doing that?

13  A    See if there's space, room enough so they're not

14  tight -- too tight, I'm sorry.

15  Q    And you did that on this instance?

16  A    I believe I did.

17  Q    So out in the main hallway -- we've seen the video

18  recording of what happened out in the main hallway.  But

19  in your own words, can you tell us what occurred out in

20  the main hallway of the jail?

21  A    Once we exited south block, we placed Mr. Kingsley

22  on the floor and continued to ask him what was wrong

23  with his foot; which foot hurt; what was wrong.  He

24  never did respond.

25  Q    Did he ever tell you what was wrong with his foot?
                STANLEY HENDRICKSON - DIRECT

1   A      No, he did not.

2   Q      Did he ever tell you which foot it was?

3   A      No, he didn't.

4   Q      Did he ever tell you why, whatever he was feeling

5   in his foot, prevented him from walking under his own

6   power?

7   A      No.

8   Q      Was Mr. Kingsley awake when he was lying on the

9   ground out on the floor out in the main hallway?

10  A      Yes, he was.

11  Q      So then he was carried into the receiving cell;

12  correct?

13  A      Correct.

14  Q      Four officers carried him?

15  A      That's correct.

16  Q      Why didn't four officers carry him originally out

17  of his cell into the main hallway?

18  A      The way the jail is designed, you don't have enough

19  room.  There's not enough people to get four people

20  around him.  So we got him out as best and as safely as

21  we could.

22  Q      I'd like to show you what was marked as Exhibit

23  510B.  Is that up on your screen?

24  A      Yes, it is.

25  Q      Very briefly can you tell us what this exhibit is?
                    STANLEY HENDRICKSON - DIRECT

1    A    It is a floor plan of the section of the jail.

2    Q    And there are some red lines on the jail; yes?

3    A    Yes, there are.

4    Q    What do those lines depict?

5    A    They indicate the direction from the fifth cell in

6    south block down the hallway, out the hall into the

7    foyer area of receiving, into the third receiving cell.

8    Q    What do those lines coincide with as it relates to

9    this case?

10   A    The route that we took Mr. Kingsley.

11         MR. JONES:  I'd like to move the admission of

12   510B, Judge.

13         MR. PARDON:  No objection.

14         THE COURT:  I have 10E [verbatim] is received.

15         MR. JONES:  May we publish it to the jury,

16   Judge?

17         MR. PARDON:  Yeah.

18         THE COURT:  Yes, you may.

19         MR. PARDON:  Sorry.

20   BY MR. JONES:

21   Q    And again, as we're looking at this, this simply

22   relates the route that Mr. Kingsley was taken from his

23   cell to the receiving cell; correct?

24   A    Correct.

25   Q    Am I correct that once Mr. Kingsley was in the

                    STANLEY HENDRICKSON - DIRECT

1 receiving cell and had been laid on the bunk, you and

2 Officer Blanton were attempting to take the handcuffs

3 off?

4 A    Correct.

5 Q    And we've heard testimony from Officer Blanton and

6 Lieutenant Conroy on this subject, but I'd like in your

7 own words for you to tell us why you were trying to take

8 his handcuffs off.

9 A    To take the handcuffs off?

10 Q    Yes.

11 A    We generally do not leave people unattended in a

12 cell with handcuffs on due to the possibility of

13 injuring themselves.

14 Q    You said generally you don't do that?

15 A    Well, we don't.  Standard practice is we don't.

16 Q    All right.  Do you ever do that if you can avoid

17 doing it?

18 A    Absolutely.  Absolutely avoid it, yes.

19 Q    Just to be clear, you're saying you absolutely

20 avoid leaving people in the cells with handcuffs on?

21          MR. PARDON:  Objection.  Leading.

22          THE COURT:  Overruled.

23          THE WITNESS:  Yes.

24          MR. JONES:  Thank you.

25
                STANLEY HENDRICKSON - DIRECT

BY MR. JONES:

Q    Did you say anything to Mr. Kingsley as Officer
Blanton was trying to take the handcuffs off?

A    "Stop resisting.  Relax.  Stop resisting.  Relax."
Numerous times.

Q    We heard on the audio from the recording that
different tones of voice were used; correct?

A    Correct.

Q    Can you explain why you and the other officers used
different tones of voice as you were speaking to
Mr. Kingsley?

A    To try to persuade him.

Q    And what was the purpose of using more aggressive
louder tones of voice?

A    To deliver an ultimatum to get him, you know, to
stop, relax right now so we can get these off.

Q    And what did you personally observe Mr. Kingsley
doing as you were trying to take the handcuffs off?

A    He was flexing and tensing, moving his hands,
shrugging back and forth, making it hard to remove the
handcuffs.

Q    And flexing and tensing, flexing and tensing what?

A    His arms, his body, pulling his arms apart,
tightening his muscles, making it difficult so we
couldn't maneuver to get in to get the handcuffs off.
                STANLEY HENDRICKSON - DIRECT

1  Q    When you said he was moving his hands, can you tell

2  us how he was moving his hands?

3  A    Back and forth, twisting them out, pulling them

4  apart.

5  Q    And you said he was shrugging.  Can you tell us

6  what you mean by that?

7  A    The shoulders moving like this back and forth.

8  (Indicating)

9  Q    Can you describe it for the record?

10 A    Side to side I guess would be the best way to

11 describe it.

12 Q    In your own words, can you tell us why that made it

13 difficult to take the handcuffs off?

14 A    It's hard enough to take them off when you're being

15 still.  It's a small hole, a small key.  When people are

16 moving and the cuffs are being moved, they're being

17 taunt, it's really difficult to try to get those off.

18 Q    Was there any other movement that you observed in

19 Mr. Kingsley's upper body beyond what you've already

20 described for us?

21 A    He raised his upper torso off the bunk.

22 Q    What did you hear Mr. Kingsley say as this was

23 going on?

24 A    "Get the mother's off, get the motherf'ers off" at

25 one point and "get the 'f' out at another point."

STANLEY HENDRICKSON - DIRECT

1    Q    At any point after you put -- well, strike that.

2    At any point in the receiving cell did Mr. Kingsley say

3    to you or any of the other officers that he was in pain?

4    A    No, he did not.

5    Q    Did Mr. Kingsley at any point in the receiving cell

6    say to you or the other officers that the handcuffs were

7    too tight?

8    A    No, he did not.

9    Q    Did he say to you at any point after you put the

10   handcuffs on that they were too tight?

11   A    No.

12   Q    Did he say to you at any point in the receiving

13   cell that he couldn't do what you were asking him to do?

14   A    No, he did not.

15   Q    We've listened to the recording obviously and we've

16   heard other sounds that Mr. Kingsley was making.  Do you

17   remember those sounds?

18   A    Yes.

19   Q    How did you perceive those sounds?

20   A    As anger.  Aggressive sounds.

21   Q    And can you tell us why that was your reaction to

22   those?

23   A    The tone and the growl that was in the noise.

24   Q    You told us that you had directed him to stop

25   resisting and to relax; right?

                    STANLEY HENDRICKSON - DIRECT

1    A    Correct.

2    Q    Did you do anything physically to respond to what

3    you were seeing and hearing from him?

4    A    At one point when he lifted his torso up, I tried

5    to stabilize him by pushing down on his upper torso, and

6    with my hand to his head, I had my hand -- do you want

7    me to demonstrate?

8    Q    Sure.

9    A    I had my hand on the side of his head holding him

10   down so he was more stable so he couldn't move around.

11   I did at one point place my thumb in a pressure point

12   right below the ear.

13   Q    And why did you react to him lifting his torso off

14   the bunk with what you've just described for us?

15   A    It was my feeling that was an aggressive move.  I

16   felt threatened by it, so I wanted to restabilize and

17   put him back down so he was not able to move around.

18   Q    And why did you put your hand on his head in the

19   way you've described?

20   A    Once I pushed down on him and had him down, his

21   head -- his mouth was open, his head went towards my

22   lower shanks.  I had my leg back up on the -- across his

23   shoulder area and his mouth was open and he came towards

24   me I think at that point and that's when I placed my

25   hand -- I moved my hand up to his head right away.
                    STANLEY HENDRICKSON - DIRECT

1  Q    And the pressure point that you described, can you

2  tell us a little bit more specifically what you were

3  doing?

4  A    I was taking the thumb, the pad of my thumb, and

5  pushing in towards the other side.  There's a cluster of

6  nerves there.  If you push on it, it causes a pain

7  sensation and you try to gain compliance by using

8  pressure points.

9  Q    Is that something that you're trained to do as part

10  of jail school?

11  A    Yes.

12  Q    You mentioned in one of your answers just now the

13  placement of your leg on Mr. Kingsley.

14  A    Yes.

15  Q    Can you tell us again what you were doing in that

16  respect?

17  A    I was trying to maintain control of Mr. Kingsley by

18  stabilizing with the leg and shin area of my right leg.

19  Q    And where was the leg and shin area of your right

20  leg?  Where did you have that on him?

