UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * *

MICHAEL KINGLSEY,

       Plaintiff,

  -vs-                        Case No. 10-CV-832-BBC

STAN HENDRICKSON            Madison, Wisconsin
and FRITZ DEGNER,          October 17, 2012
                          9:00 a.m.
       Defendants.

* * * * * * * * * * * * * * * * * * * * * * * * * *

STENOGRAPHIC TRANSCRIPT OF FOURTH DAY OF JURY TRIAL
HELD BEFORE DISTRICT JUDGE BARBARA B. CRABB, and a jury


APPEARANCES:

For the Plaintiff:  Merchant & Gould
                     BY:  EDWARD PARDON
                         WENDY WARD
                         JOEL GRAHAM
                     10 East Doty Street, Ste. 600
                     Madison, Wisconsin  53703

For the Defendants:  Whyte Hirschboeck Dudek
                     BY:  ANDREW JONES
                         TIMOTHY POSNANSKI
                     One East Main Street
                     Madison, Wisconsin  53703


Lynette Swenson    RMR, CRR, CBC
Federal Court Reporter
U.S. District Court   120 N. Henry St., Rm. 520
Madison, WI  53703   (608) 255-3821

1                        I-N-D-E-X

2   DEFENDANTS' WITNESSES          EXAMINATION          PAGES

3   JOHN PETERS              Direct by Mr. Posnanski   4-32
                             Cross by Ms. Ward         32-56
4                            Redirect Mr. Posnanski    56-63

5   Jury Instruction Conference                        65-88
    Closing argument by Mr. Pardon                     89-118
6   Closing argument by Mr. Jones                      118-147
    Rebuttal argument by Mr. Pardon                    147-149
7   Verdict                                            166

8                    **E-X-H-I-B-I-T-S**

9   PLAINTIFF'S EXHIBITS                   IDENTIFIED/RECEIVED

10  Exhibit 99     Electronic Weapons          55          ---
           100     Workbook                    44          45
11

12  DEFENDANTS' EXHIBITS

13  Exhibit 519    Peters CV                    5          32

14

15                        * * * * *

16

17          THE COURT:  Anything you want to take up before

18  the jurors come in?

19          MR. PARDON:  Yes, Your Honor.  I just wanted to

20  address two things briefly, and whether we do it now or

21  prior to the jury going to deliberate, it's up -- it's

22  obviously up to you.

23          THE COURT:  If it's something that can wait

24  until we talk about instructions, I'd just as soon wait.

25  But if it's something real quick, we can take it up.

1     MR. PARDON:  Well, one is the exhibit -- we

2 have a proposed redacted exhibit that we talked about

3 the other day.  Maybe we can talk about that at the

4 instruction conference.

5     THE COURT:  Sure.

6     MR. PARDON:  And then we are going to request

7 that we have a conversation about the instructions.

8     THE COURT:  Oh, absolutely.  Definitely.

9     MR. PARDON:  Okay.

10     THE COURT:  All right.  Then if you would bring

11 in the jurors.

12     (Jury brought in courtroom at 9:01 a.m.)

13     (Call to order)

14     THE CLERK:  Case Number 10-CV-831-BBC.  *Michael*

15 *Kingsley v. Stan Hendrickson and Fritz Degner* is called

16 for third day of jury trial.  May we have the

17 appearances, please.

18     MR. PARDON:  Yes.  Good morning, Your Honor.

19 Ladies and Gentlemen.  Plaintiff appearing is plaintiff

20 Michael Kingsley, and I'm Ed Pardon of Merchant and

21 Gould.  And with me are my colleagues Wendy Ward and

22 Joel Graham.

23     THE COURT:  Thank you.

24     MR. JONES:  Good morning.  Andrew Jones and Tim

25 Posnanski on behalf of the defendants Stan Hendrickson

1    and Fritz Degner.

2            THE COURT:  Thank you.  And Mr. Jones, you may

3    call your witness.

4            MR. JONES:  We'd like to call John Peters.

5            THE COURT:  He's here?

6            MR. JONES:  He is here.

7        **JOHN PETERS, DEFENDANTS' WITNESS, SWORN,**

8                    DIRECT EXAMINATION

9    BY MR. POSNANSKI:

10   Q    Good morning.

11   A    Good morning.

12   Q    Can you please state your full name for the record,

13   please.

14   A    John G. Peters, Junior.  P-e-t-e-r-s.

15   Q    Where do you live?

16   A    I actually live in Las Vegas, Nevada.

17   Q    Where are you from originally?

18   A    Lancaster County, Pennsylvania.

19   Q    I'm going to show you what has been marked as

20   Exhibit 519.

21           MR. POSNANSKI:  Erica, can we get --

22           THE CLERK:  I'm sorry.

23   Q    Can you tell me what this is?

24   A    It looks like a copy of my resume.

25   Q    The full copy of your resume is in the binders
                    JOHN PETERS - DIRECT

1  behind you if you need to see it.  I can page through

2  this if you need to.

3      My question is does this completely and accurately

4  reflect your professional education and experience?

5  A    I see this is dated December of 2011.  There's been

6  a couple updates since then, but most of it has stayed

7  the same.

8  Q    Can you describe your educational background?

9  A    After high school I went to the Northern Virginia

10 Community College in Andover, Virginia and obtained an

11 associate applied science degree in police science.  I

12 also obtained a certificate in corrections from that

13 same institution.

14     From there I took a year off.  I went back to work

15 or went back to school, I was working as a police

16 officer, and I obtained a bachelor of science degree in

17 criminal justice at the University of Baltimore in

18 Baltimore, Maryland.

19     From there I took an academic leave of absence from

20 the Sheriff's Department and went to Boston University

21 and obtained a master's degree in public relations, and

22 then went on to Babson College in Wellesley,

23 Massachusetts and picked up a master's degree in

24 business administration.

25     About 20 or so years later, I went back to school

JOHN PETERS - DIRECT

1  and got my Ph.D. in applied management and decision

2  sciences.  And in June of this year, I completed my

3  academic requirements for the California teaching

4  credential for the state of California.

5  Q     What do you do for a living?

6  A     My primary work is I run the Institute for the

7  Prevention of In-Custody Deaths, which is a law

8  enforcement training firm.  It's in Henderson, Nevada,

9  which is the next town over from Las Vegas.  And we

10 primarily train instructors; in other words, it would be

11 called *train the trainers* where we go out and conduct

12 training, primarily in the area of excited delirium or

13 arrest-related deaths, and also forensics where you have

14 an associated death, let's say from restraint or from

15 tasers or pepper spray.  Whatever the claim is, we teach

16 basically how to forensically process that at the scene,

17 what to collect, how to collect it, how to preserve the

18 evidence.

19       I also have another training firm called the

20 *Defensive Tactics Institute*, and in that training firm,

21 which is primarily hands-on, we teach not only the

22 weaponry which would be handcuffs, batons, flashlights,

23 unarmed self-defense.  But no handguns.  We don't do any

24 type of firearms training.

25 Q     What's your position with the Institute for
                    JOHN PETERS - DIRECT

1   Prevention of In-Custody Deaths?

2   A    I was the founder, President, and also hold the

3   title of Chief Learning Officer.

4   Q    As Chief Learning Officer, I presume that means you

5   teach?

6   A    I do teach.  I'm one of the instructional designers

7   for programs, but Chief Learning Officer primarily

8   focuses on identifying the appropriate scientific

9   literature that's out there relative to what causes

10  death, the science behind arrest-related deaths, that

11  type of thing.  So my job basically is, in addition to

12  the management side, is also looking at what's the

13  current literature, what's the current science, then

14  incorporating that into our training programs.

15  Q    In your previous answer you talked about the fact

16  that you train the trainer.  To whom do you teach?

17  A    We go all over North America to train.  I won't go

18  into a lot of detail, but some of the agencies that

19  we've conducted training for, it's been the Los Angeles

20  Police Department; Los Angeles County Sheriff's

21  Department; United States Department of State; I've been

22  here in Wisconsin at the Fox Valley -- I believe it's

23  called Technical College; other colleges here.

24       Most recently, two weeks ago I just got back from

25  Toronto, Canada.  We were up there in Ontario Province

JOHN PETERS - DIRECT

1   with the Peel Regional Police.  And I've also conducted

2   training in the United Kingdom with the Royal Army

3   Physical Training Corps, as well as the London

4   Metropolitan Police and the Kent Constabulary in

5   southern England in the Dover area.

6   Q    How many years have you taught courses affiliated

7   with this institute?

8   A    With the Institute for the Prevention of In-Custody

9   Deaths, it would be since 2005, which would be -- it was

10  seven years in March of this year; with Defensive

11  Tactics Institute it's been since 1979.

12  Q    In your role with the Institute for Prevention of

13  In-Custody Deaths, you design curricula or taught

14  courses regarding use of electronic control devices?

15  A    Yes.

16  Q    Do electronic control devices have another name?

17  A    Yes.  The most popular name for electronic control

18  device is a *Taser*, t-a-s-e-r.  There's another brand on

19  the market called *CarbonArms*, and then we have, in

20  addition to that, what's called *Nova* stun guns.  *Ultron*

21  stun guns.  But all of those fit under the umbrella of

22  electronic control devices.

23  Q    Have you taught those courses to law enforcement

24  officers?

25  A    Both, including military as well.
                    JOHN PETERS - DIRECT

1  Q    Could you explain briefly what the Defensive

2  Tactics Institute is.

3  A    The Defensive Tactics Institute again is a train

4  the trainer type of firm where we train instructors.

5  Our goal is to train instructors who then can go back to

6  their respective law enforcement agencies and conduct

7  in-house training or what we call in-service training.

8  Some of the people we get -- quite often we get police

9  academy instructors who come through.  We're very

10  specialized.

11      For example, the Defensive Tactic Institute was the

12  first training firm in the United States to develop a

13  defensive flashlight course for law enforcement officers

14  on the heavy duty flashlight such as the Maglite or the

15  Kel-lite, those type of devices.

16      We also designed the first instructor program for

17  handcuffing around the United States, which we called

18  *Tactical Handcuffing*.  We've done pepper spray, unarmed

19  self-defense, a number of those things.  So our goal is

20  to provide instructor training so people can go back and

21  then teach in their respective agencies, which is a lot

22  more cost-effective for the agency.

23  Q    What is your position with the Defensive Tactic

24  Institute?

25  A    President.

                    JOHN PETERS - DIRECT

Q     As President, what is your role and responsibility?

A     Very similar to the other institute; identifying some science relative to handcuffing or to impact tools or testing of batons, that type of thing.  But then I also have written over 30 video scripts and helped produce 30 video information manuals, as we call them, on things such as the ASP baton that's made here in Appleton, Wisconsin.  It's Armament Systems & Procedures, Maglites, handcuffing, handgun retention, handgun disarming, those types of things.

      In addition to that, because we always include information on current legal cases, we also conduct limited legal research on that and acquire that information and share it with folks.

      In addition to that, we also teach them how to train people and also evaluate them in the classroom and on the mat.

Q     In your role with the Defensive Tactics Institute, have you designed any lesson plans or taught any courses dealing with the use of electronic control devices?

A     Yes.

Q     And can you describe that for me?

A     Every manufacturer, each manufacturer has its own training program.  Taser International has its own training program.  CarbonArms has its own training

JOHN PETERS - DIRECT

1    program.  Nova Technologies has its own training

2    program.  What we do in the institute is we will take

3    those various programs and try to synthesize the most

4    important things from those into whatever we're going to

5    be teaching.

6         In the case of Nova Technologies, with all its

7    electronic restraint devices, whether it was a capture

8    shield, which is a -- looks like a riot shield with foil

9    on the front that's electrified with batteries.  We

10   redesign the entire training program, wrote the entire

11   new lesson plan, along with performance measures to

12   quantitatively evaluate people.

13        With the taser material, some of the taser material

14   that's currently out there regarding the collection and

15   storage of cartridges and probes and those types of

16   things, we found that if you follow the manufacturer's

17   directive, that you were actually destroying evidence.

18   So we altered that to bring it into more current times

19   where that shouldn't happen.  So that's basically what

20   it is.

21   Q    Have you taught courses regarding the actual use of

22   the taser as well?

23   A    Yes.

24   Q    And to whom have you taught those courses?

25   A    It varies.  In June, we were with Wyoming Attorney

                    JOHN PETERS - DIRECT

General's Office.  We trained all their agents

throughout the state of Wyoming.  And part of that

training involved showing the taser, demonstrating the

taser, showing them how it worked, showing them how it

fired, then showed them all the different parts of it.

In other words, when a taser is discharged, inside the

cartridge there's little, almost looks like confetti.

They're called AFID, anti-felon identification circles,

if you will, and they have the serial number of the

cartridge embedded on them.  So we showed them all that

because they had no working knowledge at all of how

tasers worked or anything else.  So we took them through

that whole training program.

Q    Does that training program also include any

discussion of when it's appropriate to use a taser?

A    Always.

Q    And does that training include training to -- I

think you touched on it, but if you can elaborate -- law

enforcement agencies?

A    Yes.

Q    Corrections agencies?

A    Corrections.  Military.

Q    When was the last time you gave a presentation on

the use of a taser to a law enforcement or corrections

agency?

                    JOHN PETERS - DIRECT

1  A    Two weeks ago in Peel Regional Police in Ontario,

2  Canada.

3  Q    You've touched on a number of different agencies in

4  your answers to my questions.  Can you just give us a

5  sampling of the different law enforcement agencies

6  you've taught courses to during your career?

7  A    There's a bunch of them.  Smith & Wesson Academy in

8  Springfield, Massachusetts, which is mostly a handgun

9  training firm.  But we also did a lot of different

10  courses up at Smith & Wesson; the Los Angeles Police

11  Department; the California Highway Patrol; Seattle

12  Police Department; Albuquerque Police Department; and

13  Nevada POST, which was Peace Officers' Standards and

14  Training.  Many times we've gone to Carson City, long

15  before I moved to Las Vegas, and did training there;

16  state of New Mexico.

17       I've done training in every state in the United

18  States but North Dakota.  We've trained officers in

19  North Dakota, but I personally have never set foot in

20  North Dakota.  In Canada, we've been at the Laval

21  Federal Correctional Institute outside of Montreal.

22  I've taught in Quebec.  I've taught Peel Regional

23  Police.  I've taught at the Vancouver British Columbia

24  Police College.  So we've been throughout Canada quite

25  often, and as I explained, over in the United Kingdom.

                    JOHN PETERS - DIRECT

1   Those are mostly law enforcement agencies.

2        Correctional agencies, we've taught at the New

3   Mexico State Penitentiary, Harris County Jail staff on

4   several occasions; Louisiana State Penitentiary in

5   Angola; Idaho State Penitentiary, corrections agencies

6   from California, throughout the state of California, as

7   well as Nevada, and other states as well.  Some in

8   Pennsylvania, some in Massachusetts.

9        Massachusetts, I taught for two years with the

10  Massachusetts Criminal Justice Training Council and

11  their corrections training division throughout the

12  commonwealth when I lived in Boston.

13  Q    Thank you.  Are you also familiar with an entity

14  known as *John G. Peters, Jr. & Associates*?

15  A    Yes.

16  Q    Can you describe what that organization is?

17  A    That's our consulting company where we do

18  consulting work on a variety of issues.  Mostly they

19  pertain to law enforcement.  We may do surveys, we may

20  develop surveys, we may do organizational diagnoses.

21  What I mean by that is we've been in various police

22  departments in Alabama and Illinois where we've gone in

23  and actually looked at the organizational structure of

24  the department, the problems that we could identify with

25  that, and then offer recommendations for mitigating

                    JOHN PETERS - DIRECT

1   those issues.  So we've done that.

2       We also do consulting work with organizations such

3   as the Harris County Jail, and also do work with this

4   type of issue that's before this court in police

5   practice matters.

6           THE COURT:  And Harris County Jail, is that New

7   Mexico?  Is that what you said?

8           THE WITNESS:  No, Your Honor.  Harris County

9   Jail is in Houston.  Third largest jail in the United

10  States.

11  BY MR. POSNANSKI:

12  Q    Does your consulting work involve or has it

13  involved issues relating to the corrections system?

14  A    Yes, quite often.

15  Q    And does your consulting work or has it involved

16  issues related to the use of force on detained

17  individuals?

18  A    Yes.

19  Q    Does your consulting work involve or has it

20  involved the use of tasers by law enforcement or

21  corrections officers?

22  A    Quite often, yes.

23  Q    How long have you been doing this type of

24  consulting?

25  A    I believe I started in 1982 roughly.

                    JOHN PETERS - DIRECT

1    Q    Have you ever been employed as a law enforcement

2    officer?

3    A    Yes.

4    Q    And when and where?

5    A    I was with the Northern York County Regional Police

6    Department, which is the county next to Lancaster

7    County, Pennsylvania.  It's about 60 miles north of

8    Baltimore, 30 miles south of Harrisburg, about 90 miles

9    west of Philadelphia; gives you sort of a geographical

10   area.  I was a patrol officer there.  I did routine

11   patrol.  We were a generalist in the sense that we could

12   start a criminal investigation, but then it was turned

13   over to the criminal investigator.

14        While there, I also held the title of self-defense

15   specialist and conducted in-house training for the

16   officers.  From there, I went to the York County

17   Sheriff's Department as a sworn deputy sheriff, and in

18   that position, did prisoner transports, courtroom

19   security, and worked through the Clerk of Court's office

20   serving warrants, outstanding bench warrants, and any

21   other warrant that would come into the county where we

22   were looking for fugitives or whatever the case may be.

23        From there I went to the Braintree, Massachusetts

24   Police Department in Braintree, Massachusetts, which is

25   really the first big town on the south shore going

                    JOHN PETERS - DIRECT

1   toward the cape.  It's where Routes 3 and 128 intersect.

2   And there I held the position of staff executive, which

3   was a civilian position.  Its equivalent rank was that

4   of deputy chief.  But I also held a special, what's

5   called a *special commission* in Massachusetts which was a

6   sworn commission where I could make arrests, carry a

7   handgun.  I had the same powers as a Massachusetts state

8   trooper.  And in that position, I ran the Administrative

9   Bureau, Director of Planning and Research in charge of

10  the budget.  All administrative things that the chief

11  didn't want to do pretty much got handed to me.  So I

12  was in that position.  So that was really the last law

13  enforcement sworn position/civilian position that I had.

14  Q    Thank you.  You testified that you've taught

15  courses regarding the use of the taser.  Are you a

16  certified taser instructor?

17  A    Yes.

18  Q    Have you published in the law enforcement

19  corrections field?

20  A    Yes.

21  Q    Can you describe the general subjects of your

22  published materials?  I mean general.

23  A    Probably the best way to describe it, I have about

24  196 publications as of last week.  Some are in the area

25  of use of force; some are in the area of policies and

                    JOHN PETERS – DIRECT

1    procedures; some are in the area of self-defense type

2    issues; some are in the area of recognizing behavioral

3    signs for various medical emergencies; some deal with

4    specific weaponry.  For example, I've written several

5    articles about taser devices and electronic control

6    devices.  So that's sort of a large grouping.

7    Q    I want to focus now on your work in this case.

8    When were you first asked to do work in this case?

9    A    I believe it was some time in 2011.

10   Q    And what were you asked to do?

11   A    As I recall, I got a telephone call from your

12   office asking me if I would be willing to review some

13   documents in this case, which is my normal practice.

14   Your office sent me some documents, I reviewed them,

15   recontacted your office, and said I thought I could

16   assist in the case.

17        I believe it was in December of that year I issued

18   my first report in this case and then subsequently to

19   that issued a supplemental report.

20   Q    And you touched on it, but did you review any

21   materials and develop any expert opinions you might

22   have?

23   A    Yes.

24   Q    What materials did you review?

25   A    For my initial report there were 17 various

JOHN PETERS - DIRECT

1    documents, including four video disks, which included

2    the complaint in this matter; various documents from the

3    Monroe County Jail; the incident reports by Deputy

4    Degner, Sergeant Hendrickson, Deputy Blanton, Deputy

5    Manka and Lieutenant Conroy; shift logs; incident

6    narrative report by Sergeant Hendrickson; Monroe County

7    Supervisory Taser International Use Report; Monroe

8    County Jail Inmate Major Violation Report on Michael

9    Kingsley; deposition transcripts.

10          And then in addition to that when I wrote the

11   report, I cited the various documents that are out

12   there, including the Wisconsin Department of Justice

13   Advisory Committee recommendations for training on the

14   electronic control devices, the Wisconsin DAAT Manual,

15   various documents from Taser International.

16   Q     And as a result of your review of these materials,

17   have you formed any opinions about what happened in this

18   case as an expert in the law enforcement corrections

19   field?

20   A     Yes.

21   Q     Do you hold these opinions to a reasonable degree

22   of professional certainty?

23   A     Yes.

24   Q     You mentioned the DAAT Manual as one of the

25   materials you reviewed; is that right?

                   JOHN PETERS - DIRECT

1  A    Yes.

2  Q    Okay.  Are you aware of what training manuals are

3  used to train law enforcement and corrections officers

4  in Wisconsin?

5  A    Well, there are several.  When it comes to the area

6  of self-defense, handcuffing, those types of areas, the

7  DAAT Manual is one of the primary devices known for

8  correctional -- or correctional officers have what is

9  called the POSC, P-O-S-C Manual, which basically deals

10  with prisoner and subject restraint which is a little

11  more narrow and focused.  Those would be the two that

12  deal primarily with what we would call *defensive*

13  *tactics*-type instruction.

14      Now in addition to that, throughout the academies

15  of course you have the criminal code, motor vehicle

16  code, officer safety things, but those would be the

17  primary two for officer safety regarding handcuffing

18  arrests, that type of thing.

19  Q    And again, you mentioned the DAAT Manual.  I want

20  to direct your attention to Exhibit 524.  Do you

21  recognize this document?

22  A    Yes.  That is the -- what's called the *DAAT Manual*.

23  It's the Defensive and Arrest Tactics.

24  Q    And again, you reviewed this document in connection

25  with your review of the materials in this case?

JOHN PETERS - DIRECT

1   A     Yes, that's correct.

2   Q     Are you familiar with the term *active resistance*?

3   A     Yes.

4   Q     And are you aware of how Wisconsin training guides

5   for corrections and law enforcement officers define

6   active resistance?

7   A     Yes.  There's a specific definition in the

8   documents that define active resistance for both

9   corrections and law enforcement.

10  Q     I want to direct your attention to page 41 of

11  Exhibit 524.

12            MR. POSNANSKI:  Your Honor, if we could publish

13  this.  I believe this has already been admitted into

14  evidence.

15            THE COURT:  524?

16            MR. POSNANSKI:  Yes.

17            THE COURT:  It hasn't been admitted as a

18  defendants' exhibit.  Any objection to it?

19            MS. WARD:  No, Your Honor.  It's Plaintiff

20  Exhibit 9, I believe.

21            THE COURT:  Oh, all right.  It's in as

22  Plaintiff's Exhibit Number 9, so you can show it to the

23  jury.

24            MR. POSNANSKI:  Okay.  Thank you.

25  BY MR. POSNANSKI:
                    JOHN PETERS - DIRECT

22

1    Q    On page 141, do we find the definition of active

2    resistance?

