UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

MICHAEL KINGSLEY,                         **VOLUME 2-A**

                    Plaintiff,

         vs.                          Case No. 10-CV-832-BBC

STAN HENDRICKSON and              Madison, Wisconsin
FRITZ DEGNER,                     October 15, 2012
                                  9:00 a.m.
                    Defendants.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

    STENOGRAPHIC TRANSCRIPT OF SECOND DAY OF JURY TRIAL
       HELD BEFORE THE HONORABLE BARBARA B. CRABB

APPEARANCES:

For the Plaintiff:   Merchant & Gould, P.C.
                     BY:  EDWARD J. PARDON
                          WENDY M. WARD
                          JOEL F. GRAHAM
                     10 East Doty Street, Suite 600
                     Madison, Wisconsin  53703-3376


                     Julie King, Paralegal

For the Defendants:  Whyte Hirschboeck Dudek, S.C.
                     BY:  ANDREW ALSTON JONES
                          TIMOTHY H. POSNANSKI
                     555 East Wells, Suite 1900
                     Milwaukee, Wisconsin  53202




                     CHERYL A. SEEMAN, RMR, CRR
                       Official Court Reporter
                     United States District Court
                     120 North Henry Street, Room 520
                        Madison, Wisconsin  53703
                           1-608-255-3821

1                          **I-N-D-E-X**

2    OPENING STATEMENTS                                    PAGES

3    By Ms. Ward                                          17-29
     By Mr. Jones                                         29-42

4
     PLAINTIFF'S WITNESSES          EXAMINATION           PAGES

5
     MICHAEL KINGSLEY          Direct by Mr. Pardon       43-55

6                             Cross by Mr. Jones          55-86
                              Redirect by Mr. Pardon      87-87

7    ROBERT CONROY            Adverse by Mr. Pardon       88-118
                              Direct by Mr. Jones         118-135

8
                           **E-X-H-I-B-I-T-S**

9
     EXHIBITS                          IDENTIFIED   RECEIVED

10
     Ex. 5    - Incident Report            113        113

11   Ex. 13   - Videos                     101        101
     Ex. 60   - Inmate General Request     116        116

12   Ex. 509A - Cell Photo                 129        129
     Ex. 510A - Jail Map                   125        126

13

14                            * * *

15        (Called to order.)

16             THE CLERK:  Case No. 10-CV-832-BBC, *Michael*

17   *Kingsley v. Stan Hendrickson and Fritz Degner*, is

18   called for a conference.  May we have the appearances,

19   please?

20             MR. PARDON:  Good morning, Your Honor.  For

21   plaintiff Mr. Kingsley we have plaintiff Michael

22   Kingsley.  I'm Ed Pardon of Merchant & Gould.  And my

23   colleagues are Wendy Ward and Joel Graham.

24             THE COURT:  Thank you.

25             MR. JONES:  Good morning, Your Honor.  Andrew

 1   Jones and Tim Posnanski on behalf of the defendants who

 2   are also present.

 3             THE COURT:  Thank you.  And I was informed that

 4   you had one thing that you wanted to bring up?

 5             MR. PARDON:  Yes, I did, Your Honor.

 6             THE COURT:  Mr. Pardon.

 7             MR. PARDON:  It's just a brief thing.  We would

 8   like to use a demonstrative exhibit with one of our

 9   witnesses, Mr. Landers.  And it's a handcuff and we would

10   like to have him demonstrate proper handcuffing technique

11   and the issues that he has with this and the issues about

12   how he claims -- how he's asserting that the handcuffs

13   are improperly applied.

14       I've spoken with Mr. Jones about it and he indicates

15   that he's thinking about it and we don't have a -- we're

16   not sure yet if he agrees.  But there's just a security

17   issue.  I was told that in order for him to be able to,

18   Mr. Landers to take the handcuffs into the courthouse, he

19   needs to have permission and it was understood by me that

20   it had to be referred to him.  Mr. Landers is coming this

21   morning and --

22             THE COURT:  And he has a handcuff?

23             MR. PARDON:  Yes.  He's a former police officer

24   and he's presently an instructor at MATC and he has his

25   own handcuffs that he would like to use as a

 1    demonstrative.  He has them with him.  But he will be

 2    here this morning.  And before you can make a decision

 3    about the demonstrative, he has to get into the

 4    courthouse sometime this morning, probably while the

 5    openings are going on.

 6         THE COURT:  Well, I'll start with the easier

 7    one.  Mr. Jones, do you have any objection to my letting

 8    him come into the courthouse?

 9         MR. JONES:  Absolutely not.

10         THE COURT:  Okay.  And, Erica, would you pass

11    that along to the CSOs?  Thank you.  Then the question,

12    does he have the same handcuff that was being used on Mr.

13    -- I mean, not the precise one, but the same kind of

14    handcuff that was being used on plaintiff?

15         MR. PARDON:  I don't know if he has same brand,

16    but he has the same general type of handcuffs.  If it's

17    not the same brand, he can certainly say, this is not the

18    same brand.  But I would like to illustrate in general

19    how you handcuff and in particular how you safety lock

20    handcuffs.

21         THE COURT:  Okay.  When do you plan to call him?

22         MR. PARDON:  He will be the third witness today,

23    so it's either going to be late in the morning or more

24    likely early afternoon.

25         THE COURT:  Mr. Jones.

1      MR. JONES:  It was only raised within the five

2  minutes, Your Honor.  I don't foresee it will be an

3  issue, but I would like the opportunity to show those

4  handcuffs to the officers to make sure that they are

5  comparable at least to what was being used that day

6  before I decide.

7      THE COURT:  Okay.  And if you have some more

8  objections or anything else you want to discuss we can

9  take it up maybe at the morning recess.

10     MR. JONES:  Sure.  Yes.

11     THE COURT:  Okay.  Anything else?

12     MR. PARDON:  No, Your Honor.

13     THE COURT:  All right.  When the jurors come in,

14 I will start out by giving them introductory instructions

15 and then openings statements.

16     MR. JONES:  I had one very ticky-tack thing that

17 I noticed in the introductory instructions, Your Honor.

18     THE COURT:  Mm-mm.

19     MR. JONES:  You refer to both of the defendants

20 as employees of the Monroe County Jail.  It's minor, but

21 Officer Degner is not an employee of the jail.  They're

22 both employees of the Sheriff's Department.  Officer

23 Degner is a patrol officer.

24     THE COURT:  Sure.  Okay.  That was it?

25     MR. JONES:  That was it.

 1          MR. PARDON:  Yes.

 2          THE COURT:  All right.  Then you can bring in

 3   the jurors.

 4          THE CLERK:  We're still missing one.

 5          THE COURT:  Oh, all right.

 6       (Discussion held off the record.)

 7       (Called to order at 9:12 a.m.)

 8          THE CLERK:  Case No. 10-CV-832-BBC, *Michael*

 9   *Kingsley v. Stan Hendrickson and Fritz Degner*, is called

10   for jury trial.  May we have the appearances, please?

11          MR. PARDON:  Good morning, Your Honor, ladies

12   and gentlemen.  On behalf of the plaintiff, Michael

13   Kingsley, I'm Ed Pardon of Merchant & Gould.  Also with

14   me are my colleagues, Wendy Ward and Joel Graham of

15   Merchant & Gould.

16          THE COURT:  Thank you.

17          MR. JONES:  Good morning, Your Honor, ladies and

18   gentlemen of the jury.  Andrew Jones and Tim Posnanski on

19   behalf of the defendants, Stan Hendrickson and Fritz

20   Degner, who are present at counsel's table.

21          THE COURT:  Thank you.  Members of the jury, you

22   were selected by Magistrate Judge Crocker.  I'm going to

23   be giving you some introductory instructions.  I think I

24   remember seeing most of you in the earlier jury selection

25   for the criminal case last week.

1      We are about to start the trial of this case.

2  Before it begins, I will give you some instructions to

3  help you understand how the trial will proceed, how you

4  should evaluate the evidence and how you should conduct

5  yourselves during the trial.

6      The party who begins the lawsuit is called the

7  *plaintiff*.   In this action the plaintiff is Michael

8  Kingsley.   The parties against whom the suit is brought

9  are called the *defendants*.   In this action the defendants

10 are Stanley Hendrickson and Fritz Degner.   The defendants

11 are employees of the Monroe County Sheriff's Department.

12     Plaintiff, Mr. Kingsley, is contending that the

13 defendants violated his constitutional rights by using

14 excessive force against him while he was an inmates at

15 the jail.

16     The case will proceed as follows:

17     First, plaintiff's counsel will make an opening

18 statement outlining plaintiff's case.   Immediately after

19 that, defendants' counsel will also make an opening

20 statement outlining defendants' case.   What is said in

21 opening statements is not evidence; it is simply a guide

22 to help you understand what each party expects the

23 evidence will show.

24     Second, after the opening statements, the plaintiff

25 will introduce evidence in support of his claim.   At the

1    conclusion of the plaintiff's case, the defendants may

2    introduce evidence.  They're not required to introduce

3    any evidence or to call any witnesses.  If they do

4    introduce evidence, the plaintiff may then introduce

5    rebuttal evidence.

6         Third, after the evidence is presented, the parties

7    will make closing arguments explaining what they believe

8    the evidence has shown and what inferences or conclusions

9    you should draw from the evidence.  What they say to you

10   in closing argument is not evidence.  The plaintiff has

11   the right to give the first closing argument and to make

12   a short rebuttal argument after the defendants' closing

13   argument because the plaintiff has the burden of proof.

14        Fourth, I will instruct you on the law that you are

15   to apply in reaching your verdict.

16        Fifth, you will retire to the jury room and begin

17   your deliberation.

18        You will hear the term *burden of proof* used during

19   this trial.  In simple terms, the phrase means that the

20   party who makes a claim has the obligation of proving

21   that claim.  At the end of the trial I will instruct you

22   on the proper burden of proof to be applied in this case.

23        The trial day will run from nine until 5:30 p.m.  We

24   will recess or adjourn this afternoon at 5:15.  You will

25   have at least an hour for lunch and two additional short

1  breaks, one in the morning and one in the afternoon.

2  During recesses you should keep in mind the following

3  instructions:

4      First, do not discuss the case either among

5  yourselves or with anyone else during the course of the

6  trial.  The parties to this lawsuit have a right to

7  expect from you that you will keep an open mind

8  throughout the trial.  You should not reach a conclusion

9  until you've heard all of the evidence and you've heard

10 the lawyers' closing arguments and my instructions to you

11 on the law and have retired to deliberate with the other

12 members of the jury.

13     I must warn you in particular against commenting

14 about the trial in an e-mail or a blog or on Twitter.

15 There have been news accounts recently about cases that

16 have had to be retried because a member of the jury

17 communicated electronically about the case during the

18 trial.  You can imagine how upset your fellow jurors

19 would be, to say nothing of the plaintiff and the

20 defendants, all of whose inconvenience and stress would

21 have gone for nothing because the case has to be started

22 all over again with new jurors.

23     Second, do not permit any third person to discuss

24 the case in your presence.  If someone tries to talk to

25 you despite your telling him not to, report that fact to

1    the Court, to the jury clerk, as soon as you can.  Do not

2    discuss it with your fellow jurors or discuss with them

3    any other fact you believe you should bring to the

4    attention of the Court.

5        Third, although it is a normal human tendency to

6    converse with people with whom one is thrown in contact,

7    please do not talk to any of the parties or their lawyers

8    or witnesses.  By this I mean not only do not talk about

9    the facts of case; do not talk even to pass the time of

10   day.  In no other way can the jurors -- I'm sorry -- in

11   no other way can the parties be assured of the absolute

12   impartiality they are entitled to expect from you as

13   jurors.

14       Fourth, do not read about the case in the newspapers

15   or listen to radio or television broadcasts about the

16   trial.  If a newspaper headline catches your eye, do not

17   examine the article further.  Media accounts may be

18   inaccurate and may contain matters that are not proper

19   for your consideration.  You must base your verdict

20   solely on the evidence produced in court.

21       Fifth, no matter how interested you may become in

22   the facts of the case, you must not do any independent

23   research, investigation or experimentation.  Do not look

24   up materials on the Internet or in other sources.  Do not

25   perform any kind of experiment.

1       The important thing to remember is the plaintiff has

2   the burden of proof.  That means the plaintiff has the

3   burden of bringing in all the evidence that's necessary

4   to persuade you that he's entitled to a verdict in his

5   favor.  If the plaintiff leaves something out, if he

6   doesn't produce the evidence, that means he loses.  It's

7   not up to any of you to supply the missing evidence that

8   would help the plaintiff win or for that matter help the

9   defendants win.  Each party is responsible to make the

10  amount of proof that he thinks is necessary to prove the

11  case.

12      In deciding the facts you may have to decide which

13  testimony to believe and which testimony not to believe.

14  You may believe everything a witness says, part of it or

15  none of it.  In considering the testimony of any witness,

16  you may take into account many factors, including the

17  witness's opportunity and ability to see and hear the

18  things the witness is testifying about, the quality of

19  the witness's memory, the witness's appearance and manner

20  while testifying, the witness's interest in the outcome

21  of the case, any bias or prejudice the witness may have,

22  other evidence that may have contradicted the witness's

23  testimony and the reasonableness of the witness's

24  testimony in light of all the evidence.

25      The weight of the evidence does not necessarily

depend upon the number of witnesses who testify.  During

the course of a trial the lawyers will often refer to and

read from depositions.  Depositions are transcripts of

testimony taken while the parties are preparing for

trial.  Deposition testimony is given under oath just

like testimony at trial.  You should give it the same

consideration you would give it had the witnesses

testified here in the courtroom.

You will also hear the lawyers make objections to

certain questions or to certain answers of the witnesses.

When they do so it's because they believe the question or

answer is legally improper and they want me to rule on

it.  Do not try to guess why the objection is being made

or what the answer would have been had the witness been

allowed to answer the question.

If I tell you not to consider a particular statement

that has already been made, put that statement out of

your mind and remember that you may not refer to it

during your deliberations.

During the trial I may sometimes ask witnesses

questions.  Please do not assume that I have any opinion

about the subject matter of my questions.  If any of you

wish to ask a question about something that you do not

understand that you think has not been explained

adequately, write it down on a separate slip of paper.

1  When the lawyers finish the questioning and you are not

2  satisfied with the answers you've heard, raise your hand

3  and I'll take the written question from you, show it to

4  counsel and decide whether it's a question that can be

5  asked.  If it cannot be asked, I'll let you know that.

6      If you want to take notes, there are notepads and

7  pencils for taking notes next to the jury bench.  This

8  does not mean that you have to take notes.  Take them

9  only if you want to and if you think they will help you

10 remember the evidence during your deliberations.  Do not

11 let notetaking interfere with your important duties of

12 listening carefully to all the evidence and evaluating

13 the credibility, that is, the believability, of each

14 witness.

15     Keep in mind that just because you've written

16 something down, it does not mean that the written note is

17 more accurate than another juror's mental recollection of

18 the same thing.  No one of you is the secretary for the

19 jury charged with the responsibility of recording

20 evidence.  Each of you is responsible for recalling the

21 evidence and the testimony.

22     You can see that the trial is being reported, but

23 you should not expect to be able to use trial transcripts

24 in your deliberations.  You will have to rely on your own

25 memories.  Since there are eight of you, that should be a

1  good collective memory.

2      Evidence at a trial includes the sworn testimony of

3  the witnesses, exhibits admitted into the record, facts

4  judicially noticed and facts stipulated by counsel.  You

5  may consider only evidence that is admitted into the

6  record.

7      In deciding the facts of this case, you are not to

8  consider the following as evidence:

9      The statements and arguments of the lawyers;

10      Questions and objections of the lawyers;

11      Testimony that I instruct you to disregard; and

12      Anything you may see or hear when the court is not

13  in session, even if what you see or hear is said or done

14  by one of the parties or one of the witnesses.

15      Evidence may be either direct or circumstantial.

16  Direct evidence is direct proof of a fact, such as

17  testimony by a witness about what the witness said or

18  heard or did.  Circumstantial evidence is proof of one or

19  more facts from which you could find another fact.

20      I always use this pretty dumb example:  But if you

21  saw a cat and you saw a mouse and you saw the cat eat the

22  mouse, you would have direct evidence of what happened to

23  the mouse.  If you put a mouse and a cat in a box, go

24  away for a few minutes and come back and the mouse is

25  gone, if there are no exits from the box you have pretty

1  good circumstantial evidence of what happened to that

2  mouse.

3      You should consider both kinds of evidence.  The law

4  makes no distinction between the weight to be given to

5  either direct or circumstantial evidence.  You are to

6  decide how much weight to give to any evidence.

7      A witness may be discredited by contradictory

8  evidence or by evidence that at some other time the

9  witness said or did something or failed to say or do

10  something inconsistent with the witness's present

11  testimony; for example, if a witness were to testify here

12  at trial that she was present when the accident occurred

13  and that she saw the driver going through a red light,

14  then perhaps a police officer gets up later in the trial

15  and says, "Well, I investigated the accident scene and

16  when I investigated I talked to that woman that was

17  testifying earlier and at that time she told me the light

18  was green when the driver went through it."

19      If you believe any witness has been discredited,

20  it's up to you to decide how much of the testimony of

21  that witness you believe.  If a witness has shown to have

22  given false testimony knowingly, that is, voluntarily and

23  intentionally, about any important matter, you have a

24  right to distrust the witness's testimony about other

25  matters.  You may reject all the testimony of that

1    witness or you may choose to believe some or all of it.

2         The general rule is that if you find a witness said

3    something before trial different from what the witness

4    said at trial, consider only the earlier statements as an

5    aid in evaluating the truthfulness of the witness's

6    testimony at trial.  You cannot consider as evidence in

7    this trial what was said earlier before the trial began.

8         There's a different rule, however, for people that

9    are the actual parties in the case.  If they make

10   statements before the trial began that are different from

11   the statements they make at trial, you may consider as

12   evidence in the case either statement, whichever one you

13   find is more believable.

14        You are to consider only the evidence in this case.

15   But in your consideration of the evidence, you are not

16   limited solely to what you see and hear as the witnesses

17   testify.  You are permitted to draw from facts you find

18   have been proved such reasonable conclusions as seem

19   justified in the light of your own experience and common

20   sense.

21        A person's training and experience may make him or

22   her a true expert in a technical field.  The law allows

23   that person to state an opinion here about matters in

24   that particular field.  It's up to you to decide whether

25   you believe the expert's testimony and choose to rely

 1   upon it.  Part of that decision will depend on your

 2   judgment about whether the expert's background of

 3   training and experience is sufficient for him to give the

 4   expert opinion you heard and also whether the expert's

 5   opinions are based on sound reasons, judgment and

 6   information.

 7        During the trial an expert may be asked a question

 8   based on assumptions that certain facts are true; if it

 9   was raining when the accident occurred and that skid

10   marks were 40 feet on the highway, et cetera, et cetera,

11   what do you think happened, that kind of thing.  Such an

12   opinion is of use to you only if the opinion is based on

13   assumed facts that are later proven.  If you find the

14   assumptions stated in the question have not been proven,

15   then you should not give any weight to the answer the

16   expert gave to the question.

17        All right.  That's it for the introductory

18   instructions.  And now the plaintiff's lawyer,

19   Mr. Pardon, will give the opening statement.

20             MR. PARDON:  Actually, Ms. Ward is going to give

21   the opening statement.

