UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

MICHAEL KINGSLEY,                          **VOLUME 3-A**

                    Plaintiff,

        vs.                          Case No. 10-CV-832-BBC

STAN HENDRICKSON and                 Madison, Wisconsin
FRITZ DEGNER,                        October 16, 2012
                                     11:00 a.m.
                    Defendants.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

    STENOGRAPHIC TRANSCRIPT OF THIRD DAY OF JURY TRIAL
        HELD BEFORE THE HONORABLE BARBARA B. CRABB

APPEARANCES:

For the Plaintiff:   Merchant & Gould, P.C.
                     BY:  EDWARD J. PARDON
                          WENDY M. WARD
                          JOEL F. GRAHAM
                     10 East Doty Street, Suite 600
                     Madison, Wisconsin  53703-3376


                     Julie King, Paralegal

For the Defendants:  Whyte Hirschboeck Dudek, S.C.
                     BY:  ANDREW ALSTON JONES
                          TIMOTHY H. POSNANSKI
                     555 East Wells, Suite 1900
                     Milwaukee, Wisconsin  53202




                CHERYL A. SEEMAN, RMR, CRR
                  Official Court Reporter
                United States District Court
               120 North Henry Street, Room 520
                  Madison, Wisconsin  53703
                      1-608-255-3821

1                              **I-N-D-E-X**

2   <u>PLAINTIFF'S WITNESS</u>          <u>EXAMINATION</u>          <u>PAGES</u>

3   BRIAN LANDERS            Cross by Mr. Jones        7-41
                             Redirect by Mr. Pardon   41-46
4                            Recross by Mr. Jones      46-47

5   PLAINTIFF RESTS                                    49

6   <u>DEFENDANTS' WITNESS</u>

7   KARL BLANTON            Direct by Mr. Posnanski   49-76

8                          **E-X-H-I-B-I-T-S**

9   <u>EXHIBIT</u>                           <u>IDENTIFIED</u>   <u>RECEIVED</u>

10  Ex. 67  - POSC Training Guide          24           -
    Ex. 517 -         "                    22           -
11  Ex. 518 - ECD Training Guide           11           12
    Ex. 554 - WI Statute 939.22            26           -

12

13                              ***

14        (Called to order.)

15          THE CLERK:  Case No. 10-CV-832-BBC, *Michael*

16  *Kingsley v. Stan Hendrickson and Fritz Degner*, is called

17  for a second day of jury trial.  May we have the

18  appearances, please?

19          MR. PARDON:  Yes.  Good morning, Your Honor.

20          THE COURT:  Good morning.

21          MR. PARDON:  Plaintiff Michael Kingsley and I'm

22  Ed Pardon of Merchant & Gould.  With me is --

23          THE COURT:  Why don't we skip the appearances.

24  You can do them in front of the jury --

25          MR. PARDON:  Okay.  All right.

1          THE COURT:  -- so you don't have to do this

2    twice.  I think you had something you wanted to bring up.

3          MR. PARDON:  I had two issues with respect to

4    exhibits I just wanted to call to your attention.  And

5    the first one concerns Defendants' Exhibit 512, which was

6    admitted yesterday, and it's a shift log.

7          THE COURT:  Mm-mm.  Right.

8          MR. PARDON:  It's my understanding that this

9    exhibit was admitted basically for the purpose of showing

10   Mr. Kingsley was continued to be monitored immediately

11   after the incident.  On the third page of the exhibit

12   there's material that I believe is not consistent with or

13   violates the motion in limine concerning statements made

14   after the event.  And I guess this occurred at 9:30,

15   later in the day, and I would ask that these be redacted.

16   I don't know that's particularly relevant to what was --

17   what this exhibit was admitted for.  And it's on the

18   third page of the exhibit and I can show you specifically

19   what we're referring to.

20          THE COURT:  Right.  Mr. Jones.

21          MR. JONES:  This hadn't been brought to my

22   attention before just now, Your Honor.

23          THE COURT:  Well, I think we can redact it later

24   on.

25          MR. PARDON:  I don't think we have to do it now.

1           MR. JONES:  It was not published to the jury, if

2   I remember.

3           THE COURT:  Right.

4           MR. JONES:  I guess I would want just a chance

5   to look at those entries and make sure I agree to

6   redacting them, but maybe we can do that on the break.

7           THE COURT:  Sure.

8           MR. PARDON:  And the second thing concerning

9   another exhibit that was admitted yesterday, as I recall,

10  we had a conversation where I had said --

11          THE COURT:  Are these going to be used this

12  morning, do you think, the exhibits that you want to

13  discuss?

14          MR. PARDON:  Maybe.  That's why --

15          THE COURT:  Oh.  All right.

16          MR. PARDON:  -- that's why I wanted to raise it.

17  It concerns one of the exhibits yesterday.  It was a

18  video file that I said I had never seen before.

19          THE COURT:  Right.

20          MR. PARDON:  And we verified last night I had in

21  fact never received it before, we had never received it.

22  In talking with Mr. Jones this morning, I think it was a

23  file snafu.  I think it was just something that we

24  thought we were getting one thing and they thought they

25  were giving us one thing and so we had never seen that

1   before.

2        And to the extent that that video, you know, if what

3   was played yesterday is all that's played of it, that's

4   fine, I mean, but I haven't verified that there isn't any

5   more to the video.  And to the extent that that gets

6   shown today, I guess I would like an opportunity to look

7   at it before it's shown.

8            THE COURT:  Mr. Jones.

9            MR. JONES:  Just to be clear, for the record,

10  the file, the computer file, was produced.  It was

11  requested and it was produced.  And my belief, and now of

12  course I haven't had access to Mr. Pardon's computer, but

13  my belief is that it's just somehow a problem with

14  opening the file so that it shows on his computer only as

15  audio when it's really audio and video.

16       So it was produced.  And we played the entirety of

17  the clip, so I don't think there's anything more.  But

18  I'm happy to have Mr. Pardon look at the clip on our

19  computer to verify we played the entire clip.  And if he

20  feels he needs to raise an issue at that point, then --

21           MR. PARDON:  I just -- yeah.  I can look at it

22  now or if it's going to be shown.  I just don't want to

23  stop in front of the jury and --

24           MR. JONES:  I'm not intending to show the clip

25  to Mr. Landers.

 1            THE COURT:  Okay.

 2            MR. JONES:  I'm actually not intending to show

 3   it to our witnesses today unless something comes up in

 4   the testimony that I'm surprised by.

 5            THE COURT:  Okay.

 6            MR. JONES:  But I would assume we could take

 7   care of this at lunch.

 8            THE COURT:  Great.

 9            MR. PARDON:  I just didn't want it to happen in

10   the next hour or two.

11            THE COURT:  Is that the only exhibit that we're

12   concerned about?

13            MR. PARDON:  Yeah.

14            THE COURT:  Good.  Then we will bring in the

15   jury.

16            THE CLERK:  And, Mr. Landers, if you would like

17   to come back to the stand.

18        (Jury in at 11:09 a.m.)

19            THE CLERK:  Case No. 10-CV-832-BBC, *Michael

20   Kingsley v. Stan Hendrickson and Fritz Degner*, is called

21   for a second day of jury trial.  May we have the

22   appearances, please?

23            MR. PARDON:  Yes.  Thank you.  Good morning,

24   Your Honor, ladies and gentlemen.  I'm Ed Pardon of

25   Merchant & Gould.  With me is plaintiff Michael Kingsley

 1   and my colleagues Wendy Ward and Joel Graham and Julie

 2   King.

 3         MR. JONES:  Good morning.  Andrew Jones and Tim

 4   Posnanski on behalf of defendants Stan Hendrickson and

 5   Fritz Degner, who are present.

 6         THE COURT:  Thank you.  And we're going to

 7   resume with testimony of Mr. Landers who is still under

 8   oath.  And we will go until quarter of one, recess so I

 9   can take care of some other matters, resume at quarter of

10   two.  Mr. Jones.

11         MR. JONES:  Thank you, Judge.

12                   CROSS-EXAMINATION

13               (Continued from 10/15/12.)

14   BY MR. JONES:

15   Q.   Good morning, Mr. Landers.

16   A.   Good morning.

17   Q.   We spoke yesterday at some length about both the

18   DAAT and the POSC training guides, correct?

19   A.   Correct.

20   Q.   Officers in Wisconsin can also receive specialized

21   training on the use of electronic control devices like

22   tasers, correct?

23   A.   Correct.

24   Q.   And in your review of various materials in

25   connection with this case, you are aware that both

                    BRIAN LANDERS - CROSS

1  Officers Hendrickson and Degner received that kind of

2  training, correct?

3  A.    Correct.

4  Q.    And a taser is, to be clear, a taser is one form of

5  an ECD?

6  A.    Yes.

7  Q.    *Taser* is the name of the company that makes the

8  device, correct?

9  A.    Correct.

10 Q.    And officers in Wisconsin, when they get that

11 specialized training, are trained that they are permitted

12 or that it's acceptable to use a taser in response to

13 active resistance, correct?

14 A.    Correct.

15 Q.    And they are also trained though, aren't they, that

16 they are permitted or it's acceptable under the training

17 to use a taser in response to the threat of active

18 resistance, correct?

19 A.    Correct.

20 Q.    So it can be either active resistance or the threat

21 of active resistance, correct?

22 A.    Correct.

23 Q.    Officers who get that training also learn about the

24 concept of verbal aggression, correct?

25 A.    Through the specialized training of taser or just --

BRIAN LANDERS - CROSS

1   can you be more specific, please?

2   Q.   Sure.   Officers who receive training under DAAT,

3   POSC and the ECD training learn about verbal aggression,

4   correct?

5   A.   Correct.

6   Q.   And just focusing on the ECD training, officers are

7   taught that verbal aggression occurs when a subject is

8   being argumentative or verbally confrontational, correct?

9   A.   Yes.

10  Q.   And they are trained that verbal communication is

11  the preferred way to respond to verbal aggression?

12  A.   Correct.

13  Q.   And that can range -- we talked about this

14  yesterday, there was some examples -- that can range from

15  very soft tones to all the way to heavy control talk,

16  correct?

17  A.   Correct.

18  Q.   Officers who get training on using an ECD in

19  Wisconsin are also trained though that under certain

20  circumstances, if verbal communication fails, a taser

21  could be an acceptable option to respond to verbal

22  aggression, correct?

23  A.   If it fits the threshold of active resistance, yes.

24  Q.   And officers in Wisconsin that are trained on the

25  use of an ECD are trained that they should reassess the

BRIAN LANDERS - CROSS

1  need to use the taser after each use, correct?

2  A.    Correct.

3  Q.    So if the taser is used, the officer is supposed to

4  think about whether he should use the taser again,

5  correct --

6  A.    Correct.

7  Q.    -- rather than just applying it multiple times to a

8  subject?

9  A.    You are correct.

10  Q.    And the officers, they are trained basically at that

11  point to reassess whether they should continue to use

12  force, whether they should escalate the level of force or

13  whether they should simply disengage from further contact

14  with the subject, correct?

15  A.    Correct.

16  Q.    And that's, from your review of the materials in

17  this case, that's exactly what happened in this case

18  after the taser was used, yes?

19  A.    That the officers evaluated?

20  Q.    The officers, after the use of the taser, did not

21  use further force and instead disengaged from further

22  force or further contact with Mr. Kingsley, correct?

23  A.    Eventually, yeah, they walked away.

24  Q.    They didn't use the taser twice, yes?

25  A.    No, they didn't.

1  Q.   If I could show you what we have marked as Exhibit

2  518, that's on the screen in front of you, yes?

