# *Electronic Control Devices*

## A Training Guide For Law Enforcement Officers



**Wisconsin Department of Justice**
**Law Enforcement Standards Board**
**June 2008**





PLAINTIFF'S
EXHIBIT
21

ALL-STATE LEGAL®

MONROE000972

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................2
INTRODUCTION........................................................................................3
DISTURBANCE RESOLUTION.....................................................................3
CONTROL ALTERNATIVES........................................................................4
    Control Devices ..................................................................................5
    Flammability of ECD's in conjunction with OC.....................................8
    Multiple deployments of an ECD on an individual...............................8
ELECTRONIC CONTROL DEVICES.............................................................9
WHAT IS AN ECD AND WHAT DOES IT DO?...............................................9
WHAT IS THE DIFFERENCE BETWEEN CONTACT DEPLOYMENT AND
DISTANCE DEPLOYMENT? ......................................................................11
CARING FOR ECD'S. ...............................................................................11
HOW TO USE ECDS. ..............................................................................12
    Electricity 101 ..................................................................................16
    Some Electricity Rules that apply to ECD's .......................................17
    Malfunctions ...................................................................................17
    Carrying an ECD .............................................................................19
    Flammability of ECD's in conjunction with OC....................................19
    Will I be affected when I touch a suspect who is being affected by an
    ECD?...............................................................................................19
WHAT IF A SUBJECT THREATENS ME WITH AN ECD?..............................20
AFTER-CARE ..........................................................................................20
PEOPLE EXHIBITING MEDICALLY SIGNIFICANT BEHAVIOR.....................22
MEDICALLY SIGNIFICANT BEHAVIOR AND TACTICAL EVALUATION .........22
WHAT IS MEDICALLY SIGNIFICANT BEHAVIOR?.....................................23
    First On Scene.................................................................................24
    In-Custody Death.............................................................................24
RECOGNIZING MEDICALLY SIGNIFICANT BEHAVIORS ............................25
    Field Impression .............................................................................26
    Typical Behaviors Associated with Excited Delirium..............................27
"OVERLAPPING CATEGORIES", A PROBLEM FOR OFFICERS AS FIRST
RESPONDERS .........................................................................................28
MEDICALLY SIGNIFICANT BEHAVIOR DANGEROUS ON THREE LEVELS..31
RESPONDING TO MEDICALLY SIGNIFICANT BEHAVIOR..........................31
    Multiple Officer Ground Handcuffing with Chemical Restraint Application32
DOCUMENTING AN ECD USE ..................................................................35

MONROE000973

# INTRODUCTION

Law enforcement officers may be called upon to use electronic control devices in the course of performing their duties. Because of the nature and visibility of the use of electronic control devices, it is important to clearly identify the criteria and procedures for use, limitations on their use, and appropriate follow-up care.

The Disturbance Resolution Model shown below recognizes that electronic control devices have been adopted by the law enforcement community. Under Intervention Options, the Control Alternatives mode identifies electronic control devices as one of the available options. This training guide addresses control alternatives and the role of electronic control devices for use in law enforcement situations.

# DISTURBANCE RESOLUTION

(Revised and approved by the Law Enforcement Standards Board December 2006)

## 1) APPROACH CONSIDERATIONS

A. Decision -Making      Justification
Desirability

B. Tac tical Deployment      Control of Distance
Relative Positioning
Relative Positing with Multiple Subjects
Team Tactics

C. Tactical Evaluation      Threat Assessment Opportunities
Officer/Subject Factors
Special Circumstances
Level/Stage/Degree of Stabilization

## 2) INTERVENTION OPTIONS

| MODE | PURPOSE |
|------|---------|
| A. Presenc e | To present a visible display of authority |
| B. Dialog | To verbally persuade |
| C. Control Alternatives | To overcome passive resistance, active resistance, or their threats |

3

MONROE000974

D. Protective Alternatives      To overcome continued resistance, assaultive behavior, or their threats

E. Deadly Force      To stop the threat

## 3) FOLLOW-THROUGH CONSIDERATIONS

A. Stabilize      Application of restraints, if necessary

B. Monitor/Debrie f

C. Search      If appropriate

D. Escort      If necessary

E. Trans port      If necessary

F. Turn-Over/Release      Removal of restraints, if necessary

### *Control Alternatives*

Control Alternatives is the third mode in Intervention Options. As the name implies, these interventions are designed to control subjects who are resisting or threatening to resist your lawful orders. As always, the overall purpose is to achieve compliance from a non-compliant subject, but these techniques are specifically geared toward overcoming both *passive* and *active* resistance.

Passive resistance refers to non-compliant, but non-threatening behavior. An example would be a person who refuses to get out of a car when ordered to do so. The person is not fighting with you—he or she is simply not complying with your orders. Protestors often use passive resistance as a political tactic, staging "sit-ins" to advance their agendas.

Active resistance, on the other hand, refers to behaviors that physically counteract an officer's attempts to control a subject and which pose a risk of harm to the officer, subject, and others. Examples of active resistance include attempting to pull away from the officer's grasp, running away, getting up after being directed to the ground, and so on.

4

MONROE000975



The mode of Control Alternatives includes four tactics/tools:

- Escort Holds
- Compliance Holds
- Control Devices
  - o Oleoresin Capsicum (OC spray)
  - o **Electronic Control Devices (ECD's)**
- Passive Countermeasures

Each of these is appropriate in different circumstances, as they provide different amounts of control: in general, they are arranged in increasing order of level of force and propensity for injury to the subject. As always, the appropriate choice of tactic depends on your tactical evaluation: your use of force must always be objectively reasonable.

**Control Devices**

The goal of control devices (OC spray and ECD's) is to overcome active resistance or its threat. Active resistance, unlike passive resistance, involves a subject who is physically countering an officer's control efforts—under

5

MONROE000976

circumstances in which the behavior itself, the environment in which the behavior occurs, or officer/subject factors create a risk of bodily harm.[1]

The criterion of active resistance or its threat means that in general, control devices would not be appropriate to use against verbal aggression, against people who are running away, against children and older persons, and against persons engaged in peaceful civil disobedience—*unless* reasonably justified by the circumstances covered in Approach Considerations.

Let's look at each of these situations and consider how an officer might analyze them to determine whether a control device would be an appropriate intervention option.  **Note:** Agencies differ in their policies with regard to the use of control devices by law enforcement officers.  Be sure to know and follow your agency's policy.

*Verbal Aggression.*  Verbal aggression occurs when a suspect is being argumentative, and/or confrontational with an officer.  While this behavior alone can be difficult for an officer to deal with, Professional Communication skills are the preferred method.  However, if arbitration is unsuccessful (REACT), and an officer/subject factor comparison dictates lesser levels of force would be ineffective, then a control device could be a viable alternative.

