# *Principles of*
# *Subject Control*

## A Training Guide for
## Jail and Detention Officers



**Wisconsin Department of Justice**
**Law Enforcement Standards Board**
**June, 2009**



PLAINTIFF'S
EXHIBIT
67
ALL-STATE LEGAL®

# ACKNOWLEDGEMENTS

The Training and Standards Bureau of the Wisconsin Department of Justice and the Law Enforcement Standards Board would like to thank many people for their generous contributions to the content of this text.

We extend great appreciation to the members of the POSC Training Advisory Committee, who spent many hours of their time working on the text:

| | |
|---|---|
| Greg Anderson, Deputy | Dane County Sheriff's Department |
| Michael Delvaux, Captain | Wisconsin Department of Corrections |
| Matthew Dryden, Deputy | Dunn County Sheriff's Department |
| Peter Jaskulski, Captain | Milwaukee County Sheriff's Department |
| Michael Kadamian, Deputy | Racine County Sheriff's Department |
| Gary T. Klugiewicz | Fox Valley Technical College |
| Troy Knudson, Lieutenant | Rock County Sheriff's Department |
| Charlie Law, Chief Deputy | Douglas County Sheriff's Department |
| Fred Linder, Jail Administrator | Douglas County Sheriff's Department |
| Ray Merlin, Deputy | Kenosha County Sheriff's Department |
| Jeff Noe, Instructor | Western Wisconsin Technical College |
| Mary Reel, Sergeant | Manitowoc County Sheriff's Department |
| Howard Sawyers, Sergeant | Walworth County Sheriff's Department |
| Michael Stanfield, Sergeant | Racine County Sheriff's Department |
| Brian Stuht, Victim/Witness Coord. | Kenosha County District Attorney's Office |
| Rory Thelen, Captain | Wisconsin Department of Corrections |
| Doug Verheyen, Staff Sergeant | Outagamie County Sheriff's Department |

The Principles of Subject Control (POSC) training program and student text is primarily based on more than twenty years of work done by Gary T. Klugiewicz, a nationally known defensive tactics instructor who served with the Milwaukee County Sheriff's Department. A key basis of the student text was the *Principles of Subject Control* manual developed by Mr. Klugiewicz. POSC is a registered trademark of the Active Countermeasures Instructional (ACMi® Systems, LLC), a nationally known training organization located in Greenfield, Wisconsin, of which Gary Klugiewicz is Director.

The major contributions of three people to Wisconsin's defensive tactics training programs for law enforcement and corrections personnel are noted. They include Kevin Parsons, Ph.D., who initially developed the concepts used in the Defensive and Arrest Tactics (DAAT) training program adopted by the Law Enforcement Standards Board for basic law enforcement training; Robert C. Willis, formerly with New Berlin Police Department and Calibre Press and currently with Northeast Wisconsin Technical College in Green Bay; James G. Smith, a detective with the Milwaukee Police Department.

June, 2009

Many instructors have made significant contributions to this defensive tactics training program.  Acknowledgement and appreciation is extended to the following:  Greg Anderson, Deputy with the Dane County Sheriff's Office; Todd Ashworth, Deputy Superintendent at the Milwaukee County House of Correction; Jerry Elliot, Retired Captain at the Wisconsin Resource Center in Winnebago, Wisconsin; Larry Hahn, retired sergeant at the Waterloo, Iowa Police Department; Peter Jaskulski, Captain at the Milwaukee County Sheriff's Office; Charlie Law, Chief Deputy at the Douglas County Sheriff's Department; Jeff A. Mehring, Director of the Security Department at St. Joseph's Hospital in Milwaukee, Wisconsin; John T. Meyer, Jr., President of Team One Network in Fredericksburg, Virginia; Gary Monreal, Police Officer with New Berlin, Wisconsin Police Department; Jeffrey Parker, Sergeant with the Jefferson County Sheriff's Department; Jay Sandstrom, Retired Security Director at the Mendota Mental Health Institute in Madison, Wisconsin; Dan Steckbauer, Captain at Dodge Correctional Institution in Waupun, Wisconsin; Kenneth Wilcox, Retired Sergeant with Milwaukee County Sheriff's Office; and David Young, Training and Standards Manager for the Redman® Training Division located at Fox Valley Technical College in Appleton, Wisconsin.

In addition, recognition and appreciation is extended to the following people who made contributions to the Principles of Subject Control program:

Charles Remsberg and Dennis Anderson of Calibre Press, for contributions in the areas of threat assessment, mental conditioning, weapon control and use of force reporting;

Tim Powers, Director of Fitness Institute for Police, Fire and Rescue, for contributions in the areas of tactical warm-ups, tactical aerobics, and power development training;

Bruce Siddle, Director of Pressure Point Control Tactics, for material regarding pressure points and the diffused strike;

Daniel Vega, M.S.W., a crisis intervention specialist from Tacoma, Washington, for contributions in verbalization skills and dealing with emotionally disturbed persons;

George Thompson, Ph.D., Director of the Verbal Judo Institute, Inc., of Yucca Valley, California, for contributions to the tactical communications concepts and skills;

Jane Dresser, R.N., Director of the Medical-Psychiatric Counseling Center in Milwaukee, Wisconsin, for contributions in crisis intervention tactics;

Dennis Nourse, Director of the Mediation Center of Waukesha County, Wisconsin, for materials regarding mediation tactics;

Tony Blauer, Canadian tactical instructor, for the concept of "presumed compliance";

The following instructors, for contributions in the area of tactical weapons control:  John Boren, John DeSmedt, Leo Gaje, Dan Inosantos, Jim Lindell, Jim Marsh, Ed Nowicki, and Bill Stenzel.

Lt. Colonel Dave Grossman, author of the book *On Killing*, for information on deadly force decision-making, improving combat efficiency, and the "Fight or Flight Fallacy" concept;

Larry Nadeau, Director of the National Academy of Defense Education in Denham Springs, Louisiana, for contributions in the areas of safe, realistic, dynamic, interactive decision-making simulation training.

This text was written by Marty Drapkin of the Training and Standards Bureau, Wisconsin Department of Justice, with advice from members of the POSC Training Advisory Committee.

# TABLE OF CONTENTS

ACKNOWLEDGEMENTS ................................................................................... III
TABLE OF CONTENTS ................................................................................... VI
INTRODUCTION ............................................................................................... 1
   USE OF FORCE IN A CORRECTIONAL SETTING .................................................... 2
   PURPOSES FOR USE OF FORCE .......................................................................... 2
   LIMITS ON THE USE OF FORCE........................................................................... 3
     The U.S. Constitution................................................................................... 3
     Wisconsin Statutes ..................................................................................... 5
     Wisconsin Administrative Code ................................................................... 6
     Agency Policy and Training ......................................................................... 7
   FACTORS INFLUENCING THE USE OF FORCE ..................................................... 9
THE CONCEPTUAL BASIS OF POSC ........................................................... 12
     This chapter discusses each of these in detail........................................... 12
   THE CONTROL THEORY ...................................................................................... 12
     Guidelines for Achieving Control................................................................ 13
     Proper Police Action vs. Criminal Acts...................................................... 15
   THE FIRST RESPONDER PHILOSOPHY ............................................................... 16
     Arrive ........................................................................................................ 18
     Assess ...................................................................................................... 18
     Alarm ........................................................................................................ 18
     Evaluate.................................................................................................... 18
     Enter ........................................................................................................ 18
     Stabilize ................................................................................................... 18
     Initial Medical Assessment ....................................................................... 19
     Long-Term Monitoring .............................................................................. 19
     Communication.......................................................................................... 19
     Document/Debrief..................................................................................... 20
   DISTURBANCE RESOLUTION............................................................................... 21
     Approach Considerations .......................................................................... 21
     Intervention Options.................................................................................. 21
     Follow-Through Considerations................................................................. 21
PSYCHOMOTOR SKILL DEVELOPMENT .................................................... 24
   MENTAL CONDITIONING ..................................................................................... 24
     Crisis Rehearsal ....................................................................................... 24
     Autogenic Breathing ................................................................................. 26
   TACTICAL WARM-UPS ........................................................................................ 27
     Warm-Ups................................................................................................. 28
     Stretching................................................................................................. 28
   BODY MECHANICS ............................................................................................. 28
   SUMMARY .......................................................................................................... 29
APPROACH CONSIDERATIONS ................................................................... 30
   DECISION-MAKING.............................................................................................. 30

TACTICAL DEPLOYMENT........................................................................ 32
   Control of Distance ........................................................................ 32
   Relative Positioning ........................................................................ 33
   Team Tactics .................................................................................. 36
TACTICAL EVALUATION ......................................................................... 36
   Threat Assessment Opportunities.................................................... 37
   Officer/Subject Factors ................................................................... 42
   Special Circumstances ................................................................... 43
   Level / Stage / Degree of Stabilization ............................................ 43
SUMMARY ...................................................................................... 45
**INTERVENTION OPTIONS** ......................................................................... 47
PRESENCE ............................................................................................ 48
   Open Stance.................................................................................. 49
   Ready Stance ................................................................................ 49
   Defensive Stance........................................................................... 49
DIALOGUE ............................................................................................. 50
CONTROL ALTERNATIVES / PROTECTIVE ALTERNATIVES............................ 53
   Escort Holds .................................................................................. 54
   Compliance Holds........................................................................... 54
   Oleoresin Capsicum (OC) Aerosol Spray ......................................... 54
   Passive Countermeasures............................................................... 55
   Active Countermeasures ................................................................. 56
   Incapacitating Techniques .............................................................. 57
   Intermediate Weapons.................................................................... 57
DEADLY FORCE..................................................................................... 58
   Imminence ..................................................................................... 59
   Preclusion ..................................................................................... 60
   Target Requirements ...................................................................... 60
SUMMARY: INTERVENTION OPTIONS .................................................. 60
**FOLLOW-THROUGH CONSIDERATIONS**........................................................ 62
STABILIZE.............................................................................................. 62
MONITOR / DEBRIEF ............................................................................. 63
   Calm Yourself and Your Partner...................................................... 64
   Calm the Subject ........................................................................... 64
   Perform Initial Medical Assessment.................................................. 64
   Reassure the Subject ..................................................................... 65
   Rebuild the Subject's Self-Esteem................................................... 65
SEARCH, IF APPROPRIATE ..................................................................... 66
ESCORT, IF NECESSARY ........................................................................ 67
TRANSPORT, IF NECESSARY ................................................................... 68
   Before Transport............................................................................. 68
   Place the Subject Safely In the Vehicle ............................................ 68
   Monitor the Subject During Transport ............................................... 69
TURN-OVER / RELEASE.......................................................................... 69
**POSC SUMMARY**..................................................................................... 70
**ARTICULATING USE OF FORCE:  VERBALLY AND IN WRITING** .......................... 72
   Within Your Agency ........................................................................ 73

In Legal Proceedings ....................................................................................... 73
WRITTEN USE OF FORCE REPORTS ..................................................................... 74
Background Information .................................................................................... 74
Approach Considerations ................................................................................. 74
Intervention Options ........................................................................................ 75
Follow-Through Considerations ....................................................................... 76
Investigative Findings ...................................................................................... 76
ORAL ARTICULATION OF USE OF FORCE ............................................................. 78
Be Professional................................................................................................ 78
Answer Questions Accurately .......................................................................... 79
Avoid Traps...................................................................................................... 79
**APPENDIX A:  SELECTED CONSTITUTIONAL AMENDMENTS............................. 82**
**APPENDIX B: SAFETY RULES................................................................................. 84**
**APPENDIX C: TACTICAL WARMUPS ...................................................................... 88**
INTRODUCTION ................................................................................................ 88
HEAT UP THE BODY PHASE............................................................................... 88
Run in Place ..................................................................................................... 88
Shadow Training (done alone without a training partner) ................................... 88
GENERAL STRETCHING PHASE ......................................................................... 90
Overhead Stretch.............................................................................................. 90
Neck Stretch ..................................................................................................... 90
Shoulder Stretch ............................................................................................... 90
Side Stretch ...................................................................................................... 90
Bent Stretch ...................................................................................................... 90
Hip Rotation ...................................................................................................... 90
Reaching Stretch .............................................................................................. 90
Toe Touches...................................................................................................... 90
Half Squat ......................................................................................................... 91
Ankle Stretch ..................................................................................................... 91
Calf Stretch ....................................................................................................... 91
POSITIVE SELF-TALK PHASE............................................................................... 91
**APPENDIX D: POSC TECHNIQUES ........................................................................ 94**
INTRODUCTION ................................................................................................ 94
PRESENCE........................................................................................................ 94
Open Stance...................................................................................................... 94
Ready Stance .................................................................................................... 94
Defensive Stance............................................................................................... 94
DIALOGUE ......................................................................................................... 95
Search Talk – Basic Contact Model................................................................... 95
Persuasion – Arbitration Format (REACT).......................................................... 95
Light Control Talk............................................................................................... 95
Heavy Control Talk ............................................................................................ 95
CONTROL ALTERNATIVES/PROTECTIVE ALTERNATIVES............................... 95
Escort Holds ...................................................................................................... 95
Compliance Holds.............................................................................................. 96
Pressure Points ................................................................................................. 96
OC Spray ........................................................................................................... 97

Decentralizations ................................................................................................ 97
Blocking ............................................................................................................... 99
Vertical Stun ....................................................................................................... 101
Focused Strikes .................................................................................................. 101
Impact Weapons ................................................................................................. 104
Diffused Strikes .................................................................................................. 105
DEADLY FORCE .................................................................................................. 105
APPENDIX E: OLEORESIN CAPSICUM (OC) SPRAY ........................................... 108
OVERVIEW OF OC .............................................................................................. 108
GENERAL ISSUES REGARDING OC SPRAY ..................................................... 110
Storage ............................................................................................................... 110
Shelf Life ............................................................................................................. 110
DISPERSION TYPES ........................................................................................... 110
Fog/Burst Dispersion .......................................................................................... 110
Streamer .............................................................................................................. 111
Foam .................................................................................................................... 111
LEVELS OF OC CONTAMINATION ..................................................................... 111
Level 1 ................................................................................................................. 111
Level 2 ................................................................................................................. 111
Level 3 ................................................................................................................. 111
USING OC ............................................................................................................. 112
When to Use OC .................................................................................................. 112
How to Use OC .................................................................................................... 112
Drawing Techniques ........................................................................................... 113
Spraying Techniques .......................................................................................... 114
TACTICS IF FACED WITH SUBJECT USING OC ................................................ 114
Disengagement ................................................................................................... 114
Escalation ............................................................................................................ 115
FOLLOW-THROUGH AFTER USE OF OC SPRAY .............................................. 116
The Recovery Process ........................................................................................ 116
Aftercare Procedures .......................................................................................... 116
When to Get Medical Care ................................................................................. 117
GLOSSARY OF TERMS ...................................................................................... 118
APPENDIX F: TARGET AREAS ............................................................................. 120
APPENDIX G: HANDCUFF NOMENCLATURE ...................................................... 122
APPENDIX G:  USE-OF-FORCE DOCUMENTATION CHECKLIST ......................... 124

June, 2009

# INTRODUCTION

As a jail officer, you will have continuing contacts with inmates in your custody. Your main job is to supervise inmates to try to ensure their security and safety and to maintain good order and control in your facility. Your duties will require you to exert control over inmates by giving orders, directing their movement, disciplining them, and so on. Your goal is always to get inmates to comply voluntarily. If they do, you will have achieved your objective without making the encounter unnecessarily adversarial, and without risk of injury to officers, inmates, or others.

Unfortunately, even the best efforts of the most skilled officer to gain voluntary compliance do not always work. Sometimes you will have to use physical force to achieve control and accomplish your legitimate correctional objectives.

In Wisconsin, the trained standard for such use of force in a correctional setting (prison, jail or secure juvenile detention facility) is Principles of Subject Control (POSC). In POSC training, you will learn when and how to use verbalization skills and, if necessary, physical force to control subjects. POSC techniques are psychomotor skills, meaning that they involve both the brain and the muscles. For that reason, you will spend much of your time practicing the verbal and physical techniques—learning the skills first in isolation, and then applying them in simulations.

POSC is the correctional application of Wisconsin's system of Defensive and Arrest Tactics (DAAT), which is the trained standard for use of force by law enforcement officers. The two systems are very similar in regard to their premises, concepts, and components. DAAT training is designed to train law enforcement officers to use force appropriately to accomplish legitimate law enforcement objectives in the environment in which they work, whereas POSC training is designed to train corrections officers to accomplish legitimate correctional objectives in the environment in which they work.

The definition of both DAAT and POSC is:

*A system of verbalization skills coupled with physical alternatives.*

This means that both law enforcement officers and jail officers are always expected to try to accomplish their objective of control through use of verbal skills whenever possible, and only to use physical force when the use of verbal skills either has not worked or would clearly be inappropriate in a given situation. Getting a subject to comply through talking is always preferable to getting a subject to comply through physical force, but there are times when physical force is necessary.

June, 2009

## USE OF FORCE IN A CORRECTIONAL SETTING

You must know several key concepts to understand and properly apply the POSC system.  These are listed in this section and discussed in greater detail in subsequent sections of this text.

The key concepts are these:

- Force may only be used to achieve legitimate correctional objectives
- Legal standards govern and limit the use of force
- In an institutional setting, the need for use of force may be reduced by various factors
- In Wisconsin, POSC is the basis for use of force in a correctional setting
- Corrections personnel must be able to articulate their use of force orally and in writing

This text explains the POSC system, use of which may involve just one officer or multiple officers.  However, higher-risk incidents may require use of specialized teams.

A *Correctional Emergency Response Team* (CERT®) may be activated in a situation in which use of a specially trained team of officers is required to achieve a legitimate correctional objective.  For example, CERT® personnel might be activated in a cell extraction situation or to respond to a disturbance involving a number of inmates.

Another type of specialized team, a *Special Weapons and Tactics Team* (SWAT), might be activated in a more serious emergency, such as a hostage situation, in which the application of deadly force may be required.  SWAT members carry firearms, while CERT® members generally do not.   Both CERT® and SWAT require specialized training beyond basic POSC training.

## PURPOSES FOR USE OF FORCE

As a corrections officer, you are authorized to use physical force to accomplish legitimate correctional objectives including ensuring security and safety and maintaining order and control.  Legitimate objectives for use of force would include:

- to gain control of a resistive or combative inmate
- to defend yourself from physical assault
- to defend others (other officers, inmates, visitors, etc.) from physical or sexual assault
- to prevent inmates from escaping
- to move an unwilling inmate from one location to another
- to prevent an inmate from harming himself or herself
- to prevent destruction of property

If you use physical force against an inmate for a purpose other than one of those listed above, it might be considered inappropriate or excessive use of force. Examples of inappropriate purposes for use of physical force include:

- punishing an inmate for a violation of jail rules
- "getting back" at an inmate for something which he or she said or did
- giving an inmate a "message" that you are the authority figure

As noted, part of your job is to articulate your use of force, both orally and in writing. A key element of that is articulating the reason you used force. You have to be able to show that you used force for an appropriate reason—that your decision to use force was justified.

## LIMITS ON THE USE OF FORCE

A number of legal standards govern and limit the proper use of force by correctional officers. These include the U.S. Constitution, Wisconsin Statutes, Wisconsin Administrative Codes, and agency policies and procedures. In addition, the training that you receive establishes a standard for the proper use of force. The following addresses each of these.

### The U.S. Constitution

Inmates have certain basic constitutional rights. The application of constitutional rights to particular situations is determined by decisions of the federal courts, primarily the U.S. Supreme Court and the circuit Courts of Appeal. A basic constitutional right of all citizens, including inmates, is to be free from inappropriate or excessive use of force. This right arises out of various Amendments to the U.S. Constitution (see Appendix A).

Which amendment applies to use of force in a correctional setting depends on the custody status of the person:

- The Fourth Amendment standard applies to free persons, which would include persons arrested but not yet booked.
- The Fourteenth Amendment standard applies to pre-trial detainees.
- The Eighth Amendment standard applies to convicted inmates.

These standards are discussed in more detail in the next sections.

*The Fourth Amendment.* The first standard is the Fourth Amendment "objective reasonableness" standard. Any time force is intentionally applied to a free person, the force is considered a "seizure" under the Fourth Amendment. Therefore the force used must be objectively reasonable in light of the facts and circumstances confronting the officer at the moment the force is used. The objective reasonableness standard would apply to persons just off the street or in a holding area prior to booking.

June, 2009

*The Fourteenth Amendment.*  The second constitutional standard is set by the Fourteenth Amendment's "due process" clause.  The Fourteenth Amendment is violated by actions that "shock the conscience."  Force intended in some way to injure, unjustified by any governmental interest, could rise to the level of conscience-shocking.  The Fourteenth Amendment applies to pre-trial detainees rather than to sentenced inmates.

*The Eighth Amendment.*  The third constitutional standard is the Eighth Amendment "cruel and unusual punishment" standard.  Unnecessary and wanton infliction of pain and actions taken in bad faith, for no legitimate correctional or penal purpose would be considered cruel and unusual punishment.  The Eighth Amendment standard applies to people who have been found guilty, convicted and sentenced to serve time in jail.  Only convicted inmates are in jail as a form of punishment, which is the focus of the Eighth Amendment.

You may not know the custody status of the inmate with whom you are dealing, nor are you expected to use force differently depending on the custody status of an inmate.  For these reasons, the training standard used in POSC is the most restrictive of the three— the Fourth Amendment "objective reasonableness" standard.  The following explains this standard in more detail.

Even when force is justified because it is used to accomplish a legitimate correctional objective, the level and amount of force used must be appropriate.  The legal standard requires that the level and amount of force must be "objectively reasonable" under the particular circumstances.  This standard originated in a 1989 decision by the U.S. Supreme Court in the case of *Graham v. Connor.*[1]  This case had to do with use of force by law enforcement officers, but the standard applies to use of force by corrections officers as well.  Essentially, this standard measures an officer's use of force by comparing it to actions that have been or would be taken by another officer with similar training in similar circumstances.

The legitimate purpose of your use of force is control, and control is a perception based on training, experience and the totality of circumstances in a particular fact situation.  *Graham v. Connor* recognizes that situations vary, and sets forth several criteria to be considered in deciding whether a particular use of force was reasonable.  These include:

- whether the person on whom force was used posed an imminent threat to safety
- whether the person was actively resisting or attempting to flee
- the severity of the alleged crime at issue

If a use of force comes to trial, the courts generally examine the following questions:

1. Was there a need for force in the first place to accomplish a legitimate correctional objective?

---

[1] 490 U.S. 386, 109 S. Ct. 1865 (1989)

2. If the use of force was appropriate, was the amount and type of force used appropriate in the particular situation?
3. If the use of force was inappropriate or excessive, was it so great that it violated the Constitution or state law?

In the past, an inmate had to prove that he or she received a significant injury as a result of the force in order to win a lawsuit alleging a violation of constitutional rights. However, in a 1992 ruling, the U.S. Supreme Court revised that standard. In *Hudson v. McMillan*,[2] the Court ruled that an inmate need not prove that he or she suffered significant injury—only that he or she suffered "wanton and unnecessary infliction of pain." The Court also said that when force was used "maliciously and sadistically for the very purpose of causing harm" rather than "in a good faith effort to maintain and restore discipline," such force could be deemed excessive. In other words, if a jail officer uses force for a reason unrelated to a legitimate correctional objective, that force could violate the inmate's constitutional rights—regardless of whether the inmate was injured.

## Wisconsin Statutes

Several Wisconsin statutes address the issue of use of force, including in correctional setting.

*Misconduct in Public Office* (§946.12 Wis. Stats.) covers actions by all public sector employees. Certain categories of misconduct could apply to inappropriate uses of force:

- failing to perform a ministerial (non-discretionary) duty within the time or in the manner required by law
- exceeding lawful authority or acting in a way forbidden by law
- exercising a discretionary power in a way inconsistent with one's duties or the rights of others with intent to obtain a dishonest advantage
- intentionally making a false entry in an official record

For example, if an officer intentionally used excessive force (exceeding lawful authority), or refused to follow agency policy on use of force (failing to perform a ministerial duty), or intentionally falsified a use-of-force report (false entry in an official record), that officer could be found to have violated the provisions of this law.