21  A    Across the upper back, the shoulder area.

22  Q    Did you -- how much pressure did you have on your

23  leg when you were doing that?

24  A    I was applying just enough pressure to maintain

25  control.

                    STANLEY HENDRICKSON - DIRECT

1   Q    Did you have the weight of your knee directly on

2   Mr. Kingsley's spine?

3   A    No, I did not.

4   Q    Did you put the weight of your knee directly on his

5   neck?

6   A    No, I did not.

7   Q    Did you put the weight of your knee or leg directly

8   on his head?

9   A    No, I did not.

10  Q    The things that you've described that you did and

11  said, to your observation did they have any effect on

12  getting Mr. Kingsley to stop doing what he was doing?

13  A    No, it did not.

14  Q    So he continued with the behaviors that you've

15  already described?

16  A    That's correct.

17  Q    Did you have any concerns about what was happening

18  in the receiving cell?

19  A    Yes, I did.

20  Q    What were your concerns?

21  A    Well, my concerns were for safety for not only the

22  staff and other officers' safety, but for Mr. Kingsley

23  as well.

24  Q    What specifically were your concerns in terms of

25  safety?

                STANLEY HENDRICKSON - DIRECT

1   A    Injury.  Mr. Kingsley could bump his head, roll off

2   the bed with the cuffs left on.  He could slap his head

3   into the wall if he kept thrashing around, enough to

4   where he got over there.  Officers' safety.  Kicking.

5   Biting.  There's a metal lip on the edge of the bed.

6   Somebody could have slipped and was injured that way.

7   Q    You mentioned that, to go back a little bit in your

8   testimony, you mentioned at one point in connection with

9   when you had your hand on Mr. Kingsley's head that he

10  had his mouth open and in your direction; correct?

11  A    Correct.

12  Q    Did that raise any concerns for you?

13  A    Yes, it did.

14  Q    What was the concern?

15  A    The concern of biting.

16  Q    Mr. Conroy, Lieutenant Conroy in his testimony,

17  there were some questions and he gave some testimony

18  about conversation you and he had after these events --

19  A    Correct.

20  Q    -- correct?  Can you relate to us in your own words

21  what happened or what that conversation was about?

22  A    We spoke about the reason for the tase, why we used

23  the taser.  We discussed the plan forward from that

24  point too.

25  Q    And what was the discussion about in terms of the
                    STANLEY HENDRICKSON - DIRECT

1  use of the taser?

2  A    He asked what was the reasoning I ordered the tase

3  and one was the attempt -- I want to say because of the

4  use of the -- due to Mr. Kingsley's continued resistance

5  is the best word I can think of.  He would not stop,

6  would not comply.  We already tried verbalizing, talking

7  to him, commanding him.  I did try the pressure point.

8  He was still not complying, so we used a taser to see if

9  we could gain compliance.  It didn't work.

10  Q    And was there some part of that conversation that

11  related to your concern about Mr. Kingsley biting you?

12  A    I had mentioned that there was a prior incident

13  where there was an attempted bite on me.  I did not

14  claim it was Mr. Kingsley at the time.

15  Q    And this prior incident, was it, in fact,

16  Mr. Kingsley?

17  A    No, it was not.

18  Q    Had Mr. Kingsley ever tried to bite you in the

19  past?

20  A    No, he did not.

21  Q    And Mr. Conroy also testified that at some point

22  some number of days after May 21st that you called him

23  to speak about that specific issue again?

24  A    That's correct.

25  Q    And can you relate to us why you called Lieutenant
                    STANLEY HENDRICKSON - DIRECT

1  Conroy on that occasion?

2  A    I had seen Mr. -- Lieutenant Conroy's report and it

3  said I told him that Mr. Kingsley tried to bite me and I

4  told him that that was not factual.

5  Q    Is it fair to say that you -- well, from your

6  perception, is it fair to say that you and Lieutenant

7  Conroy had miscommunicated about that issue?

8  A    Yes.

9          MR. PARDON:  Objection.

10 Q    I want to go back to May 21st.  We had talked about

11 your efforts physically and verbally to respond to what

12 Mr. Kingsley was doing; correct?

13 A    Correct.

14 Q    And at some point you directed Deputy Degner to use

15 the taser; correct?

16 A    Correct.

17 Q    And are you yourself trained to use a taser?

18 A    Yes, I am.

19 Q    And what was the course of training that you

20 undertook to learn that?  Sorry, I'll ask a better

21 question.

22 A    Okay.

23 Q    When were you trained to use the taser?

24 A    We get training every -- I believe it's every other

25 year on the taser.
          STANLEY HENDRICKSON - DIRECT

1  Q    Okay.  And can you tell us in your own words why

2  you told Deputy Degner to tase Mr. Kingsley?

3  A    Due to the concerns I had for injury to

4  Mr. Kingsley and the staff and the noncompliance up to

5  that point of Mr. Kingsley's resistance.

6  Q    What did you hope to accomplish by using the taser?

7  A    His compliance.  His stopping of the resistance.

8  We could remove the cuffs and exit safely.

9  Q    Mr. Kingsley testified that you said loud enough

10 for him to hear "tase his ass."

11 A    I did not.

12 Q    Did you say that?

13 A    No, I did not.

14 Q    At the point in time when you told Deputy Degner to

15 tase him, did you feel there were other suitable or

16 reasonable alternatives to using a taser?

17 A    Not at the time, no.

18 Q    Can you explain why that was your reasoning?

19 A    The only other option would be going to the next

20 level actually, using four strikes, and I didn't see it

21 necessary to do that.

22 Q    And you had used presence, that is the physical

23 presence of officers; correct?

24 A    Correct.

25 Q    And you had used dialogue; correct?
                    STANLEY HENDRICKSON - DIRECT

1  A    Correct.

2  Q    That is you had tried to verbally communicate with

3  him.

4  A    Correct.

5  Q    You had used physical efforts on your part --

6        MR. PARDON:  I'm going to object to this line

7  of questioning as leading.

8        THE COURT:  Sustained.

9  BY MR. JONES:

10  Q    If Mr. Kingsley was resisting, why in your mind was

11  it still a good idea to take the handcuffs off?

12  A    Going back again to the possibility of injury to

13  Mr. Kingsley if you left him alone with handcuffs on and

14  the possibility of doing a re-injury and having more

15  risk to staff at the time.

16  Q    Once the taser was used, did Mr. Kingsley stop

17  doing what he was doing?

18  A    No, he did not.

19  Q    Can you describe what was occurring after the taser

20  was used?

21  A    He was still resistive.

22  Q    Was it the same behaviors or was it different

23  behaviors from that point?

24  A    He was still moving his hands, pulling his hands

25  apart slightly.
                STANLEY HENDRICKSON - DIRECT

1  Q    In that respect was the taser used a success?

2  A    No.

3  Q    At that point, Lieutenant Conroy directed everyone

4  to exit the cell; am I right?

5  A    Correct.

6  Q    And did you use any force on Mr. Kingsley from that

7  point forward?

8  A    No.

9  Q    Did you have any further interactions with

10 Mr. Kingsley as it relates to this incident from that

11 point for?

12 A    No.

13 Q    Before we finish, I'd just like to go back briefly

14 to the use of the taser.  Did you direct that Deputy

15 Degner use the taser against Mr. Kingsley because he

16 wouldn't take the paper off the light in his cell?

17 A    No.

18 Q    Did that have anything to do with why you decided

19 it was necessary to use the taser?

20 A    No.

21 Q    Did you direct that Deputy Degner use the taser

22 against Mr. Kingsley out of anger?

23 A    No.

24 Q    Were you angry at him?

25 A    No.
                STANLEY HENDRICKSON - DIRECT

1  Q    And did you direct that Deputy Degner use the taser

2  in some way to show who was boss?

3  A    No.

4  Q    Is that anything that you do as an officer?

5  A    No, it is not.

6  Q    Did you direct that the taser be used as punishment

7  for Mr. Kingsley?

8  A    No.

9  Q    And did you direct that the taser be used in some

10 way to harm Mr. Kingsley?

11 A    No.

12         MR. JONES:  Thank you.     (2:36 p.m.)

13         THE COURT:  Mr. Pardon.

14         MR. PARDON:  Thank you, Your Honor.

15                    CROSS-EXAMINATION

16 BY MR. PARDON:

17 Q    Again, I apologize for calling you Sergeant

18 Hendrickson.  Since everybody has, I'm going to address

19 you as Sergeant Hendrickson.  Okay?

20 A    That's fine.

21 Q    Turning your attention to the evening before this

22 incident, just want to be clear, you personally did not

23 have any contact with Mr. Kingsley on the night of May

24 20th; correct?

25 A    Correct.
                STANLEY HENDRICKSON - CROSS

1   Q    You came on the shift, I think you said at eleven

2   o'clock; right?

3   A    Correct.

4   Q    And you're only aware of the incident with the

5   paper because Deputy Manka told you about it; right?

6   A    Right.

7   Q    So you decided to wait until the morning to do

8   anything about it.