3    A    Yes, we do.

4    Q    And what is active resistance?

5    A    The first paragraph introduces active resistance

6    and makes a distinction between active and passive

7    resistance.  It says that active resistance involves the

8    subject who is physically countering an officer's

9    control efforts under circumstances in which the

10   behavior itself, the environment in which the behavior

11   occurs, or the officer subject factors create a risk of

12   bodily harm.

13        The next paragraph talks about the criterion of

14   active resistance or its threat means that in general,

15   control devices would not be appropriate to use against

16   verbal aggression or against people running away or

17   against children or older persons unless reasonably

18   justified based on the circumstances.

19   Q    Okay.  Is active resistance, is that concept unique

20   to Wisconsin?

21   A    No.  It's a national concept.

22   Q    You touched on it.  Do you know whether this active

23   resistance concept is consistent with how other states

24   train their officers?

25   A    Yes.

JOHN PETERS - DIRECT

1        MS. WARD:  Objection.  Relevance.

2        THE COURT:  I'm sorry?

3        MS. WARD:  Relevance objection.

4        THE COURT:  Overruled.

5        THE WITNESS:  This is consistent.  Every state

6    we go to we have to be aware of the various definitions

7    for active resistance and passive resistance, and this

8    is consistent with what we see nationally.

9    BY MR. POSNANSKI:

10   Q    That first paragraph you read, it indicates the use

11   of an electronic control device is appropriate to

12   overcome active resistance or its threat?

13   A    Yes, it would be.

14   Q    So officers are trained that active resistances is

15   sufficient justification for the use of a taser?

16   A    Yes.  Taser would be a device for active

17   resistance.  There's various what we would call *levels*

18   of taser usage, so it could apply to a variety of active

19   resistance patterns.

20   Q    Based upon your review of the materials in this

21   case, do you believe the officers were faced with active

22   resistance?

23   A    Absolutely.

24   Q    Can you explain that?

25   A    Reading the reports, the reports that I read

                    JOHN PETERS - DIRECT

1  indicated the behavior of Mr. Kingsley.  And the

2  behavior of Mr. Kingsley, and I won't focus on all the

3  behavior, but primarily became dead weight when they had

4  to move him.  Then they put him onto that bunk,

5  basically the concrete bunk in the -- I think it was

6  receiving cell number 3.  The video does show Mr.

7  Kingsley sort of rearing up in this manner.

8  (Indicating)  That's clearly active resistance.  When

9  you try to hold somebody down or hold them in place and

10  they pull away, that would be active resistance.

11       So there's a number of times where you can watch

12  throughout that video where Mr. Kingsley did offer the

13  officers active resistance to which they had to then

14  respond.

15  Q    And as we saw, the definition of active resistance

16  incorporates two concepts.  You talked a little bit

17  about the physical manifestations that Mr. Kingsley was,

18  I guess, presenting the officers from your view of the

19  materials.  There's also an element of risk; is that

20  correct?

21  A    Correct.

22  Q    And did you see from your view of the materials an

23  element of risk to anyone?

24  A    Well, there are several elements of risk, so yes, I

25  saw several.

                    JOHN PETERS - DIRECT

1    Q    And can you talk about that?

2    A    In a correctional environment, any time you move

3    prisoners there's some element of risk, albeit in most

4    cases fairly minor.  But in this particular case where

5    we had active resistance, Mr. Kingsley was not

6    cooperating in the removal of those handcuffs.

7         Now handcuff removal under the best circumstances

8    is difficult.  If I were to put my hands out like this

9    and somebody just put handcuffs on them, coming in and

10   getting that small key into the keyway and turning,

11   that's going to take a moment or two.  That's under the

12   best of conditions.  When you have somebody who's

13   actively resisting and pulling against those cuffs, not

14   only do you have to control the subject, but you also

15   have to control the cuffs.

16        Now these were chain-style handcuffs.  There's

17   basically two types of handcuffs:  *Chain*, which have

18   this link chain going between the two handcuffs.  And

19   then we have what's called *hinged* handcuffs.  Some of

20   those had like a bicycle-type chain that allows the

21   handcuff to fold, and others have like a barn door

22   hinge, if you will.  We didn't have that model.

23        So what we're really worried about in this case and

24   what I was concerned about in this case, looking at the

25   video, if you get your fingers -- if a correctional

                    JOHN PETERS - DIRECT

1  officer in the process of trying to uncuff that

2  individual gets his fingers around the chain of that

3  handcuff and the prisoner either intentionally or just

4  inadvertently starts to move and your fingers get caught

5  in the chain of that handcuff, high probability that's

6  going to break the fingers, and in some cases,

7  particularly in prisons, people are trained to take

8  officers down using handcuffs.  There's surveillance

9  video of them practicing those techniques where you wrap

10  the chain around the officer's fingers and jerk very

11  quickly, which can amputate a finger or break a finger.

12  That was one issue just in the removal of the cuffs.

13  Because it's not simply putting the key in and turning

14  it in one direction.  If the handcuffs are double

15  locked, you have to turn it one direction and then come

16  back and turn it in the other direction.  If they're not

17  double locked, then you only turn it in one direction.

18  But you're looking at a very small key going into a very

19  small hole on the side or what's called the cheap plate

20  of the handcuff.

21      The other issue is you have a confined area, and

22  when you're in a very confined area -- think about

23  trying to manipulate somebody in your pantry.  It's very

24  difficult to do.  So if the person rolls one direction

25  or another, it could cause a correctional officer to

                    JOHN PETERS - DIRECT

1  strike his or her head against the wall.  It could cause

2  them to get injured with the concrete bunk, depending on

3  what the prisoner did.  If the prisoner was able to get

4  up, might be able to kick or do something else to the

5  officers.

6      And we also have the second part of this is the

7  officers who are trained correctional officers have to

8  also be aware of the risk to the prisoner because --

9          MS. WARD:  Objection, Your Honor.  This isn't

10  in any of his expert reports.

11          THE COURT:  I'm sorry?

12          MS. WARD:  He's testifying outside his expert

13  reports in this case.  He didn't say anything about

14  injury to the prisoner in either of his reports.

15          THE COURT:  Sustained.

16  BY MR. POSNANSKI:

17  Q    Based upon your training and experience, your

18  review of the materials in this case, was the use of the

19  taser in drive stun mode reasonable or unreasonable

20  under the circumstances?

21  A    In my opinion it was reasonable based on the

22  circumstances.

23  Q    Can you explain that?

24  A    There was active resistance.  The taser was used in

25  what's called *drive stun mode*.  D-r-i-v-e.  Drive stun

                JOHN PETERS - DIRECT

1  mode is where you take the cartridge off the end of the

2  taser.  There's two contact points.  They're 40

3  centimeters apart.  And what you do is apply the contact

4  points to a muscle mass.  And it's designed under an

5  umbrella, which is a common term in the law enforcement

6  business called *pain compliance*.  All it does is produce

7  pain.  It doesn't cause neuromuscular incapacitation.

8  If the device is shot, if the taser were shot in what's

9  called *probe mode* and the probes go out and they're

10  tethered back to the device, that causes neuromuscular

11  incapacitation, which will cause the affected area to

12  lock up.

13      This doesn't do that.  This is just for pain

14  compliance.  It's localized.  The recommended areas are

15  large muscle masses, or in some cases if somebody had an

16  arm underneath them and they were on their stomach, you

17  could apply it to the tricep area of the arm to get the

18  arm to come out.

19  Q    Do you hold this opinion to a reasonable degree of

20  certainty?

21  A    Yes.

22  Q    From your view of the materials in this case, are

23  you aware that the plaintiff's expert, Brian Landers,

24  has taken issue with the placement of Sergeant

25  Hendrickson's knee on Mr. Kingsley in the receiving

JOHN PETERS - DIRECT

1   cell?

2   A     Yes.

3   Q     And specifically, Mr. Landers takes issue with the

4   location of Sergeant Hendrickson's knee; is that right?

5   A     That's my understanding, yes.

6   Q     From your review of the materials in the video in

7   this case, can you tell where Sergeant Hendrickson's

8   knee was placed?

9   A     All you can -- all I could see in the video was up

10  around the shoulder area and it was kind of going across

11  the shoulder area.  You couldn't see specifically where

12  the knee was or wasn't.

13  Q     I'd like you to assume for purposes of my question

14  that Sergeant Hendrickson has testified under oath that

15  he placed his knee and lower leg across Mr. Kingsley's

16  upper back and shoulders, okay?

17  A     Okay.

18  Q     If that's true, was Sergeant Hendrickson using a

19  trained technique?

20  A     Absolutely.

21          MS. WARD:  Objection.  Leading.

22          THE COURT:  Sustained.

23  BY MR. POSNANSKI:

24  Q     Are officers or corrections officers trained how to

25  stabilize individuals in a prison setting?

                   JOHN PETERS - DIRECT

1  A    Yes.

2  Q    Are they trained they can use portions of their

3  body to use to help stabilize a prisoner in the

4  correctional setting?

5  A    Yes.

6  Q    Are they trained they can use their leg or their

7  lower leg to help stabilize a prisoner in a correctional

8  setting?

9  A    Yes.

10  Q    And are they trained that they can use their lower

11  leg across an inmate's upper back or shoulders to help

12  stabilize him to the ground in a correctional setting?

13  A    Yes.  Standard across the country.

14  Q    Have you ever trained that technique to corrections

15  officers?

16  A    Yes.  It's in the -- a couple of the books I've

17  written, yes.

18  Q    And if Sergeant Hendrickson's knee was, in fact,

19  placed across Mr. Kingsley's upper back and shoulders,

20  was that use of force reasonable or unreasonable in your

21  opinion?

22  A    It would be reasonable and consistent with national

23  training practices.

24  Q    And do you hold this opinion to a reasonable degree

25  of certainty as an expert in the law enforcement and

JOHN PETERS - DIRECT

1  corrections field?

2  A    Yes.

3  Q    I'd like to direct your attention to Plaintiff's

4  Exhibit 108.  Give you an opportunity to review that.

5  From your review of the materials in this case, have you

6  seen this picture before?

7  A    Many times, yes.

8  Q    What is this picture?

9  A    This is a drawing of basically a human body that

10 has areas of color with a legend on the lower left-hand

11 corner talking about the propensity for injury ranging

12 from minimum to high, and obviously the areas that are

13 designated high areas are high risk areas for injury.

14 But this is, as the document states, this is for unarmed

15 strike techniques, so it wouldn't necessarily apply to

16 the batons or flashlights, that type of thing.

17 Q    What is an unarmed strike technique?

18 A    An unarmed strike technique could be a punch, an

19 elbow, could be a kick, basically anything in what we

20 call personal weapons.  Personal weapons are fingers and

21 hands and elbows and forearms, knees, feet, anything

22 that's not, as this says, it's for unarmed.  So if

23 you're unarmed, you're not carrying a baton or a

24 flashlight or any other instrument that's in your hands.

25 So it's empty-hand techniques basically.
                   JOHN PETERS - DIRECT

1   Q     In your view of the materials in this case, did you

2   see any unarmed strike techniques?

3   A     I didn't see anything, no.

4   Q     So does this chart have any relevance to the force

5   used on Mr. Kingsley in this case?

6   A     In my opinion, no.  No relevance at all.

7           MR. POSNANSKI:  Your Honor, I would move

8   Exhibit 519 into evidence.

9           MS. WARD:  I'm sorry, 519?

10          MR. POSNANSKI:  519.

11          THE COURT:  What is it?

12          MR. POSNANSKI:  His CV.  No further questions,

13  Your Honor.

14          THE COURT:  Ms. Ward.

15                   CROSS-EXAMINATION

16  Q     Good morning, Dr. Peters.

17  A     Good morning.

18          MS. WARD:  Actually can you put 519 up,

19  Mr. Posnanski?  I'm sorry.

20          MR. POSNANSKI:  Yeah.

21  Q     You testified on direct this is your CV; correct?

22  A     Correct.

23  Q     And you testified that you have a Ph.D.; correct?

24  A     Correct.

25  Q     Now your Ph.D. dissertation is related to sexual

                    JOHN PETERS - CROSS

1  harassment; correct?

2  A    In the Sheriff's Department; correct.

3  Q    And the type of force issues involved in your Ph.D.

4  dissertation were not the type of force issues involved

5  in this case; correct?

6  A    Not directly involved; however, we -- I did uncover

7  that there were several female correctional officers who

8  were raped or sexually assaulted by co-workers in this

9  particular jail.  What type of force was used against

10 them I don't know.  So there may be some overlap or

11 there may not be.

12 Q    Okay.  Dr. Peters, I'm going to hand you a copy of

13 your deposition from this case.

14        MS. WARD:  And Your Honor, may we approach the

15 witness?  The mini doesn't match the full, so we're

16 going to hand him a copy of his full deposition.

17        THE COURT:  Certainly.

18        MS. WARD:  Would you like a copy?  We have an

19 extra one.

20        THE COURT:  If you have an extra one, that

21 would be fine.

22 BY MS. WARD:

23 Q    I'd like you to turn to page 17 of your deposition.

24 A    17?

25 Q    And we're going to start at line seven.  And I

                    JOHN PETERS - CROSS

1    asked you:

2        "Question --

3        I'm sorry.  You were under oath when you were

4    deposed in this case; correct?

5    A    Yes.

6    Q    "Does that dissertation have any relevance to this

7    case, Mr. Kingsley versus the defendants in this case?"

8    And then I think you describe what you just said in your

9    answer that it was related to sexual harassment.  And at

10   line ten of page 18:

11       "So there was some force issues involved, but not

12   the type of force issues that we would have in this

13   case."

14       Did I ask you that question and did you respond

15   with that response?

16   A    Yes.

17   Q    Thank you.  And sir, the master of science degree

18   in public relations that you have, that's also not

19   relevant to this case; correct?

20   A    Not at all.

21   Q    And your MBA, that's not directly relevant to the

22   present case; correct?

23   A    No.  We didn't cover anything about the restraint

24   of prisoners in that program.

25   Q    All right.  Now you testified on direct that you
                    JOHN PETERS - CROSS

1   were a law enforcement officers in York County; correct?

2   A    Correct.

3   Q    And so the last time that you were employed as a

4   sworn police officer was in 1977; correct?

5   A    '77 and then into '78, if we counted the Braintree

6   special sworn position.

7   Q    But York County was the last time you were a sworn

8   police officer; correct?

9   A    I'm getting hung up on the word *sworn*.  In

10  Braintree I had a commission which made me a sworn

11  officer as well.  But the primary duties were that of

12  staff executive, which were civilian.  So if we're

13  talking the last time that I actually worked the field,

14  making arrests and chasing people and that type of

15  thing, then you would be correct.

16  Q    Okay.  Thank you.  And you're not qualified to

17  offer opinions on medical issues; correct?

18  A    That's correct.  I'm not a medical doctor.

19  Q    You're also not qualified to offer opinions on

20  legal issues; correct?

21  A    I'm not a lawyer.

22  Q    And you're also not a member of the Wisconsin

23  Department of Justice Tactical Advisory Committee;

24  correct?

25  A    Correct.
                    JOHN PETERS - CROSS

1    Q    All right.  So let's turn to your work as an expert

2    witness, Dr. Peters.  One could say you're a

3    professional expert witness; correct?

4    A    I get paid.  So yeah, I guess that would match the

5    definition.

6    Q    And you're getting paid for your work in this case

7    as well; right?

8    A    My time, yes.

9    Q    And part of your work in this case involved

10   preparing two expert reports, right?  I think you said

11   that on direct testimony?

12   A    Yes.

13   Q    The first was submitted in December of 2011?

14   A    Yes, December 16th.

15   Q    And the second was submitted at the end of August

16   of this year; correct?

17   A    Yes, that's correct.

18   Q    And I took your deposition on September 26th of

19   this year; right?

20   A    I'm not sure of the date, but it's been a couple

21   weeks ago.  So...

22   Q    If you want to confirm, it's on the front page of

23   the deposition that's right in front of you.

24   A    September 26th.

25   Q    Thanks.  And as of your deposition just a couple of

                    JOHN PETERS - CROSS

1  weeks ago, you had no idea who Mr. Jones, the

2  defendants' attorney was; correct?

3          MR. POSNANSKI:  Objection, Your Honor.

4          THE COURT:  Sustained.

5  BY MS. WARD:

6  Q    All right.  When I took your deposition, I showed

7  you the video of the incident with Mr. Kingsley in the

8  receiving cell; right?

9  A    Correct.

10 Q    And I asked you some questions about that video?

11 A    Yes.

12 Q    And at that time, I asked you to identify the

13 officers in the video and you couldn't do it, could you?

14 A    No, I couldn't.

15 Q    Now you estimate that you've served as an expert

16 witness in use-of-force cases between 200 and 250 times;

17 correct?

18 A    Correct.

19 Q    And of those cases, you estimate that between 30

20 and 50 involve the use of a taser; correct?

21 A    Yes.

22 Q    And of those 30 to 50 cases, you sided with

23 defendant officers 90% of the time; correct?

24 A    That is approximately; correct.

25 Q    Okay.  I do want to talk about one of the few times

                    JOHN PETERS – CROSS

1    that you were an expert for the plaintiff.  You recall

2    the *Brown v. Trooper Berger* case; correct?

3    A    Yes.

4    Q    And you were Mr. Brown's expert in that case;

5    right?

6    A    Correct.

7    Q    Now you submitted your expert opinion in that case

8    before --

9            MR. POSNANSKI:  Objection, Your Honor.

10   Relevance.

11           MS. WARD:  Your Honor, may I be heard?

12           THE COURT:  The objection is overruled.

13           MS. WARD:  Oh.  Thanks.

14   BY MS. WARD:

15   Q    So the question was, sir, you submitted your expert

16   opinion in that case before you submitted your first

17   expert opinion in this case; correct?

18   A    Yes, that's true.

19   Q    And in *Brown v. Trooper Berger*, your opinion was

20   the use of the taser was not reasonable; correct?

21   A    That is correct.

22   Q    Okay.  And at the time Mr. Brown was tased, he and

23   the officers were outside; correct?  They weren't in a

24   prison.

25   A    That's correct.

                    JOHN PETERS - CROSS

1   Q     And he was not in handcuffs; correct?

2   A     That is correct.

3   Q     And prior to being tased, Mr. Brown had struggled

4   with officers on the ground; correct?

5   A     He was resistive, yes.

6   Q     He struggled with officers; correct?

7   A     Yes.  He didn't obey what they were saying and

8   there was some struggle involved.

9   Q     Right.  And in fact, he failed to comply with their

10  orders to place his hands behind his back and lay down;

11  correct?

12  A     That's correct.

13  Q     Yet there it was your opinion that Mr. Brown was

14  not a threat because he did not attempt to grab weapons

15  from officers; correct?

16  A     That's correct.  There was quite a bit of distance

17  between them.

18  Q     All right.  Let's turn to the incident with

19  Mr. Kingsley.  When you formed your opinion in this

20  case, you did not talk to any of the officers involved

21  in the incident; correct?

22  A     That's correct.

23  Q     And you didn't review their training records;

24  correct?

25  A     I wasn't given their training records; that's

                    JOHN PETERS - CROSS

1  correct.

2  Q    You didn't review the Monroe County policies on the

3  use of force or the use of the taser; correct?

4  A    Correct.

5  Q    You didn't go to the Monroe County Jail; correct?

6  A    That's correct.

7  Q    You didn't consider the Wisconsin ECD training

8  guide; correct?

9  A    I only considered the training advisory board's

10  recommendations.

11  Q    So you didn't consider the ECD training guide;

12  right?

13  A    I didn't consider the guide specifically, but --

14  Q    All right.  Thank you, sir.  Let's talk about the

15  video for just a minute.  Now, you think the video is

16  fairly conclusive and inclusive; correct?

17  A    The video shows what it shows.

18  Q    It's conclusive and inclusive; correct?  In your

19  words, what you told me at your deposition.

20  A    Again, it is.  It --

21  Q    Thank you.

22  A    -- can only conclude what's there.

23  Q    And now, when you watched the video of the incident

24  in the receiving cell at your deposition, you identified

25  Mr. Kingsley becoming dead weight and a verbal statement

1  that he made as being the only resistance you could

2  observe; correct?

3  A    I can't disagree with you, if you could show me the

4  page.

5  Q    Sure.  Turn to 142 in your deposition, please.

6  A    Okay.

7  Q    And the question at line one:

8      "Question:  So when you watched the video, you have

9  identified Mr. Kingsley becoming dead weight and a

10  verbal statement he made as being the resistance you

11  could observe in the video; correct?

12      "Answer:  Correct."

13      Did I ask that question and did you respond that

14  way?

15  A    Yes.

16  Q    And on direct, you said you saw some rearing up.

17  You didn't tell me that when we watched the video at

18  your deposition; did you?

19  A    I don't believe you asked me that.

20  Q    I asked you to tell me what you could observe as

21  resistance and you didn't identify rearing up; correct?

22  A    Well, there's other things on that page that I did

23  identify.

24  Q    Okay.  Well, we summed it up in this question and

25  you gave the response; correct?  Is that right?

                    JOHN PETERS - CROSS

1  A    I'm not going to get locked into just that answer

2  because this deposition contained other information.

3       MS. WARD:  Your Honor, I'm going to move to

4  strike the rest of his response.

5       THE COURT:  Sustained.

6  BY MS. WARD:

7  Q    Let's talk about Mr. Kingsley being dead weight.

8  That happened before he was put on the bunk in the

9  receiving cell; correct?

10  A    Correct.

11  Q    Now with respect to the verbal statement, one of

12  the things that Mr. Kingsley said when he was on the

13  bunk was "I'm not resisting"; right?

14  A    Yes.

15  Q    Now according to the officers, at the point he was

16  tased he was resisting by tensing his arms; correct?

17  A    Correct.

18  Q    And you didn't identify arm tensing as something

19  you could observe in the video; correct?

20  A    I don't believe.  As I recall, the officers

21  shielded that with their bodies.  You couldn't see.

22  Q    Now you testified on direct that in Wisconsin

23  officers are trained that the goal of control devices --

24  I'm sorry.  Strike that.

25       You reviewed the control device paragraph in
                   JOHN PETERS - CROSS

1    Plaintiff's Exhibit 9 with your counsel; correct?  Why

2    don't we take a look at Plaintiff's Exhibit 9.

3            MS. WARD:  Can we have the plaintiff's laptop

4    please, Erica?

5    Q    That's the DAAT guide?

6    A    Yes.

7    Q    And on page 41 of that document, can you please

8    turn to that.  And the control device is paragraph --

9    you looked at these paragraphs with your counsel; right?

10   A    Yes.

11   Q    So you agree that in Wisconsin, active resistance,

12   unlike passive resistance, involves a subject who is

13   physically counteracting an officer's control efforts

14   under circumstances in which the behavior itself, the

15   environment in which the behavior occurs, or

16   officer/subject factors create a risk of bodily harm;

17   correct?

18   A    Yes.

19   Q    And under the Wisconsin definition, it is your

20   opinion that Mr. Kingsley was actively resisting when he

21   was tased; right?

22   A    Yes.

23   Q    And you say that the active resistance was not

24   letting the officers remove the cuffs; correct?

25   A    Yes.

                    JOHN PETERS - CROSS

1  Q    I think you identified on your direct testimony

2  that there was a chance of a finger injury to officers;

3  correct?

4  A    Yes.

5  Q    Or an injury related to the small confined space

6  where officers could have gotten thrown into the walls;

7  correct?