22             THE COURT:  All right.  Ms. Ward.

23             MS. WARD:  Thank you, Your Honor.  Good morning,

24   ladies and gentlemen of the jury.  As you heard, I'm

25   Wendy Ward.  And my team is Joel Graham and Ed Pardon.

1    We also have here in the courtroom with us Julie King and

2    you will see her in the courtroom from time to time as

3    well.

4        Now, what is this case about?  First, it is about a

5    simple piece of paper similar to this one covering a

6    light fixture.  Second, it is about prison officials'

7    violent and unnecessary infliction of pain to punish a

8    prisoner for not complying with their orders to remove

9    the paper from the light fixture.  And third, and most

10   importantly, it's about this man's constitutional right

11   to be free from excessive force.

12       As you know, this is our client, Michael Kingsley.

13   And the evidence will show that the defendants, Stan

14   Hendrickson and Fritz Degner, went too far in their

15   reaction to the piece of paper.  Their reaction was

16   violent, it inflicted pain, it was unnecessary and it

17   violated Mr. Kingsley's rights.

18       Now, in particular, the defendants tased

19   Mr. Kingsley and slammed his upper body into a concrete

20   bunk while he was handcuffed in an incident that took

21   place in the Monroe County Jail on May 21st of 2010.

22   Now, in this opening statement I am going to preview for

23   you what the evidence will show in this case and then I'm

24   going to show you what happened.  We have a videotape of

25   the incident and you will see the violation of

1  Mr. Kingsley's rights with your own eyes.  First though

2  let me provide some context.

3       Now, Mr. Kingsley is currently incarcerated in the

4  Wisconsin prison system.  But at the time of the

5  incident, as I said, he was an inmate at Monroe County

6  Jail.  He was awaiting his trial.  Now, the events

7  leading up to the incident actually began the night

8  before on May 20th.  And on that evening, Deputy Nick

9  Manka, who was a jail employee, was doing a routine cell

10  check.  And when he did so, he noticed that there was

11  paper over the light in Mr. Kingsley's cell.

12       Now, inmates sometimes put paper over their lights

13  to cut down on the brightness.  However, it's a violation

14  of prison rules to have paper on the light, so Deputy

15  Manka ordered Mr. Kingsley to remove the paper.

16       Mr. Kingsley didn't comply, right or wrong, for two

17  reasons.  First, he didn't put the piece of paper there

18  and it was there when he first arrived in the cell.  And

19  the second reason that Mr. Kingsley had for not removing

20  the paper -- Mr. Kingsley, could you please stand up for

21  a moment, please?

22            MR. KINGSLEY:  Yes, ma'am.

23            MS. WARD:  -- Mr. Kingsley is not a tall man and

24  it would have been difficult, at best.  You can sit down.

25  Thank you.  It would have been difficult for him to

 1    actually remove the piece of paper, you know.  Just

 2    physically, he would have had to climb onto his bunk and

 3    then kind of jump at the piece of paper and try to grab

 4    onto it in order to comply with the order to take it

 5    down.

 6        So Mr. Kingsley sort of sarcastically said to Deputy

 7    Manka, "Taking that paper down sounds like a job for the

 8    CERT team."  The CERT team is sort of like a SWAT team.

 9    It's kind of an emergency tactical response team.  So

10    what did Deputy Manka do at that point?  He continued on

11    with the cell check.

12        Later that night Deputy Manka came back to

13    Mr. Kingsley's cell and the paper was still on the light.

14    What Deputy Manka did then was to issue Mr. Kingsley

15    what's known as a *minor violation* for failure to comply

16    with orders.  Then later that evening Deputy Manka

17    notified his supervisor, who was Sergeant Hendrickson.

18    However, the officers waited until the next day to deal

19    with the paper on the light and to deal with

20    Mr. Kingsley.  Now, that tells you that the offense was

21    not serious and the situation was not urgent.

22        So, now, coming to the next morning, Sergeant

23    Hendrickson and other officers tried again to convince

24    Mr. Kingsley to remove the paper.  At this point,

25    however, Mr. Kingsley was not responding at all to the

 1   officers.  But he also was not threatening violence and

 2   he wasn't becoming violent in any way.

 3        So in any event, the officers decided to move

 4   Mr. Kingsley from his cell to another cell in the jail

 5   called the *receiving cell*.  Now, they did this both as

 6   punishment for his failure to comply with their orders

 7   and so that they could deal with the paper on the light.

 8        Now, in Monroe County, road officers are sometimes

 9   called to the jail to provide backup when additional

10   assistance is needed and that's what happened here.

11   Sergeant Hendrickson told Deputy Blanton, another deputy,

12   to call for backup officers.  And eventually officers did

13   arrive in response to that call for backup.  One of those

14   officers was the other defendant, Fritz Degner.

15        So at this point we have five officers available,

16   including both defendants and Deputy Blanton and Deputy

17   Shisler, as well as the jail administrator, Lieutenant

18   Conroy.  All five of them went to Mr. Kingsley's cell.

19        When they told Mr. Kingsley they were moving him to

20   a receiving cell, he put his hands behind his back to

21   allow the officers to handcuff him.  The officers entered

22   Mr. Kingsley's cell.  Mr. Kingsley will tell you that he

23   did not struggle, he did not resist and he simply let

24   himself be handcuffed by Sergeant Hendrickson.

25        Now, the officers admit that at the time

1   Mr. Kingsley was handcuffed, he didn't threaten violence

2   or become violent in any way, in fact just the opposite.

3   At that point Mr. Kingsley said, "Guys, I'm not being

4   violent here."  So I want to go back to the handcuffing

5   procedure for just a minute.

6       Mr. Kingsley will tell you that the handcuffs were

7   painfully tight when they were put on him.  And it is not

8   disputed that when Sergeant Hendrickson handcuffed

9   Mr. Kingsley, he failed to do what is known as *double*

10  *locking* or *safety locking* the cuffs.

11      Now, it's undisputed also that officers are trained

12  to safety lock handcuffs to prevent further tightening as

13  soon as it's practical to do so.  Sergeant Hendrickson's

14  failure to safety lock that day likely permitted the

15  handcuffs to get even tighter during the incident, adding

16  to the pain that Mr. Kingsley had in his wrists.

17      So after he was handcuffed, the officers pulled

18  Mr. Kingsley up from the bunk and his foot smacked down

19  to something.  And this hurt Mr. Kingsley such that he

20  couldn't comply when the officers ordered him to walk.

21  He told the officers that his foot hurt.  And in

22  response, Sergeant Hendrickson and Deputy Blanton picked

23  him up under the arms and dragged him out of his cell and

24  three other officers that were present followed behind.

25      Now, an important footnote here:  Mr. Kingsley is

1   not asking you to find that the overtight handcuffs or

2   the jury to his foot were due to acts of excessive force

3   by the officers.  But these injuries are important

4   because the pain he was experiencing from those injuries

5   made it difficult for him to comply with the officers'

6   orders to walk.  It also caused pain in his body -- or

7   I'm sorry -- caused tension in his arms and body.

8        Now, the officers will characterize Mr. Kingsley's

9   behavior as resistance.  But the evidence will show that

10  in fact he was in pain, so his failure to comply was

11  involuntary on his part.

12       So after he was dragged to the hallway, he was

13  picked up and carried by four officers, one officer for

14  each of his arms and each his legs.  And they took him to

15  the receiving cell and again placed his facedown on the

16  concrete bunk.  Now, it's undisputed that while they were

17  carrying him, Mr. Kingsley was not threatening violence

18  or becoming violent in any way.

19       Once he was in the receiving cell, Deputy Blanton

20  tried to get the handcuffs off.  But because of the

21  tension in Mr. Kingsley's arms, he couldn't do it.  The

22  evidence will show though that Mr. Kingsley was not

23  resisting at this point.  In fact the video will show he

24  wanted the handcuffs off.  In fact -- now, I don't like

25  to curse in court -- but he told the officers at the time

1  he wanted those mother-f'ers off.  So when deputy Degner

2  then came into the room, Mr. Kingsley also told Deputy

3  Degner to stay out of it and get the 'f' out.

4      Now, when Mr. Kingsley was talking to Deputy Degner,

5  he sort of lifted up and looked to the side where Deputy

6  Degner was standing.  And after he spoke to Deputy

7  Degner, Sergeant Hendrickson then roughly shoved him back

8  down onto the concrete bunk and placed his lower leg

9  across Mr. Kingsley's upper back and neck.

10     Now, the officers and Mr. Kingsley dispute whether

11  the way that Sergeant Hendrickson secured Mr. Kingsley's

12  head and upper body constituted excessive force.  You

13  will have to decide that.  But Mr. Kingsley will testify

14  that hurt.

15     At this point Sergeant Hendrickson was telling

16  Mr. Kingsley to stop resisting and Mr. Kingsley said he

17  wasn't resisting.  Now, even though he wasn't resisting

18  or even really moving, the officers continued to yell at

19  him to relax.

20     Now, I want to stop for a minute and paint you a

21  picture of what the situation in the receiving cell was

22  at this point.  Mr. Kingsley is handcuffed behind his

23  back and facedown on a concrete bunk.  He is in pain.

24  There are four officers in the room with him and a fifth

25  officer, Lieutenant Conroy, standing just outside

1  the cell.

2       Sergeant Hendrickson has his knee on Mr. Kingsley's

3  upper back and neck area.  Sergeant Shisler is holding

4  his feet down.  Deputy Blanton is at his mid section.

5  Deputy Degner is in the room with his taser unholstered

6  and turned on and ready to go.  Mr. Kingsley is by far

7  the smallest guy in the room.  Common sense will tell you

8  that the officers were in control and Mr. Kingsley was

9  not a threat.

10      Now, that was exactly the scenario when Sergeant

11 Hendrickson told Deputy Degner to tase Mr. Kingsley.

12 Deputy Degner delivered what's known as a *drive stun* with

13 a taser to Mr. Kingsley's right shoulder for five

14 seconds.  Five seconds might not seem like a long time.

15 But when someone is being shocked with a taser for

16 (five-second pause) that long, it seems like a very long

17 time to them.

18      Now, when Lieutenant Conroy realized that Mr. --

19 remember, Lieutenant Conroy was outside the cell.  And

20 when he realized that Mr. Kingsley had been tased, he

21 called the officers off.  And then what he said was,

22 "It's not a punishment."  At this point Deputy Blanton

23 finally safety-locked handcuffs and the officers exited

24 the cell.

25      Ladies and gentlemen of the jury, we contend that

1   Sergeant Hendrickson and Deputy Degner used force that

2   was in excess to what was needed to control the

3   situation.   Mr. Kingsley was already controlled.   There

4   was absolutely no reason to slam him on the bunk or to

5   tase him.

6        Now, Mr. Kingsley will testify in this case and he

7   will tell you about his experience that day.   He will

8   tell you what it felt like when his upper body was

9   slammed onto the bunk.   And he will testify that the pain

10  of being tased is one of the worst pains he's ever felt.

11  In fact he felt the shock all the way to the soles of his

12  feet.

13       Now, this is not your typical case where the

14  plaintiff says one thing and the defendant says something

15  else and a huge part of what you have to do is decide

16  who's the most believable, because as I told you earlier,

17  we have a video.   Everything that happened in the

18  receiving cell was caught on videotape and we will show

19  you that videotape in just a minute.

20       Now, even the defendants' expert will tell you that

21  the videotape is inclusive and conclusive.   So, in other

22  words, the video is the most important evidence in this

23  case.   And with that, Joel, please start the video.

24       (Video played at 9:42 a.m. until 9:45 a.m.)

25            MS. WARD:   When the defendants put on their

1    case, you will hear them try very hard to come up with

2    some after-the-fact justification for doing what you just

3    saw in that tape.  In fact the defendants and their

4    expert can't even agree as to what the justification was.

5        The defendants will say that when they couldn't get

6    their handcuffs off, Mr. Kingsley needed to be tased for

7    his own safety, that he could have fallen off the bunk or

8    hurt himself had they just left him with handcuffs.  But

9    the evidence will show that leaving Mr. Kingsley in the

10   cell with handcuffs actually was a viable option all

11   along because they proved that ultimately when they did

12   just that after Deputy Degner tased him.

13       The defendant's expert in this case is Dr. John G.

14   Peters.  He has not been a sworn law enforcement officer

15   for over 30 years.  He's a professional expert witness

16   from Nevada.  And what he does is he travels around the

17   country testifying at cases such as this one.

18       Dr. Peters comes up with a different reason for why

19   it was reasonable to tase Mr. Kingsley under the

20   circumstances.  And what he says is that there was a

21   possibility that the officers could have been hurt by

22   what Mr. Kingsley was doing in the receiving cell.  And

23   as an example, he says that the officers could have

24   pinched a finger in the handcuff chain.

25       Now, our expert witness is Mr. Brian Landers.

1  Mr. Landers is currently the chair of the Criminal

2  Justice Program at Madison College, which is formerly

3  MATC.  He is also the mayor of Wisconsin Dells.  He

4  served as a police officer in the Dells for 18 years

5  until 2010.  Mr. Landers will tell you that the officers

6  acted unreasonably in light of the circumstances.

7      Mr. Landers' opinion is based on professional

8  standards for use of force in Wisconsin, including the

9  use of tasers.  And in fact as part of the committee that

10 develops those standards, Mr. Landers participated in

11 creating them.

12     Now, Mr. Landers will testify that any resistance

13 exhibited by Mr. Kingsley was passive resistance, at the

14 very most, and that the use of the taser when a subject

15 is not actively resisting is not appropriate and it's not

16 what officers in Wisconsin are trained to do.

17     Ladies and gentlemen, the Fourteenth Amendment to

18 the United States Constitution guarantees to everyone in

19 this country the right to due process, including the

20 right not to be punished prior to a determination of

21 guilt.  When a jail officer uses excessive force on a

22 person who has not yet been convicted, that is a

23 violation of that person's constitutional rights.

24     Now, Judge Crabb will instruct you, after all of the

25 evidence has been presented, regarding the constitutional

1    standard.  She will also instruct you that the burden in

2    this case is a preponderance of the evidence, which is

3    more likely than not.

4        After you hear all the evidence in this case, we

5    will ask you to find by a preponderance of the evidence

6    that the defendants used excessive force against

7    Mr. Kingsley in violation of his constitutional rights on

8    May 21st, 2010.

9        Ladies and gentlemen, what happened to Mr. Kingsley

10   that day was unnecessary, extreme and very painful to

11   Mr. Kingsley, and it all started with a piece of paper.

12   At the end of the trial you will be handed a piece paper

13   and it's called a *jury* -- or I'm sorry -- it's called a

14   *verdict form*.  I am confident that you will mark the box

15   that confirms that officers must not abuse someone in

16   handcuffs for no good reason.  They must be sent a

17   message that they cannot violate people's constitutional

18   rights.

19       When you return your verdict, I am confident that

20   you will tell these officers that a piece of paper, our

21   Constitution, protects men like Mr. Kingsley from actions

22   like theirs.  Thank you, very much, for your time and

23   attention and for your service on the jury.

24            THE COURT:  Thank you, Ms. Ward.  Mr. Jones.

25            MR. JONES:  Thank you, Judge.  Good morning.

1    May it please the Court, counsel, and ladies and

2    gentlemen of the jury.  We were introduced briefly last

3    week and again this morning.  My name is Andrew Jones.

4    My colleague, Tim Posnanski, and I have the privilege of

5    representing Stan Hendrickson and Fritz Degner in this

6    lawsuit.

7        As you have now heard, this case is centered on a

8    single use of a taser by Deputy Degner on Mr. Kingsley

9    while he was an inmate in the Monroe County Jail.

10   Mr. Kingsley alleges that Sergeant Hendrickson and Deputy

11   Degner violated his constitutional rights, that they used

12   excessive force when he was tased.

13       But the evidence you will see and hear in this trial

14   will demonstrate that the officers did not use excessive

15   force against Mr. Kingsley, not in their use of the taser

16   and not in their other efforts to maintain control over

17   Mr. Kingsley on the morning in question.  Instead, the

18   evidence will show that the officers used only as much

19   force as was reasonably necessary and to respond to

20   Mr. Kingsley's repeated physical and verbal resistance to

21   their lawful orders.

22       Before I continue, I would like to introduce the two

23   defendants to you.  Stan Hendrickson has served with the

24   Monroe County Sheriff's Department for the last 20 years.

25   On May 21st, 2010, the day that we're going to talk

1  about, he was a supervisor, a sergeant in the jail.

2  Today he is a lieutenant and the jail administrator.  In

3  that role he essentially runs the jail on a day-to-day

4  basis.

5      Now, I didn't mention this to him, but I'm going to

6  sort of demote him for the purposes of the trial and

7  refer to him by the rank that he held back on the day in

8  question as sergeant, so we'll be referring to him as

9  *Sergeant Hendrickson*.

10     Fritz Degner served with the Sheriff's Department

11 since 2002.  He is a deputy sheriff.  He does not work

12 regularly in the jail.  He is assigned to patrol duties

13 out in the community.  He has been a law enforcement

14 officer for over 20 years.

15     Now, you've already seen and heard some of the

16 evidence in this case, part of the video.  I would like

17 to talk to you about what all of the evidence will show

18 about the events of May 21st, 2010.

19     As you know, on that date Mr. Kingsley was an inmate

20 in the Monroe County Jail.  He had been in the jail since

21 April.  He was housed in one of the regular cell blocks

22 in the jail.  The evening before, the evening of May

23 20th, 2010, a correctional officer in the jail, Nicholas

24 Manka, noticed that there was a paper, piece of paper, on

25 the overhead light in Mr. Kingsley's cell.  This was

1   against jail rules, as it reduces visibility into the

2   jail cells for the officers and it creates a potential

3   fire hazard.  Mr. Kingsley knew this was against jail

4   rules.

5       When officer Manka noticed the paper on the light,

6   he asked Mr. Kingsley to take it down.  Mr. Kingsley

7   refused to remove the paper from the light and instead

8   told Officer Manka that he should get the CERT team to

9   respond, the CERT team being sort of a jail SWAT team, to

10  take the paper down.

11      When Mr. Kingsley refused, Officer Manka told him

12  that he would have to issue him a disciplinary notice

13  because of his conduct.  Officer Manka then told Sergeant

14  Hendrickson what had occurred with Mr. Kingsley when

15  Hendrickson came on duty for the next shift, the

16  overnight shift.

17      Early the next morning, so early the morning of May

18  21st, a different corrections officer, Karl Blanton, went

19  to speak to Mr. Kingsley about the paper over the light.

20  He too had no success with Mr. Kingsley, as Kingsley

21  refused his several orders that he remove the paper from

22  the light.

23      Next, Sergeant Hendrickson went to speak to

24  Mr. Kingsley about the situation.  He too directed

25  Mr. Kingsley to take the paper off of the light and

1    Kingsley refused his instructions as well.  Mr. Kingsley

2    told Sergeant Hendrickson that he had not put the paper

3    up over the light, so he was not going to take it down.

4        Finally, Lieutenant Robert Conroy went to

5    Mr. Kingsley's cell to ask him about the paper over the

6    light.  Lieutenant Conroy, he was the jail administrator

7    at that time.  He was responsible for the entire jail,

8    just as Sergeant Hendrickson is now.  He now oversees the

9    patrol operations in the department.  Lieutenant Conroy

10   asked Mr. Kingsley to remove the paper.  Mr. Kingsley

11   again refused.