3  A.   Yes, it is.

4  Q.   This is the training guide that's used to train

5  officers in Wisconsin on the use of an ECD, correct?

6  A.   Correct.

7  Q.   And this is the training guide that was in place and

8  in force as of June 2008, correct?

9  A.   Correct.

10  Q.   This was the training guide that would have been in

11  place as of the time of the incident with Mr. Kingsley,

12  correct?

13  A.   Possibly.  There would be some revisions since June

14  2008 depending upon publication, but the bulk of it would

15  be, yes.

16  Q.   And you don't -- I guess you're not sure one way or

17  the other whether this was in place in May 2010?

18  A.   Well, this was the standard.  If there was any

19  revisions, revisions might have been like name changes to

20  the members of the committee, things like that.

21  Q.   So not substantive changes?

22  A.   Correct.

23          MR. JONES:  I move the admission of 518, Your

24  Honor.

25          MR. PARDON:  No objection.

BRIAN LANDERS - CROSS

```
 1              THE COURT:  Received.

 2   BY MR. JONES:

 3   Q.   An individual who's in handcuffs can still be

 4   dangerous, yes?

 5   A.   Yes.

 6   Q.   Even when a person is in handcuffs, he can still

 7   present a risk to officers in contact with him, yes?

 8   A.   Yes.

 9   Q.   Even when a person is in handcuffs, he can actively

10   resist officers, yes?

11   A.   Yes.

12   Q.   It would be wrong to say that an officer cannot use

13   force against an individual just because they're in

14   handcuffs, correct?

15   A.   Correct.

16   Q.   It would be wrong to say that an officer cannot use

17   a taser against a subject just because he is in

18   handcuffs, correct?

19   A.   Correct.

20   Q.   If we talk about the mechanics of the taser itself,

21   just to be clear, when a taser is used as a contact stun

22   or a drive stun, that's when the taser is applied

23   directly to the subject, yes?

24   A.   Correct.  Yes.

25   Q.   And that's what was used in this case?
```

BRIAN LANDERS - CROSS

1   A.   Yes.

2   Q.   And you gave some testimony yesterday about a way to

3   use the taser where an air cartridge that's attached to

4   the taser fires off metal probes at the subject, correct?

5   A.   Correct.

6   Q.   And then those probes either enter the subject's

7   body or they attach to the subject's clothing, correct?

8   A.   Correct.

9   Q.   That is not the way the taser was used in this

10  instance, correct?

11  A.   Correct, that's not.

12  Q.   That is not a contact or drive stun?

13  A.   Correct.

14  Q.   When you use a contact or drive stun, there are no

15  metal probes that enter into the subject's body, correct?

16  A.   Correct.

17  Q.   And here the taser didn't directly touch

18  Mr. Kingsley's skin, correct?

19  A.   I believe Mr. Kingsley had on a jumpsuit, a jail

20  jumpsuit on.

21  Q.   It was applied over his jail uniform, correct?

22  A.   Yes.

23  Q.   Are you familiar with the phrase, if I'm getting it

24  right even, *neuromuscular incapacitation*?

25  A.   Yes, I am.

1  Q.   Is that a phrase that's relevant to tasers when they

2  are used?

3  A.   Yes.

4  Q.   What is neuromuscular incapacitation?

5  A.   Neuromuscular incapacitation, or electromuscular

6  disruption -- it's known as a couple different things --

7  is when the electricity of the probes of the taser enter

8  the body and causes that muscle lockup that I spoke of

9  yesterday.

10  Q.   When a taser is used in a contact or drive stun

11  mode, it does not cause neuromuscular incapacitation or

12  electromuscular disruption, does it?

13  A.   No, it does not.

14  Q.   Any electricity that's associated with the taser use

15  is really confined to the very localized area where the

16  taser is touching the body, correct?

17  A.   Correct.

18  Q.   And essentially what's happening is there are two

19  metal points on the end of the taser, correct?

20  A.   Yes.

21  Q.   A rough way of describing it.  Forgive me.

22  A.   That's okay.  Perfect description.

23  Q.   They're not more than an inch apart, correct?

24  A.   Slightly more than an inch.

25  Q.   Only slightly?

1  A.    About an inch and a half.

2  Q.    Okay.  And what happens is the electricity passes

3  from one metal point into the body and then passes out of

4  the body at the next metal point, correct?

5  A.    Correct.

6  Q.    When a contact or drive stun is used, electricity is

7  not traveling throughout the subject's body, correct?

8  A.    Correct.

9  Q.    So that's why, if we look at the video from the

10  receiving cell, the officers were able to maintain

11  contact with Mr. Kingsley even as the taser was being

12  used, correct?

13  A.    In both deployments of a taser, including distance

14  deployment, officers can still maintain contact with the

15  person's body.

16  Q.    And in this instance they are able to do that

17  because there isn't any risk of electricity passing

18  through the other parts of Mr. Kingsley's body, correct?

19  A.    Correct.

20  Q.    So Sergeant Shisler, who was down at Mr. Kingsley's

21  feet, in contact with his lower legs or feet, wouldn't

22  have felt any electricity passing through Mr. Kingsley's

23  lower legs, correct?

24  A.    Correct.

25  Q.    That's because there wasn't any passing through or

1    out his lower legs, correct?

2    A.   Correct.

3    Q.   In your experience, a contact stun is painful, yes?

4    A.   Yes.

5    Q.   But in your training and experience, the pain ends

6    when the contact stun is over, yes?

7    A.   From my personal experience, yes.

8    Q.   And each application, each separate application of a

9    contact or drive stun, lasts up to five seconds, correct?

10   A.   The taser is set to go for five seconds, yes.

11   Q.   So if you apply it once, it will, the cycle, will

12   run for no more than five seconds?

13   A.   Correct.

14   Q.   And in your experience, there's no lasting impact

15   from the use of the taser once the deployment or use is

16   over, correct?

17   A.   From my personal experience, no.

18   Q.   What I said was correct, yes, from your personal

19   experience?

20   A.   From my personal experience, correct.

21   Q.   Officers, when they're trained on using ECDs, are

22   trained about some of the basic principles of electricity

23   that are involved, correct?

24   A.   Correct.

25   Q.   And they are trained that high voltage will not

1   injure a subject if the current is low, yes?

2   A.    Theoretically, yes, correct.

3   Q.    Well, that's what they're trained, yes?

4   A.    Yes.

5   Q.    And they are trained that the current is what is

6   important, correct, rather than the voltage?

7   A.    Correct.

8   Q.    And they're trained that while tasers have high

9   voltage, they have low current; correct, that's what

10  they're trained?

11  A.    Correct, but the taser really doesn't have high

12  voltage.

13          MR. JONES:  Fair enough.

14          THE COURT:  I'm sorry.  Could you say that

15  again?

16          THE WITNESS:  The taser doesn't really have high

17  voltage.

18  BY MR. JONES:

19  Q.    Just leave the voltage out of the equation.  They're

20  trained that the tasers have low current, correct?

21  A.    Correct.

22  Q.    And they're trained that the current in a taser is

23  below dangerous levels, correct?

24  A.    Correct.

25  Q.    If we go back to what happened on May 21st, if we go

BRIAN LANDERS - CROSS

1   back to the actual events, you would agree, don't you,

2   that Mr. Kingsley disobeyed a number of orders issued by

3   the jail staff?

4   A.   Yes, he did.

5   Q.   He disobeyed orders from four different officers to

6   take down the paper off the light?

7   A.   Correct.

8   Q.   When the officers came to the cell and asked him to

9   stand up and back up to the cell bars to be handcuffed,

10   he disobeyed that order?

11   A.   Correct.

12   Q.   He would not walk out of the cell under his own

13   power, correct?

14   A.   Correct.

15   Q.   And we know that when the officers asked him what

16   was wrong, he didn't answer their questions, yes?

17   A.   Correct.

18   Q.   And we know that the officers told him multiple

19   times in the receiving cell to stop resisting, correct?

20   A.   Correct.

21   Q.   We know that Mr. Kingsley was verbally resistant

22   with the officers?

23   A.   Correct.

24   Q.   We know that he was verbally aggressive with the

25   officers?

1  A.   Correct.

2  Q.   He was shouting at them?

3  A.   Yes.

4  Q.   He swore at them?

5  A.   Yes.

6  Q.   And I think we established yesterday, you don't know

7  why he was making the other sounds he was making,

8  correct?

9  A.   Correct.

10  Q.   But those sounds obviously -- strike that.  Those

11  sounds could well have been additional verbal aggression

12  on his part, yes?

13  A.   Possibly.

14  Q.   They certainly sound aggressive, don't they?

15  A.   Yes.

16  Q.   And you spoke yesterday about the agitation that he

17  displayed, correct?

18  A.   Yes.

19  Q.   Are you aware that the officers have said that

20  Mr. Kingsley was flexing or tensing his muscles in the

21  receiving cell, yes?

22  A.   That was reported, yes.

23  Q.   And you have no way to dispute that testimony, do

24  you?

25  A.   No.

1   Q.   You are aware that the officers have said that

2   Mr. Kingsley was pulling his hands apart in the receiving

3   cell, correct?

4   A.   Yes.

5   Q.   And you do not have any way to dispute that

6   testimony, do you?

7   A.   No.

8   Q.   You are aware that the officers have said that

9   Mr. Kingsley was moving his arms while he was in the

10  receiving cell, correct?

11  A.   Correct.

12  Q.   You do not have any way to dispute that testimony,

13  do you?

14  A.   Just what I observed on video.

15  Q.   And you can't dispute that testimony?

16  A.   As a general testimony, what I observed on the video

17  was that it did not appear in portions of the video that

18  I can see his arms ever moving.

19  Q.   And there were plenty of portions in the video that

20  you couldn't see what he was doing, correct?

21  A.   Correct.

22  Q.   You are aware that the officers have said that

23  Mr. Kingsley was moving his upper body, correct?

24  A.   Correct.

25  Q.   You are not in a position to dispute that, are you?

1   A.   No.

2   Q.   And in fact if we look at the video, we see at least

3   one instance where he does move his upper body, correct?

4   A.   Correct.

5   Q.   He pushes his upper body up off of the bunk,

6   correct?

7   A.   I would say he lifts his upper body.  I don't think

8   he can push.

9   Q.   Okay.  He lifted his upper body up off the --

10  A.   Correct.

11  Q.   You're aware that Sergeant Hendrickson has said that

12  he thought Mr. Kingsley moved his head in a way that

13  suggested to him that he might try and bite him, correct?

14  A.   Correct.

15  Q.   You're not sure what Mr. Hendrickson feared or

16  didn't fear, are you?

17  A.   No.

18  Q.   And you don't know when, in the sequence of events

19  in the receiving cell that we saw on the video, that

20  Mr. Kingsley -- Sergeant Hendrickson, rather, had that

21  concern, do you?

22  A.   Could you repeat the question?

23  Q.   Sure.  I got tripped up.  You're not sure -- you're

24  not aware where, in the sequence of events in the

25  receiving cell, that Sergeant Hendrickson had that

BRIAN LANDERS - CROSS

 1  concern, if he had it, are you?

 2  A.   No.

 3  Q.   If those behaviors that we just talked about

 4  occurred, they could have counteracted the officers'

 5  efforts to maintain control over Mr. Kingsley, correct?

 6  A.   Correct.

 7  Q.   And they could have counteracted the officers'

 8  efforts to remove the handcuffs, correct?

 9  A.   Correct.

10  Q.   And in the moment in that situation, there was also

11  always the possibility that Mr. Kingsley's behaviors

12  could have escalated, correct?

13  A.   Correct.

14  Q.   In other words, that any resistance that he was

15  engaging in could have gotten greater, correct?