*People who are running away.*  Before deploying a control device (in this case, an ECD would be a better choice than OC spray) during a foot pursuit, ask yourself, "What will the suspect force me to do when I catch him?"  If the subject would force you to decentralize him or her during initial physical contact, using an ECD might be a better choice, as the risk of injury to the officer and subject would be less with an ECD as opposed to a passive countermeasure.  On the other hand, if you don't think the subject would require you to immediately take him or her to the ground, then an ECD would probably not be the best choice.  In that case you could safely respond with a lower level of force.

Another way to think about the situation is to apply the three criteria from *Graham v. Connor* to determine whether using a control device would be reasonable:

- The severity of the alleged crime at issue:  Is it a retail theft or a substantial battery?
- Whether the suspect poses an imminent threat to the safety of officers and/or others:  What is the suspect doing when you decide to use force?
- Whether the suspect is actively resisting or attempting to evade arrest by flight.  Is the suspect able to offer active resistance and/or flee?

*Children or Older Persons.*  Officers making use of force decisions involving children and older persons should ask themselves the following question when

---

[1] *Bodily harm* is defined in § 939.22(4) Wis. Stats as "...physical pain or injury, illness, or any impairment of physical condition."

6

MONROE000977

deciding if a control device is a viable alternative: *What is my alternative force option and does it increase the propensity of injury?* If the alternative creates a higher risk of injury, then a control device is a very viable alternative.

For example, suppose you are faced with a 90-year-old suicidal dementia patient armed with a small edged weapon. Your initial assessment indicates that the infirmities of age have greatly decreased the patient's ability to use his weapon. One option for controlling the situation and disarming the man could be for an officer (with deadly-force back-up) to strike the patient's weapon arm with a descending baton strike. Even if this tactic were successful in disarming the patient, there would be a high probability of injury to the patient's arm and an increased risk of harm to the officer because the officer would have to get close to the patient to deliver the strike. In this situation, an ECD deployed from a distance would decrease the likelihood of injury to both patient and officer.

**Persons engaged in peaceful civil disobedience.** Often times in these situations, officers must remove demonstrators from an area. If the protestors *actively* resist officers' attempts to remove them, a control device may be appropriate. One alternative would be for officers to attempt to carry or drag protestors out, resulting in a high probability of injury to both officers and protestors. On the other hand, swabbing OC below the protestors' eyes might achieve the same result with less likelihood of injury. In the case of civil disobedience, be sure to distinguish between *passive* and *active* resistance. If the subjects are displaying passive resistance only, compliance holds or pressure points would normally be the preferred choice.

**Pregnancy.** This issue is important because officers sometimes encounter females who are not obviously pregnant. There is no proof ECD use on pregnant females is safe or detrimental. However, the muscle contractions, risks from falling, and other unforeseen risks associated with pregnant females make it advisable to avoid deployment of an ECD on pregnant female where practicable, although there may be certain scenarios where the use of an ECD is justified in the overall context of the situation. Refer to your agency policy.

**Individuals in an elevated position.** A person who is at the top of the stairs, at the edge of a building rooftop, up a tree, or standing on a bar are exposed to the possibility of a life threatening injury if they fall from one of these locations. For this reason, an officer needs to factor the location of an individual and where they are likely to fall into the assessment when deciding whether to use an ECD or an OC spray.

**Holding a small child.** An individual who is holding an infant or small child will drop the child if they are at the receiving end of an ECD deployment. An OC spray directed at the subject will most likely also expose the child to the effects of the OC. For this reason, ECD's and OC spray are normally going to be poor choices in this situation.

7

MONROE000978

*Bystanders*. The presence of bystanders in close proximity to the subject will make using an ECD or OC spray more difficult. An officer needs a clear line of sight to the subject in order to deploy an ECD and cross-contamination is likely with OC. If feasible, an ECD is probably a better choice in this situation because the cross-contamination issues with the OC are likely to cause more problems.

## Flammability of ECD's in conjunction with OC

Some OC propellants are flammable and can be ignited when used in consort with an ECD. Check the manufacture's recommendations and see if your agency has performed its own tests on the combination of OC and ECD. Another consideration is if adjoining/assisting agencies have tested their OC and ECD. If unable to determine this through research then it recommended to not use the two tools together.

Another consideration is deploying an ECD on a suspect who has doused themselves with a flammable liquid (gasoline) or in a toxic environment (meth lab). The spark that is often generated when an ECD is activated (this is the air ionizing from the electricity being airborne) makes this very unsafe. An ECD is not to be used as a Control Device in situations like these.

## Multiple deployments of an ECD on an individual

Repeated or prolonged application of an ECD can have an additive effect and could cause injury, especially in someone whose health is already compromised in some way, including by drug use, injury, or over-exertion, as can happen in people displaying medically significant behavior. Before each application of an ECD, as with any other use of force, reassess the situation. If use of the ECD is not providing effective control to permit taking the subject into custody, consider whether it would be appropriate to disengage and/or escalate to another intervention option.

8

MONROE000979

# ELECTRONIC CONTROL DEVICES

### *What is an ECD and what does it do?*

Electronic Control Devices are instruments in which a safe amount of electricity is used to affect the sensory and/or motor nervous system of the body. Here's how it works. The ECD generates an electrical current that is transmitted to the subject's body through probes, either directly attached to the ECD (contact deployment) or attached to wires that are shot at the subject (distance deployment). Two points of contact on the body are required to complete the electrical circuit. The electrical current then follows the circuit, including the portion of the body between the probes, causing sensory and/or motor nervous system overload.

### *What are the different nervous systems?*

The human nervous system communicates using simple electrical impulses. The human nervous system is the command, control, and communication system of the human body. The nervous system is comprised of three elements.

◊   The **central nervous system** is the command center including the brain and spinal cord. All information processing and decision making processes occur in the central nervous system.

◊   The **sensory nervous system** includes the nerves that carry information to the brain. These are the "intelligence gathering" nerves which carry information about the environment (hot, cold, wet, etc.) and the state of the body (pain, body positioning, etc.) to the brain. These nerves tend to sit near the surface of the body in the skin, where they can interface with the skin and the environment around the body to gather information. The location of these nerves near the skin makes them easier to stimulate than deeper nerves. Hence, some ECDs affect only these nerves.

◊     The **motor nervous system** includes the nerves that carry command signals from the brain to the muscles controlling all movement. These nerves are located deeper in the body, protected within and beneath the muscle tissue. It takes a greater amount of ECD power or specialized electronic technology to penetrate deep enough to control these motor nerves.