*Abuse of Residents of Penal Facilities* (§940.29 Wis. Stats.) reads in part:

> *"Any person in charge of or employed in a penal or correctional institution or other place of confinement who abuses, neglects or ill-treats any person confined in or a resident of any such institution or place or who knowingly permits another person to do so is guilty of a Class 1 felony."*

---

[2] 503 U.S. 1, 112 S. Ct. 995 (1992)

This law applies to people who work in state prisons, county jails, and secure juvenile detention facilities, among others. It reinforces the concept that use of force is only to be used to achieve legitimate correctional objectives. Inappropriate use of force could constitute "abuse" under the provisions of this law.

Note that a jail officer who uses inappropriate or excessive force against an inmate could be held both criminally and civilly liable for the same offense. The officer's actions could result in a criminal conviction under §940.29 Wis. Stats., *and* civil liability for violating an inmate's constitutional (civil) rights.

Note too that §940.29 Wis. Stats., prohibits knowingly permitting someone else to abuse, neglect, or ill-treat an inmate or other person. If you observe another officer using physical force inappropriately or excessively, you have a legal obligation to try to stop it. This duty is based on the concept that there are "no innocent professional bystanders"—once you arrive on scene, you have a duty either to assist with what is going on (if it is legitimate) or stop it (if it is not legitimate). If a use of force is legitimate but being carried out incorrectly or excessively, you have a duty to step in to fix it, make the technique better, or stop it. Your duty to act also takes into account the concept of "contact officer override," which holds that an officer has a duty to intervene with the inappropriate or unlawful actions of peers or supervisors.

*Law Enforcement Officer: Failure to Render Aid* (§940.291 Wis. Stats.)[3], requires you to provide or make arrangements for first aid to anyone in your custody who is in need of it. As with §940.29 Wis. Stats., it also prohibits knowingly permitting someone else to withhold needed first aid. Clearly this law requires that you provide necessary care to an inmate or other person following a use of force. As you will see, provision of first aid is part of "Initial Medical Assessment," which is one of the steps in the First Responder Philosophy, one of the fundamental concepts behind POSC.

Technically, this law only applies to "peace officers." In a jail or detention setting in Wisconsin, that would include deputies working in the facility, but not civilian employees. However, the same principles apply to all corrections officers, sworn or civilian.

**Wisconsin Administrative Code**

DOC 350.14 Wis. Adm. Code specific requirements regarding use of force. The section reads as follows:

1.  *Jail staff may use physical force against an inmate only if force is necessary to change the location of an inmate or to prevent death or bodily injury to the staff member, the inmate or someone else, unlawful damage to property or the escape of an inmate from the jail. Staff may only use the amount of force*

---

[3] This statute reads in part, "*Any peace officer, while acting in the course of employment or under the authority of employment, who intentionally fails to render or make arrangements for any necessary first aid for any person in his or her actual custody is guilty of a Class A misdemeanor if bodily harm results from the failure…A violation for intentionally failing to render first aid under this subjection applies only to first aid which the officer has the knowledge and ability to render.*"

*reasonably necessary to achieve the objective for which force is used. Corporal punishment of inmates is forbidden.*

2. *Any staff member who has used force to control an inmate or inmates shall submit a written report to the sheriff, jail administrator or the staff member's immediate supervisor describing the incident. The report shall include all relevant facts."*

Note that the requirements under Part 1 of this section mirror the basic constitutional requirements discussed earlier.

## Agency Policy and Training

*Policy.* Your employing agency has a comprehensive set of written policies and procedures that describe how correctional officers are expected to carry out their duties and responsibilities—including with regard to use of force. Your agency's policy may be *more* restrictive than Wisconsin law or Administrative Code, but it cannot be *less* restrictive. You need to know your agency's policies on use of force and always try to act according to such policies. Not only do your policies indicate what your employer wants you to do, but they also provide protection in the event of a civil lawsuit.

If you are acting within the scope of your employment, you are indemnified against individual liability in the performance of your duties, according to provisions of Wisconsin law under §895.46 Wis. Stats., *State and Political Subdivisions Thereof to Pay Judgments against Officers.* If someone brings a lawsuit against you for a use of force incident, as long as you were acting within the scope of your employment, the county—not you—will face the liability. You will not have to hire a lawyer or pay any money damages that arise from the lawsuit.

On the other hand, if you act outside the scope of your employment (defined in part by policy) you could face individual civil liability. If someone brings a lawsuit and you lose, you (or your insurance company) could have to pay the judgment.

Your agency's use of force policy most likely also addresses use of force reporting. It may indicate the specific report form(s) to be completed following a use of force incident, when such reports are to be completed, where they are to be routed, and so on. Again, know and follow these policy requirements as carefully as possible. In the event of a lawsuit, your use of force report will be crucial because it is your formal justification of the actions taken during a use of force incident.

*Training.* POSC is the standard for basic (recruit-level) use of force training for jail officers and secure juvenile detention officers in Wisconsin. Remember that the standard established by the U.S. Supreme Court in *Graham v. Connor* is that force must be "objectively reasonable" in order to be legally justified, and that such reasonableness is generally measured against what another officer with similar training would do in similar circumstances. In Wisconsin, POSC is the state-approved standard for training. That means your actions in a use-of-force incident will be measured against what you learned to do in your POSC training. In a lawsuit, POSC trainers may be called upon to

serve as witnesses—to review what happened in a use-of-force incident and if qualified as an expert, to give an opinion about whether or not officer actions were in accordance with POSC concepts and techniques. If expert witnesses feel that an officer's actions *were* in accordance with what was taught in POSC, then it is easier to show the reasonableness of the use of force.

From a liability risk management perspective, the best thing, of course, is for an officer to apply trained POSC techniques exactly as learned during training. However, that is not always possible or feasible. Fortunately, the legal system recognizes that fact and takes it into account in judging use-of-force actions by law enforcement or corrections officers. Thus, use of force by an officer may be legally justifiable in one of three ways:

- It is a trained technique applied just as trained
- It is a dynamic application of a trained technique
- It is a technique not trained but justified under the circumstances

In some circumstances, you can apply a technique learned in POSC just as you were trained to do. Your execution of the technique mirrors the classroom model. Often, however, that is not possible because the situation is rapidly changing. As a result, the force used is a variation of some sort of the trained tactic or technique—close, but not perfect. For example, in a dynamically evolving situation involving an unarmed strike, you may not have been able to strike the specific trained target area, despite your best efforts to do so.

In some circumstances, you may end up applying a force tactic that you were never trained to do. While it is certainly preferable always to use trained techniques, there may be times when a non-trained technique is justifiable. For example, if a jail officer is being assaulted by a group of inmates, that officer may have to use any available object, such as a radio or a flashlight or a piece of furniture, to defend himself or herself. Use of such objects is not trained in POSC, but the officer's use of them might be legally justified because he or she was acting in self-defense and a tactical evaluation dictated a level or amount of force that was not available via trained technique.

Aside from basic (recruit-level) training, you may receive use of force training within your agency, or sponsored by your agency. Such training may or may not be based on the POSC system. If not, then such training also establishes a legal standard to which you may be held.

8

## FACTORS INFLUENCING THE USE OF FORCE

There are a number of factors that may influence the use of force in a correctional institution, such as a jail. These factors may mean that application of force may not be necessary—at least immediately—or, if force is necessary, may influence the level and amount of force needed to establish control. These factors include the following:

- *The need for physical force may be reduced in a controlled environment.* Officers in a jail or detention setting control the physical environment. They control physical access to the facility, and also control the items that inmates are allowed to possess. Thus, if good security measures are followed, it is less likely that inmates will have access to weapons or other potentially-dangerous items.

- *Background information on inmates aids in classification and may prevent use of force incidents.* This allows jail staff members to identify potentially violent or otherwise troublesome inmates and to house them in areas of the jail where it is easier to minimize problems and to more effectively supervise them.

- *The physical design of a facility may aid in the isolation of problem areas.* If there is a disturbance emergency, the physical environment of a jail makes it easier to close off (isolate) areas where such emergencies are occurring (such as cells, cellblocks, dayrooms, dorms, pods, etc.), thus containing the problem area until adequate help can arrive to deal with the situation effectively.

- *Use of verbalization skills in the controlled environment of a jail often defuses situations, so that physical confrontations may be unnecessary.* Proper use of Correctional Professional Communication Skills is very important in a jail or detention setting. Verbal communication should be used whenever possible to gain or regain control, rather than physical force. This is often more feasible in a jail than it is on the street. Sometimes, verbalization may include an implied to use force, as discussed below. Verbalization will not always work to gain or regain control, but should always be tried first.

- *Surveillance technology aids in early detection and suppression of situations that require the use of force.* The use of cameras, intercoms, and other monitoring devices allows staff the opportunity to detect possible problems early, and to assist in getting help to the scene in a timely manner. Such technology may also assist in properly documenting incidents. Closed-circuit televisions, of course, are only useful if someone is watching the monitors carefully.

- *Multiple officer response, when available, can minimize the need for use of force options.* Correctional disturbance emergencies can often be handled using a team response. In many cases, the application of physical force can be avoided through use of a "show of force" by officers. Or, when force is needed, a team response may mean that use of less intrusive physical control tactics are possible.

- ***There is often the ability to control some situations with a threat of force, aside from multiple officer response***. If an inmate does not comply with an order or directive, a threat of force or implied threat of force may be effective to get the inmate to comply. As noted, multiple officer response is one type of "show of force." But there are other types of threat as well. For example, if an inmate sees that an officer has O.C. aerosol spray or an electronic control device, the implied threat that such weapons will be used may be enough to gain the inmate's compliance. An inmate may posture before submitting. Using actual or implied threats might be appropriate when you do not need to immediately intervene with application of force. Of course, you must have the capacity to follow through on any threat or implied threat to use force.

- ***The ability to wait out potential violent confrontations and control the moment of initial contact may reduce the need for physical force options***. There are some situations in which immediate intervention is necessary, but there are many situations in which that is not the case. For example, if an inmate refuses to exit a cell or room, you do not always need to immediately perform a cell extraction. If the inmate is locked in the cell, you may be able to give him or her time to think about it. If there is no immediate peril or danger, use of force can sometimes be avoided or at least be delayed.

- ***In a correctional institution, rule violations result in disciplinary action rather than an arrest process, which often leads to physical confrontations.*** Inmates are already in custody, so arrests are not an issue. Disciplinary procedures to deal with inmate behavior can be done in a less stressful, less immediate, and therefore less dangerous manner. If the jail's disciplinary system is fair and consistent, inmates are more likely to comply with rules.

- ***It is often possible to seek supervisory advice or intervention before actually using force.*** In many situations in a jail setting, there is time to seek the input and/or assistance of a supervisor before applying force. A supervisor may be in a better position to determine the need for use of force at all, or may be authorized to determine the appropriate level of force to use if force is necessary.  Again, this is a factor *if* there is time to seek such assistance, in a given situation.

Knowing these factors influencing the use of force is important for you in order to understand proper use of force in a jail or detention setting. This is because, as noted above, the factors listed may limit the need for application of physical force or they may mean that a lesser level and amount of force is required in order to achieve a legitimate correctional objective.

This material is based on an article by Gary T. Klugiewicz, "Factors That Influence the Use of Force in a Correctional Institution," that appeared in *CorrectionsOne News*, February 4, 2008.

THIS PAGE INTENTIONALLY LEFT BLANK.

June, 2009

# THE CONCEPTUAL BASIS OF POSC

Use of force by officers in a correctional setting is governed by the legal standards discussed in the last chapter and by these basic principles:

- Jail officers are authorized to use force to accomplish the correctional objective of control.

- Jail officers should accomplish the correctional objective of control as quickly as possible, with minimal chance of injury or death to officers, inmates, and others.

- Necessary force used to accomplish the objective of control must be reasonable.

- If possible, officers should try to achieve and maintain control through presence and dialogue before using physical force.

- Once control has been established, ensure the safety of all and custodial care for inmates involved.

- Any use of force must be documented in a complete written report.

The POSC system is further based on three fundamental concepts:

1. The Control Theory
2. The First Responder Philosophy
3. Disturbance Resolution

This chapter discusses each of these in detail.

## THE CONTROL THEORY

The Control Theory is a concept that explains the purpose of control and that distinguishes proper police action from behavior that might otherwise be criminal. Remember that the correctional objective justifying the use of force is control of inmates—that is, management of the subjects in a correctional or detention setting. Control Theory can be described as the "rules of the game" for use of force.

Two principles underlie the Control Theory. They are:

1. The POSC system is a system of verbalization skills coupled with physical alternatives.

2. The purpose of defensive tactics training is control.

The first of these principles means that you should talk first before escalating to physical force, unless talking is not possible or clearly not appropriate—as in the case of a life-threatening assault. In addition, you should continue to talk throughout your contact with a subject—from initial contact, during the contact, and in closing the contact.

One way to describe this principle in action is, "You've got to be nice…until it's time not to be nice…and then you've got to be nice again." In other words, you must act professionally and treat the person with whom you're talking with courtesy and respect. If physical force becomes necessary to gain or regain control that is a reality you must accept. But after the application of force, you must again be "nice" in how you talk to and treat the subject.

Whenever you talk to a subject, you must "Keep it P.G. (parental guidance level)." This means you must always remember that your words—especially if they are crude, vulgar, foul, derogatory, or otherwise unprofessional—will be remembered and can taint otherwise appropriate and justifiable behavior.

Remember that talking is a psychomotor skill. Although not commonly thought of this way, verbalization skills, like physical skills, need to be trained, practiced and developed over time. As with physical skills, the outcome of poor training can be poor results. Lack of good verbalization skills can hinder performance of your duties, and can get you and others hurt.

The second principle is that the purpose of defensive tactics is control. Control is not a 50-50 proposition. That is, control requires that you be in charge—physical encounters between officers and inmates need not be a fair equal contest. It is not a game or a sporting event. As a matter of safety, you must try to control the situation as quickly as possible to ensure your safety and the safety of others, including the subject you are trying to control. The longer a confrontation lasts, the greater the likelihood of injury to all parties involved.

### Guidelines for Achieving Control

To achieve control quickly and effectively, keep in mind the following guidelines:

- An officer must maintain a position of advantage.
- Proper police action balances safety and efficiency.
- An officer may always disengage and/or escalate to take proper police action.
- Control is a perception based on an officer's training and experience and a particular fact situation.
- Once control has been established, an officer must reduce the level of force to a level sufficient to maintain control.

As an officer, you must always <u>maintain a position of advantage</u> with respect to the inmate. Remember—control is not a 50-50 proposition. This means that you may escalate to a higher level of force than the inmate is using. By doing so, you help

ensure that you will be able to achieve control as quickly as possible, reducing the likelihood of injury to officers and others.

The term "proper police action" is a generic term that refers to action by all law enforcement and corrections officers, regardless of duty assignment. Proper police action balances safety and efficiency. Your goal is to achieve control as quickly and efficiently as possible, while at the same time doing everything reasonably possible to keep everyone safe. Efficiency and safety must always go hand in hand, but the appropriate action depends on the situation. Regardless, proper police action also involves taking care of the inmate's medical needs once he or she has been stabilized.

If your efforts to control a situation are not effective, you may disengage and/or escalate as appropriate. Disengaging means backing away from or leaving a scene of an incident (either temporarily or permanently) depending on the circumstances. Proper action does not always require engaging a subject or subjects immediately—sometimes disengaging will in itself help to resolve a situation. Escalating means going to a higher force intervention option. Escalating is justified if warranted by tactical evaluation. At times, it may be appropriate to disengage for a time in order to be able to escalate properly at a later time.

It is also appropriate to escalate in order to disengage from a dangerous situation. Not being able to disengage—as in the case of a subject choking an officer in a cell, or an officer responding to an incident in which a subject is assaulting another officer—is a justifiable reason for escalating force. The concept of taking proper police action also explains why officers are required to place themselves at risk in responding to a disturbance while a private citizen could simply leave. An officer is required to take reasonable risks based on his or her perception of control. This is referred to as the "ultimate justification."

Control is a perception based on an officer's training and experience and a particular fact situation. In use of force situations, there is never a definitive answer as to what action should be taken to achieve control. Instead, the action taken depends on the reasonable perception of an officer or officers as to what needs to be done to achieve control, based on the totality of circumstances in a given incident—one that usually is evolving quickly. An officer's perception depends on his or her training (POSC), experience, and the context of a particular situation.

Later investigation may show that the officer's perception was not totally correct based on the introduction of new information, but what is important is what the officer perceived at the time and whether this perception was reasonable based on the information known to the officer. Remember that this is the legal basis for determining whether or not force in a given situation was "objectively reasonable."

Once control has been established, an officer must reduce the level of force to a level sufficient to maintain control. Remember, force must not be used to punish or retaliate against an inmate—its purpose is always to achieve and maintain control. Generally, more force is needed to achieve control than to maintain it once it has been achieved.

How much force an officer uses and how rapidly the escalation of force takes place is determined by whether the officer is operating from a position of advantage with the goal of achieving control of a subject, or whether the officer is in personal danger.

If the officer is focused on achieving control of a subject, the officer is moving toward establishing control from a position of advantage. This doesn't mean that the situation is without danger, but rather that danger is known and that the officer is making progress toward establishing control. For example, two or more correctional officers responding to an upset inmate of normal stature and strength would ordinarily be a response focused on achieving control.

On the other hand, if an officer's personal safety is at risk, the officer is not operating from a position of advantage and may well be in great danger. For example, an officer experiencing a close-quarters assault by an inmate with an edged weapon would be a response focused on personal safety.

In the first example, the officers are relatively safe and the situation would most likely be resolved with lower intervention options. The officers could, of course, escalate to higher intervention options as needed. In the second example, the officer is fighting for his life and the focus of this response is not subject control but personal safety—that is, surviving a life-threatening assault. The second example could justify immediate use of higher intervention options, up to and including deadly force.

In short, you must clearly understand what type of situation you are facing in order to make appropriate force decisions to protect yourself physically and legally. You must be able to defend your actions afterward to supervisors or managers and potentially in litigation, criminal and/or civil.

### Proper Police Action vs. Criminal Acts

When law enforcement or correctional officers take actions legitimately to achieve control, they may use force that in other circumstances could be considered criminal acts. For example, using heavy control talk (loud verbal commands) in a non-correctional setting could be considered Disorderly Conduct.[4]  Or use of an impact weapon (baton) could constitute Substantial Battery.

The difference between proper police action and a criminal act is the ability of the officer to justify his or her actions. As an example, an officer might deliver a knee strike to an inmate who is resisting. Such use of force may be legally justified. If, on the other hand, the officer delivered a knee strike to a cooperative inmate, and the officer could not justify his or her use of force, the action could be considered a criminal act. An officer's ability to explain his or her actions is critical to differentiating between justified (proper) police action and potentially criminal use of force, which is why articulating and documenting use of force is so important.

---

[4] "…*violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct…*" § 947.01 Wis. Stats.

June, 2009

## THE FIRST RESPONDER PHILOSOPHY

The First Responder Philosophy is a systematized approach for proper response by jail or detention officers to all types of correctional emergencies. Correctional emergencies are unusual or potentially serious situations in an institution that require a prompt, proper and systematic response. They include:

- disturbances
- medical emergencies
- fires
- miscellaneous emergencies

A disturbance can be any type of disturbance, such as an out-of-control inmate, a fight between two inmates, a fight or disturbance involving a group of inmates, a riot involving many inmates, a cell extraction, a hostage situation, a food strike, and so on. A disturbance might also involve visitors to the facility.

Medical emergencies are situations in which an inmate someone else has an apparent medical or mental health problem requiring an emergency response. This would include an inmate suicide attempt, a jail officer having a heart attack, or injuries resulting from a fight.

Fires can be any type of a fire in the facility, ranging from a small fire in a wastebasket to a full-scale inferno that produces thick black smoke. All require prompt response to ensure safety and reduce damage.

Miscellaneous emergencies are any type of unusual or emergency situation other than one in the first three categories. This category might include a plumbing emergency, a utility emergency (power outage, heat outage, etc.), a weather emergency (blizzard, tornado, severe storm, etc.), and so on.

The First Responder Philosophy provides a general framework and specific steps to follow responding to any of these types of correctional emergency situations. It is flexible enough to apply to a variety of emergency situations that may be different in nature but similar in that they require a systematic and professional response.

The First Responder Philosophy is shown on the following page.

# THE FIRST RESPONDER PHILOSOPHY

## The Proper Way to Respond to Correctional Emergencies

| ACTIVITY | RESPONSE CUES |
|---|---|
| 1.  ARRIVE at the scene. | Become aware of the emergency. |
| 2.  ASSESS the situation. | Determine the type of emergency. |
| 3.  ALARM is given. | Notify dispatcher or control center / get back-up responding, if needed. |
| 4.  EVALUATE the situation. | Determine if this is a set-up. |
| 5.  ENTER the emergency site. | Do so when you have sufficient back-up and it is appropriate to enter. |
| 6.  STABILIZE the subject and scene. | Restrain subject(s), if appropriate. |
| 7.  INITIAL MEDICAL ASSESSMENT | Remember that you need to stabilize the subject before proceeding to this step. |

      a.  Determine level of consciousness (yes/semi-conscious/no).
      b.  Check ABC's (check airway, breathing, circulation).
      c.  Perform a body check for severe bleeding, gross deformities, etc.
      d.  Treat to your level of training; activate emergency medical system (EMS), if appropriate.
      e.  Continue to monitor the subject (stay close; watch closely).

| | |
|---|---|
| 8.  LONG-TERM MONITORING | Determine if the subject has "special" needs which require additional care/supervision. |
| 9.  COMMUNICATION | Determine:  What do you have? What type of assistance is needed? Who is responding?  Who is bringing in the emergency equipment?  When do you have enough assistance on the scene?  When is the emergency over?  Etc. |
| 10. DOCUMENT/DEBRIEF | Prepare detailed report(s) on what led up to the situation, what occurred during the emergency, and how staff followed up after the emergency, as well as the findings of any investigation which follow the emergency.  Remember:  if staff members do not discuss and evaluate their responses, they will keep making the same mistakes. |

June, 2009

Here is a more detailed explanation of each step.

**Arrive**

In this step, you become aware of the emergency situation, by arriving on the scene. Your arrival may be initiated by you or another officer, information from an inmate or inmates, or other source.

**Assess**

In this step, you determine the type of emergency that you are dealing with—whether a disturbance, medical, fire or miscellaneous emergency.

**Alarm**

In this step, you notify the control center in the facility and request back-up to respond, if needed. An alarm may be given orally or via radio, phone, panic button, etc., depending upon the situation.

**Evaluate**

In this step, you evaluate the situation to determine if it is a set-up, or ruse, and consider other information to decide how best to respond. You do this based upon factors considered within a tactical evaluation, as described later.

**Enter**

In this step, you enter the site of the emergency—but only when you have sufficient back-up and it is appropriate to do so. Your decision as to when it is safe to enter the site of an emergency will be based on your training and experience, policies and procedures of your facility, and past practices. Remember that proper police action always balances safety and efficiency.

**Stabilize**

You must stabilize both the scene and any subjects (inmates) to ensure safety of all persons and security of the facility. Stabilization must be accomplished before proceeding to the next steps in the First Responder Philosophy. You can stabilize a subject through your presence alone, or through presence and verbalization, if he or she complies with your verbal directions. If verbal directions do not work, the subject can be stabilized physically, either prone on the ground or against a vertical surface, such as a wall.

Stabilizing a subject means getting the person in a position where you can apply restraints, such as handcuffs or placement in a restraint chair. Once the subject has been stabilized, you then decide whether it is necessary to apply restraints. The purpose of applying restraints is to maintain control—that is, to prevent the person from being able to harm you, himself or herself, or anyone else. That decision is based upon

your tactical evaluation, including your knowledge of the particular subject(s) involved as well as your agency policies.  Stabilization and restraint use are discussed in more detail in a later section of this text.

You must also stabilize the scene.  This means that you keep people away from the scene unless they have business there and follow any applicable procedures for preserving evidence to facilitate investigation.