9   A    Yes.

10  Q    All right.  At least again with respect to

11  Mr. Kingsley's behavior that evening, you didn't think

12  there was any immediate threat; right?

13  A    Correct.

14  Q    And in fact, you never personally heard

15  Mr. Kingsley say anything about calling out the CERT

16  team; right?

17  A    That's correct.

18  Q    All right.  And then I think you testified that you

19  went to talk to Mr. Kingsley in the morning while you

20  were doing medication pass and that was around 5:45; is

21  that correct?

22  A    I believe so, yes.

23  Q    And he was still lying in his bunk when you talked

24  to him; right?

25  A    Yes.
                    STANLEY HENDRICKSON - CROSS

1  Q    And he stayed in his bunk while you were talking to

2  him?

3  A    Yes.

4  Q    You didn't feel threatened by him then; right?

5  A    No.

6  Q    And then a little while later a group of you came

7  to move Mr. Kingsley from his cell; right?

8  A    Yes.

9  Q    And you testified that you had asked him to put his

10 hands behind his back and you said that he didn't come

11 to the cell door; correct?

12 A    I'm sorry.  You said he didn't come to the cell

13 door?

14 Q    Let me reask my question, all right?

15 A    Okay.

16 Q    Eventually Mr. Kingsley complied with orders from

17 Lieutenant Conroy to put his hands behind his back;

18 correct?

19 A    Correct.

20 Q    And at the time he complied with that order, he was

21 lying face down on his bunk; right?

22 A    Yes.

23 Q    He wasn't threatening anyone then; right?

24 A    No.

25 Q    All right.  You and Deputy Blanton went into the

                    STANLEY HENDRICKSON - CROSS

1  cell and you eventually -- you and Deputy Blanton

2  eventually put handcuffs on Mr. Kingsley; right?

3  A    Correct.

4  Q    All right.  And you testified that Mr. Blanton,

5  Deputy Blanton, assisted you because you needed

6  assistance with the second hand; correct?

7  A    Correct.

8  Q    And you didn't need anybody else to come into the

9  cell and assist you; correct?

10 A    Not at that time, no.

11 Q    Okay.  Yeah.  Again, we're talking about when you

12 first applied the handcuffs.

13 A    Right.

14 Q    Right.  Now you testified that you think you may

15 have double locked the handcuffs then; is that correct?

16 A    I believe I did.  I can't recall a time where I've

17 handcuffed anybody where I've not double locked them.

18 Q    You didn't write that in your report that you

19 double locked them; right?

20 A    Right.

21 Q    You didn't write in your report that you had

22 checked for the safety and the fit and everything like

23 that; right?

24 A    Right.

25 Q    All right.  And while this was going on,

                    STANLEY HENDRICKSON - CROSS

1  Mr. Kingsley didn't strike out or attempt to hit anybody

2  at all; right?

3  A    No.

4  Q    And once you got Mr. Kingsley out of the cell into

5  the hallway, you don't recall him struggling when you

6  were carrying him down the hallway; isn't that correct?

7  A    Light struggling.  Very little, if any.

8  Q    Okay.  Could you turn to your deposition that is --

9  hopefully you can locate it in the binder there.  Your

10 name should be on the tab.

11 A    Okay.

12 Q    If you could find page 47, please.  And again, if

13 there's four sections on the page, you look on the

14 little section, the number next to the box.  Yeah.

15 A    Yes.

16 Q    Okay.  You found it?

17 A    Page 47?

18 Q    Okay.  Could I ask you to turn to line 15, please.

19 A    Okay.

20 Q    All right.  Now when you gave this deposition, you

21 were under oath; right?

22 A    Correct.

23 Q    All right.  And you were asked a question:

24      "Question:  Okay.  Did Mr. Kingsley resist while

25 you were carrying him down the hallway?

                    STANLEY HENDRICKSON - CROSS

1    "Answer:  I don't recall if he was struggling much

2 then or not."

3    Lines 15 through 18.  Were you asked that question

4 and did you give that answer then?

5 A    Yes.

6 Q    Okay.  Thank you.  When you initially placed

7 Mr. Kingsley on the bunk in the receiving cell, he

8 wasn't resisting you at all as far as you can recall;

9 correct?

10 A    As far as I can recall, no.

11 Q    So just taking a step back for a second, as I

12 understand this, once he was cuffed in his own cell, you

13 had control of him; right?

14 A    Yes.

15 Q    And you had control of Mr. Kingsley when you were

16 in the hall and you were carrying him; right?

17 A    Correct.

18 Q    And so as I understand your testimony, you were

19 trying to maintain control of him in the receiving cell;

20 right?

21 A    Correct.

22 Q    Because you claim he was moving around trying to

23 keep you from getting the cuffs off.

24 A    Correct.

25 Q    But you didn't feel threatened by this resistance,

                    STANLEY HENDRICKSON - CROSS

1    did you?

2    A    Could you repeat that?

3    Q    You didn't personally feel threatened by his moving

4    around trying to get the cuffs off, did you?

5    A    Moving around?  Yes, I was concerned that -- I had

6    concerns for possible injury, yes.

7    Q    Okay.  Could you turn to page 59 of your

8    deposition, please.

9    A    Yes.  I'm there.

10   Q    Okay.  Could you go to line six.

11   A    Yes.

12   Q    I'm going to read you lines 6-13, okay?

13        "Question:  Okay.  And when you were trying to

14   maintain control -- and you were trying to maintain

15   control of him in receiving?

16        "Answer:  Because he was struggling.

17        "Question:  And you said he was thrashing around.

18        "Answer:  Moving around, trying to keep us from

19   getting the cuffs off.

20        "Question:  Did you feel threatened by his

21   resistance?

22        "Answer:  At that point probably not."

23        Were you asked those questions and did you give

24   those answers when you were under oath?

25   A    Yes.
                  STANLEY HENDRICKSON - CROSS

1  Q    Okay.  Now eventually you told Deputy Degner to

2  deploy the taser; correct?

3  A    Correct.

4  Q    And that's because Mr. Kingsley was still

5  resisting; right?

6  A    Correct.

7  Q    All right.  But in fact, at the time you deployed

8  the taser, you didn't really feel threatened by that

9  resistance, did you?  I mean you were mainly concerned

10  that if things escalated, you might feel threatened;

11  isn't that correct?

12  A    I had concerns of possible injury; correct.

13  Q    Okay.  So you were mainly concerned that if it got

14  worse, things...; right?

15  A    Correct.

16  Q    All right.  Again, you weren't actually threatened

17  at that time.

18  A    Correct.

19  Q    All right.  And just to be clear, from the entire

20  time you handcuffed Mr. Kingsley, brought him to the

21  receiving -- I'm sorry.  I'll ask my question again.

22       From the entire time you handcuffed him in his cell

23  to when you left after he was tased, he didn't strike

24  out at anybody; right?

25  A    Correct.
                STANLEY HENDRICKSON - CROSS

1  Q    If you will bear with me for a second, I'm going to

2  -- I'll call up the video.

3          MR. PARDON:  Your Honor, may I publish Exhibit

4  14, which is the receiving cell video, to the jury?

5          THE COURT:  Sure.  That's in evidence.

6          MR. PARDON:  Okay.

7          THE COURT:  Go ahead.

8  BY MR. PARDON:

9  Q    Now you've reviewed the video in this case

10 recently, the videos?

11 A    Yes.

12 Q    More than once I assume; right?

13 A    Yes.

14 Q    Many times?

15 A    I don't know how many times.

16 Q    Okay.  You reviewed the video in preparation for

17 your testimony; right?

18 A    Yes.

19 Q    Please bear with me while I locate a spot that I

20 want to ask you a question about.

21          MR. PARDON:  And for the record I'm going to

22 start -- well, I'll wait until I get there before I say

23 where I am.

24      All right.  For the record I'm -- I would like to

25 start the video and play a portion of the video

                STANLEY HENDRICKSON - CROSS

1  beginning at 6:44:30.  I'm going to go ahead now.

2       (Video played)

3  Q    I stopped it at 6:44:47 and I have a couple

4  questions about who said what there.  At one point was

5  that you who said -- who yelled -- who said, "Are you

6  going to relax while I take these off?"

7  A    Yes.

8  Q    All right.  And it was Mr. Kingsley who responded

9  "Take the motherf'ers off"; right?

10 A    Correct.

11 Q    And after that, it was you who responded "no, they

12 can stay on then"; right?

13 A    Correct.

14 Q    Did you ever consider that Mr. Kingsley was in pain

15 when this was going on?

16 A    No, I did not.

17 Q    Okay.  Now you testified that you were attempting a

18 -- to apply a pressure point to -- a mandibular pressure

19 point, was it?

20 A    Correct.

21 Q    You never wrote that in your report, did you?

22 A    No, I did not.

23 Q    Now you were not the one who decided to halt what

24 was going on in the cell; right?  It was Lieutenant

25 Conroy.

                    STANLEY HENDRICKSON - CROSS

1   A     Correct.

2   Q     And after the taser was deployed, you continued to

3   shout at Mr. Kingsley to relax, didn't you?