8  A    Correct.

9  Q    It wasn't reported anywhere that Mr. Kingsley

10 rolled or threatened to roll; right?

11 A    No.  At the end of the event, it wasn't because

12 apparently he didn't.

13 Q    Right.  Okay.  Could we please turn to Plaintiff's

14 Exhibit 100.  That's in the binders behind you there.

15 A    Okay.

16 Q    Okay.  This is a workbook used in your *Use of Force*

17 *by the Numbers* Program; right?

18 A    Correct.

19 Q    And you participated in compiling and authoring

20 this workbook; correct?

21 A    Correct.

22       MS. WARD:  Your Honor, I'd like to move for the

23 use of Plaintiff's Exhibit 100.

24       THE COURT:  Any objection?

25       MR. POSNANSKI:  No objection.
                JOHN PETERS - CROSS

1          THE COURT:  Received.

2

3   BY MS. WARD:

4   Q     I'd like you to turn -- there's a number of slides

5   at the beginning and I'd like you to turn to page 63 of

6   200 in that manual.

7          MS. WARD:  Erica, can we switch to the document

8   camera?

9   Q     The first slide on that page -- are you with me,

10  sir?

11  A     Yes.

12  Q     The first slide on that page discusses possible

13  versus immediate threat; correct?

14  A     Correct.

15  Q     And that slide states "Each application of force

16  must be justified.  A simple statement by an officer

17  that he fears for his safety or the safety of others is

18  not enough.  There must be objective factors to justify

19  such a concern"; right?

20  A     Correct.

21  Q     That's what the slide says?

22  A     Correct.

23  Q     And the point of this slide is that there has to be

24  more of an objectively immediate threat as opposed to

25  what could have, should have, would have happened;
                  JOHN PETERS - CROSS

1  correct?

2  A    I'm not sure I understand your question.

3  Q    Well, those are the words you used when I asked you

4  that question at your deposition.  Do you want to take a

5  look at the deposition?

6  A    No.  Just if you could ask the question again.

7  Q    Sure.  The point of the slide here is there has to

8  be an objectively immediate threat as opposed to what

9  could have, should have, would have happened; correct?

10 A    Right.

11 Q    Now you agree that if Mr. Kingsley was not

12 resisting, the use of a taser on him would not have been

13 appropriate; correct?

14 A    If he wasn't resistive and was cooperative;

15 correct.

16 Q    Okay.  And you don't dispute that Mr. Kingsley was

17 actually in pain during the incident; correct?

18 A    He said he was.  So...

19 Q    And he could have been in pain; correct?

20 A    Could have been.  I have no way of knowing that.

21 Q    All right.  Mr. Kingsley was groaning throughout

22 the incident in a manner that some people could

23 interpret as pain; correct?

24 A    You could interpret it as pain or groaning for

25 resistance purposes.

                    JOHN PETERS - CROSS

1  Q    Sure.  Could you look at 257 in your deposition,

2  please.  Page 257.

3  A    Okay.

4  Q    And I'm going to read for you starting at line

5  seven:

6      "Question:  And Mr. Kingsley did groan throughout

7  the incident; correct?

8      "Answer:  Yes.

9      "Question:  In a manner that some people could

10  interpret as pain; correct?"

11      And the answer at line 14:  "Yeah, I would agree

12  with that."

13      Did I ask you those questions and did you give me

14  those answers?

15  A    Yes.

16  Q    In fact, he more than likely could have been in

17  pain from the handcuffs; correct?

18  A    Possible.

19  Q    You don't dispute that he actually was in pain from

20  the handcuffs; correct?

21  A    I don't know if he was in pain from the handcuffs.

22  Q    Okay.

23  A    I mean he's resisting -- what I think is resistive,

24  which would cause the metal to pull into the skin and

25  the wrist, which could create pain.

                    JOHN PETERS - CROSS

1    Q    Handcuffs can hurt; right?  You don't dispute that

2    handcuffs can hurt; correct?

3    A    Handcuffs are uncomfortable and generally people

4    say hey, they hurt.

5    Q    Right.  And you told me at your deposition that

6    they're not marshmallows; correct?

7    A    I may have said they're not marshmallows and that

8    would be correct, they're not.  They're not soft and

9    flexible.

10   Q    Right.  And his foot could have been hurt from

11   hitting the bed; correct?

12   A    His foot could have been hurt from anything that

13   happened there.

14   Q    Right.  You agree that it could have been hurt;

15   correct?

16   A    Could have been, sure.

17   Q    Yeah.  Mr. Kingsley is the only person that knows

18   what the pressure of having Sergeant Hendrickson's knee

19   in his back felt like; correct?

20   A    I would agree with that.

21   Q    Okay.  Now I want to talk to you about the

22   handcuffing procedure that was used with Mr. Kingsley.

23        You agree that none of the officers' incident

24   reports state that the handcuffs were placed on

25   Mr. Kingsley in the correct manner and checked for

JOHN PETERS - CROSS

1  proper fit; correct?

2  A    I would agree.  I don't think there's anything in

3  the reports that say about checking for tightness.

4  Proper manner I'm not quite sure what you mean by that.

5  Q    Let's take a look at your deposition again, sir, at

6  page 201.  Beginning at line four.  So on page five,

7  which is the beginning of Mr. Lander's opinion, the

8  second sentence after opinion says:  "In supplied

9  reports, there is no mention that the handcuffs were

10  placed on Mr. Kingsley in the correct manner and checked

11  for proper fit."  Do you agree with that?

12      "Answer:  As I recall, that's accurate."

13      Did I give you or did I ask that question and did

14  you give that answer?

15  A    Yeah, I give that answer to your question was this

16  in Lander's report.  That's what the question is.

17  Q    No.  The question was did you agree with the

18  statement; correct?

19  A    Yeah.  I agree it's in Lander's opinion.

20  Q    No.  You agreed with the statement; correct?

21  A    You asked me if I agreed with Mr. Lander's opinion

22  in the second sentence of his opinion and then what you

23  just read and I agreed that that was in his opinion.

24  That's what I was agreeing to, as I understood your

25  question.

JOHN PETERS - CROSS

1   Q    We had a discussion before that where I asked you

2   -- I told you I was going to read you some statements in

3   Mr. Lander's opinion and asked you if you agreed with

4   the statements; correct?

5   A    Right.

6   Q    And I read you this statement and you agreed as

7   shown in the testimony that we just read.

8   A    Yes, that's true I agreed.

9   Q    And you have no information one way or the other

10  whether the cuffs were too tight when they were applied

11  to Mr. Kingsley; correct?

12  A    There's nothing in any of the reports that indicate

13  one way or the other.

14  Q    And you also agree that the pressure and tightness

15  of the handcuffs described as painful and excessive by

16  Mr. Kingsley during his deposition is the only

17  articulation of the manner in which the handcuffs were

18  applied; correct?

19  A    That's fair.

20  Q    And according to the statements in the officers'

21  incident reports, the handcuffs were not double locked

22  when they were initially put on Mr. Kingsley; correct?

23  A    There was nothing mentioned about double locking,

24  that's correct.

25  Q    That wasn't exactly what I asked you, sir.

                    JOHN PETERS - CROSS

1    According to the statements in the officers' incident

2    reports, the handcuffs were not double locked when they

3    were initially put on Mr. Kingsley; correct?

4    A    Right, there was no mention of it.

5    Q    Well, according to the statements they weren't

6    double locked; correct?  Initially.

7    A    As I recall, there was one report that said the

8    officer double locked it at a later point in time.

9    Q    Correct.  And that was at 6:47; right?

10   A    Six -- timewise or page number?

11   Q    Timewise.  6:47?

12   A    Timewise, yes.

13   Q    And that was reported by Officer Blanton; correct?

14   A    Correct.

15   Q    Now assuming that Mr. Kingsley was not rolling

16   around and doing things, it would have been safe and

17   practicable to double lock the handcuffs when the

18   officers laid him on his stomach in the hallway;

19   correct?

20   A    It could have been done there.

21   Q    And the hands could have tightened during the

22   period that they were not double locked if pressure were

23   applied to them; correct?

24   A    If pressure were applied to them, sure.

25   Q    And you would agree that as a general rule, if the

                    JOHN PETERS - CROSS

1    handcuffs had been double locked during that period, it

2    would not have been possible for them to tighten;

3    correct?

4    A    Generally speaking, that's correct.

5    Q    All right.  Now you testified on -- I'm sorry.  You

6    didn't.  I withdraw that.  I'm sorry.

7         Now you wrote a book on handcuffing that sort of

8    came out in the late 80s; correct?

9    A    1988 or -9.

10   Q    This is your book; correct?

11   A    That's it.

12   Q    All right.

13        MS. WARD:  May I approach the witness with his

14   book?

15        THE COURT:  You may.

16        THE WITNESS:  Thank you.

17   Q    If you could turn to page 69, please.

18        MR. POSNANSKI:  Your Honor, is this an exhibit?

19        THE COURT:  It can't be.

20        MS. WARD:  It's not an exhibit, Your Honor.

21   I'm just going to ask him a question.

22   BY MS. WARD:

23   Q    On page 69 under the heading *Double lock the*

24   *handcuffs* --

25   A    Um-hmm.

                    JOHN PETERS - CROSS

1  Q      -- your book states always double lock the

2  handcuffs.

3  A      Correct.

4  Q      Why?  So that they do not get tighter on the

5  prisoner's wrists; correct?

6  A      Correct.

7  Q      Thank you.  Put that aside.  And besides your book,

8  you've also coauthored at least one article that states

9  that handcuffs must be double locked as soon as

10  practicable after their application; correct?

11  A      That's correct.

12  Q      And you also state in that article that if an

13  officer overtightens or fails to double lock, the person

14  can be severely injured; correct?

15  A      In some cases, that's correct.

16  Q      Mr. Kingsley's hands were observed to be red after

17  the incident; correct?

18  A      I believe I read something about that, which is

19  normal when handcuffs are applied.

20  Q      Right.  But that's also not inconsistent with his

21  claim that the cuffs were overly tight; correct?

22  A      Wouldn't be inconsistent, wouldn't be consistent.

23  I mean when you put handcuffs on people, there is

24  redness.  What you're looking for are deep gouge marks

25  into the skin.  That's what you're looking for in overly

JOHN PETERS - CROSS

1  tight handcuffs.

2          MS. WARD:  Your Honor, I move to strike that

3  part of his answer that --

4          THE COURT:  Sustained.  The jury will disregard

5  it.

6  BY MS. WARD:

7  Q    Now you agree with me that the use of a taser in

8  drive stun mode without the probes is a pain compliance

9  technique; correct?

10  A    Correct.

11  Q    It's painful; correct?

12  A    Yes.

13  Q    It was applied to Mr. Kingsley for five seconds;

14  correct?

15  A    Standard cycle, yes.

16  Q    You're familiar with Judge Emory Plitt; correct?

17  A    Yes.

18  Q    And given his background, you would certainly

19  consider Judge Plitt to be an authoritative source with

20  respect to issues surrounding use of force; correct?

21  A    Correct.

22  Q    And also up to speed with respect to legal issues

23  surrounding the use of tasers; right?

24  A    Yes.

25  Q    Could you turn to Exhibit 99 in your binder, sir.
              JOHN PETERS - CROSS

1    A    Okay.

2    Q    This is the section of a Police Use-of-Force Guide

3    written by Judge Plitt entitled *Electronic Weapons*;

4    correct?

5    A    Correct.

6    Q    Okay.  Now, if you could please look at page two.

7    And on page two, Judge Plitt states:  "There are some

8    other issues with devices -- with such devices..." and

9    he's referring to electronic control devices; right?

10   A    Correct.

11   Q    "...that suggest that such devices should not be

12   used.  These include..." and then on No. 3 he says

13   "...punitively"; right?

14   A    Correct.

15   Q    And you agree with Judge Plitt that tasers should

16   not be used punitively; correct?

17   A    That's correct.

18   Q    And then No. 4 says, "When a person is already

19   handcuffed or otherwise restrained or passive"; correct?

20   A    Correct.

21   Q    Do you agree with that statement?

22   A    I agree with it insomuch as if the person is

23   passive.  If the person is actively resisting, no, I

24   would disagree with that statement.

25   Q    You disagree with Judge Plitt's statement, correct,

                    JOHN PETERS - CROSS

1   with respect to a person already handcuffed, that part

2   of it?

3   A    I disagree with it and I just talked with Judge

4   Plitt this week and --

5   Q    All right.

6          MS. WARD:  I'm going to move to strike the rest

7   of that.

8          THE COURT:  Sustained.

9          THE WITNESS:  That's fine.

10  BY MS. WARD:

11  Q    All right.  So the only observation you conducted

12  in this case was to watch the video of the incident;

13  correct?

14  A    Correct.

15  Q    And the jury can watch the video and come to a

16  different conclusion than you; correct?

17  A    Absolutely.

18         MS. WARD:  No further questions, Your Honor .

19         THE COURT:  Mr. Posnanski.

20         MR. JONES:  Can we have just one moment?

21         THE COURT:  You may.

22      (Pause at 10:05 a.m.)

23               REDIRECT EXAMINATION

24  BY MR. POSNANSKI:

25  Q    Can you estimate what percentage of cases in which
                    JOHN PETERS - REDIRECT

1  you served as an expert you served on behalf of

2  plaintiffs versus defendants?

3  A    Currently it's about 40% plaintiff.  Some years

4  it's more, some less.  Depends on the year.

5  Q    You were asked about serving as an expert in the

6  *Brown v. Trooper Berger* case.  Do you remember that, my

7  questioning?

8  A    Yes.

9  Q    And I believe you were asked that -- to confirm

10 whether or not in that case you thought the use of the

11 taser was unreasonable.

12 A    Correct.

13 Q    Why?

14         THE COURT:  I'm not -- you're asking why he --

15         MR. POSNANSKI:  Why he thought the use of the

16 taser in that case was unreasonable.

17         THE WITNESS:  The reason was in that particular

18 case, the person was on a small like moped motor bike;

19 had driven into a parking lot in an apartment complex

20 and didn't know there was a chain across the driveway

21 and got clotheslined off the bike.  He went down.  The

22 bike went down almost on top of him.  Gasoline flowed

23 from the bike.  And when the taser was deployed, it

24 ignited the gasoline and he was burned severely.

25 Officers are trained not to deploy tasers when there's

                    JOHN PETERS - REDIRECT

1  gasoline or any flammable vapors, and this was readily

2  there and the person was burned about 80% of his body.

3

4  BY MR. POSNANSKI:

5  Q    You've reviewed the videos in connection with your

6  review of materials in this case?

7  A    Yes.

8  Q    And in your review of the video, did you see

9  Mr. Kingsley rear up off the bunk?

10 A    Yes, you can see that.

11 Q    Was that resistance?

12 A    Yes.

13 Q    Is that active resistance?

14 A    Very active.

15 Q    If the officers who have testified in this case

16 that Mr. Kingsley was moving his hands while they were

17 trying to get his handcuffs off him, would that be

18 active resistance?

19 A    Yes.

20        MS. WARD:  Objection, Your Honor.  Leading.

21        THE COURT:  Sustained.  The jury will disregard

22 it.

23 BY MR. POSNANSKI:

24 Q    If the officers have testified in this case that

25 Mr. Kingsley was moving his hands while they were trying

JOHN PETERS - REDIRECT

1  to remove his handcuffs --

2        MS. WARD:  Objection Your Honor.  He's

3  summarizing testimony for the witness leading up to a

4  leading question.

5        MR. POSNANSKI:  I haven't asked the question.

6        THE COURT:  Sustained.

7        MR. POSNANSKI:  Your Honor, may I be heard on

8  this?

9        THE COURT:  You can ask another question.

10  BY MR. POSNANSKI:

11  Q    I'd like to show you what's been marked as

12  Plaintiff's Exhibit 12.  I can page through it so you

13  can identify it.  I'm showing you page three of this

14  exhibit.  Do you see what this document is?

15  A    Yes.  This is Sergeant Hendrickson's -- what

16  appears to be an incident report.

17  Q    Okay.  And you can take all the time you need with

18  this exhibit.  My question is whether this incident

19  report says whether the handcuffs were double locked

20  when Sergeant Hendrickson placed the handcuffs on

21  Mr. Kingsley in his original cell.

22  A    Could you go to the next page, please.

23  Q    Sure.  Can you read that?  It might be easier if

24  you go to the binder.

25  A    What number is it in the binder?
                    JOHN PETERS - REDIRECT

1  Q    It's Plaintiff's Exhibit 9.

2  A    9.   Thank you.

3            THE COURT:  I thought it was 12.

4            MR. POSNANSKI:  I'm sorry, 12.  Thank you, Your

5  Honor.

6            THE WITNESS:  I don't see any mention of double

7  locking.

8  BY MR. POSNANSKI:

9  Q    It doesn't mention it at all; right?

10 A    Correct.

11 Q    Doesn't say that they were not double locked.

12            MS. WARD:  Objection.  Leading.

13            THE COURT:  Overruled.

14            THE WITNESS:  I'm sorry?

15 BY MR. POSNANSKI:

16 Q    It doesn't say they were not double locked.

17 A    That's correct.

18 Q    If Mr. Kingsley moved his hands while the officers

19 were trying to remove his handcuffs, do you have an

20 opinion whether or not that would constitute active

21 resistance?

22 A    Yes, it would.

23 Q    And if Mr. Kingsley pulled his arms apart while the

24 officers were trying to remove his handcuffs, do you

25 have an opinion whether that would constitute active
                    JOHN PETERS - REDIRECT

1  resistance?

2  A     Yes.

3  Q     And what's your opinion?

4  A     It would be.

5  Q     And if Mr. Kingsley was flexing or tensing his arms

6  while the officers were trying to remove his handcuffs,

7  do you have an opinion whether or not that would

8  constitute active resistance?

9  A     That too would be active resistance.

10  Q     And if Mr. Kingsley lifted off the bunk as the

11  officers were trying to secure him and remove his

12  handcuffs, do you have an opinion on whether or not that

13  could constitute active resistance?

14  A     Yes, that would as well.

15  Q     And if that occurred, would that present objective

16  evidence sufficient to create an immediate threat to the

17  officers?

18  A     Yes.

19  Q     You were asked some questions about a slide from

20  one of your presentations.  Do you recall that

21  testimony?

22  A     Yes.

23  Q     What's the point of that slide in context with the

24  presentation?

25  A     That was, I think, on the *Use of Force by the*
                        JOHN PETERS - REDIRECT

1   *Numbers* Book; is that correct?

2   Q    It's Plaintiff's Exhibit 100, if you want to look

3   back at that.  And you were directed to page 63 of 200

4   in that exhibit.

5   A    Okay, I'm there.  The significant of that slide,

6   which is on the top of page 63 of Plaintiff's Exhibit

7   100, attempts to make a distinction between a possible

8   threat and an immediate threat.  And then you go to the

9   next slide where we give the actual examples of threats

10  where an officer said a fleeing burglar may have had a

11  gun under him.  It wasn't known.

12      Or a second example was a pregnant speeder who

13  refused to sign a ticket or get out of the car could

14  have fled in the car.

15      And then the third is beer tankers on the vehicle

16  floorboard could have been used as weapons.

17      What we teach there is not what could have

18  happened, it is what is happening.  So the fact that

19  there were beer tankers on the passenger side of the

20  floorboard and the officer said well, I used this amount

21  of force because they could have reached over, they

22  could have picked it up and they could have assaulted me

23  with it, that never happened.  So we're trying to draw

24  the distinction so that the officers understand the

25  difference between what possibly could have happened

JOHN PETERS - REDIRECT

1  versus what's happening right at the moment.  That's

2  what that's about.

3  Q    If Brian Landers testified that it would be wrong

4  to say an officer cannot use a taser against a subject

5  who is in handcuffs just because he is in handcuffs,

6  would you agree or disagree with that statement?

7            MS. WARD:  Objection, Your Honor.  Leading.

8            THE COURT:  Overruled.

9            THE WITNESS:  Could you repeat it again,

10 please?

11           MR. POSNANSKI:  Sure.

12 BY MR. POSNANSKI:

13 Q    If Brian Landers testified in this case that it

14 would be wrong to say an officer cannot use a taser

15 against a subject in handcuffs just because they're in

16 handcuffs, would you agree or disagree with that

17 statement?

18 A    I would agree with him in the sense that it would

19 be wrong to make that statement.  People who are in

20 handcuffs can hurt people.

21 Q    You were asked a question about your contact with

22 my firm and you testified earlier, when I was asking you

23 questions, how you were initially contacted.  Who have

24 you spoken with from my firm regarding your involvement

25 in this case?
                    JOHN PETERS - REDIRECT

1  A     Just you.

2          MR. POSNANSKI:  Nothing further, Your Honor.

3          THE COURT:  Ms. Ward, anything else?

4          MS. WARD:  I have no questions.

5          THE COURT:  You may step down.

6          THE WITNESS:  Thank you, Your Honor.

7      (Witness excused at 10:15 a.m.)

8          THE COURT:  And defendants, you have no other

9  witnesses; is that correct?

10         MR. POSNANSKI:  That's correct, Your Honor.

11         MR. JONES:  No further witnesses.

12         THE COURT:  And you're resting.

13         MR. JONES:  We are.

14         THE COURT:  And Mr. Pardon, do you have any

15 rebuttal evidence?

16         MR. PARDON:  We do not, Your Honor.

17         THE COURT:  All right.  10:15.  We'll -- why

18 don't you -- I'm going to send you jurors out for a

19 break.  Plan on coming back at 11 for the closing

20 arguments in the case.  In the meantime, counsel and I

21 will get the instructions ready.  I'll be reading the

22 instructions to you after the lawyers have given their

23 closing arguments.

24     Please leave your notepads on your chairs, and

25 remember do not talk about the case.

1          (Jury excused from courtroom at 10:16 a.m.)

2          THE COURT:  Counsel, we'll take a ten-minute

3     recess and when we come back, if you want to put your

4     motions on the record and we will discuss the jury

5     instructions and the form of the verdict.

6          (Recess               10:16-10:26 a.m.)

7          THE CLERK:  This Honorable Court is again in

8     session.  Please be seated and come to order.

9          MR. PARDON:  Excuse me, Your Honor.  Can I

10    knock to get Mr. Kingsley here?

11         THE COURT:  Absolutely.

12        (Plaintiff Kingsley enters courtroom)

13         THE COURT:  All right.  Mr. Jones, do you want

14    to make any Rule 50 motions at this time?

15         MR. JONES:  Yes, we do.  I'll turn it over

16    again to Mr. Posnanski.

17         MR. POSNANSKI:  Won't be quite as long-winded

18    this time.  We renew our Rule 50 motion for judgment as

19    a matter of law on the grounds that the evidence is

20    insufficient for the plaintiff to prevail on its claims

21    and no reasonable jury could find in his favor.

22        The only thing I would add to the comments I made

23    on the record the first time we moved is with respect to

24    the plaintiff's request for punitive damages, I don't

25    believe the evidence is sufficient to allow that issue

1  to even go to the jury.

2       I don't believe there was any evidence of the

3  defendants' ill will, malice, the types of conduct that

4  would be necessary to justify a punitive damage award.

5           THE COURT:  I'll continue to take that -- the

6  motions under advisement.  Mr. Pardon, did you want to

7  make any motions?