12       Conroy told him that if he refused his orders, he

13   would have to impose discipline for his failure to

14   comply.  Mr. Kingsley still refused to take the paper

15   down.  Conroy then said that he would take it down

16   himself, that he would solve the problem, but he would

17   have to remove Mr. Kingsley from the cell in order to

18   accomplish that.  Mr. Kingsley still refused.  He told

19   Lieutenant Conroy that he would not move from the cell

20   because in his mind, he had done nothing wrong.

21       At this point Mr. Kingsley had refused direct orders

22   from four separate officers to remove the paper from the

23   light.  To be clear, none of the officers, none of them,

24   will tell you that they thought the paper on the light

25   was an emergency, but the paper still needed to come down

1   from the light.  And if Mr. Kingsley was going to refuse

2   to take it down, a member of the jail staff was going to

3   have to do it.

4       And in the jail setting, the officers could not

5   overlook Mr. Kingsley's refusal to follow a simple direct

6   order.  They will explain that to maintain order in the

7   jail, they have to issue discipline, like putting

8   prisoners in segregation when they refuse to follow

9   lawful directives.

10      So under the circumstances, jail staff decided that

11  they needed to move Mr. Kingsley from his regular cell

12  into a separate cell known as a *receiving cell*.  They

13  will tell you that was necessary so they could take the

14  paper off of the light and because that is where

15  Mr. Kingsley would be segregated from the other inmates

16  as discipline for his failure to follow their orders.

17      Now, as you will learn, the receiving cells are

18  located just a short distance away from the cell block

19  where Mr. Kingsley was housed.  To get there from the

20  cell he was in, you simply walk down the hallway of the

21  cell block, you walk out into what is known as the *main*

22  *hallway* of the jail, and almost immediately you go into

23  the area where the receiving cells are located.  The

24  receiving cells are smaller cells.  They are segregation

25  cells.  They contain only a concrete bunk, a sink and a

1    toilet.

2        Five members of the Sheriff's Department staff

3    assisted in moving Mr. Kingsley:  Lieutenant Conroy

4    Sergeant Hendrickson, Deputy Degner, Officer Blanton and

5    Jim Shisler.  Officer Shisler is a sergeant in the

6    Sheriff's Department.  He works on the patrol side like

7    Deputy Degner.  Five officers helped to move

8    Mr. Kingsley, rather than just one or two, in an effort

9    to deter Mr. Kingsley from resisting the officers just by

10   their presence and so that there would be enough officers

11   present if Mr. Kingsley did decide to resist.

12       When the officers got to Mr. Kingsley's cell just

13   before 6:40 that morning, he was lying in his bunk.  He

14   was told to stand up, turn with his back to the cell bars

15   and put his hands behind his back so that he could be

16   handcuffed.  Mr. Kingsley refused to do this multiple

17   times.

18       Finally, when he was told just to stay on his bunk

19   and put his hands behind his back, he did.  Officer

20   Hendrickson and Blanton then entered the cell and tried

21   to put handcuffs on Mr. Kingsley.  The evidence will show

22   though that Mr. Kingsley tensed his arms and pulled his

23   arms apart making it difficult for Sergeant Hendrickson

24   to handcuff him.  Eventually though Mr. Hendrickson got

25   the cuffs on.

1    Then when they directed Mr. Kingsley to stand up and

2  walk out of the cell, Mr. Kingsley refused to do that.

3  He claimed he couldn't.  He said his foot hurt and that

4  he couldn't stand or walk.  The officers asked him,

5  "Which foot hurts?  What's wrong with your foot?"

6  Mr. Kingsley would not answer those questions and he did

7  not explain why he couldn't walk under his own power.

8    As a result, Officers Hendrickson and Blanton

9  carried Mr. Kingsley, one officer under each of his arms,

10 from the cell out into the hallway, down the cell block

11 out into the main hallway.  Once they had him in the

12 hallway, the officers laid Mr. Kingsley on the floor.

13    They asked him again what was wrong with his foot.

14 They asked him several times what was wrong with his foot

15 so he could not walk.  And again Mr. Kingsley did not

16 answer any of their questions.  He didn't respond.  He

17 didn't tell them what was wrong with his foot.  He didn't

18 even tell them which foot hurt.

19    As a result, the officers picked Mr. Kingsley up

20 again, this time with two officers under his upper body

21 supporting his arms and two officers supporting his legs,

22 and they carefully carried him into one of the receiving

23 cells.  This was just before 6:45 in the morning.

24    Four officers went into the cell with Mr. Kingsley:

25 Sergeant Hendrickson, Sergeant Shisler, Officer Blanton

1 and Deputy Degner.   Lieutenant Conroy remained outside of

2 the cell, sort of in the doorway of the receiving cell,

3 due to the confined space in the cell.   The officers laid

4 Mr. Kingsley on the concrete bunk in the cell.   At that

5 point the officers' goal was simple.   All they wanted to

6 do was remove the handcuffs and exit the cell without

7 incident.

8     They needed to remove the handcuffs for

9 Mr. Kingsley's safety.   As they will explain to you, it

10 is not safe to leave an individual in a cell,

11 particularly a cell like this receiving cell, with

12 handcuffs on.   It's uncomfortable for the prisoner.   But

13 more importantly, it is far too easy for the individual

14 to fall and become injured without the use of his hands

15 or arms.   Again, the receiving cell was a small, bare

16 cell, concrete bunk, concrete floor.

17     The officers told Mr. Kingsley what they were trying

18 to do, take the handcuffs off, and they told him to relax

19 so that they could accomplish that goal.   Mr. Kingsley

20 responded by flexing his arms, by pulling his hands

21 apart, by tensing the muscles in his torso, by moving his

22 torso, by shifting his head and shoulders, and even at

23 one point raising up off the bunk, all the while grunting

24 and growling.

25     The evidence will show that Mr. Kingsley was

1  resisting the officers' efforts to remove the handcuffs.

2  The officers directed him to stopped resisting, but he

3  didn't.  He cursed at them, telling them first to take

4  the cuffs off, and then telling them to get out and leave

5  the handcuffs on.

6      As the officers will explain to you, they each felt

7  that his behavior in the receiving cell presented a risk

8  both to him and to them.  They were concerned that either

9  he or they could get hurt in such a confined space if he

10  continued to do what he was doing.  They were all

11  concerned as well that Mr. Kingsley's behavior could

12  quickly escalate to the point where he actually began

13  kicking or actively fighting with them.  And again, the

14  officers did not want to leave Mr. Kingsley in the

15  receiving cell with his handcuffs on.

16      Because of Mr. Kingsley's behavior and because he

17  was concerned that his behavior presented a threat both

18  to him and to them, Sergeant Hendrickson ordered that

19  Deputy Degner use the taser on Mr. Kingsley.  Deputy

20  Degner did that.  He tased Mr. Kingsley once, what is

21  known as a *contact stun*, on the back of Mr. Kingsley's

22  right shoulder.  As you will learn, as you will hear, a

23  contact stun is when a taser is applied directly to an

24  individual's body.  It lasts for five seconds or less.

25  It causes pain, which stops, without lasting effect, when

1   the five seconds is over.

2        The taser did not succeed in getting Mr. Kingsley to

3   stop doing what he was doing.  The evidence will show

4   that he continued to resist.  At this point, with the

5   officers having tried unsuccessfully first having to

6   reason with Mr. Kingsley, then to physically restrain him

7   and then to tase him in an effort to gain his compliance,

8   Lieutenant Conroy, again from the doorway, directed the

9   officers to stop trying to remove the handcuffs.  He did

10  not want to leave Mr. Kingsley in the cell with handcuffs

11  on, again for his own safety.

12       But at that point if Mr. Kingsley was going to

13  continue resisting the officers, the only options at that

14  point, the only other options, were to tase Mr. Kingsley

15  again or to further escalate the level of force, and the

16  officers chose instead to leave Mr. Kingsley in the cell

17  with the handcuffs on.  Lieutenant Conroy directed the

18  officers to exit the cell without removing the cuffs.  No

19  additional force was used against Mr. Kingsley.

20       When he made the decision to have the officers leave

21  or exit the cell, Lieutenant Conroy intended to monitor

22  Mr. Kingsley closely and to return to remove the cuffs

23  after the situation had gone down and that is exactly

24  what happened.

25       The officers left the receiving cell at about 6:47

1    in the morning.  Lieutenant Conroy watched Mr. Kingsley

2    via closed circuit camera into the receiving cell.  And

3    he and several other officers returned at about seven

4    o'clock, just before seven o'clock, so 12 minutes later,

5    and removed the handcuffs without further incident.

6        After he was tased, the officers put Mr. Kingsley on

7    a special watch until that afternoon where he was

8    frequently checked.  They did not observe any injury to

9    Mr. Kingsley.  Officer Blanton called the jail nurse,

10   told her about the situation, and she saw Mr. Kingsley

11   that morning to be sure he didn't need medical attention.

12   He refused to see her when she arrived.  You will not be

13   presented with any medical evidence that Mr. Kingsley

14   suffered any injuries as a result of being tased.

15       Now, as you have already seen and heard the video

16   recording, in addition to the officers' testimony we have

17   the benefit of video and audio of what happened that

18   morning.  These recordings were made and preserved by the

19   Sheriff's Department.  You will have the opportunity to

20   watch and listen to all of these recordings and they

21   obviously will assist you in understanding what happened

22   that morning.

23       But because of where the recording devices are

24   located, because of the camera angles, you will still

25   need to listen to the officers' testimony to fully

1    understand what happened and why they felt it was

2    necessary to use the taser.

3         When all of the evidence has been presented in this

4    case, Judge Crabb will ask you to answer a single

5    liability question with respect to the two defendants.

6    She will ask you to decide whether Sergeant Hendrickson

7    and Deputy Degner used excessive force against

8    Mr. Kingsley.  I would like to offer you three points in

9    conclusion before you begin to hear and see the evidence

10   that will help you answer that single question.

11        First, over the course of this trial we are going to

12   spend hours and even days talking in very great detail

13   about a series of events that occurred almost entirely

14   over the course of less than 20 minutes.  The amount of

15   time the officers were in the receiving cell with

16   Mr. Kingsley amounted to less than four minutes.

17        As we examine these events and in great detail, I

18   ask you to remember that they were occurring quickly in

19   real-time.  The officers involved did not have the

20   benefit of spending the same amount of time that we will

21   hear in dissecting what was occurring.

22        Second, Judge Crabb will instruct you on what you

23   need to know about the law that applies to this case.

24   What I ask you to remember though is that the question

25   you are charged with answering after all of the evidence

 1   has been presented is not whether the officers made

 2   perfect decisions or even whether the officers made the

 3   same decisions that officers might make with the benefit

 4   of 20/20 hindsight.

 5       To answer the question posed by the judge at the end

 6   of the case you will need only to decide whether the

 7   force the officers used was excessive.  And to do that,

 8   you will need to put yourself in their position as law

 9   enforcement officers at the time these events -- at time

10   of these events and as they were occurring.

11       Third, and finally, I ask you to watch and listen to

12   the evidence in this case very closely.  Listen to what

13   the witnesses, and particularly the officers who were

14   there that morning, have to say.  Obviously watch the

15   video and listen to the audio recordings because the

16   evidence will describe exactly what did or did not happen

17   on the morning in question.

18       In the end the evidence will show, we believe, that

19   Sergeant Hendrickson and Deputy Degner did not, again,

20   *did not* use excessive force against Mr. Kingsley.  On

21   behalf of Officers Hendrickson and Degner, we appreciate

22   your time, your attention and your consideration of this

23   case.  Thank you.

24           THE COURT:  Thank, Mr. Jones.  Mr. Pardon, you

25   may call your first witness.  Do you want the lectern

1    moved away or do you want to stand there for questioning?

2            MR. PARDON:  I will stand at the lectern.

3            THE COURT:  Okay.

4            MR. PARDON:  Your Honor, we call plaintiff

5    Michael Kingsley.

6            THE COURT:  Please come forward to be sworn.

7            **MICHAEL KINGSLEY, PLAINTIFF, SWORN**

8            THE CLERK:  Please have a seat and be sure to

9    speak right into the microphone.

10                   DIRECT EXAMINATION

11   BY MR. PARDON:

12   Q.   Good morning.

13   A.   Good morning.

14   Q.   Could you please state your name?

15   A.   My name is Michael Brandon Kingsley.

16   Q.   And, Mr. Kingsley, could you tell us briefly a

17   little bit about yourself?

18   A.   Yes.  I'm 31 years old.  I was born and raised here

19   in Madison, Wisconsin.  I'm not married.  I have no

20   children.  I attended and graduated from Madison East

21   High School.  I've held several jobs.  More recently I

22   worked as an auto detailer and a car salesman.  And I

23   eventually got into trouble with the law and I got --

24   currently I'm serving a three-year sentence at this time

25   for a drug crime.  And I don't know, I'm currently

MICHAEL KINGSLEY - DIRECT

1  incarcerated at this time.

2  Q.   Okay.  When are you scheduled to be released?

3  A.   I currently have a little less than two years left

4  to do.

5  Q.   Okay.  What are you planning on doing when you get

6  out?

7  A.   Basically just take it one day at a time.  And first

8  I want to try to help my mom out as much as I can.  She

9  just recently got diagnosed with --

10         MR. JONES:  Objection.  Relevance.

11         THE COURT:  Sustained.

12  BY MR. PARDON:

13  Q.   All right.  Have you completed drug rehab?

14  A.   I'm currently in two treatment programs at the

15  Wisconsin Resource Center.  I'm currently on a waiting

16  list to attend SGIP, which is errors in thinking.  And

17  I'm, yeah, I'm just on the waiting list for right now.

18  Q.   Okay.  While you were awaiting trial for the offense

19  for which you are now incarcerated, where did you reside?

20  A.   I was in Monroe County Jail.

21  Q.   Okay.  I would like to direct your attention to the

22  incident that this lawsuit is about.  Did something

23  happen at about ten o'clock on the evening of May 20 that

24  started sort of the events we're talking about today?

25  A.   Yes.

MICHAEL KINGSLEY - DIRECT

1   Q.   Can you describe what happened?

2   A.    It was about ten or 10:30 at night.  Deputy Manka

3   was performing lockdown of the jail.  And he walked past

4   my room that I was in and he noticed there was a paper on

5   a light and he told me to take it off.  And I told him I

6   wasn't going to take it off because I didn't put it

7   there.  He soon left.

8        After he came back during his next round, I believe

9   he told me I needed to take the paper off again.  I

10  explained to him I didn't put it there again.  And he

11  said that he was going to issue me a violation report.

12  And at that time I made a sarcastic remark saying,

13  sounded like a job for the CERT team to come take the

14  paper off the light.  And he didn't say anything and he

15  just left after that.  Nothing ever happened after that.

16  Q.   What is your understanding of what the CERT team --

17  A.    It's something like the SWAT team or something, come

18  and have, like, shields, batons, helmets on I guess.

19  Q.   Did you get along with Deputy Manka?

20  A.    Yes, I did.

21  Q.   Did you put the paper over the light?

22  A.    No.  The paper was there ever since I was in that

23  cell.  I was in there for over a month or a month at that

24  time.  It was there the whole entire time.

25  Q.   Based on your experience being in the Monroe County

MICHAEL KINGSLEY - DIRECT

1  Jail, do you know whether inmates sometimes put paper

2  over the light?

3  A.    From my conversations with other jail staff members,

4  they said it happens all the time.   And like I say,

5  sometimes I think it gets overlooked.

6  Q.    During your conversation -- your two conversations

7  with Deputy Manka that night or that evening, did you

8  make any threats to him?

9  A.    Not at all, no.

10  Q.    And did you tell Deputy Manka that if someone came

11  in to take off the paper, you would resist them?

12  A.    No, I did not.

13  Q.    Did the paper -- what happened with the paper that

14  night?

15  A.    The paper -- paper just stayed on the light like it

16  had been the whole time.

17  Q.    What happened the next morning?

18  A.    The next morning Sergeant Hendrickson came and asked

19  me if I wanted my medication and I told him I didn't want

20  to take my medication.   And he asked me, did I take the

21  paper off the light.   I told him again that the paper has

22  been there for I don't know how long.   And he said -- he

23  repeated again and I think he said, "It's a direct order.

24  I'm telling you to take the paper off the light."

25      And I didn't respond to him after that.   I didn't

MICHAEL KINGSLEY - DIRECT

1  want to try to get into an argument with him.  So after

2  that, he just left after.  I didn't respond to him after

3  he kept on telling me to take the paper off.

4  Q.   Okay.  Did you make any threats to Sergeant

5  Hendrickson during this conversation or either of them?

6  A.   Not at all, no.

7  Q.   Did you tell Sergeant Hendrickson, if someone came

8  in to take off the paper that you would resist them?

9  A.   No, I didn't.

10  Q.   What happened after that?

11  A.   After that Lieutenant Conroy came in and he asked me

12  to take the paper off the light.  And I told him, you

13  know, the paper had been there for a long time.  I don't

14  even know how long it was there.  I know it was there the

15  whole time I was in the cell.  And I basically told him

16  he was probably in a better position to take the paper

17  off the light because the paper -- or the light is, like,

18  in the middle of the cell.  And he told me that he would

19  take it off, but since he was taking it off that I would

20  have to go to receiving.

21  Q.   What's your understanding or what, as of the time,

22  was your understanding of receiving?

23  A.   Receiving is like the *hole* or segregation.  You

24  know, it's basically they call it the *hole* because

25  there's a hole in the door.  It's basically for

MICHAEL KINGSLEY - DIRECT

1  punishment.

2  Q.   Okay.  Did you make any threats toward Lieutenant

3  Conroy when you spoke with him?

4  A.   No, I did not.

5  Q.   Did you tell Lieutenant Conroy, if anyone came in to

6  take down the paper you would resist him?

7  A.   No.   I didn't say anything to him.

8  Q.   And would it have been easy for you to take the

9  paper down?

10  A.   No.   Like I said, the light is in the middle of the

11  cell.   And the bed is off attached to the wall, so I

12  would have to, like, get on the bed and then try to jump

13  off and try to simultaneously grab the paper off the

14  light.   I figure I'm not going to do that.   I'm not

15  saying it's impossible, I could do it, but I just didn't

16  feel comfortable doing it.

17  Q.   What happened after Lieutenant Conroy left after

18  your conversation with him?

19  A.   After he left he came back with four other officers:

20  Officer Blanton, Degner, Sergeant Hendrickson and Deputy

21  Shisler, I believe --

22  Q.   Okay.

23  A.   -- I think his name is.

24  Q.   And what happened in your interaction with these

25  officers then?

MICHAEL KINGSLEY - DIRECT

 1   A.   Sergeant Hendrickson came up to the cell door and he

 2   told me to get up off the bed and put my hands behind my

 3   back.   And at that time I looked up and I see Deputy

 4   Degner.   He had, like, a taser.   And the taser has, like,

 5   a light or a beam on it.   And I was, like, woe, you know.

 6   I didn't -- I was, like, I thought just lay there, don't

 7   make any sudden moves because I believe they would have

 8   probably tried to justify me getting up or anything like

 9   that and they would have tased me.

10       I figured I didn't do anything wrong.   Why do I have

11   to go to the hole?   They told me for disobeying orders.

12   And I heard Lieutenant Conroy, I believe he said, "Just

13   put your hands behind your back," so at that time I put

14   my hands behind my back.   And I think they made a signal

15   or something and they opened up the door.