16  A.   Could have, correct.

17  Q.   I want to go back briefly to the POSC training

18  guide, if we could --

19  A.   Okay.

20  Q.   -- Exhibit 518 -- or '17, rather.  And I want to go

21  back to the definition of bodily harm on page 53.

22       MR. JONES:  If we could publish this to the

23  jury, Your Honor.  May we publish to the jury, Judge?

24       THE COURT:  Yes.

25  BY MR. JONES:

BRIAN LANDERS - CROSS

1    Q.    So just to go back to where we left off I think

2    yesterday afternoon, the definition of active resistance

3    includes this element of bodily harm, correct?

4    A.    Correct.

5    Q.    And there's a -- can you go back? -- in the POSC

6    training guide there's a footnote where bodily harm is

7    defined, correct?

8    A.    Correct.

9    Q.    And that footnote defines bodily harm by reference

10   to a state statute, correct?

11   A.    Correct.

12   Q.    And it defines it as "physical pain or injury,

13   illness, or any impairment of physical condition,"

14   correct?

15   A.    That's what's printed.

16   Q.    That's what the training guide states, correct?

17   A.    I view that as a training that guides those two

18   things.  It provides a state statute and then it gives a

19   portion of it.

20   Q.    Okay.  You think there's more to that state statute?

21   A.    It appears to me that there's more to the state

22   statute.

23   Q.    Okay.  And I think you testified yesterday, and tell

24   me if I'm wrong, that you had a concern that this was an

25   outdated reference, correct?

BRIAN LANDERS - CROSS

1  A.   Correct.

2  Q.   And you thought that perhaps later versions of POSC

3  had updated this reference, correct?

4  A.   I don't know if they have updated that reference.  I

5  can tell you that the DAAT curriculum and my committee

6  which defined that define it using the statute of

7  battery.

8  Q.   939.22 -- what is that?

9  A.   I would have to see a statute book to know exactly

10  what that statute is today.  I believe it's 939.22(4).

11  Q.   Yes, I can see that.  So I want to be clear.  Do you

12  know whether POSC, at any point since June of 2009, has

13  been updated or changed in terms of the definition of

14  bodily harm?

15  A.   I can't be certain of that.

16  Q.   Okay.  I would like to show you what was marked as

17  Plaintiff's Exhibit 67.  And this is the POSC training

18  guide from June 2012, correct?

19  A.   Correct.

20  Q.   So current as of this year?

21  A.   Correct.

22         THE COURT:  So this one was not received

23  yesterday?

24         MR. JONES:  This has not been received.

25         THE COURT:  Right.

 1  BY MR. JONES:

 2  Q.   If we go to page --

 3         MR. PARDON:   I'm going to object to this as

 4  irrelevant.

 5         MR. JONES:   The witness has questioned whether

 6  the definition --

 7         THE COURT:   Has changed.   For that purpose you

 8  can use it.

 9         MR. JONES:   That's the only purpose.

10  BY MR. JONES:

11  Q.   If we go to page 53, and here again, POSC talks

12  about the type of resistance where it's appropriate to

13  use control alternatives, including an ECD, correct?

14  A.   Correct.

15  Q.   And it gives the same definition for active

16  resistance as the POSC guide from June of 2009, correct?

17  A.   Correct.

18  Q.   And it again includes a Footnote 17 with the

19  definition of bodily harm?

20  A.   Correct.

21  Q.   And the definition that POSC is still giving to

22  officers being trained, jailers being trained in 2012, is

23  the same definition, correct?

24  A.   Correct.

25  Q.   I would like to show you -- the statutory reference

BRIAN LANDERS - CROSS

1  both in 2009 and in 2012 was to Wisconsin Statute Section

2  939.22(4), correct?

3  A.   Correct.

4  Q.   I would like to show you what I have marked as

5  Exhibit 554, and we're focusing in on a particular part

6  of it.  If you need to see a different part of the page,

7  let me know.  But what you're looking at --

8            MR. PARDON:  Excuse me, Your Honor.  There is no

9  554.

10           MR. JONES:  It's a cross-examination exhibit.

11 I'm not intending to introduce it; I'm simply asking the

12 witness about it.

13           THE COURT:  All right.  But that wasn't what I

14 understood the objection to be.

15           MR. PARDON:  There's no Exhibit 554.  And I

16 guess I'm also objecting that this --

17           THE COURT:  You mean there's no exhibit that's

18 been produced?

19           MR. PARDON:  Yes.

20           MR. JONES:  May I approach, Your Honor?

21           THE COURT:  Why don't you just show it to

22 Mr. Pardon so he knows what you're asking about.

23           MR. PARDON:  I'd like to see it anyway.  Well, I

24 mean, I'll just object to this whole line of questioning

25 as irrelevant, but --

BRIAN LANDERS - CROSS

 1              MR. JONES:   The witness has raised a question

 2    as --

 3              THE COURT:   I overruled that objection and allow

 4    you to ask this.

 5    BY MR. JONES:

 6    Q.   What you're looking at is 939.22 of the Wisconsin

 7    Statutes, correct?

 8    A.   Correct.

 9    Q.   And what I have highlighted for you is sub 4 of that

10    statute, correct --

11    A.   Correct.

12    Q.   -- which reads "Bodily harm"?   This is a definition

13    section in the statutes, correct?

14    A.   Correct.

15    Q.   And the statute we're looking at defines *bodily*

16    *harm*, correct?

17    A.   Correct.

18    Q.   And it defines it as "'Bodily harm' means physical

19    pain or injury, illness, or any impairment of physical

20    condition," correct?

21    A.   Correct.

22    Q.   That's exactly the language that's used in POSC,

23    correct?

24    A.   It's the reference to the statute, yes.

25    Q.   So there's no part of the statute that's not quoted

1   in POSC, correct?

2   A.    Just the main body of the statute involved.

3   Q.    You mean the prefatory language?

4   A.    Correct.

5   Q.    And is there anything in that prefatory language

6   that changes the definition of bodily harm as it's

7   relevant for POSC?

8   A.    No.

9   Q.    Thank you.  If we go back to Exhibit 517, page 53,

10  the bodily harm that POSC is talking about, that can be

11  to the officer or the subject or to another person,

12  correct?

13  A.    Correct.

14  Q.    So when an officer is trying to decide whether

15  active resistance is occurring, the risk of bodily harm

16  that the officer should be evaluating, it's not just

17  whether the officer can get hurt, correct?

18  A.    Correct.

19  Q.    It's whether the officer or the subject he or she is

20  dealing with or some other third person can get injured,

21  correct?

22  A.    Correct.

23  Q.    And officers in Wisconsin are not trained that they

24  need to wait for bodily harm to occur before they can use

25  force, correct?

```
 1   A.   Correct.

 2   Q.   That wouldn't make any sense, correct?

 3   A.   Correct.

 4   Q.   So there just has to be a risk of bodily harm,

 5   correct?

 6   A.   I will say there has to be a tangible threat of

 7   bodily harm.

 8   Q.   According to the POSC guide, the resistance has to

 9   create a risk of bodily harm, correct?

10   A.   Other portions of the POSC guide goes to describe

11   such thing as threat assessment.  Again, there could be a

12   risk of bodily harm in everyday activity.

13   Q.   Okay.  But I guess my point is just that they don't

14   have to actually see bodily harm occurring; they just

15   have to evaluate that there is a risk of bodily harm?

16   A.   A tangible risk of bodily harm.

17   Q.   And your word tangible, that does not appear here,

18   does it, in what you're looking at?

19   A.   In the one snippet that you're showing of the

20   manual, no.

21   Q.   The definition here doesn't quantify it in any way,

22   correct?

23   A.   In this portion, no.

24   Q.   And the definition also doesn't quantify the amount

25   of bodily harm, correct?
```

1    A.    Correct.

2    Q.    An officer doesn't have to think that someone is

3    going to die, correct?

4    A.    Correct.

5    Q.    An officer doesn't have to think that someone is

6    going to go to the hospital, correct?

7    A.    Correct.

8    Q.    They just have to believe that there's a risk of

9    physical pain or injury, correct?

10   A.    Correct.

11   Q.    And they have to make that judgment in the moment in

12   the circumstances that are confronting them, correct?

13   A.    Yes.  Correct.

14   Q.    A prisoner could suffer bodily harm by hitting his

15   head on a concrete wall, correct?

16   A.    Correct.

17   Q.    A prisoner could suffer bodily harm by hitting his

18   head on a concrete bunk, correct?

19   A.    Correct.

20   Q.    A prisoner could suffer bodily harm by rolling off

21   of a concrete bunk onto a concrete floor, correct?

22   A.    Correct.

23   Q.    Particularly if their hands are cuffed behind their

24   back, correct; in other words, so they wouldn't have the

25   ability to brace themselves or catch their fall?

1  A.    Can you repeat that?

2  Q.    Sure.   Chances of an individual hurting himself by

3  falling to the floor are greater when that individual is

4  handcuffed behind their back, correct?

5  A.    Yes.

6  Q.    An officer could suffer bodily harm by falling when

7  he is trying to restrain a subject, correct?

8  A.    I guess I'm thinking that if -- the way I define

9  bodily harm by statute, by showing 939.22, that is a

10  criminal element.   So if I was to just simply walk

11  escorting a person and if I tripped and fell on my own

12  and suffered pain or suffering or any illness or injury

13  doesn't necessarily mean that that action is the intent

14  of 939.22.

15  Q.    We can go back to the definition of *bodily harm* in

16  POSC.   Again, the notorious Footnote 17.   Where does it

17  talk in there about a criminal element or intent?

18  A.    I believe under 939.22 it talks about the definition

19  of crimes and I believe most crimes require some sort of

20  intent.

21  Q.    First I want you, if you could, to answer my

22  question.   Where in Footnote 17 does it talk about

23  criminal intent?

24  A.    It doesn't.

25  Q.    And if we go back to 939.22(4), which is on the

1  screen behind you, where, in 939.22(4), does it talk

2  about a criminal intent?

3  A.   It doesn't.

4  Q.   Are you testifying that in order for an officer to

5  use force in response to active resistance the subject

6  has to have criminal intent?

7  A.   No.  I'm testifying that your definition of bodily

8  harm, relative to crimes, it has to have intent.

9  Q.   But we're not talking about crimes here, correct;

10  we're talking about when an officer can use force in

11  response to active resistance, correct?

12  A.   Correct.

13  Q.   And there's no part of the definition of active

14  resistance that incorporates a requirement of criminal

15  intent on the part of the subject, correct?

16  A.   Can you repeat the question?

17  Q.   There's no part of the definition of active

18  resistance that officers in Wisconsin are trained on that

19  incorporates the requirement that the subject have

20  criminal intent?

21  A.   In the words provided, no.

22  Q.   So to go back to my question where we got onto this,

23  an officer can suffer bodily harm if he falls while

24  trying to restrain a subject, correct?

25  A.   I guess by the definition, yes.

1  Q.   And that's particularly true if the officer is in a

2  confined space where there are concrete walls and a

3  concrete floor, yes?

4  A.   I think every case is an individual case.

5  Q.   An officer could suffer bodily harm if a prisoner

6  kicks at him, yes?

7  A.   Yes.

8  Q.   An officer could suffer bodily harm if an officer

9  shoves him?

10  A.   Potentially.

11  Q.   An officer could suffer bodily harm if a prisoner

12  bites him?

13  A.   Potentially.

14  Q.   Shifting gears, you're not offering an opinion as to

15  what other forms of force the officers here might have

16  used besides the taser, correct?

17  A.   No.

18  Q.   My statement was correct, yes?

19  A.   Correct.

20  Q.   Problem with the question.  Not your fault.  You're

21  not offering an opinion as to what Sergeant Hendrickson

22  should have done instead of directing Deputy Degner to

23  use the taser, correct?