*It is the control of the motor nerves in conjunction with the stimulation of the sensory nerves that can cause temporary incapacitation.[2]

---

[2] Information taken from Taser International version 13 Instructor material

9

MONROE000980

*Why is this important?*

Officers come in contact with a myriad of suspects displaying different levels of resistance and different types of assaultive behavior. These suspects respond differently to the selected use of force an officer is forced to use. Below is a profile of two suspects.

**Suspect #1**

| | |
|---|---|
| Offense: | Warrant for Disorderly Conduct |
| Height/Weight: | 6'/200lbs. |
| Behavior upon contact: | Agitated with officer contact and does not want to be taken into custody |

**Suspect #2**

| | |
|---|---|
| Offense: | Criminal Damage to Property (smashing car windows in the street at random) |
| Height/weight: | 5'09"/165lbs. |
| Behavior upon contact: | Has between 7 and 10 three inch cuts throughout both arms and doesn't acknowledge officers presence upon contact. |

Now the profiles are very oversimplified as there are many other factors that will determine an officer's use of force. However, they set the stage to see the importance of the knowing the difference between the two systems. Suspect #1 has a higher probability of responding to techniques/tools that affect the sensory nervous system because he still feels pain. Suspect #2 obviously does not feel pain based on his observable condition so officers need to affect his motor nervous system to achieve control. This can be accomplished through team tactics (using weight and strength), impeding his ability to resist, or using an ECD that affects both systems. Not all ECD's affect both systems.

Be aware that repeated or prolonged application of an ECD can have an additive effect and could cause injury, especially in someone whose health is already compromised in some way, including by drug use, injury, or over-exertion, as can happen in people displaying medically significant behavior. Before each application of an ECD, as with any other use of force, reassess the situation. If use of the ECD is not providing effective control to permit taking the subject into custody, consider whether it would be appropriate to disengage and/or escalate to another intervention option.

10

MONROE000981

## What is the difference between contact deployment and distance deployment?

In contact deployment, the fixed probes of the ECD directly touch a part of the body. Examples of ECD's that can be used in contact deployment include the following:

- Stun Gun – hand-held device with fixed contact points on the device that are directed into a specific body part as these points do not launch wires and/or probes.

- Stun Belt – belt worn by suspect and activated by a remote control. These are most commonly used in court room settings and custodial transports.

- Stun Shield – shield designed both to protect an officer from projectiles and to deliver a current. These are most commonly used in crowd control settings.

In distance deployment, the probes are attached to wires and shot from the ECD into the subject's skin, or onto their clothing. The current then runs from the ECD through the wires and into the body. Examples of ECD's that can be deployed at a distance include these:

- AIR TASER® #340000
- TASER® M26
- TASER® X26
- The Stinger
- LEA Stun Gun

Some ECDs can be used in both ways—as contact and distance devices. Dual-purpose ECDs are the best option for street officers, because duty situations are often fluid and dynamic and require versatile tools and tactics.

## Caring for ECD's.

As there are many different ECD's on the market, you will need to refer to the manufacturer's guidelines about care and maintenance of the ECD's used by your agency. Some general guidelines are:

- ECDs are electrical devices, so you should routinely check the batteries in accordance with manufacturer's recommendations.

- If your ECD will be primarily used in distance deployment, always keep additional cartridges with the unit.

- Unless otherwise specified by the manufacturer, keep your ECD dry. Electrical instruments can malfunction when exposed to water.

11

MONROE000982

## *How to use ECDs.*

The particular method of use for an ECD depends on whether it is designed for contact or distance deployment and on the particular manufacturer's instructions. Here are some general guidelines for common devices.

Stun belts are usually secured around the suspect's waist. If the suspect displays active resistance or its threat, the belt is activated via remote control. While activating the belt you should use heavy control talk and give loud specific commands, such as "Stop Resisting!" and/or "Put your hands behind your back!" Cover officers, if available, should use the deployment time to move into positions for emergency handcuffing and/or ground stabilization. [3]

 

A stun shield is usually held in front of an officer who is involved in either a crowd-control situation or a cell extraction. Before activating a stun shield, you should be in a defensive stance. As with the stun belt, while activating the shield you should use heavy control talk and give loud specific commands, such as "Get Back!," "Stop Resisting!" and/or "Put your hands behind your back!" And cover officers, if available, should use the deployment time to move into positions for emergency handcuffing and/or ground stabilization. A stun shield can also be used to drive back members of an aggressive crowd.

 

[3] The photographs of ECD's were taken from manufacturer and retailer websites Stun Belts featured above (left) Nova (right) Sepco

12

MONROE000983

Stun guns are usually contact deployed when the officer is within arms' reach of the suspect. The ECD is then directed onto a specific part of the body of the suspect. This kind of deployment has been also been referred to as a "drive stun." To perform a contact deployment, direct the ECD into the chosen spot on the body while activating it before or during contact. Always be aware of how much force you are using when applying a contact deployment into the suspect. Remember, the ECD in this mode is not an impact tool. The more force you use when making contact, the greater the risk of injury, particularly if that area of the body is fragile. For example, a forceful drive stun to the trachea could crush it, compromising the airway. The same force directed against the large muscles of the trunk would be less likely to cause serious injury. [4]

 

The contact deployment may affect major muscle groups and will generate sensory nerve overload wherever it is applied. You can maximize the sensory nerve overload effect by focusing on clusters of nerves within the body. There are several throughout the body, including:

- Brachial/Carotid Plexus (sides of neck)
- Brachial Plexus tie-in (upper chest)
- Radial Nerve (forearm)
- Pelvic Triangle (area outside of the immediate groin area)
- Common Peroneal Nerve (behind knee extending to the outside of the thigh)
- Femoral Nerve (top outside of thigh)
- Tibial Nerve (calf muscle)

*It is recommended that the Brachial Plexus and Pelvic Triangle be used as a secondary target area as the areas are more sensitive to blunt trauma from the process of directing the ECD into that area.*

---

[4] The photographs of ECD's were taken from manufacturer and retailer websites
*Stun guns featured above (left )New Generation (right) Sabre*
*Both featured stun shields above are from Nova*

13

MONROE000984

Below is an example of how to use a stun gun on a subject facing away from you:

1. Start in a defensive stance with stun gun in your strong side hand and your reaction hand positioned in front of you (Close Combat Draw position).

2. Move forward and use your reaction hand to stabilize the upper back of the suspect. While activating the stun gun use heavy control talk, giving loud specific commands, such as "Stop Resisting!" and/or "Get Down!"