### Initial Medical Assessment

In this step, you conduct a basic assessment to determine if a subject has any medical problems needing attention.  This assessment includes at least the following:

- determining the subject's level of consciousness
- checking ABC's (airway, breathing and circulation)
- performing a body check for severe bleeding, broken bones, obvious contusions, or any gross (significant) deformities

Based on your assessment, provide treatment to your level of training.  That may include first aid, cardio-pulmonary resuscitation (CPR), EMT skills, etc.

If it appears that the subject requires emergency medical or psychiatric care, based on your assessment or the subject's request, activate the emergency medical system, as directed by your agency's policies and procedures.

Continue to monitor subjects for as long as necessary, based on your assessment of his or her medical, mental health and/or security needs.

These steps are discussed in more detail in a later section of this text.

### Long-Term Monitoring

In this step, you determine if any subject has "special needs" that require additional care or supervision.  These may include medical concerns, mental health concerns, and/or security concerns.

### Communication

In this step, you communicate with staff members and others as needed to ensure the most appropriate response to the correctional emergency situation, and to obtain information to assist both during and after the situation.  Some of the common information that must be communicated includes answers to these questions:

- What did you have?
- What type of assistance is needed?
- Who is responding?
- Who is bringing any required emergency equipment?

June, 2009

- When do you have enough assistance on the scene?
- When is the emergency over?

You may communicate with any or all of the following: subjects, witnesses to an incident, fellow officers, the facility control center, responding officers from outside the agency (such as law enforcement officers), supervisors, and other responding professionals.

## Document/Debrief

In this final step, you document an incident by preparing a detailed report on what led up to the correctional emergency, what occurred during the emergency, and how you and other officers followed up after the emergency. Additionally, your report may contain information on any findings of a follow-up investigation. Document information according to your facility's policies and procedures, in any of the following formats: a daybook, shift log, living area log, specialized forms, incident report, offense report, memorandum, and so on.

Written documentation of use of force incidents is discussed in detail in a later section of this text.

In this step, you also debrief. Debriefing is a procedure in which people involved in an emergency situation talk about the incident to assess what happened during it and to learn what, if anything, can be done to improve future performance in similar situations. The purpose of debriefing is not to assign blame for anything that went wrong during an incident. Mistakes may happen during an incident, but blame is less important than making positive changes based on what was learned. Remember: If officers do not discuss and evaluate their response, they are more likely to keep making the same mistakes.

There are different levels of debriefing—some more formal than others. They include:

- individual officers
- subjects involved in an incident
- witnesses to an incident
- other officers present at an incident
- responding officers
- other responding professionals
- supervisors
- command staff

The primary purpose of debriefing at all levels is to improve future performance. As a result of debriefing, revisions may be made to written policies and procedures, training, documentation requirements, and/or supervision of employees.

The First Responder Philosophy is a useful tool because it gives you a sound framework to know and follow when you become aware of and respond to any kind of

correctional emergency. Remember that you are expected not only to *do* the right thing as a jail officer, but also to *show* that you did the right thing—that is, to justify your actions. When you can show that your actions in response to a correctional emergency were based on this systematic approach—that you did your best to follow the steps in the First Responder Philosophy—then your actions are likely to be professional and appropriate.

## DISTURBANCE RESOLUTION

Disturbance Resolution is the foundation of Wisconsin's POSC system. It provides a structure officers can use to safely and efficiently perform their mission and function. It is the basis for explaining and justifying an officer's decisions to respond, take action and attain control. It also outlines an officer's responsibilities once control has been established.

While The First Responder Philosophy gives a framework for proper response to any type of correctional emergency, Disturbance Resolution more narrowly focuses on the specific steps to follow for one category of correctional emergencies—disturbances.

Disturbance Resolution consists of three major components:

- Approach Considerations
- Intervention Options
- Follow-Through Considerations

### Approach Considerations

The first component of Disturbance Resolution addresses actions you take before making contact with subjects involved in a disturbance. These include three activities: decision-making, tactical deployment, and tactical evaluation.

### Intervention Options

The second component of Disturbance Resolution specifies the basic trained options for use of force by jail officers in Wisconsin. It explains the five trained modes for use of force and the purposes for each.

### Follow-Through Considerations

The last component of Disturbance Resolution specifies an officer's duties following a disturbance to ensure proper care for subjects and others and follow-up activities to ensure appropriate security and safety.

Disturbance Resolution is shown on the following page.

# DISTURBANCE RESOLUTION

## 1. APPROACH CONSIDERATIONS

A. Decision-making       Justification
                         Desirability

B. Tactical Deployment   Control of distance
                         Positioning
                         Team Tactics

C. Tactical Evaluation   Threat assessment opportunities
                         Officer/subject factors
                         Special circumstances
                         Level/stage/degree of stabilization

## 2. INTERVENTION OPTIONS

| MODE | PURPOSE |
|---|---|
| Presence | To present a visible display of authority |
| Dialogue | To verbally persuade |
| Control Alternatives | To overcome passive resistance, active resistance, or their threats |
| Protective Alternatives | To overcome continued resistance, assaultive behavior, or their threats |
| Deadly Force | To stop the threat |

## 3. FOLLOW-THROUGH CONSIDERATIONS

A. Stabilize            Application of restraints, if necessary

B. Monitor/Debrief

C. Search               If appropriate

D. Escort               If necessary

E. Transport            If necessary

F. Turn-over/Release    Removal of restraints, if necessary

The primary focus of POSC training is to teach you how to apply the three components of the Disturbance Resolution.  While much of POSC is concerned with learning the techniques employed in the Intervention Options stage, the other two sections are just as important. A great many officer injuries and complaints against officers for inappropriate or excessive force result from the failure to give proper attention to the first and last phases—Approach Considerations and Follow-Through Considerations.

Each of the three major components of the Disturbance Resolution is discussed in a separate chapter of this text.

# PSYCHOMOTOR SKILL DEVELOPMENT

The application of force is a psychomotor skill, meaning one in which your brain and your body work together to accomplish a task. Psychomotor skills are complex. To perform any psychomotor skill well, a person must prepare his or her mind and body to do the skill and then practice it over and over to develop proficiency.

In POSC training, you are taught to perform many specific use-of-force techniques. Each of these techniques involves a number of psychomotor skills. But in order to apply force properly when that is necessary, it is not enough to just know and be able to do the techniques themselves. You also have to proactively address the mental, psychological aspects associated with use of force—to prepare your mind for the physical encounter.

Three elements are necessary for proper psychomotor skill development. They are:

- mental conditioning
- tactical warm-ups
- body mechanics

The following explains these further.

## MENTAL CONDITIONING

A use of force situation is often both physically and psychologically stressful. It can be physically stressful because any physical activity is potentially strenuous—your heart and lungs are operating at enhanced capacity (this is known as aerobic activity) and your physical resources (strength, flexibility, etc.) are being taxed.

It can be psychologically stressful because you are in a confrontation with another person or persons, emotions may be high, your personal safety—maybe even your life—is at risk, and you may be in the position of hurting someone else. In this sense, a use-of-force incident is often a crisis situation. As a professional, you must prepare yourself psychologically to deal with the crisis situations that you are likely to face—including use of force situations. That is why mental conditioning is important.

Two elements of mental conditioning are *crisis rehearsal* and *autogenic breathing*.

### Crisis Rehearsal

Crisis rehearsal[5] involves preparing yourself in advance to properly handle crisis situations. It involves thinking in advance about what can happen during an encounter and how best to react. Crisis rehearsal also includes giving your mind positive messages about reacting during a crisis. It involves practicing your tactics and

---

[5] The concept of crisis rehearsal was refined by Calibre Press.

techniques under stressful conditions and developing "conditioned responses" to threatening situations.

One way to practice crisis rehearsal is to go through your jail or detention facility and think about possible bad things—crisis situations—that could happen and plan your how you would respond.  For example, where are blind spots in the facility that an inmate could hide in and attack you from?  What will you do when that happens?  What will you do when a group of inmates in a living area suddenly attacks you?  What will you do when you enter an individual cell or room and an inmate attacks you?  What will you do when a group of inmates in a living area or a program area start assaulting others or begin a riot?

You do yourself and your fellow officers a favor if you think very specifically about these and other possibilities in advance, when you are calm, can think rationally, and can plan a good response.  Remember that when a crisis occurs, you will probably not be able to think clearly and rationally.  Instead, your mind and body will be under stress and you will primarily *react*, rather than think and make decisions.  By preparing yourself for a crisis, your reactions when a crisis does occur will be better.

If you do such crisis rehearsal in an appropriate physical setting when you are calm and comfortable, and think about using good tactics in response to possible crisis scenarios, then the likelihood of your prevailing in an actual crisis is much greater.

You must do more than just think about your tactics—you must also practice them.  Once you have learned good tactics, the best preparation for the real thing is to practice in simulated stressful situations in your facility.  When doing so, be sure to follow basic safety rules for use of force training.  See Appendix B for these safety rules.

In addition to thinking about your tactics and practicing them in simulated stressful situations, you must also think in advance about some of the psychological elements associated with possible use of force in a corrections setting.  You should ask yourself some important questions, such as these:

> *Can I injure, or even kill, another person?*
> *Can I deal with the gore (blood, etc.) from an incident?*
> *Do I have the will to keep fighting if I have been injured, or cut, or even shot?*

These are important questions because your mental preparation—including your psychological willingness to survive even when hurt—very much affect the outcome of a confrontation.  Once you have considered these questions and answered them for yourself, then you have started to train your mind to deal with a possible crisis.

An important aspect of such mental preparation is a concept known as positive self-talk. This means formulating positive thoughts and ideas about your capabilities and intentions, and articulating these to yourself over and over. For example, here are some positive self-talk items for response to a disturbance[6]:

---

[6] Adapted from *The Tactical Edge* by Charles Remsberg

June, 2009

- *On any disturbance call, I will survive.*

- *I am constantly aware of my environment.*

- *I am relaxed but alert.*

- *I take advantage of every assessment opportunity.*

- *I know the verbalization skills I need.*

- *I know the physical moves I need.*

- *I hit with power.*

- *I am skilled with my equipment.*

- *I know when to make deadly force decisions.*

- *I will survive and keep going, no matter what.*

- *I am proud to be one of America's finest – correctional personnel.*

If you say these affirmations to yourself over and over, you will condition your mind to believe them. They will become positive beliefs. One way to do this is to write these down and read them to yourself, preferably aloud, every day.

Once you have conditioned your mind to believe these affirmations, you will have a psychological advantage when an actual crisis occurs because you are then more likely to *act* on what you believe. This was well articulated by Police Officer III Stacy Lim of the Los Angeles Police Department, who survived a gun battle during which she was critically injured but managed to stop her assailant before becoming unconscious due to loss of blood. Crediting her survival to her training, mental preparation, and competitive spirit, Office Lim said, "You need to prepare your mind for where your body may need to go." Positive self-talk is an excellent way to prepare and condition your mind.

**Autogenic Breathing**

Proper breathing is an important aspect of crisis rehearsal development. Before, during and after a crisis situation, one of the things that will help you get through it successfully is use of good breathing techniques. Such techniques can help calm your mind, focus your thinking, and better enable you to react well and make good decisions. There is a definite relationship between your mind and your body, and breathing correctly has a positive effect on the physiology of your brain.

One useful breathing technique is known as *autogenic breathing*. Perform the technique as follows:

1. Inhale slowly through your nose on a four-count.
2. Pause and hold your breath for a four-count.
3. Exhale slowly through your mouth on a four-count.
4. Pause for a four-count.
5. Repeat steps 1-4 several times.

You can do this technique while standing or sitting, but in either case the technique will work better if your posture is somewhat erect. While learning the technique, you may want to close your eyes so as to concentrate better, although this is not required. Naturally, if you are using autogenic breathing to help calm yourself in an actual emergency, you should not close your eyes.

The purpose of autogenic breathing is to reduce both mental and physical stress. It helps control such emotions as apprehension, uncertainty, confusion, anger and fear. It also helps with the effects of physical exertion. Finally, doing this technique helps control the natural feeling of trauma after a stressful incident.

Remember that your body and your mind are not separate entities. They work together. You cannot expect to prevail in a use of force situation through physical tactics and techniques alone. That is only a part of what is required. The other part is your mental conditioning, which includes doing effective crisis rehearsal and using autogenic breathing techniques before, during, and after a crisis.

## TACTICAL WARM-UPS

Tactical warm-ups are the second key element of psychomotor skills development. This refers to activities designed to enhance your physical fitness and prevent injuries when practicing use of force tactics and techniques. Also, by doing tactical warm-ups before practicing tactics and techniques, you will help condition your body and mind to perform properly in actual use of force situations.

To prepare your body for strenuous activity, you need to do two things:

- warm up your body through aerobic activity
- stretch your muscles, tendons and ligaments

Failure to do either of these means that your body will not perform as effectively as it can, which lessens the chance that you will prevail in a confrontation. Failure to prepare your body through tactical warm-ups also means that you are more likely to suffer an injury during strenuous activity. These injuries may include muscle strains or tears, joint problems, back problems, and so on.

### Warm-Ups

When doing tactical warm-ups you should monitor your pulse rate. A good rule of thumb is to stay within your Exercise Heart Rate (EHR). Your EHR can be determined by subtracting your age from 220, which gives you your Maximum Heart Rate (MHR) Check your pulse often and moderate your exertion to keep it between 60% and 80% of your MHR.

Your tactical warm-ups can be expanded to a tactical aerobics program that can provide both an aerobic workout and a review and re-enforcement of defensive tactics techniques. This is accomplished by performing multiple, high-intensity repetitions of basic empty hand control and baton techniques between periods of running in place.

Positive self-talk, as described above, is also a component of tactical warm-ups.

In addition to doing tactical warm-ups *before* a period of strenuous exercise, it is vitally important to do proper "cool down" exercises *afterwards*. A good cool-down includes aerobic activity in which you go increasingly more slowly so that your heart rate decreases gradually. Your cool-down routine should also include stretching.

### Stretching

Stretching has many benefits. It reduces muscle tension and makes your body feel more relaxed. Stretching helps coordination by allowing for freer and easier movement and it increases range of motion. Stretching is thought to prevent injuries such as muscle strains because a pre-stretched muscle resists stress better than an unstretched muscle. Stretching also signals the muscles that they are about to be used, thus preparing the body for strenuous activity. Finally, stretching promotes better blood circulation.

You should stretch both before and after exercise. Pre-exercise stretching should be preceded by some activity to heat up the muscles—a warm muscle stretches more easily and is less susceptible to over-stretching injuries.

See Appendix C for specific information on tactical warm-ups and post-exercise protocol.

## BODY MECHANICS

Proper body mechanics is the third critical element of psychomotor skill development. Body mechanics refers to the way you position yourself and the way you move in tactical situations to achieve maximum effectiveness. Knowing and using good body mechanics is a key for effectively applying the POSC techniques.

You will learn about body mechanics in POSC training. Typically, good body mechanics are taught in three areas:

- stance and movement
- ground defense (protection from the ground; getting up safely and falling)
- power development training

## SUMMARY

Psychomotor skill development is a key element of use-of-force training and of ongoing preparation for possible application of force in a jail or detention facility.  Psychomotor skill development involves preparing your mind and body together to perform the complex skills that go into effective use of force.  Remember that it is not enough just to learn the POSC tactics and techniques.  You must also properly prepare your mind for a crisis situation.  You should practice crisis rehearsal—thinking in advance about bad things that can happen, rehearsing your proper response to specific contingencies, and giving yourself positive mental messages.  You should also practice autogenic breathing.

Tactical warm-ups help condition your body and mind for strenuous activities, such as a use-of-force situation.  These activities also help to minimize the chances of injuries.

Use of proper body mechanics is critically important in effective application of use-of-force techniques.  Not only do you have to apply good stance and movement throughout your POSC techniques, but you also have to know how to fall and get up properly and how to use your power effectively.

All of these elements of psychomotor skill development are important, and they must be practiced continually and thoroughly in order for you to be prepared to win in a use-of-force situation.

June, 2009

# APPROACH CONSIDERATIONS

Approach Considerations is the first phase of Disturbance Resolution.  In your initial approach to a correctional disturbance emergency, you need to do three things:

- Make a contact decision (decision-making)
- Position yourself & others (tactical deployment)
- Evaluate the threat level (tactical evaluation)

The following explains each of these steps.

## DECISION-MAKING

When you are considering making contact with subjects involved in a disturbance, you must first answer two questions:

- Is contact *legally justified*?
- Is contact *desirable* at this time?

Deciding whether contact is legally justified with a subject is an easier issue for jail officers than it is for law enforcement officers on the street.  Whereas law enforcement officers must determine that they have the legal right to stop a person, or to enter someone's home, or to make a traffic stop, those legal requirements do not apply in a jail or detention facility. Jail officers can initiate contact with inmates at any time to achieve a legitimate correctional objective and do not need to worry about meeting standards such as "reasonable suspicion" or "probable cause," as do law enforcement officers.

A jail officer must, however, decide if a decision to make contact with an inmate is reasonable and for a legitimate correctional purpose. If an officer cannot justify the decision then the officer's subsequent actions may be deemed inappropriate or even criminal.  For example, if an officer enters an inmate's cell and gets involved in a physical confrontation in a section of the jail where he or she is not assigned and has no reason for being, this act might be deemed legally unjustified and could be construed as harassment.

The second question—deciding whether contact with an inmate is desirable is always an issue for both jail officers and law enforcement officers.  The answer depends upon the nature of each individual situation.  Remember that disturbance emergencies range from a single inmate who may be upset or out of control to a full-scale riot in the facility.  It might be quite appropriate for a single officer to enter a living area to make contact with an upset inmate or to wait for at least one back-up officer to arrive before doing so.  But in the case of a full-scale riot, it would clearly not be appropriate to enter the emergency site and make contact with inmates until a sufficient number of responding officers—perhaps even CERT® or SWAT members—have arrived.

In determining whether to make contact in response to a disturbance emergency, ask yourself these questions:

- Is it safe? Will my safety or that of other officers be placed at undue risk if I make contact and try to control the situation? Will the safety of an inmate or inmates be placed at undue risk if I make contact—or do *not* make contact, at least immediately?

- Will facility security be somehow compromised or threatened?

- Does the situation seem to be a ruse or set-up which could threaten security or safety?

- Will larger problems occur as a result of my making contact, at least immediately?

Remember that institutional settings such as a jail or detention facility often make it possible to reduce the need for application of physical force, at least immediately.  For example,

- It may be possible to isolate the area in which a disturbance is taking place.

- It may be possible to resolve a situation through presence and dialogue rather than applying physical force to gain or regain control, especially if you can do so from outside the emergency site.

- It may be possible to wait out a situation, rather than intervening immediately.

- It may be feasible to resolve a situation through a show of force, or through an implied threat, rather than by the actual application of force.

- It may be possible to consult a supervisor before acting.

If it is possible safely to resolve a situation without actually applying physical force, as is often the case in an institutional setting, then that is a preferable option.

As noted, your safety and that of others—including inmates—is always a key factor in your decision as to the desirability of making contact to respond to a correctional disturbance emergency.  While you have the responsibilities to try to keep inmates safe and to maintain security, order and control in your facility, you are not expected to place your own health and safety unreasonably at risk in order to accomplish these objectives.  For example, if two or more inmates are fighting in a living area of the jail, you would probably be unwise to decide to enter the site until a sufficient number of backup officers have arrived, even though that delay might mean an inmate gets hurt.

Security of the facility is also a key factor affecting your decision as to whether contact is desirable in a disturbance emergency.   As noted, a disturbance could be a ruse or set-up designed to draw an officer into an area in order to overpower or harm him or her.  Such a

ruse could be part of a hostage-taking attempt, an escape attempt, etc.  Even an inmate suicide attempt could be a ruse.  Remember that according to the fourth step of the First Responder Philosophy, you are to enter an emergency site only "when you have sufficient backup and when it is appropriate to enter."

## TACTICAL DEPLOYMENT

Tactical deployment is the second step in Approach Considerations.  Tactical deployment refers to how you position yourself and other officers to best achieve and maintain control in a disturbance and ensure officer and subject safety.  Tactical Deployment consists of three components:

- control of distance
- relative positioning
- team tactics

The following is discussion of each of these.

### Control of Distance

Control of distance, sometimes called *proxemics*, is important because your ability to control the distance between you and a subject affects your safety and that of others.

Acceptable social distances vary from culture to culture. Within a single culture, the distance at which we feel comfortable with others depends on the nature of the situation and the relationship between or among the people involved. In our culture, the following social distances are generally considered acceptable:

- public distance (between strangers): more than 12 feet
- social distance (between people at social events): 4 to 12 feet
- personal distance (between friends): 1 ½  to 4 feet
- intimate distance (between intimates): 0 to 1 ½  feet

However, in an institutional setting, the acceptable social distances are smaller.  This is because people feel more crowded together in an institution, and there is less possibility of maintaining distance.  The acceptable social distances in an institution are as follows[7]:

- public distance:  more than 6 feet
- social distance:  3 to 6 feet
- personal distance: 1 to 3 feet
- intimate distance:  0 to 2 feet

---

[7] Based on the concept of "Compressed Society" developed by Jerry Elliott, Retired Captain with the Wisconsin Department of Corrections

Acceptable social distances in a jail or detention setting may also vary with different people. For example, acceptable intimate distances for inmates who are "emotionally-disturbed persons" (*EDPs*) depend on their perception of threat in a given situation. Such an inmate may feel that an officer who is more than two feet from them is still within their intimate zone because they perceive a higher sense of threat from that officer. That perception of threat may cause them to react in an inappropriate way. Of course, you cannot always know what is going in the mind of a person who is an EDP. For that reason, it is a good idea to try to maintain a little extra distance from them when making contacts.

Good tactical deployment depends on maintaining appropriate distance from people when responding to correctional disturbance emergencies, so that you are able to react quickly enough.

### Relative Positioning

Another issue in tactical deployment is relative positioning, meaning the positioning of your body in relation to an inmate or inmates. In both DAAT and POSC, relative positioning is described in terms of a system of five relative positions, each of which has particular advantages or disadvantages[8]. These five positions are

- Inside
- Level 1
- Level 2
- Level 2 ½
- Level 3

The Relative Positioning Chart on the next page illustrates each of these positions. The characteristics of each of these positions are as follows:

- Inside—should generally be avoided, because it makes an individual officer too vulnerable to attack by a subject. The inside position is used in certain multiple-officer responses
- Level 1—best for frontal approach to a subject
- Level 2—the subject usually re-positions himself or herself when approached from this position
- Level 2-1/2—best escort position
- Level 3—best for decentralizing subjects and for stabilizing a subject against an object to minimize danger to the officer(s)

Relative positioning applies to all positions that you may find yourself in, including standing, stooped, kneeling, and prone (belly-down). You will learn more about relative positioning in specific situations during training on POSC techniques.

---

[8] Concept developed by John DeSmedt, United States Secret Service.

June, 2009

THIS PAGE INTENTIONALLY LEFT BLANK.



June, 2009

Team Tactics

The third component in tactical deployment in POSC is the use of team tactics, meaning planned responses involving two or more officers. The advantage of using team tactics is that it enhances officer safety and officer coordination. Team tactics can be employed in many ways in response to disturbance emergencies.  For example, two common methods are:

- Contact-cover
- Bracketing

Contact-cover refers to using one officer (the *contact officer*) to make contact with the subject while the other (the *cover officer*) provides cover both for himself or herself and the contact officer.  Bracketing is a variation of contact-cover, used in close quarters. The cover officer takes a position at level 2½ with respect to the subject while the contact officer is positioned at level 1.

In POSC training, you will learn more about use of team tactics in tactical deployment.

## TACTICAL EVALUATION

Tactical evaluation is the third component in Approach Considerations.  Tactical evaluation involves your assessing potential hazards (such as improvised weapons, blood, urine, smeared feces, water, soap on floor, etc.) in the contact during a disturbance emergency.  You then decide the proper action to ensure safety and security and to achieve and maintain control.  *Proper action* requires you to:

1. Remain alert
2. Be decisive
3. Have a pre-planned tactical response in mind

Remaining alert allows you to act decisively because you are less likely to be caught unawares.  A useful concept to describe states of readiness is the *Conditions of Awareness* framework using five color codes:[9]

| Description | Color Code | Officer Response |
| --- | --- | --- |
| 1.  Unaware | White | Total relaxation in a safe place |
| 2.  Relaxed and alert | Yellow | Scanning for possible threats |
| 3.  Ready to act | Orange | Focusing on possible threats |
| 4.  Action state | Red | Reacting to threats: disengaging and/or escalating |

---

[9] Concept developed by Jeff Cooper, nationally-known firearms instructor.