4   A     Correct.

5   Q     You basically continued to shout at him until

6   Lieutenant Conroy put a stop to the matter; correct?

7   A     That's correct.

8   Q     Would you have tased him again?

9   A     Probably not.

10  Q     Are you sure?

11  A     Absolutely.

12  Q     All right.  After you exited the cell, you talked

13  to Lieutenant Conroy a little bit about the tasing

14  incident; correct?

15  A     That's correct.

16  Q     You don't remember exactly what Lieutenant Conroy

17  asked you, do you?

18  A     Not at this moment, no.

19  Q     You don't remember at this moment; right?

20  A     Correct.

21  Q     All right.  And you don't remember whether

22  Lieutenant Conroy actually asked you to justify the

23  taser, do you?  You don't have any memory of that.

24  A     I can't recall, no.

25  Q     You can't recall whether you have memory or you

                    STANLEY HENDRICKSON – CROSS

1  can't recall whether Lieutenant Conroy --

2  A    I can't remember right now if he asked me.  He did

3  ask me -- he did ask why I used the taser.

4  Q    Okay.  Could you turn to your deposition for a

5  second.

6  A    Yes.  What page?

7  Q    72.

8  A    Okay.

9  Q    If you could go to line 24.  I'm going to read page

10  72, lines 24 through page 73, lines 2, okay?

11      "Question:  Okay.  Did you have to justify the

12  tasing to Lieutenant Conroy?

13      "Answer:  I don't remember exactly what we

14  discussed at that point.  No."

15      Now you were asked those questions and gave those

16  answers at your deposition; right?

17  A    Correct.

18  Q    And you talked today about your testimony, on

19  direct about your testimony with what you talked about

20  with Lieutenant Conroy; correct?

21  A    Correct.

22  Q    All right.  And you remember today in your direct

23  testimony; correct?

24  A    I believe so, yes.

25  Q    But you believe you had a memory flash, isn't that

                    STANLEY HENDRICKSON - CROSS

1  correct, of being bitten?

2  A    An attempt, yes.

3  Q    Okay.  In fact, I think you testified, and I just

4  want to be clear, you don't ever remember Mr. Kingsley

5  biting you; right?

6  A    Correct.

7  Q    And in fact, he never has bitten you at all.

8  A    No, he's not.

9  Q    Did you bring up the biting incident with

10 Lieutenant Conroy because you knew without that that the

11 use -- without trying to justify something, the use of

12 the taser would not have been appropriate?

13 A    No, I did not.

14 Q    You mentioned how you had pushed Mr. Kingsley's or

15 secured Mr. Kingsley's head.  I don't want to

16 mischaracterize your testimony, but you had put your

17 hand on Mr. Kingsley's head; right?

18 A    Correct.

19 Q    And you agree it's possible he could have hit the

20 bunk when that happened; right?

21 A    It was after I had already done the downward

22 movement, my hand went over instantly to his head, yes.

23 Q    Just so I'm clear, when you pushed Mr. Kingsley's

24 head down, you agree it's possible it could have hit the

25 bunk?
                    STANLEY HENDRICKSON - CROSS

1          MR. JONES:  Objection.  Mischaracterizes his

2    testimony.

3          THE COURT:  Sustained.

4    BY MR. PARDON:

5    Q    Okay.  Did Mr. Kingsley's head hit the bunk at any

6    time during that process?

7    A    Not that I know of.

8    Q    Okay.  Is it possible that it did?

9          MR. JONES:  Objection.  Argumentative.

10         THE COURT:  Sustained.

11   BY MR. PARDON:

12   Q    You have training in the proper use of force;

13   right?

14   A    Correct.

15   Q    That includes DAAT and POSC; correct?

16   A    Correct.

17   Q    And you know that force is not permitted to be used

18   as a punishment; right?

19   A    That's correct.

20   Q    All right.  Pain is not supposed to be used as a

21   punishment?

22   A    Correct.

23   Q    Okay.  I think you testified that you needed

24   inmates to follow orders; correct?

25   A    This is correct.

               STANLEY HENDRICKSON - CROSS

1    Q    All right.  Is one of the reasons that you ordered

2    the use of the taser to teach Mr. Kingsley a lesson?

3    A    No, it is not.

4    Q    Now you've been tased; right?

5    A    Yes.

6    Q    As part of your training?  And it really hurts,

7    doesn't it?

8    A    It's not pleasant.

9    Q    Other than the incident with Mr. Kingsley, you're

10   not aware of any other situation where you applied a

11   contact on to somebody in handcuffs; isn't that correct?

12   A    Correct.

13   Q    In fact, other than the incident with Mr. Kingsley,

14   you've never personally been in a situation with anyone

15   else who's applied a contact on to somebody in

16   handcuffs; isn't that right?

17   A    That's correct.

18          MR. PARDON:  Thank you.  I have no further

19   questions, Your Honor.          (2:50 p.m.)

20          THE COURT:  Mr. Jones, anything else.

21          MR. JONES:  Just a few questions, yes.

22                    REDIRECT EXAMINATION

23   BY MR. JONES:

24   Q    Have you ever been in a situation before where a

25   subject resisted your efforts to take handcuffs off?
                    STANLEY HENDRICKSON - CROSS

1  A    Not that I can recall, no.

2  Q    You were asked about whether Mr. Kingsley complied

3  with Lieutenant Conroy's order for him to put his hands

4  behind his back while he was lying on the bunk in his

5  cell; yes?

6  A    Yes.

7  Q    Just to be clear, was Mr. Kingsley lying there with

8  his hands behind his back when you tried to put the

9  cuffs on him in the cell?

10 A    No.

11 Q    A detail like whether handcuffs are double locked

12 or not, is that something that you always put in your

13 report?

14         MR. PARDON:  Objection.  Leading.

15         THE COURT:  Sustained.

16 BY MR. JONES:

17 Q    Do you -- what is your practice with respect to

18 your reports in terms of the detail of whether handcuffs

19 are double locked or not?

20 A    Don't usually put it in my reports, no.

21 Q    Without picking a particular point in the series of

22 events in the receiving cell, asking you more generally,

23 as the events were unfolding in the receiving cell, did

24 you have concerns about anyone's safety?

25 A    Yes.
                STANLEY HENDRICKSON - CROSS

1    Q    And what were your concerns?

2    A    Injury to not just the staff, but to Mr. Kingsley.

3    Q    You testified in response to Mr. Pardon's questions

4    or you agreed with him that you did not feel threatened;

5    correct?

6    A    Correct.

7    Q    Can you explain, if you didn't feel threatened, why

8    you still had concerns about safety?

9    A    I had concerns for the potential for injury to

10   staff; if Mr. Kingsley gets a leg free, he could have

11   kicked somebody.  Like I stated before, the different

12   types of injuries that could have happened, including

13   Mr. Kingsley being injured.

14   Q    Did you have any concerns about whether the

15   situation could escalate?

16   A    Yes.

17   Q    Can you describe what your concerns were?

18   A    Possible injury.  Mr. Kingsley becoming more

19   combative.

20   Q    Becoming more combative how?

21   A    He could have, like I said before with the injury

22   part, kicking, moving around.  He could have injured his

23   wrists pulling on the cuffs as hard as he was.

24   Q    When Lieutenant Conroy gave the order to exit the

25   cell, did you agree or disagree with that order?

                    STANLEY HENDRICKSON - CROSS

1   A    I agreed.  We had taken it to the level where it

2   didn't appear like he was going to stop and become

3   cooperative with us at all.

4   Q    And did you -- did you follow Lieutenant Conroy's

5   order?

6   A    Yes, we did.

7   Q    Mr. Kingsley -- not Mr. Kingsley, I'm sorry.

8   Mr. Pardon went back to your deposition testimony to ask

9   you about the conversation you had with Lieutenant

10  Conroy; correct?

11  A    Correct.

12  Q    And if you go back to page 73 of your transcript --

13  A    I'm there.

14  Q    -- you were asked the question:  "Did you tell

15  Lieutenant Conroy that Kingsley tried to bite you

16  before?"

17          MR. PARDON:  Your Honor, I object.  I think

18  this is an improper use of the deposition.

19          THE COURT:   Sustained.

20          MR. JONES:  That's all I have.  Thank you.

21          THE COURT:  Anything further, Mr. Pardon?

22          MR. PARDON:  No, Your Honor.

23          THE COURT:  You may step down.

24      (Witness excused)

25          THE COURT:  You may call your next witness.
                STANLEY HENDRICKSON - CROSS

1          MR. JONES:  Call Deputy Degner.

2          **FRITZ DEGNER, DEFENDANT, SWORN,**

3                   DIRECT EXAMINATION

4    BY MR. JONES:

5    Q    Deputy, could you state your full name for the

6    record.

7    A    Fritz Alfred Degner.

8    Q    And you're employed by the Sheriff's Department?

9    A    Yes, I am.

10   Q    Monroe County Sheriff's Department?

11   A    Yes, I am.

12   Q    How long have you worked at the Sheriff's

13   Department?

14   A    Since July of 1992.

15   Q    And do you have any other law enforcement

16   experience?