8           MR. PARDON:  Yes.  We have a Rule 50 motion and

9  Mr. Graham is going to do it.

10          THE COURT:  Mr. Graham.

11          MR. GRAHAM:  Morning, Your Honor.  Plaintiff

12  moves for judgment as a matter of law under Rule 50(a).

13  The defendants Stanley Hendrickson and Fritz Degner used

14  excessive force against plaintiff Michael Kingsley on

15  May 21, 2010.  No reasonable jury could find for the

16  defendants on the issue of whether the tasing

17  constitutes excessive force.  It is undisputed the

18  defendants use forced on Mr. Kingsley when they tased

19  him.  It is undisputed that Mr. Kingsley was harmed when

20  he was tased.  Mr. Kingsley said it hurt.  The officers

21  agree that it's painful, and according to the law, pain

22  is harm.

23       Plaintiffs also submits that the uncontroverted

24  facts show that it was unreasonable for defendants to

25  have tased Mr. Kingsley and defendants acted with

1   reckless disregard for Mr. Kingsley's safety.  No

2   reasonable jury could find otherwise.

3       Further, no reasonable jury could find for the

4   defendants on the issue of whether Sergeant

5   Hendrickson's pushing of Mr. Kingsley's upper torso into

6   the bunk, knee and his leg constituted excessive force.

7   Again, it's undisputed that Sergeant Hendrickson used

8   physical force on Mr. Kingsley, and the same

9   circumstances that made the tasing excessive contributed

10  to the unreasonableness of Sergeant Hendrickson's

11  actions.

12      Further, the videos unambiguously show Sergeant

13  Hendrickson pushing Mr. Kingsley's head and upper torso

14  down with force.  The video shows how this happened and

15  how much force was used.  As for a harm, no reasonable

16  jury could find there was no harm here.  Mr. Kingsley

17  testified that it hurt when he was pushed down into the

18  bunk.  And there's no *de minimus* injury ruled for civil

19  rights violations.

20      To the extent that their argument is there's -- the

21  use of force was *de minimus*, the video tapes a different

22  story and no reasonable jury can find that Sergeant

23  Hendrickson's use of force in this regard was trivial.

24      Your Honor, the plaintiffs submits the Court should

25  grant plaintiff's Rule 50 motion under the excessive

1    force standards set forth in the jury instruction --

2    your order of the jury instructions.  But as the Court

3    is aware, plaintiff proposes a slightly different

4    standard and we believe that under that standard as well

5    we're entitled to judgment under a matter of law.  Thank

6    you.

7              THE COURT:  And I'll take that motion under

8    advisement as well.  Anything else then before we start

9    on the instructions and the verdict?

10         Let's start with the verdict form.  First question

11   is:  "On May 21st, 2010, did one or both of the

12   defendants use excessive force against plaintiff Michael

13   Kingsley?"

14         Any problem with that question in that form?

15             MR. PARDON:  No, Your Honor --

16             MS. WARD:  Well --

17             MR. PARDON:  I'm sorry, go ahead.

18             MS. WARD:  For Question No. 1 in its entirety

19   or just the part you read?  Because there's sub parts to

20   Question 1 as well that we did want to talk to you

21   about.

22             THE COURT:  As to Stan Hendrickson and Fritz

23   Degner?

24             MS. WARD:  I'm sorry, did you just -- you just

25   read Question No. 1?

1          THE COURT:  I'm just talking about Question No.

2  1.

3          MS. WARD:  Oh, I'm sorry.

4          MR. PARDON:  We're confused.  I'm sorry.

5          MS. WARD:  It's my fault.

6          MR. PARDON:  Primarily because I couldn't find

7  the verdict form, so...

8          THE COURT:  All right.

9          MR. PARDON:  No, the verdict form is fine.

10          THE COURT:  Okay.  Just as to Question No. 1.

11  Then Question No. 2:  "What amount of money will fully

12  and fairly compensate plaintiff Michael Kingsley for the

13  harm caused by defendants?"  And there's a place to

14  insert the sum of money.

15      And then:  "Did one or both of the defendants act

16  in a way that demonstrated a willful or reckless

17  disregard for plaintiff's rights?"  Yes or no.

18      And then Question No. 4:  "What amount of money, if

19  any, do you award as punitive damages?"

20          MS. WARD:  So Question 3, the one that relates

21  to the excessive force standard that goes hand-in-hand

22  with the instructions, we wanted to renew our request

23  for --

24          THE COURT:  Okay.  We'll get to that.  I just

25  wanted to go over the verdict form.

1          MS. WARD:  Okay.

2          THE COURT:  Okay.  Then taking the post-trial

3   instructions, first one is just the introduction.

4       Secret deliberations.

5       The need for a unanimous verdict, et cetera.

6       Then the burden of proof.

7       Preponderance of the evidence.  I'll just keep

8   going.  If you have an objection, speak up.

9       Answers not based on guesswork.

10      Number of witnesses.

11      All persons equal before the law.

12      Impeachment by conviction of a crime.  I believe

13  the impeachment part, I think that raises questions.

14      Just the heading will be conviction of a crime.

15          MR. PARDON:  Okay.

16          MR. JONES:  So not impeachment by conviction of

17  a crime.

18          THE COURT:  Huh?

19          MR. JONES:  I was trying to clarify what Your

20  Honor had said.  You mean take out *impeachment by*.

21          THE COURT:  Right.  I just think that's a

22  little bit confusing in this instance.  It explains in

23  the instruction you may use that evidence; that is, that

24  he's been convicted of crimes, to help you decide

25  whether his testimony is truthful and how much weight to

1  give to his testimony.

2          MR. JONES:  So you're just talking about

3  changing the heading.

4          THE COURT:  Just the heading, yeah.

5          MR. JONES:  No objection.

6          MR. PARDON:  Could I make a suggestion?

7          THE COURT:  Yes.

8          MR. PARDON:  I think that there was some back

9  and forth about whether the evidence could be whether

10  Mr. Kingsley had been convicted of a felony or six

11  felonies and the way it says here, it says *convicted of*

12  *crimes*.  I'm wondering if it could just say convicted of

13  a felony or just convicted.  Because the evidence

14  wasn't --

15          THE COURT:  Convicted of a felony.  Any

16  objection to that?

17          MR. JONES:  Well, given Your Honor's ruling

18  about what was permissible, without waiving our earlier

19  objection to that ruling.

20          THE COURT:  All right.  Then multiple

21  defendants.

22      You must give separate consideration to each claim

23  and each party.

24      Okay.  And now the special verdict question we get

25  into the definition of excessive force.  And was this

1    what you put on the bench?

2              MS. WARD:  Yes, Your Honor.

3              THE COURT:  This is from the Seventh Circuit?

4              MS. WARD:  Yes.  Do you want me to address the

5    question now?

6              THE COURT:  Sure.

7              MS. WARD:  Okay.  So we would just like to

8    request that the originally proposed post-trial jury

9    instructions be used because we submit that there isn't

10   a separate subjective element for the instruction for

11   excessive force in the Seventh Circuit.  There are a

12   number of Seventh Circuit pretrial detainee failure to

13   protect or conditions of confinement cases in which a

14   separate determination of intent is articulated.  In

15   those cases, the necessary level of intent is

16   deliberate, callous indifference and reckless disregard.

17   However, in excessive force cases, the conduct will

18   always be intentional.  So there's a distinction between

19   a failure to protect where, for example, a prisoner is

20   beaten by other prisoners and then the level of intent

21   comes into question because it's whether the prison

22   officials, it accidentally happened on their watch or

23   they egged it on, and that's when the level of intent

24   becomes an issue.

25        But in an excessive force case, the conduct will

1  always be intentional.  Indifference or disregard makes

2  no sense.  And in that respect, Your Honor, we submit

3  that the way the jury instructions are currently worded

4  is confusing.

5       In the Fourteenth Amendment context, excessive

6  force is any force that is determined to constitute

7  punishment, and the Seventh Circuit has squarely held in

8  *Wilson v. Williams* that intent to punish can be inferred

9  from the objective factors used to determine whether a

10  use of force is unreasonable.  That holding of *Williams*

11  is set forth in the Seventh Circuit Pattern Instruction

12  708 and 709, which we provided to Your Honor, and those

13  are the instructions on which we based our proposed

14  instructions.

15       In *Wilson*, the Seventh Circuit held that the trial

16  court's jury instruction was not inappropriate in the

17  Fourteenth Amendment context where that instruction

18  stated the test was objective on reasonableness.  That

19  was the holding of *Wilson*.

20       The Court in *Wilson* also held that even if the test

21  for excessive force is not wholly objective, the jury

22  can rely on those objective factors to infer intent, and

23  the fact that a separate subjective element isn't a part

24  of the excessive force standard in the Seventh Circuit

25  is also shown in pattern instruction 709, which

1   expressly states that "in deciding whether the

2   defendant's use of force was unreasonable, you must not

3   consider whether the defendant's intentions were good or

4   bad."

5       And I want to draw the Court's attention to two

6   additional cases that we also provided to Your Honor and

7   those are *Titran v. Ackman* and *Davis v. Peoria County*.

8   In *Titran*, the Seventh Circuit held that most of the

9   time the propriety of using force on a person in-custody

10  pending trial will track the Fourth Amendment.  The

11  court must ask whether the officials behaved in a

12  reasonable way in light of the facts and circumstances

13  confronting them.

14      In the *Davis* case that we provided to Your Honor,

15  the Central District of Illinois analyzed the Seventh

16  Circuit law on this issue and found that reasonableness

17  is the key analysis for both pretrial detainees and

18  arrestees.  The court there referred to the intent

19  element as just the intent to use force.

20          THE COURT:  So, you have no objection to the

21  proposal for No. 1, defendants used force on plaintiff.

22          MS. WARD:  No. 1 of the special verdict?

23          THE COURT:  I'm talking about --

24          MS. WARD:  Oh, yes.  Correct.  Yes, Your Honor.

25          THE COURT:  Then defendants' use of force was

1  unreasonable in light of the facts and circumstances at

2  the time.

3          MS. WARD:  Correct.  We have no problem with

4  that either.

5          THE COURT:  Okay.  So it's the third one.  That

6  defendants knew that using force presented a risk of

7  harm to plaintiff but they recklessly disregarded his

8  safety by failing to take reasonable measures to

9  minimize the risk of harm.

10         MS. WARD:  Right.  And it's that that we submit

11 is confusing.  The *disregard of plaintiff's safety* is

12 confusing in the context of an excessive force case

13 where they were deliberately applying force.

14    So we would suggest eliminating 3, and also we had

15 an argument for eliminating 4 as well.

16         THE COURT:  I'm sorry, for eliminating?

17         MS. WARD:  No. 4.  The defendants' conduct

18 caused harm.

19         THE COURT:  Well, let's stick with No. 3.

20         MS. WARD:  Sorry to jump ahead.

21         THE COURT:  Mr. Posnanski.

22         MR. POSNANSKI:  Yes, Your Honor.  We would

23 reiterate our request for the initial pretrial

24 instruction we submitted on the excessive force issue.

25 But to write intent completely out of the instruction I

76

1  think flagrantly violates what *Wilson* tells us.  *Wilson*

2  specifically says the standard is neither wholly

3  objective nor wholly subjective.  Plaintiff wants to

4  remove that subjective element in its entirety.

5      The language that Wilson specifically approved

6  right from the middle of its discussion of the

7  appropriate standard in an excessive force case

8  involving a pretrial detainee states that "a plaintiff

9  must prove the defendants acted deliberately or with

10  callous indifference evidenced by an actual intent to

11  violate the plaintiff's rights or reckless disregard for

12  his rights."  And then it goes on to cite two other

13  Seventh Circuit cases with approval for the basis for

14  that language.

15      I think this language properly instructs the jury

16  to include the intent of the officers and provides them

17  the appropriate parameters with which to assess the

18  officers' intent.  It doesn't come from the *Wilson*

19  discussion of a prison security context, it's regarding

20  the appropriate standard to evaluate excessive force

21  brought by a pretrial detainee like Mr. Kingsley.

22      I think 3 should actually be bolstered with the

23  actual language used by *Wilson* would be our position.

24          THE COURT:  What would you propose?

25          MR. POSNANSKI:  So it would read:  The

plaintiff must prove defendants acted deliberately or
with callous indifference evidenced by an actual intent
to violate the plaintiff's rights or reckless disregard
for his rights.

MS. WARD:  Your Honor, can we respond to one
point that Mr. Posnanski just raised?

THE COURT:  Yeah.  I'm just getting this in
front of me so that I know what we're talking about.

MS. WARD:  Okay.

THE COURT:  Would you say that again?

MR. POSNANSKI:  The direct quote is "Plaintiff
must prove that defendants acted deliberately or with
callous indifference evidenced by an actual intent to
violate the plaintiff's rights or reckless disregard for
his rights."  And that's from *Wilson v. Williams* at page
875.  It's 83 F.3d 870.  That comes from page 875.

THE COURT:  And Ms. Ward.

MS. WARD:  For No. 3, I mean we agree that it
is not wholly objective; that there is an intent
element.  But it's only the intent to use force.  So we
would not object to *defendants intended to use force*.

With respect to what Mr. Posnanski -- I'm sorry,
I'm going to butcher your name -- just told the Court,
what he quoted to you was not the holding of *Wilson*.  It
was, in fact, a quote of *Anderson v. Gutschenritter*

1  which the court was citing in *Wilson*, and *Anderson* is a

2  failure to protect case.  So that is exactly in line

3  with what we just presented to the Court.

4       THE COURT:  I want to look at *Wilson*.  I'm

5  really pretty much persuaded to give what I've already

6  got, but I wanted to ask you, Ms. Ward, why do you think

7  that we don't need an element about whether harm was

8  caused to the plaintiff?

9       MS. WARD:  Again, looking at the pattern

10 instructions from the Seventh Circuit, yesterday the

11 defendants in their Rule 50 motion, they argued that

12 Mr. Kingsley was injured, and we submit that in the

13 Seventh Circuit, injury isn't a required element of an

14 excessive force claim.  I think the use of harm is an

15 element.  Element would suggest to the jury that a

16 lasting injury or a severe injury is required and that's

17 not the law in the Seventh Circuit.  There's a number of

18 cases and pattern instruction 708 that are directed

19 exactly to this issue.  And if they're going to argue

20 that lasting injury is a requirement and then the

21 instruction says harm, the jury thinks that that harm

22 needs to be a lasting injury.  If there's any suggestion

23 that *de minimus* force or nonlasting injury isn't good

24 enough, we would submit that would be an incorrect

25 statement of the law.  And in fact, in one of those

1    cases cited in the pattern instruction, the force used

2    was a shove and a poke and the court said that was a

3    sufficient injury to constitute harm.

4            THE COURT:  Well, he has testified it was

5    painful.

6            MS. WARD:  Yes, Your Honor.  If there was a

7    clarifying instruction with *harm*, that pain is

8    considered harm, we wouldn't have a problem with that.

9    It's just the extent that they're going to argue and

10   there will be any suggestion to the jury that some form

11   of lasting injury is required under the law, that's what

12   we would have the objection to.

13      Your Honor, Mr. Pardon just reminded me as well

14   that it's confusing also with respect to the punitive

15   damages standard.

16           THE COURT:  I think I'll add "a person can be

17   harmed even if he does not suffer a lasting injury

18   or..."

19           MS. WARD:  Or severe injury.

20           MR. POSNANSKI:  Your Honor, I think the

21   language used in *Wilson* says *some harm*.  That was the

22   instruction that was approved in *Wilson*.  It certainly

23   doesn't raise to the level of severe injury.  That also

24   comes from page 876 of *Wilson*.

25           THE COURT:  So you're suggesting if I just said

"For the fourth element defendants' conduct caused some
harm..."

      MR. POSNANSKI:  I think that would be
appropriate.  And then in addition to the factors that
the jury is instructed to consider, one of those
elements is the extent of the plaintiff's injuries.  So
they are instructed to take that into consideration.

  From our perspective it's certainly not
inappropriate to argue the extent of the plaintiff's
injury.  It's one of the elements of the case.  It's one
of the elements the jury is going to have to consider.

      THE COURT:  And the plaintiff can argue that,
as I'm going to say, that a person can be harmed even if
he does not suffer a severe injury.  Okay.  We'll stick
with what I have with the addition of "a person can be
harmed even if he does not suffer a severe injury."

  And then the damages questions.  Compensatory
damages, anything about those?

      MR. PARDON:  Are you including or not including
a statement about nominal damages?

      THE COURT:  I will.  It's at the bottom of the
paragraph on page five.  "If you find in favor of
plaintiff on Question No. 1, but find that he's failed
to prove he suffered any compensatory damages, you
should enter one dollar in nominal damages."

1          MR. PARDON:  Okay.  We would ask that you not

2     include that for the same reasons we had stated earlier,

3     which is that it actually -- it invites that outcome.

4     There's already an instruction about the particular type

5     of damages that we're asking for and we don't think it's

6     necessary.  So we're just renewing our objection.

7          THE COURT:  Where did you have that, that

8     proposal?

9          MR. PARDON:  Originally in our objections to

10    jury instructions.

11         THE COURT:  Oh, in your objections.

12         MR. PARDON:  Yeah.

13         THE COURT:  What page was that?  I'm having

14    trouble finding it.

15         MR. PARDON:  I'm sorry, page eight.

16         THE COURT:  Page eight?

17         MR. PARDON:  I don't have a docket number in

18    front of me.  Does Your Honor have our objections, our

19    original objections?

20         THE COURT:  I thought I did.  Docket No. 117,

21    Plaintiff's Objections to Defendants' Proposed Jury

22    Instructions.

23         MR. PARDON:  That sounds right, yeah.  Page

24    eight of that under B.  It's the last part of the

25    paragraph.

1          THE COURT:  Oh, I see.  Okay.  The jury can

2     ignore any evidence of harm and instead split the --

3          MR. PARDON:  Right, yes.

4          THE COURT:  Okay.  But that's what we're doing

5     here.  First of all we're asking the jury to find was

6     there harm caused, and then asking them to consider in

7     the damages portion what that harm amounted to.  So I'm

8     not sure -- you say consider liability first and then

9     consider damages and I think that's what we're doing.

10          MR. PARDON:  I understand that.  I just think

11     that this instruction, within the context of damages,

12     even suggests that they can go back and not find

13     liability and split the baby.  I'm sorry, that they can

14     -- they can suggest that they can say -- it invites them

15     not to award an amount of damages, but just to say --

16     when, in fact, they may otherwise have, because they

17     don't need to be told they can use one.  They can figure

18     out one.  I guess that's what I've been trying to say

19     here.  They don't need to be told you can award a

20     dollar.  I mean they can figure out that they can award

21     a dollar.

22          THE COURT:  If you want it out, I'll take it

23     out, because I think it's something that's favorable to

24     the plaintiff.

25          MR. POSNANSKI:  We would request that it stay

83

1   in, Your Honor, because it's part of the standard

2   instruction from 7.23 from Seventh Circuit pattern

3   instructions.

4           MR. PARDON:  All right.  Leave it in.

5           THE COURT:  We'll leave it in.  Do you want the

6   inserts --

7           MR. PARDON:  Your Honor, I'm sorry.  May I

8   consult with my client for ten seconds?

9           THE COURT:  Of course you can.

10      (Discussion off record at 10:54 a.m.)

11          MR. PARDON:  Thank you, Your Honor.  I

12  apologize.  You can leave it in.

13          THE COURT:  Do you think we need the

14  instruction on income taxes in this case?

15          MR. PARDON:  No.

16          THE COURT:  Defendants?

17          MR. JONES:  I'm sorry.  Just one second, Your

18  Honor.  I'm reading it again.

19          THE COURT:  Sure.

20      (Pause at 10:54 a.m.)

21          MR. JONES:  We're okay with taking it out.

22          THE COURT:  Okay.  And then if you'd look over

23  the instruction on punitive damages.

24          MR. JONES:  Just as a question, Your Honor.

25  What we're looking at are the instructions that you

1  handed out to us, provided to us at the Final Pretrial

2  Conference.

3            THE COURT:  Right.

4            MR. JONES:  Okay.

5            MR. POSNANSKI:  We have no problem with the

6  punitive damages instruction.

7            THE COURT:  Okay.

8            MR. JONES:  Without waiving, however,

9  Mr. Posnanski's earlier motion.

10           THE COURT:  Right.  Any problem with the

11  punitive damages?

12           MR. PARDON:  No, Your Honor.

13           THE COURT:  Okay.  And then the final one is

14  just selection of the presiding juror and communicating

15  with the judge.

16           MS. WARD:  No issues with that one.

17           THE COURT:  Okay.

18           MR. POSNANSKI:  We have no problem with that.

19  We have two issues:  One we'd like to raise and one we'd

20  like clarification on.

21           THE COURT:  Okay.

22           MR. POSNANSKI:  We would request that the jury

23  be given a limiting instruction concerning the evidence

24  of officers' compliance with training and policy.  That

25  comes from Seventh Circuit pattern instruction 7.04.

1  Given the evidence that came in in this case regarding

2  whether or not the officers complied with or violated

3  their training, I think it's appropriate to instruct

4  them that compliance violation of that training is not a

5  constitutional violation.  The issue is whether the

6  officers used excessive force on Mr. Kingsley.

7       We have a proposed instruction.  It follows closely

8  with the model instruction.

9            THE COURT:  Why don't you bring that up to me.

10           MS. WARD:  Do you have a copy?  Thanks.

11           THE COURT:  Thank you.

12           MS. WARD:  Your Honor, this isn't exactly

13  what's in the Seventh Circuit pattern instructions.  I

14  was just wondering if I could ask for clarification

15  where they modified the pattern instruction from what

16  was in -- normally that's shown by marking it and

17  there's no marking here.  I'm not trying to be picky, I

18  just want to know what they did to the Seventh Circuit

19  pattern instruction.

20           MR. JONES:  I believe Mr. Posnanski is marking

21  as we're paused here.  I don't think the intent was to

22  materially change the instruction at all.

23           THE COURT:  Okay.

24           MS. WARD:  We don't think the instruction is

25  needed.  I mean even without seeing what the markings

1   were, the issue of whether they complied with their

2   training is part of the totality of the circumstances,

3   which I think is adequately instructed in the excessive

4   force and unreasonable force definition, especially the

5   unreasonable force factors that the Court is providing

6   already.

7           MR. POSNANSKI:  Your Honor, the Seventh

8   Circuit, this instruction is black letter law approved.

9   I mean it's appropriate where plaintiff comes in arguing

10  that, as we have here, the officers failed to comply

11  with their training.  The Advisory Committee comments

12  "this instruction should be given if evidence was

13  admitted at trial about compliance with the statute,

14  rule or regulation."  We have that.

15          Under the circumstances here, this instruction is

16  appropriate to ensure there's no confusion that just

17  because the officers may have training, they commit --

18  they use excessive force.

19          THE COURT:  I'm going to check -- I'm going to

20  check this out with the Seventh Circuit Handbook and

21  see.  Anything -- you said you had one other thing?

22          MR. POSNANSKI:  Yes, Your Honor.  If we could

23  just have clarification on what language is going to be

24  added to the jury instruction regarding harm.

25          THE COURT:  Oh, yes.  Right.  It is:  "A person

1  can be harmed even if he does not suffer a severe

2  injury."

3          MR. POSNANSKI:  Thank you.

4          THE COURT:  All right.  I'll take these

5  upstairs so we can get them amended and we'll resume at

6  11:15.  We'll resume without the jury first.