16   Q.   Okay.   When Lieutenant Conroy told you to put your

17   hands behind your back, where were you physically?

18   A.   I was laying on the bed facedown.

19   Q.   Okay.   And then so at that point then what happened?

20   A.   They opened up the cell door and Sergeant

21   Hendrickson and Deputy Blanton and Deputy Degner, they

22   entered the cell.   And Sergeant Hendrickson, he put his

23   knee into my back and put the handcuffs on extremely

24   tight.   And Deputy Blanton, I believe he was holding down

25   or pinning down my legs.

MICHAEL KINGSLEY - DIRECT

2-A-50

 1        And they told me to get up.  And I don't know, it

 2   was kind of hard.  I was lying facedown.  I had my

 3   handcuffs on behind by back.  And I told them I couldn't

 4   get up, it was kind of hard.  And they seemed like they

 5   was kind of irritated about it.

 6        And they, in a pulling and dragging motion, they

 7   dragged me off the bed.  And when they were doing so, my

 8   feet slapped -- the bed has got a frame on it and my feet

 9   slapped the bed frame.  And it caused instant pain in my

10   feet and more in my right foot than my left foot.

11        And I went down to my knees complaining of my foot.

12   And they told me to get up.  And I told them I couldn't

13   get up.  And I just kept complaining about my foot.  And

14   they said, "Get up or we're going to drag you."  And I

15   said I couldn't, my foot.  I kept complaining about my

16   foot; I remember that.  And at that time they just --

17   they drug me out of the cell block.

18   Q.   Okay.  I'm going to stop you right there and I want

19   to follow up on some other things you said.

20   A.   Okay.

21   Q.   When the cuffs were placed on you, did you resist

22   Sergeant Hendrickson putting the cuffs on?

23   A.   No, I did not.

24   Q.   And did you make any threats to any of the deputies

25   while they were putting the cuffs on?

1   A.   No.

2   Q.   And then after they sort of picked you up and

3   started to drag you, did you make any threats to anyone

4   while they were doing that?

5   A.   Absolutely not.

6   Q.   Well, then what happened after that?

7   A.   They took me to the -- through the cell block and

8   then they have, like, a hallway.  And they set me down

9   and then they, the four of them, instead of two, each one

10  grabbed one of my arms and legs and they carried me to

11  the segregation cell.

12  Q.   While they were carrying you to the segregation

13  cell, did you make any threats toward anyone?

14  A.   No, I did not.

15  Q.   Do you have any idea about how long it was or how

16  far it was that they -- that they carried you from your

17  cell to the receiving cell?

18  A.   I don't know exactly, but maybe 75, 50 feet maybe.

19  Q.   What then happened after the officers took you into

20  the receiving cell?

21  A.   After they took me into the receiving cell, Sergeant

22  Hendrickson -- they laid me down on the bed facedown --

23  Sergeant Hendrickson put his knee into my back, which was

24  pretty painful.  And Deputy Blanton was attempting to try

25  to take the handcuffs off.  And when he was doing so, he

MICHAEL KINGSLEY - DIRECT

 1  made the handcuffs even tighter than they were, which was

 2  causing me pain and to, like, tense up.

 3       And they kept yelling at me telling to relax, relax.

 4  And I was in so much pain, I was groaning and grunting.

 5  And then I heard Deputy -- Sergeant Hendrickson -- it's

 6  kind of hard to remember because I hadn't seen the video

 7  until, I don't know, like over a year and a half or

 8  something like that.

 9  Q.   Mm-mm.

10  A.   And --

11  Q.   I want you to talk about what you remember and don't

12  worry about the video today.

13  A.   Okay.  Sergeant Hendrickson put his knee in my back

14  and they were trying to make the hand -- take the

15  handcuffs off and they made them tighter.  And I tried --

16  you know, I felt like I was suffocating or it was hard

17  for me to breathe because they had their, like, knee on

18  my back.

19       And I went to, like, move my head up and, you know,

20  that's when Sergeant Hendrickson slammed my head down and

21  it caused me some pain.  And at that time I heard him

22  say, "Tase his ass," and I was shot with the taser in my

23  back, which was extremely painful.

24       And then I -- I think they left, you know.  I think

25  I fainted or I don't know if I blacked out or what.  I

MICHAEL KINGSLEY - DIRECT

1   was in so much emotion and it was kind of hard to just --

2   maybe I was having a panic attack, I don't know.  It was

3   just too much for me to deal with and it's kind of hard

4   to remember certain things of what happened.

5   Q.   All right.  Prior to the time that you heard

6   Sergeant Hendrickson tell somebody to tase you, were you

7   at all told that you might be tased or warned that you

8   might be tased?

9   A.   No, not at all.

10  Q.   What did it feel like to be tased?

11  A.   I don't know.  It's extremely painful.  I have had

12  my fair share of injuries and been subject to different

13  types of pains, but I could personally tell you that

14  being shot with a taser gun is extremely painful.  It's

15  hard to explain.  You can feel electricity come through

16  your body and exit at the bottom of your feet.  And it's

17  such serious pain that, you know, I hope no one ever has

18  to experience it because there's no -- you'll never

19  forget that type of pain ever.

20  Q.   Okay.  During any of the time that you were in the

21  receiving cell did you threaten any of the officers?

22  A.   No, I did not.

23  Q.   Did you resist their efforts to take off your

24  handcuffs?

25  A.   No, I did not.

MICHAEL KINGSLEY - DIRECT

1  Q.   Okay.  You indicated at one point that you may have

2  raised your head or raised up.  Did you attempt at any

3  time to do anything like bite any of the officers or

4  anything like that?

5  A.   Absolutely not, no.

6  Q.   Now, did you read any reports of this incident

7  later?

8  A.   Yes, I did.

9  Q.   And did you read anything about biting or anything

10 like that?

11 A.   Yeah.  I had read --

12         MR. JONES:  Objection, Your Honor.

13         THE COURT:  Sustained.

14 BY MR. PARDON:

15 Q.   All right.  I will go on.  Do you recall whether you

16 were asked sometime afterwards if you wanted to see the

17 nurse?

18 A.   Yeah.  The nurse came to my cell and asked me some

19 questions.  I don't remember what she asked me, but I was

20 pretty much -- I was just irritated with everybody, what

21 just happened to me, and I didn't want to talk to

22 anybody.

23 Q.   Okay.  What did your hands look like after they

24 removed the handcuffs?

25 A.   I remember you could see, like, the indentations.

MICHAEL KINGSLEY - DIRECT

1  And they were like purplish-blue, like, you know, cut off

2  from circulation.  It was like, you know, little white

3  dots.  It's been a long time, but I don't know.  It was

4  painful.  The handcuffs were on for a long time,

5  extremely tight.

6  Q.   You may have already alluded to this and I apologize

7  if you said this before, but other than the video today,

8  when is the last time you've seen the video of this

9  episode?

10 A.   I seen it last July, maybe about 15 or 16 months

11 ago.

12 Q.   Okay.  So not July of -- this recent July?

13 A.   No.  Yeah, yeah.  I'm sorry.  Yeah, the following

14 one, 15 -- over a year ago.

15 Q.   Okay.  Mr. Kingsley, why did you bring this lawsuit?

16 A.   I brought this lawsuit to hold the defendants

17 accountable for their actions so they wouldn't let this

18 happen.  What they did to me is totally uncalled for I

19 believe.

20          MR. PARDON:  Okay.  I have no further questions.

21          THE COURT:  Thank you.  Mr. Jones.

22          MR. JONES:  Thank you, Judge.

23                    CROSS-EXAMINATION

24 BY MR. JONES:

25 Q.   Mr. Kingsley, you've told us that you're in the

MICHAEL KINGSLEY - DIRECT/CROSS

1   custody of the state of Wisconsin currently?

2   A.   Yeah, at the Wisconsin Resource Center.  It's a

3   treatment facility.

4   Q.   You were there because you were convicted of a

5   felony, correct?

6   A.   Yes, that's correct.

7   Q.   So I, too, would like to focus though on May 21st,

8   the day of this incident.  I think you told us, but to be

9   sure, you had been in the jail for over a month at that

10  point, correct?

11  A.   Yes.

12  Q.   Since sometime in April of that year?

13  A.   Yes.

14  Q.   And you were aware, as a prisoner in the jail, that

15  there were inmate conduct rules, correct?

16  A.   Yeah.  The jail has rules, yes.

17  Q.   There was actually a written booklet that exists,

18  correct?

19  A.   I think it was just a piece of paper.  I don't know.

20  Q.   A hand-out that you were given, so to speak?

21  A.   I don't know if they gave it to you or if it's on

22  the -- if it's on the -- glued or taped to the wall.  I

23  don't know.

24  Q.   Fair enough.  And those details are not important

25  necessarily, but you did know that there were inmate

MICHAEL KINGSLEY - CROSS

1  conduct rules that applied to you as a prisoner in the

2  jail, correct?

3  A.   Yeah.   There was a piece of paper with rules on it.

4  Q.   I assume you were aware a pretty basic rule was that

5  you were required, at least according to those rules, to

6  follow the jail guards' lawful orders, correct?

7  A.   I don't know specifically what the rules say at all.

8  It was kind of -- I haven't seen them for so long.

9  Q.   Let's step back away from whatever the writing said.

10 A.   Okay.

11 Q.   A prisoner in the jail -- as a prisoner who had been

12 in the jail for over a month, you were aware that jail

13 staff expected you to follow their lawful orders, yes?

14 A.   Yeah.

15 Q.   That's not -- that wasn't a surprise to you?

16 A.   That the jail has rules, no.

17 Q.   And I assume you also knew that it was against the

18 rules to have paper or anything else covering the lights

19 in the cell, correct?

20 A.   Was it a jail violation to have paper on a light?

21 Q.   You knew it was against the rules to have paper on

22 the light; is that correct?

23 A.   I didn't at that time.   I didn't know at that time.

24 Q.   You knew that at least as of when Officer Manka came

25 and told you --

                    MICHAEL KINGSLEY - CROSS

1  A.   That's what I mean.  He told me to take it off, yes.

2  Q.   So if you didn't know about it beforehand, you knew

3  when he first came to talk to you that he felt it was

4  against the rules and you needed to take the paper down?

5  A.   Yeah, that he wanted me to take the paper off, yes.

6  Q.   And I think you said this, but in your experience,

7  it's nice to have the paper on the light because it

8  reduces the brightness of the lights in the jail,

9  correct -- in the cell, correct?

10  A.   Yes, unless that's a casual rumor maybe.

11  Q.   Fair enough.  So I just want to be clear on the

12  sequence of events that led up to the officers returning

13  to your cell, the multiple officers, to remove you from

14  your cell, okay?

15  A.   Okay.

16  Q.   So Officer Manka was the first officer to tell you

17  to take the paper off the light, right?

18  A.   That's right.

19  Q.   And that was lockdown the night before, right?

20  A.   Yes.

21  Q.   And lockdown is when they close the cells

22  essentially, it's lights-out time, correct?

23  A.   Yes.  They lock all the doors, yes.

24  Q.   And your response to him telling you to take it down

25  was to say, "I'm not going to take it down," correct?

MICHAEL KINGSLEY - CROSS

1   A.    Yeah.  I told him I didn't put it there, I wasn't

2   going to take it off.

3   Q.    Now, you say you didn't say that you would resist,

4   correct?

5   A.    No.

6   Q.    But you do agree that you told him, even if you were

7   sarcastic, that it sounded like a job for the CERT team?

8   A.    Yes, I said that, yes.

9   Q.    You responded to Officer Manka's directive that you

10  remove the paper, with sarcasm, correct?

11  A.    I made that statement, yes.

12  Q.    And you testified that you were being sarcastic?

13  A.    Yes.

14  Q.    Now, the next morning Officer Karl Blanton came to

15  your cell and asked you to remove the paper; is that

16  correct?

17  A.    I don't know if he did or not.  There was a couple

18  officers, you know, that Deputy Blanton and Deputy

19  Shisler -- I don't know.

20  Q.    At some point they run together for you?

21  A.    Yeah.  They're all -- they're all cops.

22  Q.    You don't know one way or the other whether Officer

23  Blanton came to your cell and asked you to remove the

24  paper; is that what you're telling us?

25  A.    I don't know, no.  I don't recall him saying

MICHAEL KINGSLEY - CROSS

 1    anything.

 2    Q.    At some point though you do agree that Sergeant

 3    Hendrickson came to your cell and asked you to remove the

 4    paper?

 5    A.    Yeah.   He was handing out medication I believe in

 6    the -- early in the morning.

 7    Q.    You told him no, you didn't want your medication.

 8    He asked you to take the paper off the light, correct?

 9    A.    Right, right.

10    Q.    You told him, just like you told Officer Manka, "I

11    didn't put it up there; I'm not going to take it down";

12    fair to say?

13    A.    Yes.

14    Q.    And when he asked you a second time to take it down,

15    you stopped responding to him; is that correct?

16    A.    Yeah.   I didn't want to argue with him, you know.

17    It seemed, like, argumentative.

18    Q.    So at that point you just sort of ignored what he

19    was saying; is that correct?

20    A.    Yes.

21    Q.    Instead of taking the paper down, if I have it

22    right, you went back to sleep; is that correct?

23    A.    I think so.   It was early.   Yes.

24    Q.    And then Lieutenant Conroy was the next officer, if

25    I've got the sequence right, who came and asked you to

MICHAEL KINGSLEY - CROSS

 1  remove the paper, yes?

 2  A.   Yes.

 3  Q.   And you didn't tell him anything different than you

 4  had told the other officers.  You told him you were not

 5  going to take it down, correct?

 6  A.   Yes.

 7  Q.   In fact you told him maybe he should take it down,

 8  yes?

 9  A.   I told him he was probably in a better position.  I

10  don't know what the jail has, they got ladders or

11  something, I don't know.

12  Q.   In essence, you said, "I'm not going to do it; maybe

13  you should do it"?

14  A.   Yeah.  I believe he was in a better position to take

15  the paper off the light, yes.

16  Q.   At this point at least three officers, by your

17  memory, and maybe a fourth if Officer Blanton in fact

18  came, had asked you -- told you to remove the paper from

19  the light, correct?

20  A.   Yes.

21  Q.   And you had chosen to tell each one of them, "I am

22  not going to do that," correct?

23  A.   I didn't put it there.  Yes, sir.

24  Q.   And there was nothing unlawful about what they were

25  asking you to do, was there?

 1              MR. PARDON:  Objection.

 2              THE COURT:  Sustained.

 3   BY MR. JONES:

 4   Q.   There was nothing improper about what they were

 5   asking you to do, was there?

 6   A.   To take the paper off a light?

 7   Q.   Yeah.

 8   A.   No.  They wanted me to take it off.

 9   Q.   It should have been simple, right?

10   A.   Yeah.  They wanted me to take the paper off the

11   light.

12   Q.   And so the next thing that happened is that the

13   officers came back to your cell, correct, five officers?

14   A.   Yes.

15   Q.   And you were still in bed when they came to the

16   cell?

17   A.   Yes.

18   Q.   And when they arrived, they told you that they were

19   going to move you from your cell into a receiving cell?

20   A.   No.  They told me to stand up and put my hands

21   behind my back, told me to get off the bed and put my

22   hands behind my back.

23   Q.   Did you know that they were there to move you from

24   your cell into a different cell?

25   A.   I kind of inferred that I guess.  There was, you

                    MICHAEL KINGSLEY - CROSS

2-A-63

1  know, five of them there.

2  Q.    From the context you knew what was happening, yes?

3  A.    They planned on doing something, yes.

4  Q.    And what they asked you to do was stand up off your

5  bunk and stand with your back to the cell bars, correct?

6  A.    They told me to put my hands behind my back, yes.

7  Q.    And they were telling you to do that, you

8  understood, so that you could be handcuffed standing up

9  with your back to the bars, correct?

10 A.    Yes.

11 Q.    And there was nothing improper about that request by

12 the officers, was there?

13 A.    I just had a taser pointed at me.  I didn't want to

14 get up.  I still --

15 Q.    But that's sort of standard operating --

16 A.    I don't see nothing wrong with saying that, no.

17 Q.    Sure.  But that's sort of standard operating

18 procedure?

19 A.    I don't know what their operating procedure is, no.

20 Q.    And you did not do what they asked you to do,

21 correct?

22 A.    No, I didn't get up.  I was -- you know, I seen the

23 taser.  This whole thing though, once I looked up and I

24 seen the taser, I was, like, woe, you know, if I make any

25 sudden move, they're going to shoot me with the taser.  I

MICHAEL KINGSLEY - CROSS

 1   was in fear of getting shot by the taser.  That's why I

 2   didn't move.  I was lying facedown.  I didn't want to

 3   make any sudden movements.

 4   Q.   Let see if I can break that down.  It wasn't that

 5   you physically couldn't get up and put your hands behind

 6   your back, was it?

 7   A.   No.

 8   Q.   What you're saying is that you saw the taser?

 9   A.   Yes.

10   Q.   So you knew that the officers had a taser as early

11   as that point, correct?

12   A.   I was in fear of getting shot with the taser.

13   That's what I was saying.

14   Q.   And was the taser pointed at you?

15   A.   Yes, it was.

16   Q.   So taking a step back, the officers are in the

17   walkway outside of your cell at this point, correct?

18   A.   Yeah.  The cell door is closed.  It's like old

19   style, like Alcatraz, the bars, you know.

20   Q.   And so in relation to that particular cell, there

21   was a walkway that runs along the front of all of the

22   cells in that cell block, correct?

23   A.   Yeah.  There was, like, a narrow hallway kind of,

24   yeah.

25   Q.   And the hallway, the walkway, is bound on one side

MICHAEL KINGSLEY - CROSS

1  by the doors to the cells and on the other side by

2  another set of bars, correct?

3  A.   Yeah.   There's, like, five cells or six cells I

4  think, five or six cells.

5  Q.   And the walkway runs along the front of each of

6  those cells?

7  A.   Yes.

8  Q.   And basically you take that walkway down to get

9  outside of the cell block?

10  A.   Yes.

11  Q.   So at the point in time when the officers are asking

12  you to stand up and put your hands behind your back, the

13  officers are outside your cell in that walkway, correct?

14  A.   Yeah, they're outside, yes.

15  Q.   And the bars are still closed, correct?

16  A.   Yes.

17  Q.   And that's when you noticed that Officer Degner had

18  the taser, correct?

19  A.   Yeah.

20  Q.   And if I understood your testimony just now, Officer

21  Degner was pointing the taser at you at that point?

22  A.   Yes.   There was, like, a laser beam, infrared beam

23  or something on it.

24  Q.   And him pointing the taser at you is what made you

25  concerned about standing up at that point?

MICHAEL KINGSLEY - CROSS

2-A-66

1  A.   Yeah.  I was in fear of getting shot by the taser,

2  so I didn't want to make any sudden movements.  That was

3  what was going through my mind at that time.

4  Q.   You would agree that, setting aside the taser, one

5  of the officers had given you the directive to stand up,

6  yes?

7  A.   Yes.  Sergeant Hendrickson told me to get up off my

8  bed and put my hands behind my back.

9  Q.   And what you're telling us is that you were worried

10  that if you did exactly what Sergeant Hendrickson

11  directed you to do, you would be tased?

12  A.   Once I saw the taser, I didn't want to make any

13  movements.