24  A.   Correct.

25  Q.   You don't know what, if any, alternative forms of

1  force would have worked in this situation, correct?

2  A.    Correct.

3  Q.    And you would agree, wouldn't you, that when it

4  comes to a situation where force is used, there's never a

5  definitive answer, there's never one answer, as to what

6  action should be taken to achieve or maintain control,

7  correct?

8  A.    Correct.

9  Q.    There's no one answer to how an officer should react

10  to a situation, yes?

11  A.    Correct.

12  Q.    Is it fair to say that at times in a law enforcement

13  setting that it's difficult for an officer to know

14  exactly why a subject is behaving the way he's behaving?

15  A.    That's a very fair statement.

16  Q.    That happens all the time, yes?

17  A.    Yes.

18  Q.    For instance, two people, two subjects, might be

19  behaving in the exact same way but have completely

20  different motivations or reasons for doing what they're

21  doing, correct?

22  A.    Correct.

23  Q.    And depending on the circumstances, an officer

24  dealing with those two subjects may not know why either

25  one of them is doing what they're doing, correct --

BRIAN LANDERS - CROSS

1   A.   Correct.

2   Q.   -- or that they have different reasons for doing

3   what they're doing?

4   A.   Correct.

5   Q.   And is it fair to say that it can be particularly

6   difficult to know why a subject is doing what he's doing

7   if he's not telling the officer why he's doing what he's

8   doing?

9   A.   That's a fair statement.

10   Q.   In the absence of direct verbal communication, it's

11   hard to know sometimes why someone is doing what they're

12   doing?

13   A.   Correct.

14   Q.   And oftentimes subjects don't tell officers why

15   they're doing what they're doing, yes?

16   A.   Correct.

17   Q.   And in those instances, the officer has to go by

18   what the subject is doing, not by what the officer thinks

19   the subject might be thinking, correct?

20   A.   Correct.

21   Q.   You have to -- the officer has to respond to the

22   conduct that he sees and perceives, correct?

23   A.   Combined with other factors.

24   Q.   But given how difficult it is to know exactly what a

25   subject -- what's in a subject's head, the officer really

 1  has to react to what's observable, correct?

 2  A.   Yes.

 3  Q.   And primarily the individual's conduct, correct?

 4  A.   Correct.

 5  Q.   So if the officer -- or strike that.  If the subject

 6  is engaging in behavior that makes the officer unable to

 7  control and which creates a risk of injury to the officer

 8  or the subject, the officer has to respond to the

 9  behavior and the risk, correct?

10  A.   Correct.

11  Q.   And that's true even if he is uncertain as to what's

12  motivating the subject, correct?

13  A.   Correct.

14  Q.   To try and finish up, I would like to go back

15  briefly to this phrase or this term *active resistance*.

16  And officers -- back up just one second.  We already

17  talked about some behaviors that could fit that, the

18  first part of the definition of active resistance,

19  "behaviors that physically counteract an officer's

20  efforts or attempts to control the subject"?

21  A.   Yes.

22  Q.   Okay.  Would you also agree that a subject's refusal

23  to walk in response to an officer's effort to get him to

24  walk could be behavior that physically counteracts an

25  officer's efforts at control?

1   A.   Possibly.

2   Q.   A subject's refusal to stand up in response to an

3   officer's effort to get him to stand up could constitute

4   that kind of behavior?

5   A.   Possibly.

6   Q.   Officers who are trained in Wisconsin on tasers and

7   other ECDs are trained on what sorts of behaviors

8   constitute active resistance?

9   A.   Yes.

10  Q.   They're given specific examples of what might be

11  active resistance in their EDC training, correct?

12  A.   Yes.

13  Q.   And that ECD training is supposed to sort of fit

14  hand and glove with what they have been trained in in

15  terms of the POSC training guide or the DAAT training

16  guide?

17  A.   Yes.

18  Q.   ECD is sort of a specific application of general

19  principles from POSC or DAAT?

20  A.   Yes.

21  Q.   If we look at the ECD training guide, Exhibit 518,

22  if we go to page 4 -- do you have that in front of you?

23  A.   I have page 4.  I'm going to trust that this is the

24  ECD training guide.

25  Q.   We can go back to page 1 if that would make you more

 1  comfortable.

 2  A.   I'm fine with that.

 3        MR. JONES:  Okay.  I would like to publish to

 4  the jury, Your Honor.

 5        THE COURT:  Any objection?

 6        MR. PARDON:  No.

 7        THE COURT:  You may.

 8  BY MR. JONES:

 9  Q.   If we look at the bottom of page 4, there's a

10  paragraph that describes, for officers being trained on

11  ECDs, active resistance, correct?

12  A.   Correct.

13  Q.   And again, that gives that same definition of active

14  resistance that we've talked about several times?

15  A.   Correct.

16  Q.   And it goes on to say that "Examples of active

17  resistance include attempting to pull away from the

18  officer's grasp," correct?

19  A.   Correct.

20  Q.   "Running away," correct?

21  A.   Correct.

22  Q.   "Getting up after being directed to the ground,"

23  correct?

24  A.   Correct.

25  Q.   "And so on," correct?

1   A.    Correct.

2   Q.    If we go on to the next page, there's a diagram that

3   officers are shown in their training, correct?

4   A.    Correct.

5   Q.    And this diagram gives examples of assaultive

6   behavior?

7   A.    Correct.

8   Q.    And assaultive behavior is actually behavior that an

9   officer is trained he can use a level of force that's

10  higher than an ECD, correct?

11  A.    Correct.

12  Q.    And assaultive behavior includes, officers are

13  trained, includes shoving?

14  A.    Correct.

15  Q.    Punching?

16  A.    Correct.

17  Q.    Kicking?

18  A.    Correct.

19  Q.    And it's not on this list, but biting, correct,

20  would fall in that category?

21  A.    I would classify that.

22  Q.    As assaultive behavior?

23  A.    Yes.

24  Q.    Officers trained on how and when to use an ECD are

25  also given in this diagram examples of active resistance,

1  correct?

2  A.    Correct.

3  Q.    They're giving four examples here, correct?

4  A.    Correct?

5  Q.    And one of the examples is they're trained that an

6  example of active resistance can be pulling away,

7  correct?

8  A.    Correct.

9  Q.    They're trained that active resistance can be where

10  the subject is getting up after being directed down,

11  correct?

12  A.    Correct.

13  Q.    And they're trained that active resistance can be

14  pushing off of a surface that the subject was directed

15  against, correct?

16  A.    Correct.

17  Q.    So when Sergeant Hendrickson was trained on how to

18  use an ECD, this is what he was taught, correct?

19  A.    I can't testify to what he was taught.

20  Q.    Okay.  If he was taught using this manual, this is

21  part of what he was taught?

22  A.    This manual encompasses a PowerPoint, a lecture,

23  training materials.

24  Q.    Okay.  But in this respect, this part of training

25  under ECD -- strike that.  The ECD manual trains officers

1   that these are examples of active resistance, they can

2   be?

3   A.   They can be.

4          MR. JONES:  Thank you.  Those are all my

5   questions.

6          THE WITNESS:  Thank you.

7          THE COURT:  Mr. Pardon.

8          MR. PARDON:  Yes.  Thank you, Your Honor.  I

9   have a few follow-up questions.

10                    REDIRECT EXAMINATION

11  BY MR. PARDON:

12  Q.   Mr. Landers, Mr. Jones took you through several

13  pages in the POSC manual; do you recall doing that?

14  A.   Yes.

15  Q.   All right.  Did anything Mr. Jones showed you in the

16  POSC manual justify using a taser on Mr. Kingsley in this

17  case?

18  A.   No.

19  Q.   All right.  Do you recall Mr. Jones asking you

20  yesterday whether it can be difficult to put the keys

21  into a handcuff -- the hole in a handcuff that you can

22  lock and unlock?

23  A.   Yes.

24  Q.   All right.  Does the fact that it might be difficult

25  to put the handcuff keys into the hole justify using the

1  taser on Mr. Kingsley in this case?

2  A.   No.

3  Q.   Does the fact that Mr. Kingsley might have stumbled

4  or might have tripped or might have fell if he were left

5  alone in handcuffs justify using the use of the taser in

6  this case?

7  A.   No.

8  Q.   In this case was it unreasonable to apply the taser

9  to Mr. Kingsley while he was in handcuffs?

10  A.   Yes.

11  Q.   Do any of Mr. Kingsley's actions in the receiving

12  cell or in the events leading up to his being taken to

13  the receiving cell justify the use of a taser in this

14  case?

15  A.   No.

16  Q.   All right.  Mr. Jones asked you about some events on

17  the video; do you recall that?

18  A.   Yes.

19  Q.   Is there anything in Mr. Jones' questioning of you

20  about the video that changed your opinion that

21  Mr. Kingsley was not exhibiting active resistance at the

22  time he was tased?

23  A.   No.

24  Q.   Considering the examples of active resistance in the

25  DAAT manual and the ECD manual that Mr. Jones just walked

1  you through, did any of them in the circumstances of this

2  case justify the use of a taser against Mr. Kingsley?

3  A.   No.

4  Q.   All right.  Focusing specifically on the idea of the

5  threat of active resistance, did the circumstances of

6  this case justify the use of the taser upon Mr. Kingsley?

7  A.   No.

8  Q.   All right.  Focusing on the idea of the possibility

9  that things could escalate, did that justify the use of a

10 taser on Mr. Kingsley in this case?

11 A.   No.

12 Q.   When you consider your review of all the materials

13 in this case, did any of the incident reports you

14 reviewed articulate a reasonable basis for using the

15 taser on Mr. Kingsley?

16         MR. JONES:  Objection.  Relevance.

17         THE COURT:  You can restate that I think.

18 BY MR. PARDON:

19 Q.   Did anything in your review of this case articulate

20 a reasonable basis for using the taser on Mr. Kingsley?

21         MR. JONES:  Objection.  Asked and answered.

22         THE COURT:  Overruled.

23 A.   Can you repeat the question one more time?

24 Q.   Did anything in your review of this case articulate

25 a reasonable basis for using the taser on Mr. Kingsley?

1  A.   No.

2  Q.   By the way, who deescalated the situation after the

3  taser was used; do you recall from the video?

4  A.   I believe Lieutenant Conroy.

5  Q.   It wasn't Sergeant Hendrickson, correct?

6  A.   Correct.

7  Q.   Do you recall being asked some questions by

8  Mr. Jones about some downward motions exhibited by

9  Sergeant Hendrickson on the video?

10  A.   Yes.

11  Q.   All right.  And do you recall testifying that

12  nothing about the use of pressure point techniques was

13  reported?

14  A.   Correct.

15  Q.   All right.  If Sergeant Hendrickson had attempted to

16  use a particular pressure point technique, should that

17  have been articulated in his incident report?

18            MR. JONES:  Objection.  Relevance.

19            THE COURT:  Sustained.

20  BY MR. PARDON:

21  Q.   When considering the use of force in general in

22  determining how an officer might react to somebody he's

23  dealing with, is it appropriate for that officer to

24  consider what the person's intentions might be if he

25  knows?

1  A.    No.

2  Q.    Now, in terms of the risk of bodily harm, you

3  testified a little while ago that you said something had

4  to be a tangible risk.  What did you mean by that?

5  A.    By "tangible risk," I mean that there's a difference

6  between risk.  These manuals talk about risk.  They talk

7  about threats.  What you're not being shown is a large

8  portion of the manuals that trains officers on how to

9  identify actual threats.