3. Direct the ECD into the suspect's lower back while maintaining contact and if possible, directing him to the ground.

4. Assess whether to disengage and/or escalate.

5. Cover officers, if available, should use the deployment time to move into position for emergency handcuffing and/or ground stabilization.

As always in any situation in which you are close to a suspect, be aware of the possibility that the suspect may strike you. When an ECD is deployed, a strike may result from strong muscle contractions caused by the sensory/motor nerve overload rather than from the suspect's intent to hit you—but you still need to protect against it by securing the suspect's extremities.

ECD's deployed from a distance often involve 2 to 4 points of contact from the unit. The unit has projectiles that are directed from the device and onto the suspect and electricity is transferred by signal or wires into the body.



5

---
5 Photo taken from Taser International version 13 Instructor material

MONROE000985

To maximize on your distance deployment, attempt to apply some of the following principles:

- Greater probe spread increases effectiveness
- If possible, minimum 4 inch spread
- Hold vertical unless subject is laying down or at an angle
- If practicable, deploy at suspect's back (large overlapping muscle mass)
- If possible utilize surprise factor with back-up officer deploying
- Stronger muscles -- even more overwhelming
- Aim where clothing fits more tightly, clothing tends to fit tighter in rear
- Skin penetration of the probes is not always required. Some ECD's electrical arc can "jump" through clothing

 

If in the above photos the stars represent probe contacts during a distance deployment the following areas are going to be affected.[6]

| Left Photo | Right Photo |
|---|---|
| Right side of chest | Right side of chest |
| Right upper abdomen | Right side abdomen |
| | Right pelvic area |
| | Right quadriceps |

[6] Photo and material taken from Taser International version 13 Instructor material

MONROE000986

It is obvious that the photo on the right would have a greater affect on the body as more muscle groups and nerve areas are included between the probes.

Here is an example of how to deploy an ECD at a distance:

1. Start in a defensive stance with the ECD held in position number 4 of the draw. (Alternatively, if the suspect is close enough to attempt to disarm you, use the Close Combat Draw position.)

2. If practical and feasible, use heavy control talk and give loud specific commands, such as "Stop Resisting!" and/or "Get Down!"

3. Deploy the ECD, and continue to give commands, such as "Stay Down!" or "Hands behind your Back!"

4. Assess whether to disengage and/or escalate each time you deliver an additional cycle.

5. Cover officers, if available, should use the deployment time to move into positions for emergency handcuffing and/or ground stabilization.

### Electricity 101

Some common terms used in understanding electrical units. For purposes of theses explanations, numbers from the Taser X26 are used.[7]

*Current (amperes) "A":*  "Flow"-total electrons per second.

- **It's not the volts that are dangerous; it's the amps that determine safety.**

- The electrical output of the TASER is 50,000 volts. The voltage may seem high, but the average current in the system is well below dangerous levels. The X26 output is 2.1mA (0.0021 amps).

*Voltage (volts) "V":*  "Pressure" pushing electrons.

- The high peak arcing voltage of 50,000 volts only occurs when the arc is required to jump a gap such as between the electrodes on the end of the X26, or when a probe lodges in loose clothing and must jump the gap to the body. When traveling across the human body, the peak voltage drops to 1200 V for the X26. Reports that the TASER devices send 50,000 volts through the body are inaccurate.

---

[7] Taken from Taser International version 13 Instructor material

16

MONROE000987

- Carpet Static discharge – 30,000 V.

- Van de Graaff Generator   1,000,000+ V.

**Energy (joules) "J":** Energy in single pulse.

- Energy stored in device per pulse: 0.36 joules.

- Energy delivered per pulse: 0.07 joules, compared to external cardiac defibrillators which typically deliver 150-400 joules per pulse.

## Some Electricity Rules that apply to ECD's

- Electricity must be able to flow between the probes or the electrodes.

- Electricity follows the path of least resistance between the probes.

- The greater the spread between the probes on the target, the greater the effectiveness.

- Electricity will not pass to others in contact with the subject unless contact is made directly between or on the probes.

- Electricity can arc through clothing, even some bullet resistant materials.

- Exposure to water will not cause electrocution or increase the power to the subject (the electrical charge is fixed inside the X26 TASER device, and will not increase significantly even with environmental changes).

- High voltage won't injure you if the current is low.

- Low voltage CAN injure you if the current is high enough.

## Malfunctions

ECDs deployed from a distance are not always 100% effective. This may be based on one or several factors:

- A small probe spread in which often only a few smaller muscles or limited nerves are affected by the ECD.

- Only one probe has made contact and due to the other probe(s) not contacting the body there is no completion of the electrical circuit.

17

MONROE000988

- During the initial deployment, or between cycles, the electrical circuit (2 or more probe(s) making contact) loses contact and there is no affect.

- Target is completely missed.

- Wires are broken.

If ineffective, an officer is always permitted to disengage and/or escalate. One option is to follow-up with a contact deployment. Some ECD's will complete the circuit if one probe is in contact with the suspect. This will then cause the area between the probe and contact deployment to be effected. Knowing this, whenever possible try and increase the area spread.

Here is an example to manage an ineffective distance deployment that is followed-up with a contact deployment.

1. Start in a defensive stance with the ECD held in position number 4 of the draw. (Alternatively, if the suspect is close enough to attempt to disarm you, use the Close Combat Draw position.)

2. If practical and feasible, use heavy control talk and give loud specific commands, such as "Stop Resisting!" and/or "Get Down!"

3. Deploy the ECD, and continue to give commands, such as "Stay Down!" or "Hands behind your Back!" Upon realizing that the ECD is not effective, the officer moves in for a contact deployment leaving the cartridge attached to the ECD.

4. The officer sees that a probe is still in contact with the suspect's shoulder area.

5. In order to maximize the ECD effect the contact deployment should be directed away from the probe to an area of the body such as the suspect's thigh. The officer should keep their reaction hand in a position to defend from a possible strike.

6. Upon successful completion of the circuit, and/or successful suspect reaction (i.e. suspect begins to go to the ground) remember that continual contact is required to maintain success.

7. Assess whether to disengage and/or escalate each time you deliver an additional cycle.

8. Cover officers, if available, should use the deployment time to move into positions for emergency handcuffing and/or ground stabilization.

18

MONROE000989

**Dual purpose ECD's**

Some ECDs can be used as both contact and distance devices. Dual-purpose ECDs are the best option for street officers, because duty situations are often fluid and dynamic and require versatile tools and tactics.