5. Blind panic              Black                          Indecisive and/or excessive;
                                                                    blind panic

Throughout your tour of duty, your normal state of awareness should be Condition Yellow (relaxed but alert and scanning for possible threats). Should you encounter a possible threat, you should move into Condition Orange (ready to act, focusing on possible threats). If the possible threat turns out to be real, you would move into Condition Red (reacting to threats, disengaging and/or escalating). You should never be in Condition White (unaware, totally relaxed) while on duty, nor should you be in Condition Black (blind panic, indecisive and/or excessive response to threat). Either end of the spectrum leads to bad results. In short, a tactical evaluation requires you to stay alert and ready to make a decision and act on it as the situation dictates.

More specifically, your tactical evaluation should take into account four factors:

- threat assessment opportunities
- officer/subject factors
- special circumstances
- level/stage/degree of stabilization

The following discusses each of these.

**Threat Assessment Opportunities**

Threat assessment opportunities include a variety of indicators you might notice during a contact that could allow you to predict that a subject is going to become assaultive. The better you can predict a possible assault, the better you can protect yourself.

Five factors to consider as part of Threat Assessment Opportunities are:

- levels of resistance
- early warning signs
- pre-attack postures
- indicators of emotional disturbance
- weapon control

*Levels of resistance.* The term *levels of resistance,* refers to a subject's actions during the contact that an officer can use to assess the subject's apparent degree of threat. These include the following:

- Unresponsiveness (subject is apparently unconscious)
- Non-responsiveness (subject conspicuously ignores you)
- Dead-weight tactics (subject decides not to assist your attempt to move him or her)
- Resistive tension (subject tightens up his or her muscles)
- Defensive resistance (subject attempts to get away)

- Aggressive resistance (subject comes at or moves toward you)
- Physical assault (subject uses personal weapons to strike at you or other officers)
- Great bodily harm assault (subject is able and attempts to cause harm)
- Life-threatening assault (subject is able and attempts to cause death)
- Life-threatening weapon assault (subject has a weapon and attempts to cause death).

These behaviors all allow you to assess a subject's apparent threat, based on his or her level of resistance in response to your attempt to achieve control.

*Early warning signs.* The term *early warning signs,* refers to subject behaviors that predict a possible assault. Such signs include the following:[10]

- Subject conspicuously ignores you.
- Subject gives you excessive emotional attention.
- Subject exhibits exaggerated movement.
- Subject suddenly ceases all movement.
- Subject has a history of violent behavior.

Based upon your knowledge of or experience with a particular inmate, there may be other early warning signs as well.

*Pre-attack postures.* The term *pre-attack postures* refers to physical movements or body postures by a subject that typically indicate that the subject is about to attack you or another officer. These include the following:

- boxer stance (arms raised, clenched fists)
- hand set (change in hand positioning)
- shoulder shift ("blading" the upper body)
- target glance (looking at the potential target of their assault)
- thousand-yard stare (fixed stare or gaze that is not focused at any person or object)

*Indicators of emotional disturbance. Emotionally-disturbed persons* (EDPs) are always potential threats, and signs that a person is an EDP are therefore factors in Threat Assessment.

EDPs fall into three basic categories:[11]

- Long-term EDPs
- Chemical Abusers
- Short-term EDPs

---

[10] Based on information developed by Calibre Press.
[11] Daniel Vega, Crisis Intervention Specialist, Tacoma, Washington

Long-term EDPs include people who are chronically mentally ill, meaning that they have a mental disorder (e.g., bipolar disorder, schizophrenia, etc.) and are never really cured. The symptoms of the illness may be controlled through medication or other treatment, and a person may be sicker at some times than other times, but the illness does not go away.

Chemical abusers include people who abuse alcohol or other drugs, and are possible threats while under the influence of such a substance. When they are not under the influence, they may be perfectly normal.

Short-term EDPs include people who are in a short-term crisis state for any reason: an acute episode of mental illness, a reaction to an upsetting or stressful life event, a reaction to a physical injury or illness, and so on. During this period, a person may be very angry or upset or disturbed, and thus may be a threat to self or others.

Most EDPs go through a *crisis cycle*, meaning that the crisis they are experiencing goes through common, identifiable stages. These stages include:

1. *Normal behavior.*

2. *Conflict development.* In this stage, something happens that leads to a crisis. It could be a stressful event, use of alcohol or drugs, onset of an episode of mental illness, or something else.

3. *Crisis state.* In this stage, the person is in crisis. He or she may be very upset, distressed, angry, emotional, out-of-control, suicidal, and so on. A crisis state may lead to behaviors which can be dangerous and/or unpredictable.

4. *Post-incident conflict.* In this stage, the person may experience feelings of conflict, embarrassment or being upset due to the crisis or the after-effects of the crisis. He or she may be quite emotional for a period of time.

5. *Return to normalcy.*

Some EDP's can be dangerous, for several reasons. A person might be very strong because of chemical reactions to stress, or might have a high pain tolerance, or might feel that they are fighting for their life. The latter is usually most true of people with certain forms of mental illness. For example, a person who has paranoid schizophrenia may have the delusion that other people are out to get him or wish to hurt him, and therefore may feel the need to fight against the perceived threat. A person under the influence of certain drugs—even alcohol—may have similar reactions.

As noted, EDPs include people who experience either acute episodes of mental illness or who are chronically mentally ill. This includes people who are seriously depressed and people who experience episodes of mania, often in association with an illness known as bipolar disorder. People with this disorder typically experience mood swings, from mania ("highs") to depression ("lows"). They usually feel normal between these mood swings. A person may be a threat at either end of this disorder—the depression

June, 2009

or the mania. When depressed, a person is usually more of a suicide risk; while manic a person is usually more of a risk to assault others, but can also be a suicide risk.

Some people who are experiencing a suicidal crisis may also be risks to assault you or others. Sometimes, homicidal tendencies are the flip side of suicidal feelings. For example, if you are responding to a suicidal person, he or she may be dangerous to you because you have frustrated the suicide attempt, or perhaps because the person perceives you to be insensitive to the situation and therefore becomes angry at you. In some cases, a person may try to make you the "vehicle" of their suicide by threatening to hurt or kill you, prompting you to use deadly force against them. This is sometimes referred to as "suicide by cop."

You will learn specific strategies for dealing with EDPs in Correctional Professional Communication Skills. In general, you should follow the steps in the Crisis Intervention Format, presented here in brief and discussed in greater detail in Correctional Professional Communication Skills:

1. Try to get the person's attention.
2. Check on the person's perception of reality.
3. Try to establish rapport with the person.
4. Explain your perception of reality.
5. Move toward resolution of the situation.

*Weapon Control.* The presence of weapons offers another threat assessment opportunity. If an inmate has a weapon of any kind, that obviously enhances threat. In assessing the threat presented by a weapon, take into account that different weapons present different levels of danger.[12]

| **Weapon** | **Level of Dangerousness** |
|---|---|
| Firearm (projectile of bullets) | Most Dangerous |
| Knife or other edged weapon | ↓ |
| Club (lever) | |
| Unarmed | Least Dangerous |

The danger zones of firearms and edged weapons vary depending on the effective ranges of specific weapons. The effective ranges of some common weapons are as follows:

| Unarmed | 10 feet |
|---|---|
| Club or knife | 21 feet |
| Firearm | Line of sight unbroken by adequate cover |

Here are more specific danger zones for particular kinds of weapons:

---

[12] Massad Ayoob, Lethal Force Institute

- *Projectiles:* The area of danger is a straight line, the diameter of the projectile, within the effective range of the weapon.

- *Edged weapons:* The area of danger is the tip of the weapon, the blade of the weapon, and the butt of the weapon in a "starburst" shape within the lunging range of the weapon.

- *Levers:* Although a victim may be struck with any part of a lever, the primary area of danger is the tip and last four inches of the lever, where most of the force will be generated, at the end of an arc within the lunging range of the weapon.

The threat level presented by any weapon assault is dependent not only on the type of weapon but also on the following factors:

- the distance the assailant is from the officer
- the skill level of the assailant
- the force options available to the officer
- the ability of the officer to disengage
- other variables

*Weapon Control.* If an inmate has a weapon or can get hold of an officer's weapon (of any kind) that factor enhances threat. To keep safe, you must always control your own weapons and keep inmates from injuring you if they manage to get a conventional or improvised weapon. To do so, practice these four tactics:

- *Awareness:* Always be aware of the possibility that inmates may try to get your weapons and always guard against it.

- *Avoidance:* Avoid being in situations in which there is a chance for inmates to get your weapons or get to you if they have weapons. Use barriers to stay away from inmate weapons and avoid entering areas where an inmate has a weapon. Do not unnecessarily take weapons into areas in which inmates could get them away from you.

- *Retention:* Practice appropriate weapon retention techniques to keep others from taking your weapons away from you. This applies not only to conventional weapons such as a firearm or baton, but also to objects that could be used as weapons (e.g. handcuffs).

- *Defense/Disarming:* Practice techniques to defend yourself and disarm an inmate who has a weapon or gets one from you or another officer. Basic techniques you will learn in POSC training include "Sweep and Disengage" and "G.U.N." (grab, undue, neutralize.)

Using these Threat Assessment Opportunities can help you *predict* that a subject is going to become assaultive, *prepare* you to protect yourself against this possible

assault, and—when considered along with the other components of Tactical Evaluation—may help you *justify* an earlier use of force response.

It is tempting to assume that a subject will comply with your oral directions just because you are an officer and are in a position of authority. This *presumed compliance*[13] can be dangerous. It can lead to a false sense of security and diminish your sense of perceived danger. It affects both what you perceive and how you think and behave. The lesson: never assume that inmates or other subjects will comply with your directions, just because you are an officer. Instead, keep in mind all the threat assessment opportunities that you have learned about and make your tactical decisions on that basis.

### Officer/Subject Factors

This is the second component of Tactical Evaluation. *Officer/subject factors* refers how you "match up" to the subject or subjects in terms of number of participants and individual characteristics.[14] The number of participants is clearly important. How many officers are there compared to the number of subjects? Naturally, if you are outnumbered, your perceived threat level will be higher than if officers outnumber subjects. Individual characteristics refer to the relative capabilities of officer and subject. We consider four:

- *Relative ages.* The age of the officer as compared to the age of the subject could be a factor. For example, a younger inmate might be stronger and have more endurance than an older officer.

- *Relative strength.* Who is stronger, and therefore has a potential advantage in a physical confrontation? In this regard, gender *may* be a factor, since men generally have greater physical strength than women—but not always.

- *Relative size.* If a subject is bigger than you, he or she will probably be harder to control during a confrontation. On the other hand, if you are larger, it may possibly be easier for you to control a smaller inmate.

- *Relative skill levels.* Which person is a more skilled fighter is certainly a factor in determining proper action. For example, if a subject is known to be a martial arts practitioner or a skilled athlete, that should affect your decision as to proper action. On the other hand, if you are a martial artist but the subject is not, that could also affect your decision.

You should consider these factors both individually and in combination. For example, it may be that you are facing a subject who is smaller than you or not as strong as you but who is known to be a skilled fighter. That combination of factors legitimately affects your evaluation of the situation, and thus affects your decision as to proper use of force action.

---

[13] Concept developed by Tony Blauer, Canadian tactical instructor.
[14] Concept developed by Calibre Press.

## Special Circumstances

Special circumstances is the third component of Tactical Evaluation. It refers to a variety of circumstances that may affect your evaluation of threat in a given situation, and thus affect your decision as to proper action.[15]

Special circumstances include the following:

- *Your reasonable perception of the threat.* Remember that the legal standard for use of force by law enforcement and correctional officers is that it must be reasonable—under the totality of the circumstances, which may include the need for quick action. What is reasonable in a given situation depends on an officer's *perception* of the threat, based on training, experience, and the fact situation. You must always be prepared to justify your perception of threat and the actions you took in response to that perceived threat.

- *Sudden assault.* If a subject suddenly assaults you, that certainly affects your evaluation of the situation and your decision as to proper action.

- *Physical positioning.* Your position in relation to a subject may affect your tactical evaluation. If you are in a vulnerable position—directly in front of a subject, or on the ground when the subject is standing, or backed into a corner where you cannot easily disengage, that could elevate your perception of threat.

- *Subject's ability to escalate force rapidly.* You may know that a subject is capable of escalating force quickly, perhaps because he or she has the ability to get to a weapon.

- *Special knowledge about the subject.* You may have knowledge or information about a subject that indicates the subject is a potential threat. For example, you may know that the subject is an EDP who has been violent in the past.

- *Injury or exhaustion.* If you are injured and/or exhausted, you are less capable of defending yourself properly or otherwise controlling a situation.

## Level / Stage / Degree of Stabilization

The fourth component of Tactical Evaluation is *level / stage / degree of stabilization.*[16] Stabilization means:

> *"The process of placing a subject in a fixed location or position, that aids the officer to establish control of the scene."*

---

[15] Concept developed by Calibre Press.
[16] Jay Sandstrom, Wisconsin Department of Corrections (retired).

Because use-of-force situations are typically dynamic and rapidly changing, the subject's stabilization is important to consider because it affects the subject's ability to cause harm. A subject may have the clear intent to harm an officer, but if that subject is adequately stabilized then he or she may not be able to act on the intent.

Stabilization includes placing a subject in physical restraints, such as handcuffs or a restraint chair, but restraints are just one type of stabilization. Stabilization also includes other activities, such as those in the following list. Note that these are in order from least restrictive to most restrictive. Naturally, that order is also from most potentially dangerous to least potentially dangerous, because the more a subject is restricted, the less he or she is able to resist.

| | |
|---|---|
| *Presence Stabilization:* | Subject is stabilized by the physical presence of one or more officers. |
| *Verbal Stabilization:* | Subject is stabilized by the verbal commands of one or more officers. |
| *Standing Stabilization*: | Subject is stabilized in a standing position. Restraints may or may not be applied. |
| *Wall Stabilization:* | Subject is stabilized by being directed or placed against a wall or other stationary vertical surface. Restraints may not or may not be applied. |
| *Ground Stabilization:* | Subject is stabilized by being directed or placed to the ground, in any position. Restraints may or may not be applied. |
| *Special Restraints:* | Subject is stabilized by immobilizing him or her by application of or placement in physical restraints. These can range from handcuffs to leg irons and from a restraint chair to four-point restraints. |

Stabilization, like control, is also a perception based on an officer's training, experience, and the fact situation. That perception must be based on the totality of the circumstances known to the officer at the time of the incident.

Keep in mind that your tactical evaluation is not a one-time thing. You must continually reassess the level of threat throughout each encounter. Situations are rarely static; they can change in an instant. You need to remain flexible and able to adapt to changing circumstances. Stay alert for any indications that a situation has changed, and be ready to respond appropriately.

## SUMMARY

As you have learned, Approach Considerations is the first phase of Disturbance Resolution. The steps in this phase are the first things that you will consider and make decisions about when you respond to a correctional disturbance emergency. Approach Considerations outline your responsibilities as you initially approach a disturbance emergency.

The three actions you must take during Approach Considerations are:

1. make a contact decision (decision-making)
2. position your personnel (tactical deployment)
3. evaluate the threat level (tactical evaluation)

Based on the results of these actions during Approach Considerations, you will determine whether it is necessary and justified to apply physical force in a given situation. If you determine that force is appropriate, you must choose which force option or options to apply. Application of force is the next phase under Disturbance Resolution—Intervention Options. The next chapter addresses this phase.

THIS PAGE INTENTIONALLY LEFT BLANK.

# INTERVENTION OPTIONS

The second phase of Disturbance Resolution is Intervention Options.  These are the trained POSC techniques. Much of your POSC training is devoted to learning these. The intervention options are divided into five modes as shown:

### INTERVENTION OPTIONS

| MODE | PURPOSE |
|---|---|
| Presence | To present a visible display of authority |
| Dialogue | To verbally persuade |
| Control Alternatives | To overcome passive resistance, active resistance, or their threats |
| Protective Alternatives | To overcome continued resistance, assaultive behavior, or their threats |
| Deadly Force | To stop the threat |

These five modes are the main force option categories.  Each mode includes specific tactics and techniques that you will learn.  If your initial approach to a disturbance emergency situation in your jail or detention facility leads you to decide to intervene, Intervention Options provides you with a range of possible responses.  Each of the five modes listed reflects the need for an increasing level of control.

Remember that POSC is defined as *a system of verbalization skills coupled with physical alternatives.*  This means that if possible, it is always preferable to accomplish the objective of control through the first two modes—*Presence* and *Dialogue*—which do not involve application of physical force.  Using these modes is always desirable, because it significantly lessens the chances of anyone getting hurt, minimizes stress for everyone, and also minimizes the risk of litigation.  The part of the POSC definition that says "coupled with physical alternatives" implies that you will use physical force when verbalization skills have either not worked or would clearly be ineffective.

However, you do not have to start with the lowest level of control—*Presence*—and try that first, and then if that does not work escalate to the next level—*Dialogue*—and then if that does not work escalate to *a Control Alternative*, and so on.  You can move from one mode to another as you deem appropriate, based upon your tactical evaluation. You are authorized to use the level and amount of force that is reasonably necessary to control a subject.  Depending on the circumstances, it may be appropriate to escalate quickly through the modes or to skip modes, based upon your tactical evaluation.

June, 2009

To illustrate this concept, suppose that a large inmate suddenly assaults you. You have no chance to try to control the situation with dialogue or to use escort holds or to decentralize the inmate. Instead, you would probably block the assault and then use a forearm strike and perhaps a knee strike, and take the inmate to the ground.

To understand this more clearly, remember the basic concepts which were discussed earlier, under The Control Theory:

- Officers must maintain a position of advantage.
- Proper police action balances safety and efficiency.
- An officer is always permitted to disengage and/or escalate in order to take proper police action.
- Once control has been established, you must reduce force to a level sufficient to maintain control.
- Control is a perception based on an officer's training and experience and the fact situation.

Each of the five modes under Intervention Options serves a different purpose. Following is a discussion of each of the modes and its purpose, along with a brief description of the tactics and techniques within each mode. The specific steps of each of the POSC techniques are found in Appendix D.

## PRESENCE

The first mode, *Presence*, reflects the fact that sometimes all that is needed to control a situation is the presence of one or more officers. The purpose of this mode is: *to present a visible display of authority.*

If inmates see an officer (or more than one), that alone may persuade them to comply—either because they respect authority or because they do not want to suffer the consequences of escalated force beyond officer presence. Presence often conveys an implied threat of escalation of force if compliance is not forthcoming.

A specific form of officer presence involving a clear threat of escalation of force is often referred to as a "show of force." This usually involves several officers gathered together at the site of a disturbance emergency, sometimes with equipment to control the situation. For example, if an inmate refuses an order to exit his or her cell, an option is for multiple officers to stage outside of the cell. The inmate knows that he or she cannot win in the face of such odds, and voluntarily exits the cell. The "show of force" has been successful because the situation is resolved—control has been achieved—and no one has been hurt.

For an officer's presence to be effective, it must convey authority and readiness to act. This is referred to as *command presence*. Command presence is conveyed by your *stance*, which refers to the way you stand, your posture, and the position of your hands. Not only does a proper stance convey a message to a subject, but it also puts you in the best position to react properly should the need arise.

The three basic tactical stance variations are:

- open stance
- ready stance
- defensive stance

Here is a brief description of the purposes for each. Instructions for achieving each of these stances are found in Appendix D.

### Open Stance

Use an *open stance* when initially approaching a subject and your intent is to convey a supportive, non-threatening presence. This is also the basic stance to use when simply observing inmates, when you are in a living area or other area of the jail. At this stage, you are relaxed but alert (Condition Yellow), and are scanning for possible threats. Your hands are slightly above waist level. You are not at this point expecting a confrontation, but are prepared to disengage and/or escalate if a confrontation occurs.

### Ready Stance

Use a *ready stance* if a subject does not quickly cooperate or your tactical evaluation dictates the necessity for this stance. At this stage, you are ready to act (Condition Orange) and are focusing on possible threats. Your hands are slightly above mid-chest level. The ready stance makes it easier to respond quickly to unexpected actions by a subject. You are actively prepared to disengage and/or escalate.

### Defensive Stance

Use a *defensive stance* if a subject refuses to cooperate with your requests during persuasion or light control talk (discussed next), or if the distance between you decreases further. Here, you are in an action state (Condition Red) and are actively prepared to react to threats—to disengage and/or escalate. Your hands are in front of your face, at high guard level. This stance puts you in a good position to defend yourself if a physical confrontation occurs.

To begin with, these stances may seem awkward or forced. With practice, you will be able to move fluidly between them. As you move closer to a subject, for example, you will automatically raise your hands above waist level without even thinking about it, although initially you will need to remind yourself to do this. Practice these stances in front of a mirror so that you can see the impression that you convey.

## DIALOGUE

Talking to people is the basic tool that you use in all aspects of your job as a correctional officer. It is the most important skill in your arsenal of skills, and the one that you use the most. In POSC, the term *dialogue* refers to the mode in which you use your verbalization skills to try to achieve control. However, as you will learn, you are expected to use verbalization throughout your interactions with subjects, even at very high levels of force.

The purpose of this mode is *to verbally persuade*. Remember that your goal is always to get subjects to comply voluntarily with what you want them to do, without your having to use physical force. If verbalization does not work to get a subject or subjects to comply, or if verbalization would clearly be ineffective under the circumstances, then of course you may need to escalate to use of physical force. That is how physical alternatives are coupled with verbalization skills, as stated in the definition of POSC.

The section of basic training called Correctional Professional Communication Skills focuses on proper use of dialogue in a jail or detention setting. It addresses the following topics:

- General Principles and Concepts Underlying Effective Communication
- The "Communication Model"
- Communications Skills Development
- Specific Communication Skills
- Initial Contacts
- Disturbance Resolution Tactics (mediation, arbitration, crisis intervention)
- Physical Intervention Tactics
- Debriefing Skills
- Workplace Communication
- Communication Barriers
- Applications / Simulations

As noted, verbal communication skills do not always work to achieve their intended purpose. Sometimes words fail to persuade a subject to comply, and it is then time to act—meaning that you either disengage and/or escalate to using physical intervention skills. The conditions under which it's time to stop talking and start acting can be remembered by the acronym DONE:

1. **D**anger
2. **O**verriding concern
3. **N**o progress
4. **E**scape

In any situation in which you or someone else is in imminent danger, it's time for action, not talking. If you are talking to someone, and suddenly another emergency arises that requires your immediate attention, that overriding concern means it's time to stop talking and start acting. If you are trying to persuade an inmate to cooperate and after a

reasonable time you are making no progress, then dialogue is not being effective—and it's time to move to a different force option.  Finally, if an inmate attempts to escape or flee your control, you obviously need to take action to stop him or her.

The part of Professional Correctional Communication that is specific to Dialogue mode in Intervention Options is called Tactical Communication.  Four verbal techniques are part of Tactical Communication:

- Search talk
- Persuasion
- Light control talk
- Heavy control talk

Following is a general description of each of these tactics. The specific techniques for each are listed in **APPENDIX D**.

### Search Talk

Search talk is the least directive of the tactics.  When you use search talk, you should try to project a non-threatening presence and speak in a normal conversational tone. Your goal is to gather information, either specific information about something or a more general sense of the subject's state of mind.

Examples of search talk:

- *"Hello, I'm Officer Jones. What's your name, sir?"*
- *"Where are you supposed to be now?"*
- *"Can I help you find something?"*

### Persuasion

Persuasion is intended to gain cooperation from a subject while still maintaining a relatively non-threatening tone.  Use a soft, soothing tone to try to get the subject to go along with what you wish him or her to do.  Your message is more assertive and directive than with search talk, but it still falls short of issuing orders to a subject.