17   A    Yes, I do.  I was previously employed by the Sparta

18   Police Department.

19   Q    For how long?

20   A    Eleven years.

21   Q    And you're a deputy sheriff; correct?

22   A    That is correct.

23   Q    And you've been a deputy the entire time you've

24   worked for the Sheriff's Department?

25   A    Yes, I have.

                    FRITZ DEGNER - DIRECT

1   Q    How old are you?

2   A    45.

3   Q    And what's your educational background?

4   A    I graduated from Sparta High School.  I have

5   three-and-a-half years of college at UW La Crosse, and

6   then I have an associate degree in police science.

7   Q    And are you state certified as a law enforcement

8   officer?

9   A    Yes, I am.

10  Q    When did you first get that certification?

11  A    1992.

12  Q    And you've kept it ever since?

13  A    Yes, I have.

14  Q    What are your duties as a deputy sheriff?

15  A    I'm assigned to the patrol division, so my main

16  duties conduct with traffic enforcement, traffic

17  accident investigation, criminal investigations,

18  handling complaints, and those types of things.

19  Q    And as a deputy, are you regularly assigned to work

20  in the jail?

21  A    No, I'm not.

22  Q    Are you called on to assist in the jail from time

23  to time?

24  A    On occasion.

25  Q    And can you explain -- can you explain what those

                    FRITZ DEGNER - DIRECT

1   instances entail generally?  Strike that.  I'll ask a

2   better question.

3        What are you generally called on to do to assist?

4   A    Usually when we get called to the jail to assist,

5   it's to help them with moving an inmate from one cell to

6   another.

7   Q    And you were working on May 21st, 2010?

8   A    Yes, I was.

9   Q    And your shift was what?

10  A    My shift commenced at 11 p.m. on the night of the

11  20th.  I was working midnight shift patrol.

12  Q    And at some point you were called to assist in the

13  jail; correct?

14  A    Yes, I was.

15  Q    And once you got that call, did you, in fact,

16  report to the jail?

17  A    I did.

18  Q    And what, if anything, did you learn about the

19  situation when you got there?

20  A    I was told that they needed assistance in moving an

21  inmate from a cellblock cell to the receiving cell.

22  Q    And as it turned out, that inmate was Mr. Kingsley;

23  correct?

24  A    That's correct.

25  Q    And at some point did you go to his cell to assist

                     FRITZ DEGNER - DIRECT

1    in moving him?

2    A    Yes, I did.

3    Q    And that was with a number of other officers;

4    correct?

5    A    That's correct.

6    Q    Where were you positioned outside the cell as -- as

7    officers were interacting with Mr. Kingsley inside his

8    cell?

9    A    When we entered the cellblock, I came in through

10   the dayroom and then went down a catwalk towards where

11   the cells are.  I was the third person in line behind

12   Deputy Blanton and then Sergeant Hendrickson was in

13   front of me or further in front of him.  Sorry.

14   Q    Can you -- I'd like to -- I'd like to show the jury

15   the video from the cellblock, Exhibit 520.

16            THE COURT:  Any objection?

17            MS. WARD:  No, Your Honor.

18            THE COURT:  Go ahead.

19        (Video played)

20   BY MR. JONES:

21   Q    So as we're looking at the video here, which

22   officer are you?

23   A    I am the third one in line there, the farthest back

24   to where Sergeant Shisler and Lieutenant Conroy are

25   standing.
                    FRITZ DEGNER - DIRECT

1  Q    Were you armed at the time?

2  A    I was armed with a taser.

3  Q    Anything else?

4  A    Pepper spray.

5  Q    We see here that there's a light on the floor;

6  correct?

7  A    That is correct.

8  Q    Can you tell us what that is?

9  A    On the X26 taser, it has a laser beam that is

10 indicated of where the top probe of the -- if you were

11 using a probe shot with a taser, that indicates where

12 the top probe will hit.  And then it has two LED lights

13 alongside of a tab for illumination.

14 Q    It's basically a flashlight off the front of the

15 taser?

16 A    That's correct.

17 Q    Why -- am I correct that the light on the floor

18 indicates that you had turned the taser on?

19 A    Yes.

20 Q    Okay.  And why did you do that at this point?

21 A    I believe at that time was when the decision was

22 made that Sergeant Hendrickson and Deputy Blanton were

23 going to go inside the cell.

24 Q    So why did you turn it on then?

25 A    For protection.
                    FRITZ DEGNER - DIRECT

1  Q    I'm going to move forward with the video and play

2  it just for a minute.

3       (Video played)

4       Where do you have the taser pointed here?

5  A    It's pointed at the floor.

6  Q    Tell us at any point as we play the video forward

7  whether you take aim of the taser off the floor.  As we

8  watch, it appears to me that you're talking in this part

9  of the video?

10          MS. WARD:  Objection.  Is counsel testifying?

11          MR. JONES:  Withdrawn.

12          MS. WARD:  Thank you.

13  BY MR. JONES:

14  Q    Did you speak to Mr. Kingsley as this was

15  occurring?

16  A    Yes.

17  Q    Were you speaking to him at this point?

18  A    I could have been.

19  Q    Okay.  So the cell door is opening at this point?

20  A    Yes.

21  Q    At any point before the cell door opened, did you

22  point the taser at Mr. Kingsley?

23  A    No, I didn't.

24  Q    Where was it pointed during that time?

25  A    The whole time it was pointed at the floor.
                    FRITZ DEGNER - DIRECT

1   Q    At some point did you speak to him during that

2   course of events in the cellblock?

3   A    Yes.

4   Q    And what did you say?

5   A    I had warned him that if -- he was being

6   argumentative at the time, and as part of what our

7   training is to try and de-escalate things, I had

8   asked -- you know, you go through the asking stage, and

9   then telling, and then it gets to the point where we're

10  to the making stage here.  And so I was trying to get

11  him, to convince him that he needed to come and do what

12  they needed to do, otherwise other means were going to

13  have to be done.

14  Q    Did you say anything to him about the taser?

15  A    Yes, I did.  What I had told him was if he -- if he

16  resisted us, he would be tased.

17  Q    And do you know whether he heard you?

18  A    Yes.  He responded that if I tased him, he would

19  sue me.

20  Q    At some point did you enter into the cell?

21  A    I did.

22  Q    By the way, why did you tell him if he engaged in

23  resistance he might be tased?

24  A    To give him an opportunity to comply with what he

25  was being told to do.

                    FRITZ DEGNER - DIRECT

1   Q   So at some point you went into the cell with the

2   other officers?

3   A   Yes.

4   Q   And at any point while you were in the cell, did

5   you point the taser at Mr. Kingsley?

6   A   Yes, I did.

7   Q   Where on him did you point the taser?

8   A   On his upper back.

9   Q   Why did you do that?

10  A   It was the only appropriate target area on him at

11  that time.

12  Q   You didn't actually use the taser in the cell.

13  A   No, I did not.

14  Q   Did you actually -- did you ever physically put it

15  on him while you were in the cell?

16  A   As in touch him?

17  Q   Yes.

18  A   No, I did not.

19  Q   Did you ever point it at his face or head while you

20  were in the cell with him?

21  A   No, I did not.

22  Q   Did you ever point a taser at his face or head

23  during this whole sequence of events?

24  A   No.

25  Q   At some point Mr. Kingsley was put in handcuffs?

FRITZ DEGNER - DIRECT

1    A    Yes, he was.

2    Q    And you were in the cell when that occurred?

3    A    Yes, I was.

4    Q    And did you observe what was happening as he was

5    being handcuffed?

6    A    For as much as I could see.

7    Q    Did you see anything happen to his feet or ankles

8    as he was being handcuffed?

9    A    No, I didn't.

10   Q    Did you see his feet or ankles get injured as he

11   was being handcuffed?

12   A    No.

13   Q    At some point, Mr. Kingsley was carried out into

14   the main hallway of the jail?

15   A    Yes, he was.

16   Q    In your own words, can you tell us what happened

17   out in the hallway?

18   A    Are you talking in the main hall?

19   Q    In the main hall, yes.

20   A    Once he was carried out, as you can see in the back

21   of the video, behind Sergeant Shisler, that would be the

22   doorway out into the main hallway, he was brought out

23   through there and laid down on the floor.  Once he was

24   laid on the floor, I believe Lieutenant Conroy, Sergeant

25   Hendrickson, maybe even Deputy Blanton had asked him
                    FRITZ DEGNER - DIRECT

1    repeatedly what was wrong with his feet.  What hurt.

2    Which foot.  With no response out of him.

3    Q    And at some point he was then carried into the

4    receiving cell?

5    A    That is correct.

6    Q    And we've seen on the video where you positioned

7    yourself in the cell, the receiving cell itself?

8    A    Yes.

9    Q    Can you describe in words where that was?

10   A    In the receiving cell -- when you came into the

11   receiving cell, again, as it was described before, the

12   bunk is immediately to the left of the door.