7      (Recess    11:00-11:15 a.m.)

8          THE COURT:  Okay.  If you turn to page five --

9  four, I inserted "a person can be harmed even if he did

10 not suffer a severe injury."  And then added the

11 paragraph, "You've heard evidence about whether the

12 defendants' conduct complied with or violated their

13 training..."  And then "If you find the plaintiff has

14 failed to prove any element of the excessive force

15 claim..."

16     Anything else on instructions or verdict form?

17         MR. PARDON:  No, Your Honor.

18         THE COURT:  All right.

19         MR. JONES:  There was just the one remaining

20 issue about this Exhibit 512 and whether it should be

21 redacted or not.

22         THE COURT:  Oh, right.

23         MR. JONES:  And I guess I would just take the

24 position that I don't feel it's necessary to redact the

25 exhibit or even appropriate.  It went in without

1    objection.  I guess there are things in the shift log

2    that relate entirely to other prisoners.  If that's all

3    that needed to be redacted, I guess I wouldn't have an

4    issue with that.  There are two --

5         THE COURT:  I'm sorry.  I thought the portions

6    of things that happened to Mr. Kingsley after this event

7    should be redacted.

8         MR. JONES:  I guess we would just take the

9    position that unlike -- as the motion in limine was

10   posed and as we understood Your Honor's order, these are

11   actually events that occurred that same day, and

12   certainly there has been an argument made, there will be

13   an argument made to the jury that Mr. Kingsley was doing

14   everything he could to cooperate with the officers and

15   it was completely involuntary that what happened

16   happened.  I think the two entries that are in here

17   about his behavior yet that day are relevant to that

18   issue.

19        THE COURT:  And I don't.  So they'll have to be

20   redacted, as well as the references to other prisoners.

21        Okay.  Then you can bring in the jurors.

22        Who will be giving the first closing argument?

23   Mr. Pardon?  And Mr. Jones.  Okay.

24        (Jury brought in courtroom at 11:18 a.m.)

25        THE CLERK:  This Honorable Court is again in

1  session.  Please be seated and come to order.

2       THE COURT:  Members of the Jury, we're now

3  going to have the closing arguments in this case.  As

4  you know, the plaintiff has the burden of proof.  For

5  that reason, the plaintiff's counsel, in this case

6  Mr. Pardon, will go first with a closing argument.  And

7  then he will have a short -- an opportunity for a short

8  rebuttal argument after Mr. Jones has argued on behalf

9  of defendants.

10      Listen very carefully to what the lawyers say to

11  you because it can be very helpful in seeing the bigger

12  picture, seeing how the bits and pieces of evidence go

13  together and fit into that picture.  But keep in mind

14  that you are the judges of the facts.  And if the

15  lawyers say something to you that you don't think is

16  quite what the facts are, you, as a collective body, are

17  the ones who decide what the facts of this case are.

18      I'll call now on Mr. Pardon.

19      MR. PARDON:  Thank you, Your Honor.

20      THE COURT:  And I'd ask you to put your

21  notepads and paper on the floor.  This is not an

22  evidentiary stage of the trial, this is the argument

23  stage.

24      MR. PARDON:  Ladies and Gentlemen of the Jury.

25  Before I begin discussing the case, on behalf of

1    Mr. Kingsley and on behalf of myself and my colleagues,

2    I want to say thank you for your time and your service.

3    We understand it's not the easiest thing in the world to

4    drop everything you've got going for three days.  I

5    guess it's four days when you consider last week.  But

6    it's important that you're here.

7        One of the best things about our system here is

8    that it doesn't matter whether we're talking about a

9    criminal trial or a multi-million dollar corporate trial

10   or an excessive force case involving an inmate in the

11   county jail.  No matter the size of the case, to the

12   parties involved it's really important.  And that

13   includes the defendants, as well as Mr. Kingsley.  Your

14   effort here is really what makes that work.

15       Now there are a number of reasons why we have

16   excessive force cases like this one.  But I'd like to

17   focus on one to start.  One of the reasons frankly our

18   country has generally good professional police forces

19   and jail forces is that we have courts and jurors like

20   you who can stop them when they go over the line.  And

21   that's an important part of what this case is about.

22       In addition to the video, that's why we presented

23   to you the independent opinion of Mr. Landers.  You

24   heard him.  He's a police officer with 18 years of

25   experience in Wisconsin.  He teaches police officers

1    here.  He came to confirm that what you saw with your

2    own eyes on the video is wrong, and to explain why, in

3    terms of the professional standards that are expected of

4    officers in Wisconsin.

5          Specifically we submit to you two things:  First,

6    that tasing Mr. Kingsley while handcuffed behind the

7    back face down on a concrete bunk with four larger

8    officers surrounding him was excessive force in

9    violation of his constitutional rights.

10          Second.  We submit to you that Mr. Hendrickson's

11    actions in pushing or slamming Mr. Kingsley's head into

12    the concrete bunk was excessive force.  It was uncalled

13    for.

14          Now, before I go through the evidence in greater

15    detail, I'm going to talk about the burden of proof.  As

16    the Judge said, Mr. Kingsley has the obligation to prove

17    his case, and the Judge is going to struck you that the

18    burden of proof is the preponderance of the evidence.

19    She'll tell you that that means you must be persuaded by

20    the evidence that Mr. Kingsley's claims for excessive

21    force and damages are more probably true than not true.

22    It's not a higher burden like beyond a reasonable doubt

23    like you sometimes hear in criminal trials.  So keep

24    that in mind.

25          Now the defendants are going to argue to you that

you have to consider the whole picture here, keep

everything in context, and that's because they don't

want you to look too closely at the video, which is the

most important evidence in the case.

But let's start with some context.  All right?

This incident started over a paper covering a light.

The paper had been there for a month.  Mr. Kingsley

testified to that, and you didn't hear any of the other

officers deny that.

Lieutenant Conroy said he believed Mr. Kingsley

when he said he didn't put it up.  You saw the photo of

a jail cell and you saw that it wouldn't have been that

easy for Mr. Kingsley to reach up or jump up and take it

down.

You also heard Lieutenant Conroy testify that the

cells are not always locked down.  They're open at times

during the day; and that he, in fact, had been willing

to take it down.  So it's not like the staff may not

have had the ability to take it down.

Now, despite all of that, Mr. Kingsley acknowledges

that he was ordered to take the paper down and he

didn't.  He understands that.  He admits, he knows that

he didn't comply with the orders.  He told you he

doesn't always make good decisions.  That's why he was

in jail.  But that's not the point.

1    The point is it's possible when you put this in

2 context that this entire event, incident could perhaps

3 have been avoided if there had been a little more

4 perspective here on the part of the jailers.  I mean you

5 heard we've got to maintain order.  We agree.  You've

6 got to maintain order.  But sometimes you can be

7 overzealous.  I submit to you that I don't think the

8 good order and discipline of the Monroe County Jail

9 would have crumbled if a paper that had been covering a

10 light for a month wasn't immediately dealt with at 5:45

11 in the morning.

12    Now in order to justify their action, the

13 defendants want you to think there was a serious threat

14 here when they went to move Mr. Kingsley.  So they made

15 a point of a few things.  First, they said that

16 Mr. Kingsley had said "Better call out the CERT team" to

17 Deputy Manka the night before when they moved him.  That

18 suggests that he was making threats and they took that

19 very seriously.  The only problem is there's no evidence

20 that anybody who actually heard that statement was there

21 when it was made.  Mr. Kingsley told you he was joking,

22 he was sarcastic with Deputy Manka when he made it, and

23 he had a good relationship with Deputy Manka.

24    Guess who wasn't here to testify?  Deputy Manka.

25 He's the only one who heard that remark.  We suggest if

1   there had been a real threat to what he had said, Deputy

2   Manka would have been here to tell you that.

3        Now the defendants will make -- they have and

4   they'll make a lot of hay about the fact that

5   Mr. Kingsley refused requests to walk and complained

6   about his foot; wouldn't say which foot hurt.  All

7   right.  That's all passive resistance.  The evidence is

8   undisputed that you don't tase somebody for passive

9   resistance or because you had to carry them.

10       It's also not disputed, and you heard repeated

11  testimony on this, that Mr. Kingsley was not threatening

12  to the deputies at any point during that process; wasn't

13  threatening when they talked to him before moving him;

14  he wasn't threatening while they were moving him.  In

15  fact, you also heard about some testimony from Sergeant

16  Hendrickson and Deputy Blanton that they supposedly had

17  trouble cuffing him initially.  And Mr. Kingsley denied

18  that.  He said he didn't provide any resistance.

19       Now there's no video of that, but what we do know

20  from Deputy Blanton's testimony yesterday is that he was

21  able to assist him, Sergeant Hendrickson, while he was

22  still securing Mr. Kingsley's legs.  So we submit it

23  couldn't have been -- whatever happened, it wasn't

24  significant.

25       And you also know that other than Officer Degner

1    with the taser pointed at him, and Officer Degner did

2    testify for part of the time that he had a taser pointed

3    at him, that no one else had to come in and help with

4    this handcuffing.

5        And you can recall from the silent video that you

6    saw of the cellblock -- you'll get a chance to look at

7    that again when you do your deliberation -- none of the

8    other deputies in the cellblock looked anxious or

9    worried.  They were just standing out kind of looking

10   around.  So we submit to you that whatever happened

11   putting his handcuffs on was not significant or

12   significant enough to justify using the taser here.

13       Furthermore, you heard Mr. Hendrickson acknowledge

14   yesterday that they had control of him once they had him

15   in cuffs.  That's what he acknowledged on his

16   cross-examination, and he acknowledged that they

17   maintained control of Mr. Kingsley while they carried

18   him.  And he acknowledged that they maintained control

19   of him while he was in the receiving cell.  That's the

20   situation that you need to keep in mind when you look at

21   the video.

22       So, I'd like to talk a little bit about the video,

23   which I think is the most important piece of evidence in

24   this case for you to consider.  And I would submit to

25   you, you've heard a lot of testimony, but the simplest

1  way to evaluate that testimony is to use your own common

2  sense.  Again, please put this in perspective.  There

3  are four officers around Mr. Kingsley.  They're larger

4  than him.  One of them has a taser.  He's handcuffed.

5  He's handcuffed behind his back, and he's under control

6  according to then Sergeant Hendrickson.

7      Now the officers say Mr. Kingsley was resisting

8  them by not letting them take off his handcuffs and

9  Mr. Kingsley says he wasn't.  Well, you'll have to look

10  for yourself.  We acknowledge -- I think everybody says

11  you can't specifically see his arms the entire time

12  during the video.  But there's a lot of other evidence

13  on the film that you can look to to help you make that

14  determination.

15      I would submit that first, you should look when the

16  officers first carried him in.  Look at his arms when

17  you can see them.  Look at Mr. Kingsley's arms.  You

18  won't see them moving around.  You won't see anything

19  clenched.  And when you're looking at that portion of

20  video, watch his legs.  Watch his torso or the portions

21  of the body you can't see.  I suggest you simply aren't

22  going to see active resistance.  And I'm going to ask

23  that that portion of the video be played.

24      (Video played)

25          MR. PARDON:  Look at his arms.  We stopped it

there.  I'm going to play another segment in a minute or
two.  And I'm going to ask you again, look at the parts
of his body that you can't see.  You're not going to see
a lot of movement.

     In the next segment, you'll see Mr. Kingsley lift
his head a couple of times to talk, breathe, whatever.
You'll hear Sergeant Hendrickson say "You gonna relax
while I take these off?"  And you'll hear Mr. Kingsley
say "take the motherf'ers off."  And then you'll hear
Sergeant Hendrickson reply "Well, then stay on then."  I
suggest that that response is not helping the situation
either, it's actually escalating it.

     I don't know if you paid attention -- I would
suggest that that response is not any part of
appropriate control talk.  I know you paid attention,
but what I was going to say is I don't know if you
noticed that when Mr. Jones went through the types of
control talk with Mr. Landers when he was up here, he
skipped over that comment.  He didn't want to emphasize
that comment because really, I submit it escalated
things.

     All right.  So then you're going to see
Mr. Kingsley lift his head.  He's going to say "well,
stay on then."  And then he's going to look toward
Degner, he's going to say "well, get the 'f' out."  And

1  then you'll see Sergeant Hendrickson sort of drop his

2  arm.  It's not clear, you can't tell whether he may have

3  brushed up against Mr. Kingsley or not, but you'll see

4  some sort of involuntary arching up by Mr. Kingsley with

5  no attempt to bite, by the way, followed by Sergeant

6  Hendrickson then coming down on him and began that

7  series of movements around his head where Sergeant

8  Hendrickson said he was attempting, among other things,

9  to apply a pressure point technique.  So please play

10 that portion.

11      (Video played)

12      MR. PARDON:  All right.  First of all, with

13 respect to the pressure point that Sergeant Hendrickson

14 was applying, that's a type of use of force.  As he's

15 acknowledged, he didn't write that in his report.  Now,

16 if you're an officer and you undertake a legitimate use

17 of force, you write that down.  Mr. Landers testified

18 that that's the standard, and I think you know just from

19 your own experience or your own -- it's common sense.

20 You write it down if you actually think that you applied

21 a legitimate type of force or attempted to.

22     Now, Sergeant Hendrickson testified he had a

23 concern about potential biting.  Now, he admits now that

24 he knows Mr. Kingsley had never bitten him, but he

25 suggested that at the time he had a concern about being

1   bitten.  I'm going to get to that in a little more

2   detail shortly, but I want you to recall or you'll

3   notice if you go back and look, those times when Mr.

4   Kingsley lifted his head, they were back a little bit

5   earlier than this, they were around 6:44:50 or 51 in the

6   video, that's nearly a full minute before Sergeant

7   Hendrickson ordered Deputy Degner to tase Mr. Kingsley.

8        So we submit to you that if he was tased because of

9   some concern that he was about to be bitten, that

10  doesn't make any sense.  It took an entire minute then.

11  I don't think that's a real concern.

12       All right.  So I'm going to ask you to watch the

13  next segment, and you'll see a few things.  First of

14  all, we submit you won't really see Mr. Kingsley's body

15  moving follow, you won't see the deputies moving around,

16  working hard to hold on to him as if he were struggling.

17       Now, Mr. Kingsley is small compared to the

18  deputies, but I think you'd still notice a struggle if

19  he was putting up one.  You'll see Sergeant Shisler at

20  his feet.  He's not struggling.  And for part of the

21  time, you'll notice that Deputy Degner is actually

22  looking away, and I submit to you that if you were that

23  concerned about everybody's safety, you'd be paying

24  closer attention.

25       In this segment, you'll also see Sergeant

1   Hendrickson himself sort of calm down for part of the

2   time when Lieutenant Conroy starts talking about using

3   the chair.  Basically everything kind of calms down,

4   just like Mr. Landers testified was an option.  Take it

5   easy.

6         (Video played)

7         All right.  Now I don't know why they didn't back

8   off or get a chair or do anything else then, okay?  I

9   know that Lieutenant Conroy testified this week that a

10  chair wasn't an option because Mr. Kingsley was in

11  handcuffs.  But certainly at the time, then he thought

12  it was an option, even though Mr. Kingsley was in

13  handcuffs.

14        But in any event, on the next segment you'll see

15  things start to escalate again.  What will happen next

16  is Deputy Degner will put the taser on his back.

17  Sergeant Hendrickson will start escalating, yelling at

18  him, and eventually it leads to the tasing that started

19  at 6:45:46 and went on for five seconds.  You won't see

20  Mr. Kingsley moving around.  You won't see struggling by

21  the deputies, all signs that you would expect to see if

22  there was active resistance.  Please play the next part.

23        (Video played)

24        MR. PARDON:  All right.  In the next segment,

25  we'll talk about the next segment now.  What you're

going to see first is Sergeant Hendrickson continuing to

yell at Mr. Kingsley, and finally, Lieutenant Conroy is

going to step in.

Now, you heard the testimony from Lieutenant Conroy

that he didn't know the taser was being deployed until

after it was deployed.  After he realized what had

happened, he put a stop to this.  Please play the next

segment.

(Video played 6:45:56-6:46:20)

MR. PARDON:  All right.  You heard Lieutenant

Conroy there.  He says, "All right.  Here's the deal.

We'll leave him in there.  We'll leave the cuffs on him.

If he wants the cuffs off, he can back up to the port

here and we'll take then off.  It's not a punishment,

okay?"

Lieutenant Conroy told you yesterday that for part

of the time there he was talking to the other officers,

and then for another part of the time he was talking to

Mr. Kingsley and the officers.  And then for the last

part of the time when he said "It's not a punishment,"

then he was talking to the camera.

He says he was talking to the camera then because

of some appeals or some incident involving Mr. Kingsley

and he knew he had to document things.  But then when I

asked him, he acknowledged well, he didn't know of

1  anything like that involving Mr. Kingsley that occurred

2  before this event.  In other words, whatever he was

3  referring to, it happened later.  He couldn't have been

4  documenting for the camera something based on something

5  that happened in the future.

6      We submit to you, Ladies and Gentlemen, that what

7  really happened is he was talking to the officers during

8  the whole conversation, including when he said "It's not

9  a punishment, okay?"  The reason he said that is he

10  realized that what had just happened was not right.  Now

11  I understand why he doesn't want to say that now.  When

12  something bad happens, you can convince yourself later

13  on maybe that isn't really what happened.  You start

14  thinking of justifications and rationalizations.

15  Everybody does that.  But Lieutenant Conroy's words

16  spoken at the time demonstrate something else.  He

17  thought using the taser was wrong.

18      Now, in the last segment you're going to see Deputy

19  Blanton working on the cuffs, and we submit to you

20  that -- this is when they were actually double locked

21  for the first time, just like it says in Deputy

22  Blanton's report when he locked them.  And you'll

23  continue to hear grunting as Deputy Blanton works on the

24  cuffs.  And you can see Mr. Kingsley better here, and we

25  submit again if you watch him closely, you're not going

1  to see resistance while the deputies are there either.

2  Please go ahead.

3      (Video played 6:46:25-6:47:07)

4      MR. PARDON:  Now, there's one more thing about

5  Lieutenant Conroy's testimony I'd like to talk about.

6  Recall he said that he and several other officers went

7  into the cell about roughly 15 minutes later to remove

8  the handcuffs and that Mr. Kingsley resisted taking the

9  cuffs off.  And if you review his report, you'll see

10  that he wrote that in there too.

11     Well -- and then I asked him whether there's a

12  video of that, and he said yes, there was.  In fact,

13  there is.  It was admitted into evidence.  It's a silent

14  version of the video in the receiving cell.  It doesn't

15  have sound, except that it goes on longer to the point

16  where the deputies actually came in and removed the

17  cuffs.  So I'd like you to see the alleged resistance

18  Lieutenant Conroy testified about on the video when they

19  were removing the cuffs.  And it may take a second while

20  we get to the right point in the video here.  There is

21  no sound in this one.

22     (Video played   6:58:59-6:59:34)

23     MR. PARDON:  Now there might have been a little

24  bit of difficulty removing the cuffs, I don't know, but

25  we submit that if Lieutenant Conroy is willing to call

1  that resistance, he may be willing to shade his

2  testimony about some other things, too, including what

3  he meant when he said "it's not punishment."

4      Now after the officers left the cell, Lieutenant

5  Conroy asked Sergeant Hendrickson what happened.

6  Sergeant Hendrickson says they had a conversation.  He

7  mentioned something about a memory of being bitten.  He

8  says he never said anything about Kingsley having bitten

9  him in the past and Lieutenant Conroy may have just

10 misunderstood him.

11     I think Sergeant Hendrickson also testified that he

12 had talked to Lieutenant Conroy within a few days after

13 that and clarified that he meant Mr. Kingsley had never

14 bitten him.

15     However, even though they had a conversation a few

16 days later, a month later Mr. Kingsley had reviewed the

17 reports and he, if you recall from the testimony, he had

18 asked Lieutenant Conroy to have that statement removed

19 from his report about Lieutenant -- about Sergeant

20 Hendrickson saying that Kingsley had bitten him in the

21 past, and Lieutenant Conroy was adamant that he would

22 not remove it.  And why?

23     Please put up Exhibit 60.  Would you put on the

24 document camera.  Here is what Lieutenant Conroy said:

25 "That report is an accurate account of the incident."

1   Sergeant Hendrickson did make that statement.  To state

2   otherwise would be deceitful.

3        Now Lieutenant Conroy now says, after talking with

4   Mr. Hendrickson and preparing for this case, that he

5   might have misunderstood Mr. Hendrickson.  Well, we

6   don't think so.  We submit that what happened is that

7   Mr. Hendrickson felt he had to justify the use of his

8   taser when Lieutenant Conroy asked him, so he made up

9   the first excuse he could think of.  He remembered that

10  Kingsley had supposedly bitten him.  Remember, those

11  head motions were a minute before the taser was applied.

12       What happened here, Ladies and Gentlemen, is that

13  Sergeant Hendrickson was angry.  He was frustrated.

14  Kingsley annoyed him because he wouldn't take down the

15  paper.  Kingsley told him he was making a big deal out

16  of nothing.  The frustration and the anger continued.

17  And it boiled over in the receiving cell.  He lost his

18  cool.  He hit Mr. Kingsley's head into the bunk and then

19  he ordered him tased.  It was punishment.

20       He was able to do that because Deputy Degner had

21  previously started escalating the episode, again, by

22  putting the taser on Mr. Kingsley after Lieutenant

23  Conroy had initially calmed it down.  Deputy Degner knew

24  better than to tase Mr. Kingsley too.  He's

25  independently responsible for his own use of force,

1   regardless of what Sergeant Hendrickson tells him.  But

2   he had a noncompliant inmate.  That's what he said on

3   the review form.  This was wrong.  It was unreasonable

4   and it was reckless.

5        The defendants will tell you well, it wasn't

6   reckless because they testified they had good

7   intentions.  They wanted to protect Mr. Kingsley.  I

8   submit you can infer their reckless behavior from the

9   evidence you see on the video with your own eyes.

10       Now let's say in spite of all this you think

11  Mr. Kingsley might have been tensing his arms or was

12  tensing his arms.  Even if that was true, they still

13  used excessive force because what they did was not

14  justified under the circumstances.  And that's where the

15  experts come in.

16       You heard from Mr. Brian Landers.  He told you it

17  was unreasonable to taser Mr. Kingsley under the

18  circumstance.  Tasing him did not comply with

19  professional standards of behavior that law enforcement

20  officers are expected to follow in Wisconsin, and

21  Mr. Landers knows what he's talking about.  He's not a

22  professional witness, unlike the defendants' expert.

23  Mr. Landers has been a street police officer for 18

24  years.  He knows about the proper use of force.  He

25  patrolled the streets; commanded a drug task force; he's

1  been inside jails; he's used tasers.  He's a graduate of

2  the police academy.  He worked his way through school

3  while he was working as a police officer and got his

4  bachelor's degree.  He worked his way up to the ranks of

5  lieutenant before leaving to take a full-time job to

6  teach fellow officers.  He now teaches them.  He's

7  personally trained hundreds of officers.  He's in charge

8  of administering law enforcement and jail training --

9  the law enforcement and jail training academies.  He

10  teaches on the use of force.  He's a master instructor

11  to teach other instructors on the use of force.  He's

12  earned enough of the respect of his colleagues in

13  Wisconsin to be appointed to the Wisconsin Department of

14  Justice Tactical Advisory Committee, which he's been on

15  for nearly ten years.  That Committee sets the standards

16  and protocols and the procedures involving the

17  use-of-force tactics, and it basically sets what

18  officers should do.  He's helped -- Mr. Landers helped

19  author that Manual.  And he's evaluated the use of force

20  for other agencies as well, even though, as I said, he's

21  not a professional expert witness.  He's actually only

22  testified in one case like this, as he told you.