14  Q.   You didn't even want to do what they were asking you

15  to do; that's what you're telling us?

16  A.   Yeah.  I figured I would just lay still laying on

17  the bed, so I didn't make any movements.

18  Q.   And if I understood your testimony when Mr. Pardon

19  was asking you questions, you also said to the officers

20  at that point, "What for?"  "Why are you here?"  "I

21  didn't do anything wrong."  Is that correct?

22  A.   Right.  I said I didn't do anything wrong, yes.

23  Q.   You knew of course at that point that you had failed

24  to follow orders from at least three officers to take the

25  paper down though, correct?

MICHAEL KINGSLEY - CROSS

2-A-67

1  A.   That's what they wanted me to do, yes.

2  Q.   And you knew that you hadn't done it?

3  A.   Yes.

4  Q.   When you refused, for whatever reason, to stand up,

5  Lieutenant Conroy then told you just to put your hands

6  behind your back while you were lying on your bunk,

7  correct?

8  A.   Yeah.  He said, "Just put your hands behind your

9  back" then, yes.

10  Q.   And you did do that?

11  A.   Yes, I did.

12  Q.   And that's the point at which the officers then came

13  into the cell?

14  A.   Yeah, they opened up the door, yes.

15  Q.   And that's when they put handcuffs on you?

16  A.   That's correct.

17  Q.   At the point they came into the cell, it's -- you

18  were certainly awake by this point, right?

19  A.   Yes.

20  Q.   Early in the morning, but you were wide awake?

21  A.   I was awake, yes.

22  Q.   And you had your senses about you, yes?

23  A.   Yes, I guess.  It was a long time ago.

24  Q.   You were aware of what was going on?

25  A.   Yes.

MICHAEL KINGSLEY - CROSS

1   Q.    You were able to talk?

2   A.    Yes.

3   Q.    And help me understand.  Did you or did you not

4   tense up your arms as the officers tried to put handcuffs

5   on you?

6   A.    At that time, as soon as the cell door opened,

7   Sergeant Hendrickson put his knee into my upper back.

8   So, I mean, I guess I did tense up, yes, with his knee in

9   my back.

10  Q.    And what you're telling us is that you think you did

11  tense up, but you think it was because of Sergeant

12  Hendrickson's knee in your back?

13  A.    Yeah, his body weight on top of me, yes.

14  Q.    You would agree that if you had stood up for the

15  officers to put handcuffs on you, it would not have been

16  necessary for any of that to happen, correct?

17  A.    I just didn't want to get shot with the taser.

18  Q.    But if you had stood up, it wouldn't have been

19  necessary for anyone to come in and physically handcuff

20  you in that way, would it?

21  A.    If I would have stood up, I don't know what would

22  have happened.  I just felt that maybe -- I just felt it

23  safer to lay there down facedown on the bunk.

24  Q.    Once you were handcuffed, the officers asked you to

25  stand?

1  A.   Once I had the handcuffs on, yes.

2  Q.   And you did or did not stand or get off the bunk?

3  A.   I believe I attempted -- I tried to.  I don't know.

4  It was kind of hard.  I had the handcuffs behind my back.

5  So I was laying facedown, so it was kind of hard.  They

6  told me to get up and I think I tried.  I told them I

7  couldn't get up.  It was kind of hard, I don't know, to

8  get up when you're handcuffed behind your back, so --

9  Q.   So eventually you were on the floor of your cell on

10  your knees, correct?

11  A.   When they pulled me off the bed, yes.

12  Q.   When you said you couldn't get off the bunk, they

13  pulled you off the bunk, onto the floor --

14  A.   Yes.

15  Q.   -- in a kneeling position?

16  A.   Yes.  I went to my knees because when they pulled me

17  off, my feet slapped the bed frame.

18  Q.   Okay.  And at that point they asked you to stand up

19  off the floor, correct?

20  A.   I think they said, yeah, "Get up and walk or we'll

21  drag you."  I think that's what they said.

22  Q.   And you told him, told them rather, that you

23  couldn't stand up at all, correct?

24  A.   Yeah.  My foot was hurting.

25  Q.   This is because, your testimony is, your foot hurt?

MICHAEL KINGSLEY - CROSS

1    A.    Yeah, my foot hit the bed frame, yes.

2    Q.    And which foot was it?

3    A.    Both my feet hit, but I believe my right one hit

4    harder than my left one did.  They were both hurting.

5    But it was, like, stinging and numbing, so I went to my

6    knees complaining about my foot; I remember that.

7    Q.    So your right foot hurt worse?

8    A.    Yes.

9    Q.    And you say it was stinging?

10   A.    Yeah, it was numb, yeah.

11   Q.    And as a result of your right foot stinging, you

12   were unable to stand up at all; is that your testimony?

13   A.    At that time, yes.

14   Q.    And you were unable to walk at all because of your

15   right foot stinging?

16   A.    Yes.  At that time it was very painful.

17   Q.    And you're still awake, correct?

18   A.    Yes.

19   Q.    Still able to talk, correct?

20   A.    Yes.

21   Q.    And what your testimony is is that the officers

22   dragged you from the cell?

23   A.    Yeah.  They said, "Get up and walk or we'll drag

24   you."

25   Q.    I'm not asking you what they said; I'm asking you

MICHAEL KINGSLEY - CROSS

1  what they did.  Your testimony is that the officers

2  dragged you from the cell?

3  A.   Yes.

4  Q.   Can you describe how it is that they dragged you?

5  A.   Like, one had one side of my arm and the other one

6  had the other side.  And they, you know, dragged me

7  across the floor.  They didn't carry me.

8  Q.   Did they lift you up off the floor at all?

9  A.   I don't think so.

10 Q.   And where did they take you?

11 A.   They took me through the cell block and then there's

12 a hallway.  They sat me facedown on the hallway floor.

13 Q.   And what happened out in the hallway?

14 A.   Then they gathered around and each one -- there's

15 four officers -- one each grabbed my arm and my legs and

16 they carried me to the segregation, so --

17 Q.   The officers, was there any conversation between you

18 and the officers out in the main hallway?

19 A.   I don't remember them talking to me or anything, no.

20 Q.   You don't think they did?

21 A.   I don't remember at this time no.

22 Q.   I want to be sure I understand.  You don't think

23 they did or you don't remember one way or the other?

24 A.   I don't remember.

25 Q.   Fair enough.  In fact the officers asked you what

MICHAEL KINGSLEY - CROSS

1  was wrong with your foot, didn't they?

2  A.   I think they said that a couple times.  They asked

3  me that inside the cell and I think they may have.  I'm

4  not -- I can't remember.  It's a long time ago.

5  Q.   When they asked you what was wrong with your foot,

6  you didn't respond, did you?

7  A.   I just -- I kept on saying my foot hurt.

8  Q.   Out in the main hallway you kept saying that your

9  foot hurt?

10 A.   I believe so, yes.

11 Q.   The officers asked you which foot hurt, didn't they,

12 out in the main hallway?

13 A.   I don't remember.  I was quite belligerent.  I said

14 my foot hurt numerous times.  I don't -- I'm sure I said

15 it in the hallway.  I said it in the receiving cell.  I

16 said it inside the cell.  I said it numerous times.  I

17 don't remember every time I said it.

18 Q.   I want to be clear what happened out in the main

19 hallway.  So to go back to my question, the officers

20 asked you which foot hurt when you were out in the main

21 hallway, correct?

22 A.   They could have.  I'm not for sure they did or not.

23 Q.   When they asked you that, you didn't respond to

24 them, did you?

25              MR. PARDON:  Objection.

MICHAEL KINGSLEY - CROSS

```
 1           MR. JONES:  There was an objection, Your Honor.

 2           THE COURT:  I didn't hear it.  I'm sorry.

 3           MR. PARDON:  I had objected that -- well, I

 4   don't want to argue about what the objection is in front

 5   of the jury.

 6           THE COURT:  I'm sorry.  What was your objection?

 7           MR. PARDON:  I objected to the question.  Maybe

 8   we should, you know.  I'm sorry.  I will withdraw the

 9   objection.  Go ahead.  Start over.

10           THE COURT:  Okay.

11           MR. JONES:  I will ask the question again.

12           THE WITNESS:  Okay.

13   BY MR. JONES:

14   Q.   Out in the main hallway, in response to the

15   officers' questions, you did not tell them which foot

16   hurt, did you?

17   A.   I don't remember.  I don't think I did.  I don't

18   know.  I'm not for sure.  I complained.

19   Q.   Just -- I just want to stick to the main hallway.

20   A.   Okay.

21   Q.   Out in the main hallway, the officers asked you what

22   was wrong with your foot, didn't they?

23           MR. PARDON:  Objection.

24           THE COURT:  Overruled.

25   A.   I don't -- I don't remember.  I mean, I know they
```

2-A-74

1    asked me what was wrong with my foot inside the cell.

2    It's hard for me to remember every single detail what

3    they said to me.

4    Q.   When this incident had occurred, you had been in the

5    main hallway of the jail before, hadn't you?

6    A.   Yes.

7    Q.   And you had certainly been up and down the cell

8    block before, correct?

9    A.   Yes.

10   Q.   And you had been in the receiving cell or one of the

11   receiving cells before that day, correct?

12   A.   That day?

13   Q.   Poorly-worded question.  Before May 21st, you had

14   been in one or more of the receiving cells, correct?

15   A.   Yeah.  Yes.

16   Q.   So you knew there was a camera at the end of the

17   cell block?

18   A.   Yes.  There's cameras all -- I don't know where they

19   got the cameras at.  I know there is cameras all over the

20   jail, yes.

21   Q.   You knew there was a camera in the main hallway,

22   didn't you?

23   A.   I'm sure there was one.

24   Q.   And you knew there was a camera in the receiving

25   cell?

MICHAEL KINGSLEY - CROSS

```
 1              MR. PARDON:  Objection.

 2              THE COURT:  Did you or did you not know there

 3    was a camera there?

 4              THE WITNESS:  Inside in the hallway?

 5              THE COURT:  I think you said in the receiving

 6    cell, didn't you?

 7              MR. JONES:  I was asking about the receiving

 8    cell.

 9    A.   Yeah, there was a camera on the wall, yes.

10    Q.   So just moving forward from the main hallway, the

11    officers picked you up and carried you from the main

12    hallway into the receiving cell, yes?

13    A.   Yes.

14    Q.   And when they put you in the cell, they put you

15    facedown on the bunk that's in the cell, correct?

16              THE COURT:  And, Mr. Jones, I'm going to

17    interrupt you at this point.  We will take a 15-minute

18    recess and then resume with Mr. Jones' cross-examination

19    of Mr. Kingsley.  Counsel, is there anything you wish to

20    take up outside the jury's presence?

21              MR. JONES:  No, Your Honor.

22              THE COURT:  If you have been taking notes,

23    please leave your notepads on your chairs.

24         (Jury out at 10:48 a.m.)

25         (Recess at 10:48 a.m. until 11:00 a.m.)
```

MICHAEL KINGSLEY - CROSS

```
 1              THE COURT:  Mr. Jones.

 2              MR. JONES:  Thank you, Judge.

 3   BY MR. JONES:

 4   Q.   Mr. Kingsley, when we took the break, we were at the

 5   point where the officers brought you into the receiving

 6   cell, yes?

 7   A.   I believe so, yes.

 8   Q.   And what they did when they brought you in the

 9   receiving cell is they laid you on the bunk that was in

10   the receiving cell, correct?

11   A.   Yes, they laid me facedown, yes.

12   Q.   And what they tried to do at that point is they took

13   the handcuffs off, yes?

14   A.   Yes.

15   Q.   I think it's fair to say you wanted them to take the

16   handcuffs off, yes?

17   A.   Yes.

18   Q.   I think you told us that they were tight, right,

19   from the get-go, correct?

20   A.   Yes.

21   Q.   And at that point you were obviously still awake,

22   yes?

23   A.   Yes.

24   Q.   Still able to communicate with the officers, yes?

25   A.   Yes.
```

MICHAEL KINGSLEY - CROSS

1   Q.   Still able to talk?

2   A.   Yes.

3   Q.   And what the officers were telling you as they were

4   doing what they were doing was that they wanted you to

5   relax, correct?

6   A.   Yes.  They said that a couple times.

7   Q.   I'm sorry.  I didn't mean to start with the next one

8   before you were done.  What they were telling you, in

9   their words, was to stop resisting, correct?

10  A.   I think they said, "Stop resisting and relax," a

11  couple times, yes.

12  Q.   But for whatever reason, they were having trouble

13  getting the handcuffs off, yes?

14  A.   I believe so, yes.

15  Q.   Do you agree that as the officers were taking the

16  handcuffs or trying to take the handcuffs off that your

17  arms were tense?

18  A.   My whole body was tense, if I remember right, yes.

19  Q.   So your arms were -- the muscles in your arms were

20  flexed, they were tense?

21  A.   My whole body I guess.  Sergeant Hendrickson had his

22  knee in my back, upper back.

23  Q.   For the moment I'm not -- I don't want to get into

24  why; I just want to know if certain things occurred; is

25  that fair?

MICHAEL KINGSLEY - CROSS

1  A.   Yes.

2  Q.   So you say your whole body was tense?

3  A.   Yes.

4  Q.   And that would include your arms, yes?

5  A.   Yes.

6  Q.   And what that means is the muscles in your arms were

7  tense or flexed, yes?

8  A.   Yes, I guess.   I was tense, yes.

9  Q.   And the muscles in your upper body, your torso, they

10 were tense as well?

11 A.   I believe so, yes.

12 Q.   Do you agree that you were moving your arms at all?

13 A.   I don't believe I was moving my arms at all.   I was

14 handcuffed behind my back, so I don't -- I don't think

15 there was any room to move around.

16 Q.   You don't think you can move your arms at all while

17 you are handcuffed behind your back?

18 A.   It's possible, but I wasn't.   I don't think I was,

19 no.

20 Q.   Okay.   You think your arms were still?

21 A.   Yeah.   They're behind my back, yes.

22 Q.   Do you agree that you were moving your torso?

23 A.   May have been.   I don't remember if I was.

24 Q.   Okay.   Do you agree that you were moving your head

25 and shoulders around?

MICHAEL KINGSLEY - CROSS

1  A.   I did lift my head up.

2  Q.   At one point you agree that you lifted your

3  shoulders and head up off the bunk, correct?

4  A.   Yes.

5  Q.   Other than that movement, do you agree that you were

6  moving your head and shoulders around?

7  A.   Yeah.  I lifted my head up, yes, trying to catch my

8  breath.

9  Q.   I'm asking -- okay.  If you had laid perfectly

10 still, can you think of any reason that the officers

11 would not have been able to take the handcuffs off?

12 A.   I believe that they were too tight.  It's like a lot

13 of pressure.  Handcuffs click down, like.  It's hard to

14 explain.  There's, like, a lot of pressure.  It seemed

15 like the handcuffs were getting tighter.

16 Q.   Okay.  If we set aside how tight the handcuffs were

17 around your wrists; if you laid perfectly still, can you

18 think of any reason why the officers would not have been

19 able to remove the handcuffs?

20        MR. PARDON:  Objection.

21        THE COURT:  Overruled.

22 A.   I believe I was trying to stay as still as possible

23 to try to get the handcuffs off.

24 Q.   And I'm not -- for purposes of this question, I'm

25 going in a different direction.

MICHAEL KINGSLEY - CROSS

1   A.   Okay.

2   Q.   Can you think of any reason that the officers would

3   not have been able to remove your cuffs if you had been

4   still?

5   A.   If they put them on wrong.  I don't know.

6   Q.   And you think if the handcuffs were on too tight,

7   they would be hard to remove?

8   A.   I never took handcuffs off anybody.  I don't know.

9   Q.   You don't know whether that would have factored in

10  or not?

11  A.   I don't know.

12  Q.   Okay.  You testified in terms of how the officers

13  were positioned next to you, correct?

14  A.   Inside the segregation cell?

15  Q.   Yes.

16  A.   Yes.

17  Q.   And you say that Officer Hendrickson put his knee

18  somewhere on your body, correct?

19  A.   Yeah.  He put it in my back, yes.

20  Q.   Okay.  Did Officer Shisler put any weight on your

21  body?

22  A.   I don't remember.

23  Q.   You don't know one way or the other?

24  A.   I don't know if he did or not.

25  Q.   Okay.  And he was at your feet, yes?

MICHAEL KINGSLEY - CROSS

 1  A.    I believe so, yes.

 2  Q.    Officer Blanton, did he put his body weight on you?

 3  A.    I believe he was attempting to take the handcuffs

 4  off.

 5  Q.    Okay.  And so while he was doing that, did he put

 6  his weight on you at all?

 7  A.    No, he didn't put his weight on me, no.

 8  Q.    Okay.  So in terms of the officers that were there,

 9  was it only Officer Hendrickson that had any weight on

10  you?

11  A.    He had his knee in my back, yes.

12          THE COURT:  Could you stay forward, speak into

13  the microphone?

14          THE WITNESS:  Sorry.

15          THE COURT:  Thank you.

16  BY MR. JONES:

17  Q.    If you made any movements at all, why do you think

18  you were moving?

19  A.    Because of the pain I was going through.

20  Q.    And that's the pain related to what?

21  A.    The handcuffs, my foot.

22  Q.    Okay.

23  A.    Just overall the knee in my back.

24  Q.    Okay.  So the pain in your foot was causing you to

25  move your upper body?

                    MICHAEL KINGSLEY - CROSS

2-A-82

1  A.   I guess.  If I was moving my upper body, I was

2  tensed up, yes.

3  Q.   And the pain in the handcuffs or because of the

4  handcuffs you say was causing you to move your body?

5  A.   I believe so.  I was tense, yes.

6  Q.   Okay.  And where exactly did Officer Hendrickson

7  have his knee?

8  A.   It was in, like, my upper back area.  I don't know.

9  It's kind of hard to explain.  Upper back.

10  Q.   And how much weight did he have on it?

11  A.   I don't know how much Sergeant Hendrickson weighs.

12  Q.   I don't mean in terms of a number.  Relatively

13  speaking, how much weight was he applying?

14  A.   It felt like a ton.  I don't know.

15  Q.   And are you testifying that you were moving because

16  of the weight that Officer Hendrickson was putting on

17  you?

18  A.   I mean, it was painful, yes.

19  Q.   And him having his weight on you, your testimony is,

20  that is what caused you to move?

21  A.   Accompanied by the handcuffs and my feet hurting,

22  everything altogether, yes.

23  Q.   Did Officer Hendrickson have his knee on your back

24  the entire time this was going on?

25  A.   I don't remember.  It felt like he did.

2-A-83

1  Q.   Okay.  And if there was a point in time when his

2  knee came off your back, did you continue to move or did

3  you remain still or did you -- were you still?

4  A.   I believe I was still.  I wasn't moving.

5  Q.   Okay.  So when his knee came off your back, you

6  remained still?

7  A.   I believe so, yes.

8  Q.   And I think you testified that Sergeant Hendrickson

9  at one point said the phrase, "Tase his ass"?

10 A.   That's what I heard, yes.

11 Q.   Okay.  And so he obviously said that loud enough

12 that you could hear him say that?

13 A.   Yes, I heard him, yes.

14 Q.   And I think you also testified that during this you

15 felt like you were suffocating?

16 A.   It was, like, hard to breathe.  He had his weight on

17 top of me.

18 Q.   All right.

19 A.   That's why, if any movement, I was trying to catch

20 my breath.