10      A person's intent to do something may not always be

11  an intent to harm an officer, although intents could play

12  a role.  But an officer is trained that if you just take

13  the words or snippets alone, then everybody is a risk and

14  there would be carte blanche use of force.

15      But what the trainers do -- remember, these are

16  guides, these are manuals -- what the trainers do is the

17  trainers use these guides to try to put the officers in

18  situations or have the officers understand scenarios in

19  which there are actual life threats.

20      There are many other portions of the manuals and

21  other training guides that are used to train these

22  officers on how to distinguish between a possible threat

23  and a very tangible threat against an officer's

24  well-being or somebody else's well-being or the person

25  that you're dealing with's well-being.

BRIAN LANDERS - REDIRECT

1   Q.   Do you recall Mr. Jones asking you yesterday whether

2   you were paid to be an expert in this case?

3   A.   Yes.

4   Q.   Is being paid your primary motivation for testifying

5   in this case?

6              MR. JONES:  Objection.  Relevance.

7              THE COURT:  Sustained.

8              MR. PARDON:  Your Honor, may I be heard?

9              THE COURT:  At a break.

10             MR. PARDON:  All right.  No further questions.

11             THE COURT:  Mr. Jones, any other questions?

12             MR. JONES:  Very briefly.

13                    RECROSS-EXAMINATION

14  BY MR. JONES:

15  Q.   What you're talking about -- sorry.  That wasn't

16  going anywhere.  Strike that.  You're talking about or

17  you were talking about other parts of these manuals where

18  officers are trained on how to make threat assessments,

19  correct?

20  A.   Correct.

21  Q.   And take in various factors to decide whether

22  they're actually presented with something like active

23  resistance, correct?

24  A.   Can you repeat that?

25  Q.   Sure.

1  A.   Okay.

2  Q.   They are trained on -- that they have to assess

3  various factors as they occur to decide whether there's

4  active resistance, correct --

5  A.   Correct.

6  Q.   -- or some other form of resistance?

7  A.   Correct.

8  Q.   Or assaultive behavior, correct?

9  A.   Correct.

10  Q.   Or the threat of deadly harm, correct?

11  A.   Correct.

12  Q.   And it's the officer in the moment, in real-time,

13  that has to make those judgment calls, correct?

14  A.   Correct.

15       MR. JONES:   That's all I have.   Thank you.

16       THE COURT:   Mr. Pardon and Mr. Jones, if you'd

17  like to, come to side bar.   If you want to, stand up and

18  stretch, but don't talk because then it's too hard for us

19  to hear.

20     (At side bar.)

21       THE COURT:   You wanted to be heard on your

22  question about why Mr. Landers is testifying.

23       MR. PARDON:   Yeah, just that they opened the

24  door and they suggested that he was doing this for the

25  money and he's not.

BRIAN LANDERS - RECROSS

```
 1              THE COURT:  I still don't think it's an
 2  appropriate question to ask him why he's doing it.
 3              MR. PARDON:  Can I make an offer of proof?
 4              THE COURT:  You may, yes.
 5              MR. PARDON:  I would just say that I believe
 6  Mr. Landers would testify that he takes this --
 7              THE COURT:  Speak up.
 8              MR. PARDON:  I would say that I believe that
 9  Mr. Landers would testify that he takes his
10  responsibilities as a police officer and an instructor
11  very seriously.  And he's bothered when he sees things
12  that should not go wrong, you know, that are
13  inappropriate and he feels a responsibility to say that.
14              THE COURT:  Okay.
15              MR. PARDON:  Thank you.
16         (End of side bar.)
17              THE COURT:  Okay.  And then, Mr. Landers, you
18  may step down.
19              THE WITNESS:  Thank you, Your Honor.
20              THE COURT:  And you are free to leave the
21  building, go about your business.
22              THE WITNESS:  Thank you.
23              THE COURT:  Mr. Pardon, do you have any other
24  witnesses to call?
25              MR. PARDON:  No.  Plaintiff rests their case.
```

1          THE COURT:  All right.  And without giving up

2    any rights, we'll go right into the defendants' case at

3    this point, reserving any rights that you have.

4          MR. JONES:  Can we approach briefly, Your Honor.

5          THE COURT:  Sure.

6      (At side bar.)

7          MR. JONES:  Only because I wanted to be actually

8    clear that I understood what you were saying, we do have

9    a motion.  We would like to make a motion under Rule 50.

10          THE COURT:  Right.  I assumed that you would.

11    And you are not losing any rights and not arguing it at

12    this moment.

13          MR. JONES:  Okay.

14          THE COURT:  That's what I wanted to make clear

15    to you.  I guess I didn't do a very good job.

16          MR. JONES:  Paranoia, Judge.

17      (End of side bar.)

18          THE COURT:  Mr. Jones, you may call your first

19    witness.

20          MR. JONES:  Thank you, Judge.  We would like to

21    call Karl Blanton.

22          **KARL BLANTON, DEFENDANTS' WITNESS, SWORN**

23                  <u>DIRECT EXAMINATION</u>

24    BY MR. POSNANSKI:

25    Q.   Good afternoon, Mr. Blanton.  Could you please state

KARL BLANTON - DIRECT

 1  your name for the record?

 2  A.   Karl Blanton.

 3            THE COURT:  Is that a K-A-R-L or C-A-R-L?

 4            THE WITNESS:  K.

 5            THE COURT:  Thank you.

 6  BY MR. POSNANSKI:

 7  Q.   Mr. Blanton, you were formerly employed by the

 8  Monroe County Sheriff's Department?

 9  A.   Yes, that's correct.

10  Q.   How long did you work there?

11  A.   I believe it was for about four years.

12  Q.   Do you know approximately when you started?

13  A.   February of 2009.

14  Q.   And when did you leave your employment with the

15  Monroe County Sheriff's Department?

16  A.   My last day was September 1st of this year.

17  Q.   And why did you leave?

18  A.   To go back to school and change careers.

19  Q.   Are you currently in school?

20  A.   Yes, I am.

21  Q.   Where?

22            MS. WARD:  Objection.  Relevance, Your Honor.

23            THE COURT:  Sustained.

24  BY MR. POSNANSKI:

25  Q.   Are you currently employed?

KARL BLANTON - DIRECT

1  A.    Yes, I am.

2  Q.    Where?

3          MS. WARD:   Objection.   Relevance, Your Honor.

4          THE COURT:   Overruled.   You can answer that.

5  A.    At this time I'm employed at Gunderson Lutheran

6  Hospital.

7  Q.    When you started your employment with the Monroe

8  County Sheriff's Department, what was your position?

9  A.    When I started at the Monroe --

10 Q.    That's correct.

11 A.    I started at Monroe County Sheriff's Department as a

12 jailer.

13 Q.    And during the course of your employment, did your

14 position change?

15 A.    Yes, it did.

16 Q.    How?

17 A.    I was transferred or was hired on as a road deputy

18 for I believe about six months.

19 Q.    Do you know when that was?

20 A.    I believe it was June or July of -- it was either

21 2010 or 2011.

22 Q.    At some point did you return to the jail?

23 A.    That is correct.

24 Q.    And at any point in time in your employment with

25 Monroe County Sheriff's Department did you receive a

                    KARL BLANTON - DIRECT

1  promotion?

2  A.   I did, yes.

3  Q.   And from what rank to what rank?

4  A.   As a jailer to a sergeant position.

5  Q.   Sergeant position at the jail?

6  A.   Yes, that's correct.

7  Q.   How old are you, Mr. Blanton?

8  A.   I am 35 years old.

9  Q.   Are you certified by the State of Wisconsin as a

10  corrections officer?

11  A.   Yes, I am.

12  Q.   You understand you are here today to discuss an

13  incident that occurred on May 21st of 2010?

14  A.   Yes, I am.

15  Q.   What was your position at that time?

16  A.   At that time I was a jailer, just a regular jailer.

17  Q.   And at that time were you a certified corrections

18  officer?

19  A.   Yes, I was.

20  Q.   Were you on duty in the Monroe County Jail on the

21  morning of May 21st, 2010?

22  A.   Yes, I was.

23  Q.   What shift were you working that day?

24  A.   I believe I was working 12 hours, so I came in I

25  believe at 3 a.m. the first morning.

1   Q.    At some point on the 21st did you become aware that

2   there was a potential problem involving Michael Kingsley?

3   A.    Yes.

4   Q.    And when was that approximately?

5   A.    Approximately it was earlier morning probably around

6   five or so is when I became aware of an issue with

7   Mr. Kingsley.

8   Q.    How did you become aware of it?

9   A.    I believe it was passed on to me from Deputy Manka

10  that -- he passed on that there was an issue with

11  Mr. Kingsley.

12  Q.    And at that point, what did you learn about the

13  situation?

14  A.    At that point I believe Mr. or Deputy Manka --

15          MS. WARD:  I'm sorry, Your Honor.  I'm going to

16  object to the question as calling for hearsay.

17          THE COURT:  Sustained.

18          MR. POSNANSKI:  Your Honor, if I may be heard.

19          THE COURT:  Well, you can just ask him questions

20  about what the situation was without asking him exactly

21  what the other deputy told him.

22          MR. POSNANSKI:  Fair enough.

23  BY MR. POSNANSKI:

24  Q.    At that point, Mr. Blanton, what did you learn about

25  the situation?

KARL BLANTON - DIRECT

1  A.   I learned that Mr. Kingsley was not taking I guess

2  some cover off of his light, some paper off of his light.

3  Q.   Were you aware of anything else regarding

4  Mr. Kingsley at that time?

5  A.   Not at that time.

6  Q.   Upon learning of the situation, did you do anything

7  with respect to Michael Kingsley?

8  A.   Yes.  At that -- I went back to speak with

9  Mr. Kingsley about the covering of the light.

10  Q.   What, if anything, did you say to him?

11  A.   I asked Mr. Kingsley and tried to interject with

12  Mr. Kingsley about taking off the cover over his light.

13  He would not respond to any of my questions.

14  Q.   How many times did you ask Mr. Kingsley to remove

15  the paper from the light?

16  A.   A couple times.  Once I found out that he wasn't

17  responding, I just assumed that I wasn't going to get

18  anywhere at that time.

19  Q.   What time was this, what time of day?

20  A.   I believe it was in the hour of 5 a.m., between

21  five, 5:30, right around in that area I believe.

22  Q.   When you went and spoke to Mr. Kingsley, was he

23  sleeping?

24  A.   I don't believe he was sleeping.  He was laying down

25  on his bunk.  And I just -- I was sitting there speaking

KARL BLANTON - DIRECT

1  loud enough to where he could understand what I was

2  saying.

3  Q.    And Mr. Kingsley did not respond?

4  A.    No.  He did not respond to any of my questions.

5  Q.    After Mr. Kingsley ignored your comments to him,

6  your request to remove the paper from the light, what did

7  you do?

8  A.    At that time I returned back to the office and

9  informed my sergeant of the situation that he might need

10 to talk to him.

11 Q.    Who was your sergeant?

12 A.    At that time it was Sergeant Hendrickson.

13 Q.    So you went and spoke to Sergeant Hendrickson after

14 you spoke to Michael Kingsley; is that --

15 A.    That is correct.

16 Q.    What did you say to Sergeant Hendrickson?

17 A.    I explained to Sergeant Hendrickson that I tried to

18 communicate to Kingsley about the light and of the

19 covering of the light and asked him to remove that and

20 Kingsley was not responding to any of my communication

21 towards Kingsley.

22 Q.    Once you had informed Sergeant Hendrickson of your

23 efforts to engage Mr. Kingsley, did Sergeant Hendrickson

24 do anything?