**Carrying an ECD**

Refer to your agencies policy when determining where to carry an ECD. If given the option here are some pros and cons when making your determination.

| Reaction Side Carry | Strong Side Carry |
|---|---|
| (Pro) Lower Risk of Drawing Wrong Weapon Under Stress | |
| (Pro) Hip Cross draw = Faster Engagement on Target. | |
| (Pro)Easier ID as a Non-Lethal Weapon By Other Officers. | (Con) Higher risk of weapon confusion |
| (Con) Can be a weapon retention issues, depending on Defensive Tactic training. | (Con)Incidents of accidental shootings by mistaken weapon |

**Flammability of ECD's in conjunction with OC**

Some OC propellants are flammable and can be ignited when used in consort with an ECD. Check the manufacture's recommendations and see if your agency has performed its own tests on the combination of OC and ECD. Another consideration is if adjoining/assisting agencies have tested their OC and ECD. If unable to determine this through research then it recommended to not use the two tools together.

Another consideration is deploying an ECD on a suspect who has doused themselves with a flammable liquid (gasoline) or in a toxic environment (meth lab). The spark that is often generated when an ECD is activated (this is the air ionizing from the electricity being airborne) makes this very unsafe. An ECD is not to be used as a Control Device in situations like these.

**Will I be affected when I touch a suspect who is being affected by an ECD?**

In order to prevent from being affected while moving in to assist in stabilizing a suspect an officer needs to keep his body parts out from between the probes or points of contact. Electrical settings in modern law enforcement ECD's are so low that the electricity only passes between the two points of contact. An example would be if the suspect has two probes in his back area. There is one probe near the shoulder and the second probe just above the hip. Then an

19

MONROE000990

officer need only to avoid the area between the probes to successfully stabilize the suspect and avoid being affected by the ECD.

## What if a subject threatens me with an ECD?

As always, if you are faced with a subject threatening you with an ECD, you have the options to disengage and/or escalate. An important factor in determining what option to choose would be finding out what type of ECD deployment capabilities the suspect may have. If you choose to disengage, you have two goals:

- Create enough distance to get out of range of the ECD
- If fired upon, avoid being struck with multiple projectiles to prevent completion of the electrical circuit

When disengaging, consider your next option. Here are some possibilities:

- Attempt to defuse the situation using Professional Communication skills
- Attempt to disarm the subject (especially if confrontation starts within arm's reach)
- If unable to avoid being struck by more than one projectile, direct the projectiles into a small muscle mass to decrease some of the ECD effects. Possible smaller muscle masses include the abdomen, forearm, or bicep
- Escalate to a higher level of force

The appropriate level of force depends on the totality of the circumstances, including your own response to ECD. If you have previous experience with an ECD, you may know that you can fight through its effects—or you may know that you become instantly incapacitated. Conduct a tactical evaluation to determine an appropriate level of force, which may include Deadly Force.

### After-Care

After the suspect has been properly stabilized and handcuffed, you must provide appropriate care. In most cases, the subject will not require medical care. However, always get medical assistance in these circumstances:

- If the subject requests it
- If a person has an adverse reaction to an ECD application
- If you observe any other problem or feel that medical assistance is warranted

Immediate after-care is often similar in contact and distance deployment. The big difference is that after-care for distance deployment involves removing projectiles.   If the projectiles are embedded in sensitive tissue areas, i.e. neck,

20

MONROE000991

face, groin, or the breast of a female, the suspect should be transported to a medical facility for removal. If the projectiles are embedded in other non-sensitive tissue areas, you may remove them yourself according to the manufacturer's guidelines. Remember, because the probes have penetrated the suspect's skin, they may have blood on them and should be treated as contaminated needles. _Always use standard precautions (wear gloves) and dispose of the probes properly._

The following are typical instructions:

1. Break off the wires near the probes.
2. Grasp the probe firmly with your gloved hand and pull straight out.
3. Dispose of the probe by placing it point-first into a sharps container, or securing it temporarily (until a sharps container is available) in a location where no one will accidentally touch it.[8]

Reassess the suspect for indications of mental illness, emotional disturbance, or medically significant behavior. It may be easier, now that the subject is controlled, to observe signs that were not easily observed during the initial confrontation. If you see the following, the suspect may be displaying medically significant behavior such as being in a state of excited delirium, and require immediate medical intervention:

- Sweating (or loss of sweating late)
- Dilated pupils/less reactive to light
- Rapid breathing
- Decreased awareness and perception
- Rapid changes in emotions (laughter, anger, sadness)
- Thought content inappropriate for circumstances
- Hallucinations (visual or auditory)
- Delusions (grandeur, paranoia or reference)

---

[8] Taken from Taser International version 13 Instructor material

21

MONROE000992

# PEOPLE EXHIBITING MEDICALLY SIGNIFICANT BEHAVIOR

The last chapter discussed the use of electronic control devices and appropriate after-care. This chapter will focus on "medically significant behaviors" that you may encounter in your work as an officer and how best to respond to them.

## MEDICALLY SIGNIFICANT BEHAVIOR AND TACTICAL EVALUATION

During tactical evaluation, the ongoing analysis of threat in which you identify conditions, people and the environment to determine your appropriate resolution strategy, an officer should be concerned with indications of mental illness, emotional disturbance, or medically significant behavior from subjects. While assessing a subject's mental state, you must also try to determine if that state is coupled with medically significant behavior. In some cases, mental illness, stimulant drug use, or underlying medical conditions can cause a chemical imbalance in the body that produces characteristic violent and delusional behavior. Some of the indicators that a subject may be in a state of medically significant behavior include these:

- Abrupt onset – bystanders say, "he suddenly just started acting strange"
- Agitation or excitement
- Confusion and impaired thinking and perception
- Bizarre, often violent behavior directed at objects, especially glass
- Superhuman strength and insensitivity to pain
- Profuse sweating and clothing removal caused by extremely high body temperature

You are not expected to diagnose and treat medical or psychiatric conditions, and you are not expected to jeopardize your safety or the safety of others when a subject's behavior poses a danger. However, you should be aware of these behaviors that may indicate a serious medical condition exists and take steps to ensure that the subject receives appropriate medical care as soon as practical.

22

MONROE000993

# DISTURBANCE RESOLUTION

## 1) APPROACH CONSIDERATIONS

A.  Decision-Making

Justification
Desirability

B.  Tactical Deployment

Control of Distance
Relative Positioning
Relative Positing with Multiple Subjects
Team Tactics

C.  Tactical Evaluation

Threat Assessment Opportunities
- *Resistive Tension*
- *Early Warning Signs*
- *Pre-attack Postures*
- *Indications of Mental Illness, Emotional Disturbance, or Medically Significant Behavior*
- *Weapon Control Factors*

Officer/Subject Factors
Special Circumstances
Level/Stage/Degree of Stabilization

### What is medically significant behavior?

The term "medically significant behavior" cannot be precisely defined. It includes a variety of behaviors that indicate a serious and potentially life-threatening medical condition is present. Many acute medical conditions can be life-threatening. For example, severe chest pain may indicate that a person is having a heart attack, or mental confusion coupled with flushed, hot, dry skin can indicate heat stroke. These sets of signs and symptoms indicate life-threatening medical emergencies, and you need to recognize their seriousness—but they are not medically significant *behaviors*. This chapter focuses on particular behaviors and signs exhibited by people in crisis that signal a medical emergency.