Examples of persuasion:

- *"Sir, would you mind stepping over here?"*
- *"Sir, please come to the control desk for a moment."*
- *"Ma'am, it would be best if you go back to your cell now."*

### Light Control Talk

If persuasion fails to get a subject to comply, or if the situation dictates a more pressing need for compliance, you will need to escalate to light control talk.  Light control talk is

June, 2009

more directive—you are giving orders rather than merely trying to persuade. Still, it is assertive rather than aggressive.

Examples of light control talk:

- *"Sir, you need to relax."*
- *"Show me your hands."*
- *"Step out of your cell, sir."*

## Heavy Control Talk

If light control talk fails to get the subject to cooperate or the situation requires immediate compliance, use heavy control talk to get the subject to comply. Your physical presence, your tone of voice, and your words must all convey intensity and commitment. You may issue ultimatums, in which you clearly indicate that the subject must comply or certain consequences will follow. Naturally, you must not threaten a consequence which you are not prepared to enforce. Examples of heavy control talk include these:

- *"Drop the weapon! NOW!"*
- *"Get down on the ground NOW!"*

Remember that your physical presence must be consistent with the verbal tactic that you are using. To put it another way, your non-verbal messages must match your verbal messages. Your non-verbal messages include facial expressions, posture, voice and gestures. If your non-verbal messages and your verbal messages do not match, the listener is more likely to respond to your non-verbal message than to the verbal one.

Your vocal cues—your tone of voice, the words you choose, how softly or loudly you speak, and how rapidly you speak—are particularly important. In general, soft, steady speech at a normal pace will reduce anxiety and agitation, while louder speech, using varying tone and faster pace will increase tension. Even at a high level of dialogue, keep your tone controlled and your pace relatively slow. You will convey that you are in charge and you will make it easier for the subject to understand your words.

The more emotional a situation is, the more difficult it will be for subjects to concentrate on your words. Keep your words clear and neutral.

It is important to understand that you can escalate a situation if you do certain *nonverbal* actions. These include using inappropriate facial expressions that convey disgust, sarcasm, condescension similar attitudes and physical actions such as crowding a person, pointing the "parental finger" at him or her; and inappropriate touching. You can also escalate a situation through *verbal* actions such as using profanities, using certain "buzz" words, and giving verbal parting shots to a person.

Inappropriate verbal actions are sometimes referred to as *P.O.P.* (Provoke Other People) *actions*. To do these things is unprofessional and is contrary to your best

interests and those of your fellow staff members. Your job is to do what you need to do to control people and situations as quickly and efficiently as possible—not to unnecessarily make things worse than they are and cause further problems.

The other side of the coin is that subjects with whom you are dealing (e.g., inmates or visitors or others) can do those same things to you—that is, say things or do things that will provoke you. Just as you must try not to unnecessarily provoke other people, you must also not let others provoke you. You must learn to deal with provocations from others in a professional manner, and not get angry or escalate to a physical confrontation. You need to know your "hot buttons"—those that others can push to try to provoke you, and know how to avoid letting them provoke you. This is not necessarily easy, but it is part of your job as a professional.

## CONTROL ALTERNATIVES / PROTECTIVE ALTERNATIVES

*Control Alternatives* is the third mode in Intervention Options. The purpose of this mode is *to overcome passive resistance, active resistance or their threats.* Active resistance is behavior that physically counteracts an officer's attempt to control, and which creates risk of bodily harm[17] to the officer, subject, or other person.

*Protective Alternatives* is the fourth mode in Intervention Options. The purpose of this mode is *to overcome continued resistance, assaultive behavior, or their threats.*

Several tactics may fit either into Control Alternatives or Protective Alternatives, depending on the situation. Which mode any of these tactics fits into depends on the totality of the circumstances in a given use-of-force situation. A particular tactic may qualify as a Control Alternative in one situation because of the purpose for which it is used. But that same tactic may, in a different use-of-force situation, more properly qualify as a Protective Alternative because of why it is being used in that situation. Here are a few examples to illustrate this point:

- A focused strike is a type of what are called *Active Countermeasures*. Active Countermeasures are generally classified as Protective Alternatives. However, an officer may use a focused strike (such as a knee strike to the back of the leg), to "distract" a passively-resisting inmate who is locking up his or her arm to try to prevent the officer from establishing a wrist lock. Use of this focused strike in that situation would be a Control Alternative because it is being used to "overcome passive resistance…" If the officer can get the inmate to stop resisting, he or she can establish the wrist lock and gain control.

- Use of a baton is generally classified as a Protective Alternative. However, in a crowd-control situation, an officer may use a baton to direct an inmate into a specific area. Use of the baton in this way would be considered a Control Alternative because the purpose of using it is to "overcome…passive or active resistance…" By using the baton in that way, the officer is attempting to gain

---

[17] "Bodily harm" is defined in Wisconsin statutes (§ 939.22[4] as "…physical pain or injury, illness, or any impairment of physical condition."

control quickly so as to avoid having to escalate to using the baton to strike the inmate. Use of a baton as an impact weapon would be a Protective Alternative because it would meet the stated purpose for that mode.

Nevertheless, certain tactics are usually best classified as Control Alternatives because they generally fall under the stated purpose for Control Alternatives, while others are usually best classified as a Protective Alternative because they generally fall under the stated purpose for Protective Alternatives.

The following tactics are usually categorized as Control Alternatives:

- escort holds
- compliance holds
- OC aerosol spray
- electronic control devices (ECD's)
- passive countermeasures

The following tactics are usually categorized as Protective Alternatives:

- active countermeasures
- incapacitating techniques
- intermediate weapons

The next section discusses each of these tactics.   Specific instructions for applying the techniques are found in Appendix E.

**Escort Holds**

The purpose of escort holds is *to safely initiate physical contact.*  If a subject does not comply with your verbal directions, you can use an escort hold to gain control of him or her, preventing a physical confrontation.  An escort hold also enables you to move the subject in a controlled way.

**Compliance Holds**

The purpose of compliance holds is *to overcome passive resistance.*  Passive resistance means that the subject physically resists your efforts to move him or her—but not by actively fighting with you. You might, for example, move directly to a compliance hold if you have tried to use an escort hold on an inmate and he or she physically resists that attempt.

**Oleoresin Capsicum (OC) Aerosol Spray**

Oleoresin capsicum is an inflammatory agent that is a mixture of an oily resin and a naturally occurring essential oil derived from varieties of the red pepper plant. It is generally prepared in aerosol form, in various concentrations. It works by creating in a subject a variety of physical effects that may result in confusion and disorientation, thus

disrupting the subject's ability to continue to resist. OC affects people in various ways, including these effects:

- pain and tearing in the eyes, causing  involuntary closing or rapid blinking
- reddening of affected skin (usually the face), combined with a feeling of intense heat
- inflammation of the mucous membranes of the nose, eyes ,mouth and throat
- if inhaled, coughing, gagging, and gasping for breath

Because of the effects on the eyes and breathing, subjects may panic, fearing that they are being blinded and/or suffocated.  Typically, the hands will go to the face, the upper body will bend forward, and the person may go to his/her knees for increased stability. Other subjects may run.

Although the effects can be very intense, they generally subside within 30-45 minutes. The effects also vary with different people.  Some people are incapacitated, others affected very little.

Additionally, some people, including those who are impaired by alcohol or drugs, mentally ill, emotionally disturbed, or highly motivated, may not be affected much or at all.  Even those who experience the physical effects may have the mental toughness to fight through them.  If your use of OC is not effective in assisting you to gain control, you must be ready to disengage and/or escalate.

Whether or not OC spray is used in a particular jail or detention center, it is highly likely that jail or detention officers will receive subjects who have been sprayed during an arrest and brought to jail for custody.  Such subjects may be experiencing the after-effects of use of OC spray, requiring that you apply appropriate after-care procedures. These procedures are specified in the section of this text called Follow-Through Considerations.  See also Appendix E.

**Electronic Control Devices (ECDs)**

Electronic Control Devices (ECDs) include stunning devices, such as the Taser® brand and stun shields.  These and similar devices are used in a number of jails and detention facilities.

One of the benefits of ECDs (as well as OC spray), is that they are often effective at deterring inmates from further inappropriate behavior or failure to comply.  Inmates will often comply when they see that an officer has OC or an ECD available and is ready to use the device, because they do not want to be subjected toward the painful experience of having the device used on them. In this way, control devices can often be used as a "show of force" thereby minimizing need for actual application of force.

**Passive Countermeasures**

The purpose of passive countermeasures is: *to decentralize* a subject. The term "decentralize" means to direct a subject to the ground.

It is appropriate to use passive countermeasures if you reasonably believe that you will be unable to achieve control with the subject standing.  For example, if a subject continues to violently resist even while you apply a come-along hold, Preventing you from achieving control and applying handcuffs, you may decide that it is appropriate to decentralize the subject to achieve control.  Once a subject has been decentralized, you must take appropriate action to stabilize and handcuff the subject, disengage, or escalate.

Decentralizations may be needed in a variety of situations and from a variety of positions.

The POSC training you receive includes four techniques for decentralizing a subject:

1. Secure-the-head decentralization
2. Hug-yourself decentralization
3. Lower-your-center decentralization
4. Pull-in / push-down decentralization

Any decentralization tactic used must allow you to follow two critical guidelines to minimize the chance of injury to the subject:

- Protect the subject's head and neck as much as possible
- Control the speed of the subject's descent.

Decentralizations that do not follow these guidelines might be considered excessive force.

**Active Countermeasures**

Active countermeasures are unarmed blocking and striking techniques.  Their purpose is *to create dysfunction* in an actively resistive or assaultive subject, by causing fluid shock waves that temporarily disrupt a subject's ability to resist. The goal is to interrupt the subject's resistance, enabling an officer to direct the subject to the ground for stabilization, handcuffing, and other follow-through procedures.

Active countermeasures include

- Basic blocks
- Vertical stun
- Focused strikes

Basic blocks help protect you from incoming strikes. Effective blocking of hand or leg strikes permits you to disengage temporarily or escalate to an appropriate intervention option.  You must be able to block strikes from various heights.

Vertical stuns are useful in close quarters confrontations when you are grappling with a subject and have a suitable flat, sturdy, vertical surface, such as a wall, nearby. When you use a stun, you attempt to create temporary dysfunction of the subject's respiratory system and/or mental processes by forcefully directing the subject's torso into the wall or other vertical surface. The disruption to the subject is short-term—five to seven seconds—during which you can take other appropriate action, such as disengaging, decentralizing the subject for ground stabilization, or escalating to a higher level of control, as needed.

Focused strikes are intended to create dysfunction and disrupt the subject's ability to continue resistive or assaultive behavior. Unlike stuns, however, the impact is not spread throughout the subject's body, but is instead focused on a particular target area of the subject's body. (See APPENDIX F for these target areas.)

Good use of body mechanics will enhance the effectiveness of active countermeasures. When you use active countermeasures, you should use your whole body to your advantage. Here are some basic principles:

- Stay balanced. If you over-extend your stance or reach for your target, your strike will lose energy.

- Move into strikes when possible, taking care to re-adjust your stance as needed, and maintain balance throughout the confrontation.

- Rotate your hips in the direction of the strike to add power, being sure that your front foot is oriented to allow full rotation.

### Incapacitating Techniques

The purpose of incapacitating techniques is *to cause the immediate, temporary cessation of violent behavior.*

The only technique within this tactic is the *diffused strike*. This is a non-focused strike delivered from a trained distance applied to create fluid shock waves to the base of the subject's neck, an area that is the origin of the brachial plexus of nerves. The diffused strike may be applied from the front or rear. Like the vertical stun, the diffused strike disrupts nerve impulses to the brain. Unlike the vertical stun, however, the effect is usually greater, rendering the subject temporarily unconscious.

Remember that once a situation has been stabilized after the use of force, initial medical assessment must be initiated, as set forth and trained in The First Responder Philosophy.

### Intermediate Weapons

The purpose for using intermediate weapons is *to impede a subject*, preventing him or her from continuing resistive, assaultive, or otherwise dangerous behavior.

June, 2009

Intermediate weapons include a variety of impact and other weapons designed to impede subjects. Within the DAAT system, the only trained tactic within intermediate weapons is use of batons. Use of batons, however, is not a trained tactic In the POSC system. Thus, jail and detention officers are not trained in the use of any specific intermediate weapon in basic training. Some jails and detention centers, however, do include training in use of the straight baton in their in-service or specialized training programs.

## DEADLY FORCE

*Deadly force* is the fifth mode under Intervention Options. The purpose of deadly force is *to stop the threat.*

To understand the appropriate application of this force mode, you must know both the *definition* of deadly force and the *justification* for use of deadly force, under both the DAAT and POSC systems.

The definition of deadly force is:

> *"The intentional use of a firearm or other instrument, the use of which would result in a high probability of death."*

The justification for use of deadly force is as follows:

> *"Behavior which justifies your use of deadly force is that which has caused or imminently threatens to cause death or great bodily harm to you or another person."*

The definition of deadly force and justification for such force are important because they are related to the purpose for the deadly force mode. Remember that the purpose is *to stop the threat*—not to kill a person. Even though death may well be the result of the application of deadly force, death is not the intent. The intent is to *stop* a subject who is displaying behavior "which has caused or imminently threatens to cause death or great bodily harm to you or another person." In other words, you must stop the subject right now in order to prevent death or great bodily harm to you or another person, and your tactical evaluation indicates that deadly force is justified. But it is *stopping*, not *killing*, that is the intent. That is an important distinction.

Within the DAAT system, there is only one trained tactic within the mode of deadly force, the use of firearms. However, use of firearms is not trained in the POSC system. Thus, jail and detention officers are not trained in application of any deadly force tactics. If firearms are used in a jail, it would generally be in the context of a response by a trained specialized team.

This does not mean that you cannot use deadly force in a jail or detention facility. If the justification exists, you can use deadly force. But you will not be doing so on the basis of tactics learned in POSC. Instead, your use of such force would fall into the category of legally justifiable use of force that is *not trained but is justified under the*

*circumstances.* For example, you might apply deadly force by striking an inmate in the head with a baton or other object, even including a radio or a flashlight or a coffee pot. You are not trained to strike people in the head with such objects, but if the justification exists for use of deadly force then you might have to do so.

Of course, the burden is then on you to justify your actions—to show that your use of deadly force was justified and appropriate under the particular circumstances. To do that, you must know several concepts regarding use of deadly force and deadly force decision-making. These include:

- imminence
- preclusion
- target requirements

Let's look at each of these.

### Imminence

The justification for application of deadly force is that a subject "*imminently threatens to cause death or great bodily harm to you or another person.*" The word "imminent" means "about to happen." An imminent threat is an immediate threat. For a subject's threat to be considered imminent, it must meet all three of the following criteria:

- Intent
- Weapon
- Delivery system

Here is what each of these terms means:

*Intent.* The subject must indicate his or her intent to cause great bodily harm or death to you or someone else. This can be done either by stating intent to kill you or someone else, or by showing intent to do so by approaching you armed or unarmed in a way that you reasonably perceive to be threatening.

*Weapon.* The subject must have a conventional or unconventional weapon capable of inflicting great bodily harm or death. Guns and knives are not the only weapons; many other common objects can be used as weapons. Many individuals are even able to inflict death or serious injury with their hands or feet alone, and some widely-available items, such as pens or pencils, can be used as weapons.

*Delivery system.* The subject must have a means of using the weapon to inflict harm. For example, a person with an edged weapon, having stated his or her intention of killing you, does not meet the criteria for imminent threat if he or she is on the other side of a locked door. There is no delivery system. The same person standing ten feet from you in the same room does meet the criteria. (Remember the danger zones discussed earlier in regard to control of distance under Tactical Deployment.)

Preclusion

Preclusion in this context means that you have eliminated all other reasonable alternatives to the use of deadly force. Deadly force is a last option—to be used only if all other modes and tactics have either proven ineffective or would clearly be ineffective to accomplish the objective of stopping the threat.

### Target Requirements

If you are using a firearm—generally in association with a SWAT or CERT® tactical operation—then you must also meet the *target requirements*, which include:

- *Target Acquisition*: You have acquired an actual target to shoot at.
- *Target Identification*: You have identified your target as the source of imminent threat.
- *Target Isolation*: You can shoot at your target without danger of harming innocent people.

The one exception to the requirement for target isolation is called the *greater danger exception*. Essentially, this exception allows you to shoot without target isolation if the consequence of not stopping the threat would be worse than the possibility of hitting an innocent person.

## SUMMARY: INTERVENTION OPTIONS

Intervention Options is the second phase of Disturbance Resolution. The term Intervention Options refers to the five modes which are part of the POSC system. These are Presence, Dialogue, Control Alternatives, Protective Alternatives, and Deadly Force. Each of these modes has a stated purpose.

Several premises underlie the POSC system and form the basis for understanding and application of Intervention Options. They are as follows:

- Jail officers should accomplish the correctional objective of control as quickly as possible, with minimal chances of injury or death to officers, inmates, and others.

- Necessary force used to accomplish the objective of control must be reasonable.

- An officer should always try to achieve and maintain control through non-physical force options, including presence and dialogue. If presence and dialogue have proved ineffective to achieve control or would clearly be ineffective in a particular situation, an officer is justified in escalating to use of a physical force option.

- An officer is justified in escalating to control through use of any or all force options, as necessary and reasonable. It is legitimate to escalate quickly through the modes listed in Intervention Options, or to skip modes, based upon tactical evaluation.

- Once control has been established, an officer has a responsibility to ensure safety for all people involved and to provide custodial care for inmates involved. This is done by implementing the Follow-Through Considerations specified in Disturbance Resolution.

- Jail officers should document any use of force in a complete written report. (See section below on Articulation of Use of Force.)

Follow-Through Considerations is the third phase of Disturbance Resolution and is the focus of the following section.

# FOLLOW-THROUGH CONSIDERATIONS

The third phase of Disturbance Resolution is Follow-Through Considerations. These are the steps you take to ensure safety for all persons involved in a disturbance emergency, and to ensure custodial care for inmates and others involved in an incident.

Taking these steps is just as much a part of your duty and professional responsibility as is using force appropriately. Providing appropriate care and ensuring safety for people after a use of force incident sets a good tone and gives inmates and others the message that jail staff is concerned for their welfare. There have been a number of lawsuits based on alleged failure to implement appropriate follow-through procedures.

Here is the Follow-Through Considerations section of Disturbance Resolution:

**FOLLOW-THROUGH CONSIDERATIONS**

|  |  |
|---|---|
| A. Stabilize | Application of restraints, if necessary |
| B. Monitor / Debrief | |
| C. Search | If appropriate |
| D. Escort | If necessary |
| E. Transport | If necessary |
| F. Turn-over / Release | Removal of restraints, if necessary |

Although six steps are listed under Follow-Through Considerations, you do not have to perform each of these steps in every situation. Instead, some steps are to be performed only "if appropriate" or "if necessary." These determinations are made on a case-by-case basis.

Here is discussion of each of these considerations.

## STABILIZE

You must stabilize both the subject(s) and the scene of an incident.

You can stabilize a subject through your presence alone, or through your presence and use of verbalization, if he or she complies with your verbal directions. If verbal directions do not work, the subject can be stabilized physically, either on the ground or against a vertical surface, such as a wall.

When a subject has been stabilized, it means that he or she is in a position where you can apply restraints, such as handcuffs or a restraint chair and so on. The purpose of applying restraints is to maintain control—that is, to prevent the person from being able to harm you, himself or herself, or anyone else.

Once the subject has been stabilized, you then decide whether it is necessary to apply restraints to maintain control. That decision is based upon your tactical evaluation of a

situation, including your knowledge of the particular subject or subjects as well as your agency policies. Be familiar with the policies and procedures of your agency regarding use of physical restraints.

One of the more common restraining devices is handcuffs. You will learn two basic handcuffing methods in POSC:

- cooperative-subject tactical handcuffing
- multiple-officer handcuffing

Several specific handcuffing and unhandcuffing techniques are taught in POSC. Handcuff nomenclature, the names of the parts of handcuffs is found in Appendix G.

There are general tasks performed in handcuffing:

- Dialogue, talk with the subject and ask for cooperation
- Stabilize the scene and the subject, verbally and physically as necessary
- Apply handcuffs, check snugness as soon as possible and double lock
- Monitor and search the subject while restrained when possible
- Safely release the subject when appropriate

Regardless of the handcuffing method used, always check the handcuffs for proper fitting after application and double-lock them to ensure that they do not become tighter. If a person complains that the handcuffs are too tight, check them. Do not ignore such a complaint because a serious medical problem, including impaired blood circulation, could result from overly tight handcuffs. If you check the handcuffs, there will be less likelihood of a problem or complaint later on.

Keep in mind that handcuffs are temporary restraining devices only. Keep a close watch on the subject, even when he or she is handcuffed.

## MONITOR / DEBRIEF

Whenever a person is in your custody, you are responsible for the subject's health, safety, and well-being. When you monitor and debrief a subject, you are carrying out this duty. Monitoring simply means paying attention and being aware of the subject's condition and any changes in that condition. Debriefing, as taught in Correctional Professional Communication Skills, serves two important psychological functions: enabling the participants to *come full circle*, and completing the transaction.

To come full circle means to return to the point at which you started. Contacts with subjects start with verbalization. After a physical confrontation, it is important to try to bring the level back to verbalization. This coming full circle helps both officers and

subjects regain their composure and return to normal.  Debriefing also helps to complete the transaction and provide proper closure to each contact situation.

Monitoring / debriefing includes five specific actions:

1. calm yourself and your partner.
2. calm the subject.
3. provide initial medical assessment.
4. reassure the subject.
5. rebuild the subject's self-esteem.

The following discusses each of these.

## Calm Yourself and Your Partner

After an emergency response you are likely to be in a psychologically and physiologically aroused state as a result of adrenaline in your system.  It is important to try to calm yourself down after a disturbance emergency response so that you will be able to act in a professional manner.  Also, your being calm will have a positive and calming influence on others, including the subject or subjects.  You can calm yourself by using autogenic breathing and positive self-talk.

Similarly, talking calmly to any partner officers and suggesting that they use autogenic breathing will help them return to normal.  You may even need to model such breathing.

## Calm the Subject

It is also important to try to get subjects to calm down following a disturbance emergency.  You do so by giving verbal directions to relax and take it easy.  When doing so, be sure to speak in a soothing, calm voice yourself. It is counterproductive to yell, *"Hey, calm DOWN!"* to someone.

Again, autogenic breathing helps a person calm down.  A useful technique is to say, *"Here, breathe with me,"* and then model autogenic breathing.  Have the subject breathe along with you.

## Perform Initial Medical Assessment

After any contact involving a possibility of injury or illness, which certainly includes contacts involving physical intervention, you must conduct an initial medical assessment to find out if the subject or anyone else requires medical care.

You will recall that "Initial Medical Assessment" is step #7 of the First Responder Philosophy.  As you learned, the First Responder Philosophy guides your response to any type of correctional emergency, including a disturbance emergency.  Conducting an initial medical assessment is part of your general response and is also a specific follow-through responsibility after a disturbance emergency.

Before you can perform initial medical assessment, you must make sure the subject is properly stabilized to prevent any further injury. Also make sure to protect yourself against biohazards by wearing disposable examination gloves during all steps of initial medical assessment.

Initial medical assessment consists of five steps:

1. *Determine level of consciousness*. Do so by using a verbal stimulus ("Sir, are you okay?") and/or a physical stimulus, such as gently shaking the person's shoulder.

2. *Check airway, breathing, and circulation*. Determine that the subject's airway is open, that he or she is breathing, and that he or she has a pulse.

3. *Perform a body check for injuries*. Check for severe bleeding, broken bones, obvious contusions, and other gross (significant) deformities.

4. *Provide treatment to your level of training*. Activate the emergency medical services (EMS) system if appropriate. If the subject appears to need care or treatment, then you must provide such care and treatment, but only up to the level that you have been trained to do so. If the subject appears to need emergency medical or psychiatric care, either based on your assessment or perhaps the subject's request, then you should activate the emergency medical system, as dictated in your agency's policies and procedures.

5. *Continue to monitor the subject*. Determine the subject's medical, mental health or security needs. Remain with and monitor the subject until he or she is turned over to appropriate staff (medical, mental health, etc.) or until placed in an appropriate housing area.