13   Mr. Kingsley was laying face down on that.  Sergeant

14   Shisler was at his feet.  When I had entered in, Deputy

15   Blanton was in the middle section where the handcuffs

16   and his hands would be and Sergeant Hendrickson was at

17   his head.  I stood behind Sergeant Hendrickson and

18   Deputy Blanton, basically up against the wall.

19   Q    Why did you position yourself there?

20   A    In case I needed -- you know, they needed

21   assistance from me.

22   Q    And did you observe what was going on as the

23   officers tried to take the handcuffs off?

24   A    For as much as I could see past them.

25   Q    And what, if anything, did you see as that was

                    FRITZ DEGNER - DIRECT

1  occurring, given your vantage point of course?

2  A    I could see movement out of Mr. Kingsley.  I could

3  see the officers moving.  The more of what I was aware

4  of was the verbalization where they were telling him to

5  relax so they could take the handcuffs off and to quit

6  resisting.

7  Q    Did you observe anything in terms of his upper body

8  or shoulders in terms of movement?

9  A    When I -- specifically when I put the taser on him

10 where I had placed it on his shoulder is when I could

11 see that he was shrugging and moving around.  I could

12 see that his arms were not -- weren't -- he wasn't

13 keeping them still.  He had a lot of tension and his

14 muscles were tight.

15 Q    Could you see anything in terms of what

16 Mr. Kingsley was doing with his hands -- with his arms

17 down where the handcuffs were?

18 A    Yes.  Yesterday when Mr. Landers demonstrated the

19 handcuffs, he had demonstrated them being in front.

20 When we move people or when we transport people,

21 normally the handcuffs are put in the back.  It's more

22 of a safety issue than anything else because it's for

23 our safety.  When someone is handcuffed in the front, it

24 gives them leverage to come behind us or assault one of

25 us.  So his hands were behind his back.  And what he

FRITZ DEGNER - DIRECT

1  had, his fists were clenched.  Imagine my hands are

2  behind my back.  He was pulling against them like this

3  and growling.

4  Q    Tell us more what you -- strike that.  What

5  specifically did you hear Mr. Kingsley -- what sounds

6  did you hear from him?

7  A    There was grunting.  Again, to me it sounded like a

8  growling like a bear.  He wasn't verbalizing, other than

9  what he initially verbalized at the beginning when he

10 was first brought in and told to relax about taking the

11 handcuffs off.

12 Q    And how did you perceive the sounds he was making?

13 A    I perceived them as threatening.

14 Q    Did Mr. Kingsley say he was in pain at any point?

15 A    No, he did not.

16 Q    Did he say the handcuffs were too tight at any

17 point from when they were put on until when he left the

18 receiving cell?

19 A    Not once.

20 Q    Did Mr. Kingsley say in the receiving cell that he

21 couldn't do what the officers were asking him to do?

22 A    No, he didn't.

23 Q    Did you -- we've heard from Officer Blanton and

24 Sergeant Hendrickson what they were doing in terms of

25 trying to get the handcuffs off or to stop Mr. Kingsley

                 FRITZ DEGNER - DIRECT

1  from doing what he was doing.

2  A    Yes.

3  Q    From your observation, did what they were saying or

4  doing, did that have any effect on what Mr. Kingsley was

5  doing?

6  A    No, it did not.

7  Q    Did it get him to stop?

8  A    No.

9  Q    Did you have any concerns about what was happening?

10 A    Yes, I did.

11 Q    Can you tell us what those concerns were?

12 A    There were a number of concerns obviously as has

13 been stated multiple times:  The safety issue as far as

14 with Mr. Kingsley fighting against us; the potential for

15 him getting hurt; us getting hurt should he decide to

16 escalate it.  We're taught when dealing with people, as

17 Mr. Landers explained, to look at everything that's

18 going on with this.  In 20 years, I've never had anybody

19 fight us on taking handcuffs off.  Everybody wants them

20 off and they want them off as fast as they can because

21 they're uncomfortable to have on.  That wasn't the

22 situation.

23      So when we're trying to take the handcuffs off and

24 he's pulling on the handcuffs where the handcuff chain

25 is so tight that you couldn't hardly manipulate the

                   FRITZ DEGNER - DIRECT

1   handcuff from what it appeared to me, that's one of the

2   things, you know, that I didn't know if he was trying to

3   break the handcuff, which could then lead to a sudden

4   assault by him.  I couldn't see what was going on with

5   his head because of where Sergeant Hendrickson was

6   placed.  So the discussion that was brought up as far as

7   any actions by him I couldn't tell you.

8        But again, we're in the concrete cell where the

9   edge of the cell shows where the black spot is, where

10  the toilet is.  That actually has a sharp -- I would say

11  a fairly sharp corner on it.

12       We talk about not leaving people handcuffed.  One

13  thing, as far as the law enforcement, we're taught not

14  to let somebody walk or move unescorted with their

15  handcuffs behind their back because of the fact they

16  can't catch themselves and I've experienced it where

17  I've been escorting people who've pulled away from me

18  and have fallen because of that.

19  Q    You mentioned early on in your answer something

20  about escalation.

21  A    Yes.

22  Q    Can you explain what you meant?

23  A    Any situation can escalate rapidly.  I don't know

24  what his intent is.  All I know is he's not complying

25  with what he's told to do.  I don't know if he's trying

                    FRITZ DEGNER - DIRECT

1  to break the handcuffs.  Somebody with broken handcuffs

2  has two weapons on their wrists.

3     We recently had an officer assaulted by somebody

4  with handcuffs that were --

5          MS. WARD:  Objection, Your Honor.  I'm going to

6  move to strike that last part.

7          THE COURT:  Sustained.  The jury will disregard

8  it.

9          THE WITNESS:  Could you reask the question,

10  please?

11          MR. JONES:  Sure.

12  BY MR. JONES:

13  Q    What was your concern about escalation?

14  A    This was a volatile situation.  Anything could have

15  happened rapidly within it, whether he started to kick,

16  again, the handcuffs, whether he tried to bite.  I don't

17  know.  Any one of those could have gone on.

18  Q    What about what had happened gave you a concern

19  that the situation might escalate?

20  A    Normally, like I said, anybody who is in handcuffs

21  wants them off and they don't fight us to get them off.

22  So by the fact that this whole situation, we were

23  present.  We've talked to him.  We've tried to get him

24  to comply with what we were trying to do.  We used as

25  many methods as we could up to that point and none of

               FRITZ DEGNER - DIRECT

 1 them were being effective, and so they could have

 2 become -- things could have changed very rapidly.

 3 Q    So at some point Sergeant Hendrickson told you to

 4 tase Mr. Kingsley; correct?

 5 A    That is correct.

 6 Q    Did he tell you to "tase his ass"?

 7 A    No.

 8 Q    Did you disagree with Sergeant Hendrickson's order

 9 to you?

10 A    No, I didn't.

11 Q    What would you have done had you disagreed with

12 this order from your superior officer?

13 A    I would have figured out some way to explain to him

14 that I didn't feel it was justified at that moment to do

15 things like that.

16 Q    So what did you do once the Sergeant gave you the

17 order?

18 A    From when he told me to tase him, there was maybe a

19 few second lapse in there before I actually pulled the

20 trigger on the taser.

21 Q    But you did?

22 A    Yes, I did.

23 Q    And that was on the back of his right shoulder?

24 A    Yes, it was.

25 Q    And are you trained in the use of a taser?

                    FRITZ DEGNER - DIRECT

1    A    Yes, I am.

2    Q    And how did you obtain that training?

3    A    Interdepartmental training.  We have two taser

4    instructors on our staff.

5    Q    And you use a contact stun; correct?

6    A    Yes, I did.

7    Q    How long was the taser applied in this instance?

8    A    For one cycle of five seconds.

9    Q    And how many times did you tase him?

10   A    Just one time.

11   Q    After you tased Mr. Kingsley, did he stop doing

12   what he was doing?

13   A    No, he didn't.

14   Q    And at some point Lieutenant Conroy directed

15   everyone to leave the cell; correct?

16   A    That is correct.

17   Q    Did you agree or disagree with that order?

18   A    I agreed.

19   Q    And what did you do?

20   A    Well, first -- I told Sergeant Hendrickson to go

21   first because it was easy for him to come out and go

22   past, and I remained there with the taser on

23   Mr. Kingsley's back until Deputy Blanton left, and then

24   Sergeant Shisler left.  Because keeping control of the

25   legs is the most important thing at that time as

FRITZ DEGNER - DIRECT

1  everybody was disengaging.  Once everybody was out of

2  the cell, I disengaged from Mr. Kingsley and removed the

3  taser from his back and went out of the cell.

4  Q    Do you use the taser against Mr. Kingsley because

5  of whatever -- because of whatever he had done to

6  require that he be moved to the receiving cell?

7  A    No, I did not.

8  Q    Did you use the taser to punish Mr. Kingsley?

9  A    No.

10  Q    Did you use the taser because you were somehow

11  angry at him?