23      Compare that to the defendants' expert.  He hasn't

24  worked in the field in over 30 years.  His primary work

25  is on a different matter; evaluating in-custody deaths.

1    He flies around the country testifying.  Somewhat smooth
2    talker.  He's testified in at least around 200 cases.
3    To give you a clue of how closely he pays attention to
4    this case, as you heard, he couldn't even identify the
5    officers in the video at the time of his deposition.  I
6    submit that it's pretty hard to understand what's going
7    on if you're reading reports, looking at the video, not
8    knowing who is who.
9         Now, Mr. Landers explained to you the difference
10   between active and passive resistant.  He told you
11   tasers should only be used for active resistance, not
12   passive resistance.  I'm not complying with a particular
13   order, but I'm not sitting there doing nothing.  Active
14   resistance means the subject is physically counteracting
15   an officer's control efforts under circumstances which
16   create a risk of bodily harm.  And the training manuals
17   and the examples you heard on testimony provide examples
18   of that:  Running away; getting up after being ordered
19   to get down; pulling away from your grasp.  We submit
20   that supposedly tensing your arms, again, while you're
21   cuffed, behind your back, on your stomach, on a concrete
22   bunk with three officers on top of you after you've done
23   nothing to attack or threaten them, you did follow their
24   order, true, but you didn't do anything, that's not
25   active resistance.  All right?

1    Here's some other examples of testimony that we

2    were talking about.  All right?  Now, if you look on the

3    right, you'll see examples of active resistance.  Now, I

4    think you can tell from the video Mr. Kingsley was not

5    escaping.  He was not getting up after being directed

6    down, and he was not pushing off of a stance.  His arms

7    were behind him.  Okay?

8    What you also heard yesterday from Deputy Blanton

9    was that Mr. Kingsley was not pulling away.  Now, I

10   don't know if you remember that, but the one officer who

11   was closest to Mr. Kingsley's hands at the time is

12   Deputy Blanton.  He was the one trying to get them off.

13   He testified yesterday on direct exam from defense

14   counsel that Mr. Kingsley was not pulling away.  He

15   should know.  He was there.  All right?

16   And finally, you heard Mr. Landers say he reviewed

17   the videos, looked through all the incident reports,

18   didn't find anything that would actually articulate

19   active resistance.  Now, you'll hear -- you'll try to

20   hear -- the defendants will try to tell you there's

21   always some kind of risk of harm.  And yeah, there's

22   always a risk.  Remember.  Sergeant Hendrickson said the

23   situation was under control.  He was concerned it could

24   escalate.

25   You heard Mr. Peters, Dr. Peters this morning say

1  *could do something* is not really enough.

2      They'll try to tell you that Mr. Kingsley could get

3  up and attack.  And Mr. Jones on his cross-examination

4  of Mr. Landers spent a lot of time, went through this

5  long detour about the definition of bodily harm.

6      You know, the bottom line is, you know, as

7  Mr. Landers testified, is you've got to consider the

8  real tangible threat or risk, all right?  Even

9  Dr. Peters, in his training tactics, training stuff,

10  says you have to consider possible stuff, which is not

11  the same as immediate stuff or -- and in other words,

12  what they're all saying is you've got to look at --

13  you've got to use your common sense and judgment.  You

14  can always claim that something creates a risk,

15  something might happen.  I might be walking down the

16  street and I might pick up a stone and throw it at

17  somebody it.  All right.  But you've got to consider

18  what actually happened here.

19      All right?  Another thing, Deputy Blanton, you

20  heard yesterday, he was there.  And in response to a

21  question, you heard him say that he had no opinion about

22  whether the use of the taser was appropriate.  He's also

23  a trained correctional officer.  I submit to you that if

24  you think that if he thought it was appropriate, you

25  would have heard that testimony.

1        Deputy Shisler, who was at the feet, he's not here.

2   Now, there was a lot of vague testimony from the

3   officers about moving, squirming, rolling, resisting.

4   Dr. Peters kind of reiterated some of that vague

5   testimony and he said that the pulling up in the video

6   was active resistance.  You can see the video for

7   yourself, so I think you'll have to evaluate whether

8   that is active resistance.  We submit to you that that's

9   all speculation.  All right?

10       Then he speculated about well, you could get your

11  fingers pinched.  He talked about how there was a risk

12  to the officers.  That was his opinion.  Okay.  But if

13  you notice that the original justification for all of

14  this was that they wanted to remove the handcuffs

15  because it was a risk to Mr. Kingsley?  All right?  So

16  the story is changing.  All right?

17       Then there was some testimony about grunting and

18  growling and what the deputies were sure was aggression.

19  You know, you can listen to it and decide about that.

20  But again, as Mr. Landers testified, they already had

21  him in handcuffs.  If he were really out of control, as

22  Sergeant Hendrickson said he was in control, they were

23  really out of control, there was a risk he'd be out of

24  control, you wouldn't put yourself in a situation where

25  you'd have less control by removing the handcuffs.

1   Simplest thing to do would have been to back off a
2   little bit, go "cool it, let's just stop for a second."
3   And that's ultimately what they did.  And that's what
4   worked.  There's what the training advises.  That's
5   common sense.  If they were concerned about his safety,
6   they could watch him.  That's ultimately what they did.
7   All right?
8        Now, you're going to hear about a couple other
9   things.  You're going to hear about inconsistencies in
10  probably Mr. Kingsley's testimony.  I'm sure you'll hear
11  something about that.  But, you know, I want you to
12  remember something.  All right?  I wouldn't expect
13  everybody to have a perfect memory of every single thing
14  that happened in a video.  I'd expect them to remember
15  the main things.  All right?  But it's not going to be
16  perfect.  Especially someone, who unlike some of the
17  defendants you heard -- some of the officers you heard
18  testify, unlike Mr. Kingsley who has looked -- who
19  hasn't seen this video in 15 months other than what he
20  saw here, some of the officers testified they've been
21  looking at it.  They've had time to think about what to
22  say about the video.  So keep the focus on the main
23  issue, look at the video.  Look at what's happened.
24       The other thing that I would like to address,
25  hopefully quickly, all right?  Is that even if

1   Mr. Kingsley was tensing his arms, you have to think

2   about why.  Now, you heard Mr. Landers say that the

3   cuffs were improperly applied and that could have led to

4   pain.  Deputy Blanton's report says he safety locked the

5   cuffs after the incident.  And in fact, that portion of

6   the video, it looks like he may be safety locking the

7   cuffs.  What that means is they weren't safety locked

8   before.

9       Now Sergeant Hendrickson tells you he did.  All

10  right?  It just defies the evidence.  It doesn't make

11  any sense.  We also submit that there's no emergency

12  that would have justified not locking them.  They had

13  plenty of time.  Now when cuffs are improperly applied,

14  there can tighten up.  They can cause pain.  They can

15  cause tension.  And remember, they carried Mr. Kingsley

16  75, 100 feet, depending on whose estimate of the

17  distance you believe.  They're tugging.  They're

18  pulling.  They were leaning on him.  All right?

19      So, you can see and hear in the video times when

20  Deputy Blanton pulls on the cuffs.  You can hear

21  Mr. Kingsley grunt.  All right?  Deputy Degner, recall,

22  testified that in 20 years, he never saw anyone fighting

23  over removing the cuffs.  Yeah.  Maybe because

24  Mr. Kingsley wasn't really fighting, he was tensing from

25  the pain.  That's what we submit.  All right?

1    I guess the bottom line is regardless of whether he
2    was tensing, it wasn't active resistance and it doesn't
3    justify the use of the taser.  It does not justify under
4    any professional standard of condition.  It's not
5    justified under common sense.  It's not justified under
6    the officers' training, and it wasn't even justified
7    under the Monroe County use-of-force policy which puts
8    taser in a different category and makes it more like a
9    baton.  I don't think you'd expect officers to be using
10   a baton in that situation.
11       Now, the Judge is going to instruct you on the
12   elements of excessive force, and she's going to tell you
13   there's four things to consider:  Whether the officers
14   used force; whether the force was unreasonable in light
15   of the facts and circumstances at the time; whether they
16   knew that using force presented a risk of harm but the
17   defendants recklessly disregarded Mr. Kingsley's safety
18   by failing to take reasonable measures to minimize the
19   harm; and whether they caused harm.
20       The Judge is also going to tell you that a person
21   can be harmed even if he does not suffer severe injury.
22   The question here concerning that stuff is whether
23   defendants acted recklessly and unreasonably.  The Judge
24   is going to tell you to consider a few more things
25   there:  The need to use force; the relationship between

1    the need to use force and the amount used; the injury;

2    whether the defendants reasonably believed there was

3    risk, a threat to the safety of the staff or prisoners;

4    and any efforts made to limit that force.  All right?

5        I submit to you it's not reasonable to use force

6    beyond what you're trained to do, and that's what

7    happened here.  It's common sense again.  Here is

8    someone handcuffed; on his stomach; with four bigger

9    guys around him; who has not been threatening them; who

10   has not been struggling while they carried him to the

11   receiving cell; with nowhere to go, he's not going to be

12   able to escape; he's not going to be able get up and

13   attack anyone in the cell.  They didn't need to use the

14   taser.  Sergeant Hendrickson didn't need to push

15   Mr. Kingsley's head into the bunk.  If they truly

16   believed they were going to lose control, they wouldn't

17   have wanted to remove the cuffs.  They could have simply

18   backed off.  Again, use of force was reckless and

19   unreasonable.

20       All right.  I'm going it talk briefly about

21   damages.  I want to put this in context.  All right?

22   We're seeking two types of damages.  So if you find

23   there was excessive force, we'd like you to consider two

24   types.

25       First, we're seeking damages for pain and

1    suffering.  All right?  The Judge is going to instruct

2    you on that.  She's going to instruct you, among other

3    things, that you should consider the physical, mental

4    and emotional pain and suffering that Mr. Kingsley's

5    experienced.  You heard him say it hurt.  It was one of

6    the worst pains he's ever felt.  The officers all agree

7    it hurts.  The whole point of using a taser is pain

8    compliance.  All right?

9         And I want you to think of the circumstances here.

10   It's not just a nice training mission where someone is

11   is walking up saying here is what it feels like to be

12   tased.  No.  It's not that kind of environment.  This is

13   a situation where there's four guys around him.  He may

14   not know what's going to happen.  He doesn't know

15   whether it's going to stop; what's going to happen next.

16   That's stressful.

17        And I submit to you and I'll tell you it doesn't --

18   pain and suffering doesn't have to have any lasting

19   effects.  You heard some testimony yesterday about

20   whether there was lasting effects.  It doesn't have to

21   have lasting effects.  Mr. Kingsley never told you that

22   he's got lasting pain and suffering.  He didn't say

23   that.  He's not telling you that.  All right?  So we'd

24   like you to just think about those circumstances and

25   award -- and make a consideration of an award of pain

1  and suffering.  All right?

2      Now the Judge is going to tell you that if you do,

3  it's up to you totally what you think that's worth.  All

4  right?  We're suggesting to you that you consider

5  something along the lines of 5 or $10,000.  Okay?

6  That's what we're suggesting.  But that's not -- it's up

7  to you.  It's your job.  All right?

8      Second, we're asking for punitive damages.  All

9  right?  The Judge is going to instruct you that punitive

10  damages can be awarded if the conduct of at least one of

11  these defendants was in reckless disregard of

12  Mr. Kingsley's rights.  And the Judge is going to tell

13  you that reckless disregard exists if a defendant was in

14  a position in which he certainly should have known that

15  his conduct would violate a plaintiff's rights and he

16  proceeded to act in disregard of that knowledge and of

17  the harm or the risk of harm that would result to the

18  plaintiff.  We submit to you that the conduct of the

19  defendants under these circumstances exhibited that

20  reckless disregard.

21      The Judge is also going to instruct you on the

22  factors to consider when determining an amount to award.

23  All right?  Now again, the amount is your job.  Only you

24  can decide.  All right?  But we're not asking you for a

25  million dollars here.  Okay?  It's up to you.  We're

1   asking you to start consideration of your analysis in

2   the neighborhood of $50,000.  That's because when -- the

3   reason we're doing that is when the Judge instructs you,

4   one of the factors she'll tell you to consider is the

5   likelihood the defendants would repeat the conduct if an

6   award of punitive damages is not made.

7        And that's where I'm going to end now with where I

8   started.  All right?  We're asking you to fulfill your

9   role as jurors and help enforce and keep up the

10  professional standards that our law enforcement officers

11  and jailers should be following.  Because if the outcome

12  of this case doesn't deter the defendants and others

13  from tasing an unarmed, handcuffed man lying face down

14  on a concrete bunk in a jail cell surrounded by four

15  deputies, what is next.  All right?

16       We all have a constitutional right to be free from

17  excessive force and we're asking you to do something to

18  stop this action or this action from getting worse.

19  Thank you.    (12:00 p.m.)

20            THE COURT:  Thank you, Mr. Pardon.  Mr. Jones.

21            MR. JONES:  Thank you, Judge.  Ms. Ward started

22  this case by telling you that it was about a piece of

23  paper.  Remember she held up a piece of paper?  And

24  Mr. Pardon repeated that theme when he just spoke to

25  you.  This case is not about a piece of paper covering a

1  light from a cell.  This case is about choices.  This

2  case is about choices made by Mr. Kingsley at every step

3  of the way during his interactions with the jail staff

4  on May 20th and May 21st, 2010; choices made by

5  Mr. Kingsley that led to him being in a receiving cell;

6  resisting the officers' efforts to take off the

7  handcuffs so they could safely exit the cell; choices

8  made by Mr. Kingsley that led to the officers involved

9  understandably being concerned that somebody was going

10 to get hurt; choices made by Mr. Kingsley that led to

11 him justifiably being tased once by Deputy Degner.

12      As we discussed when the case began when I first

13 spoke to you, there is one central question that you

14 need to consider in deciding whether Sergeant

15 Hendrickson and Deputy Degner are legally at fault for

16 using a taser on Mr. Kingsley.  You need to decide

17 whether the force used by the officers was excessive.

18 And as Judge Crabb will instruct you when I'm done, to

19 find that the use of the taser was excessive, you have

20 to find, you have to conclude that its use was

21 unreasonable under all of the facts and circumstances;

22 again, all of the facts and circumstances that were

23 confronting the officers in that moment.

24      In addition, as she will tell you, you have to find

25 that in tasing Mr. Kingsley, the officers knew that

1  using the taser presented a risk of harm to

2  Mr. Kingsley, but that they recklessly disregarded his

3  safety by failing to take measures to minimize the risk

4  of harm.

5      I would submit to you that the evidence you have

6  heard clearly unquestionably shows that Mr. Kingsley has

7  failed to prove either of these two things.  The single

8  use of the taser was not unreasonable under the

9  circumstances that confronted the officers, in real-time

10  and in that moment, and they did not act with reckless

11  disregard for his safety.  The evidence you have seen

12  and heard requires that the answer to the question of

13  whether Sergeant Hendrickson and Deputy Degner used

14  excessive force has to be no.  So let's talk about the

15  evidence and why that's true.

16      There are certain basic facts, certain basic things

17  that we know for sure that set the stage for what

18  happened that day.  First, we know that Mr. Kingsley was

19  aware of basic rules in the jail.  He knew he was

20  obligated to follow lawful directives from the officers.

21  He knew inmates were not supposed to have paper up on

22  the lights in their cells.  If he didn't know it somehow

23  beforehand, he certainly knew that by the time Officer

24  Manka told him you need to take the paper down from the

25  light.

1      Second, we know that the light was covered with the
2  paper.  Regardless of who put it there, regardless of
3  how long it had been there, jail staff saw it.
4  Mr. Kingsley knew it was there.  Jail staff had good
5  reason to want the paper down.  It reduces visibility
6  into the cells.  That's their job, to be able to look
7  into the cells and make sure prisoners are okay in the
8  cells.  Is it an emergency?  Absolutely not.  Nobody
9  told you it was an emergency.  Does the paper need to
10 come down?  Yes.

11      Fourth.  Mr. Kingsley refused to take the paper
12 down.  That's not in dispute.  No fewer than four
13 officers asked him to do it and he told no fewer than
14 four officers he was not going to take it down.  He told
15 the officers he didn't put it up there, he wasn't going
16 to remove it.

17      Basically he told them it wasn't his problem.  He
18 was not going to fix it.  He was not going to help them
19 fix it.  Given Mr. Kingsley's choice, and it was a
20 choice to refuse to follow their orders, jail staff
21 legitimately needed to remove him from his cell.  For
22 security reasons they needed him out of the cell so they
23 could take the paper down.  And Mr. Kingsley needed to
24 be moved into receiving because that's where he would
25 continue the lockdown status that Deputy Manka had first

1 started the night before.

2     Mr. Kingsley complains that the officers never

3 should have made such a big deal out of this.  But you

4 know that's not true.  You heard uncontroverted

5 testimony from the officers that order and discipline in

6 the jail is paramount, for the safety of the officers

7 and the prisoners alike.  And it never would have been

8 necessary to move Mr. Kingsley anywhere, to even have

9 him on lockdown status, if he had simply chosen to

10 comply with their orders.  He could have just taken the

11 paper down or cooperated with their efforts to do it and

12 this story would have ended there.

13     So let's talk about what happened when the officers

14 actually came to his cell to move him.  Remember that

15 Mr. Kingsley had already signaled how he was going to

16 react by the time the officers even got there to move

17 him.  We know when Officer Manka first asked him to take

18 the paper down, he told them it sounded like a job for

19 the CERT team.  He told you that's what he said.  There

20 was no good reason for him to say that, but he chose to.

21 And whether or not he was being sarcastic, whether or

22 not he was joking, as he claims, the officers had to

23 take it seriously and they had to be cautious against

24 the chance that he was going to resist what they needed

25 to do.

1    So when they arrived at the cell, Sergeant

2  Hendrickson asked Mr. Kingsley, he gave him a simple

3  command.  Stand up, turn with your back to the cell bars

4  so I can put handcuffs on you.  Did Mr. Kingsley choose

5  to comply?  Obviously we know he did not.  He tells us

6  now, he testified on Monday that he didn't because he

7  was concerned that he would be tased if he followed

8  Sergeant Hendrickson's order.  Because according to his

9  sworn testimony, Deputy Degner had a taser pointed at

10  his head.  But you know that's not true as well.

11    First, common sense.  Why would he be concerned

12  that the officers were going to tase him if he did

13  exactly what they had asked him to do?

14    Second, and perhaps more importantly, you know from

15  the video from the cellblock that Deputy Degner had the

16  taser pointed at the floor the entire time the officers

17  were outside the cell asking him to stand up and come

18  with his back to the cell doors.  And Officer Degner

19  testified that he never had it pointed at his head,

20  either inside or outside the cell.  Plain and simple.

21  That was a lie told to you by Mr. Kingsley.

22    When the officers finally had him handcuffed -- and

23  remember, they did have to struggle to get him with his

24  hands in position.  No one told you that it was the

25  struggle of a lifetime.  They told you just that he

1  resisted their efforts to get both hands in the

2  handcuffs.  Once they had him in the cuffs, he chose --

3  again, he chose to refuse their commands to stand up and

4  walk out of the cell.  He told them his foot hurt.  And

5  as Deputy Blanton described it, he went dead weight.

6       Now, keep in mind that Mr. Kingsley wouldn't tell

7  the officers anything.  He wouldn't tell them what was

8  wrong with his foot.  He wouldn't tell them even which

9  foot it was.  And the officers testified that from their

10 observation, absolutely nothing happened to his feet

11 while they were handcuffing him that would have caused

12 him any injury, let alone an injury that would have

13 prevented him from even standing.

14      Now Mr. Kingsley wants you to believe that his foot

15 actually hurt him so much that he was unable to even

16 stand up, let alone walk.  This makes no sense.  What

17 possibly could have happened to one foot that would have

18 made it impossible for him to stand up on the other foot

19 or at least to try walking from the cell with the help

20 of the officers?  Why go dead weight?

21      And think about what you saw and heard on the video

22 recording from the main hallway of the jail outside the

23 cellblock.  Why was it that Mr. Kingsley was completely

24 unable or unwilling to answer the questions posed by the

25 deputies as to what was wrong?  Why was it that he was

suddenly unable to communicate with them at all?  He
told you that he was awake and alert at the time.  Why
couldn't he answer their basic questions?  The obvious
truth is that he was faking an injury to his foot and
that he was simply choosing to further resist the
officers' efforts to move him to the receiving cell by
not answering their questions and making them carry him.

Once the officers had him in that receiving cell,
this situation should have been over.  As the officers
explained to you, their only interest at that point was
to remove the handcuffs so they could leave him in the
cell safely.  As they explained, they never leave
inmates in cells with handcuffs on.  It's not safe to do
so.  It's not comfortable.  But that's not the main
point.  It's not safe.  Because it's easy for someone
who's handcuffed behind their back to lose their balance
and fall and get hurt.  And for obvious reasons, this is
particularly dangerous in a cell like the receiving
cell.  Mr. Kingsley's own expert witness confirmed that
a person in handcuffs is vulnerable to injury because
they don't have the use of their hands and arms.

Now, Mr. Kingsley and his lawyers have asked well,
why would the officers want to remove the cuffs if he
was being so difficult, particularly as events unfolded
in the receiving cell.  The answer is simply it was the

1   lesser of two evils.  Yes, Mr. Kingsley presented a

2   potential risk to the officers in an agitated state if

3   they got the cuffs off, but the officers felt they

4   needed to remove the cuffs so they could safely leave

5   him in the cell and avoid having to come back again and

6   confront him again in an effort to get the handcuffs

7   off.

8       If you will recall, that was so unusual to leave a

9   prisoner in the receiving cell with handcuffs on, that

10  Lieutenant Conroy actually took the step of talking to

11  the camera to document, to record that there was no way

12  he was leaving him in that cell with handcuffs on as a

13  punishment.  He explained to you that's what he was

14  doing; that's why he was saying it; and that makes good

15  sense.  He knows he's not allowed to punish inmates.  He

16  knows he's not allowed to leave inmates in cells with

17  handcuffs on as punishment, and he wanted to be sure

18  that the record reflected that.

19      So, for Mr. Kingsley's own safety, the officers

20  tried to take the handcuffs off.  But Mr. Kingsley

21  wouldn't let them.  If he had simply laid on the bunk

22  and let the officers do what they wanted to do, they

23  could have unlocked the cuffs and removed them from his

24  wrists in no time.

25      Instead, he resisted.  He flexed his muscles and

his back and arms.  He pulled his wrists apart.  He

moved his hands back and forth.  He shifted his torso.

He moved his head and shoulders in the process.  He

lifted his head and shoulders off the bunk.  At one

point, Sergeant Hendrickson told you from his

perspective up at the head of the bunk, he moved his

head in a way that made the Sergeant concerned that

Mr. Kingsley might bite him.