21 Q.   And you did respond verbally to what the officers

22 were telling you, yes?

23 A.   I believe I made a couple comments, yes.

24 Q.   At what point you told them, and I'm trying to quote

25 you --

1   A.    Okay.

2   Q.    -- you told them to take the mother-fuckers off,

3   yes?

4   A.    I believe that's what I said.

5   Q.    And then shortly after that you also told them to

6   leave them on and get the fuck out, correct?

7   A.    I don't remember exactly what I said, but I know I

8   said, "Get the 'f' off me," you know.  I don't remember

9   exactly what I said.  I was in such pain, I can't recall

10  what I said.

11  Q.    Okay.  You would agree though that if we hear you on

12  the video saying, "Get the fuck out," that was -- you

13  said that?

14  A.    Yes, if that's what the video said, yes.

15  Q.    And you were able to make those two statements,

16  "Take the mother-fuckers off" and "Get the fuck out,"

17  even though you were suffocating?

18  A.    That felt like I was, you know, yes.

19  Q.    After the taser was used, Lieutenant Conroy told the

20  other officers to leave the handcuffs on and to exit from

21  the cell, yes?

22  A.    I don't remember what he said.  I know they ended up

23  leaving.

24  Q.    That's what the officers did?

25  A.    Yes.

1   Q.   Yes?

2   A.   Yes.

3   Q.   They left the cell and they didn't use any more

4   force against you?

5   A.   No.

6   Q.   And about ten or so minutes later, officers came

7   back and removed the handcuffs, yes?

8   A.   I don't -- I don't know exact time.  I don't

9   remember.

10   Q.   Okay.  So they did come back and take the handcuffs

11   off?

12   A.   Yes, they did.

13   Q.   Mr. Kingsley, you testified that the taser was

14   painful?

15   A.   Extremely, yes.

16   Q.   You testified specifically that you felt the

17   electricity exit at both of your feet?

18   A.   That's what it felt like.  It felt like just -- I

19   don't know.  It's like your whole body getting slapped or

20   something.  It's kind of hard to explain unless -- I

21   don't know.

22   Q.   The taser was used on the back of your right

23   shoulder, yes?

24   A.   Yes.

25   Q.   So it's sort of at the top of your back?

MICHAEL KINGSLEY - CROSS

1   A.   Yes.

2   Q.   In the muscular area there?

3   A.   In my back, yes.

4   Q.   I want to make sure I understand.  You say you felt

5   like the electricity went all way down to your feet; is

6   that correct?

7   A.   Just everywhere.

8   Q.   Mr. Kingsley, have you ever been tased other than

9   this incident?

10  A.   I don't believe so, no.

11  Q.   If we go back to May 21st, at some point not that

12  long after the incident the jail nurse came to see you?

13  A.   Yes, that's correct.

14  Q.   And you declined to see her, yes?

15  A.   Yes.

16  Q.   You were irritated; that's what you said?

17  A.   Yeah.  I didn't want to talk to anybody.

18  Q.   And you didn't ask her for any medical attention,

19  correct?

20  A.   I didn't say anything to her.

21  Q.   You didn't ask for anyone to give you medical

22  attention as a result of the taser, did you?

23  A.   I didn't want to talk to anybody.  No.

24           MR. JONES:  Those are the questions I have.  I

25  appreciate it.

MICHAEL KINGSLEY - CROSS

| | |
|---|---|
| 1 | THE COURT:  Thank you.  Mr. Pardon. |
| 2 | MR. PARDON:  Yes.  I just have a couple of |
| 3 | follow-up questions. |

REDIRECT EXAMINATION

5   BY MR. PARDON:

6   Q.   Mr. Kingsley, you testified that when the officers

7   came to take you out of the cell, you saw Deputy Degner

8   with the taser; do you recall that?

9   A.   Yes.

10  Q.   All right.  Do you know what Deputy Degner was doing

11  the entire time that they were talking to you?

12  A.   I believe he was just positioned with the taser like

13  with his hand pointed at me.

14          MR. PARDON:  Okay.  No further questions.

15          THE COURT:  Mr. Jones, anything?

16          MR. JONES:  I have nothing further.

17          THE COURT:  You may step down.  Mr. Pardon, you

18  may call your next witness.

19          MR. PARDON:  Your Honor, we call Lieutenant

20  Robert Conroy.

21          MR. JONES:  He's outside.

22          THE COURT:  Out in the hall?  Okay.

23  **ROBERT CONROY, PLAINTIFF'S WITNESS, SWORN**

24          THE COURT:  Please come forward to be sworn.

25          THE CLERK:  You can have a seat and please make

1  sure to speak right into the microphone.

2                    ADVERSE EXAMINATION

3  BY MR. PARDON:

4  Q.   Good morning, Lieutenant Conroy.

5  A.   Good morning.

6  Q.   Obvious question, but could you state your name,

7  please?

8  A.   Robert Conroy.

9          MR. PARDON:  All right.  I apologize, Your

10 Honor.  I request permission to proceed with an adverse

11 examination.

12         THE COURT:  Any objection?

13         MR. JONES:  No, Your Honor.

14         THE COURT:  You may proceed.

15         MR. PARDON:  Thank you.

16 BY MR. PARDON:

17 Q.   Lieutenant Conroy, you're presently a patrol

18 operations lieutenant for Monroe County; isn't that

19 correct?

20 A.   Correct.

21 Q.   All right.  And you've held that position since

22 March of 2011, right?

23 A.   Right around there, yes, correct.

24 Q.   And prior to that time you were a jail administrator

25 for Monroe County, right?

1   A.   Yes.

2   Q.   All right.  And you were a jail administrator as of

3   May 21st, 2010, the time of the incident in question in

4   this lawsuit; isn't that correct?

5   A.   Yes.

6   Q.   And your job as a jail administrator was to

7   supervise the jail staff and to be responsible for

8   managing the daily operation of the jail; isn't that

9   correct?

10  A.   Correct.

11  Q.   And at the time of the incident in question that led

12  to this lawsuit, you had been working in law enforcement

13  or jails in one capacity or another for about ten years,

14  correct?

15  A.   Since 1995.

16  Q.   So it's at least ten years, closer to 15 years?

17  A.   Yes.

18  Q.   You personally first became aware that there was a

19  situation involving Mr. Kingsley on the morning of May

20  21st at about around 6:15 in the morning; is that right?

21  A.   I believe it was 6:13 I received a phone call, yes.

22  Q.   Okay.  And it was Sergeant Hendrickson who called

23  you, correct?

24  A.   Correct.

25  Q.   And Sergeant Hendrickson at the time was the shift

ROBERT CONROY - ADVERSE

1  supervisor in the jail; is that right?

2  A.   Correct, third shift, yes.

3  Q.   And Sergeant Hendrickson had told you that

4  Mr. Kingsley had refused to take some paper off of his

5  light the night before, that he was facing discipline and

6  that he still didn't want to take the paper down; is that

7  right?

8  A.   Among other things, yes.

9  Q.   Okay.  And so you told Sergeant Hendrickson you were

10 on your way in and you would be there in a short while;

11 is that right?

12 A.   Correct.

13 Q.   All right.  And you got there about 6:30, right?

14 A.   Yes.

15 Q.   All right.  And you spoke with Sergeant Hendrickson

16 about the matter at the time, right?

17 A.   After I entered the jail, yes.

18 Q.   Okay.  And then after you spoke with Sergeant

19 Hendrickson, you went to talk to Mr. Kingsley, right?

20 A.   Yes.

21 Q.   And when you spoke with Mr. Kingsley, he was lying

22 on his bunk facedown with his head towards the bars,

23 right?

24 A.   Yes.

25 Q.   And during that conversation you told him that he

1   had to take the paper down and he said he didn't put it

2   up there and he didn't want to take it down; is that

3   right?

4   A.   That was -- yes.

5   Q.   All right.   When Mr. Kingsley had told you that he

6   didn't put the paper over the light, you believed him at

7   the time, didn't you?

8   A.   I did.

9   Q.   And in fact you didn't know how long the light --

10   the paper had been up on the light before that, right?

11   A.   Correct.

12   Q.   Okay.   And I think you told him that you would take

13   it down, but you needed to move him out of his cell to do

14   so, right?

15   A.   There was a discussion about that, yes.

16   Q.   Okay.   And I think, it is incorrect, you also told

17   him that he would have to go to the receiving cell to

18   face disciplinary action or because of disciplinary

19   action; is that correct?

20   A.   Yes.

21   Q.   All right.   And the receiving cell is sometimes

22   referred to by the inmates as *segregation* or *the hole*;

23   isn't that correct?

24   A.   *The hole* more than anything, yes.

25   Q.   Basically it's considered to be more restrictive

ROBERT CONROY - ADVERSE

2-A-92

1   than an inmate's regular cell, right?

2   A.   Yes, that's a basic explanation.

3   Q.   They aren't next to any inmates, right?

4   A.   There's three cells in that area.

5   Q.   Okay.  But the only way they can see out of the cell

6   basically is through a little hole in the door that can

7   be opened; is that correct?

8   A.   Correct.

9   Q.   All right.  Now, when you spoke with Mr. Kingsley

10  during your conversation, he didn't make any physical

11  threats to you; isn't that correct?

12  A.   That's correct.

13  Q.   And he didn't make any threatening statements

14  towards you?

15  A.   No.

16  Q.   All right.  And you didn't feel threatened by your

17  interaction with him, right?

18  A.   No.

19  Q.   Okay.  And so after you spoke with Mr. Kingsley, you

20  went and spoke with some of the other jail staff, right?

21  A.   Correct.

22  Q.   All right.  And I think you told the other members

23  of the jail staff, you know, he's going to receiving; is

24  that right?

25  A.   Yes.

ROBERT CONROY - ADVERSE

1  Q.   Okay.   And by that time some others had arrived, it

2  wasn't just you and Sergeant Hendrickson, right?

3  A.   Correct.

4  Q.   All right.   And the others included a Deputy

5  Blanton, Deputy Degner and a Sergeant Shisler, correct?

6  A.   Yes.

7  Q.   All right.   And you guys were going to do what you

8  call a *cell extraction*?

9  A.   Correct.

10  Q.   That means you were going to move Mr. Kingsley out

11  of his cell?

12  A.   Correct.

13  Q.   So at that time, as I understand it, the plan was

14  that Sergeant Hendrickson was going to talk to

15  Mr. Kingsley, Deputy Blanton would help handcuff him,

16  Deputy Degner would operate the taser, and yourself and

17  Sergeant Shisler would sort of fill in as needed, right?

18  A.   Yes.

19  Q.   Now, Sergeant Hendrickson was the shift supervisor,

20  but you were still the highest-ranking employee in the

21  jail at the time, right?

22  A.   Correct.

23  Q.   And it was sort of understood you were in charge,

24  right?

25  A.   Yes.

ROBERT CONROY - ADVERSE

2-A-94

1  Q.   All right.  So as I understand it, next you, along

2  with Sergeant Hendrickson, Deputy Degner, Mr. Shisler,

3  Deputy Blanton, you all went to the cell?

4  A.   I, no.

5  Q.   Okay.  At some point you and Sergeant Hendrickson

6  and Deputy Degner and Mr. Shisler and Deputy Blanton, you

7  all went down to the cell to do the cell extraction; is

8  that right?

9  A.   Three went down first and then Sergeant Shisler and

10  I came down later.

11  Q.   Got it.  Thank you.  So the cell block was locked

12  down at the time; isn't that correct?

13  A.   Correct.

14  Q.   And when it's locked down, it means you know the

15  other inmates are locked in their cells, right?

16  A.   Correct.

17  Q.   So they aren't, you know, milling aren't, they can't

18  interfere, they're not going to be in the hallway

19  interfering with anything you would be doing; is that

20  correct?

21  A.   Correct.

22  Q.   All right.  So once you got there, it's my

23  understanding Sergeant Hendrickson told Mr. Kingsley he

24  should stand up and back up to the door to be handcuffed,

25  right?

ROBERT CONROY - ADVERSE

 1   A.   Correct.

 2   Q.   All right.  And in response, as I understand it, you

 3   don't recall Mr. Kingsley saying anything in response to

 4   that?

 5   A.   I know he was saying things, but I couldn't -- I was

 6   still back by the day room area, so I couldn't really

 7   understand what he was saying, no.

 8   Q.   Okay.  Mr. Kingsley didn't make any threats at that

 9   time, did he?

10   A.   Not that I'm aware of.

11   Q.   All right.  And at some point then you told

12   Mr. Kingsley, "Place your arms behind your back,"

13   correct?

14   A.   After I went down to the cell, yes.

15   Q.   Okay.  And he did in response to your order, didn't

16   he?

17   A.   Somewhat.

18   Q.   But he put his hands behind his back, right?

19   A.   Along the sides of his body.  I wouldn't categorize

20   behind his back.

21   Q.   Okay.  At that time he was lying -- he was still

22   lying facedown on his bunk; isn't that right?

23   A.   Correct.

24   Q.   All right.  And so shortly after this the cell door

25   opened and then several of the deputies went into the

ROBERT CONROY - ADVERSE

1  cell, correct?

2  A.    Two went into the cell.

3  Q.    And they were Sergeant Hendrickson and Deputy

4  Blanton?

5  A.    Correct.

6  Q.    All right.  And Sergeant Hendrickson tried to

7  handcuff him, right?

8  A.    Yes.

9  Q.    All right.  And you personally did not actually see

10  how Mr. Kingsley was handcuffed; isn't that correct?

11  A.    Not the handcuffing, no.

12  Q.    Okay.  And actually the only thing you know for sure

13  about the actual handcuffing is from reading other

14  people's reports; isn't that correct?

15  A.    I could say that his arms were straight out and that

16  they weren't together, they were at the edge of his body.

17  Q.    To be clear though, you didn't actually see him

18  being handcuffed?

19  A.    No, I did not see him being handcuffed.

20  Q.    Thank you.  Sometimes the *no*, *yes*, it gets unclear

21  in the record.  Okay.  Well, after the handcuffs were

22  applied, Mr. Kingsley was told to stand up and walk;

23  isn't that correct?

24  A.    Correct.

25  Q.    All right.  And he didn't do that; in fact he

ROBERT CONROY - ADVERSE

1  complained about his foot hurting, right?

2  A.   Yes.

3  Q.   And so he was then carried into the hallway by

4  Sergeant Hendrickson and Deputy Blanton, correct?

5  A.   Yes.

6  Q.   Carried or dragged, depending on what you hear,

7  right?

8  A.   Carried.

9  Q.   All right.  And after he was brought out into the

10 hallway, you talked to him a little bit, didn't you?

11 A.   Correct.

12 Q.   All right.  And during the time that you were

13 talking to him, he didn't make any threats to you or to

14 any of the other deputies, correct?

15 A.   No, he didn't.

16 Q.   And so a group of you then carried him down to the

17 receiving cell, right?

18 A.   Correct.

19 Q.   All right.  And I think it's your estimate that the

20 distance he was carried from his cell down to the

21 receiving cell was approximately a hundred feet?

22 A.   Yes.  That was my estimate.

23 Q.   Okay.  And during the time he was being carried,

24 Mr. Kingsley did not make any threats to harm anyone;

25 isn't that correct?

ROBERT CONROY - ADVERSE

1  A.   Correct.

2  Q.   And during the time he was carried, Mr. Kingsley did

3  not exhibit any active resistance, as far as you know;

4  isn't that correct?

5  A.   He showed resistance, but active, no.

6  Q.   Okay.  And after Mr. Kingsley was carried to the

7  receiving cell, he was placed facedown on the concrete

8  bunk with his head away from the door, right?

9  A.   Correct.

10  Q.   All right.  And just to be clear so the jury kind of

11  has an idea, in the receiving cell there's the doorway,

12  kind of the entryway, and then the concrete bunk is on

13  the left as you walk into the cell, right?

14  A.   Correct.

15  Q.   Okay.  And basically after you helped carry him in,

16  you then sort of walked and stood outside the cell,

17  right?

18  A.   Correct.

19  Q.   All right.  And that left Sergeant Hendrickson and

20  Deputy Degner still in the cell along with Sergeant

21  Shisler and Deputy Blanton, right?

22  A.   Correct.

23  Q.   Okay.  And in terms of where the deputies were,

24  Deputy Blanton eventually sort of assumed the role of

25  removing the cuffs.  He was sort of in the middle of

ROBERT CONROY - ADVERSE

 1  Mr. Kingsley; isn't that right?

 2  A.   Yes.

 3  Q.   And Sergeant Shisler was sort of at Mr. Kingsley's

 4  legs, right?

 5  A.   Yes.

 6  Q.   And Sergeant Hendrickson was sort of at his torso

 7  and his head, right?

 8  A.   Yes.

 9  Q.   So they are all to the right of him, just to be

10  clear, right?

11  A.   They were all on his right side, yes.

12  Q.   And Deputy Degner was sort of standing behind him

13  for a while and at one point he moved to Mr. Kingsley's

14  shoulder area between Dr. Blanton and Sergeant

15  Hendrickson, right?

16  A.   Correct.

17  Q.   And you were outside, again, just to be clear?

18  A.   Just outside, yes.

19  Q.   And if you looked in, you could see some of what was

20  going on in the receiving cell, but some of it was

21  blocked by the deputies, right?

22  A.   Yes.

23  Q.   All right.  And you don't recall, for example,

24  whether you see -- saw, like, Mr. Kingsley's feet moving

25  around, right?

ROBERT CONROY - ADVERSE

2-A-100

1   A.    I don't recall his feet moving around, no.

2   Q.    And you believe you saw some movement of

3   Mr. Kingsley.  It was mostly he moved his upper body some

4   of the time, right?

5   A.    Movements in his upper body, yes.

6   Q.    He wasn't moving his upper body the entire time,

7   right?

8   A.    Not the entire time, no.

9   Q.    And you kind of heard some moaning and growing from

10  Mr. Kingsley, right?

11  A.    Yes.

12  Q.    All right.  And you heard him say, "Leave the

13  handcuffs on and get the 'f' out," right?

14  A.    Yes.

15  Q.    All right.  And you personally didn't see any

16  resistive tension in Mr. Kingsley's arms, right?

17  A.    Inside the cell?

18  Q.    Inside the receiving cell, correct.

19  A.    Not while he was inside the cell no.

20  Q.    Okay.  You didn't hear Mr. Kingsley make any

21  physical threats to harm any of the deputies while he was

22  inside the receiving cell, did you?

23  A.    I did not.

24  Q.    All right.  You did not see Mr. Kingsley attempt to

25  bite anyone, did you?

ROBERT CONROY - ADVERSE

 1  A.   I did not.

 2  Q.   You didn't hear anything from any of the deputies

 3  that suggested Mr. Kingsley was attempting to bite

 4  anyone, did you?

 5  A.   While inside the receiving cell?

 6  Q.   While inside the receiving cell.

 7  A.   No, I did not.

 8  Q.   Thank you.  All right.  And I would like to ask you

 9  about the use of the taser.  You didn't hear anyone

10  threaten to use the taser before it was used, did you?

11  A.   No.

12  Q.   Okay.  And as far as you can remember, you didn't

13  actually see Deputy Degner deploy the taser at the time

14  it was deployed; isn't that correct?

15  A.   I saw him move in, but I couldn't see it deployed

16  though.

17  Q.   You don't actually even remember hearing the taser

18  being deployed, correct?