25 A.    I'm sorry.  What was that?

KARL BLANTON - DIRECT

1  Q.   After you had informed Sergeant Hendrickson of your

2  efforts to engage with Mr. Kingsley and he hadn't

3  responded to you, did Sergeant Hendrickson do anything?

4  A.   Sergeant Hendrickson said that he would talk to

5  Mr. Kingsley and see if he could talk to him during his

6  med pass.

7  Q.   And did that happen?

8  A.   Yes, it did.

9  Q.   Did you observe Sergeant Hendrickson speaking with

10 Mr. Kingsley?

11 A.   I did.

12 Q.   Did Sergeant Hendrickson's discussions with

13 Mr. Kingsley resolve the situation?

14 A.   I do believe -- it did not, no.

15 Q.   Do you know approximately what time of day this was?

16 A.   I believe it was closer to 5:45, right around in

17 that area.

18 Q.   After Sergeant Hendrickson spoke with Mr. Kingsley,

19 did he instruct you to do anything?

20 A.   I believe Mr. Hendrickson gave me a hand signal to

21 inform to get backup.

22 Q.   How did he do that?

23 A.   I don't remember, but I just remember him saying

24 that we need -- that this wasn't going to work, for me to

25 go back to the office and start calling backup, that this

KARL BLANTON - DIRECT

 1  was going to become an issue.

 2  Q.   And did you call for backup, as instructed?

 3  A.   I did go to the office and asked -- and called

 4  dispatch and asked them to send somebody up, yes.

 5  Q.   After Sergeant Hendrickson spoke with Mr. Kingsley,

 6  did any other officers speak with him?

 7  A.   No, I do not believe so, no.

 8  Q.   At some point in time did any -- strike that.

 9  Sergeant Hendrickson was the shift supervisor; is that

10  right?

11  A.   That is correct.

12  Q.   Was he the highest-ranking official at the jail at

13  that time?

14  A.   At that time I believe, yes, he was.

15  Q.   At some point in the morning did Sergeant

16  Hendrickson's supervisor arrive at the jail?

17  A.   That is correct, yes.

18  Q.   And who was that?

19  A.   That would have been Lieutenant Conroy.

20  Q.   At any point in time that morning did Lieutenant

21  Conroy speak with Mr. Kingsley?

22  A.   Yes, he did.

23  Q.   Did you observe Lieutenant Conroy speaking with

24  Mr. Kingsley?

25  A.   Yes, from a distance.

1  Q.   Did Lieutenant Conroy's discussion with Mr. Kingsley

2  resolve the situation?

3  A.   No, it did not.

4  Q.   After Lieutenant Conroy spoke with Mr. Kingsley, did

5  he say anything to you?

6  A.   Lieutenant Conroy, at that point in time he -- we

7  spoke and that's when I believe we were all out and made

8  a plan to go in and take Mr. Kingsley out of the cell.

9  Q.   Can you describe that for me a little bit more?

10 A.   We, once backup arrived, we stood outside of the

11 hallway, which was a -- outside of the cell block and all

12 communicated who was going to do what.  It came down to

13 that Sergeant Hendrickson would be handcuffing.  I would

14 assist Sergeant Hendrickson in any way there needed to be

15 assist.  Deputy Degner was -- had a taser.  And Shisler

16 was supposed to -- Deputy -- or Sergeant Shisler was to

17 assist us in any way.  And Conroy was there to verbalize

18 any issues that needed to be dealt with.  So that was

19 basically the talking that we all had outside of the --

20 out in the hallway outside the cell block.

21 Q.   As I understand your testimony, the plan was for you

22 and Sergeant Hendrickson to go into Mr. Kingsley's cell;

23 is that right?

24 A.   Yes, that's correct.

25 Q.   What was the plan once you had gone into the cell;

KARL BLANTON - DIRECT

1  what were you going to do after that?

2  A.   The plan was to try to talk to Mr. Kingsley and try

3  to get him to cooperate as much as possible so not only

4  doesn't Kingsley but any other deputies get hurt during

5  the situation.

6      At that point we were to go in and we were going to

7  remove Kingsley.  And he could either -- he was going to

8  help us or we would help him make that movement.  So the

9  plan was to go in and Sergeant Hendrickson to handcuff

10 Mr. Kingsley and I would assist in any way.

11 Q.   Your role was assisting Sergeant Hendrickson?

12 A.   That's correct.

13 Q.   What did that entail?

14 A.   That entailed me going in and at that time, at the

15 beginning, to secure Mr. Kingsley's legs to the bunk or

16 in the most safe manner at that time was how it started

17 out.

18 Q.   And you said "as it started out."  So at some point

19 in time did you actually go to Mr. Kingsley's cell?

20 A.   Yes, we did go to Mr. Kingsley's cell, yes.

21 Q.   And who entered Mr. Kingsley's cell?

22 A.   Sergeant Hendrickson and I entered Mr. Kingsley's

23 cell.

24 Q.   And what happened next?

25 A.   At this time Mr. Kingsley was asked to put his hands

KARL BLANTON - DIRECT

1    behind his back.  He was going to be handcuffed.  His

2    hands were to his side.  Sergeant Hendrickson began the

3    handcuffing.  I secured his legs.

4        And then once one hand was cuffed, there became a

5    struggle.  Mr. Hendrickson was not able to or Sergeant

6    Hendrickson was not able to get the second cuff on.

7    There became some resistance at that time, some

8    tensioning of the arms.  Multiple times he was asked to

9    stop the resistance, that he was going to be moved.

10       At that time I went and was able to I believe assist

11   Sergeant Hendrickson, was able to get the second arm

12   secured in cuffs.  At that time we then began the --

13   began to put Mr. Kingsley up on the bunk.

14   Q.   Okay.  You said a number of things there.  I want --

15   A.   Sure.

16   Q.   -- to back up a little bit.  Did you give

17   Mr. Kingsley any instructions at this time?

18   A.   Mr. Kingsley was to place his hands behind his back.

19   And at first, when we first walked in, we asked

20   Mr. Kingsley to stand up and place his hands behind his

21   back before the gate opened so we could handcuff him.

22   That did not happen.

23       Then Sergeant Hendrickson and I entered the cell.

24   At that time he was asked to place his hands behind his

25   back.  He was going to be handcuffed and escorted out of

KARL BLANTON - DIRECT

1  the cell.  He -- I secured the legs.  Sergeant

2  Hendrickson began to start handcuffing.  At that point

3  there was some resistance with trying to get the second

4  handcuff secured and I assisted.

5  Q.   Okay.  And during that time when you were helping

6  Sergeant Hendrickson secure the handcuffs, were you

7  giving Mr. Kingsley any instructions?

8  A.   Yes, multiple times for Mr. Kingsley to stop

9  resisting, stop flexing, stop making it harder than it

10 needs to be.

11 Q.   Did Sergeant Hendrickson say anything to him?

12 A.   I cannot recall.

13 Q.   Eventually the two of you were able to secure the

14 handcuffs on Mr. Kingsley, correct?

15 A.   That is correct.

16 Q.   And what happened after the handcuffs were placed on

17 Mr. Kingsley?

18 A.   After that we were explaining to Mr. Kingsley that

19 we were going to have to set him up and get him to his

20 feet so we could escort him to a receiving cell.  He was

21 not helping us get him to his sitting position is what we

22 were trying to get him to.  We helped him up to the

23 sitting position.

24      And I believe at that time he complained that his

25 foot hurt.  I asked him multiple times what foot hurt,

KARL BLANTON - DIRECT

 1   why it was hurting, what was hurting, where it was

 2   hurting.  He would not respond to any of those medical

 3   questions.

 4       At that time we explained to Mr. Kingsley we were

 5   going to have to get him up to his feet unless he can

 6   tell us what feet or what foot was hurting.  We could get

 7   him a wheelchair and get him out.  There was other

 8   avenues.  But he wouldn't respond to us on what was

 9   hurting at all.

10       So we helped Mr. Kingsley.  I believe I was under

11   his left arm and Sergeant Hendrickson was under his right

12   arm.  We helped him up to his feet.  At that time I

13   believe he went to what you would call *dead weight* and he

14   just put all his weight so Sergeant Hendrickson and I

15   were supporting his weight and then he went to the ground

16   on his knees softly.

17       At that time I again asked him what's wrong, which

18   foot, tell us what's going on so we can get this worked

19   out, trying to make this, you know, as easy as possible

20   for everybody.  Then at that time he still was not

21   responding, was not helping us get -- resolve the

22   situation, making it more difficult.

23       At that time Sergeant Hendrickson and I, due to the

24   size of the cell, we were able to drag him out to where

25   his knees and his lower legs were on the floor.  We had

1  his upper torso.  We were able to drag him out to the

2  main hallway I guess as kindly as possible due to the

3  size of the cell or the cell and the hall or the size of

4  the catwalk.

5  Q.   I'm going to go back a little bit.

6  A.   Sure.

7  Q.   When you were assisting Sergeant Hendrickson placing

8  the handcuffs on Mr. Kingsley, I believe you testified

9  that you were securing his legs or his feet?

10 A.   I was trying to achieve both at that time to help

11 Mr. or Sergeant Hendrickson get control of that arm so we

12 could get that handcuffed, so in a type of position.  I

13 can't say I -- simultaneously did I have control of his

14 feet and get the handcuff on?  That I don't know.  I do

15 know I was assisting trying to get one arm.

16 Q.   Your primary responsibility was his legs or feet?

17 A.   Sure.

18 Q.   During this time did you slam his legs or feet into

19 the bunk?

20 A.   No, no, I did not.

21 Q.   And during this time did you observe anything that

22 may have injured Kingsley's foot or ankle?

23 A.   No, I did not.

24 Q.   Once the handcuffs were placed on Mr. Kingsley, did

25 you or Sergeant Hendrickson order him to stand up?

KARL BLANTON - DIRECT

1  A.   We asked him to go to his feet and he would not

2  respond.

3  Q.   Did Kingsley say anything at this time?

4  A.   Nothing that I can recall, no.

5  Q.   I think you testified that at some point in time he

6  complained that his foot hurt?

7  A.   Yes, that's correct.

8  Q.   Where was this?

9  A.   This was in the cell after we had him in the seating

10  position.

11  Q.   And what did you say in response to Mr. Kingsley's

12  complaint?

13  A.   I went into the medical part of it and asked him

14  what foot.  We need to find out what foot, what is going

15  on, whether you can bear on it, anything of that such,

16  and we were not getting any response from Mr. Kingsley.

17  Q.   Did you look at his foot?  Did you look at his leg,

18  observe it?

19  A.   I didn't look at the foot.  I mean, through all of

20  it, it just looked -- I did not see anything medically,

21  like, protruding, any bones coming out, any large lumps

22  or redness.  I did not take time to examine the foot.

23  Q.   I think you testified already, but did you ask him

24  what was wrong with his foot?

25  A.   Yes, multiple times.

KARL BLANTON - DIRECT

1    Q.    Do you know how many times?

2    A.    I do not, no.

3    Q.    At any point in time did Kingsley say that he

4    couldn't walk?

5    A.    I do not recall if he could or couldn't.  He just

6    said something was wrong with his foot, so --

7    Q.    And he didn't tell you what?

8    A.    Yeah.  He wouldn't tell me what foot or what was

9    wrong.

10   Q.    Was Kingsley given the option to walk out of his

11   cell?

12   A.    Yes, he was.

13   Q.    Did he walk out of his cell?

14   A.    No, he did not.

15   Q.    You testified that after Mr. Kingsley was put in

16   handcuffs, after he refused to walk, you and Sergeant

17   Hendrickson proceeded to carry him out of his cell; is

18   that right?

19   A.    That is correct.

20   Q.    Okay.  And then from his cell, where did you carry

21   him?