As we have seen, people in crisis may behave in a variety of ways that are unusual. They may act fearful or paranoid, they may talk to people you can't see, they may make odd or repetitious movements, or they may speak incoherently. While these behaviors can certainly be troublesome, they do not in and of themselves indicate that a life-threatening emergency exists. Certain unusual behaviors, however, particularly when combined with extreme agitation, can indicate physiological imbalances that if untreated often lead to death. This chapter addresses how to recognize and respond to these.

23

MONROE000994

As an officer, you must be aware of medically significant behavior for two reasons:

- You are most likely to be first on the scene
- Medically significant behavior is associated with in-custody deaths

## First On Scene

When someone is exhibiting extreme or peculiar behavior, bystanders usually call the police rather than EMS. This is particularly true when the behavior is disruptive or violent. As a consequence, when a person is exhibiting medically significant behavior, it is likely that officers will be on the scene long before EMS. In fact, unless the subject has obvious injuries—or has caused injury, EMS may not be called at all. Unless the officer recognizes medically significant behavior and requests an EMS response, the individual may not receive treatment in time to prevent death.

## In-Custody Death

Medically significant behavior is also associated with in-custody deaths. Here is a typical scenario:[9]

> A man who is high on meth suddenly begins acting bizarrely. He begins yelling and screaming for no apparent reason. He starts to attack inanimate objects, particularly a plate-glass window. He strips off his clothes. He may be cut by the glass, but acts as if he is not even aware of the injuries. Bystanders call police. The responding officers attempt to calm the individual without success. He does not even acknowledge their presence and continues to behave violently.
>
> Officers attempt to take him into custody, but he fights them off, showing "superhuman" strength. More officers arrive and join the fray. Eventually, after an extended struggle, six officers are able to subdue him. They handcuff him and apply leg restraints and place him in the back of a squad car, where he continues to struggle against the restraints. Eventually, he calms down. He does not complain of any injury. The officers arrive at the jail only to discover that the subject is dead. Resuscitation efforts fail.

---

[9] Adapted from a PowerPoint created by Michael D. Curtis, M.D., EMS Medical Director Saint Michael's Hospital, Stevens Point, Wisconsin; St. Clare's Hospital, Weston, Wisconsin; Ministry Health Care. Used by permission.

MONROE000995

What is the likely aftermath of this set of events? The subject's family will accuse the police of causing the death by excessive force or inappropriate restraint procedures. The media will give the incident widespread coverage, and editorials will appear that are critical of the agency's policies and procedures and that question its commitment to upholding arrestees' civil rights. An internal investigation will ensue and lawsuits will be filed. The findings of the investigation may be referred to the District Attorney's office to determine whether charges should be filed. The officers' lives and careers will be disrupted—and possibly permanently damaged.

While some cases of in-custody death no doubt do result from officers' misconduct, many are never satisfactorily explained. Over the years, various theories have been advanced, including that certain restraint procedures, such as "hog-tying" might cause death by positional asphyxia, by placing a prisoner in a position that compromises his or her ability to breathe. As a result, many agencies have developed policies regarding restraint options, in the hope of reducing in-custody deaths. While positional asphyxia may be a contributing factor to unexplained in-custody deaths, particularly with obese subjects, it is not the entire answer.

Other theories have suggested that the use of OC spray or electronic control devices is a primary cause of in-custody deaths. Research has so far not substantiated these claims.[10]

A relatively new theory suggests that many in-custody deaths are the result of underlying medical problems, sometimes related to the use of illicit drugs, alcohol withdrawal, or use of psychotropic medications. These medical problems may be exacerbated by prolonged struggles with police, setting in motion a series of changes in the chemistry of the blood and brain that have been referred to as "the freight train to death."[11] Immediate medical intervention may be able to reverse these changes and stop the train. Without prompt medical intervention, a person experiencing these body chemistry changes will almost certainly die.

### Recognizing Medically Significant Behaviors

Law enforcement officers are skilled at observing human behavior. After all, much of police work involves dealing with people. As an officer, you receive training in how to conduct a threat assessment—some of which is guided by your

---

[10] See Petty, Charles, S., M.D. *Deaths in Police Confrontations When Oleoresin Capsicum is Used.* Unpublished report funded by the U.S. Department of Justice under Award Number 2001-M7-56. February 2004. Available at http://www.ncjrs.gov/pdffiles1/nij/grants/204029.pdf. See also Manojlovic, Drazen, et al. *Review of Conducted Energy Devices,* Technical Report TR-01-2006 prepared for the Canadian Association of Chiefs of Police.
[11] Michael Curtis, M.D.

MONROE000996

observations of a subject's behavior. In conducting investigations, you look for cues in a subject's behavior to guide your interview and help you try to determine who is lying and who is telling the truth. Just as certain behaviors may indicate a person is threatening to attack, certain behaviors may indicate a serious medical condition. Of course, anytime the police are called because of someone's behavior, the behavior is likely to be out of the ordinary. People don't call the police because their neighbor or friend is acting normal! How can you recognize medically significant behaviors?

Identifying medically significant behaviors in a timely way depends on two skills:

- Developing an accurate field impression
- Recognizing typical behaviors associated with Excited Delirium

### Field Impression

One of the first questions that emergency medical technicians (EMT's) learn to ask in initially assessing a patient is "What's my general impression?" They are taught to form a general impression even before taking a blood pressure or checking a pulse. The idea behind this is that simply by virtue of growing up around other people, a new EMT already has a good sense of what someone looks like when they are generally well—or not. If the new EMT looks at a patient and thinks to himself, "This guy looks really sick," he's probably right. Of course, as that new EMT gains field experience, his general impressions are likely to become even more reliable.

Similarly, as you gain experience on the street dealing with a variety of people exhibiting various sorts of behavior that prompted a call to 911, you will get a sense of what's "normal" bad behavior and what's out of the ordinary. If you encounter a person whose behavior is extreme in ways you don't normally see, consider the possibility that it might indicate a serious medical problem.