A specific issue under initial medical assessment is aftercare for someone exposed to OC spray. Detailed information on this issue is contained in APPENDIX E.

**Reassure the Subject**

Verbally reassure the subject, telling the person that he or she is okay, and—if injured—that medical care will be provided for the injury.

Remember to talk calmly and directly to the person. The more calm and in control you appear to be, the more the subject will feel reassured.

**Rebuild the Subject's Self-Esteem**

It is important for you to try to take some basic steps to help subjects regain their sense of dignity and sense of control. Doing so may build good will and enhance future interactions.

When appropriate, one way to help rebuild a subject's self-esteem is to assist the subject to an upright position as soon as it is tactically feasible to do so (after the subject has calmed down and after he or she has been searched). People feel less vulnerable and more comfortable when they are in an upright position.

## SEARCH, IF APPROPRIATE

If appropriate, search subjects for weapons or other contraband as part of follow-through. When searching people remember to follow "standard precautions" in order to reduce the spread of contagious or communicable diseases (including wearing protective gloves.)

The type of search conducted will depend on the circumstances. The most common categories of searches include:

- *Visual Search*: Visually looking for weapons and other contraband.

- *Frisk or Pat-down*: A limited type of search, in a corrections or detention setting, in which the intent is to discover obvious weapons by patting down the subject in the area of the body where a weapon is suspected to exist.

- *Full-Body Search*: Top-to-bottom search without removing outer clothing and/or shoes.

- *Custodial Search:* Complete search from head to the feet after removal of all secondary outer clothing (not including underwear or the brassiere of a female) and personal property from the inmate's control. This includes removing shoes and socks.

- *Strip Search:* Per §968.255(1)(b) Wis. Stats., defined as "*a search in which a detained person's genitals, pubic area, buttock or anus, or a detained female person's breast, is uncovered and either is exposed to view or is touched by a person conducting the search.*"

- *Body Content Search:* Generally includes any of the following tests: breath, urine, blood, or X-ray.

- *Body Cavity Search:* Digital (finger) or instrument intrusion into a person's rectum, anus or the vagina of a female (does not include ears, nose or mouth).

Be aware of your agency's policies and procedures regarding when such searches are to be conducted and under what circumstances, and how they are to be documented. Always maintain a professional demeanor. Never make remarks about the subject that could be construed as sarcastic, demeaning, insulting, sexist, racist, or otherwise inflammatory.

Keep in mind these guidelines:

- Always be thorough and systematic, searching from top to bottom. *Never* take shortcuts.

- Remember to follow standard precautions, including wearing protective gloves.

- Keep in mind that the areas on a person which are most often missed during searches are: outer garments, hair, mouth, collar, small of the back, waistband, breast area, the lower abdominal area, the crotch area, buttocks, behind the knees, up the sleeves (when applicable), and the bottoms of the feet.

- Search from Position 2 ½ or 3.

- Look before touching.

- Always watch for weapons, sharp objects, and possible instruments of escape. If you find a weapon, assume there is another and try to find it.

- Search with the subject's feet spread apart and knees bent. Use the inner edge of your hand (thumb side) for searching sensitive areas.

If possible, have an officer of the same sex as the subject conduct the search. This reduces discomfort for the subject, and minimizes the chances of allegations of sexual misconduct. While a same-sex search is desirable, it is not an absolute requirement except for strip searches.[18] Know your agency policies in this regard, and follow them consistently in order to protect yourself against liability.

## ESCORT, IF NECESSARY

Following a disturbance emergency, it may be necessary to escort one or more inmates to another location. This may be to a segregation cell or room, another living area, an area where he or she is to be restrained, a location where he or she will receive medical evaluation or care, and so on. In some cases, an inmate may need to be escorted to a transport vehicle for transport to a hospital or emergency clinic.

Always make sure subjects are restrained during escort after a disturbance emergency, so that they do not have the use of their hands. Escort subjects from the level 2 ½ position, which gives you the best control.

Maintain physical contact with the subject during escort. Doing so helps you to determine the subject's level of resistive tension, prevents him or her from fleeing, will allow you to respond quickly if the subject becomes combative, and will help prevent injury to the subject if he or she stumbles or trips. How cooperative the subject is will determine the degree of control you exercise during the escort. Depending on the circumstances, any of the following may be appropriate:

---

[18] § 968.255 Wis. Stats.

- blanketing the arm
- a rear escort position (inside hand grasping the subject's near hand, outside hand on the arm)
- a rear compliance hold

With higher-risk subjects, multiple officer escort tactics may be appropriate.

## TRANSPORT, IF NECESSARY

It may be necessary to transport an inmate to another location after a disturbance emergency. For example, an inmate may need to be transported to a hospital emergency clinic or a mental health facility. Your job may only be to escort the person to the transport vehicle, or it may also include conducting the transport. If you are conducting the transport, follow these guidelines.

### Before Transport

Before transport, check on the subject's background and apparent threat level. This will help you determine the level of security needed during the transport, including the level of restraint to use with the subject. Search the subject before transport. When legally justified and if department policy allows, conduct a strip search. There have been many cases in which subjects have hidden weapons and/or handcuff keys on their persons prior to transport. Be sure that the vehicle is fueled and functioning properly, including communications. Search the vehicle thoroughly for possible contraband. If you have a screen or cage in the transport vehicle, secure it in place.

### Place the Subject Safely In the Vehicle

Know and follow your department policy regarding placement of a subject into and out of a transport vehicle, including whether a subject should be seated in the front or rear seat.

To place a subject in a vehicle, open the door and have the subject carefully sit on the edge of the seat. If the subject is handcuffed, place your hand over his or her head to prevent it from hitting the top edge of the door opening. Assist the subject to move his or her head inside the vehicle, and direct the subject to lift their feet into the vehicle. If the subject is resistive, you may have to place the feet inside. If so, be careful not to get kicked.

Secure the subject's seat belt. If another officer is available, have him or her positioned on the opposite side of the subject, so that you can hand the seat belt to the other officer, who can then secure it. If you are alone, stabilize the subject's head and upper body with your forearm while you secure the seat belt across the subject.

To remove a subject from a vehicle, reverse the process;

**Monitor the Subject During Transport**

Watch for suspicious movements and actions.  Remain alert, especially near the end of the transport—that is when most escape attempts occur.  If the subject is ill or injured, watch for problems or changes in condition.

## TURN-OVER / RELEASE

If you have been involved in the transport of a subject, you may turn that subject over to someone at the end of the transport.  Turnover or release of a subject also takes place within the jail when an inmate has been escorted from one living area to another or to a segregation cell or to a medical area.

Always search a subject again before turnover or release.  Even if the authorities to whom you turn the subject over will be searching him or her, do your own search anyway.  It is better to find your own mistakes than for someone else to do so.  Do not relax too soon.  There have been many instances of officers being assaulted in the presence of other officers.

Depending on the circumstances and the situation of the escort or transport, you may remove handcuffs or other restraints.  Department policy should address when restraints are to be removed.  If removal of restraints is appropriate, the method for doing so depends on the degree of the subject's compliance and your threat assessment.  In some situations, even if removal of restraints would be permitted, your threat assessment may dictate that they remain in place.  If there is a conflict, contact your supervisor.

Two basic methods for handcuff removal are taught in POSC:

- compliant-subject handcuff removal
- multiple-officer handcuff removal

If restraints in addition to handcuffs have been placed on a subject, remove these first before un-handcuffing the person.  Handcuffs should be the last restraints removed.

June, 2009

# POSC SUMMARY

Principles of Subject Control (POSC) is the trained standard in Wisconsin for use of force in a correctional setting, such as a county jail, house of correction, or secure juvenile detention facility. Because POSC is also the standard for training of correctional officers working in Wisconsin state prisons, it can be viewed as the trained use-of-force standard for all correctional personnel in Wisconsin.

The definition of POSC is *a system of verbalization skills coupled with physical alternatives.*

This means that correctional officers are always expected to try to accomplish the objective of achieving and maintaining control of subjects through use of verbal skills (non-physical alternatives) whenever possible, and to use physical force only when verbal skills have either not worked or would clearly be inappropriate in a given situation.

The POSC system is based on several underlying principles. The first is that physical force is permissible in a correctional setting for specified purposes relating to achieving correctional objectives. Second, legal standards govern use of force and establishing limits on use of force. These are derived from the U.S. Constitution, state laws, state administrative codes, and agency policies and procedures. Various factors in institutional settings such as a jail or secure juvenile detention facility may limit the need for application of physical force, or at least for the immediate application of force. Third, appropriate use of force in a jail or detention setting is according to a comprehensive system. In Wisconsin, this system is POSC.

Three basic concepts form the basis for the POSC system:

- *The Control Theory*, which explains the purpose of control and distinguishes proper police action from behavior that might otherwise be criminal behavior

- *The First Responder Philosophy,* which is a systematized approach for proper response by jail or detention officers to all types of correctional emergencies, including disturbance emergencies, medical emergencies, fire emergencies and miscellaneous emergencies

- *Disturbance Resolution,* which is the basis for explaining and justifying an officer's decisions to respond, take action and attain control in a correctional disturbance emergency

Disturbance Resolution is comprised of three major components, Approach Considerations, including factors to assess prior to an officer making contact; Intervention Options, which are the modes, tactics, and techniques officers may use to gain or regain control, and Follow-Through Considerations, which include aftercare and custodial duties officers must perform after control has been established.

The tactics and techniques of POSC are psychomotor skills, meaning skills in which the body and mind work together to accomplish tasks.  Accordingly, officers must prepare their minds to do these skills as well as to practice them over and over to develop proficiency.

Corrections and detention personnel must also be able to articulate their justification and use of physical force, both orally and in writing.  This includes writing a proper use of force report and may include testifying in a legal proceeding.  Knowing the principles and concepts on which POSC is based provides a framework for articulation of use of force.

# ARTICULATING USE OF FORCE: VERBALLY AND IN WRITING

As you have learned, it is not enough that you simply *use* force appropriately, when it is necessary to do so. You must also be able to properly and professionally *articulate* your use of force, both verbally and in writing.

Remember that according to The Control Theory, the difference between an act that constitutes proper police action and a criminal act is whether it is justified. You must be able to show that your actions in a use of force situation were justified based on legal standards, training standards, agency policy, and so on.

Remember that the basic standard for proper use of force by law enforcement and corrections personnel is the doctrine of *objective reasonableness*, established by the U.S. Supreme Court in their 1989 decision in the case of *Graham v. Connor*. According to this standard, whether the level and amount of force you used was reasonable is determined by comparing it to what another officer with the same or similar training and experience would have done in similar circumstances. The purpose of your use of force is control, and control is a perception based on training, experience and the totality of circumstances in the particular fact situation. Your report is your official opportunity to state your perceptions at the time of an occurrence, and to describe the actions you took based on those perceptions, using your training and experience applied in a given fact situation.

The burden is on you to explain the reasonableness of your actions in any use of force incident. Because part of the equation in determining reasonableness is your training, you must know and understand the principles and concepts of the POSC system discussed in this text. You must, for example, understand and be able to explain the Control Theory, The First Responder Philosophy and Disturbance Resolution.

You must also know and understand the *classroom model* for the POSC tactics and techniques. The term *classroom model* refers to the step-by-step training that you receive in POSC tactics and techniques. Ideally, you would apply the classroom model steps whenever you apply physical force. However, that is not always feasible, and in fact rarely actually occurs. More often, your use of force will be a "dynamic application of a trained tactic or technique" rather than the exact classroom model. That is, you will be doing your best to use a trained tactic or technique, but because you're in a dynamically evolving situation, your execution of the tactic or technique may not quite be "textbook." As you have learned, dynamic application of a trained tactic or technique is legally justifiable if it is reasonable under the circumstances. But you must understand the difference between *classroom model* and *dynamic application*, and be able to explain your actions on the basis of that distinction.

Similarly, your use of force may, as you have learned, be legally justifiable if it is neither classroom model nor dynamic application of a trained tactic or technique, but is instead

*not trained but justified under the circumstances.* That is, in a given situation in which the use of force was justified, a trained tactic or technique was either not available, not feasible, or was tried but did not work. Therefore, you had no choice but to use a tactic or technique that was not trained. You must also understand this concept, and be able to explain your actions on the basis of it, when applicable.

## WHY IS ARTICULATION IMPORTANT?

Articulation is your opportunity to explain why the actions you took were proper. Both your written use of force reports and your oral explanation of use of force actions help your agency managers to better evaluate your actions and to determine if they fall within the scope of your agency policy and training. They also may be part of civil or criminal proceedings.

### Within Your Agency

Your articulation of use-of-force actions, whether written or oral, may have several other important uses within your department. It helps other staff members to be aware of incidents that occurred in the facility, and thus be better prepared to respond to further incidents involving subjects. It helps your supervisors and managers to understand what happened during an individual incident and the reasons events happened as they did. This knowledge may help them evaluate the effectiveness of agency policy and training or guide them in revising policy or training.

Articulation of use of force can help supervisors and managers to better understand appropriate use of force by department members in a broader sense, also. Through administrative review of a number of use-of-force incident reports over a period of time, managers may detect general patterns of practice by department members, and again may be able to identify needed improvements in policy and training. They may be better able to take proactive actions to improve agency operations.

Articulating use of force is also important for liability risk management. Use of force is something that can lead to both criminal charges and civil litigation. Your written report on a use of force incident can help determine the outcome of a legal case. In a civil case, plaintiff's attorneys will go over your reports very carefully and may try to use them to show that you did not act properly. Conversely, in a civil case, the lawyers defending you will depend on your report to establish that you did act properly. If your report is comprehensive, thorough and accurate, you make it easier for the lawyers defending you to show that your actions were appropriate.

### In Legal Proceedings

You may be called upon to testify under oath in legal proceedings, in depositions (legal proceedings in which lawyers for both sides ask you questions under oath, and in which your answers are recorded), and possibly during a trial. When you do so, you will be asked questions about the incident based on your use of force report. A comprehensive, thorough and accurate report will make it easier for you answer these

questions.  Testimony about events not covered in your original written report is more likely to be contested by opposing attorneys.

Your oral articulation during a trial—that is, *what* you say in response to questions from lawyers and *how* you say it—is also important.  Your testimony helps to educate the jury about the realities of use of force.  Jury members will most likely not be law enforcement or corrections officers, and will not have the understanding of corrections work and use of force that you do.

In short, your articulation of your use of force—both your written report and your verbal articulation—may make the difference in the outcome of litigation. This is true both of criminal cases and civil lawsuits.

**Telling the Truth**

When articulating your use of force actions, you must always tell the truth.  Telling the truth, of course, it is the ethical thing to do.  It is also legally required.  In legal proceedings, lying under oath is *perjury*—and perjury is a crime.  In addition, it is hard for officers to maintain a lie, particularly when physical evidence or witness statements may contradict the untruthful testimony.

## WRITTEN USE OF FORCE REPORTS

Your written report on a use of force incident is the primary means to document your actions and your justification for those actions.  A written report on a use of force incident in a jail is also required by DOC 350.14, which reads in part:

> *"Any staff member who has used force to control an inmate or inmates shall submit a written report to the sheriff, jail administrator or the staff member's immediate supervisor describing the incident. The report shall include all relevant facts."*

Always take the time to prepare a truthful, accurate, and thorough report.  To be thorough, your written report on any use of force incident should contain information on all aspects of the incident.  A useful tool to help you write your report is the Use-of-Force Documentation Checklist.  This checklist, found in Appendix H, lists elements to be included in a good use-of-force incident report.

Those elements are described in the following paragraphs.

**Background Information**

Include basic background information relevant to the incident, such as the day, date, and time of the incident; the specific location or area; name of officers involved; names of subjects involved; and names of any witnesses to the incident.

**Approach Considerations**

Include relevant information regarding your approach to the situation. Include information about each aspect:

- *Decision-making*: Why did you initiate contact? What was your justification and why did you think it was desirable to do so?

- *Tactical deployment*: How did you approach? How did you control distance and position yourself and others? Did you use team tactics?

- *Tactical evaluation*: What were your perceptions?

  - *Threat assessment opportunities*: Did you observe levels of resistance, early warning signs, or pre-attack postures? Was the subject an apparent emotionally-disturbed person (EDP)? Were weapons present?

  - *Officer-subject factors*: How many people were involved? What were the relevant individual factors?

  - *Special circumstances*: What was your reasonable perception of threat or sudden assault? What was your physical positioning? What was the subject's ability to escalate force rapidly? Did you have special knowledge about subject? Were you injured or exhausted? Were there other special circumstances?

  - What level, stage, and degree of stabilization achieved at each point of the disturbance? Describe the use of any of the following types of stabilization:

    - presence stabilization
    - verbal stabilization
    - standing stabilization
    - wall stabilization
    - ground stabilization
    - special restraints

## Intervention Options

Describe all intervention options you used during the incident. These options include the following modes:

- Presence
- Dialogue
- Control Alternatives
- Protective Alternatives
- Deadly Force

.          June, 2009

Put the information in chronological order—what you did first, what you did next, and so on. For each technique within each mode, describe what the subject did, what you did in response and why you did it. Your accurate description of your application of force in this section of your report may well make the difference between a determination that the force was reasonable and appropriate, or excessive.

It is appropriate for you to use proper POSC terminology in your report, but be sure that you can explain such terms in ordinary language if asked.

### Follow-Through Considerations

Include information on all follow-through procedures which you implemented after a use-of-force incident to ensure safety and proper care of subjects. Specifically, state whether you did any of the following procedures and, if so, describe what you did:

- *Stabilization of scene and of subject(s), including—specifically—application of restraints*. If restraints were applied, indicate which restraints were used, how they were applied, and why they were needed.

- *Monitoring / debriefing of subject(s)*. State whomever provided monitoring/ debriefing, including all aspects of initial medical assessment and any special actions taken.

- *Searching of subject(s)*. Indicate what search methods were used and what the results of searches were.

- *Escort of subject(s)*. Indicate where the subject was escorted to and who conducted the escort.

- *Transportation of subject(s)*. Indicate where the subject was transported to, who conducted the transport, what the mode of transport was (squad, ambulance, etc.), and whether the subject was restrained during the transport. If so, describe how he or she was restrained.

- *Turnover*. State to whom or where the subject was turned over and whether restraints were removed as part of turnover.

### Investigative Findings

In addition to all of the above, you may also include background or investigative information in your report. This kind of information may be useful in helping a reviewer of the report better understand the scope of an incident and what happened in that incident, based on information about the subject or subjects involved. Depending upon policies and procedures in your agency, gathering and reporting this background information may be your responsibility, or it may be someone else's responsibility.

Some or all of the following types of information may be included in this section of a report:

- background information
- medical/psychological history
- booking information
- post-booking information
- other information

The following provides more detail on each of these.

*Background information.* Include any background information that may be useful to a reviewer of a report in understanding the totality of the circumstances. For example, you might provide information about one or more inmates who were involved in an incident, such as past problems or conduct, gang information, disciplinary history, and so on.

*Medical / psychological history.* Include any relevant information about the medical, psychological or mental health histories of subjects involved in an incident. For example, if a subject is a known EDP, that might be important in understanding the incident.

*Booking information.* Include any relevant information about the inmate or inmates based on admissions records. This may include the offenses for which they were incarcerated, history of previous arrests and/or incarcerations, and so on.

*Post-booking information.* Include any other relevant information on the inmate or inmates based on their behavior after admission to the jail, including any security or safety-related issues, conduct, special classification issues, problems with other inmates, and so on.

*Other information.* Include any other relevant information that may be useful to a reviewer of the report.

Investigative findings may be included with the original report, or they may be prepared and submitted separately, perhaps as a supplementary report.

Remember that your written report is your official version of what happened in an incident. It is your formal way of explaining and justifying professional actions that you took. Many people will read it. Your report may be used as evidence in a lawsuit or criminal action. If it is a civil action, the case may not actually get to trial for years— sometimes as many as three or four years—after an actual event. You are unlikely to remember clearly what happened during an incident that happened three or four years previously. Therefore, a comprehensive, accurate and thorough report serves as your memory-prompter for the long-ago incident and the actions you took.

In your training on report-writing, you learn the qualities of a good report and general guidelines for preparation of a good, thorough, professional report. Remember and apply these guidelines when writing your use of force reports. Also know and follow your agency's policies and procedures for use of force report-writing.

## ORAL ARTICULATION OF USE OF FORCE

Remember that written use of force reports are just one of the ways in which you are expected to professionally articulate your proper use of force. The other is oral articulation. You may be asked to orally articulate your use-of-force actions within your department, to a supervisor or administrator. This may take place in an informal discussion, or in a more formal setting, such as an administrative review, a critical incident debriefing, or a disciplinary proceeding.

You may even have to articulate your use-of-force actions in a forum involving people from outside your agency, such as a review board, commission, or similar group that may be involved in reviewing a use-of-force incident involving your department.

In either of these cases, always be professional when you discuss your use of force. Speak clearly and calmly, do not be defensive, and always give complete and accurate information. If you can, use your written use-of-force report to refresh your memory and refer to it where appropriate.

### Testimony in a Legal Setting

You may have to testify to your use of force in a legal setting, if there is a lawsuit based on a use of force incident. As noted, you may have to do this in less-formal settings, when talking to the attorneys who will defend you and others, and in more formal situations such as depositions and trials. Your attorney will probably work with you to prepare you for testimony.

Here are a few guidelines to keep in mind if you have to testify in court.

### Be Professional

Dress conservatively and properly. If you wear your uniform, be sure that it is clean and well-pressed. Maintain a professional presence. Your demeanor—your body language, tone of voice, and facial expression—contribute a lot to the court's impression of you. Try to relax and try not to appear nervous.

Never act defensively or hostilely when being questioned by the prosecutors or plaintiff's attorneys. Try to remain calm and attentive even when you feel that you are being attacked or criticized. Do not allow yourself to be baited and, if the attorney does attack you or your credibility, do not take it personally.

In a jury trial setting, look at the jury when answering questions. A good idea is to begin your answer by looking at the attorney who asked the question, and then turn toward the jury to finish your answer.

**Answer Questions Accurately**

If you do not understand a question, say so. Ask that it be repeated or ask for clarification. This conveys to the court and jury that you are being careful and attentive, and that you want your answer to be accurate.

If you do not know the answer to a question or cannot remember something, say so directly. Do not speculate. Being honest about this will enhance your credibility rather than diminish it.

Make sure that your answer is as accurate as you can make it. That means you must always tell the truth. Remember that lying under oath is perjury, which is a crime. Never try to cover up a mistake by lying—especially not under oath.

Answer the question that you have been asked, and then stop. Do not volunteer information that you have not been asked about. To do so can provide ammunition to the opposing attorneys. Resist the temptation to explain or justify actions beyond what is requested in the question. If a question can be answered with a yes or no answer, do so. On the other hand, if you honestly believe that a simple yes or no answer would be misleading, say so. Even if you are required to answer the question with a yes or no, your concern will be on the record.

**Avoid Traps**

Sometimes trial attorneys may try to trap you, particularly if they cannot find anything substantive in your report or testimony to attack. Verbal traps are designed to make you do one of two things: become defensive or say something that can be used to undermine your testimony.

The first category—becoming defensive—includes questions that are aimed to make you feel that you haven't done something that you should have done, or did something that you shouldn't have done. Examples:

- *"Officer, aren't you taught to put everything in your report?"*

- *"Officer, did you discuss your testimony with anyone?"*

If you become defensive, you lose credibility. Just remain calm and give a straightforward answer. Examples:

- *"Yes, we're taught to make our reports complete. However, that particular fact did not seem important when I wrote the report."*

- *"Yes, I discussed it with my attorney when preparing for this trial."*

The second category—saying something that can undermine your testimony—includes questions that are designed to elicit statements from you that could be damaging. Examples:

- *"Officer, isn't it possible that…" (alternative explanation for the facts)*

- *"Officer, you want to win this case, don't you?"*

- *"Officer, you've been accused of excessive use of force previously, haven't you?"*

In the first case, the attorney is trying to get you to admit to another version of events than yours. They may be trying to raise doubts in the minds of the jurors. Your answer to this question depends on what you think to be the truth. You may say, *"No, that is not possible."* Or, you may say, *"Yes, it is possible."* In some cases, *"It is possible, but not likely"* may be a good answer.