12           MS. WARD:  Objection.  Leading.

13           THE COURT:  Overruled.

14           THE WITNESS:  No.

15  BY MR. JONES:

16  Q    Did you use the taser to somehow show him who was

17  boss in this situation?

18           MS. WARD:  Objection.  Leading.

19           THE COURT:  Overruled.

20           THE WITNESS:  No, I did not.

21  BY MR. JONES:

22  Q    Did you use the taser in any way, shape or form for

23  the purpose of causing harm to him?

24  A    No, I did not.

25           MR. JONES:  Thank you, Deputy.
                  FRITZ DEGNER - DIRECT

1            THE COURT:  Ms. Ward.

2            MS. WARD:  Thank you, Your Honor.

3                    CROSS-EXAMINATION

4    BY MS. WARD:

5    Q    When you got to the jail on the morning of May 21,

6    2010, you, Sergeant Hendrickson, Deputy Blanton,

7    Sergeant Shisler and Lieutenant Conroy had a discussion

8    about what each one of you would -- what role you would

9    take in addressing Mr. Kingsley; is that correct?

10   A    That's correct.

11   Q    And in that discussion, it was decided that you

12   were going to cover with the taser in case he became

13   violent; correct?

14   A    If need be.

15   Q    Is the answer yes?

16   A    Yes.

17   Q    And your recollection is that when the officers

18   approached Mr. Kingsley in his cell, he was

19   argumentative; right?

20   A    Yes.

21   Q    But you don't recall Mr. Kingsley making any

22   threats to use physical violence against any of the

23   officers; correct?

24   A    No, I did not.

25   Q    In fact, Mr. Kingsley told the officers at the time
                    FRITZ DEGNER - CROSS

1  that he was not being violent; correct?

2  A    That's correct.

3  Q    Now after Mr. Kingsley was handcuffed, he was

4  physically picked up off of the bunk and carried out

5  into the hallway; correct?

6  A    Yes.

7  Q    And he was laid in the hallway briefly and then he

8  was carried by four officers to the receiving cell;

9  correct?

10 A    That's correct.

11 Q    And when he was being carried, he didn't make any

12 threats to use physical violence; correct?

13 A    No, he did not.

14 Q    In fact, he wasn't even exhibiting active

15 resistance when he was being carried; correct?

16 A    That's correct.

17 Q    He allowed the officers to carry him.

18 A    Yes.

19 Q    And he was complaining about his foot at the time;

20 correct?

21 A    I don't know if he complained while he was being

22 carried.  When he was laying on the floor.

23 Q    Do you recall having your deposition taken?

24 A    Yes, I do.

25 Q    Could you turn to page 24 of your deposition in the

                    FRITZ DEGNER - CROSS

1  binder.

2       Are you on page 24, sir?

3  A    Yes, I am.

4  Q    Okay.  I'm going to start reading to you from line

5  13.

6       "Question:  Did Mr. Kingsley make any threats to

7  harm anyone while he was being carried from outside his

8  cell to the receiving cell?"

9       Line 18.  Your answer.

10      "Answer:  Not that I recall, as far as -- I don't

11  remember.  The only thing I remember him saying was he

12  was complaining about his foot."

13      Did I -- I'm sorry.  Were you asked that question

14  and did you give that answer?

15 A    Yes, I did.

16 Q    Okay.  So now let's talk about what happened when

17 you got to the receiving cell.  The officers placed

18 Mr. Kingsley face down on the concrete slab; correct?

19 A    That is correct.

20 Q    And while you were in the receiving cell, Sergeant

21 Hendrickson, Deputy Blanton, and you were all telling

22 Mr. Kingsley to relax, quit pulling on the handcuffs,

23 and quit resisting; correct?

24 A    At certain points, yes.

25 Q    And at that time you didn't hear Mr. Kingsley make
                    FRITZ DEGNER - CROSS

1   any threats of physical violence; correct?

2   A    That's correct.

3   Q    And you did not see Mr. Kingsley attempt to bite

4   anyone in the receiving cell; correct?

5   A    No, I did not.

6   Q    And the officers couldn't get the handcuffs off;

7   correct?

8   A    That's correct.

9   Q    And that's when Sergeant Hendrickson told you to

10  tase him?  I'm sorry.  That wasn't specific.  I'll

11  withdraw it.

12      At some point Sergeant Hendrickson told you to tase

13  him when you were in the receiving cell; right?

14  A    That is correct.

15  Q    And you don't recall anyone telling Mr. Kingsley in

16  the receiving cell that he would be tased if he didn't

17  comply with orders; correct?

18  A    That's correct.  He was not warned in the receiving

19  cell.

20  Q    And after Mr. Kingsley was tased, the officers

21  cleared the cell.  You testified to that on direct;

22  correct?

23  A    That's correct.

24  Q    And he was still in the handcuffs when you left

25  him?

                    FRITZ DEGNER - CROSS

1   A     Yes, he was.

2   Q     And I think you testified on direct that you agreed

3   with Sergeant Hendrickson's decision to tase

4   Mr. Kingsley; is that right?

5   A     Yes, I did.

6   Q     But ultimately it was up to you whether to tase

7   Mr. Kingsley; correct?

8   A     That is correct.

9   Q     Now the reason you tased him is that he was

10  preventing you from getting the handcuffs off, and if

11  you left him in handcuffs, he could get hurt; correct?

12        MR. JONES:  Objection.  Mischaracterizes the

13  testimony.

14        THE COURT:  I'm sorry, I couldn't hear you.

15        MR. JONES:  I'm sorry.  Mischaracterizes his

16  testimony.  Objection.

17        THE COURT:  Overruled.

18  BY MS. WARD:

19  Q     Do you want me to ask it again?

20  A     Please.

21  Q     The reason you tased him is that he was preventing

22  you from getting the handcuffs off, and if you left him

23  in handcuffs, he could get hurt; correct?

24  A     No.

25  Q     Do you want to turn in your deposition to page 35,

                    FRITZ DEGNER - CROSS

1    please, sir.  At line 15, the question was asked:

2         "Question:  Did you agree with the instruction to

3    deploy the taser?

4         "Answer:  Yes.

5         "Question:  Why?

6         "Answer:  He was actively resisting.  He was

7    preventing us from taking the handcuffs off him.  It's a

8    safety issue.  We need to get the handcuffs off of him

9    because if we leave him, he could get hurt."

10        You were asked that question and you gave that

11   answer; correct?

12   A    That's correct.

13   Q    And you believe it was a safety issue for

14   Mr. Kingsley; correct?

15   A    But as I testified here also, that he was actively

16   resisting at that time.

17   Q    It was a safety issue for Mr. Kingsley; correct?

18   A    It was a safety issue.

19   Q    So let me understand.  You tased Mr. Kingsley so he

20   would be safe while alone in the cell and then you left

21   him alone in the cell with his handcuffs on; correct?

22            MR. JONES:  Objection.  Argumentative.

23            THE COURT:  Overruled.

24            THE WITNESS:  Please ask again.

25
                    FRITZ DEGNER - CROSS

1   BY MS. WARD:

2   Q     Ask again.  You tased Mr. Kingsley so he could be

3   safe -- so he would be safe while alone in the cell and

4   then you left him alone in the cell with his handcuffs

5   on anyway; correct?

6   A     Ultimately that decision was made, yes.

7   Q     Okay.  Thank you.

8         Now I want to ask you a few questions about

9   Mr. Kingsley's reputation.  You don't know whether

10  Mr. Kingsley had any particular reputation among the

11  staff in the jail; correct?

12  A     That is correct.

13  Q     And you aren't aware of any prior disciplinary

14  measures taken again Mr. Kingsley for any reason while

15  he was in the jail; correct?

16            MR. JONES:  I'm going to object to that

17  question, Your Honor, based on Your Honor's rulings on

18  motions.

19            MS. WARD:  Can I be heard, Your Honor, at side

20  bar?

21            THE COURT:  We'll take a recess at this time

22  for 15 minutes.  Please remember not to talk about the

23  case.  Leave your notepads on your chairs.

24      (Jury excused from courtroom at 3:15 p.m.)

25            THE COURT:  Deputy, you may step down.
                    FRITZ DEGNER - CROSS

1       (Witness excused)

2               THE COURT:  Mr. Jones.

3           MR. JONES:  I understand Your Honor's pre-trial

4    rulings to be that we were not going to go into any

5    prior disciplinary incidents regarding Mr. Kingsley, yet

6    they're asking him about prior -- they're asking this

7    witness about prior disciplinary incidents about

8    Mr. Kingsley when I had purposefully avoided talking

9    about anything about prior discipline with other

10   witnesses, including Sergeant Hendrickson.

11          MS. WARD:  Your Honor, actually I was asking

12   him if he was aware of any prior disciplinary measures,

13   and this goes to his state of mind, just like many of

14   Mr. Jones' questions went to the officer's state of mind

15   at the time of the incident.  This also goes to what

16   Deputy Degner knew about Mr. Kingsley.

17          THE COURT:  Well, but if you open it up with

18   this witness, there are other witnesses that may know a

19   lot about him.  I don't -- this was not what I

20   contemplated when I issued the order.  It was -- we're

21   to look at this as if it were the only experience that

22   these people had ever had with this prisoner.