There's been a lot of discussion about exactly --

from Mr. Landers and from Mr. Pardon in his closing

argument about exactly when in the series of events that

occurred.  But neither one of those individuals knows

when that occurred.  Mr. Landers told you he couldn't

tell you when that occurred on the video, and there is a

long stretch of the video where Sergeant Hendrickson is

positioned up at Mr. Kingsley's head where we can't see

what's happening.

The only evidence we have on that point is Sergeant

Hendrickson's word and he explained to you that he moved

in a way that made him concerned.  He never told you

that Mr. Kingsley had tried to bite him in the past.  He

never tried to represent that to you.  He simply said

all he was saying is he moved in a way that made me

think that was possible; and that had happened to me in

the past, not from Mr. Kingsley, someone else.  It made

1   me concerned.

2       Now Mr. Pardon talked to you at length about the

3   miscommunication that Sergeant Hendrickson had had with

4   Lieutenant Conroy after this was all over.  And that's

5   all it was, a miscommunication.  There's no sinister

6   conspiracy as to why they were talking after this

7   occurred.  That makes common sense.

8       Lieutenant Conroy, from his position, as he was

9   asked when he was testifying, he couldn't see very well

10  what was occurring.  And you know that from the video.

11  You could see yourself from his vantage point.  He's not

12  going to be able to see everything.  He asked a simple

13  question.  What did you see from where you were that

14  made you use the taser.  That makes sense.  That's a

15  responsible thing for him to do as the Lieutenant, the

16  individual in charge of the jail.  There's nothing

17  sinister about that.  There's nothing there that

18  indicates that he doubted what had occurred.

19      And they had a miscommunication.  Sergeant

20  Hendrickson has told you he didn't think he would have

21  ever told him that it was Mr. Kingsley, because as he

22  said to you, Mr. Kingsley hadn't tried to bite him in

23  the past.  Lieutenant Conroy thought he heard him say

24  that it was Mr. Kingsley.  They miscommunicated.  And he

25  told you later on he was not comfortable going back and

1  changing his original report because that's what he

2  thought he heard at the time.  We're talking about a

3  miscommunication, and that's it.

4      One other point that Mr. Pardon made about

5  Lieutenant Conroy's testimony and he played you the

6  video of when they went back in to take off the

7  handcuffs.  Lieutenant Conroy never testified that

8  Mr. Kingsley was actively resisting them at the time

9  that he took the handcuffs off.  He never told you that

10 he was doing the same kind of things that Mr. Kingsley

11 did when they were originally trying to take the

12 handcuffs off.  What he told you is that Mr. Kingsley

13 displayed some resistive tension.

14     And you heard from Mr. Landers that's a term of

15 art.  Simply what that means is that someone's muscles

16 are flexed.  And that is exactly what he wrote in his

17 report, that Mr. Kingsley did show resistive tension.

18 He never tried to make that out for anything more than

19 it was; not in his report and not in his testimony here

20 today -- not today, yesterday.

21     So going back to what was occurring on May 21st,

22 the officers faced with what Mr. Kingsley was doing,

23 they responded by telling him to relax and to stop.  We

24 heard them do that multiple times on the video from the

25 receiving cell.  They were firm.  They were direct.  At

times, Sergeant Hendrickson used a loud tone of voice.
He used a command tone of voice.  As Mr. Landers
described to you, that's something known as *heavy*
*control talk*, recognized in how the officers are
trained.  They were firm and direct, but they were clear
about what they wanted him to do.  And when those
orders, when those directives failed, the officers did
what they could do to try and physically get his
compliance.

Officer Blanton said he couldn't get control of
Mr. Kingsley's hands.  Sergeant Hendrickson used his
lower leg, his shin to try and place pressure across
Mr. Kingsley's back to hold him down and in place, and
when Mr. Kingsley lifted his head and shoulders off the
bunk, and you saw him do that, Sergeant Hendrickson
pushed his torso back down onto the bunk.

He also tried then after that to hold
Mr. Kingsley's head in place on the bunk with his hand,
using a pressure point behind his ear in an effort to
get him to stop.  All of those things are trained
techniques.  You heard that from the expert witnesses in
this case.  You heard that from the other witnesses.

Mr. Kingsley's story is that he was only moving
around, as the officers have described to you, because
of pain and because of what they were doing.  In other

1  words, what he's telling you is that it was the

2  officers' fault.  He says first, the handcuffs were on

3  too tight to begin with.  But Sergeant Hendrickson

4  testified that he checked the handcuffs for fit and

5  there was uncontroverted testimony from Lieutenant

6  Conroy that he could see, as he was helping to carry him

7  into the receiving cell, that at least one of the

8  handcuffs was loose enough or there was enough roof --

9  room that the handcuff had actually slipped up over the

10  wrist bone and onto the lower portion of Mr. Kingsley's

11  hand.

12      Next, Mr. Kingsley tells you well, then the

13  handcuffs might have tightened while I was being moved

14  and while I was in the receiving cell and that caused me

15  pain.  I say *might*, because he and his lawyers never

16  presented any evidence that the cuffs actually did

17  tighten.

18      Mr. Landers, their expert witness, specifically

19  admitted that he did not know -- he did not know one way

20  or the other whether the cuffs tightened.

21      In any event, Sergeant Hendrickson testified that

22  he double locked the handcuffs when he put them on; that

23  he has never not doubled locked a pair of handcuffs when

24  you put them on a prisoner.  Nobody else can actually

25  tell you whether or not those handcuffs were double

1   locked.  Mr. Kingsley can't.  And neither can

2   Mr. Kingsley's expert.  He told you exactly that.  He

3   doesn't know one way or the other.

4        And Officer Blanton confirmed that he doesn't know

5   whether they were already double locked when he checked

6   to make sure they were and that they may already have

7   been double locked.

8        Regardless, Mr. Kingsley never let the officers

9   know he was in pain.  If that was true, that he was in

10  pain, and he couldn't do what they wanted him to do,

11  what they needed him to do, all he had to do was tell

12  them that.  Instead, what we hear on that video is

13  Mr. Kingsley grunting.  What we hear is him growling.

14  He did not even try and claim in his testimony that he

15  told them he was in pain.  And how could he?  You heard

16  the recording from the receiving cell.  Once he was

17  placed on the bunk, he didn't tell the officers he was

18  in pain, if that was the case.  He told you he felt like

19  he was suffocating.  That was his testimony.  But you

20  know that he managed to yell at the officers on at least

21  two occasions while he was in the receiving cell, and

22  I'm paraphrasing.  First he told them to take the cuffs

23  off, then he told them to leave them on and get out.

24        The only other sounds he made, and again the video

25  documents this, were sounds of aggression.  There's no

other reasonable way to interpret those sounds.  Put yourselves in the shoes of the officers in that moment, which is what you're required to do.  Would you have known by listening to Mr. Kingsley that he really wanted to comply with the officers' orders and that all he was trying to communicate was that he couldn't?

The bottom line is this:  Mr. Kingsley was resisting.  We know he had chosen to resist the officers in different ways at every step along the way:  He wouldn't take down the paper; told them to call the CERT team; told them it was their problem to fix; he wouldn't stand up to the handcuffed; he wouldn't tell them what was wrong with his foot, and he refused to walk.  And given his behavior up to that point, he expects you to believe that he actually stopped resisting and wanted to comply but he couldn't?

Common sense should tell you to doubt this explanation for no other reason because it is entirely inconsistent with everything Mr. Kingsley had done up to the point he had entered the receiving cell.

Mr. Kingsley and his lawyers want to paint the officers as the ones who are angry.  But the truth is that Mr. Kingsley is the one who was angry.  He was angry about being told what to do; he was angry about being removed from his cell; he told you in his own

1   words in his own testimony that he was agitated, and his

2   expert said the same thing.

3       I want to talk for a moment about Mr. Kingsley's

4   credibility.  Remember, as Judge Crabb told you when we

5   started on Monday, in assessing a witness's credibility,

6   you can take into account such things as other evidence

7   that may have contradicted a witness's testimony and the

8   reasonableness of the testimony in and of itself.

9       So what are just some of the things Mr. Kingsley

10  told you in his sworn testimony that you know are not

11  true?  Let me give you three prime easy examples.

12      First, he told you when the officers came to his

13  cell and stood outside the cell doors, he was afraid to

14  stand up because Deputy Degner had the taser pointed at

15  him.  We've already talked about that.  You know that

16  was not true.

17      Second.  Mr. Kingsley told you that in the

18  receiving cell, he laid still.  He said he laid

19  perfectly still when Sergeant Hendrickson did not have

20  his knee on his back and across his shoulders.  But you

21  know from watching the video that's not true; that

22  Mr. Kingsley wasn't telling the truth on that point.

23  You could see him moving when Sergeant Hendrickson had

24  his leg off his back.  You could see when Mr. Kingsley

25  pushed his upper body off of the bunk.

1       Third.  Mr. Kingsley told you that when he was

2  tased, when the taser was being applied, he felt the

3  electricity all the way down to his feet.  He testified

4  under oath that he felt as though the electricity were

5  flowing through his legs and out his feet.  But his own

6  expert witness explained that that is not what happens

7  when a contact stun is used.  A contact stun produces

8  localized pain, not electromuscular disruption.

9       As Landers conceded, electricity does not travel

10  throughout someone's body when you're tased with a

11  contact stun.  Mr. Kingsley simply was not truthful on

12  these and other points.

13       Mr. Kingsley's resistance in the receiving cell,

14  and that's what it was, presented a risk of injury, both

15  to him and the officers.  Common sense tells you that's

16  true.  You heard the officers explain that they were

17  concerned that he could have gotten hurt by hitting his

18  head against the wall, against the bunk, by rolling into

19  the metal lip, by rolling over the edge and falling to

20  the floor.

21       You also heard them explain that they could have

22  been injured if one of them were pushed or slipped in

23  that confined space.  And most importantly, you heard

24  them explain that they were equally concerned that what

25  he was doing could escalate and that he could begin

136

1  actively assaulting them.  If that occurred, the risk of

2  injury obviously could only go up.

3      So only when they couldn't get him to comply with

4  their verbal orders, only when they couldn't gain

5  control of the situation by their physical efforts, and

6  given the risk, that risk of injury, both to the

7  officers and Mr. Kingsley, that's when Sergeant

8  Hendrickson directed that Deputy Degner use the taser.

9  And as you saw, Deputy Degner did that.  He did it once

10 for less than five seconds.  And as he explained to you,

11 he did that solely for the purpose of getting

12 Mr. Kingsley to comply so they could take the cuffs off

13 and leave the cell.

14     As Mr. Kingsley and his lawyers have emphasized,

15 the taser didn't work.  It was not effective in doing

16 what the officers wanted to do to accomplish.  And at

17 that point, Lieutenant Conroy directed everyone to

18 disengage, to leave the handcuffs on, and simply exit

19 the cell.  He told you he gave that order at that point

20 given that the taser hadn't worked because he wanted --

21 that it was necessary to end the situation without using

22 any further force, even if that meant leaving

23 Mr. Kingsley in handcuffs.  So that's exactly what

24 everyone did.

25     As you saw, he was tased once and only once and no

1   other force was used against him.  As they were trained

2   to do, they reassessed the situation after the taser was

3   used; they came to the decision that it was better to

4   back off, and they disengaged without using any

5   additional force.

6        Now, you heard Mr. Kingsley's expert witness,

7   Mr. Landers, say in broad strokes that he doesn't think

8   the use of force was reasonable under the circumstances.

9   But let's talk about the specifics of what Mr. Landers

10  otherwise told you at the same time.

11       First, he testified that for all his law

12  enforcement experience, and no one is saying he's not an

13  experienced law enforcement officer, he does not and he

14  has never taught POSC training to jailers.  And when he

15  was pressed about one of the aspects of the POSC Manual,

16  he actually told you that.  He actually answered that he

17  couldn't say for sure what officers are told in jail

18  school.

19       He spent a great deal of time explaining to you why

20  he thought the defendants had failed to live up to

21  adhere to their training and the jail's use-of-force

22  policy.  But he also admitted, and this is important to

23  remember, and the Judge will instruct you on this, that

24  just because an officer fails to comply with this

25  training, just because an officer doesn't live up to the

tee to department policy does not mean that the officer

used excessive force.

Third.  Mr. Landers told you that officers in

Wisconsin are trained that they can use an ECD, a taser,

to respond to active resistance or its threat.  Active

resistance or its threat.  And we know from Mr. Lander's

testimony and from the POSC and DAAT training guides

that officers in Wisconsin are trained in active

resistance amounts to behaviors that physically

counteract their efforts to control a subject where

there's a risk of bodily injury to the officers or the

subject.

Mr. Landers told you he didn't see any active

resistance, and that was the argument made by Mr. Pardon

in his closing statement from watching the video.  And

he told you somehow that he was actually able to see

from the video exactly what Mr. Kingsley was or was not

doing.  He told you that even though you know from

watching a recording that you can't see Mr. Kingsley for

much of that video, for much of the video you're

watching the backs of the officers, not Mr. Kingsley.

Remember when Mr. Landers told you he could see

what Mr. Kingsley was doing because he could identify a

tiny piece of the uniform that Mr. Kingsley was wearing

from the video?  That was not credible testimony.

1   Mr. Kingsley's lawyers made sure to confirm with

2   Lieutenant Conroy that he couldn't see everything that

3   was happening from his vantage point in the doorway of

4   the cell.  But they expect you to believe that their

5   expert can tell exactly what was happening and what

6   Mr. Kingsley was or was not doing from a perspective

7   that's even further removed from the one that Mr. --

8   Lieutenant Conroy had at the time.

9        Remember, the video doesn't tell anything that

10  Lieutenant Conroy wouldn't have been able to see from

11  his vantage point, and they wanted you to be sure you

12  understood that Lieutenant Conroy couldn't see what was

13  happening.  Why then can their expert tell what was

14  happening?  Common sense tells you that simply can't be

15  true.

16       Mr. Landers also told you that he was sure there

17  was no active resistance, even though, number one, he

18  confirmed that the types of behaviors that the officers

19  say they observed on Mr. Kingsley's part could well

20  constitute behaviors physically counteracting control

21  efforts by the officers.  And number two, that the

22  injuries testified -- that the officers testified they

23  were concerned might occur could constitute bodily harm

24  as defined in POSC and DAAT.

25       Mr. Pardon showed you this diagram, and I assume

you remember this diagram.  This diagram is part of what
officers are trained on when they're trained on using
ECDs, tasers.  They are trained that active
resistance -- they are taught that active resistance is
sufficient to use a taser, and they're trained that
examples of active resistance include pulling away,
getting up after being directed down, and pushing off of
the surface.  We saw Mr. Kingsley pushing off of a
surface in the cell, and the officers told you that he
was moving his body in a way that pulled his hands and
arms away from their efforts to control him.

Mr. Landers told you there was absolutely no active
resistance, even though the training guide confirms that
there was.  And even assuming there was no active
resistance, there clearly was a threat of active
resistance under the circumstances.

Mr. Landers offered no real explanation of what the
officers should have done instead of using the taser.
He suggested only that -- I think his words were a
calmer approach should have been used, and that again,
his words, *time and diplomacy* should have ruled the day.

But the evidence actually shows that the officers
used remarkable restraint and patience throughout these
events:  Four officers over eight hours asking him to
take the paper down; two corrections officers, the

1  Sergeant, the boss in the jail.  You saw the video of
2  how the officers behaved in the cellblock and in the
3  hallway of the jail.  They obviously gave him every
4  opportunity to do what they were asking him, to do the
5  right thing.  And even in the receiving cell, you heard
6  them tell him umpteen times to stop resisting and just
7  to calm down, to relax.  They used softer tones of
8  voice; they used firmer tones of voice.  But you know
9  from Mr. Lander's testimony that's exactly what they
10  were trained to do.  And while Mr. Landers first on the
11  one hand told you there shouldn't have been a sense of
12  urgency, he also then admitted in reference to the way
13  the officers are trained that they are actually trained
14  -- that they should act with a sense of urgency to try
15  and control and end confrontations as quickly as
16  possible, both for their safety and the safety of the
17  subject involved.
18      Fifth.  Again, talking about Mr. Landers, and this
19  is not about the taser, but it's important to address.
20  He offered you his professional opinion that Sergeant
21  Hendrickson also used unreasonable force against
22  Mr. Kingsley in the way he placed his leg on -- his shin
23  on Mr. Kingsley's body.  He assured you he could tell
24  exactly where Sergeant Hendrickson's leg was placed on
25  Mr. Kingsley's, and that the weight of his leg, the

1   weight of his body was directly on his spine.

2        But you know from looking at the video that it's

3   not possible for him to say that.  It's not possible for

4   him to be so definitive about where Sergeant

5   Hendrickson's leg was.  He can't tell us any more than

6   you or I can see from that video.  It's unclear in the

7   video and the only person who gave any testimony on that

8   point from actual knowledge was Sergeant Hendrickson.

9   And he explained to you that he actually had his leg

10  across his back and shoulders, not on his spine and

11  neck.

12       As you heard from our expert this morning,

13  Mr. Peters, that is absolutely a trained technique to

14  restrain a subject.  Mr. Landers also tried to offer an

15  opinion about the way Sergeant Hendrickson pushed down

16  on Mr. Kingsley's back after he had lifted up off of the

17  bunk.  But in the same sentence, he told you that his

18  opinion was that force was unreasonable.  He also told

19  you that he wasn't sure what he was doing; that he

20  couldn't tell exactly what the movement was.  If he

21  didn't know what it was, how could he tell you it was

22  unreasonable force?

23       And then he pointed to an exhibit from the POSC

24  training guide.  The diagram of a person, front and

25  back, color coded areas, that was specific only to

1    preferred target areas for unarmed focus strikes:
2    Punches, kicks, that kind of force.  But Sergeant
3    Hendrickson didn't punch or kick Mr. Kingsley.
4    Mr. Landers agreed with that.  Dr. Peters said that.
5    Nobody has said that anybody struck Mr. Kingsley.  As
6    Dr. Peters confirmed, that diagram has nothing to do
7    with this case.

8        Sergeant Hendrickson explained exactly what he did
9    when Mr. Kingsley pushed up off of the bunk.  When he
10   reared up like that, he used his hands to push him down
11   and then to restrain him on the bunk.  He told you he
12   used his hand, another trained technique, to hold
13   Mr. Kingsley's head in place.  There's nothing in that
14   evidence to suggest that that force was unreasonable.

15       In contrast to the inconsistent, and I would submit
16   to you in many respects incredible testimony from
17   Mr. Landers, you heard this morning the explanation from
18   Dr. Peters that the force used in this case was
19   consistent with the officers' training, and most
20   importantly was reasonable under the circumstances.

21       I'm not going to repeat his testimony for you.  You
22   just heard it.  But his testimony coupled, with the
23   inconsistent explanations for Mr. Landers, confirmed for
24   you what the evidence already tells you; that is, that
25   under the circumstances confronting the officers,

Sergeant Hendrickson's order to use the taser and Deputy

Degner's use of the taser did not amount to excessive

force.  Anything but.

    Given the situation, the use of the taser was not

unreasonable in the least.  And by using the taser, the

officers did not recklessly disregard Mr. Kingsley's

safety in any way, shape or form.

    So to summarize, based on the factors that the

Judge is going to instruct you that you can consider:

First.  The officers needed to gain control of the

situation, to regain control of the situation, and get

Mr. Kingsley to comply with their directives so they

could safely leave him in the cell without handcuffs on.

Simply put, they needed to use force to maintain control

of the situation.

    Second.  They used only as much force as was

necessary to accomplish their goals.  They tried to get

him to comply with their verbal commands.  They tried to

get them to comply with their efforts to physically

regain control.  Only when those methods fail did they

resort to an increased level of force of the taser.  And

when the taser didn't work, they stopped.  They limited

the amount of force to the situation at hand.

    Third.  The officers did not injure Mr. Kingsley.

They caused him pain.  But Mr. Landers testified that

officers are trained that a taser uses electricity at

levels that are not dangerous, and that contacts done,

in his experience, has no lasting effects after the

five-second deployment is over.  We know he refused

medical attention that morning and we know he didn't

testify to any injuries he suffered beyond the pain of

that moment.

And as we've already discussed, we know he even

exaggerated that, as he described a physical sensation

that's inconsistent with what we know about the way a

taser works in a contact stun mode.

And fourth.  The officers reasonably believed in

that moment that his resistance presented a very real

risk of harm to him or to them, particularly if he

escalated his resistance.  They saw and felt a very real

risk.  And Mr. Landers confirmed for you that it is very

difficult for officers to know what's in a subject's

head, particularly if the subject does not tell them why

he's behaving in a certain way.

For that reason, he told you they need to respond

to the behavior that they're confronted with in the

moment regardless of what's in the subject's mind.

That's exactly what happened here.  The officers didn't

know why Mr. Kingsley was doing what he was doing and he

just knew that he needed to respond to the behaviors and

1   the risk they created.

2        And there was no evidence that the officers knew

3   using a taser presented a risk of harm to Kingsley, let

4   alone that they acted with reckless disregard for his

5   safety.  Remember they were only responding to a

6   situation he created through his choices.  Their only

7   goal was to leave the cell with him unhandcuffed.

8   Nobody hit him.  Nobody punched him.  Nobody used a

9   baton.  They used a device that they had been trained

10  only causes pain and discomfort for a short duration.

11  And as Sergeant Hendrickson explained, he felt they had

12  exhausted any other reasonable options available to

13  them:  Presence; dialogue; physical efforts; and when

14  the taser didn't accomplish the goal, rather than

15  escalating the force, they disengaged and de-escalated

16  the level of force.

17       As I said to you at the start of the case, these

18  events occurred very quickly in real-time.  The amount

19  of time the officers spent dealing with Mr. Kingsley was

20  less than 20 minutes.  The amount of time they were in

21  that receiving cell was less than four minutes.  They

22  did not have the benefit of spending three days

23  dissecting what occurred that morning.  They had to make

24  quick judgments about his resistance, the threat it

25  presented, and what to do about it.

1        And remember as well, the question you have to

2   answer is not whether the officers made the best

3   choices, perfect choices, or even choices that officers

4   might make with perfect 20/20 hindsight.  You need to

5   decide only whether the officers made a choice that

6   resulted in the use of excessive force.  And to do that,

7   you need to put yourself in their position, in their

8   shoes as law enforcement officers in the moment.  If you

9   do that, if you put yourself in their shoes, in the

10  moment, in real-time, there is only one answer to the

11  question that Judge Crabb will ask you to decide and

12  that is that neither Sergeant Hendrickson nor Deputy

13  Degner used excessive force against Mr. Kingsley.

14       Mr. Pardon and I have disagreed about a lot in this

15  case, but we do agree on one thing and that is that we

16  are very appreciative of the time you've spent here this

17  week.  We recognize that jury service is an imposition.

18  We very much appreciate the time, the attention, and the

19  patience that you've shown and given to us this week.

20  Thank you very much.    (12:44 p.m.)

21       THE COURT:  Thank you, Mr. Jones.  Mr. Pardon,

22  I'm going to hold you to five minutes for rebuttal.

23       MR. PARDON:  Great.  Thank you.

24       Ladies and Gentlemen, there was some -- paper may

25  have start the incident, but the defendants finished it.