19  A.   Correct.

20  Q.   And in fact you didn't recognize that the taser had

21  been applied until probably a few seconds after that;

22  isn't that correct?

23  A.   Correct.

24  Q.   All right.  And at the time the taser was used, you

25  didn't know why they chose to use it; isn't that right?

1  A.   Correct.

2  Q.   All right.  In fact I think you said something about

3  that when you wrote an incident report about it as well,

4  didn't you?

5  A.   Yes.

6  Q.   Okay.  And just to be clear, from your personal

7  experience, if Deputy Degner had disagreed with an

8  instruction from Sergeant Hendrickson to use the taser,

9  it would have been his obligation not to use the taser;

10  is that correct?

11  A.   Correct.

12  Q.   All right.  And that's because if one officer tells

13  another officer to use force, the person who is actually

14  applying the force is still responsible for making their

15  own decisions, aren't they?

16  A.   It's your obligation to not follow through with that

17  or if you see somebody, yes, officer override, that's

18  correct.

19  Q.   All right.  At this time I would like to introduce

20  Plaintiff's Exhibit 13, which is a collection of some

21  videos.  And it's my understanding, Your Honor, we have a

22  stipulation that this can be admitted into evidence.

23        MR. JONES:  That's correct.  No objection.

24        THE COURT:  All right.

25        MR. PARDON:  Could you turn on the laptop here?

ROBERT CONROY - ADVERSE

 1   If you would bear with me just for a second, hopefully we

 2   can get it up.  Erica, is it on?

 3           THE CLERK:  It is.  Whatever you need to do with

 4   your laptop though is --

 5           THE COURT:  Does he have to use the -- to put

 6   DVD, does he have to use the gadget on the back?

 7           MR. PARDON:  Our laptop is plugged into the

 8   system here.

 9           THE CLERK:  And it's displaying the image that

10   should be on your laptop as well?

11           MR. PARDON:  Yes.  My apology.  It's my

12   inability to figure out which button to push.  I'm sorry.

13   BY MR. PARDON:

14   Q.   I would like to direct your attention to this video

15   that is on the screen.  Do you recognize this as a view

16   of the hallway that's just outside of the receiving area?

17   A.   Yes.

18   Q.   Okay.  All right.  I'm going to start the video and

19   I'm going to stop it at a few points and I'm going to ask

20   you to identify some things that you may be personally

21   familiar with, okay?  So I'm going to play it.

22       (Videotape played.)

23   BY MR. PARDON:

24   Q.   I'm going to start the video right here where the

25   timestamp says May 21st, 2010, and at 6:44:04.  And just

ROBERT CONROY - ADVERSE

1  to be clear, are you the individual at the lower right

2  hand -- lower right of the screen carrying Mr. Kingsley?

3  A.    Yes.

4  Q.    So that would be you carrying his left leg just, to

5  be clear?

6  A.    Correct.

7  Q.    And Deputy Blanton is located carrying

8  Mr. Kingsley's left arm, right?

9  A.    Correct.

10  Q.    And that's Sergeant Hendrickson sort of at

11  Mr. Kingsley's right arm next to the blue door, correct?

12  A.    Correct.

13  Q.    And Sergeant Shisler is located at his leg, right

14  leg?

15  A.    Correct.

16  Q.    And then Deputy Degner is walking behind there; is

17  that correct?

18  A.    Yes.

19  Q.    All right.  I'm just going to continue playing it

20  for a bit.

21        (Videotape played.)

22  BY MR. PARDON:

23  Q.    Okay.  I have now stopped the video at 6:44:34.  And

24  again I just want to make sure things are clear.  That's

25  now you standing outside the receiving cell; isn't that

ROBERT CONROY - ADVERSE

1   correct?

2   A.    Correct.

3   Q.    Okay.  I'm going to continue to play it then for a

4   while.

5         (Videotape played.)

6   BY MR. PARDON:

7   Q.    I have now stopped the video at 6:45:14.  Did you

8   just hear somebody say something about a chair?

9   A.    Yes.

10  Q.    And just so we're clear, that's you speaking now,

11  correct?

12  A.    Correct.

13  Q.    Okay.  Continuing on.

14        (Videotape played.)

15  BY MR. PARDON:

16  Q.    I have now stopped the video at 6:45:27.  And again

17  that was you making reference to possibly using the

18  chair, correct?

19  A.    Correct.

20  Q.    And a chair is a type of restraint, correct?

21  A.    Right.

22  Q.    Okay.  I'm going to continue playing the video now.

23        (Videotape played.)

24  BY MR. PARDON:

25  Q.    Now I've played it through and I've stopped it at

ROBERT CONROY - ADVERSE

1  6:45:41.  And at this time you were looking into the

2  cell, correct?

3  A.    Yes.

4  Q.    And did you hear somebody yell, "This is the last

5  time I'm going to ask you.  Are you going to relax?"

6  A.    Yes.

7  Q.    And that was Sergeant Hendrickson, correct?

8  A.    Correct.

9  Q.    Okay.  Now, do you happen to know, from your review

10  of this case, when the taser was -- the time that the

11  taser was actually deployed?

12  A.    The time, no.  I don't recall that.

13  Q.    All right.  I'm going to continue to play it now.

14        (Videotape played.)

15  BY MR. PARDON:

16  Q.    All right.  I have now stopped the video at 6:46:08.

17  And you are heard on the screen or on the video saying,

18  "All right.  Here's the deal," correct?

19  A.    Correct.

20  Q.    So at that time you knew the taser had gone off,

21  correct?

22  A.    Yes.

23  Q.    Or been deployed I guess is a better way to describe

24  it.  All right.  I'm going to continue playing the video

25  for a short while.

ROBERT CONROY - ADVERSE

 1          (Videotape played.)

 2   BY MR. PARDON:

 3   Q.    I have now played the video through 6:46:23.  And I

 4   just want to verify, did I then hear you during this

 5   segment say, "We'll leave him in there and leave the

 6   cuffs on him.  If he wants the cuffs off, he can go back

 7   up to the door here and we'll take them off.  It's not a

 8   punishment.  Okay."  Is that roughly what you said?

 9   A.    Yes.

10   Q.    All right.  And when you started this entire

11   conversation by saying, "All right.  Here's the deal,"

12   you were talking to the officers in the cell, weren't

13   you?

14   A.    The officers and Mr. Kingsley, yes.

15   Q.    You were talking to the officers and Mr. Kingsley or

16   the officers in the cell?

17   A.    It was to the officers in the cell, but also so

18   Mr. Kingsley was aware what we were going to do.

19   Q.    All right.  You gave a deposition in this matter,

20   didn't you?

21   A.    Yes.

22   Q.    All right.  And may I approach the witness, Your

23   Honor, with a copy of the deposition?

24          THE COURT:  Sure.

25          MR. PARDON:  Thanks.

ROBERT CONROY - ADVERSE

1    BY MR. PARDON:

2    Q.   And at the time you gave the deposition in this

3    matter, you were under oath, correct?

4    A.   Yes.

5    Q.   And you were asked questions and your attorney was

6    present, correct?

7    A.   Yes.

8    Q.   All right.  If you could, I would like you to turn

9    to page 132 of the deposition, in particular line 23.

10   All right.  Actually, I'm sorry, page 132, line 18.  And

11   I'm going to read from the deposition and ask you if

12   that's what you were asked and that's what you said.

13   Beginning at page 132, line 18:

14        "So I've now stopped it [the video] at 6:45:17, and

15   there's a series of statements you made beginning at

16   6:46:07 in which you said, 'All right.  Here's the deal.'

17   Did you hear that?

18        "ANSWER:  Yes.

19        "Basically, who were you talking to when you started

20   that conversation saying, 'All right.  Here's the deal'?

21        "ANSWER:  The employees within the cell."

22        Those were the questions you were asked and the

23   answer that you gave when you were under oath, correct?

24   A.   Yes.

25   Q.   You didn't say anything about talking to

ROBERT CONROY - ADVERSE

1  Mr. Kingsley at that time, correct?

2  A.    Correct.

3  Q.    Okay.  Now, when you said you were going to leave

4  him there and he could come to the door if he wanted to

5  take the handcuffs off, you were talking to the officers

6  in the cell, weren't you?

7  A.    That first part of the conversation I was talking to

8  the officers, yes.

9  Q.    Okay.  And then you also made the statement, "It's

10 not a punishment," correct?

11 A.    That would be the third part of the conversation,

12 yes.

13 Q.    And when you said that, you were also talking to the

14 officers in the cell, weren't you?

15 A.    The main part of that statement was towards the

16 camera.

17 Q.    Okay.  So just so I understand your testimony, when

18 you said, "All right.  Here's the deal," you were talking

19 to the officers, perhaps Mr. Kingsley.  When you said --

20 well, you were talking to the officers; that's what you

21 testified in your deposition, right?

22 A.    The way I see that is there's three parts to that

23 conversation.

24 Q.    The second part of the conversation when you said he

25 can come up here and leave the handcuffs on, he can come

ROBERT CONROY - ADVERSE

 1   up to the cell, you're talking to the officers?

 2   A.   About his handcuffs, I was talking to the officers,

 3   but also so Mr. Kingsley could hear that part, yes.

 4   Q.   And then so you were saying -- and then when you

 5   talked -- now, when you say you talked to the -- the last

 6   statement about "It's not a punishment," you were talking

 7   to Mr. Kingsley or the camera?  I'm sorry.

 8   A.   Correct.

 9   Q.   All right.  You weren't talking to the camera before

10   then, were you?

11   A.   The way that I see this, there's three parts to that

12   statement.  The first part, "Here's the deal," I was

13   speaking to the officers.  Second part about the

14   handcuffs and how he could back up to the door, that was

15   to the officers but also for instruction for Mr. Kingsley

16   so he could hear.  The last part regarding "This is not a

17   punishment," that is for the record and the camera, yes.

18   Q.   Did you say anything else to the camera during this

19   time?

20   A.   No.

21   Q.   Are you sure you just weren't telling the officers,

22   hey, we got to deescalate the situation here; you just

23   tased him and it's not supposed to be the punishment?

24   A.   I'm positive that was not the point.

25   Q.   Well, if you were speaking to the camera, did you

ROBERT CONROY - ADVERSE

1  think that something had gone wrong and you had a need to

2  document something in front of the camera?

3  A.   There's been a lot of conversations and appeals that

4  I've been involved with with Mr. Kingsley.  And I found

5  that after conversations I had with Mr. Kingsley, I had

6  to write him a letter or document it because there would

7  be words twisted and he would ask other officers

8  different things.  So the point of that conversation or

9  that statement was for the camera so that it was on the

10 record.

11        MR. PARDON:  Your Honor, may I approach the

12 bench?

13        THE COURT:  Certainly.

14      (At side bar.)

15        MR. PARDON:  Your Honor, that particular --

16        THE COURT:  Make sure to speak into the mike.

17        MR. PARDON:  Your Honor, that particular

18 testimony about appeals and other instances I believe is

19 stuff that happened after the incident here and it's also

20 not supposed to be -- this is the subject of the motion

21 in limine, so I'm going to ask that it be stricken.

22        THE COURT:  Any objection?

23        MR. JONES:  He directly asked him why he was

24 talking to the camera and he gave an honest answer as to

25 why he was talking to the camera.  If some of what he was

1   testifying about occurred afterwards, Mr. Pardon can ask

2   him whether it occurred before or after.  That's part of

3   cross-examination.  But he asked a question and he got an

4   honest answer.

5        MR. PARDON:  The specific -- the specific motion

6   in limine was that none of this was supposed to be in.

7        THE COURT:  I'm not sure I understood your

8   point, Mr. Jones.  When you say he --

9        MR. JONES:  He asked him why he was speaking to

10  the camera at that point and he gave a direct answer as

11  to why he felt it necessary to talk to the camera.

12  Mr. Pardon also made the point though, he thinks what the

13  witness is talking about is stuff that occurred after

14  this incident.

15       THE COURT:  I see.

16       MR. JONES:  I'm saying, if that's true, then

17  that can be cured by a question from Mr. Pardon.

18       MR. PARDON:  Again, the stuff before or after

19  the incident was not supposed to be discussed at all.

20       THE COURT:  Well, it's true for the defendants

21  as a group, but I don't know if this witness was told

22  about that.

23       MR. JONES:  As I understood the motion in

24  limine, it's we're not going to introduce other

25  disciplinary issues, other times you had to punish him.

ROBERT CONROY - ADVERSE

1    All the witness said was that he has been involved in

2    dealings with Mr. Kingsley in the past, I think he said,

3    where he has twisted what this officer has said or what

4    other officers have said.  He didn't say, we had to

5    punish him on other occasions.  He didn't say, we've had

6    to extract him from the cell on other occasions.  So I

7    think he's stayed within the boundaries of what Your

8    Honor's order alluded to.

9           THE COURT:  I will overrule that objection in

10   this instance.

11          MR. PARDON:  Thank you, Your Honor.

12       (End of side bar.)

13   BY MR. PARDON:

14   Q.   Lieutenant Conroy, you mentioned about having --

15   dealing with Mr. Kingsley with respect to some other

16   incidents.  In fact you are not aware of any other

17   incidents that happened with Mr. Kingsley prior to this

18   incident in question, are you?

19   A.   Not right offhand, no; not use-of-force incidents,

20   no.

21   Q.   Immediately after this happened, as you were walking

22   away from the receiving cell and walking toward the main

23   office, you had a conversation with Sergeant Hendrickson

24   about why he chose to use the taser, didn't you?

25   A.   I did.

ROBERT CONROY - ADVERSE

1   Q.   All right.  And there's no audiotape of that

2   conversation, right?

3   A.   No.

4   Q.   All right.  When you asked Sergeant Hendrickson

5   about why he used the taser, he said he had been part of

6   a cell entry in the past in which he had been bitten by

7   Mr. Kingsley, didn't he?

8   A.   Yes.  That's what I believed at the time, yes.

9   Q.   Okay.  And in fact you wrote a report, an incident

10  report at the time, in which you wrote that Sergeant

11  Hendrickson told you he had been involved in an incident

12  where Mr. Kingsley had tried to bite him; isn't that

13  correct?

14  A.   Yes.

15       MR. PARDON:  Your Honor -- well, excuse me.

16  BY MR. PARDON:

17  Q.   Could you turn in the binders behind you to your

18  right and locate Plaintiff's Exhibit 5?

19       THE COURT:  It would be in Volume 1.

20       MR. PARDON:  Thank you.

21  A.   Under Tab 5?

22  Q.   Yes.  Could you identify Plaintiff's Exhibit 5?

23  A.   That's a report that I wrote.

24       MR. PARDON:  All right.  Your Honor, I would

25  move to admit --

1  BY MR. PARDON:

2  Q.    And this is a report about the incident in question

3  here?

4  A.    Correct.

5          MR. PARDON:  Your Honor, I would move to admit

6  Plaintiff's Exhibit 5.

7          MR. JONES:  No objection.

8          THE COURT:  Received.

9          MR. PARDON:  Excuse me, Your Honor.  Could you

10 turn on the document camera?

11 BY MR. PARDON:

12 Q.    I'm going to turn your attention to the second page

13 of your incident report and I'm going to put it up on the

14 screen here and I'm going to highlight a portion of it.

15 And the highlighted portion is not part of the exhibit

16 itself, but I'm just highlighting it to draw your

17 attention to it.

18          THE COURT:  The highlighting part is not part of

19 the exhibit.  The part you highlighted is part of the

20 report?

21          MR. PARDON:  That's correct.  Thank you.  I just

22 want people to know that the yellow stuff is not part of

23 the original exhibit.

24          THE COURT:  Right.

25

ROBERT CONROY - ADVERSE

1  BY MR. PARDON:

2  Q.   Okay.  All right.  I would like to draw your

3  attention to the second-to-the-last paragraph in the

4  report.  And do you see that?

5  A.   I do.

6  Q.   All right.  And do you see that you wrote, "After

7  leaving the receiving area, Sergeant Hendrickson and I

8  discussed the use of the taser.  Due to the confined

9  space, I could not exactly see how it was used and the

10  reasoning"; do you see that?

11  A.   Yes.

12  Q.   All right.  And do you see in the next several

13  sentences there's a line in which you wrote that

14  "Hendrickson stated he had been involved with a cell

15  entry in the past where Kingsley bit him"; do you see

16  that?

17  A.   Yes.

18  Q.   All right.  And, Sergeant, you also wrote that

19  "Kingsley was raising his chest and at one point appeared

20  to have moved toward Hendrickson in a biting manner.

21  Hendrickson stated he had been involved with a cell entry

22  where Kingsley had bit him"; do you see that?

23  A.   Yes.

24  Q.   Those are words you received from Sergeant

25  Hendrickson, correct?

ROBERT CONROY - ADVERSE

1   A.    That's what I believed at the time, yes.

2   Q.    Okay.  You also had at least one conversation with

3   Mr. Kingsley about that particular statement in your

4   report, didn't you?

5   A.    Yes.

6   Q.    And Mr. Kingsley told you he wanted that changed in

7   the report because it wasn't true that he had ever bitten

8   Sergeant Hendrickson; isn't that correct?

9   A.    He asked me if I would change my report, yes.

10  Q.    In fact he made a specific written request to you

11  about a month later to change your report, to amend your

12  report; isn't that correct?

13  A.    I believe there was one in June and one in July.

14  Q.    Okay.  Could you turn to Plaintiff's Exhibit 60 in

15  the binder?  It might be in the second binder, I'm not

16  sure.  All right.  And Exhibit 60 is an Inmate General

17  Request Form that you responded to; isn't that correct?

18  A.    Yes.

19  Q.    And it was an Inmate General Request Form initiated

20  by Mr. Kingsley, correct?

21  A.    Yes.

22        MR. PARDON:  All right.  Your Honor, if there's

23  is no objection, I would like to move to admit

24  Plaintiff's Exhibit 60.

25        THE COURT:  Any objection?

ROBERT CONROY - ADVERSE

```
 1              MR. JONES:  No objection.

 2              THE COURT:  Received.

 3  BY MR. PARDON:

 4  Q.   And in this report Mr. Kingsley requested that you

 5  amend your report about him previously supposedly biting

 6  Sergeant Hendrickson, correct?

 7  A.   Yes.

 8  Q.   All right.  And in the report -- you responded to

 9  the report or to the request and your request was that

10  you were denying the request because, as you wrote, "That

11  report is an accurate account of the incident.  Sergeant

12  Hendrickson did make that statement.  To state otherwise

13  would be deceitful."  And you signed it on June 28th;

14  isn't that correct?

15  A.   Yes.

16  Q.   Okay.  You can set this aside.  Lieutenant Conroy,

17  you've never applied a taser to anyone who has been in

18  handcuffs, have you?

19  A.   No.

20              MR. PARDON:  All right.  No further questions,

21  Your Honor.

22              THE COURT:  Mr. Jones.

23                     DIRECT EXAMINATION

24  BY MR. JONES:

25  Q.   Lieutenant, have you ever had someone in handcuffs
```

ROBERT CONROY - ADVERSE/DIRECT

1  resist your efforts to remove the handcuffs?

2  A.   No.

3  Q.   Mr. Pardon was asking you about the portion of your

4  report where you indicated something that Sergeant

5  Hendrickson had said to you in the moments after the

6  incident, yes?

7  A.   Yes.

8  Q.   And where was the conversation between the two of

9  you?