22   A.    We carried him to the outer hallway outside the

23   blocks.

24   Q.    Did you say anything to Kingsley as you were

25   carrying him?

1  A.   I do not recall, no.

2  Q.   Did you ask him to walk?

3  A.   Before going out.

4  Q.   What happened once Kingsley had been carried out to

5  the main hallway?

6  A.   At that point in time we sat Mr. Kingsley down on

7  the ground facedown again, asking him if he would walk,

8  if he would go to the receiving cell; what was wrong with

9  his foot, which foot was hurting, you know; what can we

10  do to get you to help us get you to the receiving cell.

11  Q.   What was his response?

12  A.   He would not respond to any of those questions.

13  Q.   When he was in the main hallway, did he indicate he

14  was willing and able to walk at that point?

15  A.   No, he did not.

16  Q.   Did he indicate what was wrong with him physically?

17  A.   No, he did not.

18  Q.   Did he indicate what foot hurt, if any, if either?

19  A.   No, he did not.

20  Q.   Once Mr. Kingsley was escorted into the main

21  hallway, was he given the option to walk into the

22  receiving cell under his own power?

23  A.   Yes.  We asked him if he would walk into the

24  receiving cell.

25  Q.   Did he respond?

1    A.    No, he did not.

2    Q.    What happened after that?

3    A.    At that time, since we had more room, we went ahead

4    and decided that a deputy grab each limb, would be once

5    again Sergeant Hendrickson and I would have the upper

6    torso.  I believe I was on the left arm, Sergeant

7    Hendrickson was on the right arm.  And I believe two

8    deputies were -- had each leg.  I'm not sure which

9    deputies those were.

10   Q.    And where was Mr. Kingsley carried ultimately?

11   A.    Ultimately he was carried to one of our receiving

12   cells in our receiving area.  We have three of them.

13   Q.    And can you describe how he was carried in and

14   placed in the cell?

15   A.    Yes.  He was -- once again I believe four deputies.

16   I had the left upper torso under his left arm, Sergeant

17   Hendrickson had up under his right arm, and two deputies

18   had each of his legs.  He would have been in the facedown

19   position as we carried him.  We carried him through one

20   doorway, then the second doorway, then we laid him

21   facedown on the concrete bedding that is in a receiving

22   cell.

23   Q.    Once he was placed on the concrete bunk, what did

24   you and the other officers do?

25   A.    At that time we were trying to get the handcuffs off

1  of Mr. Kingsley.  Mr. Kingsley was not making it easy for

2  us, struggling, trying to flex, making it more difficult

3  to remove the handcuffs with his wrist, grunting, showing

4  a lot of anger, and we were trying to get the handcuffs

5  off at that time.

6  Q.   Why did you want to remove the handcuffs?

7  A.   You want to remove the handcuffs once you have

8  somebody in a receiving cell because that would be a safe

9  place for them.  Leaving somebody in there that is under

10  distress, their hands behind their back, can severely

11  hurt themselves and others.  So it's a good option to try

12  to remove the handcuffs as soon as possible to make sure

13  that they don't hurt themselves.  There's not a lot you

14  can do when you're in handcuffs behind your back when you

15  could possibly hurt yourself.

16  Q.   Did you have any role with respect to removing the

17  handcuffs?

18  A.   I'm sorry.  Can you repeat that?

19  Q.   Did you have any role with respect to removing the

20  handcuffs from Mr. Kingsley?

21  A.   I did.  I had the handcuff key and I was the one

22  trying to remove the handcuffs.

23  Q.   As you attempted to remove the handcuffs, what was

24  Mr. Kingsley doing?

25  A.   Mr. Kingsley was kind of rolling, shifting, flexing;

KARL BLANTON - DIRECT

1  trying to pull the handcuffs apart as I'm trying to take

2  them off, which made it difficult; lifting his upper

3  torso, grunting, moving his hands; definitely was not

4  making it easy to where I can remove the handcuffs.

5  Q.   Is it fair to say that Mr. Kingsley did not

6  cooperate with your efforts to remove his handcuffs?

7  A.   That is correct.

8  Q.   You described a number of things that he was doing

9  as you attempted to remove the handcuffs.  I want to make

10 sure that I understand all of these things.

11 A.   Sure.

12 Q.   You indicated that he was pulling his arms apart?

13 A.   Yes.

14 Q.   Moving his hands?

15 A.   Yes.

16 Q.   Lifting his torso?

17 A.   Yes.

18 Q.   Tensing his arms?

19 A.   Yes.

20 Q.   Was there anything else?

21 A.   I would guess also just kind of rolling back and

22 forth just trying to, you could say, make it difficult or

23 resisting.  He was asked multiple times, stop resisting,

24 making it harder for us to try to get these off.

25 Q.   I don't want you to guess.  Was he rolling?  Was he

KARL BLANTON - DIRECT

1  moving?

2  A.   He is -- he would move just a little bit left to

3  right.   I wouldn't say rolling, but just kind of moving,

4  swaying left to right.

5  Q.   Thank you.   As you were attempting to get the

6  handcuffs off of Mr. Kingsley, did he attempt to pull his

7  hands or arms away from your grasp?

8  A.   He was moving them, so I don't know if he was

9  pulling them away from my grasp, but moving them enough

10  to where I wasn't able to get the key into the keyhole.

11  I felt like there was a lot of tension on the cuffs and

12  his arms.

13  Q.   You described that he was lifting his torso.   Did he

14  attempt to lift his body off of the bunk?

15  A.   I don't know if he was lifting his body, but his

16  upper torso kind of came up off the bunk.

17  Q.   Did you and the other officers do or saying anything

18  to counteract his resistance?

19  A.   Multiple times trying to explain to Mr. Kingsley,

20  let's get these cuffs off, let's work out this issue,

21  let's just deal with this in a safe way, stop resisting,

22  stop fighting us, let's get these cuffs off.

23  Q.   What was his response?

24  A.   A lot of grunting and hollering, just grunting,

25  anger, frustration, is what I got out of it.

KARL BLANTON - DIRECT

1   Q.   Did any of the officers' efforts to get him to stop

2   resisting work?

3   A.   No, they did not.

4   Q.   Can you explain that?

5   A.   Multiple efforts of trying to talk him down, trying

6   to hold him down, would not succeed.

7   Q.   Did Mr. Kingsley's resistance create a risk to

8   anyone in the cell?

9            MS. WARD:  Objection.  Leading.

10           THE COURT:  Overruled.

11  A.   To himself and to other officers, yes.

12  Q.   Can you explain that?

13  A.   Just the lifting of the torso, other officers on top

14  of him, the moving around, can fairly -- there's

15  multiples things that could happen for people's safety

16  when trying to resist.  I can't assume, but multiple

17  things could happen.

18  Q.   When you said "for people's safety," by that, what

19  do you mean?

20  A.   I mean the inmate and the officers, yes.

21  Q.   You indicated that Mr. Kingsley was making some

22  sounds at this time?

23  A.   Yes.

24  Q.   Could you describe those?

25  A.   It sounded like grunting out of anger and

3-A-72

1  frustration, is the way that I took it.

2  Q.   Do you know whether he was grunting because he was

3  in pain?

4  A.   No.  I did not take any of that as being in pain.  I

5  have experienced people being in pain, you know, "Get

6  these off.  I'm in a lot of pain."  None of that came

7  out.

8  Q.   Based on your experience, what did you perceive the

9  sounds that he was making to be?

10 A.   In my experience it's just aggression, anger and

11 frustration.

12 Q.   What happened next?

13 A.   After that, still trying to get the handcuffs off,

14 at some point in time I believe there was an order by

15 Sergeant -- there was an order by Sergeant Hendrickson to

16 drive stun or tase Mr. Kingsley and that was done by

17 Deputy Degner.  And then at that point in time we were

18 still trying to get the cuffs off.  That still didn't

19 happen.  And eventually, a few moments later, Lieutenant

20 Conroy asked for all the inmates -- or I'm sorry -- all

21 the officers to step out.

22 Q.   If Mr. Kingsley was resisting your efforts, why were

23 you still trying to remove the handcuffs?

24 A.   I think it came down to safety for Mr. Kingsley was

25 the most important part.  Leaving somebody handcuffed

KARL BLANTON - DIRECT

1  behind their back in a cell like that is very dangerous,

2  so it's very important to try to get those handcuffs off

3  so that person is not left in a place by themselves with

4  their hands behind their back.

5  Q.    "Cell like that," what do you mean?

6  A.    It's a receiving cell.  It's concrete all around.

7  There's places they can stand up on a ledge and try to

8  hurt themselves and things of that sort.

9  Q.    Once the taser was applied, did Mr. Kingsley stop

10  resisting?

11  A.    During the tasing the body tensed up.  And then

12  shortly after I think he was more agitated and he was

13  still resisting.  I was not able to get the cuffs off.

14  There was still some struggling with the hands, a lot of

15  anger, and we were still not able to get the cuffs off.

16  Q.    What happened at that point?

17  A.    At that point we were not able to get the handcuffs

18  off.  Lieutenant Conroy I believe gave the order for all

19  the deputies to step out.

20  Q.    Upon receiving that order from Lieutenant Conroy,

21  what did you do?

22  A.    Once we're -- then we all stepped out, not at the

23  same time.  I believe I was probably the second one out

24  and I believe Degner or Sergeant Shisler was the last one

25  out.

KARL BLANTON - DIRECT

1  Q.   At the time that Lieutenant Conroy gave the order

2  for the officers to leave the cell, was there any force

3  used on Mr. Kingsley by any of the officers from that

4  point forward until you left the receiving cell?

5  A.   No, I don't believe so.

6  Q.   Did you have any further interactions with

7  Mr. Kingsley in connection with this incident?

8  A.   Before this incident or -- I'm sorry.

9  Q.   Let me rephrase that.  After you had left the cell

10 the other officers on May 21st, 2010, did you have any

11 other further involvement with Mr. Kingsley that day?

12 A.   Yes, I did.  A short time after we went back with I

13 believe three other deputies and we were able to get the

14 cuffs off of Mr. Kingsley at that time.

15 Q.   Do you know who, besides yourself, was involved in

16 that?

17 A.   I believe it was Deputy Wildes, Deputy Bedenbaugh,

18 myself and I believe there was one more.  I'm not sure.

19 Q.   What was your role?

20 A.   At that time I was -- I had the taser outside the

21 cell.

22 Q.   Who was responsible for removing the handcuffs, if

23 you remember?

24 A.   I do not remember.

25 Q.   Setting aside who may have been responsible for

KARL BLANTON - DIRECT

1  removing the handcuffs, was that officer able to do so?

2  A.   Yes.

3  Q.   After the handcuffs were removed from Mr. Kingsley,

4  did you have any further interactions with anyone in

5  connection with this incident?

6  A.   I made a phone call to medical staff to let them

7  know of the situation and that Mr. Kingsley was still in

8  handcuffs in the receiving cell, before I went back the

9  second time, to notify -- before we took the handcuffs

10  off so nursing staff was notified that Mr. Kingsley was

11  still in cuffs.

12  Q.   Mr. Blanton, at any point in time, from the time

13  that you and Sergeant Hendrickson entered his cell to

14  remove him to the time that Mr. Kingsley was left in the

15  receiving cell with handcuffs on, did Mr. Kingsley say

16  anything about the handcuffs being on too tight?

17  A.   No, I don't believe so.

18  Q.   When you were attempting to remove the handcuffs

19  from Mr. Kingsley, did Mr. Kingsley say that he couldn't

20  do what you were asking him to do?

21  A.   No.

22  Q.   When you were attempting to remove his handcuffs,

23  did you see or hear anything that led you to believe that

24  Mr. Kingsley was physically unable to comply with your

25  instructions?