As you arrive on scene, during the Approach Considerations phase of Disturbance Resolution, in addition to assessing the threat potential, make a conscious effort to form a field impression of the person. Ask yourself if the person's behavior is similar to other people you've dealt with in similar circumstances. For example, officers are frequently called to remove an intoxicated person who is refusing to leave a residence. Sometimes these people are combative, or have difficulty processing information, or repeat themselves. Those are all common behaviors associated with alcohol intoxication. If instead, when you respond to the call, you find the subject fighting with his own reflection in a mirror while totally ignoring the fact that you're there, that's *not* typical for an everyday drunk. Something else may be going on.

26

MONROE000997

## Typical Behaviors Associated with Excited Delirium

Many medical conditions can cause behavior problems. Head injuries, for example, can often cause behavior that is atypical for the person. Mental disorders and mental illness, as discussed in an earlier chapter, often have associated behaviors. Purely medical conditions, such as hypoglycemia (a type of diabetic emergency) or hyperthyroidism can produce irritable or combative behavior. Of course, ingestion of excessive alcohol or use of stimulant drugs such as cocaine and methamphetamine can cause disruptive behavior as well. Recently, researchers have identified a syndrome called *Excited Delirium* that may explain otherwise inexplicable in-custody deaths.

While the existence of Excited Delirium as a distinct condition is still somewhat controversial in the medical world, autopsies of persons who have died in police custody after violent confrontations have revealed certain abnormalities in the brain and blood chemistry that are unlikely to be the result of police action. Usually, the person has ingested a stimulant drug that may serve as a trigger to set the process in motion. In some cases, psychiatric drugs may also be involved.

In the cases studied, the subjects' behavior at the time of their confrontation with police contained some common elements. Some of these signs and behaviors associated with excited delirium are readily observable by a responding officer:

**Agitation or Excitement = Increased activity and intensity**
- Aggressive, threatening or combative – gets worse when challenged or injured
- Amazing feats of strength
- Pressured loud speech
- Sweating (or loss of sweating late)
- Dilated pupils/less reactive to light
- Rapid breathing

**Delirium = Confusion**
- Disoriented
- Person, place, time, purpose
- Rapid onset over a short period of recent time
- "He just started acting strange"
- Easily distracted/lack of focus
- Decreased awareness and perception
- Rapid changes in emotions (laughter, anger, sadness)

**Psychotic = bizarre behavior**
- Though content inappropriate for circumstances
- Hallucinations (visual or auditory)
- Delusions (grandeur, paranoia or reference)

27

MONROE000998

- Flight of ideas/tangential thinking
- Makes you feel uncomfortable

Frequently, bystanders will report that the subject "just snapped" or suddenly started acting strange. The subject will not follow your commands and indeed, may not even acknowledge your existence.

If you see these behaviors, you may have a subject who is experiencing an extreme medical emergency. While your first job is always to protect the safety of yourself and others, you should recognize that getting medical help to this individual is also a priority. Without medical intervention, a person experiencing Excited Delirium will almost certainly die—and die quickly.

## *"Overlapping Categories", a problem for officers as First Responders*

Below is a hypothetical scenario involving an individual displaying signs of medically significant behavior.

*Officers are dispatched to a disturbance call at a residence. Dispatch advises that the female half (the caller) of the disturbance stated that her husband "just started acting strange" and after breaking several mirrors and windows in the house has stepped outside into the 20 degree weather.*

*Upon arrival officers observe the man to be removing what little clothing he has on. The man is screaming at the top of his lungs but is unintelligible. He goes from screaming to crying uncontrollably as the officers being to walk up the driveway. Suddenly the man smashes two of the windows in the minivan in his driveway. The man is about 5' 9" with a medium build and is about 35-40 years of age. He begins to throw his body into the side of the van three times. The last two hits leave huge dents as if the van was in an accident.*

*Officers attempt dialogue approximately 20 feet from the man. He suddenly turns towards the officers and begin to walk rapidly towards them. He is looking through them and as they attempt more dialogue it appears as if he doesn't acknowledge their existence. His hands are balled up in fists as he continues to approach the officers while breathing rapidly. Blood drips down his arms from large cuts received while smashing the van windows, but he doesn't appear to acknowledge the injury or the pain the wounds cause.*

*Officers feel that he is preparing to attack them and they apply several commands for the man to "stop" and "stay back". He continues and is nearly 10 feet from the officers when he shouts to them "You're not going to take my brain today!"*

MONROE000999

*An officer is able to access his ECD and deploys it from a distance. Both probes successfully hit and the man falls to the ground. He is obviously not fazed from the pain caused by the ECD however his motor functions have been successfully incapacitated.*

*The window of opportunity that this creates is utilized by the second officer who attempts to ground stabilize the man. The second the initial ECD deployment is completed the officer has managed to direct the man's hand behind his back and the officer is in the ground stabilization position. Once the ECD is off the man nearly throws the officer off his back even though the officer is 6' 215lbs and very athletic. A second ECD cycle is started and again the man appears not fazed by the pain but his motor functions are incapacitated.*

*A third officer has arrived on scene and moves in to assist in ground stabilization. During the second cycle both hands have been directed behind the man's back. Upon completion of the second cycle the man attempts to throw both officers off of his back but they are barely able to maintain their positions. A third ECD cycle is started and during that cycle the handcuffs are successfully applied.*

*Although it is 20 degrees out and the man is naked the officers can feel the heat from his body through their uniform pants and long johns. The third officer has secured his ECD and is stabilizing the man's head.*

In the above scenario the officers are put in a very difficult position as they face a subject that falls in an overlapping set of categories. In order to explain these categories an oversimplification of the role of Police and EMS will make it easy. The police deal with "bad guys." More importantly they deal with Crime or in this example Crimes in Progress. EMS personnel (EMT's, Paramedics, Nurses, and Doctors) deal with "sick people," medical cases or in this example a medical crisis.

### Crime in Progress
In a variation of the above scenario, the officers are called to a disturbance at the residence and upon arrival they meet with both parties and are able to ascertain that the parties had been arguing about their relationship. During a fit of rage the male threatened to hit the female and began to smash the mirrors and windows in the house. He later shows that same level of aggression to the van windows. The female in a panic calls 911. The officers in the adjusted scenario would more likely than not arrest the male for Disorderly Conduct/Domestic.

### Medical Crisis
If the couple in the above scenario were to have sole contact with EMS personnel and the below symptoms were either observed and or described it would be a medical crisis.
- Sudden onset of behavior "He just started acting strange"
- Elevated Body Temperature

MONROE001000

- High pain threshold
- Incredible Strength
- Rapid Breathing
- Delusions



MEDICAL CRISIS
HANDLED BY
EMS

The difficult position that officers are placed in is when these two circles of behavior are overlapped.  The overlapping area is very dangerous to the officers, the public, and to the suspect.