With the second example, a good answer is something like, *"Winning or losing is not my concern. I just want the jury to have all the information so they can make a decision."*

With the third example, again, tell the truth. If you have in fact been formally accused of excessive use of force, just say yes. Do not try to give a lot of explanations, such as that it was a setup or a bogus case, etc. Your attorney will probably ask follow-up questions to get at the truth about such a situation.

In short, always try to be straightforward, neutral and professional, and to answer questions honestly and forthrightly. That approach and a solid written report make an unbeatable combination.

Remember that your oral testimony in a use of force case is an opportunity for you to explain your perceptions and actions to a jury and the court as to what happened in an actual use of force incident, based upon your training, experience, and the fact situation. If you do a good and credible job of explaining your use of force actions, based on your written report on that incident and making reference to POSC concepts and terms, you enhance the chances of winning the court case.

In some cases, a POSC instructor may also testify as a witness to further explain aspects of use of force to the court and perhaps even qualify as an expert.

THIS PAGE INTENTIONALLY LEFT BLANK

# APPENDIX A: SELECTED CONSTITUTIONAL AMENDMENTS

## First Amendment

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

## Second Amendment

A well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be abridged.

## Third Amendment

No soldier shall, in time of peace be quartered in any house, without the consent of the owner, nor in time of war, but in a manner prescribed by law.

## Fourth Amendment

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, and supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

## Fifth Amendment

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

## Sixth Amendment

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the

nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense.

## Seventh Amendment

In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any court of the United States, than according to the rules of common law.

## Eighth Amendment

Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

## Ninth Amendment

The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.

## Tenth Amendment

The powers not delegated to the United States by the Constitution, nor prohibited to it by the states, are reserved to the states respectively, or to the people.

## Fourteenth Amendment (Section One)

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities if citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

# APPENDIX B: SAFETY RULES

(Safety Rules for Use-of-Force Training adapted with permission from ACMI® Systems)
Note: terms such as simulation training, activity-centered learning and scenario training are synonymous for purposes in this text.

1. Treat each other as peers; we are on the same team.

2. Ask questions, including "how to" questions.

3. No horseplay will be tolerated; staff members get hurt.

4. Cooperate, don't compete. Instructors are here to help you develop job skills.

5. No jewelry is to be worn during training. Remove any jewelry you may be wearing now.

6. Mouth guards will be used, as needed, for simulation training.

7. We are responsible for each other's safety. Watch out for each other.

8. Three (3) Officer Safety Concept – During simulation training, at least one student in each group will act as a safety/officer coach.

9. Use of whistle: cadence and emergency stops.

10. Report injuries immediately. Don't suffer in silence. You are all supposedly "fit for duty," but you know your body and if something doesn't feel right when you do a certain technique or movement, let the instructors know.

11. At no time is any participant allowed to leave the training area without the permission of the primary instructor.

12. There will be a "Current Wellness Check" before each class is conducted and a "Final Wellness Check" after the class is completed.

13. It is each participant's responsibility to cover all open wounds and cuts before class begins. If this type of injury occurs during the training session the participant will immediately notify the primary instructor, attend to this injury, and cover it with the first aid material available (Band-aids and, for larger wounds, gauze pads and tape). Treat all blood with utmost caution. Any blood must be properly cleaned up using a bleach solution of at least 1 part bleach to 99 parts water, and then disposing of any contaminated material in a "hazardous material" bag for proper disposal. Use standard precautions if there is any possibility of coming in contact with blood.

14. Even during defensive tactics, range safety rules (as originally developed by Jeff Cooper) must be enforced when firearms are present:

Rule 1:   Treat every firearm as if it were loaded.
Rule 2:   Always point the muzzle in a safe direction.
Rule 3:   Keep your finger off the trigger and out of the trigger guard unless you intend to shoot.
Rule 4:   Know your target, back stop, and beyond.

No one will be allowed to enter the training area without following these safety procedures:

- Only specially-designated weapons and training munitions are permitted in the training area.
- No live ammunition is permitted.
- All participants and firearms will be visually and physically checked to ensure that no live ammunition enters the area.

    The Three Check Safety Rule will be in effect during all training programs. Before entering the training area, you must be triple-checked:

    1) Check yourself for unauthorized weapons and live ammunition;
    2) Have your partner check you;
    3) Have the Safety Officer or Instructor check you.

    If you leave the training area, you must always be triple-checked before re-entering.

- If you see any safety violation, immediately call out the designated "STOP SCENARIO!" signal and notify the Instructor or Safety Officer.
- If you hear the "STOP SCENARIO!" signal, immediately cease all activity.
- Read, understand, and follow all safety instructions. Failure to do so may result in serious injury, disability, or death.

15. Safety is every participant's responsibility. Certain scenarios that participants may be required to role-play could contain deadly force decision-making situations. Therefore, firearms may be pointed at demonstrators who pose a "real" threat to participants. Otherwise, weapons will be pointed in a safe direction. Participants involved in training exercises utilizing firearms will maintain absolute muzzle control at all times, follow the "Laser Rule" when handling firearms.

16. No training equipment is to be handled without the permission of the primary instructor. This includes a participant's personal duty/training equipment.

17. Likewise, knives, OC, ECD cartridges and other weaponry are not allowed in the training area without the express permission of the primary instructor.

18. Remember to work at your own pace; do not over-exert yourself.

THIS PAGE INTENTIONALLY LEFT BLANK.

# APPENDIX C: TACTICAL WARMUPS

## INTRODUCTION

Tactical warm-ups help get the body ready for the intense activity of POSC training and help prevent injury.  The three phases of proper tactical warm-ups are:

- Heat Up the Body Phase
- General Stretching Phase
- Positive Self-Talk Phase

The following describes each of these.

## HEAT UP THE BODY PHASE

### Run in Place

- Pump legs
- Pump arms
- Cross arms
- Lift arms

### Shadow Training (done alone without a training partner)

*High Guard Blocking*

- Sweep and disengage
- Middle level blocks
- Face level blocks
- Lower abdominal blocks
- Downward blocks

*Vertical Stunning*

- Initiate a defensive stance
- Establish a grappling position – Verbalize: "STOP RESISTING"
- Direct subject to wall – Verbalize "BACK"
- Hook subject up
- Step and drag step backwards, if possible
- Push subject down – Verbalize "DOWN"
- Stabilize subject – Verbalize: "STAY DOWN"
- Be prepared to disengage and/or escalate

*Focused Hand Strikes*

- Reaction side hand strike – Verbalize: "BACK"
- Reaction side forearm strike – Verbalize: "STAY BACK...BACK...STAY BACK"
- Strong side forearm strike ' Verbalize: "DOWN"
- Inside position multiple strike forearm overload – VERBALIZE: "LET! ME! GO!"
- Level Three multiple strike forearm overload – VERBALIZE: "LET! ME! GO!"

*Focused Leg Strikes*

- Reaction side front kick – Verbalize: "BACK"
- Reaction side knee strike – Verbalize: "BACK"
- Strong side knee strike from grappling position – Verbalize: "DOWN"
- Multiple knee strike overload from a "hooked up" position – Verbalize: "LET! ME! GO!"

*Diffused Strike Component- Inside Position Application*

- Initiate a defensive stance
- Establish a grappling position – Verbalize: "STOP RESISTING"
- Stabilize the side of the neck (with reaction hand)
- Index on the base of the neck (with strong hand) – Verbalize: "GET DOWN"
- Load (draw back) the strong arm 6-8 inches
- Apply fluid shock waves to the base of the neck – Verbalize "DOWN"
- Prepare to direct the subject to the ground
- Direct / lower subject to the ground
- Stabilize the subject on the ground – Verbalize: "STAY DOWN"
- Be prepared to escalate and/or disengage

*Diffused Strike Component - Level Three Application*

- Initiate a defensive stance
- Secure the head – Verbalize: "STOP RESISTING"
- Gently turn the head toward the reaction side with the reaction hand that is stabilizing the chin
- Index on the base of the neck (with strong side palm) – Verbalize: "GET DOWN"
- Load (draw back) the strong arm 6-8 inches
- Apply fluid shock waves to the base of the neck – Verbalize "DOWN"
- Prepare to direct the subject to the ground
- Direct / lower subject to the ground
- Stabilize the subject on the ground – Verbalize: "STAY DOWN"
- Be prepared to escalate and/or disengage

## GENERAL STRETCHING PHASE

### Overhead Stretch

- Hands together
- Arch back slightly
- Stretch

### Neck Stretch

- Front
- Left
- Right
- Left center
- Right center

### Shoulder Stretch

- Forward
- Rearward
- Up and down
- Alternate

### Side Stretch

- Hands together behind the head: right / left

### Bent Stretch

- Grab hands
- Bend over
- Life up and then lower arms

### Hip Rotation

- Double forearm strike position: right and then left

### Reaching Stretch

- Right hand on the thigh
- Left hand over head
- Stretch the left hand on the thigh
- Stretch right over the hand

### Toe Touches

- Bend knees while moving into the intermediate stance – right hand to left toe
- Left hand up, and look at left hand
- Then left hand to right toe
- Right hand up, and look at right hand

**Half Squat**

- Put hands into the hook-up position
- Staying in one position, perform a "pull in  / push down" decentralization while verbalizing "DOWN" as you go into an intermediate stance
- Then continue into a ground stabilization position – Verbalize "STAY DOWN"
- Repeat five (5) times
- Ankle Stretch
- Right ankle: forward and backwards / side to side / rotate right / rotate left
- Left ankle: forward and backwards / side to side / rotate right / rotate left

**Ankle Stretch**

Right ankle: forward & backwards / side to side / rotate right / rotate left
Left ankle: forward & backwards / side to side / rotate right / rotate left

**Calf Stretch**

*Right side*

- Point right toe out
- Lift right heel off the floor
- Tighten the entire leg

*Left side*

- Point left toe out
- Lift left heel off the floor
- Tighten the entire leg

## POSITIVE SELF-TALK PHASE

- (Three repetitions of each phrase)

- *I am constantly aware of my environment.*
  (Look around.)

- *I am relaxed but alert.*
  (Breathe deeply – in and out.)

- *I take advantage of every assessment opportunity.*

(Hide hands—in a ready position with open palms. Verbalize: "What do you have in your hands?"  For the second and third repetition, disengage and/or escalate as appropriate.)

- *I know the verbalization skills I need.*
  (In a ready position with open palms, verbalize.  Use the Basic Contact Model from your Professional Communications Skills Training: O.I.R.—that is, opening, information-gathering, resolution.)

- *I know the physical skills I need.*
  (Verbalize: "Come with us" while performing a blanket to escort position, and then verbalize: "Stop resisting!" while performing a compression hold, and then verbalize "Just relax" while releasing the pressure.)

- *I hit with power.*
  (Verbalize: "Stay back!" then perform a strong side forearm strike, verbalize "Down!" and then while moving forward into a high guard position, verbalize "Get down!")

- *I will survive and keep going – no matter what.*

- *I am proud to be one of America's finest – correctional personnel.*

THIS PAGE INTENTIONALLY LEFT BLANK.

# APPENDIX D: POSC TECHNIQUES

## INTRODUCTION

The psychomotor skills techniques for POSC are illustrated in the standard PowerPoint® presentation which includes photographs of the classroom model for each tactic and technique.  Following is the text accompanying those.

## PRESENCE

### Open Stance

- Feet hip width apart
- Strong foot slightly back
- Knee slightly bent
- Shoulders squared
- Hands at waist level
- Be prepared to disengage and/or escalate
- Scan and breathe
- Continue follow-through

### Ready Stance

- Feet hip width apart
- Strong foot one step back
- Knees bent
- Shoulder squared
- Hands at chest level
- Be prepared to disengage and/or escalate
- Scan and breathe
- Continue follow-through

### Defensive Stance

- Feet hip width apart
- Strong foot one and a half step back
- knees bent more
- shoulder squared
- Hands at high guard level
- Be prepared to disengage and/or escalate
- Scan and breathe
- Continue follow-through

## DIALOGUE

### Search Talk – Basic Contact Model

*Opening*

- Identify self / department
- Explain reason for contact

*Information-Gathering*

- Understanding the context
- Asking for identification
- Follow-up questions
- Giving orders

*Resolution*

- Make your decision
- Appropriate close
- Ending the contact

### Persuasion – Arbitration Format (REACT)

- **R**equest cooperation
- **E**xplain reason
- **A**llow choice

### Light Control Talk

- **C**onfirm non-compliance

### Heavy Control Talk

- **T**ake action

## CONTROL ALTERNATIVES/PROTECTIVE ALTERNATIVES

### Escort Holds

*Blanket the Arm*

- Defensive stance
- Blanket the arm
- Be prepared to disengage and/or escalate
- Scan and breathe

- Continue to follow through

*Escort Position*

- Defensive stance
- Blanket the arm
- Outside hand slides down the arm
- Outside hand controls the wrist
- Bring subject's arm to center
- Be prepared to disengage and/or escalate
- Scan and breathe
- Continue to follow through

**Compliance Holds**

*Come-Along*

- Defensive stance—verbalize
- Blanket the arm—verbalize
- Escort position—verbalize
- Wrist up
- Elbow back
- Inside hand around
- Outside hand on top
- Slide elbow to center
- Apply pressure, if appropriate—verbalize
- Release pressure, when appropriate—verbalize
- Be prepared to disengage and/or escalate
- Scan and breathe
- Continue to follow through

*Safe Release*

- Step forward—verbalize
- Nudge with inside shoulder
- Raise your hands
- Defensive stance—verbalize
- Close the Door—verbalize
- Continue to follow through

**Pressure Points**

*Below the Ear*

- Defensive stance—verbalize
- Secure the head from Level Three—verbalize

- Move strong hand into proper position
- Slide strong hand into position
- Apply pressure, if appropriate, towards the subject's opposite side eye—verbalize
- Release pressure, when appropriate—verbalize
- Be prepared to disengage and/or escalate
- Scan and breathe
- Continue to follow through

*Beneath the Jaw*

- Defensive stance—verbalize
- Secure the head from the inside position—verbalize
- Move strong hand into proper position
- Slide strong hand into position
- Hook the jaw
- Apply pressure, if appropriate, towards the subject's opposite side eye—verbalize
- Release pressure, when appropriate—verbalize
- Be prepared to disengage and/or escalate
- Scan and breathe
- Continue to follow through

**OC Spray**

*Basic Tactic*

- Defensive stance—verbalize
- Hand on the weapon—verbalize
- Draw the weapon —verbalize
- Load the weapon—verbalize
- Use weapon —verbalize
- Stabilize—verbalize
- Defensive stance—verbalize
- Be prepared to disengage and/or escalate
- Scan and breathe
- Continue to follow through

**Decentralizations**

*Secure the Head*

- Defensive stance—verbalize
- Encircle the head
- Strong hand secures the face / reaction hand secures the chin
- Bring to center—verbalize

- Take out the slack
- Roll the ball
- Movement along an arc
- Stabilize—verbalize
- Be prepared to disengage and/or escalate
- Scan and breathe
- Continue to follow through

*Hug Yourself*

- Escort positions—verbalize
- Bring to center
- Take out the slack
- Roll the ball—verbalize
- Along an arc
- Stabilize—verbalize
- Be prepared to disengage and/or escalate
- Scan and breathe
- Continue to follow through

*Lower Your Center*

- Compression hold—verbalize
- Bring to center
- Take out the slack
- Roll the ball—verbalize
- Along an arc
- Stabilize—verbalize
- Be prepared to disengage and/or escalate
- Scan and breathe
- Continue to follow through

*Pull In / Push Down*

- Defensive stance
- Grappling position—verbalize
- Secure the head
- Bring to center
- Take out the slack
- Roll the ball—verbalize
- Along an arc
- Stabilize—verbalize
- Be prepared to disengage and/or escalate
- Scan and breathe
- Continue to follow through

**Blocking**

*Sweep & Disengage Tactic*

High to left

- Defensive stance
- Step left
- Sweep high—verbalize
- Continue to disengage
- Be prepared to disengage and/or escalate
- Scan and breathe
- Continue to follow through

Low to Left

- Defensive stance
- Step left
- Sweep low—verbalize
- Continue to disengage
- Be prepared to disengage and/or escalate
- Scan and breathe
- Continue to follow through

High to Right

- Defensive stance
- Step right
- Sweep high—verbalize
- Continue to disengage
- Be prepared to disengage and/or escalate
- Scan and breathe
- Continue to follow through

Low to Left

- Defensive stance
- Step right
- Sweep low—verbalize
- Continue to disengage
- Be prepared to disengage and/or escalate
- Scan and breathe
- Continue to follow through

*Traditional Blocking*

Middle Blocks

- Defensive stance
- Block left
- Recover
- Block right
- Recover
- Defensive stance
- Be prepared to disengage and/or escalate
- Scan and breathe
- Continue to follow through

Face-Level Blocks

- Defensive stance
- Block left
- Recover
- Block right
- Recover
- Defensive stance
- Be prepared to disengage and/or escalate
- Scan and breathe
- Continue to follow through

Lower Abdominal Blocks

- Defensive stance
- Block left
- Recover
- Block right
- Recover
- Defensive stance
- Be prepared to disengage and/or escalate
- Scan and breathe
- Continue to follow through

Lower Blocks

- Defensive stance
- Block left
- Recover
- Block right
- Recover
- Defensive stance
- Be prepared to disengage and/or escalate
- Scan and breathe

- Continue to follow through

**Vertical Stun**

*Direct to Wall*

- Defensive stance
- Grappling position—verbalize
- Elbows in
- Push in
- Stun—verbalize
- Hook up—verbalize
- Step and drag
- Pull in
- Step and drag
- Push down
- Stabilize—verbalize
- Be prepared to disengage and/or escalate
- Scan and breathe
- Continue to follow through

*Get Off the Tracks*

- Defensive stance
- Check subject—verbalize
- Spin subject
- Grappling position—verbalize
- Elbows in
- Push in
- Stun—verbalize
- Hook up—verbalize
- Step and drag
- Pull in
- Step and drag
- Push down
- Stabilize—verbalize
- Be prepared to disengage and/or escalate
- Scan and breathe
- Continue to follow through

**Focused Strikes**

*Reaction Side Hand Strike*

- Defensive stance—verbalize
- Step and load

- Reaction side hand strike—verbalize
- Defensive stance—verbalize
- Be prepared to disengage and/or escalate
- Scan and breathe
- Continue to follow through

*Strong Side Hand Strike*

- Defensive stance —verbalize
- Step and load
- Strong side hand strike —verbalize
- Defensive stance—verbalize
- Be prepared to disengage and/or escalate
- Scan and breathe
- Continue to follow through

*Reaction Forearm Strike*

- Defensive stance—verbalize
- Step and load
- Reaction side check—verbalize
- Reaction side forearm strike—verbalize
- Reaction side check—verbalize
- Defensive stance—verbalize
- Be prepared to disengage and/or escalate
- Scan and breathe
- Continue to follow through

*Strong Side Forearm Strike*

- Defensive stance—verbalize
- Step and load
- Strong side forearm strike—verbalize
- Defensive stance—verbalize
- Be prepared to disengage and/or escalate
- Scan and breathe
- Continue to follow through

*Inside Position Forearm Strike Overload*

- Defensive stance—verbalize
- Establish grappling position—verbalize
- Step and load
- Middle strong side forearm strike—verbalize
- Step and load
- Middle reaction side forearm strike—verbalize

- Step and load
- High strong side forearm strike—verbalize
- Defensive stance—verbalize
- Be prepared to disengage and/or escalate
- Scan and breathe
- Continue to follow through

*Level Three Position Forearm Strike Overload*

- Defensive stance—verbalize
- Step and load
- Middle strong side forearm strike—verbalize
- Step and load
- Middle reaction side forearm strike—verbalize
- Step and load
- High strong side forearm strike—verbalize
- Defensive stance—verbalize
- Be prepared to disengage and/or escalate
- Scan and breathe
- Continue to follow through

*Reaction Side Front Kick*

- Defensive stance —verbalize
- Reaction side front kick—verbalize
- Shuffle step forward
- Defensive stance—verbalize
- Be prepared to disengage and/or escalate
- Scan and breathe
- Continue to follow through

*Strong Side Angle Kick*

- Defensive stance—verbalize
- Step and load
- Strong side angle kick—verbalize
- Step through
- Reposition as necessary
- Defensive stance—verbalize
- Be prepared to disengage and/or escalate
- Scan and breathe
- Continue to follow through

*Reaction Side Knee Strike*

- Defensive stance—verbalize

- Reaction side knee strike—verbalize
- Step forward
- Reposition as necessary
- Defensive stance—verbalize
- Be prepared to disengage and/or escalate
- Scan and breathe
- Continue to follow through

*Strong Side Knee Strike*

- Defensive stance—verbalize
- Step and load
- Strong side knee kick—verbalize
- Step through
- Reposition as necessary
- Defensive stance—verbalize
- Be prepared to disengage and/or escalate
- Scan and breathe
- Continue to follow through

*Knee Strike Overload*

- Defensive stance—verbalize
- Establish grappling position—verbalize
- Step and load
- Strong side knee strike—verbalize
- Step and load
- Reaction side knee strike—verbalize
- Step and load
- Strong side knee strike—verbalize
- Step forward
- Reposition
- Defensive stance—verbalize
- Be prepared to disengage and/or escalate
- Scan and breathe
- Continue to follow through

## Impact Weapons

*Basic Tactic*

- Defensive stance—verbalize
- Hand on the baton—verbalize
- Present the baton—verbalize
- Load the baton—verbalize
- Strike with the baton—verbalize

- Defensive stance—verbalize
- Be prepared to disengage and/or escalate
- Scan and breathe
- Continue to follow through

**Diffused Strikes**

*Inside Position*

- Initiate a defensive stance—verbalize
- Establish a grappling position—verbalize
- Stabilize the side of the neck
- Index on the base of the neck—verbalize
- Load the arm 6 - 8 inches away from the neck
- Apply fluid shock waves to the base of the neck—verbalize
- Prepare to direct the subject to the ground
- Direct / lower the subject to the ground
- Stabilize the subject on the ground—verbalize
- Be prepared to disengage and/or escalate
- Scan and breathe
- Continue to follow through

*Level Three Position*

- Initiate a defensive  stance—verbalize
- Secure the head —verbalize
- Gently turn the head with the hand stabilizing the chin
- Index on the base of the neck—verbalize
- Load the arm 6 - 8 inches away from the neck
- Apply fluid shock waves to the base of the neck—verbalize
- Prepare to direct the subject to the ground
- Direct / lower the subject to the ground
- Stabilize the subject on the ground—verbalize
- Be prepared to disengage and/or escalate
- Scan and breathe
- Continue to follow through

## DEADLY FORCE

The POSC System teaches no trained deadly force techniques.

## STABILIZATION TECHNIQUES

**Tactical Handcuffing**

- Verbalize
- Secure (the right hand)
- Touch
- Push
- Ratchet
- Flip
- Secure (the right hand)
- Touch
- Push
- Ratchet
- Stabilize (rear escort hold)
- Verbalize
- Be prepared to disengage and/or escalate
- Scan and breathe

## TACTICAL UNHANDCUFFING

- Verbalize
- Remove (the left hand)
- Verbalize
- Stabilize (the left hand)
- Flip (the handcuff counter-clockwise)
- Move (to the right)
- Remove (the right handcuff)
- Verbalize
- Stabilize (the right hand)
- Verbalize
- Be prepared to disengage and/or escalate
- Scan and breathe

COMPLIANCE HOLD HANDCUFFING (dealing with active and passive resistance)

*Multiple Officer Unhandcuffing Procedures*

Emergency Unhandcuffing

- Decentralize subject and "stabilize" him or her against some object
- Secure subject's appendages in the following sequence:
  - (1) Arms
  - (2) Head
  - (3) Legs
- Stabilize subject using rear escort holds

- Handcuff subject
- Continue "follow-through" procedures

Three (3) Officer Unhandcuffing Technique

- Stabilize subject on a wall using rear escort holds
- Take the handcuffs off
- Rotate the subject's arms from rear escort holds to front compression holds (*less pain than compliance hold*)
- Issue verbal commands
- Disengage safely

# APPENDIX E: OLEORESIN CAPSICUM (OC) SPRAY

Oleoresin capsicum, generally known as "OC" or "pepper spray," is a tactic usually within the mode of Control Alternatives.[19]

Use of OC is an option when you encounter active resistance or the threat of active resistance from a subject.  Your actual use of OC depends on the same tactical evaluation factors which govern your decision to use any other force option on the Force Option Continuum.  Those factors include:

- Threat assessment opportunities
- Officer(s)/subject(s) factors
- Special circumstances
- Level / stage / degree of stabilization

The purpose for use of OC is the same as for other tactics within this mode—to gain compliance from a noncompliant subject—in this case by disrupting the subject's ability to continue resisting.  OC is designed to create pauses in combat.  These pauses can be both physical and mental.