23          MS. WARD:  Okay.  I understand, Your Honor.

24          THE COURT:  Okay.  Then we will resume at 3:40.

25       (Recess        3:27-3:42 p.m.)
                    FRITZ DEGNER - CROSS

1          THE COURT:  You can bring in the jury.

2          (Jury brought in courtroom at 3:42 p.m.)

3          THE COURT:  Where were we?  Ms. Ward.

4          MS. WARD:  Thank you.

5   BY MS. WARD:

6   Q     You reviewed the videos in preparation for your

7   testimony here in court today; right?

8   A     Yes, I did.

9   Q     Now I'm going to ask you about times that you've

10  used the taser other than the incident with

11  Mr. Kingsley.

12  A     Okay.

13  Q     Other than the incident with Mr. Kingsley, you've

14  used the taser about ten times; correct?

15  A     That would probably be correct.

16  Q     And of those ten times, on only two occasions was

17  the subject already handcuffed; correct?

18  A     That's correct.

19  Q     Let's just talk about those two occasions.  One of

20  those times the subject was riding in your squad car

21  after an arrest and she had kicked out the window of

22  your car and slipped out of one of the handcuffs at the

23  time she was tased; correct?

24  A     That's correct.

25  Q     And there the loose handcuff became a weapon the

                    FRITZ DEGNER - CROSS

1  subject could use against you or other officers;

2  correct?

3  A    Correct.

4  Q    The other time the subject was also handcuffed and

5  trying to kick out the window of your squad car;

6  correct?

7  A    That is correct.

8  Q    And that time you already had to fight with that

9  subject in the process of taking him into custody;

10  correct?

11  A    That's correct.

12  Q    Now going back to the incident with Mr. Kingsley.

13  After Mr. Kingsley was tased and the group of officers

14  left him in the receiving cell, you wrote an incident

15  report; correct?

16  A    That is correct.

17  Q    And you also prepared a supervisory taser use

18  report; correct?

19  A    That's correct.

20  Q    Okay.  I want you to turn in the binders that are

21  by you up there, I believe binder one, volume one, to

22  Exhibit -- Plaintiff's Exhibit 37.

23  A    Which number?

24  Q    37.  Are you there?

25  A    Yes.

                    FRITZ DEGNER - CROSS

1  Q    And do you recognize this as a copy of the taser

2  supervisor report -- Supervisory Taser Use Report that

3  you prepared?

4  A    Yes, it is.

5        MS. WARD:  Your Honor, I move for the admission

6  of Plaintiff's Exhibit 37.

7        MR. JONES:  No objection.

8        THE COURT:  Received.

9  BY MS. WARD:

10  Q    In the two reports you prepared in connection with

11  this case, you did your best to completely and

12  accurately describe the incident with Mr. Kingsley on

13  May 21, 2010; correct?

14  A    Yes.

15  Q    And at the beginning of your testimony, your

16  cross-examination, you said that when you and the other

17  officers talked about what roles each of you would have,

18  you were going to cover with the taser in case

19  Mr. Kingsley became violent; correct?

20  A    That's correct.

21  Q    Deputy Degner, nothing in either of your reports

22  states that Mr. Kingsley became violent; correct?

23  A    That is correct.

24  Q    In fact, the Taser Use Report has a box to check

25  for type of incident; doesn't it?

                FRITZ DEGNER - CROSS

1    A    Yes.

2    Q    Okay.  Let's turn to page two of your Supervisor

3    Taser Use Report.  I apologize for the long name of that

4    document.

5         MS. WARD:  And if you could please publish that

6    to the jury.  One moment.  I apologize.  All right.

7    There we go.

8    Q    This is the section of the Supervisor Taser Use

9    Report where you check what type of incident type was

10   involved; correct?

11   A    That's correct.

12   Q    And here you checked *Other*; correct?

13   A    Yes.

14   Q    And you added *noncompliant inmate*; correct?

15   A    That is correct.

16   Q    So you tased Mr. Kingsley because he was

17   noncompliant; correct?

18   A    No.

19   Q    That's what you checked on the box.

20   A    Correct.

21        MS. WARD:  No further questions.  (3:47 p.m.)

22        THE COURT:  Mr. Jones.

23                   REDIRECT EXAMINATION

24   BY MR. JONES:

25   Q    From your experience, does an inmate have to be
                   FRITZ DEGNER - REDIRECT

1  violent to be resistive?

2  A    No, they don't.

3  Q    In your experience, can an inmate be actively

4  resisting without at the same time being violent?

5  A    Yes.

6  Q    In your -- in the Taser Use Report that counsel had

7  you looking at, I'd have you look at page three of the

8  report.  This is a page with a diagram and then three

9  paragraphs of text; is that correct?

10  A    That's correct.

11  Q    I'm going to refer you down to the last two

12  sentences of the second paragraph.  Beginning *Deputy*

13  *Blanton attempted* -- do you see where I am?

14  A    Yes.

15  Q    Can you read those two sentences?

16  A    "Deputy Blanton attempted to remove the handcuffs

17  from Kingsley but Kingsley began to growl and pull

18  against the handcuffs making it so they cannot be

19  removed.  He was repeatedly told to relax so the

20  handcuffs could be removed, but Kingsley remained

21  resistive."

22  Q    Officer, in your experience, twenty years as a law

23  enforcement officer, have you ever had a prisoner resist

24  your efforts to take handcuffs off?

25  A    No, they have not.

                    FRITZ DEGNER - REDIRECT

1   Q    How do prisoners normally react to having their

2   handcuffs taken off?

3   A    Usually they're pretty happy about it.  Like I

4   said, it's not comfortable to have them on.  When

5   they're behind your back, it puts pressure on the body.

6   Q    When you were in the receiving cell, could you see

7   Mr. Kingsley's head the whole time?

8   A    No, I couldn't.

9   Q    Why not?

10  A    He was blocked by Sergeant Hendrickson.

11  Q    And am I correct that you warned Mr. Kingsley about

12  the possible use of the taser when you were standing

13  outside his cell in the south block?

14          MR. WARD:  Objection.  Leading.

15          THE COURT:  Sustained.

16  BY MR. JONES:

17  Q    Did you ever warn Mr. Kingsley about the use of the

18  taser?

19  A    Yes, I did.

20  Q    Where were you when you did that?

21  A    Outside of his cell.

22          MR. JONES:  Thank you.  That's all.

23                  RECROSS-EXAMINATION

24  BY MS. WARD:

25  Q    Just to be clear, you didn't warn him in the
                    FRITZ DEGNER - RECROSS

1  receiving cell when he was tased; correct?

2  A     That is correct.

3         MS. WARD:  Nothing further, Your Honor.

4      (Witness excused at 3:50 p.m.)

5         THE COURT:  You may step down.  Mr. Jones, you

6  may call your next witness.

7         MR. JONES:  Your Honor, the next witness is the

8  witness we discussed for tomorrow.

9         THE COURT:  Oh, this is -- that's your only

10 witness is the expert for tomorrow?  And he will be here

11 at nine o'clock.

12        MR. JONES:  Yes.

13        THE COURT:  All right.  Then Members of the

14 Jury, we'll adjourn for the night.  Please remember not

15 to talk about the case.  Leave your notepads on your

16 chairs if you've been taking notes.  And you can assume

17 that probably by the middle of the day tomorrow we'll be

18 hearing the closing arguments in the case and that you

19 will be beginning your deliberations.

20     The defendants' expert is the last witness that's

21 going to be called.  I suppose plaintiff could still

22 call a rebuttal witness, but I will leave that

23 possibility open.  But anyway, we should be through by

24 tomorrow, by noon tomorrow.  All right.

25        (Jury excused from courtroom at 3:51 p.m.)
                    FRITZ DEGNER - RECROSS

1          THE COURT:  Counsel, anything you wish to take

2    up now outside the presence of the jury?

3          MR. JONES:  Not from the defendants.

4          THE COURT:  Okay.

5          MR. PARDON:  No.  I mean we have to resolve the

6    issues of exhibits.

7          THE COURT:  Then we're adjourned.

8        (Proceedings concluded at 3:51 p.m.)

9

10                    *  *  *  *  *

11          I, LYNETTE SWENSON, Certified Realtime and Merit
     Reporter in and for the State of Wisconsin, certify that
12   the foregoing is a true and accurate record of the
     proceedings held on the 16th day of October 2012 before
13   the Honorable Barbara B. Crabb, District Judge for the
     Western District of Wisconsin, in my presence and
14   reduced to writing in accordance with my stenographic
     notes made at said time and place.
15   Dated this 1st day of November 2012.

16

17

18                    /s/_____

19                    Lynette Swenson, RMR, CRR, CBC
                          Federal Court Reporter

20

21

22   The foregoing certification of this transcript does not
     apply to any reproduction of the same by any means
23   unless under the direct control and/or direction of the
     certifying reporter.

24

25