1    All right?  Order and discipline in the jail is

2    important.  That's true.  But excessive force and anger

3    is not.  I encourage you to look at the videos.  Note

4    that Mr. Jones didn't show you any of the videos.  What

5    he talked about was a lot of -- an awful lot of

6    miscommunication, confusion and vague testimony about

7    resistance.  And as I predicted, there was a lot of

8    nitpicking about certain things.  Like Mr. Kingsley

9    testified about electricity going through him.  I

10   thought Mr. Kingsley testified that the pain went

11   through him.

12       But it doesn't really matter.  Who cares if

13   Mr. Kingsley thinks it's electricity.  Nobody is

14   claiming that electricity went through him.  What we're

15   claiming is that it hurt and it was painful and it

16   happened under circumstances -- put yourself in his

17   position.  It happened under circumstances that were not

18   justified and that would put one at reasonable fear of

19   being very harmed and you don't know what's going to

20   happen to you.  That's a lot.  You don't know if it's

21   going to stop.  That is really bad.

22       Now, you also heard a lot of nitpicking about

23   Mr. Landers.  There was something about -- something

24   about not knowing about a POSC Manual.  What Mr. Landers

25   actually said was he didn't know the very specific

1  training that the deputies had said.

2        And there was very little said about the

3  defendants' own expert.  The defendants' own expert has

4  a different explanation for why this was appropriate

5  than the defendants do.  The defendants' own expert says

6  the officers were in danger.  The defendants said their

7  primary reason was to get the handcuffs off because that

8  would make Mr. Kingsley in danger.

9        And Mr. Peters, half of his testimony was about his

10 irrelevant background frankly.  And he didn't even know

11 what the deputies' training was because he didn't read

12 the deputies' training records.  All right?  What also

13 Mr. Jones didn't tell you was that Deputy Blanton was

14 there, right there, over his cuffs, and he didn't see

15 any pulling away.  All right?  And he had no opinion

16 about whether the taser was appropriate.

17       The bottom line is look at the video.  Put yourself

18 in that position.  And please do something to stop this

19 from happening again.  This was excessive.  It should

20 not happen.  Because it can only get worse.  Thanks.

21       THE COURT:  Thanks, Mr. Pardon.  The clerk will

22 put the instructions and the verdict form on the visual

23 presenter so that you can follow along.  Read them while

24 I read them out loud to you.  And you'll have copies of

25 these instructions, as well as the ones that I read to

1  you on Monday to take back with you in the jury room,

2  along with the exhibits.

3      Ladies and Gentlemen of the Jury.  Now that you

4  have heard the evidence and the arguments, I will give

5  you the instructions that will govern your deliberations

6  in the jury room.  It is my job to decide what

7  instruction -- what rules of law apply to the case and

8  to explain those rules to you.  It is your job to follow

9  the rules, even if you disagree with them or don't

10  understand the reasons for them.  You must follow all of

11  the rules; you may not follow some and ignore others.

12      The decision you reach in the jury room must be

13  unanimous.  In other words, you must all agree on the

14  answer to each question.

15      Your deliberations will be secret.  You will never

16  have to explain your verdict to anyone.

17      If you have formed any idea that I have an opinion

18  about how the case should be decided, disregard that

19  idea.  It is your job, not mine, to decide the facts of

20  this case.

21      The case will be submitted to you in the form of a

22  special verdict consisting of four questions.  In

23  answering the questions, you should consider only the

24  evidence that has been received at this trial.  Do not

25  concern yourselves with whether your answers will be

1  favorable to one side or another, or with what the final

2  result of this lawsuit may be.

3      Note that certain questions in the verdict are to

4  be answered only if you answer a preceding question in a

5  certain manner.  Read the introductory portion of each

6  question very carefully before you undertake to answer

7  it.  Do not answer questions needlessly.

8      The burden of proof.  When a party has the burden

9  to prove any matter by a preponderance of the evidence,

10  it means that you must be persuaded by the testimony and

11  exhibits that the matter sought to be proved is more

12  probably true than not true.  On the liability questions

13  in the special verdict, the burden of proof is on the

14  party contending that the answer to a question should be

15  "yes."  You should base your decision on all of the

16  evidence, regardless of which party introduced it.

17      If after you have discussed the testimony and all

18  other evidence that bears upon a particular question you

19  find that the evidence is so uncertain or inadequate

20  that you have to guess what the answer should be, then

21  the party having the burden of proof as to that question

22  has not met the required burden.  Your answers are not

23  to be based on guesswork or speculation, they are to be

24  based upon credible evidence from which you can find the

25  existence of the facts that the party must prove in

1  order to satisfy the burden of proof on the question

2  under consideration.

3      In determining whether any fact has been proved,

4  you should consider all of the evidence bearing on the

5  question, regardless who introduced it.

6      You may find the testimony of one witness or a few

7  witnesses more persuasive than the testimony of a large

8  number.  You need not accept the testimony of the larger

9  number of witnesses.  This case should be considered and

10  decided by you as a dispute between persons of equal

11  standing in the community, of equal worth, and holding

12  the same or similar stations in life.  All persons stand

13  equal before the law and are to be treated as equals.

14      You've heard evidence that plaintiff Michael

15  Kingsley has been convicted of a felony.  You may use

16  that evidence to help you decide whether his testimony

17  is truthful and how much weight to give to his

18  testimony.  You may not consider this evidence for any

19  other purpose.

20      You must give separate consideration to each claim

21  and each party in this case.  Although there are two

22  defendants, it does not follow that if one is liable,

23  the other is also liable.  In considering a claim

24  against a defendant, you must not consider evidence

25  admitted only against the other defendant.

Plaintiff is alleging that defendants used excessive force against him.  Question No. 1 asks whether on May 21, 2010, one or both defendants used excessive force against plaintiff.

*Excessive force* means force applied recklessly; that is, unreasonable in light of the facts and circumstances of the time.  Thus, to succeed on his claim of excessive use of force, plaintiff must prove each of the following factors by a preponderance of the evidence:

First, defendants used force on plaintiff.

2.  Defendants use of force was unreasonable in light of the facts and circumstances at the time;

3.  Defendants knew that using force presented a risk of harm to plaintiff, but they recklessly disregarded plaintiff's safety by failing to take reasonable measures to minimize the risk of harm to plaintiff; and

4.  Defendants' conduct caused some harm to plaintiff.

In deciding whether one or more defendants used "unreasonable" force against plaintiff, you must consider whether it was unreasonable from the perspective of a reasonable officer facing the same circumstances that defendants faced.  You must make this

1    decision based on what defendants knew at the time of

2    the incident, not based on what you know now.

3         Also, in deciding whether one or more defendants

4    used unreasonable force and acted with reckless

5    disregard of plaintiff's rights, you may consider such

6    factors as:

7         The need to use force;

8         The relationship between the need to use force and

9    the amount of force used;

10        The extent of plaintiff's injury;

11        Whether defendants reasonably believed there was a

12   threat to the safety of staff or prisoners, and

13        Any efforts made by defendants to limit the amount

14   of force used.

15        A person can be harmed even if he did not suffer a

16   severe injury.

17        You have heard evidence about whether the

18   defendants' conduct complied with or violated their

19   training and Monroe County Sheriff's Department

20   policies.  You may consider this evidence in your

21   deliberations.  But remember that the issue is whether

22   the defendants used excessive force on plaintiff, not

23   whether defendants complied with or violated their

24   training or the Monroe County Sheriff's Department

25   policies.

1    If you find that plaintiff has proved each element

2  of his excessive force claim by a preponderance of the

3  evidence with respect to one or both defendants, you

4  should answer yes in the appropriate space in Question

5  No. 1.  Then proceed to Question No. 2.

6    If, on the other hand, you find that plaintiff has

7  failed to prove any element of his excessive force claim

8  by a preponderance of the evidence with respect to one

9  or both defendants, you should answer no in the

10  appropriate space in Question No. 1.

11    If you answer no as to both defendants in Question

12  No. 1, you should not consider any more questions.

13    Questions Nos. 2, 3 and 4 involve the issue of

14  damages.  If you answer yes to Question No. 1 for one or

15  both defendants, then you must answer Question No. 2 and

16  Question No. 3 for those defendants.

17    Question No. 2 asks:  What amount of money, if any,

18  will fully and fairly compensate plaintiff for the harm

19  caused by defendants.  These are called *compensatory*

20  damages.  Plaintiff has the burden of convincing you by

21  the preponderance of the evidence both that he has been

22  injured or damaged and the amount of the damages.  This

23  does not mean, however, that plaintiff must prove

24  evidence that is as exact as the evidence needed to

25  support findings on other questions in the verdict.

1  Determining damages involves the consideration of many

2  different factors that cannot be measured precisely.

3      In determining the damages, you must base your

4  answer on evidence that reasonably supports your

5  determination of damages under all the circumstances of

6  the case.

7      Compensatory damages are not restricted to the

8  actual loss of money.  They include both the physical

9  and mental aspects of injury, even if these are not easy

10  to measure.  You should consider the physical, mental

11  and emotional pain and suffering that plaintiff has

12  experienced.

13      Do not measure damages by what the lawyers ask for

14  in their arguments.  Their opinions as to what damages

15  should be awarded should not influence you unless their

16  opinions are supported by the evidence.  It is your job

17  to determine the amount of the damages sustained from

18  the evidence you have seen and heard.

19      Examine that evidence carefully and impartially.

20  Do not add to the damage award or subtract anything from

21  it because of sympathy to one side or because of

22  hostility to one side.  Do not make any deductions

23  because of a doubt in your minds about the liability of

24  any of the parties.

25      If you find in favor of plaintiff on Question No. 1

1   but find that he has failed to prove that he has

2   suffered any compensatory damages, you should enter one

3   dollar in nominal damages for plaintiff in Question No.

4   2.

5       Question No. 3 asks whether one or both defendants

6   acted in a way that demonstrated a willful or reckless

7   disregard for plaintiff's rights.  If you answered yes

8   to Question No. -- that doesn't make sense.  The first

9   line includes a mistake.  It should be Question No. 3.

10  So if you answer yes to any part of Question No. 3, you

11  may award punitive damages in Question No. 4 against the

12  defendants.

13      Punitive damages are never a matter of right.  This

14  means that you are not required to make any award of

15  punitive damages, but you may do so if you think it is

16  proper under the circumstances.  It is in the jury's

17  discretion to award or withhold them.

18      Punitive damages may be awarded even if the

19  violation of plaintiff's rights resulted in only nominal

20  compensatory damages; that is, you may award punitive

21  damages even if the plaintiff can show no damages or

22  other injury as a result of defendants' actions.

23      The purposes of punitive damages are to punish the

24  defendants for their conduct and to serve as an example

25  or warning to the defendants and others not to engage in

similar conduct in the future.  Plaintiffs must prove --

plaintiff must prove by a preponderance of the evidence

that punitive damages should be assessed against

defendants.

     You may assess punitive damages only if you find

that the conduct of at least one of the defendants was

in reckless disregard of plaintiff's rights.  An action

is in reckless disregard of plaintiff's rights if, under

the circumstances, it reflects complete indifference to

plaintiff's safety or rights.  If you find that a

defendant's conduct was motivated by evil motive or

intent, such as ill will or spite or grudge either

toward plaintiff individually or toward all persons such

as plaintiff, then you may find that the defendant

deliberately violated the plaintiff's rights.

     In addition, if the defendant was in a position in

which he certainly should have known that his conduct

would violate the plaintiff's rights and proceeded to

act in disregard of that knowledge and of the harm or

the risk of harm that would result to the plaintiff,

then that defendant acted with reckless disregard for

the plaintiff's rights.

     If you find that punitive damages are appropriate,

then you must use sound reason in setting the amount of

those damages.  Punitive damages, if any, should be in

any amount sufficient to fulfill the purposes I have

described to you, but should not reflect bias, prejudice

or sympathy toward any party.

In determining the amount of any punitive damages,

you should consider the following factors:

The reprehensibility of defendants' conduct;

The impact of defendants' conduct on the plaintiff;

The relationship between the plaintiff and

defendants;

The likelihood that defendants would repeat the

conduct if an award of punitive damages is not made;

And the relationship of any award of punitive

damages to the amount of actual harm the plaintiff

suffered.

When you go to the jury room to begin considering

the evidence in this case, you should first select one

of the members of the jury to act as your presiding

juror.  This person will help to guide your discussions

in the jury room.  You are free to deliberate in any way

you decide or select whomever you like as presiding

juror.

When thinking about who should be the presiding

juror, you may want to consider the role that the

presiding juror usually plays.  He or she serves as the

chairperson during the deliberations and has the

responsibility of ensuring that all jurors who wish to speak have a chance to do so before any vote.  The presiding juror should guide the discussion and encourage all jurors to participate.

I encourage you at all times to keep an open mind if you ever disagree or come to conclusions that are different from those of your fellow jurors.  Listening carefully and thinking about the other juror's point of view may help you understand that juror's position better or give you a better way to explain why you think your position is correct.

I would suggest the second thing that you do in the jury room is decide on lunch.  The bailiff can give you a menu of take-out food that you can order and then it will be brought to the jury room for you.  Once you are in the jury room, if you need to communicate with me, the presiding juror will send a written message to me. However, don't tell me how you stand as to your verdict. If you're 6-2 or 7-1 or 3-5, don't tell me that.  Just if you have a question though, send it out in writing.

As I have mentioned before, the decision you reach must be unanimous.  You must all agree.  When you have reached a decision, the presiding juror will sign the verdict form, put a date on it, and all of you will return with the verdict into the courtroom.

1        I want to thank you all at this time for your

2  service as jurors.  I will not thank you when you return

3  with a verdict because I don't want it to sound as if

4  I'm thanking you for a particular verdict.  I'm thanking

5  you for your service, as Mr. Jones and Mr. Pardon did.

6  We are very grateful to you for your service as jurors

7  in this case.  You can see that some of these disputes

8  could never be decided unless people like you were

9  willing to carry out your duties as jurors, come to

10  court at great inconvenience, sit through an odd and

11  complicated and difficult schedule, pay close attention

12  for long periods of time.  We know that it's a hard job

13  that we ask of you and we are very grateful for it.

14        I want to also say that I think you've seen some

15  exceptional work by the lawyers in this case and I want

16  to compliment them and thank them for their work.  We're

17  very pleased when lawyers can present cases, defend

18  cases as well as the lawyers in this courtroom and in

19  this case have done, and I really compliment them on

20  their work in this case.

21        All right.  Anything else before the jurors are

22  excused?  Mr. Pardon.

23          MR. PARDON:  No, Your Honor.

24          THE COURT:  Mr. Jones.

25          MR. JONES:  No, Judge.

1          THE COURT:  All right.  After you're back in

2     the jury room, we'll be sending you a copy of the

3     instructions I just read you, the instructions I read

4     you on Monday, the verdict form, and the exhibits.

5          (Bailiff sworn in at 1:04 p.m.)

6          (Jury excused from courtroom at 1:05 p.m.)

7          THE COURT:  I have two plea hearings right now.

8     If you could get your exhibits together, if there's any

9     exhibit you have any kind of disagreement about, I'll

10    take a break between the first one and the second one

11    and come down and resolve it.  The only thing I would

12    say is we don't send the CVs of the experts back to the

13    jurors very often, otherwise I didn't see anything that

14    I thought wouldn't go back.  But if you have any dispute

15    about anything, just let Erica know.  Thank you.

16         MR. JONES:  Thank you, Judge.

17         (Recess    1:05-1:53 p.m.)

18         THE CLERK:  This Honorable Court is again in

19    session.  Please come to order.

20         THE COURT:  We have a question from the jury.

21    I'll read it for the record, although I assume you have

22    copies of it.  "Taser," arrow "see one."  I don't know

23    what that means.  "Have to notify before using a taser.

24    Is this the law -- a law."  I was contemplating sending

25    an answer back along these lines that there's been no

1    evidence about notification and it's something you

2    should not consider.

3          MS. WARD:  Part of totality of the

4    circumstances for unreasonableness involves whether the

5    subject was warned prior to use of the taser.  I don't

6    know if that's what they mean by notify, if a warning

7    was given.  I would suggest that it would be part of the

8    totality of the circumstances surrounding the use of

9    force.

10          THE COURT:  Who testified that there was a duty

11   to warn?

12          MS. WARD:  Some of the -- that there was a duty

13   to warn --

14          THE COURT:  I'm sorry, I can't hear you.

15          MS. WARD:  Did Landers?

16          MR. PARDON:  The only concern we have, Your

17   Honor, is to the -- I don't -- I don't know whether I

18   recall line-by-line all the pages of the exhibits, to

19   the extent there's anything in any of the manuals that

20   make a suggestion about that, about the preferability of

21   using a warning.  I guess I don't want to preclude that,

22   but I don't -- is this a law?  I mean it's not a law.

23          MS. WARD:  It's not a law, it's just part of

24   the totality of the circumstances.

25          THE COURT:  Well, I was going to say --

1      MR. PARDON:  I mean maybe perhaps --

2      THE COURT:  -- there's no evidence that -- of

3  any law requiring notification, so you should not take

4  this into consideration.  Or just say there's no

5  evidence of any law requiring notification and just end

6  there.

7      MR. PARDON:  I guess I don't -- I don't want to

8  suggest -- well, could it be something more like you

9  should only consider this -- you should only consider

10 the evidence that was presented about this and let the

11 jury decide whether they heard evidence about this?

12     MR. JONES:  But there was no evidence about

13 that.

14     MS. WARD:  There was evidence as to whether or

15 not he did receive warning before he was tased.  I mean

16 that was the factual evidence.  I guess they're asking

17 you for legal guidance as to whether that has any legal

18 impact.

19     MR. JONES:  And I think the response Your Honor

20 is proposing directly responds to the question and is

21 consistent with the evidence or in this case the lack of

22 notice on that point.

23     THE COURT:  So, just to say that there's no

24 evidence of any law requiring notification, period.

25     MR. PARDON:  There may be evidence in the

1   exhibits that -- not about an actual statute, but about

2   preferability of --

3         THE COURT:  Well, I'm just saying there's no

4   evidence of any law requiring notification.

5         MR. PARDON:  Okay.

6         THE COURT:  I'll just say there's no evidence

7   in this case.

8         MR. PARDON:  The other thing, Your Honor, is I

9   don't know if the line on the top is actually a question

10   about seeing a taser.  I'm not sure, but I would point

11   out that might be a question.

12         THE COURT:  I'm not going to try to answer

13   that.  I have no idea.

14         MR. PARDON:  Other than that's not been

15   presented already.

16         THE COURT:  We'll send this back to the jury

17   room and recess to await the jury's verdict.

18     (Recess                1:58-3:58 p.m.)

19         THE COURT:  All right.  You can bring the jury

20   in.

21     (Jury brought in courtroom at 3:58 p.m.)

22         THE CLERK:  This Honorable Court is again in

23   session.  Please be seated and come to order.

24         THE COURT:  Mr. Rowley, I understand you're the

25   presiding juror and you've reached a verdict; is that

1    correct?

2         JUROR ROWLEY:  Yes, Ma'am.

3         THE COURT:  Would you hand the verdict form to

4    the bailiff, please.

5       (Verdict handed to Bailiff, who hands it to Court)

6         THE COURT:  The clerk will read the verdict.

7         THE CLERK:  *Michael B. Kingsley, plaintiff, v.*

8    *Stan Hendrickson and Fritz Degner, defendants*.

9       Special Verdict.

10      We, the jury, for our special verdict find as

11   follows:

12      "Question No. 1.  On May 21st, 2010, did one or

13   both of the defendants use excessive force against

14   plaintiff Michael Kingsley?

15      Stan Hendrickson.  No.

16      Fritz Degner.  No."

17      Mark Rowley, presiding juror, Madison, Wisconsin.

18   Dated October 17th, 2012.

19         THE COURT:  Thank you.  The clerk will poll the

20   jurors.

21         THE CLERK:  Juror Gleason-Ranzen, was this and

22   is this your verdict?

23         JUROR GLEASON-RANZEN:  (Nods head)

24         THE CLERK:  Juror Kane, was this and is this

25   your verdict?

1              JUROR KANE:  Yes.

2              THE COURT:  Juror Lambert, was this and is this

3    your verdict?

4              JUROR LAMBERT:  Yes.

5              THE COURT:  Juror Algrim, was this and is this

6    your verdict?

7              JUROR ALGRIM:  Yes.

8              THE CLERK:  Juror Dobson, was this and is this

9    your verdict?

10             JUROR DOBSON:  Yes.

11             THE CLERK:  Juror Vanvught, was this and is

12   this your verdict?

13             JUROR VANVUGHT:  Yes.

14             THE CLERK:  Juror Rowley, was this and is this

15   your verdict?

16             JUROR ROWLEY:  Yes.

17             THE CLERK:  Juror Floerke, was this and is this

18   your verdict?

19             JUROR FLOERKE:  Yes.

20             THE COURT:  Counsel, anything you want to take

21   up before the jurors are discharged?

22             MR. PARDON:  No, Your Honor.

23             MR. JONES:  No, Judge.

24             THE COURT:  The jurors are discharged from

25   their service as jurors in this case and are free to

1    leave the building and go about their business.  Good

2    evening.

3         (Jury excused from courtroom at 4 p.m.)

4         THE COURT:  Anything you want to take outside

5    the jury's presence?

6         MR. PARDON:  Just one brief question, Your

7    Honor, regarding the Court's procedures.  I understand

8    that at one point the Court allowed counsel to contact

9    jurors afterward if it were to ask simple questions

10   about performance, what was convincing you, what wasn't,

11   and I don't know if that's still the -- it's for our

12   learning experience.  I don't know if that's still the

13   practice.  If it is, I'd like to ask permission to do

14   that.

15        THE COURT:  I'll grant you permission.  These

16   jurors are through with their jury service, so if you

17   want to contact them.  Just make it clear that they're

18   under no obligation to talk to you.

19        MR. PARDON:  Absolutely.  Thank you.

20        THE COURT:  And that would be true for you,

21   Mr. Jones and Mr. Posnanski, if that's what you want to

22   do.

23        MR. JONES:  Thank you.

24        THE COURT:  And judgment will be entered for

25   defendants.  I don't think there's anything else we need

1  to take care of today except Mr. Pardon and Ms. Ward and

2  Mr. Graham, I want to thank you very much for your

3  willingness to take on this case and then to do such a

4  really remarkable job of trying it.

5          MR. PARDON:  Thank you, Your Honor.

6          THE COURT:  It was a great service to the

7  court.  In the end, defendants prevailed.  They were

8  also represented by very remarkable lawyers.  It was a

9  pleasure to sit in this case.

10      All right.  Court will adjourn.

11      (Proceedings concluded at 4:03 p.m.)

12                    * * * * *

13      I, LYNETTE SWENSON, Certified Realtime and Merit
   Reporter in and for the State of Wisconsin, certify that
14 the foregoing is a true and accurate record of the
   proceedings held on the 17th day of October 2012 before
15 the Honorable Barbara B. Crabb, District Judge for the
   Western District of Wisconsin, in my presence and
16 reduced to writing in accordance with my stenographic
   notes made at said time and place.
17 Dated this 3rd day of November 2012.

18

19

20                      /s/_____

21                      Lynette Swenson, RMR, CRR, CBC
                          Federal Court Reporter

22

23

24 The foregoing certification of this transcript does not
   apply to any reproduction of the same by any means
25 unless under the direct control and/or direction of the
   certifying reporter.