10  A.   We left the receiving area hallway and we went up

11  towards the main office, so it was in that hallway just

12  outside the main office of the jail.

13  Q.   And this was in the moments after everyone had

14  exited the receiving cell?

15  A.   Just after exiting, yes.

16  Q.   And can you just relate to us what the conversation

17  amounted to?

18  A.   Basically, I asked Sergeant Hendrickson, hey, why

19  did you use the taser; why did -- you know, why was he

20  tased, that kind of thing.  I couldn't see what was in

21  the cell.  I wanted his reasoning.  And at that time I

22  understood him to say, you know, he was resisting and he

23  made, you know, a movement towards him.  He had been

24  involved in a cell entry in the past where he had been

25  bitten.

ROBERT CONROY - DIRECT

1  Q.   And are you, as you sit here today, are you certain

2  exactly what Mr. -- Sergeant Hendrickson said?

3  A.   No, I'm not certain exactly.

4  Q.   As you sit here today, are you certain whether he

5  said Mr. Kingsley had tried to bite him or whether it was

6  somebody else?

7  A.   I interpreted it as that, but I'm not certain, no.

8  Q.   And you interpret.  What you're telling us is you

9  interpreted what he said as that Mr. Kingsley had bitten

10 him in the past or tried to bite him in the past?

11 A.   Correct.

12 Q.   And so that's what ended up in your report, correct?

13 A.   Correct.

14 Q.   At some point after May 21st, 2010, did you and

15 Sergeant Hendrickson speak again about the incident?

16 A.   We did.  A few days later I received a phone call

17 from Sergeant Hendrickson.

18 Q.   And can you relate to us what the substance of that

19 conversation was?

20 A.   At that time I was in the upper office of the jail

21 in my office, received a phone call.  And at that time he

22 clarified that it was not Mr. Kingsley that had bitten

23 him in that cell entry, the original one where he was

24 involved in a CERT team entry in the past.

25 Q.   So he was saying it was someone else, not

ROBERT CONROY - DIRECT

 1  Mr. Kingsley?

 2  A.    Correct.

 3  Q.    And you don't know one way or the other, do you,

 4  whether it was Mr. Kingsley or someone else?

 5  A.    I don't know.  I wasn't there.

 6  Q.    And do you have any reason to doubt Sergeant

 7  Hendrickson at that time that it was someone else, not

 8  Mr. Kingsley?

 9  A.    I have no reason to doubt Mr. Hendrickson, now

10  Lieutenant Hendrickson.

11  Q.    Why did you choose to not amend your report in

12  response to Mr. Kingsley's request that you do so?

13  A.    Because it was what I believed at the time I wrote

14  my report.  I didn't think it had major bearing on why

15  the taser was deployed.  It was a conversation after the

16  fact.  It was just a simple miscommunication.

17  Q.    When you say you don't think it was a major factor

18  in why the taser was deployed, why do you say that?

19  A.    Well, because of Mr. Kingsley's actions during the

20  time within the receiving cell was the reason that the

21  taser was deployed, not a conversation that took place

22  between Sergeant Hendrickson and myself afterwards.

23  Q.    I would like to go all the way back to the

24  beginning, if I can.  How long did you serve as the jail

25  administrator?

ROBERT CONROY - DIRECT

1  A.   March 7th of 2005 until I became the patrol

2  lieutenant in 2011.

3  Q.   And was March -- when did you start with the

4  department?

5  A.   On that day as the jail administrator.

6  Q.   And how long had you been in law enforcement before

7  you came to the Monroe County Sheriff's Department?

8  A.   From 1995 to 2007.

9  Q.   And in what capacities had you been employed in law

10  enforcement?

11  A.   I was a correctional officer, I was a training

12  officer, I was a shift supervisor, I was a shift

13  commander and I was a central records office manager.

14  Q.   What rank did you hold in May of 2010 with the

15  Sheriff's Department?

16  A.   I was lieutenant.

17  Q.   How old are you?

18  A.   40.

19  Q.   Where did you grow up?

20  A.   Janesville.

21  Q.   And what's your educational background?

22  A.   I have an associate degree from Black Hawk Technical

23  College and a bachelor's degree from Upper Iowa

24  University.

25  Q.   Have you ever served in the military?

ROBERT CONROY - DIRECT

```
 1              MR. PARDON:  Objection.

 2              THE COURT:  Sustained.

 3   BY MR. JONES:

 4   Q.   Are you certified by the State of Wisconsin as a

 5   corrections officer?

 6   A.   I am.

 7   Q.   Can you explain what that means?

 8              MR. PARDON:  Objection.

 9              THE COURT:  Overruled.

10   A.   It means that I met the entry requirements to attend

11   the jail academy and attended the 160-hour certification

12   course.

13   Q.   And who puts on the jail academy?

14   A.   It's put on in several different schools within the

15   state.  It's supervised and the training standards are

16   put on -- are by the Department of Justice within the

17   state.

18   Q.   When were you first certified as a corrections

19   officer?

20   A.   I believe it was 1995.

21   Q.   And have you maintained that certification ever

22   since then?

23   A.   Yes.

24   Q.   Are you also certified by the State of Wisconsin as

25   a law enforcement officer?
```

1  A.   I am.

2  Q.   What's the difference between that certification and

3  the corrections officer certification?

4       MR. PARDON:  Objection.  Your Honor, may I

5  approach the bench?

6       THE COURT:  I don't think -- no.

7       MR. PARDON:  Okay.

8       THE COURT:  Overruled.  You may answer.

9  A.   Jail certification is 160 hours long.  It focuses

10  more on administrative code and law as it relates to

11  jails and incarceration.  The police academy is 520 hours

12  long and it focuses more on criminal procedure, arrest

13  procedures, emergency vehicle operations, criminal law.

14  Q.   So if we turn then to May 21st, 2010, were you on

15  duty that day?

16  A.   I was.

17  Q.   And what was your shift?

18  A.   Normally it was from eight to four.

19  Q.   And you testified that at some point you received a

20  call from Sergeant Hendrickson?

21  A.   I did, 6:13 that morning.

22  Q.   And you were at home I believe you said?

23  A.   I was.

24  Q.   And so can you tell us specifically what it was that

25  Sergeant Hendrickson explained to you over the phone?

ROBERT CONROY - DIRECT

 1  A.    He stated that Mr. Kingsley was in his cell

 2  currently locked down on discipline for failure to remove

 3  paper from his light within his cell.  He further

 4  explained that Deputy Manka had talked to him the night

 5  before and that's the reason he was on discipline.  And

 6  there was a comment made by Mr. Kingsley that he was not

 7  going to cooperate and that we might as well call the

 8  CERT team.

 9  Q.    And that is what Sergeant Hendrickson relayed to

10  you?

11  A.    During that phone call, yes.

12  Q.    Go ahead.  I just show you -- I would like to show

13  you what's been marked as Exhibit 510-A.  It will show up

14  on your screen there.  Do you recognize what Exhibit

15  510-A is?

16  A.    I do.

17  Q.    What is it?

18  A.    It's a map of a portion of the Monroe County Jail.

19  Q.    And is an accurate map of a portion of the jail?

20  A.    Yes.

21  Q.    The blackened areas around what's shown, can you

22  explain what that is?

23  A.    There's a portion of that that is a changeover area,

24  the office area, cell blocks across the hallway and then

25  the back of the jail.

 1   Q.    So there are portions of the jail that do not appear

 2   on this diagram?

 3   A.    Correct.

 4           MR. JONES:  I move the admission of 510-A, Your

 5   Honor.

 6           THE COURT:  Any objection to 510-A?

 7           MR. PARDON:  No objection.

 8           THE COURT:  Received.

 9           MR. JONES:  May we publish that to the jury or

10   we request permission rather?

11           THE COURT:  You may.

12   BY MR. JONES:

13   Q.    I have highlighted a portion of 510-A.  Can you

14   describe the part that's highlighted; what is that?

15   A.    The portion on the right side of the screen where

16   the cross is, that's the hallway.  That's now moved.  The

17   portion towards the top of the screen is what we consider

18   north block.  The portion -- the lower part of the

19   yellowed-in area is the south block.

20   Q.    And can you tell us, was that the cell block that

21   Mr. Kingsley was housed in at the start of these events?

22   A.    The lower one, yes.

23   Q.    South block?

24   A.    South block, correct.

25   Q.    Can you identify how many cells are there in south

1   block?

2   A.   Six.

3   Q.   And can you identify which cell Mr. Kingsley was

4   housed in?

5   A.   The second to the last.  That's the one.

6   Q.   That's the one he was housed in?

7   A.   Yes.

8   Q.   How many -- well, were there other inmates that were

9   housed on the cell block that morning?

10  A.   There was.

11  Q.   And how many inmates total did the jail hold back in

12  May of 2010?

13  A.   Total capacity of the jail is 69.

14  Q.   How many jail staff were on duty for any given shift

15  for the jail back in May 2010?

16  A.   Generally we had three on second shift, three on

17  third shift.  And during court, or Monday through Friday,

18  generally we would have four on day shift.

19  Q.   So third shift is the overnight shift?

20  A.   Correct.

21  Q.   And you would have three staff total to monitor the

22  total inmate population?

23  A.   Yes.

24  Q.   And on day shift, that's first shift?

25  A.   Yes.

1  Q.   And you'd have four staff total to monitor the

2  entire jail population?

3  A.   Monitor the entire jail population as well as take

4  people to court.

5  Q.   I would like to show you now -- actually, before we

6  move on, I've highlighted a different portion on the

7  diagram.  Could you tell us what that is?

8  A.   That's the main hallway that runs north and south in

9  the Monroe County Jail.

10  Q.   Okay.  And I've highlighted one last portion of the

11  jail.  What is that area?

12  A.   It's the receiving area.  There's three cells and

13  two closets there.

14  Q.   Okay.  And so that's where the receiving cells are

15  in the jail?

16  A.   Correct.

17  Q.   And can you tell us which one Mr. Kingsley was

18  brought into that morning?

19  A.   The upper left.

20  Q.   I will highlight that with an arrow.

21  A.   That's the one.

22  Q.   Okay.  So he started off where the first arrow was

23  located and he ended up where the second arrow was

24  located?

25  A.   Correct.

ROBERT CONROY - DIRECT

1  Q.    And I believe you testified that the total distance

2  between the two was something in the order of a hundred

3  feet?

4  A.    I think it's just shy of that, yes.

5  Q.    I'd like to show you different Exhibit, 509-A.  Do

6  you recognize what 509-A shows?

7  A.    That's a cell in the older portion of our jail.

8  Q.    And is that a picture of one of the cells in the

9  south block?

10 A.    It could be.  All of our cells in the older part of

11 the jail are similar, so that could be one, yes.

12 Q.    Okay.  Does that accurately depict what a cell in

13 the south block area of the jail would look like?

14 A.    Yes.

15         MR. JONES:  I move the admission of 509-A, Your

16 Honor.

17         MR. PARDON:  No objection.

18         THE COURT:  Received.

19 BY MR. JONES:

20 Q.    I'd like to show you the second page of 509-A.  I'd

21 like to publish to the jury as well.

22         THE COURT:  You may.

23         MR. PARDON:  Wait.  Go ahead.

24 BY MR. JONES:

25 Q.    Mr. Conroy, is that a picture of the same type of

ROBERT CONROY - DIRECT

 1  cell that was shown in the first picture on 509-A?

 2  A.   It does.  It is.

 3  Q.   Does it accurately depict what a cell in the south

 4  block looks like?

 5  A.   Yes.

 6  Q.   And it shows a bunk, toilet and a sink, correct?

 7  A.   Yes.

 8  Q.   The light at the top of the picture, is that the

 9  overhead light in one of those cells?

10  A.   Yes.

11  Q.   So is that the light in Mr. Kingsley's cell that was

12  covered with paper that morning?

13  A.   That would be a light similar to one, yes.

14  Q.   I asked a bad question.  It's not necessarily the

15  light, but that's what the overhead light looks like?

16  A.   Correct.

17  Q.   And are inmates permitted to cover the lights in

18  those cells with anything?

19  A.   No.

20  Q.   Why not?

21  A.   Well, it's an older jail.  There's always that

22  possibility of it being a fire hazard.  But then as we go

23  through -- these lights are on during the day -- as we go

24  through, we have to look through one set of bars and a

25  second set of bars.  And if those lights are covered, we

ROBERT CONROY - DIRECT

1  can't adequately see into that space, therefore it

2  creates a safety and security hazard.

3  Q.    How much light comes into that cell block?

4  A.    The way the cells are set up, they're linear this

5  way.  And then there's a few windows at the end, but

6  there's no direct light going into those cells, natural

7  light anyways.

8  Q.    How common or uncommon is it for the inmates to

9  cover the light in their cell?

10  A.    It's hard to say as a jail administrator.  I -- you

11  know, the staff generally deals with that.  People do it

12  and they're told to take it down.

13  Q.    Is that the response of jail staff to paper on the

14  light?

15  A.    Yes.  They're told to take it down.

16  Q.    Does anyone consider it an emergency that there's

17  paper up on the light?

18  A.    Not necessarily, no.

19  Q.    Is it still a situation that needs to be taken care

20  of?

21  A.    Yes.

22  Q.    So what did you do once you heard from Sergeant

23  Hendrickson that there was the situation with

24  Mr. Kingsley refusing to take the paper off of the light

25  in his cell?

1  A.   Based on the conversation, I decided to get dressed

2  and I came down to the cell.

3  Q.   About what time did you arrive?

4  A.   6:30 a.m.

5  Q.   And what did you do once you arrived?

6  A.   When I arrived I entered the jail office through the

7  back door and I met with Sergeant Hendrickson.

8  Q.   And what happened from that point?

9  A.   We spoke and Sergeant Hendrickson told me that

10  nothing had changed regarding Mr. Kingsley's actions.

11  Q.   Now, there was -- you made reference in what you

12  told us about the conversation with Sergeant Hendrickson

13  that he had mentioned a comment that he understood that

14  Mr. Kingsley made about the CERT team, yes?

15  A.   Yes.

16  Q.   From your conversation with Sergeant Hendrickson,

17  did you understand that that was some sort of joke?

18  A.   No.

19       MR. PARDON:  Objection.  This is --

20       THE COURT:  Overruled.

21  A.   No, I didn't.  We have -- we have to take all those

22  comments seriously, we just don't have the luxury not to.

23  Q.   So what happened going -- moving forward, what

24  happened next?

25  A.   I decided at that point, sometimes when I go in and

ROBERT CONROY - DIRECT

 1  talk to them as jail administrator, sometimes people

 2  cooperate, so I decided to go in and talk with

 3  Mr. Kingsley.

 4  Q.   And that's what you did?

 5  A.   I did.  At 6:34 I went in and spoke to him.

 6  Q.   I would like to go ahead and play a portion of the

 7  video for you.  Just bear with us for a moment.  This is

 8  one of the videos on Plaintiff's Exhibit 13.  So before I

 9  play the video for you, what are we looking at here?

10  A.   That's inside.  On the left-hand side are the cells

11  within south block.  On the right-hand side are bars.

12  And this would be the walkway where inmates walk while

13  housed in that block.

14  Q.   Okay.  So this is a view from the end of the walkway

15  down the length of the cell block?

16  A.   Yes.

17  Q.   If we go back to the diagram we looked at a minute

18  ago in our head, is this at the left end of the cell

19  block or right end of the cell block?

20  A.   It's at the left end.  Mr. Kingsley would be in the

21  second cell in here.

22  Q.   Okay.  I'm going to start playing the video again.

23        (Videotape played.)

24  BY MR. JONES:

25  Q.   So we see the cell doors closing there?

ROBERT CONROY - DIRECT

1  A.    Yes.

2  Q.    Could you explain why that was occurring?

3  A.    Because I was entering the cell block to go in and

4  speak to Mr. Kingsley.  He was already locked down at the

5  time, but I wanted everybody else in their cell so it

6  didn't create a hazard or distraction.

7  Q.    When you say Mr. Kingsley was already locked in his

8  cell, was his cell door already closed then at that

9  point?

10  A.    Yes.

11  Q.    There is no sound on this video, correct?

12  A.    Correct.

13  Q.    Can you explain why that is true?

14  A.    There's certain cameras within the jail that we do

15  not have sound associated with an actual microphone

16  connected to it and this is one of those cameras.

17  Q.    So there is no microphone here?

18  A.    There is no microphone there.

19  Q.    The video that's recorded on this camera and the

20  other cameras in the cell -- or in the jail, is that a

21  continuous video feed?

22  A.    It's a continuous video feed, but it's not a

23  continuous recording.

24  Q.    Can you explain what you mean?

25  A.    Well, our camera system in the jail is set up where

2-A-135

1  it's based on movement.  So once it hits a certain

2  threshold of movement within the viewing area, then it

3  will automatically trigger the camera system to record to

4  the hard drive on the computer.

5  Q.   As you're watching the video or a video, how is that

6  reflected in the videos, that is, when it stops

7  recording?

8  A.   When it stops recording and you download the video,

9  what it does is it fills in that time frame with a

10  GeoVision -- I believe a GeoVision, I guess, symbol --

11  and so the time frame is there, but there may not be any

12  video on that -- just to show that there wasn't any video

13  at that time.

14  Q.   So the screen goes blank and something that says

15  "GeoVision" comes up?

16  A.   I believe it's GeoVision.

17  Q.   The videos that were part of this exhibit, how is it

18  that they were preserved so we could look at them today?

19  A.   I preserved them.

20  Q.   How did you do that?

21  A.   I physically went in and downloaded them to either

22  CD or DVD.

23  Q.   I'm going to go ahead and start playing again.

24        THE COURT:  Perhaps before you do that, this

25  would be a good time for lunch and we could -- then we

ROBERT CONROY - DIRECT

1  could pick up this point in an hour, at 1:15.  Counsel,

2  do you have anything you wish to take up?

3          MR. PARDON:  I do not.

4          THE COURT:  Maybe we should take up one thing.

5  Jurors, you are excused.  Please leave your notepads on

6  your chairs and remember not to talk about the case.  If

7  you have questions about where to go for lunch, I think

8  the CSO will be able to give you some suggestions.

9      (Jury out at 12:17 p.m.)

10         THE COURT:  Mr. Jones, did you have a chance --

11  I don't think so -- to look at the handcuffs?

12         MR. JONES:  I did not, but I will over the lunch

13  hour.

14         THE COURT:  Why don't we meet at 1:10 and we can

15  take up any questions or objections we have at that time.

16  Anything else?

17         MR. PARDON:  No, Your Honor.

18         THE COURT:  Okay.

19      (Recess at 12:18 p.m. until 1:10 p.m.)

20                        * * *

21

22

23

24

25

1            I, CHERYL A. SEEMAN, Certified Realtime and

2    Merit Reporter, in and for the State of Wisconsin,

3    certify that the foregoing is a true and accurate record

4    of the proceedings held on the 15th day of October, 2012,

5    before the Honorable Barbara B. Crabb, of the Western

6    District of Wisconsin, in my presence and reduced to

7    writing in accordance with my stenographic notes made at

8    said time and place.

9    Dated this 2nd day of November, 2012.

10

11

12

13

14

15                         _____/s/_____

16                         Cheryl A. Seeman, RMR, CRR
                           Federal Court Reporter
17

18

19

20

21

22

23   The foregoing certification of this transcript does not
     apply to any reproduction of the same by any means unless
24   under the direct control and/or direction of the
     certifying reporter.
25