KARL BLANTON - DIRECT

1  A.    No.

2  Q.    When you were attempting to remove the handcuffs,

3  did Mr. Kingsley do anything that led you to believe he

4  was unable to keep his hands together so that you could

5  remove his handcuffs?

6  A.    No.

7  Q.    When you were attempting to remove his handcuffs,

8  did Mr. Kingsley do anything that led you to believe that

9  he was trying to assist your efforts to try to remove

10  them?

11  A.    No.

12        MR. POSNANSKI:  I have nothing further, Your

13  Honor.

14        THE COURT:  Ms. Ward.  Actually, we could -- why

15  don't we break right now.  We could maybe take up that

16  other matter.  That would be a good idea.  All right.  We

17  will resume at quarter of two.  Please remember not to

18  talk about the case.  Leave your notepads on your chairs.

19     (Jury out at 12:42 p.m.)

20        THE COURT:  All right.  Mr. Jones, you wanted to

21  move for Rule 50, under Rule 50?

22        MR. JONES:  I did.  Mr. Posnanski is actually

23  going to make the motion.

24        THE COURT:  All right.  Mr. Posnanski.

25        MR. POSNANSKI:  Thank you, Your Honor.  At this

1  point in time the plaintiff has now been fully heard.

2  It's our position that a reasonable jury does not have a

3  legally-sufficient basis, evidentiary basis, to find for

4  the plaintiff.  The defendants ask that judgment be

5  entered in their favor, dismissing the plaintiff's

6  excessive force claim in its entirety.

7      Specifically, Your Honor, the plaintiff has failed

8  to establish three necessary elements that he must prove

9  by a preponderance of the evidence in order to prevail on

10  his claim:  First, the defendants' use of force was

11  unreasonable in light of the facts and circumstances

12  confronting them; second, that the defendants acted

13  deliberately or with callous indifference, evidenced by

14  an actual intent to violate the plaintiff's rights or

15  reckless disregard for those rights; and third, that the

16  defendants' conduct caused harm to the plaintiff.

17      First, Your Honor, it's our contention that the

18  force -- I'm sorry -- that the plaintiff cannot establish

19  the force under these circumstances was unreasonable.

20  The plaintiff admits he repeatedly refused to follow

21  instructions given to him by the defendants.  He admits

22  he was tensing and flexing his entire body, including his

23  arms and his hands, while the officers were trying to

24  remove his handcuffs.  He admits he raised his body off

25  of the bunk.  He admits the officers were struggling to

1  remove his handcuffs.  From the video and from the

2  plaintiff's testimony, he was growling aggressively while

3  the officers attempted to stabilize him and remove the

4  handcuffs, and in his own words admits he was quite

5  belligerent.

6      Plaintiff repeatedly ignored the defendants'

7  request to explain what was wrong with him and repeatedly

8  ignored their instructions to relax.  Plaintiff admits

9  that he never, not once, told the officers that his

10  handcuffs were on too tight; that he never, not once,

11  told the officers he was trying to relax or he was trying

12  to comply or that he simply couldn't comply.

13      The plaintiffs have -- the plaintiff has not

14  introduced any evidence that the handcuffs were on too

15  tight; but even if he did, he certainly failed to

16  introduce any evidence that the officers knew the

17  handcuffs were on too tight.

18      In essence, the plaintiff asks the jury to believe

19  that even though he had repeatedly disobeyed the

20  officers' orders, even though he had repeatedly ignored

21  their efforts to establish a dialogue about his physical

22  condition, even though he was tensing and flexing his

23  arms, even though he was moving his body as the officers

24  attempted to stabilize him and remove his handcuffs, and

25  even though he was quite belligerent, that all of this

1    conduct was involuntary because he was in pain.

2        As the plaintiff's own expert was forced to admit,

3    the officers were trained on when they could

4    appropriately use a taser; when they were faced with

5    active resistance or its threat.

6        Landers, Brian Landers, quite reluctantly had to

7    concede that the definition of active resistance does not

8    contain any element of the subject's intent.  Whether or

9    not Mr. Kingsley intended to resist the officers' control

10   efforts and efforts to remove the handcuffs -- he has

11   admitted that he did -- he physically countered their

12   control efforts, creating a risk of harm to both the

13   officers and himself.

14       As Mr. Landers, the plaintiff's own expert, stated,

15   the DAAT manual is the bible on the use of force in

16   Wisconsin.  Well, the bible gives specific examples of

17   active resistance, as Mr. Landers stated in his

18   testimony, to insure that the officers understand this

19   important concept; one of those examples, pushing off of

20   a surface that he was directed against.

21       I think that it's completely undisputed at this

22   point that the plaintiff and his expert both admit that

23   the plaintiff lifted his torso off of the concrete bunk

24   as the officers were attempting to remove his handcuffs.

25       The officers were presented with a textbook example

1  of active resistance and responded appropriately.  Under

2  these circumstances, no reasonable jury could find that

3  the officers' use of the taser in the circumstances

4  confronting them was unreasonable or excessive.

5       I want to focus then, Your Honor, on the intent that

6  the plaintiff must prove with respect to the officers.

7  Under the Fourteenth Amendment, we know that the standard

8  is neither wholly objective nor wholly subjective, but we

9  have to take into consideration the officers' intent when

10 they used the force that they did.  We're provided this

11 instruction from the *Wilson v. Williams* case, which is 83

12 F.3d 870.

13      The plaintiff has not introduced any evidence, none,

14 that the defendants knew he was tensing his body or

15 resisting the officers' efforts to stabilize him because

16 he was in pain.  There wasn't a single bit of evidence

17 that came in with respect to that.  Likewise, the

18 plaintiff has not introduced any evidence that the

19 defendants used the taser in a manner that recklessly

20 disregarded is rights and not in a good-faith effort to

21 maintain control or discipline.

22      The plaintiff has not introduced any evidence that

23 he was suffering from any obvious injury that should have

24 been readily detected by the officers.  And again, he

25 certainly didn't tell the officers that the handcuffs

1   were on too tight and might be causing him to tense up or

2   resist their efforts to remove the handcuffs.

3        Accordingly, the plaintiff has failed to demonstrate

4   the officers acted in reckless disregard for his rights.

5   And employing the *Wilson* factors, we know that the

6   officers had good reason to remove the handcuffs.  We

7   know that the plaintiff engaged in resistive behavior,

8   which he admits.  We know that the officers had good

9   reason to be concerned with injury to both the plaintiff

10  and to themselves as they were struggling with a subject

11  in a confined concrete box.

12       The officers attempted to talk with the plaintiff

13  repeatedly and the plaintiff admits he did not respond to

14  their efforts.  Once the officers tased him, only once,

15  they stopped, they disengaged.  They realized the force

16  that they used was not working.  In addition, the

17  plaintiff wasn't injured and actually refused medical

18  treatment.

19       Indeed the evidence has shown the officers were

20  trained to use the taser when confronted with active

21  resistance.  The training manuals provide specific

22  examples of active resistance: attempting to pull away

23  from the officer's grasp, getting up after being directed

24  to the ground, pushing off of a surface he was directed

25  against.  We have those exact facts in this case.

1    In other words, the defendants were confronted with

2 conduct they're specifically trained amounts to active

3 resistance.  They responded appropriately and consistent

4 with their training.  And instead of recklessly

5 disregarding the plaintiff's rights, they believed they

6 were following that training.

7    Under the facts and circumstances confronting the

8 defendants, no reasonable jury could find that the

9 defendants used excessive force against the plaintiff in

10 reckless disregard of his rights.

11    Third, Your Honor, I don't believe we've heard

12 sufficient evidence of harm.  There's some amorphous

13 complaints of pain.  We believe these are insufficient.

14 And indeed the plaintiff's testimony is that he was in so

15 much pain that he refused medical treatment.

16    I want to focus on the use of the leg on

17 Mr. Kingsley's back separate from the taser for this

18 portion of our argument, Your Honor.  We believe the use

19 of this force was *de minimis*.  At summary judgment the

20 plaintiff told us the evidence would show his head was

21 slammed into the concrete bunk.  That's why that claim

22 was allowed to go forward.  We did not hear any such

23 evidence.

24         MR. PARDON:  Your Honor?

25         MR. POSNANSKI:  In fact plaintiff did not

1  testify regarding any injuries to his head.  Indeed,

2  contrary to his own expert witness, plaintiff didn't

3  testify regarding pain or injury to his neck or spine.

4  He testified there was pressure applied to his upper

5  back.  This is insufficient to state a constitutional

6  claim.  "An excessive force claim cannot be predicated on

7  a *de minimis* use of force.  That comes from *Filmore v.*

8  *Page*, which is 358 F.3d 496, out of the Seventh Circuit.

9       "Not every malevolent touch by a prison guard gives

10  rise to a federal cause of action, even if the use of

11  force in question made it later seem unnecessary in the

12  peace of a judge's chambers."  That comes from *Outlaw v.*

13  *Newkirk*, which is 298 F.3d 833.

14       Even if the plaintiff has potentially stated a claim

15  here, Your Honor, with the evidence we have seen, and

16  it's been introduced, I believe the officers are still

17  entitled to qualified immunity under the facts and

18  circumstances as have been testified here.  Given that

19  the officers complied with their training or at the very

20  least reasonably believed they were complying with their

21  training, they are entitled to qualified immunity.

22       Qualified immunity protects the officers, provides

23  the officers with the ability to predict when their

24  actions will create liability for them and offers them

25  the assurance they will not be held personally liable as

 1   long as their actions are reasonable in light of current

 2   American law.

 3        Qualified immunity is a two-part analysis:  First

 4   is, do the facts, as established, show the defendant

 5   official violated a constitutional right; and second, was

 6   the right clearly established at the time it was

 7   violated.  A negative answer to either of those questions

 8   is enough to establish the defense of qualified immunity.

 9   That comes from *Hanes v. Zurich*, which is a Seventh

10   Circuit case, 578 F.3d 491.

11        Even if the contours of a federal right in question

12   are found to have been clearly delineated at the relevant

13   time, a public official, such as the defendants in this

14   case, still enjoy qualified immunity if it was

15   objectively reasonable for them to believe that their

16   actions did not violate the federal right.  In fact

17   public officials are shielded from suit where officials

18   of reasonable competence could disagree that such acts

19   were objectively reasonable.

20        In other words, qualified immunity provides ample

21   protection to all but the plainly incompetent or those

22   who knowingly violate the law.  If officers of reasonable

23   competence could disagree, immunity should be recognized.

24        As we know from the Supreme Court's discussion in

25   the *Saucier* case --

1          THE COURT:  I'm going to have to cut you off.

2   I'm running into time problems.

3          MR. POSNANSKI:  That's fine, Your Honor.

4          THE COURT:  I'm going to take this motion under

5   advisement and we will continue with the evidence.  All

6   right.  See you at 12:45 -- 1:45.

7          (Recess at 12:52 p.m.)

8                              ***

9          I, CHERYL A. SEEMAN, Certified Realtime and

10  Merit Reporter, in and for the State of Wisconsin,

11  certify that the foregoing is a true and accurate record

12  of the proceedings held on the 16th day of October, 2012,

13  before the Honorable Barbara B. Crabb, of the Western

14  District of Wisconsin, in my presence and reduced to

15  writing in accordance with my stenographic notes made at

16  said time and place.

17  Dated this 2d day of November, 2012.

18

19                        _____/s/_____

20                        Cheryl A. Seeman, RMR, CRR
                          Federal Court Reporter

21

22

23

    The foregoing certification of this transcript does not
24  apply to any reproduction of the same by any means unless
    under the direct control and/or direction of the
25  certifying reporter.