MEDICAL CRISIS
HANDLED BY
EMS

MONROE001001

### Medically Significant behavior dangerous on three levels

Danger to the officer

The danger presented to the officer is that he/she is facing an individual that has a high threshold for pain, is superhumanly strong, and could believe that the officer is trying to harvest his/her brain (i.e. delusional).

Danger to the public

The danger presented to the public is that the behavior displayed above can be directed towards members of the public.  If these individuals are dangerous to well trained groups of police officers, they are more dangerous to untrained individual members of the public.

Danger to the suspect

The individual experiencing this type of behavior could very well be on the "Freight Train to Death."  The medical crisis that they are experiencing could be the beginning of a condition that could result in their death unless they are able to receive medical treatment, and even then it could still occur.

So what should you do?  The next section addresses how best to respond to those exhibiting medically significant behavior.

### Responding to medically significant behavior

If you are confronted with a subject who is displaying behaviors that suggest the possibility of an underlying medical problem, especially an imminently life-threatening one, managing the situation becomes more complex.  Your immediate goals remain the same as always:  to stabilize the scene and preserve life and evidence.  How you accomplish these goals, however, may change.

An important point to remember is that at the center, what you are seeing is not so much a crime in progress—although criminal acts may be taking place—as it is a medical emergency in progress.  If you recognize medically significant behaviors, especially those consistent with Excited Delirium, your priority must be the safety of all involved, *including the suspect*.  Criminal prosecution can wait, but the medical emergency won't.[12]

If a person is experiencing Excited Delirium or some other medical problem that is contributing to violent behavior, your response tactics should be geared to accomplish the following:

- Avoid increasing the subject's agitation or excitement
- Minimize physical struggles with the subject

---

[12] From a PowerPoint by Michael D. Curtis, M.D.

31

MONROE001002

- Minimize the use of restraints
- Get medical care for the subject as quickly as possible

Of course, your first priority is always safety—and your safety, your partner's safety, and the public's safety come first. If, however, circumstances allow, the following procedure may be helpful:

1. Attempt to calm the subject, using verbal techniques from Crisis Management and Professional Communication.
2. Request backup and Advanced Life Support (ALS) EMS response (paramedics).
3. Weigh the need for immediate control against the risk to the subject
4. Maximize the number of officers in hopes of minimizing the initial level of force
5. Once EMS is on scene, use an Electronic Control Device to make it possible to approach the subject.
6. Have the paramedics administer a tranquilizer, in accordance with local protocols.
7. Contain the subject without restraints until he or she is calm.
8. Transport the subject to a hospital in an ambulance, using minimal restraints.

Of course, not every situation will allow this procedure. If the subject is posing an imminent threat of injury to someone, you cannot stand by while you wait for EMS to arrive. Nor will this procedure work if an ALS ambulance is not readily available (EMT-Basics and EMT-Intermediates cannot administer tranquilizing drugs). If the subject does not calm down and remains combative, you may need to use restraints. You certainly cannot place a combative patient in an ambulance without restraints—nor should an ambulance transport a restrained subject without an officer along who can remove the restraints if needed.

If the circumstances do not permit this procedure, use other customary practices to gain control of the subject.

When circumstances do make this procedure possible, however, following it can literally save lives. By recognizing medically significant behavior early and acting to allow quick medical intervention, you may be able to provide critical care and derail the "freight train to death."

## Multiple Officer Ground Handcuffing with Chemical Restraint Application

Multiple officer ground handcuffing is a coordinated procedure for handcuffing a violently resistive subject who has been directed to the ground in a prone position. In this procedure, officers first stabilize the subject's arms, head, and

32

MONROE001003

legs, then place the arms in the proper configuration for handcuffing. This approach is in accordance with the basic principle that subjects must be stabilized before they can be handcuffed.

**Note:** This procedure may be modified to stabilize and handcuff a subject who has been placed against a wall or other vertical surface.

To apply the procedure:

1. Once the subject has been directed to the ground, the first officer secures the subject's first arm by pinning it to the ground at elbow and wrist, extended away from the body (where the subject might have access to weapons).

2. The second officer secures the subject's other arm in the same manner.

3. The third officer secures the subject's head, by placing both hands on it and holding it against the ground. The officer should take care to avoid being bitten. Pressure points may be used to encourage compliance. Throughout the remaining procedure, this officer attempts to calm the subject by giving soft, simple verbal directives ("Stop resisting." "Take it easy.")

4. The fourth officer secures the subject's feet and legs, pinning them to the ground by holding them near the ankle or, alternatively, by placing his or her body perpendicular to the subject's legs, using only necessary body weight to secure them to the ground.

   **Options:**
   - The feet and ankles can be rolled to the side to inhibit the subject from using his or her hamstrings to lift the officer by doing a leg curl.
   - The ankles can be crossed and the heels brought past 90 degrees and secured near an officers thigh while straddling over the subject in an intermediate stance. Officer can also secure a hold on the suspect's belt if present, or have a second officer use body weight behind the straddling officer to prevent movement.

5. Once all body parts are stabilized, the officers controlling the subject's arms can sweep them along the ground rotating them to the small of the back for handcuffing. **Important: Maintain wrist compression while completing this maneuver.**

6. Any of the officers then applies handcuffs and double-locks them.

33

7. Once the subject has been stabilized and handcuffed, the officer nearest the subject's head should monitor and continue to debrief the subject, using a calm, reassuring tone of voice.

8. When the EMS personnel is advised by officers he/she can move in towards one of the suspect's thighs.  The EMS personnel will confirm that it is the suspect's thigh then inject the chemical restraint.

9. An officer should search the subject while he or she is still prone, and then again when the subject is assisted to rise.

10. When safe to do so the suspect can be turned on his side to facilitate deep breathing.

MONROE001005

# DOCUMENTING AN ECD USE

*The organization of a use of force report should follow the following format:*

### Describe
*Describe the physical and environmental factors that you observe.*
*"...while attempting to stabilize Mr. Smith against the wall for handcuffing he used his hands to push himself away from the wall. He shouted "I'm not going to jail pig!...."*

### Identify
*Explain what your trained observations tell you.*
*"..I recognized this action as active resistance. I was unable to control Smith using my body weight and strength and he continued to push off the wall..."*

### Forced Actions
*Explain what your trained observations forced you to do.*
*"...Based on his actions Smith forced me to access my ECD and deploy it into his right leg. As I deployed the ECD I yelled "Hands behind your back!" During deployment Officer Jones and I were able to direct Smith's hands behind his back, and stabilize him for cuffing..."*

MONROE001006