As with any use of force, whenever you use OC spray you should complete a report on the incident.

## OVERVIEW OF OC

Oleoresin capsicum (OC) is an extract of pepper plants of the genus Capsicum.  It is generally prepared in aerosol form, in various concentration levels such as 5%, 5.5%, or 10%.  These aerosols are sold under a number of brand names.  Depending on the brand, an OC spray may contain water, alcohols or organic solvents as liquid carriers; and nitrogen, carbon dioxide, or halogenated hydrocarbons as propellants to discharge canister contents.

OC does not affect everyone the same way, and in fact does not have much affect at all on some people.  However, most people who are sprayed experience such discomfort that their ability to resist is reduced to the point that they are more easily controlled.  When used properly, OC usually has several physical effects on a person who has been sprayed. These may include the following:

---

[19] Grateful appreciation is extended to the following for their review of and suggestions for revision of this appendix material: Lieutenant Phil Steffen, Brown County Sheriff's Department; and Dave Young, Director of Specialized Training Programs for Fox Valley Technical College and Director of Training – RedMan Training Division.

- The eyes will open and close rapidly or close completely. The pain may be extreme. Vision may be affected.

- The face may feel hot – more so if the person is perspiring or has a fair complexion. The mucous membranes in the nose, lips and mouth may also swell. Areas around the eyes, nose and mouth will usually remain red for a longer period.

- If OC is inhaled by the subject, the respiratory system may become inflamed, causing coughing, gagging, and gasping for breath. Breathing typically becomes labored.

Other effects of being sprayed with OC may include:

- Hands go directly to the face, dropping whatever is in the hands.
- Upper body bends forward.
- Subject shakes uncontrollably.
- Legs become weak. Subject gropes around for the ground or floor.
- Subject goes to his/her hands and knees for stability.
- Subject cannot easily hear what officer is saying (note: This is known as "auditory exclusion").
- The muscles of the body become rigid.
- Subject may not respond to commands.
- Subject panics and runs into a place where a rational person might not go.

The diversion of pain in the eyes and face and gasping for air typically produces an involuntary response which indirectly addresses the most basic fears of blindness and suffocation.  This causes confusion and disorientation.

OC has no history of lasting after-effects.  To date, there has never been a substantiated case of death or injury attributed to OC.  Subjects with heart problems, asthma, emphysema and/or other illnesses who have been sprayed had no lasting after-effects.  This is not to say that there is no possibility that a person can be injured or permanently harmed by OC use; as yet, however, there is no evidence of lasting injury or harm.

OC is an effective tool because OC:

- produces rapid physiological actions
- produces desired effects in low concentrations
- permits rapid recovery without lasting effects
- is an inflammatory, and therefore it is less likely for a person to build up an immunity however, like spicy food a person could build up a "tolerance"

## GENERAL ISSUES REGARDING OC SPRAY

If OC is used in your agency, you should have policies and procedures governing such issues as storage and checking the aerosol as to the number of bursts available in the unit. Always follow the manufacturer's instructions for use and care of OC spray. In the absence of manufacturer information, the following guidelines may be used.

### Storage

1. Always store away from heat or open flame. Because OC is usually in an aerosol container, it may explode when exposed to heat. Additionally, the carrier that holds the active ingredient in solution may be flammable. **WARNING!** If staff members carry electronic control devices (ECDs) in addition to OC spray, only non-flammable OC spray should be used. The current generated by an ECD could ignite flammable spray.

2. Do not store at temperatures below 50°F or above 120°F, or exposed to direct sunlight. Storage at proper room temperature will help maintain proper aerosol pressure.

3. Do not puncture or incinerate the container.

### Shelf Life

OC usually will not decompose over time, but the propellant may escape from the seals and cause the container to lose its aerosol pressure. In addition the unit valves may become clogged or the canister may rust with time. Always shake and test OC spray before its initial use and periodically thereafter. To do so,

1. Choose a safe location, outdoors, with the wind behind you.
2. Shake the unit for ten seconds to check for leaks.
3. Test spray a ¼-second burst to ensure that there is no debris in the nozzle and the unit works as expected.

Follow the same procedure if an OC unit has not been used for six months or more.

## DISPERSION TYPES

OC is dispersed in three ways. Each way has advantages and disadvantages:

### Fog/Burst Dispersion

In this type of dispersion, the active ingredient is sprayed as an aerosol spray of very fine droplets. Its advantage is that it adheres well (i.e., it does not "run off") and therefore is a reliable means of ensuring that the subject sprayed experiences the effect of the OC. On the other hand, it is relatively long-lasting (it has a residual effect), and because the fine spray can remain suspended in the air, it carries the possibility of

affecting the officers as well as the subject (commonly called *cross-contamination*).  The spray is also subject to wind effects.  At close range, this type also produces a lot of force ("burst force"), meaning that a great amount of the OC material is expelled, thus quickly emptying the canister.

**Streamer**

In this type of dispersion, the OC is dispensed as a liquid stream.  It does not have the same residual effect as the fog/burst dispersion, but it does tend to run off.  Thus, even if the OC reaches the eyes, it can wash out as quickly as it goes in.  Streamer dispersion, because the liquid stream is heavier, is less subject to wind effects than either of the other two types.

**Foam**

In foam dispersion the OC is dispensed as foam.  Because of the more solid nature of the foam, it has a greater effect on the eyes, and limited respiratory effects.  As the foam bubbles decay, the OC is released, meaning that it takes a few seconds longer to have an effect.  However, the cross-contamination possibility is also reduced.  This type of dispersion is primarily designed for indoor use, because it is more subject to wind effects than either of the other two types.

You should know which type of dispersion your OC unit uses, so that you will be aware of the possible drawbacks or concerns.

# LEVELS OF OC CONTAMINATION

Contamination by OC aerosol spray is usually described in terms of three levels.

**Level 1**

Level 1 contamination is defined as direct physical contact with the chemical used and is the result of a direct spray to the subject's face. Level 1 is the most severe level of contamination.

**Level 2**

Level 2 contamination is defined as an indirect or secondary contact to the chemical resulting from touching a person or object which has been sprayed directly.   Level 2 contamination may occur, for example, from moving in to control a subject who has just been sprayed.  Level 2 contamination is probably the most common level of contamination.

**Level 3**

Level 3 contamination is defined as an area contamination with the chemical that was used. For example, if OC aerosol spray is used in a cell or room, the area remains

contaminated as long as the aerosol remains in the air—or even on surfaces.  This is the most uncontrollable level of contamination.

## USING OC

The justification for use of OC is *active resistance or its threat* from a subject.  Your purpose in using OC with such a subject would be to disrupt the subject's ability to resist, so that you can stabilize him or her in order to gain control of the situation.

### When to Use OC

As with any use of force option, your decision to use OC depends upon your tactical evaluation of the situation.  Remember that your tactical evaluation includes the following:

- Threat assessment opportunities
- Officer(s)/subject(s) factors
- Special circumstances
- Level / stage / degree of stabilization

### How to Use OC

Once you have decided to use OC, you should deploy it in the most effective way.  Always follow the manufacturer's instructions.  While manufacturer's guidelines vary, depending on the specific product, the following are common guidelines:

- Shake the unit before use, if time permits.

- Hold the unit upright when spraying.  The unit is designed to operate best in the upright position and will become less effective if it is held otherwise.

- Hold the canister between 10 o'clock & 12 o'clock when deploying.

- Spray in one-second bursts, never in a continuous spray.  Short bursts allow you to control the spray and will make it more difficult for the subject to anticipate the spray and possibly defeat it.

- Always push straight down to avoid crimping the actuator and to allow for a smooth discharge of the OC.

- Try to maintain a minimum distance of six to eight feet when spraying an individual.

Follow the manufacturer's guidelines for any warnings regarding OC use. This includes any warnings regarding wind effects.

Use the following procedure when use of OC is warranted:

1. Use verbal warnings and heavy control talk, as necessary to get the subject to stop resisting.

2. Place your hand on the OC unit, without actually drawing it.

3. If the subject does not stop resisting, draw the unit.

4. If other officers are present, warn them that you are about to use OC by shouting, "SPRAY!"

5. If the subject does not stop resisting, spray from a proper distance.

6. Spray directly into the subject's face with one-second bursts, depending on distance and movement of the subject.

   If a subject is holding his or her breath or is breathing shallowly, the OC may not enter the lungs. Using multiple short bursts maximizes the likelihood that the OC will enter the subject's lungs. Similarly, if the subject is closing his or her eyes, a series of short bursts make it likely that the OC will eventually enter the eyes when they open. Create a safe distance between you and the subject. Use lateral movement, if possible,

7. As with any application of force, stop applying OC when the subject's level of resistance decreases to the point that you can safely control him or her using other means.

8. If the OC is ineffective, stop using it and disengage and/or escalate. It is best to have a plan as to what you will do ("If the OC does not work, then I will..."). Be aware that the effects of OC may not be immediate. For example, adrenaline in a person's system can cause a delay in OC effects. Also, the impact of OC on individuals may be affected by cultural issues and even by types of diets. Thus, if you can, allow some time for the OC to take effect before you make a decision to disengage or to enter the cell of an inmate who has been sprayed.

## Drawing Techniques

You should have your OC unit in your hand prior to approaching a subject on whom you may need to use the spray. To draw the OC, use one of two basic drawing techniques:

1. Strong Side Draw: If you carry the OC unit on your strong side, simply use your strong side hand to draw the unit.

2. Reaction Side Draw: If you carry the OC unit on your reaction side, draw the unit with your reaction hand and immediately transfer it to your strong side hand.

While drawing the unit and preparing to use it, always maintain a proper defensive stance.

Spraying Techniques

Hold the OC in your strong hand, either at belt level or eye level in front of you.  You can hold the unit either with four fingers and your thumb on the actuator/trigger or with three fingers, using your forefinger on the actuator/trigger.

Three spraying techniques are commonly used:

- Side to side spray - effective for multiple subjects;
- Defensive push and spray; and
- Defensive push, draw and spray.

Whichever technique you use, be sure to verbalize and maintain a defensive stance.  If you are outdoors, be sure to note the direction of the wind, to avoid spraying upwind, where the wind could carry the OC back to you.

After each spray, move to a different location, changing your relative positioning by moving to the left or right.

## TACTICS IF FACED WITH SUBJECT USING OC

You may be faced with a subject—inmate or other person—who is threatening to use OC or another aerosol spray against you. In such case, you have several tactical options.  As in any use-of-force situation, you may either disengage and/or escalate as dictated by circumstances.

### Disengagement

When faced with a subject using an aerosol spray against you, your options for disengaging include specific avoidance tactics as well as general disengagement options.

The specific avoidance tactics include protecting your eyes by closing them, turning your head or using your hands or an object to re-direct or block the spray.  If you have already been sprayed with OC that is affecting your eyes,  "strobe" your eyes—that is, rapidly open and close them so as to start the flushing-out process and to restore vision and focus.  Keep your chin up, and focus on the threat.

You may be able to protect your lungs and airway by holding your breath until you can move out of the area with OC in the air.

Besides these specific tactics, your general tactics for disengaging include using obstacles to impede the subject from reaching you with OC spray and using the "best weapon defense."  If you have a firearm, that is obviously a better weapon than OC, so your procedure would be to:

1. Draw your firearm.
2. Attempt to maintain and/or create distance.
3. Attempt to diffuse the situation with verbalization skills.

If you do not have a firearm, steps 2 and 3 would still apply.

## Escalation

If disengaging is not the best option, you may choose to escalate.  The ideal option is to disarming the subject, if possible.  If that is not possible, you can choose another higher force option.  In the POSC system, these include use of an intermediate weapon (baton) or deadly force, if it is justified.  Because OC can be incapacitating, the use of deadly force *may* be justified based on an officer's reasonable perception of threat that he or she would be placed in immediate danger of death or great bodily harm.  This perception must be based on the totality of circumstances of the officer's tactical evaluation, including:

- threat assessment opportunities
- officer(s)/subject(s) factors
- special circumstances
- level / stage / degree of stabilization

The deadly force decision-making criteria must be met before the use of deadly force can be justified.  The mere fact that a subject is threatening you with OC does not automatically justify use of deadly force.  In short, use of deadly force to prevent a subject from spraying you with OC and then inflicting great bodily harm or death on you may be an option, but one that you would use only if you could clearly justify your decision to do so.

## FOLLOW-THROUGH AFTER USE OF OC SPRAY

Following an incident in which you have sprayed a subject with OC, you must initiate follow-through procedures to ensure proper care of the subject and to prevent further harm.

Most problems which occur in an incident involving use of OC happen as a result of improper or inadequate follow-through, rather than as a result of the spraying. Remember that being sprayed with OC may be a terrifying and uncomfortable experience for a person. He or she may experience severe problems with seeing and breathing. For that reason, it is important to stay with a subject who has been sprayed, reassure and care for him or her.

Know the manufacturer's after-use guidelines for the particular OC product which you are using. Read the material safety data sheet (MSDS) and the first aid information that is provided for the product used.

**The Recovery Process**

Recovery from being exposed to OC generally occurs in three stages:

- partial recovery
- moderate recovery
- full recovery

Partial recovery occurs in the first 1-3 minutes. The person regains control of respirations. At this point, the person still has to force the eyes to open, and the eyes still burn. The face is red and feels very hot.

Moderate recovery usually follows in 4-10 minutes. At this point the subject is able to control respirations and the eyes can focus, but they still burn and the face is still inflamed.

Full recovery takes 10-20 minutes or more. The subject can fully control respiration and open and close the eyes at will. The face still feels tight and coarse, though much less inflamed.

**Aftercare Procedures**

After spraying a subject or subjects, if possible, allow the OC agent to settle for 10 to 15 seconds, and issue appropriate verbal commands to subject. Stabilize the scene and the subject, including handcuffing if appropriate. Note that there may be some cross-contamination of non-involved inmates.

Ask subject these three questions:

- Are you wearing contact lenses?

- Do you take any medication?
- Do you have any other medical concerns? (besides the discomfort from the OC)

Monitor the subject and verbally reassure him/her that he or she is safe and will feel okay after a while.  Try to help the subject calm down and try to breathe normally.  Speak in a calm reassuring tone of voice.  Tell the person that the effects of the OC will wear off in 30-45 minutes, and he or she will be okay.  Remember, the person may be very upset because he or she cannot see or breathe properly, and cannot get immediate relief.

Encourage the subject to open his/her eyes and blink.  This will stimulate tearing, which will help alleviate the effects of the OC. Tell subject to keep his or her chin up, and to focus on breathing—in through the mouth and out through the nose.  Remind the person that he or she will be okay.

If possible, remove the subject to fresh air and face him or her into the wind.  This is the first step to decontamination, when feasible, but it may not be feasible in a correctional environment, unless there is an outdoor recreation area or other easy outdoor access.

Allow the subject to rinse the OC from his or her face and eyes with cool water—preferably from a running tap, since dipping into standing water will contaminate that water and result in re-exposure to the inflammatory substance.  **Do not** allow the subject to rub the eyes, but do allow removal of contact lenses, if worn.  If the burning sensation persists, ice may be applied.  Dry the face with an electric or hand-held fan.

Using a spray bottle filled with cool water will also assist in relieving the heat of the OC.  Avoid use of salves, creams or lotions.  These products trap the OC against the skin.  If subject is wet with OC, dry him/her before escorting or transporting.  This will only take a few minutes and should be accomplished before subject is escorted or transported.

As soon as feasible, allow the inmate to shower, with warm (not hot) water and soap.  Using soap and water will remove the resin from the skin, assisting in the recovery process.  However, avoid soaps containing oils or lotions.  Explain to the individual that he or she should lean forward and wash the hair and face first to avoid rinsing the OC onto other parts of the body.

### When to Get Medical Care

Your jail policies might direct that medical attention is to be obtained for every inmate who has been sprayed.  This is generally a good policy.  However, in any case, get medical attention for any subject who requests it, particularly if he or she is wearing contact lenses.  You should also get medical attention if a subject's symptoms do not visibly improve after 45 minutes.  Do not bring health care providers into an area contaminated with OC—instead take the inmate who has been sprayed to the providers.

June, 2009

## GLOSSARY OF TERMS

*Oleoresin*: a mixture of an essential oil and a resin found in nature.

*Capsicum*: any solanaceous plant of the genus capsicum, as C. Frutescent, the common pepper of the garden, occurring in many varieties that range from mild to hot, having pungent seeds, also ranging from mild to hot, enclosed in a podded or bell-shaped pericap.

*Oleoresin Capsicum*: oil of capsicum.

*Capsaicinoids*: a group of compounds, naturally occurring within the fats, oils, and waxes of the pepper plant.  The amount of these compounds determines the pungency of the pepper.

*Capsaicin*: the most prevalent of the seven compounds found within the Capsaicinoids and considered to be the active ingredient in OC.  These compounds can be measured in a laboratory using a method of analysis called High Performance Liquid Chromatography (HPLC).

*Scoville Heat Units (SHU)*: a measurement of heat as perceived from the burning sensation when peppers are placed on the tongue.

   1. A measure based on the perception of heat from taste, which is assigned to various peppers by a panel of five tasters as described in the American Spice Trade Association, Analytical Methods 21.0.

   2. A green bell pepper has zero SHU, while a jalapeno pepper has 5,000 SHU.

   3. Scoville heat units note that comparatively, SABRE® is 1.33 Capsaicinoids at the nozzle.

*Solvents*: liquid substances capable of dissolving or dispersing one or more other substances.

*Emulsifier*: a substance that creates an emulsion or a mixture of mutually insoluble liquids in which one is dispersed in droplets throughout the other - bonds two or more liquids together.

*Carrier*: the ingredient or ingredients, other than the OC, which comprise the OC Formulation - carries the OC from the canister to the target.

*Propellant*: the gas or liquid, which pressurizes the canister and propels the carrier and agent to the target.

*Strobing*: the rapid opening and closing of your eyes to start the flushing out process to restore vision and focus.

*Combat Breathing*: term coined by Dave Grossman referring to a system for breathing to calm blood flow and allow officer to focus physically and mentally on the threat at hand and reducing the possibility of hyper ventilating. In POSC we use the term autogenic breathing, defined as inhaling through the mouth to allow the maximum amount of oxygen into their lungs, then exhaling through the nose to clear the mucus membranes and any other obstruction that may hinder or restrict breathing.

*Standard Precautions*:  apply to 1) blood; 2) body fluids; 3) non-intact skin; and 4) mucous membranes. Standard Precautions are designed to reduce the risk for transmission of infection.  Hand Care and Protective Barriers are normally included as part of an agency's policies.

*"Laser Rule"*:  imagine a laser beam is coming out of the barrel of any firearm, and NEVER let this beam slice up any person or thing you would not intend to shoot. Always, safe direction, always.

# APPENDIX F: TARGET AREAS

## TARGET AREAS *
( FOR UNARMED STRIKE TECHNIQUES )



PROPENSITY FOR INJURY
LEGEND:

 MINIMUM

MEDIAN

HIGH

\* NOTE: AREAS INDICATED ARE "ANATOMICAL APPROXIMATIONS."

Development by Gary T. Klugiewicz          design & illus. © .1986 K.E.Keith

THIS PAGE INTENTIONALLY LEFT BLANK.

June, 2009

# APPENDIX G: HANDCUFF NOMENCLATURE



design & illus. © .1986 K.E.Kieth

THIS PAGE INTENTIONALLY LEFT BLANK.

# APPENDIX G: USE-OF-FORCE DOCUMENTATION CHECKLIST

## I. BACKGROUND INFORMATION

    A. Day/date/time
    B. Location / address / specific area
    C. Officer(s) involved
    D. Subject(s) involved
    E. Witness(es)

## II. APPROACH CONSIDERATIONS

    A. Decision-making – why did you initiate contact? That is, what was your justification and desirability?

        1. Dispatched / Duty assignment / Uniformed?
        2. Reasonable suspicion
        3. Probable cause
        4. Other reasons

    B. Tactical deployment – how did you approach?

        1. Control of distance
        2. Positioning
        3. Team tactics

    C. Tactical evaluation – what were your perceptions?

        1. Threat Assessment Opportunities?

            a. Levels of resistance – Describing what the subject was doing

                (1) Unresponsive (subject apparently unconscious)
                (2) Non-responsive (subject conspicuously ignoring)
                (3) Dead-weight tactics (subject decision not to assist his/her movement)
                (4) Resistive tension (subject tightening up muscles)
                (5) Defensive resistance (subject attempting to get away)
                (6) Aggressive resistance (subject coming at / moving toward officers)
                (7) Physical assault (subject personal weapons striking at officer)
                (8) Great bodily harm assault (subject's actions / ability to cause harm)
                (9) Life threatening assault (subject's ability to cause death)
                (10) Life threatening weapon assault (subject's ability to cause death)

            b. Early Warning Signs? Explain

(1) Conspicuously ignoring
(2) Excessive emotional attention
(3) Exaggerated movement
(4) Ceasing all movement
(5) Known violent background

c. Pre-Attack Postures? Explain

(1) Boxer stance
(2) Hand set
(3) Shoulder shift
(4) Target glance
(5) Thousand yard stare

d. Subject apparently "emotionally disturbed"—that is, mentally ill, under the influence of alcohol and/or drugs, or is obviously in crisis and out of control.

e. Weapon threat assessment – what weapons have you brought to the scene?  What weapons have the subject brought to the scene?  What other weapons are available?  Explain.

2. What Were the Officer(s) / Subject(s) Factors?

a. Number of Participants?

b. Individual Factors          Officer          Subject

(1) Relative ages

(2) Relative strengths

(3) Relative sizes

(4) Relative skill levels

3. Were There Any Special Circumstances?

a. Your reasonable perception of threat
b. Sudden assault
c. Your physical positioning
d. Subject's ability to escalate force rapidly
e. Your special knowledge about the subject
f. Your injury or exhaustion
g. Other special circumstances

4. Describe the Level / Stage / Degree of Stabilization Achieved at Each Point of the Disturbance:

   a. Presence Stabilization – describe type and degree to which the presence of officer or officers stabilized the scene.

   b. Verbal Stabilization – describe type and degree to which officer's verbal commands stabilized the scene.

   c. Standing Stabilization – describe type, degree of stabilization, and if restraints were on yet.

   d. Wall Stabilization – describe type, degree of stabilization, and if restraints were on yet.

   e. Ground Stabilization – describe type, degree of stabilization, and if restraints were on yet.

   f. Special Restraints – describe type, degree, and degree of immobilization.

## III. INTERVENTION OPTIONS
(Summation of what happened in chronological order)

|  | *Subject's* | *Officer's* |
|---|---|---|

A. Presence

B. Dialogue

C. Control Alternatives

D. Protective Alternatives

E. Deadly Force

**Note:** The use of any force option is dependent on the officer's tactical evaluation of the situation, based on *threat assessment opportunities, officer / subject factors,* and *special circumstances.*

## IV. FOLLOW-THROUGH CONSIDERATIONS

A. Stabilization                    Application of Restraints, if appropriate

B. Monitoring / Debriefing

C. Searching, if appropriate

D. Escorting, if necessary

E. Transportation, if necessary

F. Turnover                          Remove Restraints, if necessary

Additional comments

## V. INVESTIGATIVE FINDINGS

A. Background Information

B. Medical / Psychological History

C. Booking Information

D. Post-booking Information

E. Other Information